JONES MAYER
Angela M. Powell, State Bar No. 191876
amp@jones-mayer.com
Thurgood M. Wynn, State Bar No. 345199
tmw@jones-mayer.com
Ryan M. Allein, State Bar No. 318078
rma@jones-mayer.com
3777 North Harbor Boulevard
Fullerton, CA 92835
Telephone: (714) 446-1400
Facsimile: (714) 446-1448

Attorneys for Defendants,
CITY OF TORRANCE; ARTURO CASTILLO;
CODY WISSLER; JESUS GARCIA; JASON
BERMUDEZ

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARIA GUADALUPE DIAZ; A.D., a minor by and through his Guardian Ad Litem, MARIA GUADALUPE DIAZ; A.D., a minor by and through his Guardian Ad Litem, MARIA GUADALUPE DIAZ; LEONARDO DIAZ; and RAMONA RAMIREZ DE DIAZ<br><br>Plaintiffs,<br><br>v.<br><br>CITY OF TORRANCE; ARTURO CASTILLO; CODY WISSLER; JESUS GARCIA; JASON BERMUDEZ; and DOES 6-10, inclusive<br><br>Defendants. | Case No. 2:25-cv-03389-JLS(AYPx)<br><br>Honorable Josephine L. Staton<br>Courtroom 8A<br><br>**DEFENDANTS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT AND/OR PARTIAL SUMMARY JUDGMENT OF ISSUES; MEMORANDUM OF POINTS AND AUTHORITIES**<br><br>**[Filed concurrently with: Separate Statement of Uncontroverted Facts; Declaration of Ryan M. Allein; Declaration of Arturo Castillo; Declaration of Cody Wissler; Declaration of Jesus Garcia; Declaration of Jason Bermudez; Declaration of Samuel Choi; Declaration of Ryan Schmitz; Exhibits; [Proposed] Order]**<br><br>Date: February 5, 2027<br>Time: 10:30 a.m.<br>Ctrm: 8A<br><br>Action filed: October 8, 2025 |

PLEASE TAKE NOTICE that on **February 5, 2027, at 10:30 a.m.** in Courtroom 8A of the above-entitled court, located at 350 W. First Street, Suite 4311, Los Angeles, California 90012, or as soon thereafter as the matter may be heard, Defendants CITY OF TORRANCE (hereinafter referred to as "City"); ARTURO CASTILLO; CODY WISSLER; JESUS GARCIA; and JASON BERMUDEZ (hereinafter referred to as "Defendant Officers") (collectively referred to as "Defendants") will and hereby move for summary judgment and/or partial summary judgment of issues on Plaintiffs MARIA GUADALUPE DIAZ; A.D., a minor by and through his Guardian Ad Litem, MARIA GUADALUPE DIAZ; A.D., a minor by and through his Guardian Ad Litem, MARIA GUADALUPE DIAZ; LEONARDO DIAZ; and RAMONA RAMIREZ DE DIAZ's (collectively referred to as "Plaintiffs") First Complaint as follows:

1. Plaintiffs have failed to carry their burden of demonstrating they are entitled to relief on the first cause of action for excessive force in violation of the Fourth Amendment;

2. Plaintiffs have failed to carry their burden of demonstrating they are entitled to relief on the second cause of action for denial of medical care in violation of the Fourth Amendment;

3. Plaintiffs have failed to carry their burden of demonstrating they are entitled to relief on the third cause of action for substantive due process in violation of the Fourteenth Amendment;

4. Plaintiffs have failed to carry their burden of demonstrating they are entitled to relief on the fourth cause of action for battery;

5. Plaintiffs have failed to carry their burden of demonstrating they are entitled to relief on the fifth cause of action for negligence; and

6. Plaintiffs have failed to carry their burden of demonstrating they are entitled to relief on the sixth cause of action for a violation of the

Bane Act (Cal. Civ. Code, § 52.1).

The Motion is based on this Notice of Motion and Motion and attached Memorandum of Points and Authorities, the Statement of Uncontroverted Facts and Conclusions of Law, declarations, exhibits, the file and records in this case, and any further argument or evidence the Court deems fit to receive at the hearing.

Prior to bringing this motion, Defense counsel met and conferred with Plaintiff's counsel regarding the issues presented herein as required by Local Rule 7-3. See, Declaration of Ryan M. Allein, at ¶¶ 10-15. As a result of this meet and confer, Plaintiffs agreed to dismiss Count Two (Denial of Medical Care) with prejudice in its entirety. *Id.* at ¶ 15.

Dated: August 28, 2026 JONES MAYER

By: ______________________
Angela M. Powell,
Thurgood M. Wynn,
Ryan M. Allein,
Attorneys for Defendants,
CITY OF TORRANCE, et al.

# TABLE OF CONTENTS


MEMORANDUM OF POINTS AND AUTHORITIES ........................................ 10

I. INTRODUCTION ........................................ 10

II. STATEMENT OF FACTS ........................................ 12

A. 911 Call / Dispatch and Broadcast logs ........................................ 12

B. TPD Officers Arrive on Scene and Contact Diaz ........................................ 13

C. Facts Relevant to Plaintiffs' Claims Regarding Failure to Train Defendant Officers ........................................ 14

III. SUMMARY JUDGMENT IS PROPER WHEN PLAINTIFFS CANNOT DEMONSTRATE GENUINE ISSUES OF MATERIAL FACT. ...... 17

IV. 42 U.S.C. § 1983 CLAIMS ........................................ 19

A. Excessive Force (Count One) ........................................ 19

1. *Severity of the Crime at Issue* ........................................ 20

2. *Immediate Threat to the Safety of Officers and Others* ........................................ 21

3. *Diaz's Resistance* ........................................ 23

B. Interference with Familial Relations (Count Three) ........................................ 25

C. Defendant Officers are Entitled to Qualified Immunity as to Plaintiffs' Interference with Familial Relations Claim (Count One) ........................................ 26

D. Defendant Officers are Entitled to Qualified Immunity as to Plaintiffs' Interference with Familial Relations Claim (Count Three) ........................................ 30

V. STATE LAW CLAIMS ........................................ 30

A. Battery Claim (Count Four) ........................................ 30

B. Negligence (Count Five) ........................................ 31

C. Bane Act Claim (Count Six) ........................................ 34

VI. CONCLUSION ........................................ 36

CERTIFICATE OF COMPLIANCE ........................................ 37

# TABLE OF AUTHORITIES


Page(s)

**Federal Cases**

*A.D. v. Cal. Highway Patrol*, 712 F.3d 446 (9th Cir. 2013) .......... 25

*Anderson v. Liberty Lobby*, 477 U.S. 242 (1986) .......... 18

*Ashcroft v. al-Kidd*, 563 U.S. 731 (2011) .......... 27

*J.P. ex rel. Balderas v. City of Porterville*, 801 F.Supp.2d 965 (E.D. Cal. 2011) .......... 23

*Banks v. Mortimer*, 620 F.Supp.3d 902 (N.D. Cal. 2022) .......... 35

*Brosseau v. Haugen*, 543 U.S. 194 (2004) .......... 27

*Buchanan v. City of San Jose*, 782 Fed. Appx. 589 (9th Cir. 2019) .......... 12, 23

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) .......... 18

*Chambers v. Cnty. of Los Angeles*, 2022 U.S. Dist. LEXIS 240199 (C.D. Cal. Dec. 12, 2022) .......... 35

