JONES MAYER
Angela M. Powell, State Bar No. 191876
amp@jones-mayer.com
Thurgood M. Wynn, State Bar No. 345199
tmw@jones-mayer.com
Ryan M. Allein, State Bar No. 318078
rma@jones-mayer.com
3777 North Harbor Boulevard
Fullerton, CA 92835
Telephone: (714) 446-1400
Facsimile: (714) 446-1448

Attorneys for Defendants,
CITY OF TORRANCE; ARTURO CASTILLO; CODY WISSLER; JESUS GARCIA; JASON BERMUDEZ

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

MARIA GUADALUPE DIAZ; A.D., a minor by and through his Guardian Ad Litem, MARIA GUADALUPE DIAZ; A.D., a minor by and through his Guardian Ad Litem, MARIA GUADALUPE DIAZ; LEONARDO DIAZ; and RAMONA RAMIREZ DE DIAZ

Plaintiffs,

v.

CITY OF TORRANCE; ARTURO CASTILLO; CODY WISSLER; JESUS GARCIA; JASON BERMUDEZ; and DOES 6-10, inclusive

Defendants.

Case No. 2:25-cv-03389-JLS(AYPx)

Honorable Josephine L. Staton
Courtroom 8A

**DEFENDANTS' STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT AND/OR PARTIAL SUMMARY JUDGMENT OF ISSUES**

**[Filed concurrently with: Defendants' Notice of Motion and Motion for Summary Judgment and/or Partial Summary Judgment of Issues; Declaration of Ryan M. Allein; Declaration of Arturo Castillo; Declaration of Cody Wissler; Declaration of Jesus Garcia; Declaration of Jason Bermudez; Declaration of Samuel Choi; Declaration of Ryan Schmitz; Exhibits; [Proposed] Order]**

Date: February 5, 2027
Time: 10:30 a.m.
Ctrm: 8A

Action filed: October 8, 2025

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

Defendants CITY OF TORRANCE; ARTURO CASTILLO; CODY WISSLER; JESUS GARCIA; and JASON BERMUDEZ (collectively referred to as "Defendants") hereby submit the following Statement of Uncontroverted Facts and Conclusions of Law, in support of their Motion for Summary Judgment and/or Partial Summary Judgment of Issues.

## A. 911 CALL / DISPATCH LOGS

| UNDISPUTED FACTS | SUPPORTING EVIDENCE |
|---|---|
| 1. On December 2, 2024, at approximately 4:35 p.m., TPD received a 911 call whereby the caller stated, "[T]here's a man with a gun at 2909 Oregon Court" in Torrance. | 1. Declaration of Ryan M. Allein ("Allein Declaration"), at ¶ 2-3; 911 Audio, at 0:00-0:06, Exhibit A; Dispatch Audio Transcript, at 1:10-12, Exhibit B. |
| 2. The 911 caller further stated he was the individual with the gun and that he was "gonna shoot somebody, [and] gonna stab somebody." | 2. Allein Declaration, at ¶ 2-3; 911 Audio, at 0:00-0:25, Exhibit A; Dispatch Audio Transcript, at 1:22-38, Exhibit B. |
| 3. The dispatcher asked the 911 caller, "How come? What's going on? Why do you want to?"; however, the 911 caller hung up the phone. | 3. Allein Declaration, at ¶ 2-3; 911 Audio, at 0:28-0:33, Exhibit A; Dispatch Audio Transcript, at 2:2, Exhibit B. |
| 4. Subsequently, at approximately 4:41 p.m., dispatch informed TPD | 4. Allein Declaration, at ¶ 3; Dispatch Audio Transcript, at 2:29- |



JONES MAYER LAW

| | |
|---|---|
| officers that "RP states there is a man with a gun [at 2909 Oregon Court]. States he wants to shoot someone. We have one caller only." | 31, Exhibit B. |
| 5. Officer Bermudez responded, "[C]opy from Hawthorne and Fashion." | 5. Allein Declaration, at ¶ 3; Dispatch Audio Transcript, at 2:35-36, Exhibit B. |
| 6. At or around this same time, Officer Castillo requested to "get a drone up[.]" | 6. Allein Declaration, at ¶ 3; Dispatch Audio Transcript, at 3:9-11, Exhibit B. |
| 7. Dispatch eventually told officers the 911 caller's phone number belonged "to a Leonardo Diaz, 34 year old Hispanic male, 6"1', 285, brown over black, black over brown" and that he "possibl[y] work[ed] at the Apollo Scooters at 2909 Oregon Court." | 7. Allein Declaration, at ¶ 3-5; Dispatch Audio Transcript, at 6:5-6, 8:31-32, Exhibit B; Deposition of Arturo Castillo ("Castillo Deposition"), at 19:11-16, Exhibit C; Deposition of Jason Bermudez ("Bermudez Deposition"), at 29:7-17, Exhibit D. |
| 8. It was later confirmed Diaz worked at the Apollo Scooters shop as a repair technician, but that the store moved out of the location approximately a week ago prior to the incident. | 8. Allein Declaration, at ¶ 3; Dispatch Audio Transcript, at 9:26-28, 10:11-13, Exhibit B. |
| 9. Based on Diaz being near his old place of employment, Officer Castillo "believed that this possibly | 9. Allein Declaration, at ¶ 4; Castillo Deposition, at 44:3-12, Exhibit C. |