*Chew v. Gates*, 27 F.3d 1432 (9th Cir. 1994) .......... 21

*Draper v. Reynolds*, 369 F.3d 1270 (11th Cir. 2004) .......... 24

*Est. of Strickland v. Nevada Cnty.*, 69 F.4th 614 (9th Cir. 2023) .......... 34

*Glenn v. Washington County*, 673 F.3d 864 (9th Cir. 2011) .......... 24

*Graham v. Connor*,
490 U.S. 386 (1989) ........................................................19, 20, 21, 22, 23, 33

*Grandison v. Hense*,
2012 U.S. Dist. LEXIS 63499 (C.D. Cal. Mar. 26, 2012) ..........................23, 34

*Greene v. Barber*,
310 F.3d 889 (6th Cir. 2002) .......................................................................24

*Hansen v. Black*,
885 F.2d 642 (9th Cir. 1989) .......................................................................19

*Harlow v. Fitzgerald*,
457 U.S. 800 (1981) ...................................................................................26

*Hart v. City of Redwood City*,
99 F.4th 543 (9th Cir. 2024)....................................................21, 22, 23, 28, 29

*Hayes v. County of San Diego*,
736 F.3d 1223 (9th Cir. 2013)...........................................................23, 25, 34

*Hunter v. Bryant*,
502 U.S. 224 (1991) ...................................................................................26

*Jeffers v. Gomez*,
267 F.3d 895 (9th Cir. 2001) ..................................................................25, 27

*Lies v. Farrell Lines, Inc.*,
641 F.2d 765 (9th Cir. 1981) .......................................................................19

*M.B. v. City of Los Angeles*,
2025 U.S. Dist. LEXIS 82498 (C.D. Cal. Apr. 29, 2025)................................29

*Matsushita Elec. v. Zenith Radio*,
475 U.S. 574 (1986) ...................................................................................18

*Mattos v. Agarano*,
661 F.3d 433 (9th Cir. 2011) .......................................................................26

*Monzon v. City of Murrieta*,
978 F.3d 1150 (9th Cir. 2020)......................................................................29

*Moreno v. City of San Bernardino*,
2022 U.S. Dist. LEXIS 137863 (C.D. Cal. Jun. 2, 2022) ................................25



JONES MAYER LAW

*Mullenix v. Luna*,
136 S. Ct. 305 (2015)....................27

*Napouk v. Las Vegas Metro Police Dep't*,
123 F.4th 906 (9th Cir. 2024)....................34

*Nelson v. City of Davis*,
685 F.3d 867 (9th Cir. 2012)....................24

*Nicarry v. Cannaday*,
260 F.App'x 166 (11th Cir. 2007)....................23

*Pearson v. Callahan*,
555 U.S. 223 (2009)....................26, 27

*Reese v. Cnty. of Sacramento*,
888 F.3d 1030 (9th Cir. 2018)....................34, 35

*Romero v. Kitsap County*,
931 F.2d 624 (9th Cir. 1991)....................26

*Ryburn v. Huff*,
565 U.S. 469 (2012)....................12, 20

*S.B. v. Cnty. of San Diego*,
864 F.3d 1010 (9th Cir. 2017)....................28

*Sartor v. Cnty. of Riverside*,
2025 U.S. Dist. LEXIS 47295 (C.D. Cal. Mar. 14, 2025)....................21

*Saucier v. Katz*,
533 U.S. 194 (2001)....................27

*Shafer v. Cnty. of Santa Barbara*,
868 F.3d 1110 (9th Cir. 2017)....................28

*Smith v. City of Hemet*,
394 F.3d 689 (9th Cir. 2005)....................20, 22

*Smolen v. Deloitte, Haskins & Sells*,
921 F.2d 959 (9th Cir. 1990)....................19

*Vos v. City of Newport Beach*,
892 F.3d 1024 (9th Cir. 2018)....................33

*West v. Atkins*,
487 U.S. 42 (1988) .......... 19

*White v. Pauly*,
580 U.S. 730 (2017) .......... 28

*Wilkinson v. Torres*,
610 F.3d 546 (9th Cir. 2010) .......... 25, 26, 30

**California Cases**

*Brown v. Ransweiler*,
171 Cal.App.4th 516 (2009) .......... 30

*Grudt v. City of Los Angeles*,
2 Cal.3d 575 (1970) .......... 31

*Hayes v. County of San Diego*,
57 Cal.4th 622 (2013) .......... 31

*Munoz v. Olin*,
24 Cal.3d 629 (1979) .......... 31

*Nally v. Grace Community Church*,
47 Cal.3d 278 (1988) .......... 31

*People v. Simons*,
42 Cal.App.4th 1100 (1996) .......... 23

**Federal Statutes**

42 U.S.C.
§ 1983 .......... 19, 26

**California Statutes**

Cal. Civ. Code
§ 52.1 .......... 34

Cal. Penal Code
§ 245(a)(1) .......... 23, 34

**Other Authorities**

Fourth Amendment .......... 31, 34

Fourteenth Amendment ........................................................................ 25

Fed. R. Civ. P. 56(c) ........................................................................ 18

Rule 50(a) ........................................................................ 18

Rule 56(a) ........................................................................ 19



JM JONES MAYER LAW

# MEMORANDUM OF POINTS AND AUTHORITIES

## I. INTRODUCTION

In the late afternoon, around 5:00 p.m., on Monday, December 2, 2024, Leonardo Diaz ("Diaz") called 911 and told the 911 operator that he had a gun and that he was "GONNA SHOT SOMEBODY" [and] GONNA STAB SOMEBODY". The phone ping was the vicinity of 2909 Oregon Court, in the City of Torrance. This area in Torrance is a heavily populated business district and is just blocks away from the Torrance Superior Courthouse and Torrance City Hall. Dispatch then communicated to Defendant Officers that there was a man[1] armed with a gun and was going to shoot somebody.

In response, the Torrance Police Department ("TPD") deployed a drone and located a person – later identified as Diaz – inside a green Dodge Charger "opening and closing his door, looking around in the area." Ultimately, Defendant Officers arrived on scene and positioned themselves to conduct a felony stop. Officer Jason Bermudez ("Officer Bermudez") positioned himself on the driver's side of Officer Arturo Castillo ("Officer Castillo")/Officer Bermudez's vehicle ("CB Vehicle"); [2]Sergeant Jesus Garcia ("Sergeant Garcia") positioned himself on the passenger side of CB's vehicle; and Officer Cody Wissler ("Officer Wissler") positioned himself to the driver's side of Officer Wissler/Sergeant Garcia ("WG Vehicle"). Officer Castillo grabbed the M4 rifle from his trunk and positioned himself on the passenger side of WG's vehicle.

At this point, Officer Wissler commanded Diaz to open the door and on seven separate occasions to "Let me see your hands." Diaz opened the

---

[1] Defendant Officers did not learn until after the shooting that it was Leonardo Diaz who had called 911.

[2] Then Officer Garcia was later promoted and is now a Sergeant.

car door and Officer Wissler stated, "He's got a knife. He's bleeding." Officer Wissler again told Diaz to "Let me see your hands[,] but to also "Open the door" and "Drop the knife." Without being told to get out of the car, Diaz got out of his car and walked towards Defendant Officers with blood dripping from his hands with what appeared to be a knife in his right hand on the side of his hip and pointed towards the Defendant Officers. Officer Wissler told Diaz to "turn around," "get on the ground," and "drop the knife"; however, Diaz continued to advance towards the officers with the weapon his hand. Eventually, Diaz pivoted and began walking directly towards Sergeant Garcia..