JONES MAYER LAW

| | |
|---|---|
| was a disgruntled employee that possibly killed his former employer and had him in the vehicle." | |
| 10. Further, it was discovered "the phone ping that was being used was in the intersection of Maple and Oregon Court, where the potential man with a gun was at." | 10. Allein Declaration, at ¶ 4-5; Castillo Deposition, at 18:8-16, Exhibit C; Bermudez Deposition, at 29:7-12, Exhibit D. |

**B. TPD OFFICERS ARRIVE ON SCENE AND CONTACT DECEDENT**

| | |
|---|---|
| 11. At or around this time, the drone operator – Officer J. Clark ("Officer Clark") – "advis[ed] [officers] that there was a male subject in a green Dodge Charger that was opening and closing his door, looking around in the area." | 11. Allein Declaration, at ¶ 3-4; Castillo Deposition, at 22:9-15, 25:25-26:4, Exhibit C; Dispatch Audio Transcript, at 11:2-4, Exhibit B; Declaration of Arturo Castillo ("Castillo Declaration"), at ¶ 6; Drone Video #1, at 8:40-14:13, Exhibit G. |
| 12. The male subject was later determined to be Diaz. | 12. Allein Declaration, at ¶ 8; Los Angeles County Department of Medical Examiner, Autopsy Report ("Autopsy Report"), at 1, Exhibit M. |
| 13. At this point, Officer Wissler and Sergeant Garcia "continued to the intersection of Oregon Court and Maple, conducted a U-turn, and then proceeded to conduct a | 13. Allein Declaration, at ¶ 6-7; Deposition of Cody Wissler ("Wissler Deposition"), at 21:16-23, Exhibit E; Deposition of Jesus Garcia ("Garcia Deposition"), at |



JM JONES MAYER LAW

| | |
|---|---|
| traffic stop on the green Charger." | 42:10-19, Exhibit F. |
| 14. Officer Garcia testified there was a malfunction with his body camera causing it not to activate during the incident. | 14. Allein Declaration, at ¶ 7; Garcia Deposition, at 98:12-17. |
| 15. Officers Castillo and Bermudez then arrived in their vehicle and parked their vehicle "southwest . . . just a bit offset" of where Officer Wissler and Sergeant Garcia were parked. | 15. Allein Declaration, at ¶ 4, 6-7; Castillo Deposition, at, 27:25-28:24, Exhibit C; Bermudez Deposition, at 34:16-25, Exhibit D; Garcia Deposition, at 43:5-44:1, Exhibit F. |

## C. PLAN TO SAFELY DETAIN LEONARDO DIAZ BY CONDUCTING A HIGH RISK STOP

| | |
|---|---|
| 16. "Initially, when [the officers] exited the[ir] vehicle[s], Officer Wissler was tasked with saying commands" – specifically, for Diaz "to lower [his] windows [and] '[l]et me see your hands.' " | 16. Allein Declaration, at ¶ 6-7; Garcia Deposition, at 47:3-10, Exhibit F; Wissler Deposition, at 26:9-13, Exhibit E. |
| 17. During this time, drone operator Officer Clark "continued to notify [the officers] that the driver in the green Charger began to open and close his door." | 17. Allein Declaration, at ¶ 4, 6-7; Wissler Deposition, at 26:19-23, Exhibit E; Garcia Deposition, at 47:14-17, Exhibit F; Castillo Deposition, at 38:20-24, Exhibit C. |
| 18. Sergeant Garcia then "told Officer Bermudez to move his vehicle from its current position | 18. Allein Declaration, at ¶ 4-5, 7; Garcia Deposition, at 47:23-48:8, Exhibit F, Castillo Deposition, at |



JM JONES MAYER LAW

| | |
|---|---|
| and position it [like a felony stop] north of Officer Wissler and [Sergeant Garcia's] vehicle; Officer Bermudez then "moved his vehicle and parked it just north of Officer Wissler and [Sergeant Garcia's] vehicle [("WG Vehicle")]." | 41:25-42:3, Exhibit C; Bermudez Deposition, at 39:5-11, Exhibit D. |
| 19. A plan was developed to conduct a high-risk stop, to create time, distance, and cover while safely detaining Diaz; Officer Bermudez positioned himself on the driver's side of Castillo/Bermudez's vehicle ("CB Vehicle"); Sergeant Garcia positioned himself on the passenger side of CB's vehicle; and Officer Wissler positioned himself to the driver's side of WG's vehicle. | 19. Allein Declaration, at ¶ 4, 7; Castillo Deposition, at 31:10-23, 33:2-13, 41:8-11, Exhibit C; Garcia Deposition, at 48:9-15, Exhibit F. |
| 20. Behind Defendant Officers was Maple Avenue, which was full of "a lot of cars . . . leaving work." | 20. Allein Declaration, at ¶ 5; Bermudez Deposition, at 60:3-10, Exhibit D. |
| 21. Officer Castillo grabbed the M4 rifle from his trunk and positioned himself on the passenger side of WG's vehicle. | 21. Allein Declaration, at ¶ 4, 7; Castillo Deposition, at 37:16-20, Exhibit C; Garcia Deposition, at 47:18-21, Exhibit F. |