Eventually, Diaz was *at most* five feet away from Defendant Officers and still walking towards Defendant Officers with a deadly weapon in his hand. Based on Diaz's 911 call and the subsequent broadcast, Defendant Officers believed Diaz had a gun, he was not complying with commands, he had a deadly weapon in his hand and he was advancing towards the officers. . Based on this imminent threat, Defendant Officers fired their weapons. Diaz fell just feet from where Sergeant Garcia was located right up against the right passenger wheel well of CB's vehicle.

Prior to the shooting, Defendant Officers had a plan and had Diaz complied with the Officers' commands, it would have allowed them to safely detain him.

Once they located the person whom they thought to be the person armed with a gun, the plan was to conduct a high risk stop, to eventually order that person out of his vehicle and safely detain him. Defendant Officers had been trained to designate 4 officers as lethal coverage and one officer as less lethal coverage. As the 4 Defendant Officers had set up to conduct the high risk stop, they knew that Officer Samuel Choi and Officer Kevin High were minutes behind them and one of them was to equip

himself with the less lethal option – specifically the 40 millimeter. – However, Diaz got out of his vehicle and advanced towards the Defendant Officers before Officers Choi and High arrived. Further, Defendant Officers had no means of retreat based on having to position themselves near Diaz' vehicle which was in the middle of a street, in a business area at rush hour.

The law does not require police officers to wait until the last possible moment when a suspect is "capable of actually inflicting death or serious harm, before being justified in using deadly force." *Buchanan v. City of San Jose*, 782 Fed. Appx. 589, 592 (9th Cir. 2019). Officers Castillo, Wissler, Garcia, and Bermudez faced an incredibly difficult situation where they were forced to make split-second decisions to not only ensure they themselves were safe and protected, but also to ensure that Diaz did not harm members of the public who were simply going to and leaving work.

This Court "should be cautious about second-guessing a police officer's assessment, made on the scene, of the danger presented by a particular situation." *Ryburn v. Huff*, 565 U.S. 469, 477 (2012). Accordingly, Plaintiff's federal and state law claims fail as a matter of law based on the undisputed material facts of the interaction between Defendant Officers and Diaz.

## II. <u>STATEMENT OF FACTS</u>

### A. 911 Call / Dispatch Broadcast and Logs

On Monday, December 2, 2024, at approximately 4:35 p.m., TPD received a 911 call whereby the caller stated, "[T]here's a man with a gun at 2909 Oregon Court" in Torrance. Uncontroverted Fact ("UF") 1. The 911 caller further stated he was the individual with the gun and that he was "gonna shoot somebody, [and] gonna stab somebody." U.F. 2. The 911 operator asked the 911 caller, "How come? What's going on? Why do you

want to?"; however, the 911 caller hung up the phone. U.F. 3.

Subsequently, at approximately 4:41 p.m., dispatch informed TPD officers that "RP [Reporting Party] states there is a man with a gun [at 2909 Oregon Court]. States he wants to shoot someone. We have one caller only." U.F. 4. Officer Bermudez responded, "[C]opy from Hawthorne and Fashion." U.F. 5. At or around this same time, Officer Castillo requested to "get a drone up[.]" U.F. 6. Dispatch eventually told officers the 911 caller's phone number belonged "to a Leonardo Diaz, 34-year old Hispanic male, 6"1', 285, brown over black, black over brown" and that he "possibl[y] work[ed] at the Appollo Scooters [3] at 2909 Oregon Court." U.F. 7. Based on Diaz being near his place of employment, Officer Castillo "believed that this possibly was a disgruntled employee that possibly killed his former employer and had him in the vehicle." U.F. 9. Further, it was discovered "the phone ping that was being used was in the intersection of Maple and Oregon Court, where the potential man with a gun was at." U.F. 10.

**B. TPD Officers Arrive on Scene and Contact Diaz**

At or around this time, the drone operator – Officer Jeffrey Clark ("Officer Clark") – "advis[ed] [officers] that there was a male subject in a green Dodge Charger[4] that was opening and closing his door, looking around in the area." U.F. 11. At this point, Officers Wissler, Garcia, Bermudez and Castillo went to Diaz' former place of employment to see if they could find him or worse yet, find any victims. Officers Samuel Choi and Kevin High responded to that same location shortly thereafter. The Officers then learned that the business where Diaz worked had moved from that location. U.F. 8. The Defendant Officers then left that location and

[3] It was later confirmed Diaz worked at the Apollo Scooters shop as a repair technician. U.F. 8.

[4] The male subject was later determined to be Diaz. U.F. 12.

headed just seconds up the same street (Oregon Court) where the green Dodge was parked. Officer Wissler and Sergeant Jesus Garcia[5] "continued to the intersection of Oregon Court and Maple Avenue, conducted a U-turn, and then proceeded to conduct a traffic stop on the green Charger." U.F. 14. Officers Castillo and Bermudez then arrived in their vehicle and parked their vehicle "southwest . . . just a bit offset" of where Officer Wissler and Sergeant Garcia were parked. U.F. 15.

### C. Plan to Safely Detain Leonardo Diaz by Conducting a High Risk Stop

"Initially, when [the officers] exited the[ir] vehicle[s], Officer Wissler was tasked with saying commands" – specifically, for Diaz "to lower [his] windows [and] '[l]et me see your hands.' " U.F. 16. During this time, drone operator Officer Clark "continued to notify [the officers] that the driver in the green Charger began to open and close his door." U.F. 17. Sergeant Garcia then "told Officer Bermudez to move his vehicle from its current position and position it [like a felony stop][6] north of Officer Wissler and [Sergeant Garcia's] vehicle; Officer Bermudez then "moved his vehicle and parked it just north of Officer Wissler and [Sergeant Garcia's] vehicle [("WG Vehicle")]." U.F. 18. A plan was developed to conduct a high-risk stop, to create time, distance, and cover while safely detaining Diaz; Officer Bermudez positioned himself on the driver's side of Castillo/Bermudez's vehicle ("CB Vehicle"); Sergeant Garcia positioned himself on the passenger side of CB's vehicle; and Officer Wissler positioned himself to the driver's side of WG's vehicle. U.F. 19. Behind Defendant Officers was Maple Avenue, which was full of "a lot of cars . . . leaving work." U.F. 20. Officer

---

[5] Sergeant Garcia testified there was a malfunction with his body camera causing it not to activate during the incident. U.F. 13.

[6] "High risk stop" and "felony stop" are the same.

JONES MAYER LAW

Castillo grabbed the M4 rifle from his trunk and positioned himself on the passenger side of WG's vehicle. U.F. 21.

Prior to Sergeant Garcia repositioning himself, Officer Castillo had told Sergeant Garcia, "Why don't you quarterback this? I got the long gun[.]" U.F. 22. Sergeant Garcia understood Officer Castillo's statement to "basically take charge and designate any – any roles . . . [to] basically take over . . . giving any instructions to [Officer Castillo's] partner [Officer Bermudez] who was on his first day of patrol." U.F. 23. Sergeant Garcia "also asked for less lethal" – specifically, "for the next unit arriving on scene – to bring less-lethal option with them[.]" in accordance with how TPD Officers are trained to conduct a high risk stop. U.F. 24.