| | |
|---|---|
| 22. Prior to Sergeant Garcia repositioning himself, Officer Castillo had told Sergeant Garcia, "Why don't you quarterback this? I got the long gun[.]" | 22. Allein Declaration, at ¶ 4, 7; Garcia Deposition, at 52:16-21, Exhibit F; Castillo Deposition, at 51:17-23, Exhibit C; Castillo Declaration, at ¶ 5; Castillo Body Cam, at 1:27-1:31. |
| 23. Sergeant Garcia understood Officer Castillo's statement to "basically . . . take charge and designate any – any roles . . . [to] basically take over . . . giving any instructions to [Officer Castillo's] partner who was on his first day of patrol." | 23. Allein Declaration, at ¶ 7; Garcia Deposition, at 52:22-53:5, Exhibit F. |
| 24. Sergeant Garcia "also asked for less lethal" – specifically, "for the next unit arriving on scene – to bring less-lethal option with them[.]" | 24. Allein Declaration, at ¶ 3, 7; Garcia Deposition, at 49:1-6, Exhibit F; Dispatch Audio Transcript, at 12:36-13:2, Exhibit B. |
| 25. Subsequently, Officer Wissler commanded Diaz to open the door and told Diaz on seven separate occasions, "Let me see your hands." | 25. Allein Declaration, at ¶ 4-7; Wissler Deposition, at 41:7-12, Exhibit E; Declaration of Cody Wissler ("Wissler Declaration"), at ¶ 5; Cody Wissler Body Worn Camera ("Wissler Body Cam"), at 0:37-3:02, Exhibit H; Garcia Deposition, at 48:16-21, Exhibit F; Castillo |

| | |
|---|---|
| | Deposition, at 48:10-24, Exhibit C; Castillo Declaration, at ¶ 5; Arturo Castillo Body Worn Camera ("Castillo Body Cam"), at 0:37-2:45, Exhibit I; Bermudez Deposition, at 49:21-50:4, Exhibit D; Declaration of Jason Bermudez ("Bermudez Declaration"), at ¶ 5; Jason Bermudez Body Worn Camera ("Bermudez Body Cam"), at 1:50-2:00, Exhibit J. |
| 26. Diaz partially opened the door and Officer Wissler stated, "He's got a knife. He's bleeding." | 26. Allein Declaration, at ¶ 6; Wissler Deposition, at 31:12-18, Exhibit E; Wissler Declaration, at ¶ 5; Wissler Body Cam, at 2:29-2:31, Exhibit H; Castillo Declaration, at ¶ 6; Drone Video #2, at 0:46-0:50, Exhibit K; Declaration of Jesus Garcia ("Garcia Declaration"), at ¶ 5; Patrol Vehicle Camera, at 1:33-1:35, Exhibit L. |
| 27. It was later determined the weapon in Diaz's right hand was not a knife, but rather a flathead screwdriver. | 27. Allein Declaration, at ¶ 4-5, 7; Castillo Deposition, at 71:21-24, Exhibit C; Bermudez Deposition, at 73:17-21, Exhibit D; Garcia Deposition, at 109:8-10. |
| 28. At this point, Officer Wissler | 28. Wissler Declaration, at ¶ 5; |





JONES MAYER LAW

| | |
|---|---|
| again told Diaz to "Let me see your hands[,]" but also told him to "Open the door" and "Drop the knife." | Wissler Body Cam, at 2:36-2:58, Exhibit H; Garcia Declaration, at ¶ 5; Patrol Vehicle Camera, at 1:35-2:02, Exhibit L. |
| 29. Diaz then exited the vehicle and began walking towards the officers while holding what appeared to be a knife "off to his side of the hip, pointed toward[s] [them]" and his left hand/wrist were covered in blood. | 29. Allein Declaration, at ¶ 4-7; Castillo Deposition, at 57:20-24, Exhibit C; Bermudez Deposition, at 53:24-54:6, Exhibit D; Wissler Deposition, at 37:11-16, Exhibit E; Garcia Deposition, at 63:21-23, 65:22-66:7, Exhibit F; Castillo Declaration, at ¶ 6; Drone Video #2, at 0:52-1:07, Exhibit K; Garcia Declaration, at ¶ 5; Patrol Vehicle Camera, at 2:02-2:19, Exhibit L. |
| 30. Officers commanded Diaz to "turn around," "get on the ground," and "drop the knife"; however, Diaz continued to walk towards officers with the weapon in his hand pointed at the officers. | 30. Allein Declaration, at ¶ 4-5, 7; Wissler Deposition, at 41:13-42:3, Exhibit E; Wissler Declaration, at ¶ 5; Wissler Body Cam, at 3:00-3:15, Exhibit H; Castillo Deposition, at 56:21-25, Exhibit C; Castillo Declaration, at ¶ 5; Castillo Body Cam, at 2:48-2:58, Exhibit I; Bermudez Deposition, at 57:2-15, Exhibit D; Bermudez Declaration, at ¶ 5; Bermudez Body Cam, at 2:12-2:21, Exhibit J; Garcia |