Subsequently, Officer Wissler commanded Diaz to open the door and told Diaz on seven separate occasions, "Let me see your hands." U.F. 25. Diaz partially opened the door and Officer Wissler stated, "He's got a knife.[7] He's bleeding." U.F. 26. At this point, Officer Wissler again told Diaz to "Let me see your hands[,]" but also told him to "Open the door" and "Drop the knife." U.F. 28. Suddenly, Diaz then got out of his car and began walking towards the officers while holding what appeared to be a knife "off to his side of the hip, pointed toward[s] [them]" and his left hand/wrist were covered in blood U.F. 29. Officers commanded Diaz to "turn around," "get on the ground," and "drop the knife"; however, Diaz continued to walk towards officers with the weapon in his hand pointed at the officers. U.F. 30. As Sergeant Garcia and Officer Castillo instructed Diaz to "Stop; get on the ground; [and] drop the knife," Diaz "nodded his head in a side-to-side motion . . . as if to say, 'No, I'm not going to do what you ask.' " U.F. 31. "Initially, once [Diaz] began walking he walked

[7] It was later determined the weapon in Diaz's right hand was not a knife, but rather a flathead screwdriver. U.F. 27.

diagonally in a northwest position. He maybe did that for 7 or 8 feet, and then he did what [Sergeant Garcia] . . . describe[d] as like a quarter turn and then continued westbound in a straight . . . line." U.F. 32.

Prior to the officers' firing their weapons, Diaz was: "[l]ess than 5 feet" away from Officer Castillo; "[a]pproximately 3 feet" away from Officer Wissler; and "4 to 5 feet" away from Sergeant Garcia.[8] U.F. 33. Specifically, Diaz walked past the front of the two vehicles directly in front of Sergeant Garcia. U.F. 35. Officer Castillo[9] then fired two shots; Officer Bermudez fired three shots; Officer Wissler fired three shots; and Sergeant Garcia fired two shots. U.F. 36. Diaz fell right against the front passenger wheel of WG's vehicle – directly in front of Sergeant Garcia and between both patrol vehicles. U.F. 38.

### D. Facts Relevant to Plaintiffs' Claims Regarding Failure to Train Defendant Officers

TPD Officers Castillo, Wissler, Garcia, and Bermudez completed the Los Angeles County Sheriff's Department Academy and the "Basic Course – Intensive" before becoming patrol officers. U.F. 39. Further, TPD Officers Castillo, Wissler, Garcia, and Bermudez received training on the use of force. U.F. 40. The TPD trains its officers that officers shall use only that

[8] Officer Bermudez testified the nearest officer was approximately 5 feet away from Diaz before he fired. U.F. 34.

[9] Immediately prior to firing his two shots, Officer Castillo yelled, "40, 40, 40, c'mon[,]" which was in reference to the 40-millimeter less lethal weapon. However, at this time, the 40-millimeter was locked in the trunk and officer "would then [have to] locate . . . a small bag that contain[ed] the rounds that's used for the 40 millimeter, which would be the sponge rounds [and] [¶] would then have to remove the correct round to load into the 40-millimeter weapon." Further, although Officers Samuel Choi ("Officer Choi") and Kevin High ("Officer High") were designated as less-lethal coverage, they were unable to respond and position with the 40-millimeter before engaging Diaz because: (1) they arrived as the shooting was occurring; (2) Diaz "exited the vehicle on his own, without being told to so, and began to close the distance on [the Defendant Officers], limiting the effective range for that 40-millimeter launcher" and (3) as described by Officer Choi in his declaration, the 40-millimeter required an extensive process before he could have it ready for use. U.F. 37.

amount of force that reasonably appears necessary given the facts and totality of the circumstances known to or perceived by the officer at the time of the event to accomplish a legitimate law enforcement purpose. U.F. 41.

The TPD's policy requires officers to use only the level of force that is objectively reasonable and to consider actions that may increase officer safety and may decrease the need for using force and that "[i]f the officer reasonably believes that a threat exists based on the totality of circumstances presented at the time (e.g., high-risk stop, tactical entry, armed encounter), firearms may be directed toward such threat until the officer no longer perceives such threat." U.F. 42. Further, the TPD's policy states an officer is justified to use deadly force when the officer reasonably believes it is necessary "to protect themselves or others from what the officer reasonably believes is an imminent threat of death or serious bodily injury to the officer or another person." U.F. 43. The TPD's policy also states that an officer should consider actions that may increase officer safety and may decrease the need for using force only if "time and circumstances reasonably permit, and when community and officer safety would not be compromised[.]" U.F. 44. Finally, officers are trained that "[o]nce it is reasonably safe to do so, properly trained officers should promptly provide or procure medical assistance for any person injured or claiming to have been injured in a use of force incident[.]" U.F. 45. Officers Castillo, Wissler, Garcia, and Bermudez received adequate training on the use of force and use of deadly force. U.F. 46.

As a result of this incident, Plaintiffs filed the underlying First Amended Complaint in this Court. U.F. 47.

## III. <u>SUMMARY JUDGMENT IS PROPER WHEN PLAINTIFFS CANNOT DEMONSTRATE GENUINE ISSUES OF MATERIAL FACT</u>

Summary judgment is proper if the moving party demonstrates "that there is no genuine issue as to any material fact . . ." Fed. R. Civ. P. 56(c).[10] In a trilogy of cases, the Supreme Court clarified the burden of proof of each party with regard to the resolution of summary judgment motions. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986); *Anderson v. Liberty Lobby*, 477 U.S. 242 (1986); *Matsushita Elec. v. Zenith Radio*, 475 U.S. 574 (1986).

In *Celotex*, the Court rejected the contention that the moving party must support its summary judgment motion with evidence proving the non-existence of an essential element of plaintiff's cause of action. Rather, the Court held the "party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp.*, 477 U.S. at 323. The burden then shifts to the respondent to set forth affirmative evidence showing there is a genuine issue of material fact for trial. *Anderson*, 477 U.S. at 248.

The Supreme Court also made it clear the party who bears the burden of proof at trial also bears the burden of producing sufficient evidence in opposition to the summary judgment motion to enable reasonable jurors to find for that party. The standard is the same as that for judgment as a matter of law under Rule 50(a). *Anderson*, 477 U.S. at 249.

In opposing a motion for summary judgment, it is insufficient to merely show that there is some "metaphysical doubt as to material facts." *Matsushita Elec.*, 475 U.S. at 596. The plaintiff must show the existence of a genuine issue and "produce at least some 'significant probative evidence

[10] All further references to a "Rule" are to the Federal Rules of Civil Procedure.

tending to support their complaint.' " *Smolen v. Deloitte, Haskins & Sells*, 921 F.2d 959, 963 (9th Cir. 1990) (citations omitted). The responding party cannot merely rest upon the allegations and the pleadings. *Hansen v. Black*, 885 F.2d 642, 644 (9th Cir. 1989).

Finally, Rule 56(a) provides for partial summary judgment. *See* Rule 56(a) ("A party may move for summary judgment, identifying each claim or defense – or the part of each claim or defense – on which summary judgment is sought."). Partial summary judgment is a mechanism through which the court deems certain issues established before trial. *See Lies v. Farrell Lines, Inc.*, 641 F.2d 765, 769 n.3 (9th Cir. 1981).