JM JONES MAYER LAW

| | |
|---|---|
| | Deposition, at 70:5-23, Exhibit F; Garcia Declaration, at ¶ 5; Patrol Vehicle Camera, at 2:02-2:19, Exhibit L. |
| 31. As Sergeant Garcia and Officer Castillo instructed Diaz to "Stop; get on the ground; [and] drop the knife," Diaz "nodded his head in a side-to-side motion . . . as if to say, 'No, I'm not going to do what you ask.' " | 31. Allein Declaration, at ¶ 4, 7; Garcia Deposition, at 96:1-6, Exhibit F; Castillo Deposition, at 57:1-4, Exhibit C; Wissler Declaration, at ¶ 5; Wissler Body Cam, at 3:07-3:08, Exhibit H; Castillo Declaration, at ¶ 6; Drone Video #2, at 0:56-0:58, Exhibit K; Garcia Declaration, at ¶ 5; Patrol Vehicle Camera, at 2:09-2:11, Exhibit L. |
| 32. "Initially, once [Diaz] began walking, he walked diagonally in a northwest position. He maybe did that for 7 or 8 feet, and then he did what [Sergeant Garcia] would describe as like a quarter turn and then continued westbound in a straight . . . line." | 32. Allein Declaration, at ¶ 7; Garcia Deposition, at 68:21-69-7, Exhibit F; Wissler Declaration, at ¶ 5; Wissler Body Cam, at 3:01-3:15, Exhibit H; Castillo Declaration, at ¶ 6; Drone Video #2, at 0:52-1:03, Exhibit K; Garcia Declaration, at ¶ 5; Patrol Vehicle Camera, at 2:02-2:12, Exhibit L. |
| 33. Prior to the officers' firing their weapons, Diaz was: "[l]ess than 5 feet" away from Officer Castillo; | 33. Allein Declaration, at ¶ 4, 6-7; Castillo Deposition, at 77:3-6, Exhibit C; Castillo Declaration, at ¶ |



JM JONES MAYER LAW

| | |
|---|---|
| "[a]pproximately 3 feet" away from Officer Wissler; and "4 to 5 feet" away from Sergeant Garcia. | 5; Castillo Body Cam, at 2:44-3:00, Exhibit I; Wissler Deposition, at 45:7-9, Exhibit E; Wissler Declaration, at ¶ 5; Wissler Body Cam, at 3:15-3:16, Exhibit H; Garcia Deposition, at 81:4-6, Exhibit F; Castillo Declaration, at ¶ 6; Drone Video #2, at 1:07, Exhibit K; Garcia Declaration, at ¶ 5; Patrol Vehicle Camera, at 2:19, Exhibit L. |
| 34. Officer Bermudez testified the nearest officer was approximately 5 feet away from Diaz before he fired. | 34. Allein Declaration, at ¶ 5; Bermudez Deposition, at 61:2-9, Exhibit D. |
| 35. Specifically, Diaz walked past the front of the two patrol vehicles directly in front of Sergeant Garcia. | 35. Allein Declaration, at ¶ 7; Wissler Declaration, at ¶ 5; Wissler Body Cam, at 3:15-3:20, Exhibit H; Garcia Deposition, at 87:15-88:11, Exhibit F; Castillo Declaration, at ¶ 6; Drone Video #2, at 1:07, Exhibit K. |
| 36. Officer Castillo then fired two shots; Officer Bermudez fired three shots; Officer Wissler fired three shots; and Sergeant Garcia fired two shots. | 36. Allein Declaration, at ¶ 4-7; Castillo Deposition, at 62:5-6, Exhibit C; Castillo Declaration, at ¶ 5; Castillo Body Cam, at 2:58-3:00, Exhibit I; Bermudez Deposition, at 23:17-19, Exhibit D; Bermudez Declaration at ¶ 5; Bermudez Body |

| | |
|---|---|
| | Cam, at 2:20-2:22, Exhibit J; Wissler Deposition, at 47:5-6, Exhibit E; Wissler Declaration, at ¶ 5; Wissler Body Cam, at 3:16-3:18, Exhibit H; Garcia Deposition, at 81:10-12, Exhibit F. |
| 37. Immediately prior to firing his two shots, Officer Castillo yelled, “40, 40, 40, c’mon[,]” which was in reference to the 40-millimeter less lethal weapon. However, at this time, the 40-millimiter was locked in the trunk and an officer “would then [have to] locate . . . a small bag that contain[ed] the rounds that’s used for the 40 millimeter, which would be the sponge rounds [and] [¶] would then have to remove the correct round to load into the 40-millimeter weapon.” Further, although Officers Samuel Choi (“Officer Choi”) and Kevin High (“Officer High”) were designated as less-lethal coverage, they were unable to respond and position with the 40-millimeter before engaging Diaz because: (1) they arrived as | 37. Allein Declaration, at ¶4, 7; Declaration of Samuel Choi, at ¶¶ 1-13; Castillo Deposition, at 30:4-12, 74:19-75:1, 90:6-9, 91:7-13, Exhibit C; Castillo Declaration, at ¶ 5; Castillo Body Cam, at 2:54-2:57, Exhibit I; Garcia Deposition, at 26:3-19, Exhibit F; Garcia Declaration, at ¶ 5; Patrol Vehicle Camera, at 2:14-2:16, Exhibit L. |