## IV. 42 U.S.C. § 1983 CLAIMS[11]

To state a claim under 42 U.S.C. § 1983, a plaintiff must allege two essential elements: (1) that a right secured by the Constitution or laws of the United States was violated, and (2) that the alleged violation was committed by a person or persons acting under the color of state law. *West v. Atkins*, 487 U.S. 42, 48 (1988).

Turning to the merits of the case, Plaintiffs have asserted civil rights violations for excessive force and a violation of substantive due process. However, as set forth below, Plaintiffs have failed to carry their burden in establishing a valid constitutional violation.

### A. Excessive Force (Count One)

In *Graham v. Connor*, 490 U.S. 386 (1989), the United States Supreme Court determined that § 1983 excessive force claims for deadly force are addressed under the Fourth Amendment's reasonableness standard. *Id.* at 389. The *Graham* court set forth a non-exhaustive list of

[11] As stated above, Plaintiffs agreed to dismiss their denial of medical care claim (Count Two) in its entirety. Allein Declaration, at ¶ 15. Accordingly, Defendants do not address this claim in their Motion.

factors to be considered in evaluating whether the force used to affect a particular seizure is reasonable: (1) the severity of the crime at issue; (2) whether the suspect poses an immediate threat to the safety of the officers or others; and (3) whether the suspect actively resists detention or attempts to escape. *Id.* at 395-95. The test is an objective one, viewed from the vantage of a reasonable officer at the scene, and is highly deferential to the police officer's need to protect himself or others. *Id.* at 396-97.

The Supreme Court has indicated that "judges should be cautious about second-guessing a police officer's assessment, made on the scene, of the danger presented by a particular situation." *Ryburn v. Huff*, 565 U.S. at 477. Moreover, the most important single element of the three specified factors is whether the suspect poses an immediate threat to the safety of the officers or others. *Smith v. City of Hemet*, 394 F.3d 689, 702 (9th Cir. 2005).

**1. *Severity of the Crime at Issue***

This was an emergency dispatch where it was reported the 911 caller – who was later identified as Diaz – stated he was armed with a firearm and that he was "gonna shoot somebody [and] gonna stab somebody." U.F. 1-2, 7. Further, after contacting Diaz, Officer Wissler confirmed that Diaz was armed in the vehicle when he stated, "He's got a knife. He's bleeding" – corroborating what was communicated to Defendant Officers from the 911 call (i.e., that Diaz was armed with a weapon). As this Court made clear:

> Regarding the first *Graham* factor, the severity of the crime at issue, the Court agrees . . . that, at least at the outset of the encounter, the suspected crime was severe. Law enforcement was dispatched in response to an emergency call reporting that [the suspect] was armed with a gun and intended to shoot or

> otherwise seriously physically harm someone. [Citation.] Plaintiff's argument that 'it was no crime for [the suspect] to say he had a gun and wanted to smoke someone' discounts the legitimate public safety concern that prompted the [] employees to call the police.

*Sartor v. Cnty. of Riverside*, 2025 U.S. Dist. LEXIS 47295, at *10 (C.D. Cal. Mar. 14, 2025). Therefore, in this context, the information known to the the Defendant Officers was that the suspect was armed with a gun and was going to shoot somebody.

**2. *Immediate Threat to the Safety of Officers and Others***

The second *Graham* factor, "whether the suspect pose[d] an immediate threat to the safety of the officers or others," is "the most important single element of the three specified factors[.]" *Chew v. Gates*, 27 F.3d 1432, 1441 (9th Cir. 1994). The Ninth Circuit's decision in *Hart v. City of Redwood City*, 99 F.4th 543 (9th Cir. 2024) is instructive, in which the Court found the officer's conduct to be objectively reasonable under the circumstances. In that case:

> [O]fficers [] responded to a tragic call involving a man attempting suicide with a knife in his backyard. When they arrived, they found the man's wife covered in blood and frantically pleading for help. At her urging, the officers went to the backyard, where they found Hart holding a knife. They told him to drop the knife, but instead of doing so he began moving towards them while raising the knife. As Hart neared the officers, [an officer] deployed her taser, but it was ineffective. With Hart approaching closely and wielding a knife, [another officer] took action to protect himself and his partner, shooting Hart.

*Hart*, 99 F.4th at 545.

In concluding the officers' conduct was objectively reasonable, the Ninth Circuit focused on several key circumstances. Notably, Hart briskly walked towards the officers with a knife, going from "thirty feet away to eight or ten feet away" in around 6 seconds. *Id*. at 546. Hart failed to respond to or comply with the officer's command to "drop the knife" and instead continued to approach the officers, holding the knife out towards them. *Id*. at 550. The Ninth Circuit found the "immediacy of the threat posed by Hart as he approached with a knife [was] dispositive." *Id*. at 552.

Here, Diaz similarly posed an immediate threat to Defendant Officers when he continued to advance and close in on the officers while holding what appeared to be a knife at the time at his side. The undisputed facts establish that: (1) Diaz wielded a weapon from the moment he exited his vehicle and his left hand/wrist was covered in blood – indicating he may have hurt someone else prior to exiting the vehicle U.F. 29-35; (2) Diaz closed the gap and came within three to five feet of Officer Wissler and Sergeant Garcia in less than two minutes U.F. 33-35; (3) Diaz failed to comply with Defendant Officers' repeated commands to stop and drop the knife U.F. 28, 30-31; and (4) while approaching Defendant Officers, Diaz held the weapon in his hand with the object pointed towards the officers. U.F. 29-30. A reasonable officer in these circumstances would have perceived Diaz's conduct as an immediate threat. In *Hart*, the Ninth Circuit found "a non-responsive individual approaching while holding out a knife is *unarguably* an immediate threat." *Id*. at 552 (emphasis in original). This factor, "which is the most important single element of the three specific [*Graham*] factors," supports a finding the officers' conduct was objectively reasonable under the circumstances.[12] *Id*.

---

[12] *See also Smith v. City of Hemet*, 394 F.3d 689, 704 (9th Cir. 2005) (en banc) ("[W]here

Nevertheless, it is anticipated that Plaintiffs will argue that Diaz did not possess a knife but rather had a flathead screwdriver in his possession. However, not only have courts concluded that attacks by suspects wielding knives are sufficiently dangerous to justify the use of deadly force, *e.g., Hart*, 99 F.4th 543, courts have also held that screwdrivers, when wielded as weapons, may justify the use of deadly force. *See J.P. ex rel. Balderas v. City of Porterville*, 801 F.Supp.2d 965, 981-83 (E.D. Cal. 2011); *Nicarry v. Cannaday*, 260 F.App'x 166, 170 (11th Cir. 2007).[13] Again, during the encounter, Diaz held the screwdriver in his right hand while his left hand was covered in blood; he approached the officers while pointing the screwdriver towards the officers; and he got within three to five feet of the officers before the Defendant Officers used their weapons resulting in Diaz falling right up against the front passenger wheel of WG's vehicle directly in front of Sergeant Garcia, and between both patrol vehicles . U.F. 29-38. Overall, Defendant Officers were not required to wait until Diaz was "capable of actually inflicting death or serious harm, before being justified in using deadly force." *Buchanan v. City of San Jose*, 782 Fed. Appx. at 592.