| | |
|---|---|
| the shooting was occurring; (2) Diaz "exited the vehicle on his own, without being told so, and began to close the distance on [the Defendant Officers], limiting the effective range for that 40-millimeter launcher"; and as described by Officer Choi in his declaration, the 40-millimeter required an extensive process before he could have it ready for use. | |
| 38. Diaz fell right up against the front passenger wheel of WG's vehicle – directly in front of Sergeant Garcia and between both patrol vehicles. | 38. Allein Declaration, at ¶ 4-7; Castillo Deposition, at 82:3-9, Exhibit C; Castillo Declaration, at ¶ 5; Castillo Body Cam, at 4:35, Exhibit I; Bermudez Deposition, at 70:11-18, Exhibit D; Bermudez Declaration, at ¶ 5; Bermudez Body Cam, at 2:41-2:43, Exhibit J; Wissler Deposition, at 55:6-56:2, Exhibit E; Wissler Declaration, at ¶ 5; Wissler Body Cam, at 3:23, Exhibit H; Garcia Deposition, at 87:16-88:11, Exhibit F; Castillo Declaration, at ¶ 6; Drone Video #2, at 1:07, 1:12, Exhibit K. |

**D. FACTS RELEVANT TO PLAINTIFFS' CLAIMS REGARDING FAILURE TO TRAIN DEFENDANT OFFICERS**

| | |
|---|---|
| 39. TPD Officers Castillo, Wissler, Garcia, and Bermudez completed the Los Angeles County Sheriff's Department Academy and the "Basic Course – Intensive" before becoming patrol officers. | 39. Declaration of Ryan Schmitz ("Schmitz Declaration"), at ¶¶ 5-8; Officer Castillo's California Commission on POST Profile ("POST Profile"), "Basic Course – Intensive," completed on March 13, 2020, at 1, Exhibit O; Officer Wissler's POST Profile, "Basic Course – Intensive," completed on August 30, 2024, at 1, Exhibit P; Sergeant Garcia's POST Profile, "Basic Course – Intensive," completed on July 28, 2004, at 1, Exhibit Q; Officer Bermudez's POST Profile, "Basic Course – Intensive," completed on November 8, 2024, at 1, Exhibit R. |
| 40. Further, TPD Officers Castillo, Wissler, Garcia, and Bermudez received training on the use of force. | 40. Schmitz Declaration, at ¶¶ 5-8; Officer Castillo's POST Profile, "Use of Force (PSP)/Force Options Use of Force/De-Esc", completed on February 24, 2022, July 27, 2023, February 15, 2024, February 29, 2024, January 30, 2025, February 12, 2025, at 1-2, Exhibit O; Officer |

| | |
|---|---|
| | Wissler's POST Profile, "Force Options Use of Force/De-Esc", completed on October 2, 2024, at 1, Exhibit P; Sergeant Garcia's POST Profile, "Use of Force (PSP)/De-Escalation Awareness/Use of Force Instructor", completed on January 20, 2022, March 9, 2023, July 27, 2023, October 23, 2024, July 11, 2025, at 1-4, Exhibit Q; Officer Bermudez's POST Profile, "Use of Force (PSP)/Force Options Use of Force/De-Esc", completed on July 30, 2025, September 11, 2025, at 1, Exhibit R. |
| 41. The TPD trains its officers that officers shall use only that amount of force that reasonably appears necessary given the facts and totality of the circumstances known to or perceived by the officer at the time of the event to accomplish a legitimate law enforcement purpose. | 41. Schmitz Declaration, at ¶ 4; Torrance Police Department Policy Manual ("Policy Manual"), 300.3, at 63-64, Exhibit N. |
| 42. The TPD's policy requires officers to use only the level of force that is objectively reasonable and to | 42. Schmitz Declaration, at ¶ 4; Policy Manual, 300.3, 300.3.2, 300.4.2, at 63-64, 68, Exhibit N. |



JONES MAYER LAW

| | |
|---|---|
| consider actions that may increase officer safety and may decrease the need for using force and that "[i]f the officer reasonably believes that a threat exists based on the totality of circumstances presented at the time (e.g., high-risk stop, tactical entry, armed encounter), firearms may be directed toward such threat until the officer no longer perceives such threat." | |
| 43. Further, the TPD's policy states an officer is justified to use deadly force when the officer reasonably believes it is necessary "to protect themself or others from what the officer reasonably believes is an imminent threat of death or serious bodily injury to the officer or another person." | 43. Schmitz Declaration, at ¶ 4; Policy Manual, 300.4, at 67, Exhibit N. |
| 44. The TPD's policy also states that an officer should consider actions that may increase officer safety and may decrease the need for using force only if "time and circumstances reasonably permit, and when community and officer | 44. Schmitz Declaration, at ¶ 4; Policy Manual, 300.3.6, at 66, Exhibit N. |