### 3. *Diaz's Resistance*

The third *Graham* factor considers whether Diaz resisted arrest. Refusing to comply with an officer's lawful commands or making movements or verbal gestures that indicate an unwillingness to cooperate

---

a suspect threatens an officer with a weapon such as a gun or a knife, the officer is justified in using deadly force."); *Hayes v. County of San Diego*, 736 F.3d 1223, 1234 (9th Cir. 2013) ("[T]hreatening an officer with a weapon does justify the use of deadly force.").

[13] A screwdriver has also been held to be a deadly weapon for purposes of California Penal Code § 245(a)(1). *See Grandison v. Hense*, 2012 U.S. Dist. LEXIS 63499, at *29-30 (C.D. Cal. Mar. 26, 2012) (citing to *People v. Simons*, 42 Cal.App.4th 1100, 1107-08 (1996) (screwdriver, while not inherently a deadly weapon, constituted "deadly weapon" for purposes of defendant's conviction where defendant used screwdriver to hold police officers at bay, daring them to kill him).

with a police officer's lawful commands can constitute active resistance. *See Greene v. Barber*, 310 F.3d 889, 898 (6th Cir. 2002); *see also Draper v. Reynolds*, 369 F.3d 1270, 1278 (11th Cir. 2004). The indisputable evidence shows that Diaz refused to comply with Defendant Officers' commands to drop the weapon. U.F. 28, 30-31. This factor weighs heavily in Defendants' favor.

The Ninth Circuit also considers whether there were less intrusive means of force that might have been used before an officer resorted to force. *Glenn v. Washington County*, 673 F.3d 864, 876 (9th Cir. 2011). However, "officers 'are not required to use the least intrusive degree of force possible[.]' " *Nelson v. City of Davis*, 685 F.3d 867, 882 (9th Cir. 2012) (quoting *Forrester v. City of San Diego*, 25 F.3d 804, 807 (9th Cir. 1994). Here, prior to the shooting, Sergeant Garcia "asked for less lethal" – specifically, "for the next unit arriving on scene – to bring [a] less-lethal option with them" – specifically, the 40-millimeter launcher. U.F. 24, 37. Further, immediately prior to the shooting, Officer Castillo yelled, "40, 40, 40, c'mon" in reference to the 40-millimeter launcher; however, Officers Choi and High – who were designated as less-lethal coverage – were unable to arm themselves in time with the 40 millimeter launcher because they arrived as the shooting began and as Diaz began "to close the distance on [the Defendant Officers], limiting the effective range for t[he] 40-millimeter launcher." U.F. 37. Further, as Officer Choi attested in his declaration, the 40-millimeter required an extensive process before it was ready for use. U.F. 37. Specifically, the 40-millimeter needed to be unlocked from its mount on the liftgate; the side compartment of the trunk needed to be unlocked to retrieve the pouch containing six rounds of ammunition; the 40 millimeter chamber needed to be opened, loaded, and closed, and the red sight needed to be adjusted; and the pouch and 40-millimeter needed to be

secured against Officer Choi's person. U.F 37. All this needed to occur *before* Officer Choi could utilize the launcher. Defendant Officers had a plan to utilize a less lethal tool, , but Diaz's actions of stepping out of the vehicle and approaching Defendant Officers with a weapon made the use of less-lethal options futile. Accordingly, summary judgment is appropriate as to count one.

**B. Interference with Familial Relations (Count Three)**

"The Ninth Circuit has recognized that parents and children have a Fourteenth Amendment substantive due process right to the companionship and society of one another." *Moreno v. City of San Bernardino*, 2022 U.S. Dist. LEXIS 137863, at *9 (C.D. Cal. Jun. 2, 2022) (referring to *Wilkinson v. Torres*, 610 F.3d 546, 554 (9th Cir. 2010)). If Defendant Officers' conduct, when viewed in the light most favorable to Plaintiffs, deprived Plaintiffs of their familial interest in a manner that "shocks the conscience," then Defendant Officers' conduct "is cognizable as a violation of due process." *Hayes v. Cnty. of San Diego*, 736 F.3d 1223, 1230 (9th Cir. 2013) (quoting *Wilkinson*, 610 F.3d at 554).

When an officer "makes a snap judgment because of an escalating situation, his conduct may only be found to shock the conscience if he acts with a purpose to harm unrelated to legitimate law enforcement objectives." *Id.* "Legitimate law enforcement objectives [include] arrest, self-defense, or the defense of others." *A.D. v. Cal. Highway Patrol*, 712 F.3d 446, 454 (9th Cir. 2013). Under the "purpose to harm" standard, an officer "violates the due process clause if he uses force with only an illegitimate purpose in mind." *Id.* at 453. "The purpose to harm standard is a subjective standard of culpability." *Id.* Under this standard, a plaintiff must submit non-speculative evidence that demonstrates an officer's improper motive. *See Jeffers v. Gomez*, 267 F.3d 895, 907 (9th Cir. 2001).

Here, there is *no* evidence that Officer Defendants acted "with a purpose to harm [Diaz] unrelated to legitimate law enforcement objectives." *Wilkinson*, 610 F.3d at 554. Rather, the evidence supports a finding that Defendant Officers utilized deadly force in "self-defense, or the defense of others" based on Diaz walking toward them with a weapon in hand. Accordingly, summary judgment is appropriate as to count three.

### C. Defendant Officers are Entitled to Qualified Immunity on Plaintiffs' Excessive Force Claim (Count One)

Defendant Officers are entitled to qualified immunity as to the excessive force claims against them arising under 42 U.S.C. § 1983.

Under the doctrine of qualified immunity, government officials are shielded from liability for civil damages from mistakes unless their conduct violates "clearly established statutory or Constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1981); *Romero v. Kitsap County*, 931 F.2d 624, 627 (9th Cir. 1991). Qualified immunity gives ample room for mistaken judgments by protecting "all but the plainly incompetent or those who knowingly violate the law." *Hunter v. Bryant*, 502 U.S. 224, 229 (1991). "The protection of qualified immunity applies regardless of whether the government official's error is a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (citations omitted).

Once the official pleads qualified immunity, the burden is on the plaintiffs to prove a constitutional right was violated and that the right was clearly established at the time of the alleged incident. *See Mattos v. Agarano*, 661 F.3d 433, 440 (9th Cir. 2011). Even if a plaintiff can establish a constitutional violation, the Court must then determine: (1) whether the Constitutional right at issue was clearly established at the time of the

alleged violation (the "clearly established requirement"); and (2) whether it would be clear to a reasonable official in the defendant's specific position that his conduct was unlawful (the "objectively reasonable requirement"). *Pearson*, 555 U.S. at 230.

"A clearly established right is one that is sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (internal quotation marks omitted). Such clarity an only be established by "existing precedent" that has "placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). "Because the focus is on whether the officer had fair notice that [his or] her conduct was unlawful, reasonableness is judged against the backdrop of the law at the time of the conduct." *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004).

As such, "officials can have reasonable, but mistaken, beliefs . . . and in those situations courts will not hold that they have violated the Constitution. *Saucier v. Katz*, 533 U.S. 194, 205 (2001). Particularly, in tense and rapidly evolving situations, officials are afforded "broad discretion" and "immunity even when [they] make mistakes." *Jeffers v. Gomez*, 267 F.3d 895, 909 (9th Cir. 2001).