JONES MAYER LAW

| | |
|---|---|
| safety would not be compromised[.]” | |
| 45. Finally, officers are trained that “[o]nce it is reasonably safe to do so, properly trained officers should promptly provide or procure medical assistance for any person injured or claiming to have been injured in a use of force incident[.]” | 45. Schmitz Declaration, at ¶ 4; Policy Manual, 300.6, at 69, Exhibit N. |
| 46. Officers Castillo, Wissler, Garcia, and Bermudez received adequate training on the use of force and use of deadly force. | 46. Schmitz Declaration, at ¶¶ 5-8; Officer Castillo’s POST Profile, “Use of Force (PSP)/Force Options Use of Force/De-Esc”, completed on February 24, 2022, July 27, 2023, February 15, 2024, February 29, 2024, January 30, 2025, February 12, 2025, at 1-2, Exhibit O; Officer Wissler’s POST Profile, “Force Options Use of Force/De-Esc”, completed on October 2, 2024, at 1, Exhibit P; Sergeant Garcia’s POST Profile, “Use of Force (PSP)/De-Escalation Awareness/Use of Force Instructor”, completed on January 20, 2022, March 9, 2023, July 27, 2023, October 23, 2024, July 11, 2025, at 1-4, Exhibit Q; Officer Bermudez’s POST Profile, “Use of |

| | |
|---|---|
| | Force (PSP)/Force Options Use of Force/De-Esc", completed on July 30, 2025, September 11, 2025, at 1, Exhibit R. |
| 47. As a result of this incident, Plaintiffs filed the underlying First Amended Complaint in this Court. | 47. Allein Declaration, at ¶ 9; First Amended Complaint, Exhibit S. |

## CONCLUSIONS OF LAW

1. Summary judgment is proper if the moving party demonstrates "that there is no genuine issue as to any material fact . . ." Fed. R. Civ. P. 56(c).[1] In a trilogy of cases, the Supreme Court clarified the burden of proof of each party with regard to the resolution of summary judgment motions. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986); *Anderson v. Liberty Lobby*, 477 U.S. 242 (1986); *Matsushita Elec. v. Zenith Radio*, 475 U.S. 574 (1986).

2. In *Celotex*, the Court rejected the contention that the moving party must support its summary judgment motion with evidence proving the non-existence of an essential element of plaintiff's cause of action. Rather, the Court held the "party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp.*, 477 U.S. at 323. The burden then shifts to the respondent to set forth affirmative evidence showing there is a genuine issue of material fact for trial. *Anderson*, 477 U.S. at 248.

[1] All further references to a "Rule" are to the Federal Rules of Civil Procedure.

3. The Supreme Court also made it clear the party who bears the burden of proof at trial also bears the burden of producing sufficient evidence in opposition to the summary judgment motion to enable reasonable jurors to find for that party. The standard is the same as that for judgment as a matter of law under Rule 50(a). *Anderson*, 477 U.S. at 249.

4. In opposing a motion for summary judgment, it is insufficient to merely show that there is some "metaphysical doubt as to material facts." *Matsushita Elec.*, 475 U.S. at 596. The plaintiff must show the existence of a genuine issue and "produce at least some 'significant probative evidence tending to support their complaint.' " *Smolen v. Deloitte, Haskins & Sells*, 921 F.2d 959, 963 (9th Cir. 1990) (citations omitted). The responding party cannot merely rest upon the allegations and the pleadings. *Hansen v. Black*, 885 F.2d 642, 644 (9th Cir. 1989).

5. Finally, Rule 56(a) provides for partial summary judgment. *See* Rule 56(a) ("A party may move for summary judgment, identifying each claim or defense – or the part of each claim or defense – on which summary judgment is sought."). Partial summary judgment is a mechanism through which the court deems certain issues established before trial. *See Lies v. Farrell Lines, Inc.*, 641 F.2d 765, 769 n.3 (9th Cir. 1981).

6. In *Graham v. Connor*, 490 U.S. 386 (1989), the United States Supreme Court determined that § 1983 excessive force claims for deadly force are addressed under the Fourth Amendment's reasonableness standard. *Id*. at 389. The *Graham* court set forth a non-exhaustive list of factors to be considered in evaluating whether the force used to affect a particular seizure is reasonable: (1) the severity of the crime at issue; (2) whether the suspect poses an immediate threat to the safety of the officers

or others; and (3) whether the suspect actively resists detention or attempts to escape. *Id*. at 395-95. The test is an objective one, viewed from the vantage of a reasonable officer at the scene, and is highly deferential to the police officer's need to protect himself or others. *Id*. at 396-97.

7. The Supreme Court has indicated that "judges should be cautious about second-guessing a police officer's assessment, made on the scene, of the danger presented by a particular situation." *Ryburn v. Huff*, 565 U.S. at 477. Moreover, the most important single element of the three specified factors is whether the suspect poses an immediate threat to the safety of the officers or others. *Smith v. City of Hemet*, 394 F.3d 689, 702 (9th Cir. 2005).