The Ninth Circuit has defined the type of existing precedent that is necessary to create clearly established law:

> In analyzing this question, we acknowledge the Supreme Court's recent frustration with failures to heed its holdings. The Supreme Court 'has repeatedly told courts – and the Ninth Circuit in particular – not to define clearly established law at a high level of generality.' [Citation.] Our courts lack a monopoly over such immunity missteps. When recently reversing the Tenth Circuit, the Supreme Court wrote: 'In the last five years,

> [the Supreme Court] has issued a number of opinions reversing federal courts in qualified immunity cases.' [Citations.] 'The Court has found this necessary both because qualified immunity is important to "society as a whole," and because as an immunity from suit, qualified immunity is effectively lost if a case is erroneously permitted to go to trial.' [Citation.]
>
> We hear the Supreme Court loud and clear. Before a court can impose liability on [the defendant officers], we must identify precedent . . . that put [the officers] on clear notice that using deadly force in these particular circumstances would be excessive. General excessive force principles, as set forth in *Graham* and *Garner*, . . . 'do not by themselves create clearly established law outside an obvious case.' [Citation.] Instead, we must 'identify a case where an officer acting under similar circumstances as [the defendant officers here] was held to have violated the Fourth Amendment.' We cannot locate any such precedent.

*S.B. v. Cnty. of San Diego*, 864 F.3d 1010, 1015-16 (9th Cir. 2017) (citing *City & Cnty. of San Francisco v. Sheehan*, 575 U.S. 600, 613 (2015); *White v. Pauly*, 580 U.S. 730, 79 (2017). "It is the plaintiff who 'bears the burden of showing that the rights allegedly violated were clearly established.' " *Shafer v. Cnty. of Santa Barbara*, 868 F.3d 1110, 1118 (9th Cir. 2017).

Again, *Hart* is instructive. In *Hart*, two officers confronted a man, "Hart", holding a knife in his backyard. *Hart*, 99 F.4th at 546. Like the Defendant Officers in this case, the two officers told Hart to drop the weapon, and just like Diaz, Hart did not. *Id.* at 546. Rather, Hart "approached the officers, holding the knife out towards them." *Id.* at 549. Once Hart was 8-10 feet away, one officer fired a taser (which missed Hart)

and at the same time, the other officer shot Hart with a standard issue firearm killing him. *Id*. at 546. The Ninth Circuit held for the officers on both prongs of qualified immunity holding the officers used reasonable force and, even if they did not, that any constitutional violation was not clearly established. *Id*. at 549-557.

*Hart* is meaningfully similar to the present case. In both cases, the *Hart* officers and Garcia/Castillo/Wissler/Bermudez were confronted with an individual approaching them while holding a weapon U.F. 29; the *Hart* officers and Garcia/Castillo/Wissler/Bermudez instructed the man to drop the weapon and he did not U.F. 30-31; and neither Hart or Diaz ran at the police, verbally threatened the police, or made slashing movements with their knives. See generally U.F. 29-36. Further, in *Hart*, the officer fired when the man was 10 feet away, while in this case Garcia/Castillo/Wissler/Bermudez fired at Diaz when he was – at most – five feet away. U.F. 33-36; *id*. at 546. Overall, "[t]here is no black and white rule that the police must wait for an aimed and threatening individual to get within a certain distance before protecting themselves. 'A reasonable officer need not await the glint of steel before taking self-protective action[.]' " *M.B. v. City of Los Angeles*, 2025 U.S. Dist. LEXIS 82498, at *22 (C.D. Cal. Apr. 29, 2025) (quoting *Estate of Larsen v. Murr*, 511 F.3d 1255, 1260 (10th Cir. 2008).

Further, Officer Bermudez was "permitted to use deadly force to protect the lives of" Sergeant Garcia, Officer Castillo, and Officer Wissler. *Monzon v. City of Murrieta*, 978 F.3d 1150, 1159 (9th Cir. 2020). Specifically, Officer Bermudez testified the nearest officer was approximately 5 feet away from Diaz before he fired his weapon. U.F. 34. The uncontroverted facts establish that Diaz walked towards the Defendant Officers with a weapon in his right hand and pointed towards

the officers. U.F. 29-30. It was not required for Diaz to walk towards *all* the officers before Bermudez could use deadly force. Rather, in this chaotic situation, Officer Bermudez was justified in using force to protect the lives of Sergeant Garcia, Officer Castillo, and Officer Wissler. *See Wilkinson*, 610 F.3d at 552-53 ("[W]e conclude as a matter of law that deadly force was authorized to protect a fellow officer from harm.").

Accordingly, Defendant Officers are entitled to qualified immunity as to count one.

### D. Defendant Officers are Entitled to Qualified Immunity as to Plaintiffs' Interference with Familial Relations Claim (Count Three)

As stated above, because Defendant Officers were required to "make[] a snap judgment because of an escalating situation" the purpose to harm standard applies which requires Plaintiffs to establish the officers "acte[d] with a purpose to harm unrelated to legitimate law enforcement objectives." *Wilkinson*, 610 F.3d at 554. Defendant Officers had legitimate law enforcement objectives when engaged in "self-defense, or the defense of other others" when they protected themselves and their fellow officers from Diaz who approached them with a weapon in his right hand. *A.D.*, 712 F.3d at 454. Overall, there are no facts to establish Defendant Officers acted with an improper purpose when they shot Diaz. Accordingly, Defendant Officers are entitled to qualified immunity as to count three.

## V. <u>STATE LAW CLAIMS</u>

### A. Battery Claim (Count Four)

"A state law battery claim is a counterpart to a federal claim of excessive use of force. In both a plaintiff must prove that the peace officer's use of force was unreasonable." *Brown v. Ranswieler*, 171 Cal.App.4th 516, 527 (2009). Here, as discussed *ante* in section IV(A), Defendant Officers'

use of force against Diaz was reasonable. Accordingly, because the use of force was reasonable, no issues of material fact exist with regard to the battery claim, and therefore, count four should be dismissed as a matter of law.

### B. Negligence (Count Five)

"[I]n order to prove facts sufficient to support a finding of negligence, a plaintiff must show that [the] defendant had a duty to use due care, that he breached that duty, and that the breach was the proximate or legal cause of the resulting injury." *Nally v. Grace Community Church*, 47 Cal.3d 278, 292 (1988). The California Supreme Court has long recognized that peace officers have a duty to act reasonably when using deadly force. *Munoz v. Olin*, 24 Cal.3d 629, 634 (1979); *Grudt v. City of Los Angeles*, 2 Cal.3d 575, 587 (1970). In *Hayes v. County of San Diego*, 57 Cal.4th 622 (2013), the California Supreme Court observed that California "negligence law, which considers the totality of the circumstances surrounding any use of deadly force [citation], is broader than federal Fourth Amendment law, which tends to focus more narrowly on the moment when deadly force is used." *Id*. at 639.

Here, as to Plaintiffs' negligence claim, Plaintiffs allege the following actions/inactions constituted negligence:

(a) the failure to properly and adequately assess the need to detain, arrest, and use force or deadly force against [Diaz];

(b) the negligent tactics and handling of the situation with [Diaz], including pre-shooting negligence;

(c) the negligent detention, arrest, and use of force, including deadly force, against [Diaz];

(d) the failure to recognize that [Diaz] was possibly suffering from a mental health crisis;

(e) failure to recognize that [Diaz] was holding a flathead screwdriver and not a weapon such as a knife or a gun;[14]

(f) the failure to use less than lethal alternatives to deadly force that were readily available to the involved officers;

(g) the failure to summon[] and provide prompt medical care to Decedent;

(h) the failure to properly train and supervise employees, both professional and non-professional, including Arturo Castillo, Cody Wissler, Jesus Garcia and Jason Bermudez;

(i) the failure to ensure that adequate numbers of employees with appropriate education and training were available to meet the needs of and protect the rights of [Diaz]; and

(j) the negligent handling of evidence and witnesses.