8. The Ninth Circuit's decision in *Hart v. City of Redwood City*, 99 F.4th 543 (9th Cir. 2024) is instructive, in which the Court found the officer's conduct to be objectively reasonable under the circumstances. In that case:

> [O]fficers [] responded to a tragic call involving a man attempting suicide with a knife in his backyard. When they arrived, they found the man's wife covered in blood and frantically pleading for help. At her urging, the officers went to the backyard, where they found Hart holding a knife. They told him to drop the knife, but instead of doing so he began moving towards them while raising the knife. As Hart neared the officers, [an officer] deployed her taser, but it was ineffective. With Hart approaching closely and wielding a knife, [another officer] took action to protect himself and his partner, shooting Hart.

*Hart*, 99 F.4th at 545.

9. In concluding the officers' conduct was objectively reasonable,


JONES MAYER LAW

the Ninth Circuit focused on several key circumstances. Notably, Hart briskly walked towards the officers with a knife, going from "thirty feet away to eight or ten feet away" in around 6 seconds. *Id.* at 546. Hart failed to respond to or comply with the officer's command to "drop the knife" and instead continued to approach the officers, holding the knife out towards them. *Id.* at 550. The Ninth Circuit found the "immediacy of the threat posed by Hart as he approached with a knife [was] dispositive." *Id.* at 552.

10. The third *Graham* factor considers whether Diaz resisted arrest. Refusing to comply with an officer's lawful commands or making movements or verbal gestures that indicate an unwillingness to cooperate with a police officer's lawful commands can constitute active resistance. *See Greene v. Barber*, 310 F.3d 889, 898 (6th Cir. 2002); *see also Draper v. Reynolds*, 369 F.3d 1270, 1278 (11th Cir. 2004)

11. The Ninth Circuit also considers whether there were less intrusive means of force that might have been used before an officer resorted to force. *Glenn v. Washington County*, 673 F.3d 864, 876 (9th Cir. 2011). However, "officers 'are not required to use the least intrusive degree of force possible[.]' " *Nelson v. City of Davis*, 685 F.3d 867, 882 (9th Cir. 2012) (quoting *Forrester v. City of San Diego*, 25 F.3d 804, 807 (9th Cir. 1994).

12. "The Ninth Circuit has recognized that parents and children have a Fourteenth Amendment substantive due process right to the companionship and society of one another." *Moreno v. City of San Bernardino*, 2022 U.S. Dist. LEXIS 137863, at *9 (C.D. Cal. Jun. 2, 2022) (referring to *Wilkinson v. Torres*, 610 F.3d 546, 554 (9th Cir. 2010)). If Defendant Officers' conduct, when viewed in the light most favorable to Plaintiffs, deprived Plaintiffs of their familial interest in a manner that


JONES MAYER LAW

"shocks the conscience," then Defendant Officers' conduct "is cognizable as a violation of due process." *Hayes v. Cnty. of San Diego*, 736 F.3d 1223, 1230 (9th Cir. 2013) (quoting *Wilkinson*, 610 F.3d at 554).

13. When an officer "makes a snap judgment because of an escalating situation, his conduct may only be found to shock the conscience if he acts with a purpose to harm unrelated to legitimate law enforcement objectives." *Id.* "Legitimate law enforcement objectives [include] arrest, self-defense, or the defense of others." *A.D. v. Cal. Highway Patrol*, 712 F.3d 446, 454 (9th Cir. 2013). Under the "purpose to harm" standard, an officer "violates the due process clause if he uses force with only an illegitimate purpose in mind." *Id.* at 453. "The purpose to harm standard is a subjective standard of culpability." *Id.* Under this standard, a plaintiff must submit non-speculative evidence that demonstrates an officer's improper motive. *See Jeffers v. Gomez*, 267 F.3d 895, 907 (9th Cir. 2001).

14. Under the doctrine of qualified immunity, government officials are shielded from liability for civil damages from mistakes unless their conduct violates "clearly established statutory or Constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1981); *Romero v. Kitsap County*, 931 F.2d 624, 627 (9th Cir. 1991). Qualified immunity gives ample room for mistaken judgments by protecting "all but the plainly incompetent or those who knowingly violate the law." *Hunter v. Bryant*, 502 U.S. 224, 229 (1991). "The protection of qualified immunity applies regardless of whether the government official's error is a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (citations omitted).

15. Once the official pleads qualified immunity, the burden is on

the plaintiffs to prove a constitutional right was violated and that the right was clearly established at the time of the alleged incident. *See Mattos v. Agarano*, 661 F.3d 433, 440 (9th Cir. 2011). Even if a plaintiff can establish a constitutional violation, the Court must then determine: (1) whether the Constitutional right at issue was clearly established at the time of the alleged violation (the "clearly established requirement"); and (2) whether it would be clear to a reasonable official in the defendant's specific position that his conduct was unlawful (the "objectively reasonable requirement"). *Pearson*, 555 U.S. at 230.

16. "A clearly established right is one that is sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (internal quotation marks omitted). Such clarity an only be established by "existing precedent" that has "placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). "Because the focus is on whether the officer had fair notice that [his or] her conduct was unlawful, reasonableness is judged against the backdrop of the law at the time of the conduct." *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004).