FAC, at ¶ 68. Notwithstanding these allegations, Plaintiffs cannot present admissible, non-hearsay, and non-speculative evidence that Defendant Officers' conduct before, during, and after the struggle were unreasonable under the totality of the circumstances that resulted in the use of force. It is undisputed that Diaz: (1) called 911 and told the dispatcher he was "gonna shoot somebody, [and] gonna stab somebody" U.F. 2, 7; (2) repeatedly refused to comply with Defendant Officers' commands – specifically, "to lower [his] windows and '[l]et [the officers] see [his] hands' " from inside the vehicle U.F. 16; (3) without being prompted to do so exited the vehicle and walked towards Defendant Officers with a weapon in his right hand, and his left hand/wrist was covered in blood U.F. 29; (4) again refused to comply with Defendant Officers' commands to drop the weapon U.F. 28, 30-31; (5) acknowledged the command, but "nodded his head in a

[14] The FAC refers to subdivisions (d) and (e) twice. For purposes of consistency, Defendants list the allegations in their correct alphabetical order.

side-to-side motion . . . as if to say, 'No, I'm not going to do what you ask' " U.F. 31; (6) continued to approach Defendant Officers and got within five feet of Defendant Officers before they discharged their weapons U.F. 33-34; (7) was so close to Sergeant Garcia that he fell in between the two patrol vehicles and right up against the front passenger wheel of WG's vehicle – the vehicle where Sergeant Garcia was positioned U.F. 35-36, 38; and (8) was immediately provided CPR by Defendant Officers, and Defendant Officers permitted EMS to arrive on scene once the scene was safe and secure. U.F. 40-45.

Nonetheless, apart from arguments already addressed above, Plaintiffs further allege Defendant Officers: engaged in negligent tactics; failed to recognize that Diaz was possibly suffering from a mental health crisis; and failed to recognize that Diaz was holding a flathead screwdriver and not a weapon such as a knife or gun.

First, the uncontroverted facts establish that Defendant Officers were properly trained in the use of force *and* TPD policies clearly articulated when deadly force could be applied, along with the circumstances for when officers were required to render medical aid to a suspect. U.F. 47-54. Second, Plaintiffs fail to adequately allege Diaz was suffering from a mental illness or that it should have been apparent to Defendant Officers that Diaz had a mental illness. *See Vos v. City of Newport Beach*, 892 F.3d 1024, 1034 (9th Cir. 2018) (stating the *Graham* factors are not exclusive and "[o]ther relevant factors include the availability of less intrusive force, whether proper warnings were given, and whether it should have been apparent to the officers that the subject of the force used was mentally disturbed"). Finally, the fact that Diaz was holding a flathead screwdriver does not affect the reasonableness of Defendant Officers' decision to use deadly force. As stated above, a screwdriver has been held to be a deadly weapon for

purposes of California Penal Code § 245(a)(1). *See Grandison*, 2012 U.S. Dist. LEXIS at *29-30 (citing to *Simons*, 42 Cal.App.4th at 1107-08). Further, it was reasonable – based on the totality of the circumstances – for Defendant Officers to believe Diaz was armed with *both* a knife and firearm. Specifically, Diaz called 911 and told dispatch *he* was the individual with the gun and that he was "gonna *shoot* somebody, [and] gonna *stab* somebody." U.F. 2 (emphasis added). Although Defendant Officers mistakenly believed Diaz held a knife, this belief was reasonable as a matter of law. *See Est. of Strickland v. Nevada Cnty.*, 69 F.4th 614, 621-23 (9th Cir. 2023) (concluding that officers reasonably believe a toy gun was real when reports suggested the suspect carried a shotgun and the suspect did not comply with orders to drop the gun); *Napouk v. Las Vegas Metro Police Dep't*, 123 F.4th 906, 916 (9th Cir. 2024) (concluding that officers reasonably believe a plastic sword was real when reports suggested the suspect carried a "machete" and the suspect ignored orders to drop the "knife").

Accordingly, because Defendant Officers use of force was objectively reasonable, even under the higher standard as articulated in *Hayes*, count five should also be dismissed as a matter of law.

**C. Bane Act Claim (Count Six)**

The Bane Act creates a cause of action against persons who interfere with constitutional right "by threat, intimidation, or coercion[.]" Cal. Civ. Code § 52.1. In an excessive force cause, the Bane Act requires establishing a Fourth Amendment violation and "a specific intent to violate the arrestee's right to freedom from unreasonable seizure." *Reese v. Cnty. of Sacramento*, 888 F.3d 1030, 1043 (9th Cir. 2018) (quoting *Cornell v. City & Cnty. of San Francisco*, 17 Cal.App.5th 766, 801 (2017)). Evidence of "[r]eckless disregard for a person's constitutional rights" is sufficient to

establish "a specific intent to deprive that person of those rights." *Id.* at 1045 (quoting *United States v. Reese*, 2 F.3d 870, 885 (9th Cir. 1993)). Courts have concluded a reasonable jury could find an officer's use of deadly force on a suspect amounted to reckless disregard where the evidence raised a triable question of fact as to whether the suspect posed a threat to the officer or others. *See, e.g. Banks v. Mortimer*, 620 F.Supp.3d 902, 935 (N.D. Cal. 2022) (concluding reasonable jury could find use of deadly force amounted to reckless disregard where evidence suggested suspect was fleeing and posed no threat); *Chambers v. Cnty. of Los Angeles*, 2022 U.S. Dist. LEXIS 240199, at *12 (C.D. Cal. Dec. 12, 2022) (concluding reasonable jury could find use of deadly force amounted to reckless disregard where, despite claim that suspect approached deputies in a "threatening manner[,]" video footage of incident did "not clearly show [suspect] posing a threat to the deputies").

For substantially the same reasons that Plaintiffs cannot show that Defendant Officers' shots amounted to an unreasonable use of deadly force, Plaintiffs are also unable to show that these shots violated the Bane Act. There is no triable issue of fact as to whether Defendant Officers fired their shots with a specific intent to violate Diaz's constitutional rights.

Accordingly, count six should also be dismissed as a matter of law.

## VI. CONCLUSION

Based on the foregoing, Defendants respectfully request that the Court grant Defendants' Motion for Summary Judgment and/or Partial Summary Judgment of Issues.

Dated: August 27, 2026

Respectfully Submitted,

JONES MAYER

By: ______________________

Angela M. Powell,
Thurgood M. Wynn,
Ryan M. Allein,
Attorneys for Defendants
CITY OF TORRANCE, et al.

## CERTIFICATE OF COMPLIANCE

The undersigned, counsel of record for CITY OF TORRANCE, et al., certifies this brief contains 8061 words, as determined by my word-processing software, which complies with the stipulation signed by all parties and this Court's order on August 26, 2026 [Dkt. 56].

Dated: August 27, 2026

Respectfully Submitted,

JONES MAYER

By: ______________________________

Angela M. Powell,
Thurgood M. Wynn,
Ryan M. Allein,
Attorneys for Defendant
CITY OF TORRANCE, et al.