17. As such, "officials can have reasonable, but mistaken, beliefs . . . and in those situations courts will not hold that they have violated the Constitution. *Saucier v. Katz*, 533 U.S. 194, 205 (2001). Particularly, in tense and rapidly evolving situations, officials are afforded "broad discretion" and "immunity even when [they] make mistakes." *Jeffers v. Gomez*, 267 F.3d 895, 909 (9th Cir. 2001).

18. The Ninth Circuit has defined the type of existing precedent that is necessary to create clearly established law:

In analyzing this question, we acknowledge the Supreme Court's

> recent frustration with failures to heed its holdings. The Supreme Court 'has repeatedly told courts – and the Ninth Circuit in particular – not to define clearly established law at a high level of generality.' [Citation.] Our courts lack a monopoly over such immunity missteps. When recently reversing the Tenth Circuit, the Supreme Court wrote: 'In the last five years, [the Supreme Court] has issued a number of opinions reversing federal courts in qualified immunity cases.' [Citations.] 'The Court has found this necessary both because qualified immunity is important to "society as a whole," and because as an immunity from suit, qualified immunity is effectively lost if a case is erroneously permitted to go to trial.' [Citation.]
>
> We hear the Supreme Court loud and clear. Before a court can impose liability on [the defendant officers], we must identify precedent . . . that put [the officers] on clear notice that using deadly force in these particular circumstances would be excessive. General excessive force principles, as set forth in *Graham* and *Garner*, . . . 'do not by themselves create clearly established law outside an obvious case.' [Citation.] Instead, we must 'identify a case where an officer acting under similar circumstances as [the defendant officers here] was held to have violated the Fourth Amendment.' We cannot locate any such precedent.

*S.B. v. Cnty. of San Diego*, 864 F.3d 1010, 1015-16 (9th Cir. 2017) (citing *City & Cnty. of San Francisco v. Sheehan*, 575 U.S. 600, 613 (2015); *White v. Pauly*, 580 U.S. 730, 79 (2017). "It is the plaintiff who 'bears the burden of showing that the rights allegedly violated were clearly established.' "

*Shafer v. Cnty. of Santa Barbara*, 868 F.3d 1110, 1118 (9th Cir. 2017).

19. "A state law battery claim is a counterpart to a federal claim of excessive use of force. In both a plaintiff must prove that the peace officer's use of force was unreasonable." *Brown v. Ransweiler*, 171 Cal.App.4th 516, 527 (2009).

20. "[I]n order to prove facts sufficient to support a finding of negligence, a plaintiff must show that [the] defendant had a duty to use due care, that he breached that duty, and that the breach was the proximate or legal cause of the resulting injury." *Nally v. Grace Community Church*, 47 Cal.3d 278, 292 (1988). The California Supreme Court has long recognized that peace officers have a duty to act reasonably when using deadly force. *Munoz v. Olin*, 24 Cal.3d 629, 634 (1979); *Grudt v. City of Los Angeles*, 2 Cal.3d 575, 587 (1970). In *Hayes v. County of San Diego*, 57 Cal.4th 622 (2013), the California Supreme Court observed that California "negligence law, which considers the totality of the circumstances surrounding any use of deadly force [citation], is broader than federal Fourth Amendment law, which tends to focus more narrowly on the moment when deadly force is used." *Id*. at 639.

21. The Bane Act creates a cause of action against persons who interfere with constitutional right "by threat, intimidation, or coercion[.]" Cal. Civ. Code § 52.1. In an excessive force cause, the Bane Act requires establishing a Fourth Amendment violation and "a specific intent to violate the arrestee's right to freedom from unreasonable seizure." *Reese v. Cnty. of Sacramento*, 888 F.3d 1030, 1043 (9th Cir. 2018) (quoting *Cornell v. City & Cnty. of San Francisco*, 17 Cal.App.5th 766, 801 (2017)). Evidence of "[r]eckless disregard for a person's constitutional rights" is sufficient to establish "a specific intent to deprive that person of those rights." *Id*. at

1045 (quoting *United States v. Reese*, 2 F.3d 870, 885 (9th Cir. 1993)). Courts have concluded a reasonable jury could find an officer's use of deadly force on a suspect amounted to reckless disregard where the evidence raised a triable question of fact as to whether the suspect posed a threat to the officer or others. *See, e.g. Banks v. Mortimer*, 620 F.Supp.3d 902, 935 (N.D. Cal. 2022) (concluding reasonable jury could find use of deadly force amounted to reckless disregard where evidence suggested suspect was fleeing and posed no threat); *Chambers v. Cnty. of Los Angeles*, 2022 U.S. Dist. LEXIS 240199, at *12 (C.D. Cal. Dec. 12, 2022) (concluding reasonable jury could find use of deadly force amounted to reckless disregard where, despite claim that suspect approached deputies in a "threatening manner[,]" video footage of incident did "not clearly show [suspect] posing a threat to the deputies").

Dated: August 28, 2026 JONES MAYER

By: ______________________
Angela M. Powell,
Thurgood M. Wynn,
Ryan M. Allein,
Attorneys for Defendants,
CITY OF TORRANCE, et al.