JONES MAYER
Angela M. Powell, State Bar No. 191876
amp@jones-mayer.com
Thurgood M. Wynn, State Bar No. 345199
tmw@jones-mayer.com
Ryan M. Allein, State Bar No. 318078
rma@jones-mayer.com
3777 North Harbor Boulevard
Fullerton, CA 92835
Telephone: (714) 446-1400
Facsimile: (714) 446-1448

Attorneys for Defendants,
CITY OF TORRANCE; ARTURO CASTILLO; CODY WISSLER; JESUS GARCIA; JASON BERMUDEZ

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

MARIA GUADALUPE DIAZ; A.D., a minor by and through his Guardian Ad Litem, MARIA GUADALUPE DIAZ; A.D., a minor by and through his Guardian Ad Litem, MARIA GUADALUPE DIAZ; LEONARDO DIAZ; and RAMONA RAMIREZ DE DIAZ

Plaintiffs,

v.

CITY OF TORRANCE; ARTURO CASTILLO; CODY WISSLER; JESUS GARCIA; JASON BERMUDEZ; and DOES 6-10, inclusive

Defendants.

Case No. 2:25-cv-03389-JLS(AYPx)

Honorable Josephine L. Staton
Courtroom 8A

**DECLARATION OF RYAN M. ALLEIN IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT AND/OR PARTIAL SUMMARY JUDGMENT OF ISSUES**

Date: February 5, 2027
Time: 10:30 a.m.
Ctrm: 8A

Action filed: October 8, 2025

## DECLARATION OF RYAN M. ALLEIN

I, Ryan M. Allein, declare:

1. I am an attorney licensed to practice law in the State of California and before this Court. I am an attorney in the law firm of Jones

Mayer, counsel of record for Defendants in this matter. This Declaration is submitted in support of Defendants' Motion for Summary Judgment and/or Partial Summary Judgment of Issues. If called as a witness, I would and could competently testify to all of the facts contained within this declaration upon my personal knowledge.

2. Attached hereto as **Exhibit A**, is a 911 call/dispatch audio which was produced during the course of discovery, and describes the events before and during Torrance Police Department ("TPD") officers arrival on scene on December 2, 2024. A true and correct copy of this call is being physically lodged with the Court concurrent with the filing of this motion.

3. Attached hereto as **Exhibit B**, is a copy of the Dispatch Audio Transcript, which was produced during the course of discovery, and accurately reflects the radio traffic between dispatch and the TPD officers on scene.

4. Attached hereto as **Exhibit C**, is a true and correct copy of relevant portions of the Deposition of Arturo Castillo, dated July 13, 2026, which was taken in this matter.

5. Attached hereto as **Exhibit D**, is a true and correct copy of the relevant portions of the Deposition of Jason Bermudez, dated July 13, 2026, which was taken in this matter.

6. Attached hereto as **Exhibit E**, is a true and correct copy of the relevant portions of the Deposition of Cody Wissler, dated July 13, 2026, which was taken in this matter.

7. Attached hereto as **Exhibit F**, is a true and correct copy of the relevant portions of the Deposition of Jesus Garcia, dated July 13, 2026, which was taken in this matter.

8. Attached hereto as **Exhibit M**, is a true and correct copy of the Los Angeles County Department of Medical Examiner, Autopsy Report,

completed by Dr. Edwin Partovi on December 17, 2024.

9. Attached hereto as **Exhibit S**, is a true and correct copy of the First Amended Complaint, filed on October 8, 2025, in the underlying case.

10. On August 11, 2026, I sent a letter to Plaintiffs' counsel to meet and confer pursuant to Local Rule 7-3 regarding Defendants' intention to file a summary judgment motion. A true and correct copy of the letter is attached hereto as **Exhibit T.**

11. On August 12, 2026, Plaintiffs' counsel sent me an email whereby he indicated he was available to meet and confer on Tuesday, August 12, 2026.

12. Thereafter, on August 12, 2026, I met and conferred telephonically for 14 minutes with Plaintiffs' counsel Eric Valenzuela regarding the relief sought in the instant motion.

13. As to Counts One through Three, I discussed in detail with Plaintiffs' counsel the defense's position that there was no Constitutional violation and that the Officer Defendants' conduct was reasonable and that these claims should be dismissed because Plaintiffs are unable to carry their burden as to these three claims. Finally, as to Counts Four through Six, I explained the defense's position that these claims should also be dismissed because Plaintiffs have failed to carry their burden as to these three state law claims as well. Plaintiffs were unwilling to dismiss Counts One, Three, Four, Five, and Six in their entirety.

14. However, Plaintiffs' counsel did inform me he would consider dismissing the denial of medical care claim (Count Two) after conducting a conversation with co-counsel.

15. Thereafter, on August 24, 2026, Plaintiffs' counsel emailed defense indicating that Plaintiffs agreed to dismiss the denial of medical care claim (Count Two).

16. Attached hereto as **Exhibit U** is a photograph of the area around Diaz's vehicle taken on the day of the incident. Circled in red is blood.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed this 28th day of August, 2026, at Fullerton, California.

Ryan M. Allein

# EXHIBIT "B"

December 2, 2024:

[000_CONS4 16:35:23]

(No sound)

[8_PD_911_0618_T3 16:41:00]

Call Taker
Officer LaLonde: Torrance 911.

Caller: Yeah, there's a man with a gun at 2909 Oregon Court.

Officer LaLonde: There's a what?

Caller: Man with a gun.

Officer LaLonde: There's a man with a gun at 2909 Oregon Court?

Caller: Yeah.

Officer LaLonde: Where's he at? Inside the business, outside the business? To the rear?

Caller: Outside the business. It's me.

Officer LaLonde: He's what?

Caller: It's me.

Officer LaLonde: You have a gun?

Caller: Yeah.

Officer LaLonde: Okay, well what's going on, man?

Caller: Aahhh, I'm gonna shoot somebody, I'm gonna stab somebody.

Officer LaLonde: How come? What's going on? Why do you want to?

Caller: [HANGS UP]

[006_CONS4 16:42:20]

Dispatcher 1: (Outgoing call. No answer)

[5_CONS4_2024 16:44:06]

Dispatcher 1: (Outgoing call. No answer)

[7_CONS4 16:46:36]

Dispatcher 1 Lindner: (Outgoing call. No answer, forwards to voicemail)

[001_NEW_PD1_Trunked 16:41:46]

Dispatcher 1 Lindner: Torrance to 9A23.

[002_NEW_PD1_Trunked 16:41:51]

Officer Bermudez: 9-Adam-23.

Dispatcher 1 Lindner: 9-Adam-23, 925 circs 2909 Oregon Court. RP states there is a man with a gun. States he wants to shoot someone. We have one caller only.

[003_NEW_PD1_Trunked 16:42:06]

Officer Bermudez: 9-Adam-23, copy from Hawthorne and Fashion

[004_NEW_PD1_Trunked 16:42:12]

Dispatcher 1 Lindner: The line is disconnected. We're attempting a twenty-one.

[005_NEW_PD1_Trunked 16:42:19]

Dispatcher 1 Lindner: Torrance, to 9-Adam-26 [unintelligible]

[007_NEW_PD1_Trunked 16:42:23]

Officer Castillo: 9-Adam-23, can we get a drone up?

Dispatcher 1 Lindner: 10-4, Torrance 9-Drone-1.

[008_NEW_PD1_Trunked 16:42:39]

Officer: [unintelligible] copy, we'll be going shortly [unintelligible].

Dispatcher 1 Lindner: 10-4. Torrance to 9-Drone-1.

Officer: Drone-1.

Dispatcher 1 Lindner: Can you assist on 9-Adam-23's call, the 925 Circs at 2909 Oregon Court?

[009_NEW_PD1_Trunked 16:42:55]

Officer: Okay, I'm sending it now.

Dispatcher 1 Lindner: 10-4.

[010_NEW_PD1_Trunked 16:43:11]

Officer Bermudez: 9-Adam-23, we'll take any additional unit to assist.

Dispatcher 1 Lindner: 10-4, Torrance to 9-Adam-21.

Officer Choi: Two one en route.

[011_NEW_PD1_Trunked 16:43:26]

Officer Wissler: Adam-24. Clear us, see report and we'll be en route to the last on Oregon Court.

Dispatcher 1 Lindner: 10-4.

[012_NEW_PD1_Trunked 16:43:46]

Dispatcher 1 Lindner: Units responding to Oregon Court. Rapid deploy shows the phone in the middle of Oregon Court just east of Maple.

[013_NEW_PD1_Trunked 16:43:59]

Dispatcher 1 Lindner: When the call taker calls back, the male answered and then hung up on the call taker again.

[014_CONS4 16:44:06]

Call Taker Officer LaLonde: [phone ringing – no answer]

Male subject: Hello?

Call Taker Officer LaLonde: What's going on, man? How come you hung up?

[MALE SUBJECT HANGS UP PHONE]

[015_NEW_PD1_Trunked 16:44:29]

Dispatcher 1 We are attempting additional 21's.

Lindner:

[016_NEW_PD1_Trunked 16:44:47]

Officer Castillo: 23 to Drone 1, once you guys are up can you give us the best way to approach that area. In case you guys find the subject in that intersection.

[017_NEW_PD1_Trunked 16:44:58]

Officer Clark: Drone-1 we copy, we're going over there now. I'll let you know.

[018_NEW_PD1_Trunked 16:45:31]

Dispatcher 2 Labon: To units on Oregon Court, per First Two, a—the phone could possibly belong to a Leonardo or Leo Diaz.

[019_NEW_PD1_Trunked 16:45:52]

Officer Wissler: Adam 24 97

Dispatcher 1 Lindner: 10-4, 24.

[020_NEW_PD1_Trunked 16:46:10]

Officer Clark: Drone 1 to the units responding there is no one in the street at that intersection coming off of Maple were checking the interior of the parking lot now.

[021_NEW_PD1_Trunked 16:46:21]

Officer Wissler: Adam 24, 10-4.

Dispatcher 1 Lindner: Torrance to 9Drone-1 check your work cell.

[022_NEW_PD1_Trunked 16:46:31]

Officer Clark: Drone 1, copy.

Dispatcher 2 Labon: The phone number is in local to a Leonardo Diaz, 34 year old Hispanic male, 6”1’, 285, brown over black, black over brown.

[023_CONS4 16:46:36]

Call Taker Officer LaLonde: [outgoing call – no answer. Forwards to voicemail]

[024_NEW_PD_Trunked 16:46:52]

Officer Clark: Drone 1 as we were going overhead, there was a subject riding a bike northbound Maple from that intersection. I’m not sure if he’s related or not.

[025_NEW_PD1_Trunked 16:47:02]

Dispatcher 1 Lindner: 10-4, Drone-1, copy. The subject is riding his bike northbound Maple from the intersection unknown if related.

[026_NEW_PD1_Trunked 16:47:13]

Officer Garcia: Adam 24 we have driven past that subject as well there’s another subject riding southbound. Does not appear related.

[027_NEW_PD1_Trunked 16:47:21]

Dispatcher 1 Lindner: 10-4, 24 does not appear related.

[028_NEW_PD1_Trunked 16:48:08]

Officer Bermudez: 23 97.

Dispatcher 1 Lindner: 10-4, 23. The phone is still—Rapid Deploy is still showing the phone on Oregon Court.

[029_NEW_PD1_Trunked 16:48:27]

Officer Wissler: 24, 28-29-77-William-Boy-237.

[030_NEW_PD1_Trunked 16:48:34]

Dispatcher 1 Lindner: 10-4, 77-William-Boy-237.

[031_NEW_PD1_Trunked 16:48:47]

Officer Garcia: 24 that's going to be a green Dodge Charger that's parked on Oregon Court just east of Maple and there's a Hispanic male adult sitting in the driver's seat.

[032_NEW_PD1_Trunked 16:48:57]

Dispatcher 1 Lindner: 10-4, just east of Maple on Oregon Court. Hispanic male adult sitting in the driver's seat in a green Dodge Charger.

[033_NEW_PD1_Trunked 16:49:09]

Dispatcher 2 Labon: What's the state for that license plate?

[034_NEW_PD1_Trunked 16:49:16]

Officer Wissler: 24, it's going to be a California plate.

Dispatcher 2 Labon: Could be 7-Zebra?

[035_NEW_PD1_Trunked 16:49:24]

Officer Wissler: 24 possibly.

[036_NEW_PD1_Trunked 16:49:31]

Officer Wissler: 23, it is a Zebra. 7-Zebra.

Dispatch 2 Labon: 7ZWB237 expired July 24 on a 12 Dodge to a Sylvia Sandoval on 108th street in Inglewood.

[037_NEW_PD1_Trunked 16:50:01]

Officer Clark: Drone 1 do we have anything on Local for the return on that subscriber for the cell phone?

Dispatcher 2 Labon: I'm checking it. It appears that he was involved in a 459. I'm trying to see how—reading the incident.

[038_NEW_PD1_Trunked 16:50:15]

Officer Clark: Drone copy. Thank you.

[039_NEW_PD1_Tr-unked 16:51:38]

Officer Bermudez: 9-Adam 23, we're checking the rear of 2909 Oregon Court.

Dispatcher 1 Lindner: 10-4 23. Checking the rear of 2909 Oregon Court.

Dispatcher 1 Lindner: It appears the subject Leonardo Diaz possible works at the Apollo Scooters at 2909 Oregon Court.

[040_NEW_PD1_Trunked 16:52:01]

Officer Clark: Drone 1 copy. Do you have a responsible phone number for the business?

Dispatcher 1 Lindner: Standby.

[041_NEW_PD1_Trunked 16:52:14]

Officer Bermudez: 9-Adam 23, what's the unit number? There's multiple businesses at that location.

[042_NEW_PD1_Trunked 16:52:32]

Dispatcher 2 Labon: Should be C5. C-Charles-5.

[043_NEW_PD1_Trunked 16:52:38]

Officer Bermudez: 9 Adam 23, thank you.

[044_NEW_PD1_Trunked 16:52:52]

Dispatcher 1 Lindner: Units out on Oregon Court monitor your 21 for a photo.

[045_NEW_PD1_Trunked 16:53:00]

Dispatcher 2 Labon: In a previous report, the manager for Apollo Scooters, is a Dale-Juan-P-William-Adam-Nora-Tom-Edward. Diaz works there as a repair tech.

[046_NEW_PD1_Trunked 16:53:17]

Officer Wissler: Adam-24. We'll be out in front of 2090-C5, on Oregon Court.

[047_NEW_PD1_Trunked 16:53:27]

Dispatcher 1 Lindner: 10-4, confirming. 2090?

[048_NEW_PD1_Trunked 16:53:31]

Officer Wissler: 2909.

Dispatcher 1 Lindner: 10-4. It's 2909 Oregon Court, C-Charles-5.

[049_NEW_PD1_Trunked 16:53:52]

Officer Castillo: 23. I'm talking to the business owner at C9. He's saying that scooter shop, C5, actually moved out about a week ago. Break.

[050_NEW_PD1_Trunked 16:54:05]

Officer Castillo: 23, We advise on the rear door. Locked and secured. We don't see a subject out.

[051_NEW_PD1_Trunked 16:54:14]

Dispatcher 1 Lindner: 10-4. Speaking with the people at C9. The scooter shop moved out a week ago. As on the rear door, it appears locked and secured.

[052_NEW_PD1_Trunked 16:54:24]

Officer Wissler: Adam-24. We're out in the front and it looks locked, as well.

Dispatcher 1: 10-4, 24. The front door is locked, as well.

[053_NEW_PD1_Trunked 16:54:32]

Officer Wissler: 24. It also appears to look vacant.

Dispatcher 1 Lindner: 10-4. It appears vacant.

Officer Clark: Drone 1, to the units on Oregon Court. That green Charger, the door is now ajar on the driver's side. It's not open, but it's ajar.

[054_NEW_PD1_Trunked 16:54:50]

Officer Garcia: 24 copy. Yeah, maybe something has the door. It was partially ajar when we first pulled up. I've seen that Charger regularly driving through the city.

[055_NEW_PD1_Trunked 16:55:08]

Officer Garcia: 24, He might be worth talking to and see if it's our guy.

[056_NEW_PD1_Trunked 16:56:31]

Officer Clark: Drone 1, have we tried to get 21 back to the subject?

Dispatcher 1 Lindner: We've tried several. No answer.

[057_CONS4 16:56:41]

Officer LaLonde: [Outgoing call – no answer. Forwards to voicemail.]

[058_NEW_PD1_Trunked 16:56:43]

Officer Clark: Drone 1, copy. Can we possibly call the responsible for that old scooter shop and see if he knows why the subject would be in the area?

[059_NEW_PD1_Trunked 16:56:52]

Dispatcher 1 Lindner: 10-4.

[060_CONS4 16:58:01]

Officer LaLonge: [Outgoing call – no answer]

[061_NEW_PD1_Trunked 16:58:34]

Officer Castillo: 23 we're going to try and make contact with the driver. Adam-24 is going to be the one making the initial contact.

Dispatcher 1 Lindner: 10-4. Attempting to make contact with the driver of the green Dodge.

[062_NEW_PD1_Trunked 16:59:13]

Officer: 23, [unintelligible] the driver keeps messing around with the door and not opening it.

Dispatcher 1 LaLonde: 10-4. Driver keeps messing around with the door and not opening it.

[063_NEW_PD1_Trunked 17:00:31]

Officer: He's got an eye on it. (Echoing)

[064_NEW_PD1_Trunked 17:00:40]

Officer Castillo: 9A23- Turn this into a backup. The subject has a knife and he's bleeding from his wrist and we'll take TFD for staging.

Dispatcher 1 Lindner: Subject has a knife, bleeding from the wrist. Requests TFD.

(Beeping)

[065_NEW_PD1_Trunked 17:00:53]

Officer Garcia: 24 can you get us less lethal.

[066_NEW_PD1_Trunked 17:00:58]

Dispatcher 1 Lindner: 10-4. Someone with less lethal.

[067_NEW_PD1_Trunked 17:01:01]

Officer Clark: Drone 1. He's exiting with the knife in his hand.

Dispatcher 1 Lindner: 10-4. Subject exiting (Cut off).

[068_NEW_PD1_Trunked 17:01:07]

Dispatcher 1 Lindner: Subject exiting with knife in his hand.

[069_NEW_PD1_Trunked 17:01:10]

(Beeping)

[070_NEW_PD1_Trunked 17:01:20]

Officer: 23 shots fired.

Dispatcher 1 Lindner: Shots fired.

[071_NEW_PD1_Trunked 17:01:28]

Officer Castillo: 23, shots fired. Officer needs help. We're going to need a couple of units out here to start off the traffic control. Guns are still facing westbound. All the units are attempting to contact the subject now.

Dispatcher 1 Lindner: Shots fired. Officer needs help. Guns are facing westbound. Torrance to the 9-Sam 20 and 9 Sam 25.

[072_NEW_PD1_Trunked 17:01:46]

Sgt Stiller: 20, I copy. En route code.

[073_NEW_PD1_Trunked 17:01:49]

Officer Clark: Drone 1. Correction on that, guns are facing eastbound.

[074_NEW_PD1_Trunked 17:02:00]

Officer Choi: 21 we will take a shield as well.

Dispatcher 1 Lindner: 10-4. Units need a shield.

[075_NEW_PD1_Trunked 17:02:10]

(beeping)

[076_NEW_PD1_Trunked 17:02:20]

(beeping)

[077_CONS4 17:02:27]

Officer LaLonde: Hey, Redondo.

Redondo PD: Hey, what do you guys have going on?

Call Taker Officer LaLonde: Some guy called us and said he had a gun. Long story short, he said man with a gun, then he said it was him, said he wants to shoot somebody. Our guys just located him. Looks like he came out of the car with a knife, bleeding from the wrist. We got in a shooting, so. Yeah, it looks like he's probably down. It looks like they're approaching him now. It doesn't look like there's anyone outstanding.

Redondo PD: [unintelligible]

Officer LaLonde: Yeah, yeah, no. It looks like it's going to be isolated right there.

Redondo PD: Where's the location at?

Officer LaLonde: 2909 Oregon Court. So, Oregon Court, just east of Maple Avenue.

Redondo PD: I got it, okay. Sounds good. Thanks a lot.

Officer LaLonde: Yeah, thanks man. Bye.

[078_NEW_PD1_Trunked 17:02:30]

(beeping)

[079_NEW_PD1_Trunked 17:02:40]

(beeping)

[080_TOR_FD_1__P25 17:02:44]

(beeping)

[081_NEW_PD1_Trunked 17:02:50]

(beeping)

[082_TOR_FD_1__P25 17:02:50]

Automated: Engine 91, Rescue 93, Battalion 91, BLS 93. Gunshot wound, 2909 Oregon. Ma page 122.

[083_NEW_PD1_Trunked 17:03:00]

(beeping)

[084_NEW_PD1_Trunked 17:03:10]

(beeping)

[085_TOR_FD_1__P25 17:03:13]

Firefighter : Torrance Rescue 91 is available. We got a call [unintelligible].

Dispatcher: [unintelligible] 91 copy, 93 cancel

[086_NEW_PD1_Trunked 17:03:20]

(beeping)

[087_NEW_PD1_Trunked 17:03:30]

(beeping)

[088_TOR_FD_1__P25 17:03:31]

(beeping)

[089_TOR_FD_1__P25 17:03:36]

Automated: Rescue 91. Gunshot wound. 2909 Oregon. Mass page 122.

[090_NEW_PD1_Trunked 17:03:40]

Officer Clark: Drone 1. Looks like officers on the scene took the knife away and they're starting lifesaving measures.

Dispatcher 1 Lindner: 10-4. Officers on scene took the knife away, starting lifesaving measures.

Officer: 10-4 and copy.

[091_TOR_FD_1__P25 17:03:47]

Dispatcher: All units out to Oregon Court, please staged. All units are stage for PD.

[092_NEW_PD1_Trunked 17:04:00]

(beeping)

[093_TOR_FD_1__P25 17:04:09]

Dispatcher: Rescue 93 for Torrance confirm you copy you can cancel?

[094_NEW_PD1_Trunked_17:04:10]

(beeping)

[095_NEW_PD1_Trunked 17:04:30]

(beeping)

[096_TOR_FD_1__P25 17:04:30]

Rescue 93: Rescue 92 copy, available.

[097_CONS8 17:04:35]

Call Taker Officer Crofton: Torrance Police Department.

Hermosa PD: Hey Torrance, this is Hermosa.

Officer Crofton: Yes.

Hermosa PD: Do you guys have something going on?

Officer Crofton: What's that?

Hermosa PD: Do you guys have something?

Officer Crofton: We just had shots fired. I'm not sure if it was officer fired or suicide by cop or what happened exactly.

Hermosa PD: Okay, what's the location?

Officer Crofton: 2909 Oregon Court.

Hermosa PD: Okay. Do you have the incident?

Officer Crofton: Incident number is 240045785.

Hermosa PD: Thank you.

Officer Crofton: You got it.

Hermosa PD: [unintelligible]

[098_NEW_PD1_Trunked 17:04:40]

(beeping)

[099_TOR_FD_1__P25 17:04:49]

Fire: Torrance Battalion 91 responding. I copy, staging for PD.

Dispatcher: Copy.

[100_NEW_PD1_Trunked 17:04:50]

(beeping)

[101_NEW_PD1_Trunked 17:04:53]

Officer Castillo: 23, code 4 (echo the word code-4). The vehicle is being cleared. I have a couple of units administering first aid to the subject right now. We're starting compressions.

[102_NEW_PD1_Trunked 17:05:05]

Dispatcher 1 Lindner: 10-4. Code-4, vehicle cleared.

Officer: TFD is clear to roll in.

Dispatcher 1 Lindner: 10-4, 2-1.

Officer: Sam 20, if the next units getting there can set up a perimeter, I would appreciate it. We'll need a crime scene log going as well.

Dispatcher 1 Lindner: 10-4. Torrance to 9A20 and 9A28 when you go 97 start a perimeter. Units need to start a crime log.

[103_TOR_FD_1__P25 17:05:34

Dispatcher 3: Units en route to Oregon Court. PD is clear for you to roll in. PD is clear for you to roll in.

[104_NEW_PD1_Trunked 17:05:39]

Officer Camacho: 20 we copy. Going 97 [unintelligible] See if we can organize this traffic.

Dispatcher 1 Lindner: 10-4

[105_TOR_FD_1__P25 17:05:46]

Fire: [unintelligible] copy. Code 4 at Oregon Court.
[106_NEW_PD1_Trunked 17:05:57]

Officer: 24, confirming TFD is rolling in?

Dispatcher 1 Linder: Affirm.

[107_CONS7_2024 17:06:21]

Call Taker
Off. C. Gonzalez: Good afternoon, Torrance Police.

Female caller: Hi, I'm over here at 340 Maple and Torrance, just down the street, and were going to leave work but we heard gun shots and there are all these police cars right in front of our building.

Off. C. Gonzalez: Yes, Officers were involved but everything is contained. Everything is fine.

Female caller: Ok, so we can go head to our cars and leave.

Off. C. Gonzalez: Correct. As long as you don't walk into where the officers are at everything is fine.

Female Caller: We just want to drive by because you know, that's where are cars are, we have to pass them.

Off. C. Gonzalez: If you do that, I suggest you do it ASAP before they close down the street.

Female Caller: Okay.

Female caller: Okay, thank you.

Off. C. Gonzalez: No problem. By Bye.

[108_NEW_PD1_Trunked 17:06:27]

Officer Wing: Hey, traffic control up there. Let's get that traffic moving so TFD has to use a clear path in.

[109_NEW_PD1_Trunked 17:06:35]

Officer Camacho: A20. We've got Maple and Columbia.

Dispatcher 1 Lindner: 10-4, 20. Covering Maple and Columbia.

Officer Garcia: Adam 24, we need to start setting up some crime tape here and lock this down please. So, can we get responding units to start doing that?

Dispatcher 1 Lindner: Confirm. They've already been told.

[110_CONS8 17:06:41]

Call Taker Officer Crofton: Torrance Police Department.

Gardena PD: It's Gardena. Do you need us anywhere?

Officer Crofton: I don't think so right now. I think we're good for now. We'll—

Gardena PD: What's going on?

Officer Crofton: I think we just had an OIS at 2909 Oregon Court.

Gardena PD: 2909 what?

Officer Crofton: Oregon Court.

Gardena PD: Oregon Court?

Officer Crofton: Yeah.

Gardena PD: Alright.

Officer Crofton: Pretty secluded area. Looks like it's total industrial business area. So—

Gardena PD: Okay.

Officer Crofton: We're going to be good for now.

Gardena PD: Alright, thank you.

Officer Crofton: You got it.

[111_NEW_PD1_Trunked 17:06:55]

Officer Garcia: 24, my apology.

Dispatcher 1 Lindner: 10-4. Just confirming all officers are accounted for?

[112_NEW_PD1_Trunked 17:07:07]

Dispatcher 1 Lindner: Confirming all officers are Code 4 and accounted for.

Officer Wing: 28. All officers are accounted for and Code 4.

Dispatcher Lindner: 10-4. Thank you 24.

[113_NEW_PD1_Trunked 17:07:22]

Officer: Confirming TFD en route?

Dispatcher 1 Lindner: Affirm.

[114_NEW_PD1_Trunked 17:07:46]

Officer: TFD is 97.

Dispatcher 1 Lindner: 10-4, TFD is 97.

[115_TOR_FD_1__P25 17:08:11]

Fire Fighter: Hey, Engine 91, can you pull around and come down to Oregon Court? I'm coming by.

[116_NEW_PD1_Trunked 17:08:16]

Sgt. Stiller: Sam 20 97.

Dispatcher 1 Linder: 10-4, 9 Sam 20

[117_CONS8 17:08:23]

Call Taker Officer Crofton: Torrance Police Department.

Female Caller: Hey Torrance, its South Bay. Do you guys need assistance on that shots fired call?

Officer Crofton: I don't think we need assistance right now. Everything—I think it was an OIS and I think we've got it contained right now, but I'll let you know.

Female Caller: Okay, thank you.

Officer Crofton: Okay.

[118_CONS4 17:08:38]

(phone ringing)

Call Taker Officer LaLonde: I'm going to call ICC and tell them, hey we're code 4.
Yeah, I'll just tell all of our CCs.

Dispatcher 4: Police Dispatch, can I help you?

Officer LaLonde: Hey, it's Officer LaLonde from Torrance.

Dispatcher 4: I'm sorry, is this regarding the 2909 Oregon Court?

Officer LaLonde: Yeah, I know—I think one of you guys just called over here?

Dispatcher 4: Yes.

Officer LaLonde: If you could let all of South Bay know we're Code 4. There is one person down. It's not our officers. Everyone is okay.

Dispatcher 4: Got it, I'll let them know. Thank you so much.

Officer LaLonde: Appreciate it. Bye.

Dispatcher 4: Bye.

[119_NEW_PD1_Trunked 17:10:17]

Officer Okazaki: [unintelligible] Okazaki to Salas

Officer Salas: Go ahead.

Officer Okazaki: I'm trying to get these people out of here. With the ambulance in the way, they can't get out. [unintelligible]

[120_NEW_PD1_Trunked 17:10:32]

Officer Salas: [unintelligible]

[121_TOR_FD_1__P25 17:11:15]

Fire: Rescue 93. We need back into Oregon Court.

[122_TOR_FD_1__P25 17:11:23]

Fire: [unintelligible] copy.

[123_NEW_PD1_Trunked 17:13:10]

Officer: A26 conducting safety sweep at 326 Maple.

Dispatcher 1 Lindner: 10-4. Conducting a safety sweep at 326 Maple.

[124_NEW_PD1_Trunked 17:14:15]

Watch Commander Lt. Moreno: W21, show me out on Oregon Court

Dispatcher 1 Linder: 10-4, 9W21.

[125_NEW_PD1_Trunked 17:14:54]

Officer: 26. Code 4, on Maple.

Dispatcher Linder: 10-4, 26. Code 4, Maple.

[126_NEW_PD1_Trunked 17:16:07]

Officer Wing: 28 Torrance, TFD pronounced at 1715 hours.

[127_NEW_PD1_Trunked 17:16:13]

Dispatcher 1 Lindner: 10-4, TFD pronounced at 1715 hours.

[128_NEW_PD1_Trunked 17:16:19]

Officer Guell: 28, Paramedic Odien. O-D-I-E-N.

Dispatcher 1 Lindner: 10-4, Paramedic Odien.

[129_NEW_PD1_Trunked 17:16:48]

Sgt. Stiller: Sam-20 Torrance?

Dispatcher: Sam 20 go ahead.

Sgt. Stiller: Sam-20. I realize most people are already here but if there's anybody on their way from the station, if they can grab the barriers that would be fantastic. We're going to have to eventually make an area for people in the cul-de-sac to egress, because there's no way out other than where we are.

[130_NEW_PD1_Trunked 17:17:12]

Dispatcher 1 Lindner: All units are already on the scene. I have no one responding.

Sgt. Stiller: Sam 20. Okay, we'll figure it out. Thank you.

Dispatcher 1 Lindner: 10-4.

Officer Clark: Drone 1, we're at the station. If we can grab those barriers for you guys we can. We just need to know where they're located.

[131_NEW_PD1_Trunked 17:17:32]

Officer Clark: Drone 1, we're here at the intersection. Just come up where the police cars are.

[132_NEW_PD1_Trunked 17:17:46]

Officer Salas: 29. Northern outer perimeter is going to be Del Amo and Maple.

Dispatcher 1 Lindner: 10-4. Northern outer perimeter, Del Amo and Maple.

[133_NEW_PD1_Trunked 17:18:04]

Officer Salas: 29. Inner perimeter, Northern, will be 316 Maple.

[134_NEW_PD1_Trunked 17:18:11]

Dispatcher 1 Lindner: 10-4. Inner Northern perimeter, 316 Maple.

[135_NEW_PD1_Trunked 17:18:31]

Officer Camacho: A20 to all units. We've got media showing up. They're starting at Columbia and Maple.

[136_NEW_PD1_Trunked 17:18:40]

Dispatcher 1 Lindner: Code 20 on scene, Columbia and Maple.

[137_NEW_PD1_Trunked 17:19:47]

Officer Saldivar: 26 searching 2909 Unit A-Adam.

Dispatcher 1 Lindner: 10-4, 2909. Unit A-Adam.

[138_NEW_PD1_Trunked 17:20:35]

(Static)

[139_NEW_PD1_Trunked 17:20:42]

Dispatcher 1 Lindner: 10-4, 9-Adam-16.

[140_NEW_PD1_Trunked 17:21:06]

Officer Clark: Drone 1. Sending Sam units.

[141_NEW_PD1_Trunked 17:21:17]

Officer: 21 what do you need Drone 1?

[142_NEW_PD1_Trunked 17:21:22]

Clark: Drone 1. We're coming around with those barriers at the station to bring them over.

[143_NEW_PD1_Trunked 17:21:28]

Officer: Standby.

[144_NEW_PD1_Trunked 17:21:33]

Officer: Charles 2 is out on Oregon.

Officer: 10-4 Charles 2.

[145_NEW_PD1_Trunked 17:21:53]

Watch Commander Lt. Moreno: 9W21 to Torrance.

[146_NEW_PD1_Trunked 17:21:55]

Dispatcher 1 Lindner: 9W21.

[147_NEW_PD1_Trunked 17:21:58]

Watch Commander Lt. Moreno: Can you have FIS respond here with some body barriers.

Dispatcher 1 Lindner: 10-4, Torrance to 9Edward18

[148_NEW_PD1_Trunked 17:22:10]

FIS Williams: Edward 18

[149_NEW_PD1_Trunked 17:22:13]

Dispatcher 1 Lindner: They need somebody barriers at 2909 Oregon Court.

[150_NEW_PD1_Trunked 17:22:24]

Watch Commander Lt. Moreno: William 21, I'll be notifying detective callout.

Dispatcher 1 Lindner: 10-4, detective callout.

[151_NEW_PD1_Trunked 17:22:32]

FIS Williams: Edward 18, 10-4

[152_NEW_PD1_Trunked 17:22:38]

Sgt. Salary: Sam10. Can you set up a command post at 375 Maple?

[153_NEW_PD1_Trunked 17:22:44]

Dispatcher 1 Lindner: 10-4. Command post will be at 375 Maple.

[154_NEW_PD1_Trunked 17:22:50]

Officer: C1 to Drone 1. The location of the barriers are unknown right now. The last time I saw them they were in the Sergeant's office, if you can access that. I think we have blockers in there.

[155_NEW_PD1_Trunked 17:23:05]

Officer Clark: Drone 1 copy, I believe the Edward unit is bringing them over right now. Do we need those ones from the Sergeant's office, as well?

[156_NEW_PD1_Trunked 17:23:15]

Officer: Standby. We'll assess it once they get here, I guess.

[157_NEW_PD1_Trunked 17:23:26]

Officer Clark: Drone 1, I copy.

[158_CONS4 17:23:41]

Call Taker
Officer LaLonde: Torrance Police.

Lt. Harris: Hey, it's Ron Harris.

Officer LaLonde: Hey, sir. Eddie LaLonde, how are you?

Lt. Harris: Hey, sir. Who are the sergeants working?

Officer LaLonde: The sergeants right now are, I believe, Stiller and Ron Salary. I'll double check for you. Ron Salary is Sam-25 and Stiller is Sam-20.

Lt. Harris: Okay, thanks.

Officer LaLonde: Yep, bye.

[159_NEW_PD1_Trunked 17:29:23]

Officer: 2909, A-Adam, B-Borden, C-Charles code 4.

[160_NEW_PD1_Trunked 17:29:31]

Dispatcher 1 Lindner: 10-4. 2909, A-Adam and C-Charles checked code 4.

[161_NEW_PD1_Trunked 17:30:34]

Sgt. Salary: Sam-10. Can you draw a second DR for the OIS for this incident? We need two DR's. One for the initial call and the other one for the OIS.

Dispatcher 1 Lindner: 10-4

[162_NEW_PD1_Trunked 17:30:49]

(static)

[163_NEW_PD1_Trunked 17:30:54]

Officer Wing: 28 Torrance, was our male subject identified?

[164_NEW_PD1_Trunked 17:31:00]

Dispatcher 1 Lindner: We reversed the phone number that he was dialing in from and it did come up with who the phone was registered to.

Officer Wing: 10-4, thank you. TFD further take a look.

Dispatcher 1 Lindner: 10-4, and you were sent a photo.

[165_NEW_PD1_Trunked 17:31:23]

Officer Guell: 28 Torrance, we have a [unintelligible] 97. Can you see if forensics has an EZ up that they can bring out, as well, the barriers?

Dispatcher 1 Lindner: 10-4.

[166_NEW_PD1_Trunked 17:31:37]

Dispatcher 1 Lindner: Torrance to 9-Edward-18.

[167_NEW_PD1_Trunked 17:31:40]

FIS Williams: Edward-18.

Dispatcher 1 Lindner: Do you have an ETA?

[168_NEW_PD1_Trunked 17:31:46]

FIS Williams: Edward-18. Less than five minutes.

Dispatcher 1 Lindner: 10-4.

[169_NEW_PD1_Trunked 17:31:55]

Dispatcher 2 Labon: Edward 18, do you also have an Easy up?

[170_NEW_PD1_Trunked 17:32:03]

FIS Williams: Edward-18. Can you 10-9?

Dispatcher 2 Labon: Do you have a pop-up tent?

[171_NEW_PD1_Trunked 17:32:10]

FIS Williams: Edward-18. Affirmative.

[172_NEW_PD1_Trunked 17:32:13]

Dispatcher 2 Labon: 10-4.

Sgt. Stiller: Sam20, copy. Thank you for asking. That would be great if they could bring that, as well.

[173_NEW_PD1_Trunked 17:36:06]

Officer Salas: Salas to Marquez, were going to be sending the rest of the traffic traveling northbound Maple.

[174_NEW_PD1_Trunked 17:36:16]

Officer Marquez: Copy

[175_NEW_PD1_Trunked 17:36:45]

Officer: [unintelligible] If we could also notify the city to get some signs and barricades to block southbound lanes at Del Amo and Maple.

Dispatcher 1 Lindner: 10-4.

[176_CONS4 17:37:38]

(phone ringing)

Male voice: Hello.

Officer LaLonde: Hey, is this Tony?

Male voice: Yeah.

Officer LaLonde: Hey sir, it’s Officer LaLonde from Torrance, how are you?

Male voice: Oh, fine. What’s going on?

Officer LaLonde: Not much. Hey, sorry to bother you. So, we just had an officer involved shooting. So, I’m going to need some sign boards and barricades to block some traffic.

Male voice: Where at?

Officer LaLonde: So, the shooting is basically at Oregon Court and Maple.

Male voice: Oh, okay.

Officer LaLonde: But I’m going to need the left turn pocket westbound Del Amo to southbound Maple shut down. And then, I think, once you get there they’ll probably direct you to some other—because we’ll probably need northbound Maple shut down as well, at Columbia. I think that’s where they have it. So, if you guys wouldn’t mind, I would appreciate it.

Male voice: Okay, I’ll get some people out there.

Officer LaLonde: Appreciate it. Thank you, sir.

Male voice: Alright.

Officer LaLonde: Bye.

[177_NEW_PD1_Trunked 17:38:39]

Dispatcher 1 Lindner: Torrance 914N for sign boards.

[178_NEW_PD1_Trunked 17:38:43]

Officer: [unintelligible] thank you.

[179_NEW_PD1_Trunked 17:38:57]

FIS Martelli: Edward 17 and Edward 18 are 97.

Dispatcher 1 Lindner: 10-4.

[180_NEW_PD1_Trunked 17:46:21]

FIS Martello: Edward Units will be 10-19

[181_NEW_PD1_Trunked 17:46:24]

Dispatcher 1 Lindner: 10-4.

[182_CONS8 17:48:32]

Officer Crofton: Communications, Crofton.

Det. Sola: Hey Keith, it’s Sola. Can I talk to Eddie, please?

Officer Crofton: Okay, one sec.

[183_CONS4 17:48:47]

Officer LaLonde: What’s up, buddy?

Officer: Hey, well Lindsey said you have a bunch of info. What—what’s the deal?

Officer LaLonde: So, long story short, dude calls 911. Says hey, there’s a man with a gun. I’m like okay, where’s he at? He says 2909 Oregon Court. I’m like okay, how do you know this? What does he look like? He says, well, it’s me. And I’m like, oh, okay. I’m like why do you have a gun, where are

you at, what's going on? He's like, I want to shoot somebody. I'm like, okay, tell me where you're at and then he hung up. So, I tried calling back, nothing. The wonderful police work that we have going on now, unit goes—so I'm looking at Rapid Deploy. I can see where the phone is pinging at, and it's not pinging at the address he says, but he's showing like on Oregon Court itself. Units go 97, they put out a plate, they put out a vehicle description and they roll right by it. They go and check the business. Hey, we're Code 4, basically. They come back to the car because the drone unit is like, hey the driver's side door is open to that car now. They said, "Yeah, no, it was open when we went by originally. I seen that car before. It's here all the time." And then hey, we're going to contact one. And then hey, dude's uncooperative, he's got a knife, cut his wrist and shots fired. So.

Det. Sola: Okay.

Officer LaLonde: So, I've got what looks like probably the guy who is the deceased. I think we've got him ID'd. He's in Local with a phone number. I just pulled up a photo of him and shot it to the guys in case he's out on foot. And Wing says hey, looks like that's probably the guy's name. His name is Leonardo Diaz.

Det. Sola: What is he in Local for?

Officer LaLonde: It just says an IP. Involved person on an attempt burg and a 459 over off of Oregon Court. So, where he apparently used to work, so, yeah. Super strange. Just a heavier set. He's got a couple priors, nothing crazy. He's got two prior felony bookings, no convictions. But just some minor bullshit stuff, so, yeah, who knows.

Det. Sola: Alright, and everybody's okay?

Officer LaLonde: Yeah, everybody is good. Everybody is good except for him.

Det. Sola: Okay, and he's at HGH?

Officer LaLonde: No, I think he's still there. Yeah, he's still there.

Det. Sola: Oh, he's still there?

Officer LaLonde: Yeah, they pronounced there.

Det. Sola: Okay.

Officer LaLonde: Cool.

Det. Sola: Alright. (laughing)

Officer LaLonde: I know. So, we're very fortunate, dude. We're very fortunate that he didn't have a fucking gun. Because he would have ambushed them, 100 percent. So—

Det. Sola: Absolutely.

Officer LaLonde: It's fucking disgusting, man. I mean, I sent them photos of like where the phone was. I told them where he fucking was and they fucking—they put out the plate and fucking rolled right by him. Didn't even bother to contact, man. So stupid. So, anyway, I'll shoot you—I'll shoot you the info I got with the dude so that you can. Wing it looks like the guy.

Det. Sola: Okay, could you just email it to me. I'm literally pulling into the parking lot. I'll be pulling in in one minute.

Officer LaLonde: Sounds good.

Det. Sola: Once this idiot in front of me turns.

Officer LaLonde: Okay, sounds good, buddy.

Det. Sola: Alright.

Officer LaLonde: Alright, later, bye.

[184_NEW_PD1_Trunked 17:49:43]

Sgt. Stiller: Sam 20 Torrance?

[185_NEW_PD1_Trunked 17:49:45]

Dispatcher 1 Linder: Sam 20?

Sgt. Stiller: Sam 20, has anybody asked for sign boards yet?

[186_NEW_PD1_Trunked 17:49:51]

Dispatcher 1 Lindner: Affirm.

[187_NEW_PD1_Trunked 17:49:54]

Sgt. Stiller: Thank you.

Dispatcher 1 Linder: 10-4

[188_NEW_PD1_Trunked 17:50:01]

Dispatcher Labon: [unintelligible]

[189_NEW_PD1_Trunked 17:54:57]

Sgt. Salary: Sam 10, can you conduct a roll call for Oregon Court?

Dispatcher 1 Lindner: 10-4, 9 Sam 25, standby. Torrance to Torrance units standby for roll call.

[190_NEW_PD1_Trunked 17:55:10]

Dispatcher 1 Lindner: Torrance 9-Adam-16, your 20?

Officer Alvarez: 16, in the inner perimeter.

[191_NEW_PD1_Trunked 17:55:18]

Dispatcher 1 Lindner: 10-4. 9-Adam-16 inner perimeter. Torrance 9-Adam-20?

[192_NEW_PD1_Trunked 17:55:27]

Dispatcher 1 Lindner: Torrance 9-Adam-20?

[193_NEW_PD1_Trunked 17:55:30]

Officer Camacho: 20.

Dispatcher 1 Lindner: Your 10-20 please.

Officer Camacho: 20, we are at Columbia and Maple.

Dispatcher 1 Lindner: 10-4. Columbia and Maple. Torrance 9-Adam-21?

[194_NEW_PD1_Trunked 17:55:43]

Officer Choi: 21, the location of the shooting.

Dispatcher 1 Lindner: 10-4. 2909 Oregon Court. Torrance 9-Adam-23?

[195_NEW_PD1_Trunked 17:55:56]

Officer Wing: 28 to Torrance. 23 will be involved.

Dispatcher 1 Lindner: 10-4. Torrance [unintelligible].

[196_NEW_PD1_Trunked 17:56:03]

Officer Wissler: Both 23 and 24, um both partners are at the station.

Dispatcher 1 Lindner: 10-4. 23 and 24 at the station. 9-Adam-26, your 20?

[197_NEW_PD1_Trunked 17:56:13]

Officer: 26, Maple Oregon.

Dispatcher 1 Lindner: 10-4. 26 Maple and Oregon. Torrance 9-Adam-28?

[198_NEW_PD1_Trunked 17:56:21]

Officer Wing: 28, Maple and Oregon. Crime scene log.

Dispatcher 1 Lindner: 10-4, 28. Maple and Oregon. Crime scene log. Torrance 1-Adam-29?

[199_NEW_PD1_Trunked 17:56:30]

Officer Okazaki: Maple and Oregon Court. Traffic control.

Dispatcher: 10-4. Maple and Oregon Court. Traffic control. Torrance 9-Zebra-18?

[200_NEW_PD1_Trunked 17:56:39]

Dispatcher 1 Lindner: 9-Zebra-1?

[201_NEW_PD1_Trunked 17:56:47]

Dispatcher: Torrance 9-Zebra-1, should be Officer Lassak.

[202_NEW_PD1_Trunked 17:56:54]

Officer Wing: 28. I believe he is with 23 and 24 on Oregon Court.

Dispatcher 1 Lindner: 10-4

Officer: That's where he is.

Dispatcher 1 Lindner: 10-4. Torrance to 9-Zebra-2?

[203_NEW_PD1_Trunked 17:57:15]

Dispatcher 1 Lindner: Torrance to 9-Zebra-2.

Officer Marquez: Zebra-2. Traffic control.

Dispatcher 1 Lindner: 10-4. Maple and Del Amo for traffic control. Torrance to 9-Sam-20.

[204_NEW_PD1_Trunked 17:57:33]

Officer Wing: Adam-28. He is on the inner perimeter of Maple and Oregon Court. He's on the phone right now.

Dispatcher 1 Lindner: 10-4. Inner perimeter Maple and Oregon Court. Torrance to 9 Sam-25?

Sgt. Salary: 9 Sam 25 at the CP.

Dispatcher 1 Lindner: 10-4. 9 Sam 25 at the CP 375 Maple Court. Torrance to 9-William-21.

[205_NEW_PD1_Trunked 17:57:54]

Lt. Moreno: William 21 Command Post.

[206_NEW_PD1_Trunked 17:57:57]

Dispatcher 1 Lindner: 10-4. 9-William-21, command post, 375 Maple Court. Torrance to Charles 2.

[207_NEW_PD1_Trunked 17:58:10]

Dispatcher 1 Lindner: Please confirm your CP, 375 Maple.

[208_NEW_PD1_Trunked 17:58:18]

Dispatcher: CS to Drone 1.

[209_NEW_PD1_Trunked 17:58:24]

Clark: Drone 1, station, home.

Dispatcher 1 Lindner: 10-4.

[210_NEW_PD1_Trunked 17:58:27]

Dispatcher 1: Lindner: Roll call complete.

[211_NEW_PD1_Trunked 17:58:31]

Sgt. Salary: Sam-25 copy. Thank you.

Dispatcher: 10-4.

[212_NEW_PD1_Trunked 18:04:16]

Officer Marquez: Zebra 2 sign boards are 97.

[213_NEW_PD1_Trunked 18:04:21]

Dispatcher 1 Lindner: 10-4.

[214_NEW_PD1_Trunked 18:05:07]

Officer: 15. We're sending one vehicle towards you.

[215_CONS6_2024 18:07:45]

Sgt. Salary: Its Salary, can I talk with Eddie?

Dispatcher: Yeah, hold on.

Sgt. Salary: Alright.

[216_CONS4 18:07L54]

Officer LaLonde: Hey, sir.

Sgt. Salary: Hey sir, sorry to bother you. I just wanted to give you some basic information, because a lot of times we have this happen out here and you guys don't have any idea what's going on.

Officer LaLonde: Yep, appreciate it.

Sgt. Salary: So, it turns out that from that 925, there was a subject with a knife but they put it out and there was an OIS that involved four officers.

Officer LaLonde: Okay.

Sgt. Salary: Two training teams. None of our officers were injured.

Officer LaLonde: Okay.

Sgt. Salary: At the time, the suspect did not survive his wounds. He was medically treated at the scene and didn't survive. He is still at the scene at this time. The officers that were involved in the shooting are back at the station. They're no longer on scene.

Officer LaLonde: Okay.

Sgt. Salary: So, the scene is pretty much Code 4 as far as safety. No one was injured other than the suspect in that situation. And I realized we're on a recorded line, so there's only so much I can give you. I just want to give you basic information so you can have more than you probably get when you're at there.

Officer LaLonde: All good. I greatly appreciate it. I'll let the people know.

Sgt. Salary: Alright, thank you, sir.

Officer LaLonde: Yep, bye.

[217_NEW_PD1_Trunked 18:09:41]

Sgt. Salary: Sam-25. Am I clear for a request?

[218_NEW_PD1_Trunked 18:09:46]

Dispatcher 1 Lindner: Sam-25, go ahead.

[219_NEW_PD1_Trunked 18:09:49]

Sgt. Salary: 9 Sam-25. Can you ensure that all TFD responding personnel's names are on the columns?

Dispatcher 1 Lindner: 10-4.

Sgt. Salary Thank you.

[220_NEW_PD1_Trunked 18:45:16]

Dispatcher 1 Lindner: Torrance to Zebra-2.

[221_NEW_PD1_Trunked 18:45:21]

Officer Marquez: Zebra 2

Dispatcher 3: Confirming you are cleared from traffic control?

[222_NEW_PD1_Trunked 18:45:27]

Officer Marquez: Negative. I'm still at Maple and Delamo.

[223_NEW_PD1_Trunked 18:45:34]

Dispatcher 3: 10-4

[224_NEW_PD1_Trunked 18:47:43]

Officer: 23 can you 10-9 that last transmission?

Dispatcher 3: Is anybody out there from Public Works with sign boards or have they all left the scene?

[225_NEW_PD1_Trunked 18:47:56]

Officer Camacho: That's affirmative. They're finishing right at our position right now.

[226_NEW_PD1_Trunked 18:48:03]

Dispatcher 3: 10-4. Can you check with them if they have enough equipment to relieve Zebra-2 from his location?

[227_NEW_PD1_Trunked 18:48:14]

Officer Camacho: Affirmative. Where is his position so I can send them over there?

Dispatcher 3: Maple and Del Amo.

[228_NEW_PD1_Trunked 18:48:25]

Officer Camacho: 20. I'll advise them.

Dispatcher 3: 10-4.

[229_NEW_PD1_Trunked 18:49:51]

Officer Camacho: 20 to the unit at Maple and Del Amo. Do you guys just need cones or do you actually need boards? I'm just letting the Public Works person know.

Officer Marquez: Zebra 2. I think we need the boards to block off the entire roadway.

[230_NEW_PD1_Trunked 18:50:13]

Officer Camacho: 20, copy. I'll let them know.

[231_NEW_PD1_Trunked 19:05:27]

FIS Edward 21: Edward 21 to Torrance. Can you show me en route to the FIS request on Oregon Court?

Dispatcher 2 Labon: Affirm

[232_NEW_PD1_Trunked 19:09:23]

FIS: Edward 21 97

Dispatcher 2: Labon: 10-4.

[233_CONS4 19:28:03]

Call Taker Officer LaLonde: Torrance Police.

Lt. Harris: Hey, it's Ron Harris.

Officer LaLonde: Hey, what's up, sir?

Lt. Harris: Hey, sir. I don't have my radio out there, but can you show David-21 here at the scene?

Officer LaLonde: Yep. Roger that.

Lt Harris: And I have my work cell on me if you guys need anything.

Officer LaLonde: Perfect. Got it.

Lt. Harris: Thanks.

Officer LaLonde: Uh-huh. Bye.

[234_CONS7 19:47:10]

Off. C. Gonzalez: Communications.

Service Officer Woodson: Yeah, this is Woodson. I was trying to get ahold of WC. He's not in his office.

Off. C. Gonzalez: Is that the suspect's family?

Woodson: Yeah. So, if you can kind of let him know they're in the lobby.

Off. C. Gonzalez: Okay, I'll let him know.

Woodson: Alright, thank you.

Off. C. Gonzalez: Thank you.

Woodson: Bye.

[235_NEW_PD1_Trunked 19:47:39]

Dispatcher 2 Labon: Torrance to 9W21.

[236_NEW_PD1_Trunked 19:47:45]

Lt. Moreno William 21.

Dispatcher 2 Labon: 21 the OIC.

Lt. Moreno: 10-4

[237_CONS4 19:48:39]

(phone ringing)

Recording: Detective Sola, 5645. Sola, 5645.

[238_CONS4 19:48:56]

Officer LaLonde: Radio LaLonde

Det. Sola: What's up, Eddie?

Officer LaLonde: Hey, I think homeboy's family is here.

Det. Sola: Yeah, yeah, we got the heads up.

Officer LaLonde: Okay, perfect.

Det. Sola: I think Sola let Danny Mo know.

Officer LaLonde: Okay, perfect.

Det. Sola: I'll let Galassi know.

Eddie: Awesome, thanks, man.

Det. Sola: Uh-huh. Bye.

[239_CONS8 19:50:50]

Call Taker
Officer Crofton: Communications, Crofton.

Lt. Moreno: Hey, is Eddie there? LaLonde?

Dispatcher: Yeah, sir.

Lt. Moreno: Thank you.

[240_CONS4 19:51:02]

Officer LaLonde: Hey, sir. It's Eddie.

Lt. Moreno: Hey, what's up?

Eddie: Hey, I think you guys are aware that the family's here?

Lt. Moreno: Yeah, are they in the lobby?

Officer LaLonde: In the lobby, yeah. I got three females in there.

Lt Moreno: Okay. Cool.

Officer LaLonde: Cool.

Lt. Moreno: Yep, alright.

Officer LaLonde: Alright, bye.

Lt. Moreno: Thanks, bye.

[241_NEW_PD1_Trunked 20:47:13]

Sgt. Salary: Sam 25

Officer Okazaki: 29 I got a, DA investigators here. You want a unit over there or go to the station?

[242_NEW_PD1_Trunked 20:47:30]

Officer: [unintelligible]

[243_NEW_PD1_Trunked 20:47:52]

Sgt. Salary: Sam-25. Can you confirm the DA investigator's name.

[244_NEW_PD1_Trunked 20:48:07]

Officer Camacho: It's Danielle.

[245_NEW_PD1_Trunked 20:48:13]

Sgt. Salary: 10-4. I'll 21 you.

[246_NEW_PD1_Trunked 20:48:17]

Officer: [unintelligible]

[247_NEW_PD1_Trunked 20:48:24]

Sgt. Salary: Sam-25. Go ahead.

Officer 2: Sam-25. The detectives are in route right now. She knows just to standby and we'll get a meeting.

[248_NEW_PD1_Trunked 21:18:30]

Officer: [unintelligible]

[249_NEW_PD1_Trunked 21:18:38]

Dispatcher 3: Standby.

[250_NEW_PD1_Trunked 21:23:36]

Dispatcher 3: Torrance Adam-26.

[251_NEW_PD1_Trunked 21:23:40]

FIS: Edward-21 was 97 at 1909 hours.

[252_NEW_PD1_Trunked 21:23:48]

Officer: [unintelligible]

[253_NEW_PD1_Trunked 21:25:09]

Lt. Moreno: William-21, station.

Dispatcher 3: 10-4, William-21.

[254_NEW_PD1_Trunked 21:25:27]

Sgt. Galassi: David-15, show me out at Maple.

Dispatcher 3 Kramer: 10-4, David-15.

[255_NEW_PD1_Trunked 21:51:14]

Officer Clark: Drone 1, can you show us out of Oregon Court.

Dispatcher 3 Kramer: 10-4.

[256_NEW_PD1_Trunked 22:03:12]

Det. Sola: David 22, can you open the front gate for the DA investigator.

Dispatcher 3 Kramer: 10-4.

[257_NEW_PD1_Trunked 22:37:42]

Officer Clark: Drone 1, 10-19.

Dispatcher 3 Kramer: 10-4.

[258_NEW_PD1_Trunked 22:52:53]

Sgt. Gribben: Sam-35 to 34, I apologize first. I didn't realize you were going to that 2-11. I'm going to have 38 split up into Lincoln units and head over to Oregon Court to release the team two units.

[259_NEW_PD1_Trunked 22:53:09]

Officer: 38 we copy. We en route to the station.

[260_NEW_PD1_Trunked 22:55:28]

Sgt. Gribben: Sam 35. I'm 10-8. Show me out of Oregon Court, please.

Dispatcher 3 Kramer: 10-4.

[261_NEW_PD1_Trunked 22:59:41]

Sgt. Gribben: Sam 35 to the AT and Lincoln units. If I could get one of you to go to—sorry, Maple and Columbia and the other to Maple and Del Amo. Nobody in or out of either one.

[262_NEW_PD1_Trunked 22:59:58]

Officer: Lincoln-38. Copy. I will be en route to Maple and Delamo.

[263_NEW_PD1_Trunked 23:00:06]

Officer: Lincoln-39, copy.

Dispatcher 3 Kramer: Station Read

[264_NEW_PD1_Trunked 23:07:31]

Officer Gonzalez-Rodriguez Lincoln-39. 10-8, can you show me 97 at Columbia and Maple.

[265_NEW_PD1_Trunked 23:07:38]

Dispatcher 3 Kramer: 10-4, 39.

[266_NEW_PD1_Trunked 23:09:09]

Officer Gonzalez-Rodriguez: 9-Lincoln-38. I'm 97 at Del Amo. Can you assign me a unit number? Numbers are 22205.

[267_NEW_PD1_Trunked 23:09:30]

Dispatcher 3 Kramer: 10-4.

[268_NEW_PD1_Trunked 23:15:22]

| | |
|---|---|
| Officer Okazaki: | A29 is at the station. |
| Dispatcher 3 Kramer: | 10-4. |

[269_NEW_PD1_Trunked 23:15:48]

| | |
|---|---|
| Officer Camacho: | 20 will be at the station 10-7. |

[270_NEW_PD1_Trunked 23:15:52]

| | |
|---|---|
| Dispatcher 3 Kramer: | 10-4, Adam-20. |

[271_NEW_PD1_Trunked 23:15:57]

| | |
|---|---|
| Officer: | 26 zero. |
| Dispatcher 3 Kramer: | 10-4, Adam-26. |

[272_NEW_PD1_Trunked 23:16:13]

| | |
|---|---|
| Lt. Moreno: | William-21 Torrance. |
| Dispatcher 3 Kramer: | Go ahead, William-21. |

[273_NEW_PD1_Trunked 23:16:19]

| | |
|---|---|
| Lt. Moreno: | Clear from the CP. Back at the station, I'll be 10-7. Sergeant Gribben will be in charge of the crime scene with his personnel. |

[274_NEW_PD1_Trunked 23:16:30]

Dispatcher 3 Kramer: 10-4. 291, 21.

[275_NEW_PD1_Trunked 23:16:40]

Sgt. Salary: Sam 25 out at the station.

Dispatcher 3 Kramer: 10-4, Sam-25.

[276_CONS6 23:27:33]

Call Taker Owens: Torrance Police.

Sgt. Gribben: Hey, this is Gribben.

Owens: Hey, sir.

Sgt. Gribben: Can you—can you just indicate on the CAD for the Oregon Court calls that Officer Gonzalez-Rodriguez is at Maple and Del Amo and Officer David Garcia is at Columbia and Maple.

Owens: 39, so I did that earlier when you guys put it out, so I don’t have it by name, but I have it by number. I have Lincoln-38 en route to Maple and Del Amo and 39 en route to Maple and Columbia, and that was at 2301 hours. Do you want me to specify their names better?

Sgt. Gribeen: Yeah, just do the officer’s names. Lieutenant Moreno was wanting that, and just put me here obviously, also. Gribben. And Officer Choi here doing the crime scene log.

Owens: Choi is doing crime scene log. Okay.

Sgt. Gribben: That’s it.

Owens: I will add that.

Sgt. Gribben: That's all of our current patrol resources that we have here.

Owens: So, just those three officers and you?

Sgt. Gribben: Yep, and then obviously there's detectives. But in terms of Patrol resources, those are the only three that I'm going to worry about that make sure that we get out.

Owens: Okay, got it. So, what I'll do is I'll just update the comment from earlier and just add their names to the unit numbers, and then I'll put Choi—whatever number he is. I'll figure it out, and his name in there that he's doing the crime scene, and then you guys, that you were there.

Sgt. Gribben: You're the best, thank you.

Owens: You're very welcome.

Sgt. Gribben: Bye-bye.

Owens: Bye.

[277_NEW_PD1_Trunked 23:53:40]

Officer High: Adam-36, Torrance.

Dispatcher 3 Kramer: Go ahead 36.

Officer High: Torrance unit Lincoln-21 is at the scene with the crime log and I will be teamed up with Castner for Adam 36, we're 10-8.

Dispatcher Kramer 3: 10-4. You'll be cleared to log in as well.

December 3, 2024:

[278_NEW_PD1_Trunked 02:25:25]

Officer Choi: Lincoln-21. 1 926 please.

[279_NEW_PD1_Trunked 02:25:29]

Dispatcher 3 Kramer: 10-4.

[280_CONS6 02:25:40]

(phone ringing)

Van Lingen Tow Dispatch Rose: Dispatch, how can I help you?

Call Taker Owens: Hey, this is Torrance.

Van Lingen Dispatch Rose: Hey.

Owens: Hey, can I get you over to 2909 Oregon Court?

Rose: Oregon Court? Okay.

Owens: And I'm sorry, your name?

Rose: Rose.

Owens: Rose, okay, thank you.

Rose: No problem, bye.

Owens: Okay, bye-bye.

[281_NEW_PD1_Trunked 02:26:39]

Dispatcher 3 Kramer: Lincoln-21, 926A

[282_NEW_PD1_Trunked 02:26:45]

Officer Choi: Copy thank you.

[283_NEW_PD1_Trunked 02:57:31]

Officer Choi: Lincoln-21 to Torrance.

[284_NEW_PD1_Trunked 02:57:35]

Dispatcher: Go head Lincoln 21.

Officer Choi: Can we have TFD respond to Oregon Court to clean up blood on the street.

Dispatcher 3 Kramer: 10-4

[285_NEW_PD1_Trunked 02:58:23]

Dispatcher: Torrance to Lincoln-21.

[286_NEW_PD1_Trunked 02:58:27]

Officer: 21.

Dispatcher 3 Kramer: Per TFD phonetic) Ocean [unintelligible] will need to be contacted. They won’t come out for that.

[287_NEW_PD1_Trunked 02:58:41]

Officer Choi: 10-4. We just need them to take out some of the powder that they normally take out for like oil and blood.

[288_NEW_PD1_Trunked 02:58:50]

Dispatcher 3 Kramer: 10-4 stand by.

[289_NEW_PD1_Trunked 03:00:04]

Dispatcher 3 Kramer: Lincoln-21, 914N TFD.

[290_NEW_PD1_Trunked 03:00:09]

Officer Choi: 10-4. Thank you.

[291_TOR_FD_1__P25 03:01:33]

(beeping)

[292_TOR_FD_1__P25 03:01:38]

Automation: Engine 95, PD assist, 2909 Oregon Court. Mass page 122.

[293_TOR_FD_1__P25 03:03:20]

Officer: Torrance, Engine 95 to TPD state, do they need multiple bags or just one bag or [unintelligible]?

[294_TOR_FD_1__P25 03:03:32]

Dispatcher 3 Kramer: One bag is needed.

[295_TOR_FD_1__P25 03:03:36]

Fire Engine 95: Copy.

[296_NEW_PD1_Trunked 03:03:48]

Officer Choi: 21, cleared from the crime scene and I'll be following Van Lingen to evidence bay.

Dispatcher 3 Kramer: 10-4 21

[297_NEW_PD1_Trunked 03:03:59]

Sgt. Kyle: Sam 30 Torrance.

[298_NEW_PD1_Trunked 03:04:02]

Dispatcher 3 Kramer: Go ahead.

Sgt. Kyle: Unit to come and assist here on Oregon Court. We need to get these two patrol units back to the station.

[299_NEW_PD1_Trunked 03:04:16]

Dispatcher 3 Kramer: 10-4. Torrance to Adam 32

[300_NEW_PD1_Trunked 03:04:21]

Officer: 32, PCH and PV.

[301_NEW_PD1_Trunked 03:04:27]

Officer: 34, we can handle this.

Dispatcher 3 Kramer: 10-4. 32 22.

[302_NEW_PD1_Trunked 03:04:33]

Officer: 32, copy.

[303_NEW_PD1_Trunked 03:04:48]

Sgt. Kyle: Sam 30, copy. Thank you.

[304_NEW_PD1_Trunked 03:14:37]

Officer Choi: Lincoln-21, 97 Van Lingen.

Dispatcher 3 Kramer: 10-4, 21.

[305_NEW_PD1_Trunked 03:15:05]

Sgt. Galassi: David 15 you can show me clear.

Dispatcher 3 Kramer: 10-4, David 15.

[306_NEW_PD1_Trunked 03:22:40]

Officer Gonzalez-Rodriguez 38 to Torrance. Southbound lanes from Maple to Del Amo have been opened up.

[307_CONS4 03:22:47]

Call Taker LaLonde: Radio LaLonde.

Lt. Harris: Good morning, sir. Ron Harris.

Officer LaLonde: What's up, sir.

Lt. Harris: If we haven't already, show detectives back at the station.

Officer LaLonde: Will do.

Lt. Harris: Thanks, buddy.

Officer LaLonde: Yep, bye.

Lt. Harris: Bye.

[308_NEW_PD1_Trunked 03:22:47]

Dispatcher: [unintelligible]

[309_NEW_PD1_Trunked 03:26:26]

Officer Choi: Lincoln-21. Vehicle is secured in evidence bay number 3. I'll be 10-19 with the 180.

Dispatcher 3 Kramer: 10-4 21.

[310_NEW_PD1_Trunked 03:27:08]

Sgt. Kyle: Sam 30 Torrance. Adam-38 junior is going to remain behind. It's part of the 902. You can show all the patrol here is clear for Oregon Court.

Dispatcher 3 Kramer: 10-4

# EXHIBIT "C"

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

--oOo--

MARIA GUADALUPE DIAZ; A.D., a minor by and through his Guardian Ad Litem, MARIA GUADALUPE DIAZ; A.D., a minor by and through his Guardian Ad Litem, MARIA GUADALUPE DIAZ; LEONARDO DIAZ; and RAMONA RAMIREZ DE DIAZ,

Plaintiff,

v. Case No. 2:25-cv-03389-JLS (JCx)

CITY OF TORRANCE; ARTURO CASTILLO; CODY WISSLER; JESUS GARCIA; JASON BERMUDEZ; and DOES 6-10, inclusive,

Defendants.
_________________________________/

STENOGRAPHIC REPORTER'S TRANSCRIPT OF

REMOTE VIDEO DEPOSITION OF

ARTURO CASTILLO

MONDAY, JULY 13, 2026

Reported Stenographically by:

KIMBERLY D'URSO, CSR 11372, RPR

Job No. 28993

the plaintiffs.

MS. POWELL: Angela Powell, on behalf of the defendants.

(Whereby the Certified Shorthand Reporter introduced herself to the deponent and the oath was administered.)

THE WITNESS: I do.

EXAMINATION

BY MR. VALENZUELA:

Q. Good morning, Officer Castillo.

A. Good morning, sir. How are you?

Q. Doing good. Thank you.

Have you ever had your deposition taken before?

A. Yes, sir.

Q. Okay. So I'll kind of skip some of the admonishment rules. If I ask you a question that you don't understand, will you please let me know?

A. Yes, sir.

Q. And if you need to take a break at any time, will you please let me know?

A. Yes, sir.

Q. I usually go about an hour, and I'll take a break; but if you need to take one before that, just let me know and it shouldn't be an issue. Okay?

A. Okay. Thank you.

A. Yes.
Q. Do you recall the date of the incident?
A. Can you repeat that? I couldn't hear you.
Q. Sure. Do you recall the date of the incident?
A. Yes, sir. December 2nd of 2024.
Q. And do you recall how long after the incident that you gave your interview?
A. Approximately one week after that, or a little bit more than that.
Q. Did you give your interview on December 9th of 2024?
A. Yes.
Q. Okay. So, like you said, a week or seven days after the incident, you gave your interview; correct?
A. Yes.
Q. Do you know why it took seven days to give your interview after the incident? Do you know how that timing worked?
A. No, sir. I don't know how Internal Affairs does their interview timelines like that.
Q. They just basically contact you and say, "Hey, you're going to give an interview on this date," and then you go do it?
A. They contact my attorney.
Q. Okay. Did you have an attorney present with

reviewed and ultimately found to be within policy? Was that ever communicated to you?

A. From what I recall, I think it's still being reviewed right now.

Q. Oh, okay.

A. Yes.

Q. So as far as you understand, the -- the review board has not made a determination yet as to whether your shooting was in policy or not?

A. Yes. I still believe Internal Affairs is still conducting their investigation.

Q. Okay. You haven't been informed of any findings of that review; is that correct?

A. No.

Q. Okay. Now, let's talk a little bit about the incident. I first want to focus on the initial call, okay, the information you had about the initial call?

First of all, do you recall what the first information you received relating to this incident was?

A. Yes.

Q. Go ahead. What was that?

A. It was regarding a man with a gun in the area of 2909 Oregon Court. The caller stated that he, himself, is the man with the gun, and he is there to kill someone.

Q. Now, I take it you, yourself, did not hear the 911 call; is that correct?
A. Yes, sir.
Q. Does Dispatch communicate to you that they had received the 911 call and provide you with that information?
A. They provide us with limited information, but not all the details of the call.
Q. And the source of this information, would part of it be from the radio?
A. Yes.
Q. Would part of it also be from, like, an onboard computer in your vehicle?
A. Yes.
Q. Okay. Do you recall where you were when you first received information relating to this incident?
A. Yes, I do recall.
Q. And where were you?
A. I was in the area of Hawthorne and Fashion Avenue, which is by the Del Amo Mall.
Q. I don't know Torrance all that well. What distance would you say you were when you first received the call to the scene of where the actual shooting occurred? Like, how many miles, an estimate? I don't expect you to know exactly.

A. Approximately one mile, I would say.
Q. Okay. So relatively close?
A. Yes.
Q. Were you on another call when you first received information about this incident?
A. No, sir.
Q. Okay. Were you kind of doing patrol?
A. Yes. I was working with my partner at the time.
Q. And who was your partner?
A. Officer Bermudez.
Q. Was he training at that point?
A. Yes, he was.
Q. And were you his field training officer?
A. Yes, I was.
Q. Was this your partner's first day doing field training?
A. Yes.
Q. Do you recall approximately what time it was that you first received information regarding this incident?
A. It was possibly ten minutes before 1700 hours, which would be 5:00 p.m.
Q. And after receiving information about the call, do you begin to go to the area?

A. Yes. We start responding from the area of Hawthorne and Fashion, where I begin to talk tactics with my partner at the time.

Q. How much time would you estimate it took you to travel that approximate mile from where you were to the scene?

A. Just over five minutes, I would say.

Q. Okay. While you were traveling in this five-minute period of time, were there any updates regarding the call?

A. Yes, there was updates. The call-taker said that the caller hung up. They attempted to call back. There was no more information. But they worked on getting pings, and the phone ping that was being used was in the intersection of Maple and Oregon Court, where the potential man with a gun was at.

Q. Did you receive any information that anybody had been injured?

A. Not at the moment.

Q. Okay. Is there any other information that you had received about the call that we haven't discussed yet?

MS. POWELL: Objection. It's vague and ambiguous as to time.

You mean up until this point, Mr. Valenzuela?

BY MR. VALENZUELA:
Q. While you're traveling from where you received the call to the scene, have you told me so far the information about the incident?
A. Yes. He was just a man with a gun, and he was there to shoot someone.
Q. Okay. But you didn't -- the call did not indicate that somebody had actually been shot; would you agree?
A. Yes. He was there, looking to shoot someone.
Q. Okay. At some point did you receive information as to who the caller was?
A. While going to the call, our TPD communications -- which is the Torrance Police communications -- advised that the phone number possibly belonged to a Leonardo Diaz.
Q. Okay. Based on that information, did you recognize having ever dealt with Mr. Diaz in the past?
A. No.
Q. Okay. Did you have any information about Mr. Diaz's criminal history?
A. No.
Q. For example, you didn't know whether or not he had ever physically injured anyone in the past; correct?
A. No.

Q. Okay. Did you have any other background information about Mr. Diaz, other than his name?
A. The only other information, again, was provided by our communications division, saying that he worked in the area of 2909 Oregon Court. And he was involved -- I said, I guess, as an involved party to a burglary that happened at his place of employment.
Q. And this is information you are receiving from the dispatch?
A. Yes. It gets broadcasted over the radio.
Q. And what information did you have about his involvement in a burglary?
A. Just that, what I stated earlier.
Q. Can you please repeat that?
A. Yes. That he was just involved as an involved party. He wasn't the one that committed the crime. If you need me to clarify...
Q. Okay. Like, was he, like, a reporting party?
A. He didn't specify that part.
Q. Okay. So he was an involved party, but if I understand you correctly, he was not suspected of burglarizing the place of employment? Do I understand you correctly?
A. Yes, he was an employee there.
Q. Okay. Gotcha.

At some point, do you arrive in the location of -- of the scene?
A. Yes.
Q. Do you go to that place of employment?
A. Immediately when we arrive, based off the information that we got that this possible man with a gun was in the middle of the intersection, we searched the surrounding area. Once we received the information, then we responded to the former place of employment to see if there was anybody that was possibly shot or hurt there.
Q. When you're searching the area for an individual with a gun, you didn't see anybody with a gun; correct?
A. Not yet.
Q. Okay. And then after that, you go to search the place of employment?
A. Yes.
Q. Do you guys get out of your vehicle to search the place of employment, or do you kind of drive by it? Can you explain it?
A. No. We -- I -- in that area, we went to search the rear of the business. Yes, we got out of our vehicle. We went to check the doors to that location to make sure there was no burglary or possibly anybody that

broke into the business to commit a crime.
Q. Okay. Did you make contact with anybody while you were searching that business?
A. A neighboring business we did, who told us that that business had recently closed down.
Q. Okay. After you were told that that business had recently closed down, do you return to your vehicle?
A. Yes, I did.
Q. Okay. And then do you continue to search the surrounding areas, in your vehicle?
A. Yes. While we are doing that, our drone operators broadcasted over the radio, advising us that there was a male subject in a green Dodge Charger that was opening and closing his door, looking around in the area.
Q. Okay. Let me go back a little bit. You said that you had discussed tactics with your trainee while you were on the way to the location. Do you remember that?
A. Yes.
Q. Can you let me know what you discussed in relation to tactics?
A. Of course. So based on the fact that this was a man-with-a-gun call, we need to take things slowly while going there, and getting sufficient units. I

many times?

A. Approximately, over eight times.

Q. Prior to the date of this incident, had you ever encountered suspects who were armed with knives?

A. Yes.

Q. Do you have an estimate as to approximately how many times?

A. That one, I would say approximately over 15 times.

Q. So approximately eight times, prior calls with guns, and approximately 15 times prior calls with knives?

A. Yes.

Q. Prior to the date of this incident, had you ever encountered suspects who appeared to be suffering from mental illness or a mental health crisis?

A. Prior to this call, yes.

Q. And do you have an estimate as to approximately how many times?

A. Approximately, over 30 times.

Q. And I understand these are estimates. I'm not expecting you to know the exact number. I'm just trying to get a general understanding.

A. Of course.

Q. Based on your training, were you trained that

you could shoot somebody if they have a knife, based on that fact alone?

A. On that fact alone, we need more circumstances.

Q. Okay. And same thing with the gun. Based on your training, were you trained that if somebody has a gun, you can shoot them based on that fact alone?

A. Based on the totality of the circumstances, there will be options that, yes, we will have to shoot somebody with a gun.

MS. POWELL: Listen to his question.

MR. VALENZUELA:

Q. Let me try to ask it a little different. I'm trying to figure out, based on your training, were you trained that you could shoot somebody for merely having a gun?

A. No.

Q. Okay. Now, you had mentioned a little bit earlier that a drone had spotted a green Charger. Is that what you indicated?

A. Yes.

Q. Okay. And you're receiving this information from the dispatch still?

A. Yes, it gets broadcasted over the radio to myself and other officers in the area.

Q. Okay. And what, if anything, was communicated

to you about this green Charger?
A. That there was an individual possibly seated inside who kept manipulating his door and looking outside of it.
Q. Had you received any information that a weapon was seen on this individual at this time?
A. At that moment, no.
Q. Okay. At some point, do you -- do you locate the green Charger?
A. Yes. After searching the business, it was brought to my attention by my other partner officers who were there, that they wanted to go and contact this individual. Main reason why, because the phone pings had stated that the man with the gun was at the intersection of Maple and Oregon Court, just east of the intersection where that -- in the general area where that green Dodge Charger was at.
Q. Okay. And then at some point, you locate the green Charger?
A. Yes.
Q. Approximately how much time passed from when you're done searching the business, you get back in your car, start driving around, again, until you locate that green Charger?
A. Approximately five minutes, I would say, at

most.

Q. Okay. And you've told me you received an update on the call about the drone locating the green vehicle; correct?

A. Yes.

Q. Did you receive any other updates about the call, from the time you entered back in your vehicle until you locate the green Charger?

A. No. That's the most information we got.

Q. Okay. At some point, do you park your car near the green Charger after locating it?

A. I was -- yes. I was the secondary unit assisting the primary unit, who was doing the initial contact.

Q. Would you be considered the primary unit on the call, or would a different unit be the primary?

A. We were the first unit to be dispatched. However, there was a unit that was closer who ended up responding there, and they were the first ones to arrive.

Q. Okay. And was that unit already stopped when you located the green Charger?

A. No. They were still searching the area, prior to us making the contact.

Q. Okay. Was your unit the first one to park near

the green Charger, after locating it?
A. No. Second.
Q. Okay. And who was in the first unit that was parked there?
A. That would be 9 Adam 24, who is Officer Garcia and Officer Wissler.
Q. So let me see if I understand this correctly. Officer Garcia and Wissler's unit is already parked near the green Charger prior to you stopping and parking near the green Charger; correct?
A. No. We actually, before approaching the vehicle, we had talked over the radio, saying, like, "Hey, there might be a person inside of the Dodge green Charger. We could go and contact him."
So 9 Adam 24, which is Officer Garcia and Wissler, were the first ones to arrive there, and we were behind them within a couple of seconds.
Q. Oh, okay. So they arrive and stop a few seconds before your cruiser that you were driving?
A. Yes.
Q. Okay. Do you guys get out of your unit at approximately the same time as Officer Garcia and Wissler?
A. Yes, approximately the same time.
Q. Okay. Now, would you still be considered the

Bermudez and Garcia and Wissler at that point; or are there additional officers when you guys exit out of your vehicles?

A. When we exited our vehicles, yes, we were the first four officers. There was a third unit that was still in the area, checking the other neighboring businesses.

Q. Do you know if that third unit arrived prior to the shooting?

A. They arrived as the shooting was occurring.

Q. Would that be Officers Choi and High?

A. Yes.

Q. Now, between Officer Garcia, Wissler, yourself, and Bermudez, who would be considered the senior officer between the four of you?

A. Based on time on the job and experience, it would be Officer Garcia.

Q. So, in addition to being the primary unit, Officer Garcia would be considered, like, the supervisor out of you four; is that fair?

A. He would be the senior officer.

Q. Now, as the senior officer, would Officer Garcia be the one to designate roles, such as lethal, less-lethal, contact, cover; or would it be somebody else?

A. He could do that, but we also planned that within ourselves. Especially as him and I are field training officers, we assigned those roles with our trainees at the time, who were Officer Wissler and Officer Bermudez.

Q. Okay. And did you assign a role to Bermudez in this incident?

A. Yes. He was a cover officer.

Q. What does the cover officer do?

A. In this situation, because it was with a man with a gun, and we were within the general area, and a reasonable suspicion left us to believe that this person in the vehicle could be possibly the man with the gun, we transitioned over to high-risk tactics, which, in that situation, it requires four officers who are assigned as lethal coverage, one officer being the contact officer who starts the commands.

And the other officers who gets different vantage points, based on the configuration of the cars, to get a better visual of inside the vehicle. Once that configuration is done, we try to utilize time, distance, and cover, to get more resources there to help assist us with the problem.

Q. Okay. So if I understand you correctly, you designated Bermudez as a lethal-cover officer; correct?

giving conflicting commands?
A. Yes. Especially during high-risk tactics, we want to keep it to one voice, that way so other officers can start requesting other resources over the radio, such as getting more responding units there to bring us necessary tools, such as less-lethal options, shield options, or if it gets to a higher-level threat, maybe more pieces of armor.
Q. Did you, yourself, ever designate Bermudez to be a less-lethal officer?
A. No. Based on the high-risk tactics, he has to be assigned as lethal coverage until sufficient units get there.
Q. Okay. And at any point, did you ever hear Garcia designate Wissler as a less-lethal officer?
A. No. Based on the high-risk tactics that we transitioned over to, Officer Wissler was a lethal and contact officer.
Q. Okay. I want to ask you about the different equipment you had on you that day. Okay?
A. Yes, sir.
Q. Did you have a handgun on you?
A. Yes.
Q. What kind of gun did you have?
A. It's a Staccato P 2011, which is a 9-millimeter

ineffective, because Mr. Diaz, at the time, also had glasses, which would be another challenge that we would have to consider in that situation.

Q. Based on your training, if an individual is wearing glasses, are you trained that OC spray won't have an effect on them?

A. It's not going have the desired effect that we would want.

Q. But just so I understand you correctly, you, yourself, did not deploy OC spray during this incident; is that correct?

A. Yes, sir.

Q. Okay. And you, yourself, did not deploy a Taser during this incident; is that correct?

A. Yes, sir.

Q. Okay. In your vehicle, at some point, you transition to what was the M4 rifle?

A. Yes, I did.

Q. And that's stored in your trunk?

A. Yes, it is.

Q. Do you have any other weapons in your vehicle, other than the -- the M4?

A. Any other lethal weapons, it's just the M4 rifle that we have in the vehicle.

Q. Did you have any other less-lethal weapons in

your vehicle, like a 40?
A. Yes.
Q. You had a 40-millimeter less-lethal in your trunk?
A. We did. But based off of the --
MS. POWELL: You answered his question. Listen to his question.
THE WITNESS: Okay.
MR. VALENZUELA:
Q. So, just so I understand, you did have a 40-millimeter in the trunk of your cruiser; correct?
A. Yes.
Q. At any point, did you ever designate Bermudez to use the 40-millimeter?
A. No, sir.
Q. Okay. So, going back to when you first stopped your cruiser near the green Charger -- going back to that point. Okay?
A. Okay.
Q. You had some information that the individual in the green Charger was, like, opening and closing the door?
A. Yes. We observed that as we were going to attempt to talk to this individual.
Q. So could you see the individual inside of the

vehicle when he would open and close the door?
A. No. And the windows were heavily tinted, as well.
Q. So you saw the door opening and closing, but you couldn't see anybody inside of the vehicle?
A. No. And then, based off prior training that I've received, a man with a gun that's inside a vehicle, tend to use that as a method to fire from a very concealed position.
The opening and closing of the door could be used as a method to gauge and observe where officers' positions are at.
MS. POWELL: Listen to his question, because that wasn't his question.
BY MR. VALENZUELA:
Q. When the door was opening and closing, did you ever see a gun?
A. Not at the moment.
Q. Okay. When the door was opening and closing, could you see the individual's hands?
A. Yes. And they had blood on them.
Q. Okay. When he's opening and closing the door, could you just basically see the hands, or can you see any other part of the body?
A. I would say up to the forearms, which were also

yourself or somebody else?
A. Myself and Officer Garcia.
Q. You guys kind of did it in conjunction together?
A. Yes.
Q. Okay. And what was the tactical plan that was formulated?
A. The tactical plan was to conduct a high-risk stop, because if this person was the man with the gun, we want to make sure we get the possible resources, and we created time, distance, and cover.
Q. And I think we discussed the different roles of the tactical plan; correct? Everybody was a lethal cover, and one individual was a contact; correct?
A. Yes.
Q. Other than those roles or designations, was there any other roles designated at that point?
A. At that point, we were also requesting backup to get more units to us with lights and sirens.
Q. Okay. But other than the designations we discussed of the four officers that were present, there were no other roles assigned? For example, nobody was assigned less-lethal; correct?
A. No. Based off high-risk tactics, no.
Q. At some point, did you order one of the

vehicles to be repositioned?

A. Yes. That was when we transitioned to high-risk tactics.

Q. Was it you that ordered the vehicle to be repositioned, or somebody else did that?

A. That was Officer Garcia.

Q. Okay. And was he repositioning his vehicle or your vehicle?

A. He -- my partner, Officer Bermudez, was the one that repositioned our patrol vehicle.

Q. Okay. So if I understand you correctly, Garcia told Bermudez to reposition the cruiser that you guys had arrived in?

A. Yes, so we could configure our vehicles to the high-risk tactics we use.

Q. Were -- were you guys going to be conducting a felony stop at this point?

A. Yes, which is what we consider as high-risk -- a high-risk stop, which is used to deal with armed suspects.

Q. And what do you do to do a high-risk stop? In other words, what does that entail, doing a "high-risk stop"?

A. We are doing a detention of a potential man-with-a-gun call.

Q. Okay. And during one of these high-risk stops, you give commands to the individual in the car?
A. That would be the contact officer.
Q. Okay. And do you recall what commands were given to the individual in the car?
A. To open the car door and let us see their hands.
Q. Okay. Other than that, do you recall any other commands?
A. No. Just to let -- just to let us see his hands and open the car door. Never to step out of the vehicle.
Q. Okay. And after the command was given to open the car door and show your hands, do you ever see the car door open after that?
A. Yes.
Q. And are you able to see the individual's hands when the car door opens?
A. Yes. And he was armed with a knife and had large amounts of blood on both hands.
Q. Okay. Did you make a communication to the dispatch at some point, that the individual had a knife and was bleeding from his wrist?
A. Yes.
Q. That's a -- you made that communication over

the radio; correct?

A. Yes.

Q. Okay. Did you think, at that point, that it was at least a possibility that the individual may have cut his wrist with that knife?

A. Based on the information we had, and that this individual wanted to shoot somebody, at that point I believed that this possibly was a disgruntled employee that possibly killed his former employer and had him in the vehicle. The large -- the large amounts of blood, led me to believe that this was possibly somebody else's blood.

Q. Had you -- up until that point, had you received any information that anybody had been killed?

A. Not at that moment, because the caller would not answer any phone calls after the initial statements.

Q. Up until that point, did you have any information that any of his employees were missing?

A. There was only one caller at that time.

Q. So, you did not have any information that an employer or an employee at his work was missing at that point; correct?

A. Not at that point.

Q. Okay. So, just so I understand your testimony, when you saw him with the knife, the injuries to his

at this point?
A. Yes. We saw the knife, blood on the arms.
Q. Okay. And when you made the dispatch regarding this, you specifically referenced blood on the wrist, specifically; correct?
A. Yes.
Q. Okay. After this is going on for a little while, does he eventually get out of the car?
A. Yes.
Q. Was he ever ordered to get out of the car?
A. No. He was specifically told to stay in the car by Officer Wissler.
Q. Okay. You heard Officer Wissler command him to stay in the vehicle?
A. Yes.
Q. And approximately how many times did you hear this command?
A. Approximately one time.
Q. And the other commands, I think you had indicated, were, "Show your hands"?
A. Yes.
Q. Do you have an estimate as to how many times you heard that, prior to him exiting out of the vehicle?
A. Approximately three times.
Q. Is there any other commands that you heard that

we haven't discussed?

A. When he exited the car, after Officer Wissler told him to get back into the car, he did also tell him to face away from us.

Q. Prior to Mr. Diaz exiting out of the vehicle, is there any other commands that you heard that were given to him that you haven't mentioned yet?

A. Not that I recall.

Q. Okay. Do you ever run the plates on the car of the green Charger?

A. Yes. Prior to contacting the vehicle, Officer Wissler broadcasted the license plate over the radio.

Q. Do you recall what, if any, information came back to that license plate?

A. I don't recall the registered owner of that vehicle.

Q. Okay. Now, prior to Mr. Diaz getting out of the vehicle, it's still just the two cruisers; correct?

A. Yes. And a request was made for a third unit to respond to the scene.

Q. Okay. And you went and got the M4 out of your trunk, prior to Mr. Diaz exiting the vehicle; correct?

A. Yes, sir.

Q. And do you take a position on the passenger side of the vehicle?

A. I take the passenger side position of Officer Wissler's vehicle.

Q. Okay. Are you kind of like in the V of the passenger front door?

A. I would say just a step or two back, yeah.

Q. Okay. Do you have some training that a vehicle could be used for cover sometimes?

A. Yes, I do.

Q. And why did you take that position in that particular area with your rifle?

A. Because the suspect could also utilize their vehicle as cover. In this situation, we were dealing with a man with a gun; so we are allowed to deploy our rifle if we are going to be dealing with an armed suspect, or to meet their fire power or exceed it, as well.

Q. Generally speaking, when you receive information about a call, is one of the things that you try to do is respond to the call and to investigate?

A. Yes.

Q. And in your experience, sometimes the information you receive about the call is accurate, and other times it's not?

A. Yes.

Q. And one of the duties you do when you arrive is

to investigate, to gather information; correct?
A. Yes.
Q. Okay. When you took your position near the front passenger door of Wissler's vehicle, was there anybody to the right of you?
A. Prior to moving to the high-risk tactics, yes, my partner, Officer Bermudez, and also Officer Garcia.
Q. Okay. Both of them were near the front passenger door of Wissler's vehicle?
A. Yes, before we changed the configuration of the patrol vehicles to high-risk tactics.
Q. I think you indicated earlier, one of the documents or videos you reviewed in preparation for your deposition today was the body cam. Do you remember that?
A. Yes.
Q. In your body camera video, can you hear yourself -- I believe it's Garcia that you're talking to, say something to effect, "Do you want to quarterback this? I've got the rifle," or words to that effect?
A. Yes, I do.
Q. Was that Garcia that you were talking to?
A. Yes.
Q. Okay. Explain to me a little bit, what does it mean when you say, "Do you want to quarterback this"?

Q. Okay. And I understand you're not staring at your watch. This is an estimate of time. Understood?
A. Yes.
Q. At some point, you see Mr. Diaz exit out of the vehicle?
A. Yes.
Q. Okay. And what, if anything, does Mr. Diaz do after he exits out of his vehicle?
A. When he exits out of his vehicle, he has the knife on his right hand, staring at every single one of us, with the -- what I would describe as a "thousand-mile stare," where he has no remorse, and just identifies each one of us from left to right, before proceeding to advance to us.
Q. Did you ever make eye contact with Mr. Diaz at this point?
A. Yes.
Q. Okay. Do you, yourself, ever give any commands to Mr. Diaz when he exits out of the vehicle?
A. I do.
Q. And what commands do you give?
A. To get on the ground and drop the knife.
Q. And approximately how many times do you give those commands to get on the ground and drop the knife?
A. Approximately three times.

Q. Okay. And while you're giving these commands, does Mr. Diaz say anything in response?
A. He nods his head left to right, gesturing as, "No."
Q. Okay. Do you ever hear him say anything verbally, Mr. Diaz, at this point?
A. No.
Q. Did you ever hear him make any sounds?
A. No.
Q. Okay. Is Mr. Diaz walking towards -- strike that.
Is Mr. Diaz walking at this point?
A. Yes.
Q. And does that street run north and south?
A. East and west.
Q. Okay. What cardinal direction is Mr. Diaz walking at this point when he exits out of the vehicle?
A. He is walking east to west, towards us.
Q. Okay. From east to west.
And as he's walking, where is this knife now? Is it on his side? Is it up? How would you describe it?
A. He has it off to his side of the hip, pointed towards us.
Q. Okay. And it would have been off to his side,

A. No.
Q. Did you ever see him jogging?
A. No.
Q. Okay. When Mr. Diaz exits out of his vehicle, is he bleeding?
A. Yes.
Q. And where do you see blood on Mr. Diaz?
A. He had it on his arms, wrist, shirt, pants, hands.
Q. When Mr. Diaz exits out of his vehicle -- when he exits out of the vehicle, is the door to the green Charger left open, or does he close it?
A. He closes it.
Q. So after he exits out, he closes the door behind him?
A. Yes.
Q. Okay. Prior to him closing the door behind him, do you ever see any other occupants in that vehicle?
A. No.
Q. Okay. At some point while Mr. Diaz is walking in a westerly direction, are you able to see his full body?
A. Can you repeat that?
Q. Sure. It was a bad question. If I ask a

A. Yes.
Q. Okay. At some point, you discharge your weapon?
A. I do.
Q. Okay. How many shots did you fire?
A. Two shots.
Q. Okay. Do you know if a round count was ever done on your gun?
A. Yes.
Q. Did you say in your interview that you fired three shots?
A. I did.
Q. Okay. But as you sit here today, you say you fired two shots?
A. Yes. After reviewing, I discovered it was only a volley of two shots.
Q. Is that, in part, after having done a round count?
A. After reviewing our body-worn and documents, yes.
Q. How many bullets fit in the magazine of your M4?
A. Maximum capacity is 30 rounds, but we remove up to one or two rounds from the maximum capacity.
Q. What is your custom and habit? How many do you

usually load? Do you usually load 28?
A. Yes.
Q. Okay. Do you also keep one in the chamber when you have the magazine with 28, or do you just not have one in the chamber, as well?
A. No. Patrol ready is magazine inserted. However, the chamber is empty until it gets deployed. Then we chamber one round.
Q. Okay. So you would have -- in order to first fire, you would have to rack a round in, basically?
A. Yes.
Q. Okay. And after a round count was conducted on your gun, were there 26 rounds in the magazine after the round count?
A. Twenty-five in the magazine, one in the chamber --
Q. Okay.
A. -- which will equal the 26.
Q. I'm not a mathematician, but that sounds like it would be two, then; correct?
A. Yes.
Q. Okay. Gotcha.
Now, did you, yourself, ever give a verbal warning that deadly force would be used before firing?
A. No, but my partners did.

Q. Okay. Based on your training, are you trained to give a verbal warning before using deadly force, when feasible?
A. When feasible, yes.
Q. Okay. Did you hear any gunshots prior to you firing your weapon?
A. No.
Q. Okay. How about after you fired your two shots, did you hear any additional shots being fired?
A. I would say it was simultaneously.
Q. Okay. Did you fire your two shots in rapid succession, or was there a pause in between your two shots?
A. A pause between rounds.
Q. Okay. Do you have an estimate as to how long you paused in between the two rounds?
A. I would say half a second.
Q. Did you reassess in between firing your two rounds?
A. Yes.
Q. As you're firing, do you hear other officers also firing their weapons?
A. Yes, I do.
Q. Okay. Do you know which other officers were firing their weapons at that point? I'm not talking

about what you learned later down the road. While you're actually firing, like, were you cognizant of which of the other officers were firing?
A. At that point, only Officer Wissler and Officer Garcia. Yeah.
Q. Okay. You -- you didn't know whether or not your trainee, Bermudez, had fired yet; correct?
A. Yes. He was further away from me.
Q. At some point, did you later learn from Bermudez that he also had fired his weapon?
A. Yes.
Q. Okay. And I think you said this earlier -- sorry for asking again -- did you hear anybody else give a verbal warning that deadly force would be used prior to firing?
A. Yes, I did.
Q. Do you know who it was that gave that verbal warning?
A. I believe it was Officer Garcia.
Q. Okay. And what do you recall him saying in regards to that verbal warning?
A. To "Stop, we don't want to shoot you."
Q. And you think, "Stop, we don't want to shoot you" is the verbal warning that deadly force would be used?

that if you shoot somebody center mass, it could cause them death or serious bodily injury?
A. Yes, it's to stop a threat.
Q. And your training is shooting somebody center mass could cause death or serious bodily injury; correct?
A. Yes, to stop a threat.
Q. Did you intentionally press the trigger twice on your M4 rifle?
A. Yes.
Q. For example, you didn't have, like, an accidental discharge or something like that; correct?
A. No.
Q. Okay. At some point, do you see Mr. Diaz stop walking -- stop walking in that westerly direction?
A. Prior to the shooting?
Q. At any time, prior to, during, or after.
A. No. He continued to walk until the threat was stopped.
Q. And based on what you observed, he was walking while all the gunshots were being fired at him still?
A. Yes. He was still proceeding forward.
Q. At any point, do you see Mr. Diaz going to the ground, like, falling to the ground?
A. Yes, after.

A. Yes.
Q. And you would agree no gun was recovered from his person after he was patted down; correct?
A. At that moment, I did not know, because I transitioned to clearing the vehicle for any possible downed victim.
Q. When you went and cleared the vehicle, did you see anybody inside of the vehicle?
A. No. Just a large amount of blood on both of the driver and passenger seat.
Q. Okay. Did you ever see a gun inside the vehicle?
A. No. I didn't finish searching the vehicle, before -- plain view, no.
Q. Did you ever see, like, a bloody razor blade or anything in the vehicle?
A. A razor blade? No, not that I recall.
Q. Or any edged weapon?
A. Just the one that he had in his hand.
Q. At some point when Mr. Diaz goes to the ground, do you guys eventually put a tactical plan together to approach him?
A. Yes.
Q. Okay. At some point -- did he still have that object in his hand when he went to the ground?

A. Yes. That's when we came up with a tactical plan to safely apprehend him and administer first aid.
Q. Do you have an estimate as to -- after Mr. Diaz went to ground, as to how much time passed before you guys did the approach?
A. I would say approximately one minute.
Q. Okay. At some point is the item removed from Mr. Diaz's hand?
A. Yes.
Q. Did you do that or somebody else?
A. That was an assisting officer who did that.
Q. Do you know the name of that officer?
A. Officer Choi.
Q. At some point prior leaving the scene, are you able to see that that was a flathead screwdriver that he was holding?
A. No.
Q. So before you left the scene, you were still under the impression that it was a knife?
A. Yes.
Q. When did you first learn that it was, in fact, a screwdriver that he had?
A. That was after the incident was done and there was the review that the department does.
Q. Okay. But while you were at the scene, you

were still under the belief that it was a knife?
A. Yes, I was.
Q. Okay. At some point, is medical aid rendered to Mr. Diaz?
A. Yes. During the tactical plan, that was what I discussed with Officer Choi and Officer Bermudez: "Once we safely apprehend him, we have to administer first aid immediately."
Q. Did you participate in that, or no?
A. No. I directed officers on how to do it, which was to do immediate pressure on any puncture wounds or exit wounds.
Q. When you fired your first shot, did you have the impression that your shot struck him?
A. Yes.
Q. And what gave you that impression?
A. I visually observed it.
Q. And where did you see it strike him?
A. The upper chest area, on the left side.
Q. Okay. The same question with regards to your second shot. Were you under the impression that that one also struck him?
A. Yes, sir.
Q. And where do you believe that one struck him?
A. Similar area, just on the upper, left side of

MS. POWELL: Objection. Calls for a medical conclusion, and calls for speculation.
MR. VALENZUELA:
Q. Based on what you observed, were you under the impression that he was still alive at that point?
A. I believe he was still alive.
Q. Okay. At any point while you were at the scene, did you get the impression that Mr. Diaz had passed away?
A. Not until after.
Q. Not until you left the scene?
A. Yes.
Q. Okay. How long were you at the scene after the shooting before you left?
A. Approximately five minutes.
Q. Do they then, like, separate you and escort you out of there?
A. Yes.
Q. Okay. In reviewing your body camera, you keep yelling out for somebody to use the 40, prior to discharging your weapon. Do you remember that?
A. Yes, I do.
Q. And you keep yelling out, like, "40. 40. Hurry up. Somebody use the 40," or words to that effect. Do you remember that?

A. I do.
Q. Were you under the impression that somebody had the 40-millimeter out at that point?
A. At that point, we had requested for the next responding unit, which would be the third unit that was there, to grab the 40, so we could have a less-lethal option, as Mr. Diaz was advancing towards us.
And from my recollection, I do recall that those officers, once they arrived, they were getting the less-lethal launcher, but there was insufficient time because Mr. Diaz continued to advance towards us, prior to that unit getting the 40-millimeter launcher.
Q. But when you're yelling out "40, 40," did you think somebody had the 40-millimeter out, ready to go?
A. No. That was me for telling them to hurry up.
Q. Okay. You didn't think somebody had already brought out the 40-millimeter and was ready to use it; you were saying that for them to hurry up?
A. Yes. "Hurry," as we need this, because Mr. Diaz was continuing to advance on us, limiting our distance and time to react.
Q. When you yelled out, "40-millimeter, hurry up," or "40-millimeter," or words to that effect, at least at that point, did you think it was appropriate to shoot with the 40-millimeter?

so?

A. When it's safe to do so, yes.

Q. When you fired your weapon at Mr. Diaz, the first shot, approximately what distance was Mr. Diaz to you at that point?

A. Less than 5 feet.

Q. Okay. And what distance do you believe he was to Officer Wissler?

A. Approximately 3 feet.

Q. Would he have -- would Mr. Diaz have been the closest to Wissler when you fired your shot, or to another officer?

A. From that angle, it would be Officer Wissler and Officer Garcia.

Q. Okay. And that distance you believe to be approximately 3 feet?

A. Yes.

Q. Okay. And was he also approximately -- and 5 feet from you; did I understand you correctly?

A. Yes.

Q. Okay. And was he still that approximate 3 feet from Garcia and Wissler when you fired your second shot?

A. Yes, he still was.

Q. Okay. Okay. I want to show you, briefly, the body cam footage, just to confirm whether this is your

body cam or not. Okay?
A. Yes, sir.
Q. Can you see this video on your screen?
A. Yes, I do.
Q. Let me play it.
(Video being played.)
BY MR. VALENZUELA:
Q. Okay. Is this your body cam?
A. Yes, it is.
MR. VALENZUELA: And just for the record, it's Bates-stamped TPD 00040.
THE CERTIFIED STENOGRAPHER: Will this be marked as an exhibit?
MR. VALENZUELA: No, I don't think so. There's a lot of body camera footage.
BY MR. VALENZUELA:
Q. Let me show you this drone really quick. Can you still see the screen?
A. Yes, sir.
(Drone footage being played.)
BY MR. VALENZUELA:
Q. Okay. Do you see where my cursor is, up to the right?
A. Yes.
Q. Who would that officer be?

fired the last shot?
A. Yes.
Q. Do you recall how the decedent fell to the ground? In other words, did he fall on his butt? His back? Prone? On his chest? Do you recall how he went down to the ground?
A. Yes. He fall -- he fell to his buttocks, and his back landed on the wheel well of my patrol vehicle, on the passenger side.
Q. The front wheel well of the passenger side?
A. Yes, which would be the front passenger tire.
Q. Okay. Gotcha.
Did you notice where he was struck with the gunfire, after the shooting?
A. I believe center mass.
Q. You saw shots to his, like, chest and torso area?
A. When we were administering first aid, yes.
Q. Okay. Did you see shots to any other part of his body?
A. No.
Q. Okay. While they're rendering medical aid on Mr. Diaz, did you hear him make any sounds?
A. "Sounds," no.
Q. You didn't hear him say anything, did you?

leading.

BY MS. POWELL:

Q. You can answer.

A. Yes. At that point, I did not know where exactly they were at and who was getting the 40-millimeter launcher.

Q. Why did you not wait for Officers High and Choi to respond and position with the 40-millimeter before engaging Mr. Diaz?

A. Mr. Diaz exited the vehicle on his own, without being told so, and began to close the distance on us, limiting the effective range for that 40-milimeter launcher.

MS. POWELL: All right. I have nothing further, Mr. Valenzuela.

MR. VALENZUELA: Really briefly.

FURTHER EXAMINATION

BY MR. VALENZUELA:

Q. There's initially four officers there, right? You, Bermudez, Garcia, and Wissler; correct?

A. Yes, sir.

Q. Before Mr. Diaz ever exits out of his vehicle, none of those officers were ever designated as less-lethal; is that correct?

A. Yes, sir.

STATE OF CALIFORNIA)
) ss:
COUNTY OF BUTTE )

I, KIMBERLY E. D'URSO, do hereby certify:

That the witness named in the foregoing deposition was present remotely and duly sworn to testify to the truth in the within-entitled action on the day and date and at the time and place therein specified;

That the testimony of said witness was reported by me in shorthand and was thereafter transcribed through computer-aided transcription;

That the foregoing constitutes a full, true and correct transcript of said deposition and of the proceedings which took place;

Further, that if the foregoing pertains to the original transcript of a deposition in a federal case, before completion of the proceedings, review of the transcript [ ] was [ ] was not requested.

That I am a certified stenographic reporter and a disinterested person to the said action;

IN WITNESS WHEREOF, I have hereunder subscribed my hand this 26th day of July, 2026.

______________________________________

KIMBERLY D'URSO, CSR NO. 11372, RPR

# EXHIBIT "D"

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

MARIA GUADALUPE DIAZ; A.D., a minor by and through his Guardian Ad Litem, MARIA GUADALUPE DIAZ; A.D., a minor by and through his Guardian Ad Litem, MARIA GUADALUPE DIAZ; LEONARDO DIAZ; and RAMONA RAMIREZ DE DIAZ,

Plaintiffs,

vs.

CITY OF TORRANCE; ARTURO CASTILLO; CODY WISSLER; JESUS GARCIA; JASON BERMUDEZ; and DOES 6-10, inclusive,

Defendants.

Case No.: 2:25-cv-03389-JLS (JCx)

VIDEO-RECORDED REMOTE VIDEOCONFERENCE DEPOSITION OF

OFFICER JASON BERMUDEZ

THURSDAY, JULY 16, 2026

Reported by: Michelle Bulkley, CSR #13658
Job #28994; Pages 1 - 104

OFFICER JASON BERMUDEZ,

having been first duly sworn, was examined and testified remotely as follows:

EXAMINATION

BY MR. VALENZUELA:

Q Okay. Good afternoon, Mr. Bermudez.
A Good afternoon, sir.
Q Can you please state and spell your name for the record.
A My name is Jason, J-A-S-O-N. Last name Bermudez, B-E-R-M-U-D-E-Z.
Q You've listened in on the depositions of the other officers; correct?
A Yes.
Q So I'm going to skip the kind of introduction rules and just get right into it. Okay?
A Sounds good.
Q What documents did you review in preparation of your deposition today?
A I reviewed the, essentially, call comments is what they're referred to, which is just written transcript of the call for service, as well as my Learning Domain 20, which is on the academy.
Q Is there anything else that you've

reviewed?
A And the transcript for my Internal Affairs interview.
Q Did you review any of the videos of the incident?
A Yes.
Q Would it just be your video that you reviewed or other officers' body-worn cameras and/or dashcam videos?
A I reviewed my body-worn camera, the in-car camera, and drone footage.
Q Have you ever seen any of the body cam footage from Officers Castillo or Wissler?
A Just Wissler.
Q Okay. Have we gone over all the documents you reviewed in preparation for your depo today?
A Yes.
Q Okay. Have you ever had your deposition taken before?
A No.
Q Have you ever testified in court before?
A Yes.
Q And how many times?
A About ten times.
Q And was that in criminal matters?

designated as lethal cover?
A Any written policies? No.
Q Okay. What about any written training with regards to that?
A Written training? Not that I can recall.
Q Did you yourself -- strike that.
Do you recall the date of the incident?
A Yes.
Q Is it December 2, 2024?
A Yes.
Q Did you provide a recorded interview at some point?
A I did.
Q Did you give that on December 10th?
A Yes.
Q So approximately eight days after the incident?
A Yes.
Q Does somebody else decide when the interview would be provided?
A Yes. The interview was decided based on conversations between my attorney at the time and the Internal Affairs investigators.
Q You're not part of the decision-making as to the date that the interview is given. Is that

fair?

A That's correct.

Q Did you have an attorney representing you during your interview?

A Yes.

Q Is that attorney Stephen Chulak, C-H-U-L-A-K?

A Yes.

Q Do you know if that's the same attorney that was provided to the other three shooting officers?

A I believe so.

Q Other than the interview that you gave on December 10th, did you give any other interview?

A No.

Q Okay. On the date of the incident -- I want to talk a little bit about the equipment you had on you. Okay?

A Okay.

Q First of all, you were in the vehicle with Officer Castillo; correct?

A Yes.

Q And Officer Castillo was your field training officer on the date of the incident; correct?

A Yes.
Q And were you driving or was Officer Castillo driving?
A Officer Castillo was driving.
Q Okay. And with regards to the equipment you had on you that day, did you have a handgun?
A I did have a handgun.
Q What kind of handgun did you have?
A A Glock Model 45.
Q Is that a 9 millimeter?
A Yes.
Q Is that a semi-automatic weapon?
A Yes.
Q Does that require you to pull the trigger for each bullet to be fired?
A Yes.
Q How many shots did you fire during this incident?
A Three.
Q And did you intentionally pull the trigger three times on the date of the incident?
A Yes.
Q In other words, there was no accidental discharge; correct?
A Correct. There was not an accidental

Q And based on your training with regards to the use of deadly force, were you trained that if an individual has a gun in their hand, deadly force can be used against them, that fact alone?
A No. We would also need more information.
Q On the date of the incident, had you been on some prior calls prior to the call related to this incident?
A Yes.
Q Approximately how many?
A I think it was two calls.
Q Okay. And when you first received information relating to this call, where were you?
A I was in the area of Hawthorne Boulevard and Fashion Way by the Del Amo Mall.
Q Were you at Chipotle?
A Yes.
Q Have you -- were you guys like eating lunch at that time -- or strike that. This would have been later in the day.
Were you guys having food at -- when you first received the call?
A I was in the car. My FTO was getting food.
Q Okay. And do you recall the information

you first received relating to the call?
A Yes.
Q And what was that?
A It was a man with a gun who stated he wanted to shoot somebody.
Q Was your FTO out of the vehicle when you first received that call?
A I believe he was at the trunk of our car while I was in the passenger seat.
Q But he would have been outside the vehicle near the trunk area?
A Yeah.
Q And did you receive the information on the call over the radio?
A Yes.
Q Okay. Does your vehicle also have an onboard computer?
A Yes.
Q Do you recall ever receiving any information relating to the call on the onboard computer?
A Yes. My FTO was receiving that information.
Q Okay. But when that call first came in, he wouldn't be able to see the computer, right,

call?

A Yes.

Q Okay. And do you have an estimate as to the distance from where you were near the Del Amo Mall to where the incident ultimately occurred?

A It was about a five-minute drive.

Q Okay. While en route, do you receive any updates relating to the call?

A We got updates that our dispatchers were pinging the cell phone used by the reporting party who called 911, and that phone was pinging in the middle of Oregon Court, just east of Maple.

Q Did you receive any other updates?

A Yes. They said that phone belonged to a Leo or Leonardo Diaz, and they provided physical descriptors of him, that he's about 6 feet and 285 pounds.

Q Were you given any information about his criminal history?

A No.

Q Did the initial call indicate that anybody had been physically injured?

A No.

Q Did the initial call indicate that shots had been fired?

Q Okay. At some point do you speak to any of the occupants of the nearby businesses?
A I believe FTO Castillo did.
Q Were you near FTO Castillo when he spoke to one of the occupants of the nearby business?
A Yes.
Q Okay. And do you recall what, if anything, the occupant said to FTO Castillo?
A He relayed to him that the business that Mr. Diaz worked at was no longer there.
Q Did he relay that that business had vacated approximately a week prior?
A Yes.
Q And then at some point do you receive some information that a drone is being utilized?
A Yes.
Q At some point do you receive some information about a green Dodge Charger?
A Yes.
Q Did you yourself ever see the green Dodge Charger prior to receiving radio communications about that vehicle?
A I believe the radio put out there was a Hispanic male in the green Charger before we might have arrived on scene.

Q At some point did the vehicle containing Garcia and Wissler become the primary unit because that area was part of their beat?

A Yes.

Q When did that transition occur from you being the primary to Garcia's vehicle being the primary?

A I would say when Officers Wissler and Garcia arrived on scene because they had arrived before us.

Q And when you first saw the vehicle with Wissler and Garcia, was that near the place you believed that Mr. Diaz had worked at?

A It was -- I believe it was on Maple. We were just -- on Maple just west of Oregon Court.

Q And then at some point you guys drive to the area where the green Charger is; correct?

A Yes.

Q And the vehicle you're in, is it then parked somewhere behind the green Charger?

A Yes.

Q Do you recall whether or not Garcia's vehicle was parked behind the Charger first?

A Yes. They parked maybe a couple of seconds before us.

Q Okay. And prior -- at some point you exit your vehicle?
A I did.
Q Prior to exiting your vehicle, did you have any discussions regarding tactics with FTO Castillo?
A FTO Castillo had brought up that due to he was the driver and it was my first day on patrol that he would be the contact officer. If [unintelligible] --
(Reporter clarification.)
THE WITNESS: Oh, yeah, yeah.
Can you repeat the question? Sorry. I got distracted with that.
MR. VALENZUELA: Sure. Can you read back the question, Madam Court Reporter?
(Whereupon the record was read as follows:
"Question: Prior to exiting your vehicle, did you have any discussions regarding tactics with FTO Castillo?")
THE WITNESS: Yes. So because Castillo was driving and because it was my first day on patrol, he -- he told me that he would be the contact officer if and when we did encounter this suspect, and that because we're going to a call of a

man with a gun who wants to shoot somebody, that we would be utilizing our firearms in contacting the subject.

BY MR. VALENZUELA:

Q So were you essentially designated as a lethal cover at that point?

A Yes. That's how I understood it.

Q At any point prior to exiting your vehicle, were you ever designated as a less-lethal option?

A No, never.

Q Prior to exiting your vehicle, did you and FTO Castillo have any discussions about somebody being a less-lethal option?

A Between me and FTO Castillo?

Q Correct.

A No.

MS. POWELL: I'm going to object that the question was vague.

Mr. Valenzuela, if you could clarify. Do you mean the conversation as between the two of them who would be lethal or anyone else?

MR. VALENZUELA: I think he answered it already, and it was just between him and Castillo.

MS. POWELL: Okay. All right. Very good.

BY MR. VALENZUELA:
Q At some point you and Castillo exit out of your vehicle?
A Yes.
Q Do you know whether or not Garcia and Wissler exited their vehicle prior to you guys?
A Yes. I -- I assume they did, a few seconds before -- before us.
Q Okay. So you guys exit your vehicle a pretty short time period after Garcia and Wissler; correct?
A Yes. It's within seconds.
Q Okay. And if I understand you correctly, you've been designated as a lethal, and your understanding, that Castillo was going to be a contact officer; correct?
A Yes.
Q At some point, when you exit your vehicle, where do you take a position up at?
A Right upon exiting, I'm on the like passenger side of my patrol vehicle.
Q Are you taking cover behind the passenger front door at this point?
A I believe I did, and then I moved up to take cover behind a -- I believe it was a gray

Q Okay. At some point, when you take that second position after moving from the Altima, were you then instructed to move one of the vehicles?
A Yes.
Q Were you instructed to move the vehicle that you had been riding in or Garcia and Wissler's vehicle?
A Me and Castillo's vehicle.
Q Okay. And who told you to move the vehicle?
A FTO Garcia.
Q Do you recall around this time FTO Castillo telling you, "Do what Garcia says," words to that effect?
A Yeah, something along those lines.
Q Did you ever hear Castillo tell Garcia, "You want to quarterback this," words to that effect?
A I think -- I think I heard him say that, yeah.
Q Were you under the impression that Garcia was going to be taking the lead after you heard Castillo reference quarterbacking the situation and telling you, "Listen to what Garcia says"?
A The lead as in doing what FTO Garcia says

"Hey, you're lethal cover." I think that was something me and FTO Castillo kind of -- that was my understanding when we were -- in going en route to this call.

Q And to clarify, I meant did Garcia ever verbally tell you that you were going to be designated as a lethal cover?

A No.

Q Okay. Did Garcia ever tell you that you were going to be designated as a less-lethal cover?

A No.

Q And then you followed Garcia's directive to move the vehicle; correct?

A Yes.

Q And during this time, when Garcia told you to move the vehicle, he never told you to get the 40 millimeter out of the vehicle that you were going to be repositioning; correct?

A Correct. I was never instructed to get the 40 millimeter.

Q Where did you position that vehicle in relation to the other vehicle?

A I park -- I parked it just north of Officer Wissler and Officer Garcia's police vehicle, both facing east.

Q That street that the green Charger was on, does that run north and south?
A No. The Charger was parked in Oregon Court which runs east/west.
Q Okay. And I think you said the vehicle was pointed east?
A Yes.
Q The green Charger, that is.
A Yes. The green Charger facing east.
Q Okay. And you parked your vehicle north of the other police cruiser?
A Yes.
Q Did you understand the doors of that vehicle to be ballistic doors?
A Yes.
Q And ballistic doors are -- essentially means they could stop a bullet, some kind of bullet?
A Yes.
Q And I think I may have asked it, and I apologize. Where did you take up a position after you repositioned the vehicle?
A I was behind the driver door of my police vehicle that I moved, which was north of Officer Wissler and Garcia's vehicle.
Q Would you have been the further -- the

furthest northern officer at that point, the way the officers were lined up?
A Yes.
Q Would the next officer to your right or to the south -- would that have been Officer Garcia?
A Yes.
Q And would he have been positioned near the open passenger front door of -- of the vehicle you just repositioned?
A Yes. He -- he was there.
Q Would the next officer to the right or to the south -- would that be Wissler?
A Yes.
Q And he would have been positioned behind the front driver's door of the other vehicle?
A Yes.
Q And then the next officer -- excuse me -- to the right or to the south, that would have been FTO Castillo?
A Yes.
Q At some point did you become aware that FTO Castillo had went and retrieved the long rifle?
A Yes.
Q When did you become aware of that?
A Right after we parked, I saw him go -- go

to his trunk and got his rifle and then rack a round in it.
Q Is that rifle an M4 Colt?
A I -- I think so. He may have a different rifle due to him being on SWAT. I'm not sure.
Q If you know. If you don't know, that's fine.
A No. I don't know.
Q Okay. Did you yourself ever volunteer to be the less-lethal cover?
A No.
Q At some point prior to Mr. Diaz exiting the vehicle, did you receive information that Mr. Diaz was bleeding from his wrist and that he had a knife?
A Yes.
Q Okay. And is that information you received over the radio or from the other officers or both?
A Yes. Over the -- over the radio.
Q Okay.
A And I -- I heard Officer Wissler, I believe, yell, "He has a knife."
Q Okay. So that information, you got it both over the radio and from what you heard from the

other officers?

A Uh-huh, yes.

Q When you heard that the individual in the vehicle was bleeding from the wrist and had a knife, did you ever think it was a possibility that he had self-inflicted those wounds?

A I only -- so when he exited the vehicle and then I saw -- I saw him bleeding from his wrists and the knees and thighs, that's when I assumed he was maybe cutting himself.

Q When you assumed that he was maybe cutting himself, did you ever think he may be suicidal?

A Maybe, but that was before we were contacting him. Once he exited the car, to me, his behavior changed, and he appeared to be homicidal, that he wanted to stab one of -- one of us officers.

Q So I think you indicated right now that when he stepped out of the vehicle and you saw that he was bleeding and had a knife, that you thought he may have cut himself. Did I understand you correctly?

MS. POWELL: I'm going to object that it misstates his testimony.

But you can --

THE WITNESS: Sorry. Like -- can you

A Yes. He stands up.
Q Okay. And when he stands up, are you able to see the front profile of him?
A Yes.
Q Can you see, for example, the top of his head to his feet?
A I can, yes.
Q And when he first stepped out of the vehicle and stood up, could you see his hands?
A Yes. I could see he was holding a -- what I thought was a knife in his right hand.
Q Okay. When he was holding this knife in his right hand, was it down by his side near his hip or his -- the side of his right thigh?
A I would say it was by the right side of his hip, maybe slightly above it, near maybe his belly button.
Q Was it off to the side?
A Yes. His -- his right arm was -- was off to the side. It was -- the knife was clearly visible. It wasn't intended to be concealed by any part of his body.
Q But what I'm trying to get at is, the knife is off to the side, his right side, maybe the height of his hip or his belly button; is that

A Correct.
Q Okay. Did you ever see him at any point reach into his waistband?
A No.
Q Did you ever see him reach into any of his pockets?
A No.
Q Up until this point, where he's now stood up out of the vehicle and you could see him, had you received any information that anyone other than Mr. Diaz had been injured?
A No.
Q Did you receive any information that anyone had been shot?
A No.
Q And did you receive any information that any gunshots had been fired up until that point?
A No.
Q At some point do you hear commands being given -- or strike that.
I'm talking about at any point now, not before he exited the vehicle. While he's still in the vehicle, do you hear any commands being given to him?
A Yes.

Q And what are those commands that you hear?
A I hear Officer Wissler saying, "Roll down the window, let me see your hands, and kick the door open."
Q While Mr. Diaz was still inside the vehicle, did you ever hear any commands from Mr. Diaz [sic] to exit out of the vehicle?
A No.
Q At some point, when Mr. Diaz exits the vehicle, do you hear additional commands being given to him?
A Yes.
Q And what are those commands?
A Initially it's "Turn around and drop the knife."
Q Did you ever hear any command for him to turn around and walk backwards towards the officer?
A No. No commands were ever given for him to walk towards officers.
Q When Mr. Diaz first exit out -- exits out of the vehicle and stands up, is he stationary, or is he already walking?
A No. He's walking to -- he's walking in my -- in my direction.
Q So upon exiting the vehicle, he

Officer Castillo now gives commands to, "Get on the ground" --
Q Okay.
A -- "and drop the knife."
MR. VALENZUELA: Okay. We've been going for about an hour. Is this a good time to maybe take a ten-minute break?
THE WITNESS: Sure.
MR. VALENZUELA: Okay.
THE VIDEOGRAPHER: Going off record at 2:45 p.m.
(Recess.)
THE VIDEOGRAPHER: Back on record at 12:54 p.m. -- 2:54 p.m.
BY MR. VALENZUELA:
Q All right. I think we were up until the point where Mr. Diaz has exited out of the vehicle and stood up and was -- started walking. Okay?
A Yeah.
Q And the direction that he's walking, what direction would that be? What cardinal direction would he be walking?
A Initially, northwest.
Q And earlier you described the knife as being to his side, maybe the height of his hip or

his belly button.

Do you remember that?

A Yes.

Q Did the knife remain in that position up until the time of the shooting?

A Yes.

Q And when Mr. Diaz is walking in a northwestern direction, how would you describe the speed that he's walking? Is he slow walking, normal walking, fast walking? How would you describe the speed?

A I'd say it was a -- it was a normal walk.

Q Okay. And did he continue that normal walking pace up until the time of the shooting?

A Yes.

Q For example, you never see him -- you never saw him jogging?

A Correct. I never saw him jogging.

Q Did you ever see him running?

A No.

Q Did you ever see him lunging at anybody?

A No.

Q Did you ever see Mr. Diaz making a stabbing motion with that knife?

A No.

A Yes.
Q Okay. Did you ever make eye contact with Mr. Diaz after he exited out of his vehicle prior to the gunshots?
A Yes.
Q And when was that?
A I think around the time when he pivoted, maybe like 15 feet in front of me because, when I saw him walking towards my direction, he was refusing to listen to Officer Wissler and Officer Castillo's commands.
I started -- I started giving commands now, such as, "Drop the knife; get on the ground and stop," and he didn't do any of those things, but he was -- he was looking at me.
Q Did you ever hear Mr. Diaz say anything prior to the gunshots?
A No.
Q Did you ever hear him make any noises prior to hearing the gunshots?
A No.
Q For example, you never heard Mr. Diaz verbally threaten anybody after having exited out of the vehicle; is that correct?
A I never heard Mr. Diaz say anything.

period?

A No.

Q Was there anything physically obstructing you, behind you, preventing you from moving backwards and increasing the distance between yourself and Mr. Diaz?

A Well, behind -- behind me, probably several feet behind me is the direction of Oregon Court and Maple Avenue, and it's about 5:00 p.m., so a lot of cars were in the area leaving work.

Q How many feet behind you do you think that street was?

A I think maybe like 20 feet.

Q Okay. So in between that 20-foot space, is there anything physically obstructing you from backing up?

A No, I don't think so.

Q Okay. Who -- at the time of the incident -- not what you learned later. Right now I want to kind of focus on what you knew at the time of the actual incident.

When you heard that first gunshot, who did you believe was the closest officer to Mr. Diaz?

A I -- I assumed it was either Officer Garcia or Officer Wissler. I did not know

Q Were you in some kind of shooting stance?
A Yes.
Q Did you have your gun in one or -- one hand or both hands?
A Both hands.
Q Okay. You have a red dot on your gun?
A I do.
Q And does that allow you to pick up your sights with having both of your eyes open?
A Yes.
Q After Mr. Diaz fell to the ground, are you still able to see him?
A After he fell to the ground, I don't believe I was able to see him. That's why I went behind my vehicle and then went to the passenger side, and then that's when I saw Mr. Diaz sitting/laying down next to the front wheel well -- or front passenger wheel well of the police vehicle.
Q Okay. And did he still have what you believed to be a knife in his hand?
A Yes.
Q Were you ever part of the arrest team that arrested Mr. Diaz after he was shot?
A Yes.
Q Were you the individual that put the

handcuffs on Mr. Diaz?
A Yes.
Q Was a tactical plan formulated to approach Mr. Diaz after the gunshots?
A Yes.
Q And who formulated that tactical plan?
A FTO Castillo.
Q Okay. Was the knife removed from his hand prior to you putting the handcuffs on Mr. Diaz?
A Yes.
Q And who removed that knife?
A Officer Choi.
Q At some point does a police vehicle containing Officer Choi and High arrive on scene?
A Yes.
Q Do you know whether they exited their vehicle prior to the gunshots being fired?
A What I knew at the time or what I know now?
Q What you knew at the -- at the time.
A No. At the time I -- I didn't know they arrived on scene.
Q Okay. At some point prior to hearing that first gunshot, did you hear any of the officers yell out, "40," multiple times?

bad lighting?

MS. POWELL: Objection. Vague and ambiguous as to "good or bad."

BY MR. VALENZUELA:

Q Do you understand the question?

A Are you able to clarify? I'm not really sure what good or bad lighting means.

Q Sure. How would you describe the lighting conditions at the time of the shooting?

A It wasn't -- it was like a dawn. The sun is going down, but -- the sky wasn't as bright as the middle of the day, but it wasn't as dark as the night. It was almost like a sunset.

Q Based on the lighting conditions, did you have trouble observing Mr. Diaz's actions?

A No.

Q When Choi removed that knife from Mr. Diaz's hand and you were approximately 5 feet away, did you notice at that point that it was actually a flathead screwdriver?

A Yes.

Q Was that when you first learned that it was a flathead screwdriver, when Choi was removing it from Diaz's hand?

A So when I went around the -- after I had

Then did you participate in providing medical aid to Mr. Diaz after the shooting?

A Yes.

Q And what did you do in that regards?

A I provided direct pressure over his gunshot wounds to stop the bleeding.

Q Where did you observe gunshot wounds on his person?

A I remember observing gunshot wounds to the right side of his stomach and I believe the left side of his chest.

Q What part of his body were you applying pressure on the gunshot wound?

A I believe both of those spots, the left side -- the left side of the chest and then the right side of his stomach.

Q As you were doing that, was Mr. Diaz's chest still expanding and contracting, like moving up and down?

A No. No. I did not see his chest rising and falling.

Q Okay. Did you ever notice whether or not Mr. Diaz was breathing when you were applying pressure on his wounds?

A To me, it appeared as though he wasn't

A No.

Q Were you yourself physically injured during the incident?

A No.

Q Do you know whether or not any of the other officers were injured -- physically injured during the incident?

A I don't think they had any physical injuries.

Q Prior to leaving the scene, were you told whether or not Mr. Diaz had passed away?

A No. I didn't know.

Q Okay. While you went back to the station for this five to six-hour period, were you told that Mr. Diaz had passed away?

A Yes.

Q Okay. I wanted to show you a copy of your body camera just to confirm whether or not it's your body cam. Okay? I think it is, but I just kind of want to confirm. One second.

(Audio played.)

Q Can you see this on your screen, this still shot of the body cam?

A Yes.

Q Okay. Let me play it for you.

REPORTER'S CERTIFICATE

I, MICHELLE BULKLEY, a Certified Shorthand Reporter of the State of California, do hereby certify:

That OFFICER JASON BERMUDEZ, in the foregoing deposition named, was present and by me sworn as a witness in the above-entitled action at the time therein specified;

That said deposition was taken before me at said time, and was taken down in shorthand by me, a Certified Shorthand Reporter of the State of California, and was thereafter transcribed into typewriting, and that the foregoing transcript constitutes a full, true, and correct report of said deposition and of the proceedings that took place;

IN WITNESS WHEREOF, I have hereunder subscribed my hand on 7/26/2026.

Michelle Bulkley

MICHELLE BULKLEY
CSR #13658

# EXHIBIT "E"

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

--oOo--

MARIA GUADALUPE DIAZ; A.D., a minor by and through his Guardian Ad Litem, MARIA GUADALUPE DIAZ; A.D., a minor by and through his Guardian Ad Litem, MARIA GUADALUPE DIAZ; LEONARDO DIAZ; and RAMONA RAMIREZ DE DIAZ,

Plaintiff,

v. Case No. 2:25-cv-03389-JLS (JCx)

CITY OF TORRANCE; ARTURO CASTILLO; CODY WISSLER; JESUS GARCIA; JASON BERMUDEZ; and DOES 6-10, inclusive,

Defendants.
_________________________________/

STENOGRAPHIC REPORTER'S TRANSCRIPT OF

REMOTE VIDEO DEPOSITION OF

CODY WISSLER

MONDAY, JULY 13, 2026

Reported Stenographically by:

KIMBERLY D'URSO, CSR 11372, RPR

Job No. 28993

introduced herself on the record and administered the oath to the deponent.)

THE WITNESS: Yes, ma'am.

EXAMINATION

BY MR. VALENZUELA:

Q. Good afternoon, Officer Wissler.

A. Good afternoon, sir.

Q. Were you listening in on the first deposition that we did earlier this morning?

A. Yes, sir.

Q. Okay. So I'll skip all the introduction stuff and just get right into it. Okay?

A. Yes, sir.

Q. Okay. Have you ever had your deposition taken before?

A. No, sir.

Q. Okay. Have you ever testified in court before?

A. Yes, sir.

Q. Do you have an estimate as to how many times you have testified in court?

A. Approximately five times.

Q. Would that be only in criminal cases, or would it be in both criminal and civil cases?

A. Criminal only.

Q. Okay. Did you review any documents in

ultimately Mr. Diaz was in, prior to the date of the incident?
A. No, sir.
Q. Okay. As you sit here today, do you know whether you have ever had any contact with Mr. Diaz prior to the date of the incident?
A. No.
Q. Okay. So, it's safe to say you didn't know anything about his background, for example?
A. That is correct. I didn't know anything.
Q. Okay. You didn't know if he had a criminal history; correct?
A. That is correct.
Q. Okay. And you didn't know if he had ever physically injured anyone prior to the date of the incident; correct?
A. That is correct.
Q. Okay. Did you receive any information on the call that anyone had been physically injured?
A. No.
Q. Okay. On the way to the location, from the storage unit where you were at on the prior call, did you and Officer Garcia have any discussions relating to the call en route?
A. Yes, en route. Due to the fact that we were

really close nearby, my job was to take a look on the west side of Maple. And he was keeping eyes on the east side of Maple, to see if anybody would flag us down; that way we could get more information, since we were right around the corner.

As we continued to get more and more closer, due to the fact that the call stated that there was a man with a gun and he wanted to shoot people, we had to take it very slowly, because we didn't know if were going to get ambushed or not.

(Reporter clarification.)

THE WITNESS: We would have to make sure that we were ready. And then we also discussed that that area, there are a lot of commercial businesses there with multiple workers, so we would have to systematically search both sides of the intersection of Oregon Court.

BY MR. VALENZUELA:

Q. At some point was your attention drawn to a green Charger?

A. Can you clarify when?

Q. Sure. I guess what I'm trying to figure out, my understanding is the drone -- the drone operator made reference to a green Charger, somebody potentially being inside. I guess what I'm trying to figure out, did you

receive that information prior to arriving to the area of the location?

A. No. We were already at the location when that information was dispatched to us.

Q. Okay. And approximately how long were you at the location when you received that information about the green Charger?

A. Approximately five minutes.

Q. Okay. And in that five-minute time, are you essentially driving around, looking for a suspect with a gun?

A. Yes. And then we were notified that the phone possibly returned to a Leonardo Diaz. And then as we were continuing to still look, our dispatch notified us that he was an involved party in some type of burglary that occurred at 2909 Oregon Court.

Q. And when you say "involved party," did the information indicates that he was a suspect in that burglary?

A. No. Dispatch just notified us that he was just involved. I didn't rule anything out, just that he was involved.

Q. Okay. I think the other officer, Castillo, made reference that they kind of exited their vehicle and looked at that prior place of employment. Did you

A. That is correct.
Q. Okay. Do you, then, go back into your cruiser after checking the front of the business?
A. While we are outside the business, that is when the drone operator notifies us that someone inside a green Charger is manipulating the driver's side door. At that point, that is when my FTO, Officer Garcia, notifies me that when we drove prior to that, passing a green Dodge Charger, he was able to observe a Hispanic male adult, sitting in that vehicle.
And he also notified me that that man possibly could match Leonardo Diaz, due to the fact that another dispatcher sent my FTO a picture of Leonardo Diaz.
Q. And you didn't recognize the namely Leonardo Diaz, did you?
A. That is correct. I did not recognize him.
Q. Did you see that photograph that was sent to your FTO?
A. Yes.
Q. Okay. And when you saw that photograph, again, you did not recognize the individual?
A. That is correct. My responsibility was to look on the north side of Oregon Court. So as we're driving down Oregon Court, I did not seen that green Dodge Charger, just because I was mainly focusing on the

businesses that are located on the north side.

Q. When your FTO told you that he saw a male Hispanic in this green Charger, did he tell you that the individual -- he had seen the knife?

A. No.

Q. Did he tell you that he had seen any injuries on the individual at that point?

A. No.

Q. Okay. And so at some point while you're outside the vehicle, you get this information from the drone operator, and then you get back into your cruiser?

A. That is correct.

Q. And then do you begin to go search for the green Charger?

A. That is correct.

Q. And do you essentially drive straight to where the green Charger was parked at that point?

A. Yes. I continued westbound on Oregon Court. I passed the green Dodge Charger that was located parked on the south side of Oregon Court. I continued to the intersection of Oregon Court and Maple, conducted a U-turn, and then proceeded to conduct a traffic stop on the green Charger.

Q. At some point, do you see the cruiser with Castillo and Bermudez in it?

A. I was not concerned on what was behind me. My main focus was to focus on the driver, in case he does come out and start shooting.
Q. And you indicated you were the contact officer; correct?
A. That is correct.
Q. At some point prior to the shooting, did you become aware that Bermudez and Castillo had exited out of their vehicles?
A. Prior to the shooting?
Q. Yes.
A. Yes.
Q. Okay. And when did you become aware that they were no longer inside their vehicles?
A. When we decided to conduct a high-risk stop, that is when I overheard Castillo talking to Officer Garcia and Officer Bermudez on formulating a game plan on how to conduct a high-risk stop.
Q. And did that include repositioning Castillo's vehicle?
A. That is correct.
Q. Okay. When you get out of your car, where do you take a position at?
A. I exit my vehicle, and I am between the driver's side seat and the door panel.

Q. And do you essentially stay in that position during the incident, including at the time of the shooting?

A. Yes.

Q. Okay. In other words, you didn't change positions from that initial position, up until the time of the shooting; correct?

A. That is correct.

Q. Okay. At some point, do you begin giving commands to the individual in the green Charger?

A. Yes.

Q. Okay. And what commands do you begin to issue?

A. "Open the door," and "Let me see your hands."

Q. Prior to that, had you received some information from, like, the drone operator or from another source that the individual in the car kept opening and closing the door?

A. That is correct.

Q. Would that have came from the drone operator?

A. Yes. While me and Officer Garcia were at the 2909 address, the drone operator continued to notify us that the driver in the green Charger began to open and close his door. It was never fully open.

He was almost manipulating it so it would come out 3 inches, and then go back closed, and then come out

another 3 inches. So that was broadcast at us via the drone officer.

Q. At any time, did you, yourself, ever see the individual doing this with the door? Like, you, yourself, see that?

A. Yes.

Q. Would you have been inside your vehicle or outside when you saw that, or both?

A. I was outside my vehicle.

Q. And when you saw the individual in the car opening and closing his door, could you see inside of the vehicle at all?

A. Not initially.

Q. Okay. What, if anything, could you see when he was initially opening and closing the door?

A. When I exited my vehicle and I commanded him to open the door, he began to open and close the door. I began to give him multiple commands on opening the door; "Let me see your hands."

And then, after giving commands for approximately two minutes, he was able to open the door further enough to where I could see that he had blood over his hands and arms and that he was armed with a knife.

Q. In this approximately two-minute period that

Q. One man with a gun, correct; not multiple individuals?

A. That is correct.

Q. Okay. When you saw the door opening and closing, at some point you could see -- I think you said you saw blood and a knife?

A. Yes, sir.

Q. When this was occurring, like, up to what part of the body could you see? Could you see all of the arm up to the elbow? How would you describe that?

A. Up to the forearm.

Q. Okay. And before the individual exited out of the vehicle, did you ever hear somebody say that, "He has a knife and he's bleeding from the wrist"?

A. I do not recall. I just -- since my job is the contact, I notified other officers that he has a knife and that he's bleeding. I'm -- my job is not to dispatch the information to the radio.

So when I saw that he opened the door and that there was blood on him, and he had a knife, that is when I broadcasted that to my other officers; and then that is when Officer Castillo broadcasted that over the air.

Q. Did you hear Castillo broadcast that the individual had a knife and was bleeding from the wrist, prior to firing your gunshots?

Q. And you indicated you could see up to what portion of his arm, again, when he was opening and closing this door?
A. The forearm.
Q. Okay. And then you dispatched that he had a knife; correct?
A. I didn't -- I didn't dispatch that. I just notified my partners, and then they would notify the radio or who used the radio and notified dispatch.
Q. Thank you for clarifying that.
Did you also notify your partners that the individual was bleeding, or no?
A. I just stated that I saw blood, and that he had a knife. I could not tell if was -- if he had any injuries --
Q. Okay.
A. -- or if there was a person down in that vehicle.
Q. Gotcha. At some point -- strike that.
Did you ever command him to exit out the vehicle?
A. No.
Q. Okay. Other than seeing a knife -- strike that.
You did see a knife on the person while he was

still inside vehicle; correct?
A. Yes.
Q. Okay. But you did not see a gun on this individual while he was inside the vehicle; is that correct?
A. That is correct.
Q. At some point, the individual exits out of the vehicle?
A. Yes.
Q. And was the two-minute period of time that you indicated, was that an estimate as to when you exited your vehicle until Mr. Diaz exited his vehicle?
A. That is correct.
Q. Okay. When Mr. Diaz exited his vehicle, does he then exits out and stands up?
A. Yes.
Q. Okay. And does he begin walking in a westerly direction towards you guys?
A. Yes. I command him to open the door and see his hands. As he begins to stand up, I command him to stay there. That is when he exits the vehicle, stands up, and looks at all four of the officers, and then continues walking west on Oregon Court, towards me.
Q. In your experience as a police officer, is it uncommon for an individual that you're giving commands

Q. Did you ever see him -- strike that.
You don't see a gun in his hands; would you agree?
A. Yes.
Q. Did you ever see him reaching for his waistband?
A. No.
Q. Did you ever see him reaching for any of his pockets on his clothing?
A. No.
Q. When he's walking in your direction, where does he have what you believe to be a knife? Is it at his side? Is it up? How would you describe that?
A. It is in his right hand, and it is at his side, slightly up towards us. Not all the way up, but at an angle.
Q. And when you say "by his side," would the knife be at his side near the hip area, or somewhere else?
A. It would be a little further up. So it was -- his hands were down, but it was at a slight angle, towards officers.
Q. What part of his body would have been closest to the knife, Mr. Diaz? Would it have been, like, the side abdomen? His hip? How would you describe that?
A. His hip.

Q. Do you have an estimate as to how many times, approximately, you said that?

A. Approximately, five times.

Q. Did you give him any additional commands?

A. Yes. I commanded him to open -- well, can you clarify when?

Q. Sure. Let's start when he was still in the car. You told him to open the door?

A. Yes. I told him, at that point, to open the door and let me see his hands. I continued to do that for approximately two minutes, until he exited the vehicle.

As he opens the door and continues to exit the vehicle, I command him to, "Stay there." He then exits the vehicle, and that is when I command him to, "Turn around." He does not obey any of my commands and continues walking towards officers.

That is when I tell him to, "Drop the knife; turn around."

As he continues to get closer, that is when I hear Officer Castillo saying, "Get on the ground."

So to avoid miscommunications, I changed my commands to telling him to, "Get on the ground."

(Reporter clarification.)

THE WITNESS: And, "Drop the knife." Those

were my repeated commands. I continued to say, "Drop the knife. Get on the ground. Drop the knife. Get on the ground."

BY MR. VALENZUELA:

Q. Did you ever tell him to get back in his vehicle?

A. At the very beginning when he exited his vehicle, I told him to, "Stay there." I did not command him to exit his vehicle.

Q. Did you ever tell him to walk backwards in your direction?

A. No.

Q. Okay. And I think you indicated after you heard Castillo say, "Get on the ground," that you then began commanding him to, "Get on the ground"?

A. Correct. To avoid miscommunication, and due to the fact that there were two people giving commands, we didn't want to give false instructions. So I changed my commands to, "Get on the ground." That way there was no confusion.

If I kept on saying, "Turn around," there could be confusion, so that is why I said, "Get on the ground."

Q. What do you think -- strike that.

What do you estimate the distance was from

Mr. Diaz, when he first exits out of his vehicle to where you're positioned near the front driver's door? What do you estimate that distance to be?

A. Approximately 20 feet.

Q. Okay. And then he began closing that 20-foot distance, by walking in your direction; correct?

A. Correct.

Q. Okay. When he's walking, is he generally walking from -- I was told earlier that that street goes east to west?

A. That is correct. That street goes east to west is.

Q. Is Mr. Diaz generally walk in an east to west direction?

A. Correct.

Q. Is he kind of walking in a diagonal line, or is he kind zigzagging? How would you describe that?

A. Once he exits his vehicle, he continues walking in a slight angle, towards me and Officer Garcia.

Q. When you say "angle," would that be, like, in a southwest or a northwest direction? How would you describe that cardinal direction-wise?

A. He would be walking in a northwest direction.

Q. Okay. Got you.

At a slight diagonal?

Q. Okay. And if I recall, Garcia, is he at the passenger side of the vehicle at that point?
A. Correct.
Q. In other words, you're at the driver's side of the vehicle, and Garcia would be at the passenger?
A. Correct.
Q. Okay. Now, when you heard that first shot, what distance would you estimate Mr. Diaz was from you?
A. Approximately 3 feet.
Q. Prior to hearing that first shot, did you ever hear any officer yell out for the 40-millimeter?
A. Yes.
Q. Do you know which officer? I don't want to know if you learned it later down the road. I'm trying to, right now, ask while you're there in the incident --
(Simultaneous speakers.)
A. At the time of the incident, I did not hear who exactly said it, but do I remember hearing, "40, 40, 40."
Q. Okay. And what did you think when you heard, "40, 40, 40"? Did you think someone was going to deploy the 40?
A. At that time, that is when I believed that whoever was speaking was trying to communicate to the third unit to get the 40 up. At that point, my main

focus what giving commands, so I did not know what was going on behind me.
Q. Do you know whether or not a third unit had even arrived yet, when you heard, "40, 40"?
A. Yes. As I'm giving commands to the driver, I hear -- or I see a unit coming westbound, as well. So that's when I know that there are three units there.
But my main focus is keeping eyes on the driver and the suspect, and so I do not know what's going on behind me, because my main focus is a man that's armed with a knife, and is possibly still armed with a firearm.
Q. Is this third unit, is that the unit with Officer Choi and High in it?
A. Yes, sir.
Q. Okay. Do you know if they had arrived already when the gunfire started?
MS. POWELL: Objection. Calls for speculation.
You can answer.
THE WITNESS: I -- I -- I know that they were at the scene prior to the gunshot. Just because they were in my line of sight as he's walking towards me with a knife in his hands, I see another unit continuing westbound. But I cannot -- or let you know where exactly they were. I just knew that they were at the scene.

BY MR. VALENZUELA:
Q. Okay. How many shots did you hear before you fired your first shot?
A. One.
Q. Okay. How many shots did you, yourself, fire?
A. Three.
Q. Do you know whether a round count was done on your gun?
A. Yes.
Q. And did that round count confirm that you fired three shots?
A. Yes.
Q. Did you fire your three shots in rapid succession, or was there a pause in between any of the shots?
A. There was a slight pause at each -- after each shot. But due to the fact that Mr. Diaz was closing the distance, and I already observed one gunshot not stopping him, there was minimal time between each shot.
So it was not a rapid succession, but there was a slight pause in between each -- each shot.
Q. Do you have an estimate as to how much of a pause there was in between the shots that you were firing?
A. Approximately half a second.

Q. And was he still approximately this 3-feet distance, or a different distance?
A. He was approximately 2 and 1/2 feet away.
Q. Okay. What about when you fired this third shot? Where were you aiming for your third shot?
A. Center mass, as well.
Q. And what distance would you estimate he was when you fired the third shot?
A. Approximately 2 feet away.
Q. Okay. Was he still moving in this northwestern direction for all the shots?
A. Yes.
Q. Okay. Was the decedent stopped for any of the shots that you fired?
A. No.
Q. Was the decedent falling to the ground for any of the shots that you fired?
A. No.
Q. At some point after you fired your shots, did you see the decedent stop?
A. Yes. After my last shot, I observed the decedent fall to the ground and land on the passenger -- the front passenger door -- tire. And due to the fact that he was still armed with a knife, we had to reposition ourself to get coverage because he was 2 feet

away from us.

So that is when I backed up, tactically, because it was feasible, and began giving him commands to, "Drop the knife."

Q. Did you still think he posed a threat of imminent death or serious bodily injury when he was stopped and falling to the ground, Mr. Diaz?

A. No.

Q. Is that why you weren't firing while he was stopped and falling to the ground?

A. Correct.

Q. Okay. Did you, yourself, ever give a verbal warning that deadly force would be used prior to firing?

A. No.

Q. Okay. Did you hear anybody else give a verbal warning that deadly force would be used prior to hearing the gunshots?

A. Yes.

Q. And who was that?

A. That would be Officer Garcia.

Q. And what did you here in that regard?

A. While I was giving commands and Mr. Diaz continued to walk towards me and Officer Garcia, that's when I heard Officer Garcia saying, "I don't want to shoot you. I don't want to shoot you. Stop. I don't

hands team and go and contact Mr. Diaz.

But then my role was changed to keep eyes on the vehicles, since that vehicle was not cleared. So that is when the officers approached Mr. Diaz. And then I went to my driver's side door and kept eyes on the vehicle. I did not see what was going on with the other officers and Mr. Diaz.

Q. At some point, did you participate in clearing the green Charger?

A. That is correct.

Q. When you went to clear the green Charger, did you see any other occupants inside of the green Charger?

A. No.

Q. Did you see blood inside of the Charger?

A. Yes.

Q. Did you see, like, a razor blade or any edged weapons in there?

A. I did not. I did not search the vehicle, as well. We were just making sure no was one else was down in that vehicle, and then we left and had other officers conduct a -- an inventory search of that vehicle.

Q. Did you, yourself, ever see a gun inside of the green Charger?

A. I did not see anything in plain view. And then once we made sure no one else was in that vehicle, that

is when we left. I did not systematically search through the whole entire vehicle.

Q. Were you involved at all in the pat-down of Mr. Diaz after the shooting?

A. I was not involved in that.

Q. After the shooting, did you see that Mr. Diaz was still holding the item in his hand?

A. Yes. Once I saw Mr. Diaz fall onto the front passenger wheel, that is when I was able to tactically reposition. And I still commanded Mr. Diaz to, "Drop the knife." Once other officers came to formulate a plan, that is when they approached and handled Mr. Diaz. And my then focus was on the vehicle, so I --

(Simultaneous speakers.)

BY MR. VALENZUELA:

Q. Sorry. I didn't mean to cut you off there.

A. Yeah. So the last time I saw him, he still had the knife in his hand, and I was giving him commands to "Drop the knife."

Q. And where did you tactically position yourself to?

A. Once Mr. Diaz fell and he was approximately 2 feet away from me, that is when I closed my driver's side door and went back to the rear of my patrol vehicle to get a more tactical advantage and get better

coverage. And that's when I still commanded him to, "Drop the knife."

Q. At some point while you were at the scene, did you ever notice that the object he had in his hand was a flathead screwdriver?

A. No.

Q. Was that ever brought to your attention later?

A. Yes.

Q. Okay. After the shooting, how long are you at the scene before you leave?

A. Approximately five minutes.

Q. And you never approached Mr. Diaz, after he went down, to participate in the rendering of medical aid or anything like that; correct?

A. No -- yeah. My job was to focus on the car. I was not assigned to render aid. Once we finished clearing the car, we had multiple officers already on scene, administering first aid to Mr. Diaz.

Q. Did you see them do a pat-down of Mr. Diaz when he went to the ground?

A. I did not see them.

Q. And where do you go next after you're at the scene? Where do you then go, once you leave the scene?

A. Once we leave the scene, we were instructed to go to the Torrance Police Department station.

STATE OF CALIFORNIA )
) ss:
COUNTY OF BUTTE )

I, KIMBERLY E. D'URSO, do hereby certify:

That the witness named in the foregoing deposition was present remotely and duly sworn to testify to the truth in the within-entitled action on the day and date and at the time and place therein specified;

That the testimony of said witness was reported by me in shorthand and was thereafter transcribed through computer-aided transcription;

That the foregoing constitutes a full, true and correct transcript of said deposition and of the proceedings which took place;

Further, that if the foregoing pertains to the original transcript of a deposition in a federal case, before completion of the proceedings, review of the transcript [ ] was [ ] was not requested.

That I am a certified stenographic reporter and a disinterested person to the said action;

IN WITNESS WHEREOF, I have hereunder subscribed my hand this 26th day of July, 2026.

______________________________

KIMBERLY D'URSO, CSR NO. 11372, RPR

# EXHIBIT "F"

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

MARIA GUADALUPE DIAZ; A.D., a minor by and through his Guardian Ad Litem, MARIA GUADALUPE DIAZ; A.D., a minor by and through his Guardian Ad Litem, MARIA GUADALUPE DIAZ; LEONARDO DIAZ; and RAMONA RAMIREZ DE DIAZ,

Plaintiffs,

vs.

CITY OF TORRANCE; ARTURO CASTILLO; CODY WISSLER; JESUS GARCIA; JASON BERMUDEZ; and DOES 6-10, inclusive,

Defendants.

Case No.: 2:25-cv-03389-JLS (JCx)

VIDEO-RECORDED REMOTE VIDEOCONFERENCE DEPOSITION OF

SERGEANT JESUS GARCIA

THURSDAY, JULY 16, 2026

Reported by: Michelle Bulkley, CSR #13658
Job #28994; Pages 1 - 128

testified remotely as follows:

EXAMINATION

BY MR. VALENZUELA:

Q Good morning, Sergeant Garcia.

A Good morning, sir.

Q Could you please state and spell your name for the record.

A My name is Jesus Garcia, J-E-S-U-S, G-A-R-C-I-A.

Q Have you listened in on some of the other officer depositions that -- that I've done?

A Yes, sir.

Q Okay. So, if it's okay with you, I'm going to skip some of the introductory rules and just get right into it. Okay?

A Yes, sir.

Q Okay. I'm going to go for about an hour and take a break, but if you need to take a break before that, you just let me know. Okay?

A Yes, sir.

Q Okay. Do you prefer I call you Sergeant Garcia or Mr. Garcia? Do you have a preference?

A I have no preference, sir.

Q Okay. Were you a sergeant at the time of

sheriff's academy, were you then hired by an agency?
A No. I was hired by the Torrance Police Department prior to my attendance with the academy. I was -- I was hired here during my -- after hiring, then I was sent to the academy.
Q Okay. And is the Torrance Police Department the only agency you have worked for throughout your law enforcement career?
A Yes, sir.
Q Okay. Do you recall the date of this incident?
A Yes.
Q Was it December 2nd of 2024?
A Yes.
Q Okay. Can you take me through your different assignments chronologically from when you were first hired after the academy up until the date of the incident, just briefly?
A Yes. Initially out of the academy, I was assigned to patrol where I worked at for approximately three years before being assigned to detectives as a school resource officer. I did that for three years.
I then got assigned to juvenile area investigator where I worked at for an additional

make contact with the TASER on the individual; correct?

A Correct, at very close contact.

Q Okay. And the probe mode is -- obviously, it fires out the two probes?

A That's correct.

Q Let me ask you a little bit about the equipment that you had on you on the date of the incident. Okay?

A Yes, sir.

Q You had a firearm?

A Yes.

Q And what kind of -- it was a handgun?

A It was a handgun.

Q What kind of gun was it?

A It was a Glock Model 45.

Q Is that a 9 millimeter?

A Yes.

Q That's a semi-automatic handgun?

A Correct.

Q You have to pull it each time to fire a single bullet?

A Yes, sir.

Q Okay. And you fired that gun during this incident?

A Yes, sir.
Q How many -- do you recall how many shots you fired?
A Two shots.
Q And you intentionally pressed the trigger twice to fire those two shots; correct?
A Yes, sir. It was a volley of two shots.
Q In other words, there wasn't an accidental discharge?
A No, sir.
Q Okay. Other than your firearm, let me ask you about some other equipment that you may have had on you. Did you have a TASER on you?
A Yes, sir.
Q Do you recall what model that was?
A It was a TASER 7.
Q Does that have two cartridges for the probes?
A Yes, sir.
Q And did you have OC or pepper spray on your person?
A Yes, sir.
Q Did you have a baton on your person?
A No, I did not.
Q Did you have one in your vehicle?

would have to load the rounds into the 40 millimeter?

A Correct. You would have to exit your vehicle. You would have to unlock the rear trunk. You would then have to press a button, which is a hidden button so that if the public were to get access to our vehicle, they wouldn't be able to just quickly release the 40-millimeter weapon and have access to it.

So it's a hidden button, which has to be pressed, which unlocks the 40 millimeter, which then you would remove. You would then locate the -- we have a bag, a small bag that contains the rounds that's used for the 40 millimeter, which would be the sponge rounds.

I believe there's three -- three sponge rounds and three of the OC rounds in that pouch, which you then would have to remove the correct round to load into the 40-millimeter weapon.

Q Is that bag that stores the ammo for the 40 millimeter kept like in close proximity to the 40 millimeter?

A Correct.

Q Okay. And I think you indicated it had both sponge rounds and OC rounds?

A Yes, sir.
Q Okay. You're familiar with Officer Castillo?
A Yes.
Q And were you familiar with Officer Bermudez, who I understand was also a new trainee?
A Yes.
Q Okay. So they're assigned initially as the primary unit, and then you begin to make your way to the location of the call; correct?
A Correct. When I first heard the call come out, I waited for my partner to see if he heard it, which he didn't, at which point I advised him of a call in our beat and advised him to let the radio know that we would be responding from our location.
Q And you indicated from your beat. Were you familiar with that location because it was part of your beat where you regularly patrol?
A Yes, sir.
Q Okay. And do you recall what the nature of the call was when you first heard it?
A Yes.
Q And what was that?
A The nature of the call was there is a

caller indicating that there is a man with a gun and that he was going to shoot people.

Q Okay. And are you receiving this information over the radio or also from the onboard computer in your vehicle?

A It's over the radio, and then some of the information is added to the onboard computer as well.

Q Okay. But primarily are you receiving this over the radio?

A Yes.

Q Okay. And then while you're en route to the location, prior to arriving to the location, were there any updates on the call?

A Yes. The updates on the call were that -- I believe someone from dispatch was conducting pings on the caller, and they indicated that the caller was calling from the area of Oregon Court and Maple, just east of.

Q Okay. Did the information of the call indicate that anybody had been physically injured?

A No, sir.

Q And then you ultimately arrive in the area of where the call came from; correct?

A Correct.

Q Is there any other updates up until the point you arrive in the area of the call that we haven't discussed yet?
A Not that I recall. I believe they tried calling the person back, and initially there was no answer.
Q At some point did you receive some info that like a police drone had been utilized?
A Yes. A police drone had been dispatched to the location to get an overhead view of the area.
Q Do you have an estimate as to how much time it took you from when you left the storage till you arrived in the area of the call?
A I'd say a minute.
Q Okay. So pretty short period of time.
A That's correct.
Q Okay. At some point do you receive information as to the name of the suspect?
A Yes, sir.
Q Okay. Was that a Leonardo Diaz?
A Yes, sir.
Q Okay. Did you recognize that name as having ever dealt with him?
A No, sir.
Q Okay. At some point do you receive

A At the time I don't recall them saying that.
Q Okay. Did you ever receive that info prior to the shooting?
A I don't recall.
Q Okay. Not a problem.
At some point do you receive some information about a green Charger?
A Yes.
Q Okay. What was the first info you received about the green Charger?
A Well, the green Charger, actually, I -- when I first saw the green Charger was when my partner and I first arrived on scene and we made that eastbound turn onto Oregon Court from Maple.
I recall seeing someone sitting in that green Charger. I believe the window was down maybe 6 to 8 inches, and I recall seeing a Hispanic male sitting in the driver's seat of that vehicle.
However, that person didn't appear to try to wave -- flag us down or alert us that they had observed a shooting or witnessed a shooting.
Additionally, there was a business that was just south of him that we drove by, and that business appeared to be open. I could see that

maybe it is related to the call at hand.

So it was worth going and checking, basically either establishing that it is the vehicle and that is the person or eliminating that person, or maybe that person saw something and we can at least do our due diligence of checking, clearing the call, making sure that no one is hurt or that that person, in fact, is the person that called, and, you know, we have to basically contact him.

Q So do you then tell Wissler to approach that vehicle and stop the vehicle somewhere near the green Charger?

A Correct.

Q Okay. And you indicated Wissler is driving; right?

A Yes, sir.

Q Okay. Do you then drive to the area of that vehicle and park your vehicle?

A Yes.

Q Okay. Is -- do you see Castillo's vehicle also going in that area as well?

A Yes.

Q Do you guys arrive and park your vehicle prior to Castillo parking his vehicle or around the same time?

A We arrived a few seconds before.
Q Okay. And then when you arrive, at some point you get out of your car; correct?
A That is correct.
Q When you got out of your car, were Castillo and Bermudez already there, their vehicle?
A Yes.
Q Okay. Do you guys exit your vehicle around the same time, if you know?
A I probably was one to two seconds ahead of them.
Q Okay.
A Just because it took longer for them to circle around and clear traffic and avoid being hit by northbound and southbound traffic on Maple.
Q That street that the green Charger was parked on, does that run north and south?
A It runs east/west.
Q Okay. Would that vehicle be parked on the north side of the street?
A South side.
Q It was on the south side?
A South side facing east.
Q Okay. Does Castillo initially park his vehicle north of yours?

A He parks it, I would say, southwest of mine, just a bit offset.

Q Okay. Now, prior to exiting your vehicle to make contact with the green Charger, did you ever discuss any tactics with Wissler up until -- prior to exiting out of your vehicle?

A Yes. While en route to the call, when we first received details of a possible man with a gun wanting to shoot people, once again, it was a very short drive there.

So briefly just talked to him about basically scanning the area, looking for anyone to either, A, flag us down or people running for cover or running to -- running for help, looking for any suspects or anyone armed with a gun, and basically being ready once we turned that corner on Maple and Oregon Court to be ready to be confronted potentially with -- by someone with a gun and basically confront that person and, if need be, you know, be ready to fire back if we get fired upon, you know, in case we get ambushed kind of thing.

Q And prior to exiting your vehicle, did you ever designate any role for Wissler, such as contact, cover, lethal, less lethal?

A So because we were the first two units on

point?

A No, sir.

Q Okay. At that point, when all four of you exit out of your vehicle, do you ever formulate a tactical plan at that point assigning various roles to the different officers?

A Initially, when we exited the vehicle, Officer Wissler was tasked with saying commands. Initially I believe he told the driver to lower his windows, "Let me see your hands."

It wasn't until we noticed that the driver's side door began to partially open maybe 2 to 3 inches, and it did that maybe two to three times while we were standing there, at which point we realized that somebody was inside the car, and that person's actions, as far as opening and closing the door momentarily was a bit odd.

At that point is when I believe Officer Castillo went to his vehicle and retrieved his -- his patrol rifle, and he took my position from the passenger side door of our vehicle, and he instructed Bermudez to basically follow my lead in regards to any -- any instructions, at which point I told Officer Bermudez to move his vehicle from its current position and position it north of

Officer Wissler and my vehicle and instructed him to -- so that it would be easier for him to understand.

Without having to explain too much, I just told him to position it like a felony stop so that he knew basically what I was trying to convey to him, at which point he moved his vehicle and parked it just north of Officer Wissler and my vehicle.

He remained at the driver's side door of the vehicle. I then repositioned to the passenger side of his vehicle. So now I am at the passenger side of his vehicle, which is north of Officer Wissler and my vehicle, and then Officer Wissler is just south of me at the driver's side door of our vehicle.

During that time -- and in that time when Officer Bermudez is moving his vehicle, I'm instructing Officer Wissler to, you know, continue to give that person commands, as far as, you know, "Let me see your hands," and those -- those types of things.

I believe also at that time, when we observed that, Officer Castillo upgraded the call and asked for backup, meaning for officers to respond and respond code 3.

We also asked for less lethal. We asked for the next unit arriving on scene to -- to bring less-lethal option with them, and then that's when we then moved over to -- well, I -- I was now at my new position, and we were focused on the vehicle and the occupant inside.

Q Okay. So going back a little bit, at least when you guys, all four of you, exit out of your vehicles, at least at that point, you did not formulate a tactical plan and assign various roles at that point. Would you agree?

A At the initial stage, no. It was just Officer Wissler and I. He was going to contact the driver, and we were either going to identify if that was the person involved or not.

Q And the reason Wissler was the contact officer, that was because he was -- he was the driver, and generally the driver is the contact; correct?

A Correct. In fact, when we first pull up and Officer Wissler opened the door, he began to walk around the driver's side door as if he was going to walk up on the car and make contact similar to a regular traffic stop, at which point I stopped him and said, "No, you know, get back. Like we're

A Correct.
Q Okay. At some point after Castillo grabs the long rifle, does he basically tell you, "I'm going to be lethal; I've got the long rifle"?
A He --
MS. POWELL: Objection. Compound.
You can answer.
THE WITNESS: No. I believe what he tells me is -- he walks up beside me to my right and says, "Hey, I've got the long rifle; I can take point; I'll take your position," at which point I moved away from that -- that position and given it to him since he had a long rifle and had a better vantage point.
BY MR. VALENZUELA:
Q Prior to moving from that initial position on the passenger side of your vehicle, does Castillo tell you words to the effect, "Why don't you quarterback this? I got the long gun," or words to that effect?
A Yes, sir.
Q Okay. What did you understand that to mean when he told you, "Why don't you quarterback this"?
A It was basically to take charge and

designate any -- any roles, because at that time he had also told Officer Bermudez to basically follow my lead. To me, that indicated to, you know, basically take over also giving any instructions to his partner who was on his first day in patrol.

Q After Castillo told you to quarterback the situation and take charge of it, at that point did you ever designate either Bermudez or Wissler as lethal?

MS. POWELL: I'm going to object that it's compound; it may misstate his testimony. I don't recall if he said he understood it to be take charge of it.

But you can go ahead and answer.

THE WITNESS: No. At that time I did not specifically designate them as lethal.

However, based on their training and knowing that we're the first four officers on scene dealing with a potentially armed suspect, they -- base -- based on their training, knew that they were going to be designated as lethal without me having to tell them.

BY MR. VALENZUELA:

Q Okay. At that point, when Castillo told you to quarterback and take charge, did you ever

Plus I believe pretty much as soon as he parked his car in that new position and opened his door and I was able to open the passenger side door, I believe within a second or two is when the driver's side door opened and -- and Mr. Diaz stepped out.

Q Did you ever hear Wissler tell Mr. Diaz to exit out of his vehicle?

A No, sir.

Q Prior to Mr. Diaz exiting out of his vehicle, did you ever hear anybody indicate that Mr. Diaz was bleeding from his wrist and that he had a knife?

A Yes.

Q Okay. Did you hear that over the radio, or did you hear that from one of the other officers or both?

A I heard it from the officers and then also the radio repeated the broadcast.

Q When you heard that the individual was bleeding from his wrist and had a knife, did you ever think it was a possibility that the individual had self-inflicted those wounds?

A At that time, no.

Q Did you ever think, when you heard that

officers on scene?

Q Correct, to where Mr. Diaz is positioned.

A Based on everything that we had observed leading up to that point, that, once again, still was not an option, regardless of the distance, because of the position that we all took at that time.

Q And were you behind -- a position of cover behind your door?

A Correct.

Q And is that door like a ballistic door?

A Yes, it is.

Q Okay. Up until that point, had you seen a gun on Mr. Diaz or anywhere around him?

A No, we had not. However, the call did indicate that the caller said he had a gun, so we treated it as if someone was armed with a gun, which leads to another point, that we would not use a TASER or a 40 millimeter on someone who is potentially armed with a gun themselves.

Q But could you use a TASER or a 40 millimeter on somebody that is not armed with a gun?

MS. POWELL: I'm going to object. It would assume that they knew the person didn't have a

gun.

But you can go ahead and answer. I'll object that it's an incomplete hypothetical.

THE WITNESS: So at the time of the call, we believed that the occupant of the vehicle was armed with a gun. It wasn't until he exited with a knife that we saw that he had a knife in his hand.

However, he was wearing baggy clothing, making it easy to conceal a gun in his waistband.

To answer your question, can you use a TASER or a 40 on a person armed with a knife? Depending on the distance or if you have lethal coverage there and you have -- it's safe to do so, then, yes, it's possible.

BY MR. VALENZUELA:

Q Prior to Mr. Diaz exiting out of the vehicle, did you ever see a knife on Mr. Diaz?

A Prior to him exiting, no.

Q Prior to him exiting, did you ever see Mr. Diaz bleeding at all?

A I saw blood on his arms, but I did not know if that was his own blood or a victim's blood.

Q Up until that point, had you received any information that anybody else had been injured other than Mr. Diaz?

period of time?

A For the officers on scene, none of them were specifically designated as less lethal because, once again, we were being confronted by a potentially armed suspect with a firearm.

However, we did request that the additional responding units arrive and arm themselves with a less-lethal option. Specifically the 40 is what we asked for. Because of the distance at which we were at, that would be the most effective less-lethal option.

Q At some point Mr. Diaz exits his vehicle; correct?

A Correct.

Q When Mr. Diaz exits his vehicle, are you looking at the front profile of him?

A Correct.

Q Can you see him from the top of his head to his feet, basically?

A Yes, sir.

Q Okay. At that point do you see him holding what you believe to be a knife?

A Yes, sir.

Q At that point do you see a gun?

A No, sir, I do not.

below the elbow down to his hands, fingertips.
Q Did you see it anywhere else?
A I can see blood on his shirt, and I can see blood on his leg, like thigh and pelvic area.
Q So when you saw him with the knife and the blood on the different parts of his body that you just described, did you ever think it was a possibility that those -- that that blood may have been from self-inflicted wounds?
A At that time, no.
Q Prior to you firing your shots, did you ever think it was a possibility that that blood was from self-inflicted wounds that Mr. Diaz inflicted on himself?
A At that time, no.
Q So that thought never crossed your mind?
A No, sir.
Q When Mr. Diaz first exits out the vehicle, you see him holding the knife that you described; correct?
A Correct.
Q How was he holding it?
In other words, was it down by his side? Was it up? Was it out -- how would you describe it?
A It was -- I believe his right arm --

sorry -- his left arm was pretty much straight down along the side of his body, maybe 2 to 3 inches away, and his right arm that was -- right hand that was holding the knife was maybe out away from his body maybe 8 to 9 inches away. It was -- so straight down but angled away, almost at like a 45 from his body.
Q When you say "8 to 9 inches," would that be 8 to 9 inches horizontally from his body?
A Correct, with a -- not with the elbow straight but with the arm -- arm -- not with the elbow bent but with the arm straight out.
Q What -- would the hand holding the knife be like near his hip or his right -- the side of his right thigh, that area?
A He had fairly long arms, so I'd say it's closer to just below the hip, more -- more on the thigh.
Q And that would be the side of his right thigh?
A Correct.
Q Did the knife essentially stay in that position up until the time of the gunshots?
A Yes.
Q In other words, you never saw him raise

motion with the knife he was holding?
A No, sir.
Q When he first -- when Mr. Diaz first exits out of his vehicle, he then stands up; correct?
A Correct.
Q When he first exits out of his vehicle and then stands up, what distance would you estimate he was from you at that point?
A I'd say 30 to 35 feet.
Q And I understand these are just estimates. I don't -- you didn't have a measuring tape. I don't expect it to be precise. I'm just asking for general estimates.
At that point are commands continuously being given to him?
A Yes, sir.
Q Is it essentially just Wissler giving commands, at least when he first steps out of the vehicle?
A Yes, sir.
Q And when he steps out of the vehicle, does he begin walking in the direction of the officers?
A There was a slight pause, less than a second, I would say, before he starts walking.
Q And would he be walking in a westerly

direction, or what direction would he be walking?
A Initially, once he began walking, he walked diagonally in a northwest position. He maybe did that for 7 or 8 feet, and then he did what I would describe as like a quarter turn and then continued westbound in a straight -- in a straight line.
Q So he's initially walking in a northwest direction, and then he kind of changes direction and now is walking in a westerly direction?
A Correct.
Q And when he first starts walking in this northwestern direction, how would you describe the speed of his walk? Was it a slow walk, a normal walk, a fast walk? How would you describe the speed of the walk?
A I would describe it as a -- as a normal walk.
Q Did he essentially maintain that same normal speed of walk from when he initially started walking till he was shot?
A Yes.
Q In other words, you never saw him jogging, for example?
A No.

Q Never saw him quick walking, for example?

A No.

Q You never saw him run; correct?

A Correct.

Q While he's walking, are some of the commands being given to him, "Drop the knife; get on the ground," words to that effect?

A Yes. Actually, when he first stepped out of the vehicle, Officer Wissler, I believe, initially told him to get back inside the car, but as he continued to stand, Officer Wissler told him to turn around, face away from us, and drop the knife.

Once he did not obey those commands and he began to walk diagonally and then eventually west, the commands were continued by Officer Wissler to, you know, "Stop. Get on the ground. Drop the knife."

I believe Officer Castillo then began to yell, "Stop the knife" -- I mean, "Stop. Get on the ground. Drop the knife." And then as he got closer to my location, I began to basically give the same commands, as far as, "Stop and drop the knife."

Q Was he ever told like, "Turn around and walk backwards towards us"?

from like a distance of 21 feet?

A That would be the maximum range, yes, if everything works out perfectly.

Q Did you think you had enough lethal cover to transition to the TASER when he was approximately 20 feet away from you?

A No, because at that time, you know, my lethal cover was Officer Castillo, who's a seasoned veteran officer, but I also had two trainees, one who's on his first day, probably his third or fourth call of the day, and another trainee who has -- you know, is on his 25th shift and has -- you know, we've only responded to three calls at that time.

So I couldn't rely on two trainees to provide lethal coverage for me. I wasn't sure how they would respond, being that this was probably the first time that they've encountered a situation like this.

So at that time it wasn't -- wasn't feasible for me to fully transition to a TASER and -- and not have the proper lethal coverage to, one, keep myself safe and keep my partner safe.

Q And so just so I understand you correctly, in part, you did not transition to your TASER when he began walking in the direction of the officers

Q At some point now, Mr. Diaz is walking towards the officers. When he transitions from walking to a northwest direction to a westerly direction -- do you remember indicating that?
A Yes, sir.
Q When he kind of made that change in direction, how far would you estimate Mr. Diaz was to the closest officer?
A I'd say 20 to 25 feet.
Q And who would be, in your opinion, the closest officer at that point when he transitions from a northwest to a westerly direction?
A That would be me.
Q And you estimated the distance to be 20 to 25 feet?
A Correct.
Q Prior to the gunshots, did you ever hear Mr. Diaz ever say anything?
A No.
Q When Mr. Diaz begins walking in the westerly direction, at some point do you fire your gun?
A Yes.
Q Okay. And what distance -- strike that.
When you fired your gun, would Mr. Diaz

have been the closest to you or to a different officer?
A Closest to me.
Q And when you fired your gun, what distance would you estimate Mr. Diaz to be?
A 4 to 5 feet.
Q Prior to firing your shot, did you hear any other shots being fired before you fired yours?
A No.
Q After you fired your -- how many shots did you fire?
A Two, sir.
Q After you fired your two shots, did you hear any other shots being fired?
A No. I mean, to me, they sounded like they're simultaneous. If I did hear another round, maybe I thought it was just an echo of -- of the last round being fired, including mine.
Q While you were discharging your weapon, were you aware of whether or not any of the other officers were also discharging their weapons?
A I can -- I can hear what sounded like other gunshots, so I -- I figured other officers shot, but I didn't know who.
Q Do you know those other shots that you

earlier, is a ballistic door, correct, the doors on the vehicle you were driving?

A Correct.

Q Does that mean that like it's -- it's designed to stop bullets if you're shot at?

A Yes. I don't know up to what capacity or what type of bullet, but, yes, it could.

Q And up -- and up until the time that you fired your first shot, you had not observed a gun on Mr. Diaz's person; correct?

A Correct.

Q When you fired your first shot, where were you aiming?

A I was aiming -- aiming center mass.

Q And what was center mass based on what you were observing?

A Center mass was basically below his collarbone -- collarbone and above, I'd say, the belly button.

Q Were you under the impression that your first shot struck him?

MS. POWELL: Objection. Calls for speculation.

You can go ahead and answer.

THE WITNESS: Yes. I believe that the

shots I fired struck him.
BY MR. VALENZUELA:
Q You believe both shots you fired struck him?
A I believe so.
Q Do you have an impression as to where the shots -- the two shots you fired struck him?
MS. POWELL: Objection. Lack of foundation; calls for speculation.
BY MR. VALENZUELA:
Q If you know.
MS. POWELL: If you know, you can answer.
THE WITNESS: I believe they -- they struck him somewhere in the chest area, which is where I was aiming.
BY MR. VALENZUELA:
Q Okay. Did you fire your two shots in rapid succession, or was there a pause in between?
A It was a volley of two shots. I would describe them as a rapid succession. And that was due to the closeness of where Mr. Diaz was at the time when I fired and his physical appearance, size. I felt that firing two shots would increase the -- the chances of stopping him and not advancing any further or pushing through the door and attacking

either myself or Officer Wissler.

Q Did you fire the two shots that were fired in rapid succession as quickly as you could?

In other words, did you fire the two as fast as you could?

MS. POWELL: Objection. That's vague and ambiguous as to "as fast as you could."

BY MR. VALENZUELA:

Q Do you understand the question?

A Yes, I understand the question.

THE WITNESS: I can answer?

MS. POWELL: You can answer.

THE WITNESS: I wouldn't say as fast as I could. I'm sure that I could have pulled them -- I mean, I've been to the range many times, and I would say I -- I could have pulled them a lot faster, but it was -- it was a short volley, just a slight pause, not -- not like a full pause in between.

BY MR. VALENZUELA:

Q But you would describe the two shots that you fired as being fired in rapid succession?

A Correct.

Q Did you assess in between firing the two shots?

In other words, did you assess after

A Yes.

Q After you fired your two shots, did he stop walking in a westerly direction?

A Yes.

Q And after he stopped walking in a westerly direction after you fired your two shots, did he begin to fall to the ground?

A Yes.

Q Did you fire any of your two shots while he was stopped?

A No.

Q Did you fire any of your two shots as he was falling to the ground?

A No.

Q Did you believe -- strike that.

Why did you stop firing after your two shots?

A Well, after my -- my two shots, like I said, he began to fall to the ground. I believe when I fired my first shot, he was closer to my front bumper, and like I said, he was able to take another step or half step, at which point I fired my second shot.

And then that's when he fell and ended up landing basically at my wheel -- at my wheel well,

and his back was up against the wheel of my vehicle. That's when I stopped firing.

Q What distance would you estimate he was -- strike that.

Was -- did you say he -- you were the closest officer to Diaz when you fired?

A Yes, sir.

Q Okay. What distance would you estimate between you and Mr. Diaz when you fired your second shot?

A 4 feet.

Q Did you think Mr. Diaz posed an immediate or imminent threat of death or serious bodily injury when he stopped and started falling to the ground?

MS. POWELL: Wait. Objection. That's compound. When he stopped and started falling to the ground?

MR. VALENZUELA: Correct.

MS. POWELL: It's compound.

BY MR. VALENZUELA:

Q Okay. You may respond.

MS. POWELL: It includes two different motions, so if you want to break it up.

MR. VALENZUELA: Well, let's see if he could answer the first one.

BY MR. VALENZUELA:
Q When he stopped and started falling to the ground, did you believe he posed an immediate or imminent threat of death or serious bodily injury?
MS. POWELL: Again, that's compound because I believe his testimony was as -- when he was falling to the ground, he wasn't firing.
But go ahead and answer.
THE WITNESS: At that point, as previously stated, I had to reassess to determine whether I felt like I was in danger and needed to fire another round, which I didn't.
However, I still felt that he did pose a threat because he was holding a knife. However, he was no longer advancing toward me, so I was able to reposition.
So I would say, at that point, no. If not, I would have fired another round.
BY MR. VALENZUELA:
Q That was going to be my next question. That -- that's why you stopped; correct? Because you thought he didn't pose an imminent or immediate threat of death or serious bodily injury when he was stopped and falling to the ground; correct?
A Correct.

driver's side, once again, on an island by himself.

MR. VALENZUELA: Okay. Why don't we take another ten minutes? Does that work for everybody?

MS. POWELL: Sure. That's fine.

MR. VALENZUELA: Okay.

THE VIDEOGRAPHER: Okay. Going off record at 12:14 p.m.

(Recess.)

THE VIDEOGRAPHER: Back on record at 12:29 p.m.

BY MR. VALENZUELA:

Q Okay. I want to ask you another question with regards to your training on the use of deadly force, just focusing on the training right now.

Based on your training with regards to the use of deadly force, is one of the factors you are to consider in deciding to use deadly force whether or not it's safe to tactically reposition yourself?

A Yes.

Q I think I was asking it very wonky earlier, so Counsel may be very aware of that, so I tried to clean it up a little bit. But at any point did you give a verbal warning that deadly force was going to be used before you fired?

A At one point, as Mr. Diaz was getting

closer to my position, I was giving him instructions to, "Stop; get on the ground; drop the knife," at which point he was looking directly at me and nodded -- nodded his head in a side-to-side motion like this [demonstrating] as if to say, "No, I'm not going to do what you ask."

At that point I said something to the effect of like, "Stop. Don't shoot" -- I mean, sorry. "Stop. Don't" -- "Drop the knife. I don't want to shoot you. Stop. I don't want to shoot you."

And to me, that was basically my warning that if he continued coming forward, that he was going to be shot. To me, that -- a reasonable person being faced with a police officer pointing their gun at them, telling them to stop and not continue or, you know, they would be shot, that that was -- to me, that was a feasible or reasonable warning.

Q Okay. Based on your training, is a verbal warning that deadly force is going to be used -- is that you give them a command and tell them, if they don't comply, that you will shoot them?

A I would -- I would say it's based on the totality of what's going on; right? Someone coming

A Yes.
Q At any point did you ever see Mr. Diaz try to flee?
A No, sir.
Q Did you ever hear any of the other officers give a verbal warning that deadly force would be used prior to hearing the gunshots?
A Not a specific warning, no.
Q I want to ask you a couple of questions about your interview. Do you have a copy handy?
A Yes, sir.
Q During this incident, did you attempt to activate your body camera?
A Yes, sir, I did.
Q Was there some kind of malfunction with your body cam where it did not activate?
A Correct.
Q Did you believe this was a threshold incident which required the activation of the body cam pursuant to Torrance Police Department policy?
A Yes, sir.
Q Did you ever figure out what was wrong with the body camera, why it didn't activate?
A No, sir.
Q Did you continue to use that body camera

After the shooting, did you take part in -- of the -- were you part of the arresting?
A Yes.
Q Did -- did you handcuff him, or did somebody else?
A Someone else did.
Q Did you assist in providing any medical aid to Mr. Diaz?
A No, I did not. I was providing cover downrange toward the vehicle. So although I was part of the arrest, I was not hands on. I was part of the team providing cover for the arrest team to put handcuffs on Mr. Diaz.
Q Okay. Were you part of clearing the vehicle after the shooting?
A Yes.
Q When you went to clear the vehicle, did you see anybody inside?
A No.
Q Did you see a gun inside the vehicle?
A No. We just did a quick -- cursory search for any victims or potential suspects, other suspects or something.
Q Did you see any blood inside the vehicle?
A Yes. I believe I saw some blood.

Q Did you see any other weapons in the vehicle?

A No.

Q After Mr. Diaz went down to the ground, did he still have what you believe to be a knife in his hand?

A Yes.

Q And when you were providing cover to the green vehicle after the shooting, as part of the arrest team, did you ever see anybody remove that item from Mr. Diaz's hand?

A Yes.

Q Who removed the item? Do you recall?

A I believe it was Officer Choi.

Q When Off- -- did you see Officer Choi remove that item from Mr. Diaz's hand?

A Yes.

Q How far away were you from Mr. Diaz when Officer Choi removed that item from his hand?

A Maybe 3 feet.

Q Did you notice at that point that the item he was holding was a flathead screwdriver?

A I did not notice it was a flathead screwdriver. I did notice that it was a black handle, and I recall seeing the brand Husky, but

I -- I did not recognize that it was a screwdriver. I didn't see that.

Q At any point prior to leaving the scene, did you receive information that the item he was holding was, in fact, a flathead screwdriver?

A Not at that time.

Q At some point -- strike that.

At some point later, did you learn that it was, in fact, a flathead screwdriver?

A Yes.

Q But you didn't learn that while you were at the scene?

A No.

Q At some point you saw medical aid being provided to Mr. Diaz; correct?

A Yes, sir.

Q Could you still hear him breathing at that point while medical aid was being provided to him?

A No. Actually, as we approached Mr. Diaz, while we were formulating a plan to approach him because he still had a pretty firm grip on the -- on the -- what we thought was a knife, we were formulating a plan to basically give him commands or at least approach him safely to be able to safely remove the knife.

correct?

A Correct.

Q Why didn't you wait for Officers High and Choi to exit their vehicles and for one of them to arm themselves with a 40 millimeter before you used deadly force that day?

A Because there wasn't enough time to wait. Mr. Diaz continued to disobey our commands to stop and drop the knife or get on the ground, and he continued to close that distance, which was increasing the potential for deadly force or serious injury -- or deadly force -- yeah, deadly force or serious injury to -- to myself or one of the other four officers.

So there was -- it wasn't feasible to wait without further increasing our chances of getting injured or killed.

Q So, in other words -- I'm trying to understand -- when Mr. Diaz began -- got out of the vehicle and began to advance toward you and the other officers, the plan had been for Officers High and Choi, one of them to be armed with a 40 millimeter, but because of his actions, you weren't able to do so; correct?

A That is correct.

REPORTER'S CERTIFICATE

I, MICHELLE BULKLEY, a Certified Shorthand Reporter of the State of California, do hereby certify:

That SERGEANT JESUS GARCIA, in the foregoing deposition named, was present and by me sworn as a witness in the above-entitled action at the time therein specified;

That said deposition was taken before me at said time, and was taken down in shorthand by me, a Certified Shorthand Reporter of the State of California, and was thereafter transcribed into typewriting, and that the foregoing transcript constitutes a full, true, and correct report of said deposition and of the proceedings that took place;

IN WITNESS WHEREOF, I have hereunder subscribed my hand on 7/26/2026.

Michelle Bulkley

MICHELLE BULKLEY
CSR #13658

# EXHIBIT “M”

"Enriching Lives"

COUNTY OF LOS ANGELES
DEPARTMENT OF MEDICAL EXAMINER
1104 N. MISSION RD, LOS ANGELES, CALIFORNIA 90033

Odey C. Ukpo, M.D., M.S.
Chief Medical Examiner

## DEATH INVESTIGATION SUMMARY

**Medical Examiner Case Number:** 2024-18831
**Decedent Name:** DIAZ, LEONARDO
**Date of Birth:** 02/08/1990
**Date of Injury:** 12/02/2024
**Place of injury:** Oregon Court and Maple Avenue, Torrance, California 90503 County Los Angeles
**Pronounced date/time:** 12/02/2024 5:15:00 PM
**Date of examination:** 12/04/2024
**Deputy Medical Examiner:** Dr. Partovi, Edwin
**Forensic Technician:** Flores, Sergio

**CAUSE OF DEATH A:** MULTIPLE GUNSHOT WOUNDS
**MANNER OF DEATH:** HOMICIDE
**HOW INJURY OCCURRED:** SHOT BY OTHER(S) DURING ENCOUNTER WITH LAW ENFORCEMENT

Edwin Partovi

Dr. Partovi, Edwin
Completed On: 12/17/2024 2:37 PM

Please call (323) 343-0518 should you have any questions after reviewing this material.

CONFIDENTIAL
FOR LAW ENFORCEMENT USE ONLY

## Medical Report Summary

1. Multiple gunshot wounds of torso and left upper extremity
   a. Penetrating gunshot wound of right clavicular region "A"
      i. Gunshot entrance wound of right clavicular region of chest; no soot or stippling of surrounding skin
      ii. Wound track involves right thoracic inlet, right paravertebral ribs 1-3 with fractures of ribs, soft tissues of back with nondisplaced fractures of T3/T4
2. Hemothorax, right (100 mL)
      i. Projectile recovered from soft tissue overlying left paramidline posterior vertebra T3 (jacket) and T3/T4 (core) [separation of jacket and core; submitted in two envelopes to Evidence Unit]
      ii. Directionality: downward, right to left, and slightly front to back
   a. Penetrating gunshot wound of superomedial left shoulder "B"
      i. Gunshot entrance wound of superior left shoulder; no soot or stippling of surrounding skin
      ii. Wound track involves left thoracic inlet, upper and lower lobes of left lung, left hemidiaphragm, and peripancreatic mesentery
3. Hemothorax, left (400 mL)
4. Hemoperitoneum, trace
      i. Projectile recovered from peripancreatic soft tissue (mesentery) and Submitted to Evidence Unit
      ii. Directionality: downward, slightly left to right, and without discernible front to back deviation
   a. Perforating gunshot wound of left chest "C"
      i. Entrance gunshot wound of left upper chest, just superior and medial to nipple; no soot or stippling of surrounding skin
      ii. Wound track involves only subcutaneous and muscular soft tissue of lateral left chest, tunneling superficially under skin only
      iii. Exit gunshot wound of lateral left chest
      iv. Directionality: right to left, front to back, and slightly downward
   b. Perforating gunshot wound of torso "D"
      i. Entrance gunshot wound of right upper quadrant of abdomen; no soot or stippling of surrounding skin
      ii. Wound track involves anterior abdominal wall, right lobe of the liver, right retroperitoneal soft tissue, and musculature of right lower back
5. Pulpified wound track of liver
6. Hemoperitoneum, trace
      i. Exit gunshot wound of right lower back
      ii. Directionality: front to back, slightly right to left, and slightly downward
   a. Penetrating gunshot wound of right upper back "E"
      i. Entrance gunshot wound of right upper back; no soot or stippling of surrounding skin
      ii. Wound track involves soft tissue and musculature of back
      iii. Projectile recovered from soft tissue overlying right paramidline posterior thoracic level 1 (T1) vertebra and submitted to Evidence Unit
      iv. Directionality: back front, to slightly right to left, and without discernible upward or downward deviation
   b. Perforating gunshot wound of right upper back "F"
      i. Entrance gunshot wound of right upper back; no soot or stippling of surrounding skin
      ii. Wound track sequentially involves the soft tissue and musculature of back, posterior right 5th intercostal space, upper and middle lobes of right lung, carina, hilar region of left lung, and anterior chest wall at anterior left 8th rib
7. Fracture of anterior left 8th rib
8. Hemothoraces (right 100 mL; left 400 mL)
9. Hemoaspiration pattern of lungs, bilateral
      i. Exit gunshot wound of region of left nipple/areola
      ii. Directionality: back to front, right to left, and downward
   a. Penetrating gunshot wound of superior left shoulder "G"
      i. Entrance gunshot wound of superior left shoulder; no soot or stippling of surrounding skin
      ii. Wound track involves musculature of the left arm, soft tissue and musculature of left axilla, and left anterolateral chest wall at approximately left anterolateral rib levels 8-11
10. Multiple displaced fractures of left anterolateral ribs levels 8-11
11. Hemothorax, left (400 mL)
      i. Projectile recovered from left pleural cavity and submitted to Evidence Unit

FOR LAW ENFORCEMENT USE ONLY CONFIDENTIAL

ii. Directionality: left to right, slightly downward, and without discernible front to back deviation

a. Penetrating gunshot wound of left arm "H"

i. Entrance gunshot wound of mid lateral left arm; no soot or stippling of surrounding skin

ii. Wound track involves musculature of left arm and distal aspect of left humerus

12. Comminuted and displaced fractures of distal aspect of left humerus with vascular injury and patchy soft tissue hemorrhage

i. Projectile recovered from soft tissue of distal aspect of left arm and submitted to Evidence Unit

ii. Directionality: left to right and downward

a. Penetrating gunshot wound of left arm and left axilla "I"

i. Entrance gunshot wound of anteromedial left arm; no soot or stippling of surrounding skin

ii. First wound track involves muscular soft tissue of left arm

iii. Exit gunshot wound of left axilla

iv. Re-entrance gunshot wound of left axilla

v. Second wound track involves soft tissue and musculature of back, retroperitoneum, and lumbar level 3 (L3) vertebra with associated vertebral fracture

vi. Projectile recovered from the right paramidline lumbar level 3 (L3) vertebra and submitted to Evidence Unit

vii. Directionality: left to right, downward, and without discernible front to back deviation

b. Signs of exsanguination, including:

i. Conjunctival pallor

ii. Poorly formed lividity

iii. Generalized visceral pallor, especially of kidneys

iv. Shriveled splenic capsule, slight

13. Incised wounds of upper extremities

a. Incised wound of dorsal right hand "A"

i. Wound extends to underlying fibromuscular soft tissues, including tendinous structures, without significant vascular injury

b. Cluster of incised wounds of left distal volar forearm "B"

i. Wounds extend to skin only without significant vascular injury

c. Incised wound of dorsal left hand "C"

i. Wound extends to underlying fibromuscular soft tissues, including tendinous structures, without significant vascular injury

14. Puncture wounds of neck, torso, and upper extremities

a. All wounds without associated fractures or significant vascular injury

b. Cluster of approximately 9 puncture wounds of right aspect of neck

c. Cluster of approximately 32 puncture wounds of left aspect of neck

d. Cluster of approximately 16 puncture wounds of lower midline chest

e. Cluster of approximately 44 puncture wounds of right upper quadrant of abdomen

f. Cluster of approximately 42 puncture wounds of left aspect of abdomen

g. Cluster of 3 puncture wounds of right antecubital fossa

h. Cluster of approximately 10 puncture wounds of right distal volar forearm

i. Cluster of approximately 5 puncture wounds of dorsal right hand

j. Cluster of approximately 8 puncture wounds of left antecubital fossa

k. Cluster of approximately 11 puncture wounds of left distal volar forearm

l. Cluster of approximately 6 puncture wounds of dorsal left hand

m. 2 superficial puncture wounds of palmar left hand

15. Coronary artery atherosclerosis, slight

16. Obesity (BMI 36.9 lb/in2)

a. 4-chamber cardiac dilation, slight

b. Hepatic steatosis, slight

17. Status post resuscitative efforts

18. See separate toxicology report

FOR LAW ENFORCEMENT USE ONLY CONFIDENTIAL

## Summary and Opinion Narrative

34-year-old man who was reportedly involved in an encounter with law enforcement when he sustained multiple gunshot wounds. The decedent reportedly had a history of nitrous oxide abuse, resulting in paranoia and delusions. The decedent was also recently seen at a medical center for altered mental status, with reported

discharge diagnoses including psychosis and illicit substance abuse. On the day of the encounter, law enforcement received a call that there was an individual with a gun. On police arrival to the scene, officers searched the area and observed the decedent sitting in his vehicle. The decedent was asked to exit the vehicle. The decedent exited his vehicle with blood on his hands, and holding an unknown object. Police officers gave the decedent multiple commands, and the decedent ignored all the commands. The decedent then reportedly walked toward the police officers with the object, and the officers continued to give the decedent commands. The decedent continued to approach the officers, and the officers shot at the decedent. Paramedics arrived and pronounced the decedent at the scene. Per investigation report and scene photographs, it was determined that the object the decedent was holding was a screwdriver. There was an apparent razor blade in the decedent's vehicle, which was stained with blood. There were multiple regions of blood staining of the interior and exterior of the decedent's vehicle, including the steering wheel, dashboard, driver's seat, driver's door frame, and bumper.

On postmortem X-rays, there are scattered projectile fragments and multiple deformed projectiles, consistent with those recovered at autopsy. At autopsy, there are 6 penetrating and 3 perforating gunshot wounds of the body, involving the torso and left upper extremity. Notable injuries associated with these gunshot wounds include (but are not limited to) bilateral rib fractures, vertebral fractures, bilateral lung injuries with hemothoraces, carina injury with hemoaspiratorion pattern of bilateral lungs, liver injury with trace hemoperitoneum, and comminuted and displaced fractures of the left humerus. Associated with these injuries are signs of exsanguination, including conjunctival pallor, poorly formed lividity, generalized visceral pallor, and a slightly shriveled splenic capsule.

There are self-inflicted incised wounds of the upper extremities, involving the bilateral dorsal hands and the left distal volar forearm. There are self-inflicted clusters of and individual puncture wounds of the neck, torso, and upper extremities. The dimensions of the puncture wound are consistent with being inflicted by the screwdriver found at the scene. The location, clustering, orientation, and morphology of the puncture wounds and incised wounds are consistent with being self-inflicted. The incised wounds and puncture wounds are without associated fractures or significant vascular injury and are not contributory to death.

Cause of death is Multiple Gunshot Wounds. For the purposes of public health and vital statistics, given the history and circumstances as currently known in the setting of the findings by examination and ancillary studies, the manner of death is classified as Homicide.

## Decedent Identification

- Two unique patient identifiers reviewed
  - Same As Decedent Name
    - Decedent Name: DIAZ, LEONARDO
  - Case Num: 2024-18831

**Phenotypic Sex**

- Male

**Type of examination**

- Full

**Form Sections**

- Decedent Identification
- Prior Postmortem Procedures
- External Examination
- Evidence Of Traumatic Injury
- Internal Examination
- Cardiovascular System

CONFIDENTIAL
FOR LAW ENFORCEMENT USE ONLY

- Respiratory System
- Digestive System
- Urinary Tract
- Male Reproductive Tract
- Endocrine System
- Lymphoreticular System
- Musculoskeletal System
- Head And Central Nervous System
- Special Senses
- Examination Procedures And Ancillary Testing

- **Exam Start:** 12/04/2024 08:45

## Prior Postmortem Procedures

- Radiology Reviewed: Yes
  - X-ray

Interpretation: Scattered projectile fragments and multiple deformed projectiles, as follows:
A cluster of 3 projectiles of approximately midline upper torso region (consistent with 2 projectiles, 1 of which has separated jacket from core).
1 projectile in approximately midline lower torso region.
1 projectile in right lower torso region.
1 projectile in left lateral torso region.
1 projectile in distal left arm with associated displaced and comminuted distal left humerus fracture.

- Organ/Tissue Donation: No

- Mortuary Preparation: No

FOR LAW ENFORCEMENT USE ONLY
CONFIDENTIAL

## External Examination

**General**
- Appropriately-Developed
- Adequately Nourished
- Obese

**Race**
- Hispanic

**Phenotypic Sex**
- Male

**Body Weight and Height**
- Weight: 280 lb
- Height: 73 in
- BMI: 36.9 lb/in2

**Extremities**
- Well developed

Other Extremities: See Evidence of Traumatic Injury section

FOR LAW ENFORCEMENT USE ONLY
CONFIDENTIAL

**Skin**

- Without Significant Pathologic Finding

Other Skin Findings: Patchy dyspigmentation and hyperpigmentation and focal erythema of skin of buttocks and posterior proximal thighs

- Scars: Present
  - Other

    Description: Ovoid well-healed scar of right shin

**Tattoos**

- Present
  - Other

    Description: Multiple monochromatic tattoos of bilateral arms and forearms (depicting text, roses, cross)

**Hair**

- Balding
  - Vertex
  - Frontal
- Short

**Facial hair**

- Mustache
- Beard

**Hair color**

- Black

**Eye Color**

- Brown

**Sclerae**

- Anicteric
- Other

  Description: Conjunctival pallor

**Conjunctival Petechiae**

- Not identified

**Facial petechiae (i.e. non-conjunctival)**

- Absent

**Ears**

- Unremarkable

**Nose**

- Unremarkable

**Oral cavity**

- Dentition: Good Dentition
- Frenulae and Mucosae: Intact

**Neck**

- Normal

**Chest**

- Normal

Other: See Evidence of Traumatic Injury section

**Abdomen**

- Normal

Other: See Evidence of Traumatic Injury section

**Back**

- Unremarkable

Other: See Evidence of Traumatic Injury section

**External genitalia**

- Male

**Evidence of medical intervention/therapy at examination**

- Intravascular and/or intraosseous access lines
  - Location: Shin Right

**Postmortem Changes**

- Livor mortis: Indiscernible
- Rigor mortis: Altered

**External decomposition changes**

- None

**Internal Organs and Tissue**

- Well Preserved

FOR LAW ENFORCEMENT USE ONLY
CONFIDENTIAL

## Evidence of traumatic injury

Other Traumatic Injuries: Disclaimer for Labeling/Measuring Wounds:
There 6 penetrating and 3 perforating gunshot wounds of the body, involving the torso and left upper extremity. There are incised wounds of the upper extremities. There are puncture wounds of the body, involving the neck, torso, and upper extremities. The labeling/numbering of gunshot wounds and all other wounds is for descriptive and organizational purposes only and is not intended to imply the sequence of injuries. All wound measurements and estimates of wound path directions within the body are performed in the standard anatomic position at all times and may not reflect the position of the decedent at the time of injury. 12 o'clock indicates the direction toward the head; 6 o'clock indicates the direction toward the feet. There is no soot or stippling of the skin surrounding any of the gunshot wounds. All medical examiner diagrams are not intended to be facsimiles nor are they drawn to scale.

Multiple gunshot wounds of torso and left upper extremity:

Penetrating gunshot wound of right clavicular region "A":
There is a penetrating entrance gunshot wound of the right clavicular region of the chest, centered 10-1/4" below the top of the head and 3-1/4" to the right of midline. It consists of a 3/8" circular defect with an asymmetric, partially circumferential margin of abrasion measuring at its thickest 1/8" on the 11-2 o'clock aspect. After perforating the skin of the chest, the wound track sequentially involves the right thoracic inlet, right paravertebral ribs levels 1-3, with associated fractures of the ribs, the soft tissue and musculature of the back, before coming to rest in the soft tissues of the upper back. There are associated nondisplaced fractures of the spinous processes of thoracic vertebrae levels 3/4 (T3/T4). Associated with this gunshot wound is 100 mL of right hemothorax. The projectile is recovered in two fragments (separation of jacket and core from single projectile): the jacket is recovered from the soft tissue overlying the left paramidline posterior thoracic level 3 (T3) vertebra, and the core is recovered from the soft tissue overlying the left paramidline posterior thoracic levels 3/4 (T3/T4) vertebrae. The projectile consists of two separate recovered fragments, including a deformed orange metal jacket and a

separate deformed dark gray metal core. The directionality is downward, right to left, and slightly front to back.

Penetrating gunshot wound of superior left shoulder "B":
There is a penetrating entrance gunshot wound of the superomedial left shoulder, centered 8-1/2" below the top of the head and 6-1/4" to the left of midline. It consists of a 3/8 x 1/4" ovoid defect with a 1/16 to 1/8" circumferential margin of abrasion. After perforating the skin of the shoulder, the wound track sequentially involves the left thoracic inlet, the upper lobe of the left lung, the lower lobe of the left lung, the left hemidiaphragm, and the peripancreatic mesentery. Associated with this gunshot wound is 400 mL of left hemothorax and trace hemoperitoneum. The projectile is recovered from the peripancreatic soft tissue (mesentery). The projectile consists of a deformed orange metal jacketed bullet with a dark gray metal core. The directionality is downward, slightly left to right, and without discernible front to back deviation.

Perforating gunshot wound of left chest "C":
There is a perforating entrance gunshot wound of the left chest, just superior and medial to the nipple, centered 15-3/4" below the top of the head and 5-3/4" to the left of midline. It consists of a 1/4" circular defect with an asymmetric, partially circumferential margin of abrasion measuring at its thickest 3/8" on the 7 to 5 o'clock aspects. After perforating the skin of the chest, the wound track involves only the subcutaneous and muscular soft tissue of the lateral left chest, tunneling superficially under the skin only. There is an exit gunshot wound of the lateral left chest, centered 17-1/2" below the top of the head and 8-1/4" to the left of midline. It consists of a 7/8 x 1/2" slit-like to ovoid, reapproximating defect. The directionality is right to left, front to back, and slightly downward.

Perforating gunshot wound of torso "D":
There is a perforating entrance gunshot wound of the right upper quadrant of the abdomen, centered 23" below the top of the head and 5" to the right of midline. It consists of a 3/8 x 1/4" ovoid defect with an asymmetric, partially circumferential margin of abrasion measuring at tits thickest 3/16" on the 2 to 5 o'clock aspects. After perforating the skin of the abdomen, the wound track sequentially involves the anterior abdominal wall, the right lobe of the liver, the right retroperitoneal soft tissue, and the musculature of the right lower back. Associated with this gunshot wound is a pulpified wound track of the liver and trace hemoperitoneum. There is an exit gunshot wound of the right lower back, centered 25-1/2" below the top of the head and 3-1/2" to the right of midline. It consists of a 3/8 x 1/4" irregular reapproximating defect with marginal microlacerations. The directionality is front to back, slightly right to left, and slightly downward.

Penetrating gunshot wound of right upper back "E":
There is a penetrating entrance gunshot wound of the right upper back, centered 10-1/4" below the top of the head and 4" to the right of midline. It consists of a 3/8 x 1/4 ovoid defect with an asymmetric, partially circumferential margin of abrasion measuring at its thickest 1/8" on the 4 o'clock aspect. After perforating the skin of the back, the wound track sequentially involves the soft tissue and musculature of the back. The projectile is recovered from the soft tissue overlying the right paramidline posterior thoracic level 1 (T1) vertebra. The projectile consists of a deformed orange metal jacketed bullet with a dark gray metal core. The directionality is back front, slightly right to left, and without discernible upward or downward deviation.

Perforating gunshot wound of right upper back "F":
There is a perforating entrance gunshot wound of the right upper back, centered 12" below the top of the head and 5" to the right of midline. It consists of a 3/8 x 1/4 ovoid defect with a slightly asymmetric, circumferential margin of abrasion measuring at its thickest 1/16 to 1/8" on the 3 o'clock aspect. After perforating the skin of the back, the wound track sequentially involves the soft tissue and musculature of the back, the posterior right 5th intercostal space, the upper and middle lobes of the right lung, the carina, the hilar region of the left lung, and the anterior chest wall at anterior left 8th rib with associated fracture of the rib. Associated with this gunshot wound is 100 mL of right hemothorax, 400 mL of left hemothorax, and hemoaspiration pattern of the bilateral lungs. There is an exit gunshot wound of the region of the left nipple/areola, centered 16-3/4" below the top of the head and 6"

FOR LAW ENFORCEMENT USE ONLY CONFIDENTIAL

to the left of midline. It consists of a 1/2 x 1/8" slit-like, reapproximating defect. The directionality is back to front, right to left, and downward.

Penetrating gunshot wound superior left shoulder "G":
There is a penetrating entrance gunshot wound of the superior left shoulder, centered 1" below the top of the left shoulder. It consists of a 3/8 x 1/4" ovoid defect with an asymmetric, partially circumferential margin of abrasion measuring at its thickest 3/16" on the 3 to 6 o'clock aspect. After perforating the skin of the arm, the wound track sequentially involves the musculature of the left arm, the soft tissue and musculature of the left axilla, and the left anterolateral chest wall at approximately left anterolateral rib levels 8-11. Associated with this injury are multiple displaced fractures of left anterolateral ribs levels 8-11 and 400 mL of left hemothorax. The projectile is recovered from the left pleural cavity. The projectile consists of a deformed orange metal jacketed bullet with a dark gray metal core. The directionality is left to right, slightly downward, and without discernible front to back deviation.

Penetrating gunshot wound of left arm "H":
There is a penetrating entrance gunshot wound of the mid lateral left arm, centered 6" below the top of the left shoulder. It consists of a 5/8 x 3/8" defect with a 1/8" circumferential margin of abrasion. After perforating the skin of the arm, the wound track sequentially involves the musculature of the left arm and distal aspect of the left humerus. Associated with this gunshot wound are comminuted and displaced fractures of the distal aspect of the left humerus with vascular injury and patchy soft tissue hemorrhage. The projectile is recovered from the soft tissue of the distal aspect of the left arm. The projectile consists of a deformed orange metal jacketed bullet with a dark gray metal core. The directionality is left to right and downward.

Penetrating gunshot wound of left arm and left axilla "I":
There is a penetrating entrance gunshot wound of the anteromedial aspect of the left arm, centered 8-1/2" below the top of the left shoulder. The entrance gunshot wound consists of a 1/2 x 3/8" defect with an asymmetric, partially circumferential margin of abrasion measuring at its thickest 1/2" on the 3 to 5 o'clock aspects. After perforating the skin of the arm, this first wound track sequentially involves the muscular soft tissue of the left arm. There is an exit gunshot wound of the left axilla, centered 13-1/2" below the top of the head and 10-1/2" below the top of the head. The exit gunshot wound consists of a 5/8 x 5/8" irregular to slit-like, reapproximating defect. There is a re-entrance gunshot wound of the left axilla, just inferior and medial to the exit gunshot wound, centered 14" below the top of the head and 10" to the left of midline. The re-entrance gunshot wound consists of a 1/2 x 3/8" irregular defect with an asymmetric, partially circumferential margin of abrasion measuring at its thickest 1/2" on the 11 to 12 o'clock aspects. After perforating the skin of the axilla, this second wound track sequentially involves the soft tissue and musculature of the back, the retroperitoneum, and the lumbar level 3 (L3) vertebra with associated vertebral fracture. The projectile is recovered from the right paramidline lumbar level 3 (L3) vertebra. The projectile consists of a deformed orange metal jacketed bullet with a dark gray metal core. The directionality is left to right, downward, and without discernible front to back deviation.

Associated with the gunshot wounds are multiple signs of exsanguination, including conjunctival pallor, poorly formed lividity, generalized visceral pallor, especially of kidneys, and a slightly shriveled splenic capsule.

Incised wounds of upper extremities:
There are multiple incised wounds of the upper extremities. Unless otherwise specified, there are no abrasions or contusions of the skin surrounding any of the incised wounds. There are no fractures or significant vascular injury associated with any of the incised wounds.

Incised wound of dorsal right hand "A":
There is an incised wound of the dorsal right hand, centered 21-1/2" below the top of the shoulder. It consists of a

FOR LAW ENFORCEMENT USE ONLY
CONFIDENTIAL

2" gaping incised wound with features of overlapping incised wounds, including multiple bifurcations of both ends. The incised wound is vertically oriented. Overlapping with and involving the skin surrounding the incised wounds are puncture wounds (see description below). The incised wound extends to the underlying fibromuscular soft tissues, including tendinous structures, without significant vascular injury.

Cluster of incised wounds of left distal volar forearm "B":
There is a cluster of 3 incised wounds of the left distal volar forearm, centered 17-1/2" below the top of the shoulder. The wounds are parallel and each horizontally oriented. The wounds are 2-3/4" (proximal), 2-3/8" (middle), and 2-3/8" (distal) in length. There is slight bifurcation of the radial aspect of the distal incised wound. Overlapping with and involving the skin surrounding the incised wound are puncture wounds (see description below). The incised wounds extend to the skin only, without significant vascular injury.

Incised wound of dorsal left hand "C":
There is an incised wound of the dorsal left hand, centered 21" below the top of the shoulder. It consists of a 1-1/2" gaping incised wound with slight features of overlapping incised wounds, including bifurcations at the proximal end. The incised wound is vertically oriented. Just to the proximal and ulnar aspect of the incised wound is a cluster of puncture wounds (see description below). The incised wound extends to the underlying fibromuscular soft tissues, including tendinous structures, without significant vascular injury.

Puncture wounds of neck, torso, and upper extremities:
There are clusters of and individual puncture wounds of the right aspect of the neck, the left aspect of the neck, the lower midline chest, the right upper quadrant of the abdomen, the left aspect of the abdomen, the right antecubital fossa, the right distal volar forearm, the dorsal right hand, the left antecubital fossa, the left distal volar forearm, the dorsal left hand, and the palmar left hand. Each puncture wound consists of an approximately 1/4 x 1/8" slit-like to rectangular red-brown defect. There is variable presence of microlacerations of the margins of the defects. There is variable presence of cutaneous hemorrhage surrounding the defects. Unless otherwise specified, the wounds involve the skin and underlying superficial soft tissue and without associated fractures or significant vascular injury.

There is a 4 x 1-3/4" cluster of approximately 9 puncture wounds of the right aspect of the neck. The wounds have variable orientation. The wounds extend to the superficial aspects of the strap muscles of the lateral right and anterior aspects of the neck, without significant vascular injury.

There is a 5 x 3" cluster of approximately 32 puncture wounds of the left aspect of the neck. The wounds are mostly horizontally oriented. The wounds extend to the superficial aspects of the strap muscles of the lateral left and anterior aspects of the neck, without significant vascular injury.

There is a 3 x 3" cluster of approximately 16 puncture wounds of the lower midline chest. The wounds have variable orientation. The wounds extend to the skin and underlying superficial soft tissue, without associated fractures or significant vascular injury.

There is a 7 x 4" cluster of approximately 44 puncture wounds of the right upper quadrant of the abdomen. The wounds are mostly horizontally oriented. The wounds extend to the skin and underlying superficial soft tissue, without involvement of the abdominal cavity and without significant vascular injury.

There is a 13 x 6" cluster of approximately 42 puncture wounds of the left aspect of the abdomen. The wounds have variable orientation. The wounds extend to the skin and underlying soft tissue, without involvement of the abdominal cavity and without significant vascular injury.

FOR LAW ENFORCEMENT USE ONLY
CONFIDENTIAL

There is an approximately 2-1/2 x 1" cluster of 3 puncture wounds of the right antecubital fossa. The wounds are mostly horizontally oriented. The wounds extend to the skin and underlying superficial soft tissue, without significant vascular injury.

There is an approximately 4 x 3" cluster of approximately 10 puncture wounds of the right distal volar forearm. The wounds are mostly horizontally oriented. The wounds extend to the skin and underlying soft tissue, without significant vascular injury.

There is an approximately 2 x 1-1/2" cluster of approximately 5 puncture wounds of the dorsal right hand, surrounding the incised wound of the dorsal right hand "A" (see description above). The wounds are mostly horizontally oriented. The wounds extend to the skin and underlying soft tissue, without associated fractures or significant vascular injury.

There is an approximately 1-1/4 x 1" cluster of approximately 8 puncture wounds of the left antecubital fossa. The wounds have variable orientation. The wounds extend to the skin and underlying superficial soft tissue, without significant vascular injury.

There is an approximately 2 x 1" cluster of approximately 11 puncture wounds of the left distal volar forearm, surrounding the cluster of incised wounds of left distal volar forearm "B" (see description above). The wounds are mostly horizontally oriented. The wounds extend to the skin and underlying soft tissue, without significant vascular injury.

There is an approximately 1 x 3/4" cluster of approximately 6 puncture wounds of the dorsal left hand, just to the proximal and ulnar aspect of the incised wound of the dorsal left hand "C" (see description above). The wounds are mostly horizontally oriented. The wounds extend to the skin and underlying soft tissue, without associated fractures or significant vascular injury.

There are 2 superficial puncture wounds of the palmar left hand. The wounds are mostly horizontally oriented. The wounds extend to the skin only, without associated fractures or significant vascular injury.

These injuries, having been described, will not be repeated.

FOR LAW ENFORCEMENT USE ONLY
CONFIDENTIAL

## Internal Examination

**Body Cavities**

- Organs in Normal Anatomic Positions: Yes

**Right Pleural Cavity**

- Smooth
- Glistening

**Right Pleural Fluid**

- Present
  - Fluid Description
    - Volume: 100 ml
    - Blood

    Other: See Evidence of Traumatic Injury section

**Left Pleural Cavity**

- Smooth
- Glistening

**Left Pleural Fluid**

- Present
  - Fluid Description
    - Volume: 400 ml
    - Blood

    Other: See Evidence of Traumatic Injury section

**Peritoneal Fluid**

- Present
  - Fluid Description
    - Volume: 0 ml
    - Blood

    Other: Trace hemoperitoneum; see Evidence of Traumatic Injury section.

**Peritoneal Surfaces**

- Smooth
- Glistening

## Cardiovascular System

- **Heart Weight:** 400 gr

**Shape**

- Usual

**Pericardium**

- Intact

**Pericardial Fluid**

- None

**Epicardial Surface**

- Smooth
- Glistening

**Coronary Ostia**

- Normally Positioned
  - %Stenosis: None

**Foramen Ovale**

- Closed

**Septal Defects**

- None

**Coronary Arteries**

- Coronary Dominance: Right Dominant
- Coronary Artery Atherosclerosis: Present
  - Segmental
- Coronary Arteries Follow Normal Anatomic Course: Yes

**Left Anterior Descending Artery (LAD)**

- %Stenosis: Present
  - Stenosis Percentage: 10

FOR LAW ENFORCEMENT USE ONLY CONFIDENTIAL

- Stenosis Location
  - Proximal
  - Mid
- Stenosis Description: Eccentric

**Left Circumflex Artery (LCX)**

- %Stenosis: None

**Right Coronary Artery (RCA)**

- %Stenosis: None

**Chamber Dilation**

- Yes
  - Chamber Dilation Detail: All Chambers

  Description: Slight 4-chamber cardiac dilation

**Heart Valves**

**Description**

- Leaflets Thin/Delicate
- Normal Number of Leaflets
- Absent of Vegetations
- Absent of Atheromas
- No Annulus Calcification

**Chordae Tendinae**

- Thin

**Myocardium**

- Usual Consistency
- Red-Brown
- Absent of Focal Lesions
- Absent of Abnormalities of Apices of Papillary Musculature

**Endocardium**

- Smooth and Glistening

**Thickness (not including trabeculations)**

- Left ventricular free wall: 1.3 cm
- Right ventricular free wall: 0.3 cm
- Septum: 1.4 cm

**Pulmonary Artery**

- Appropriate Caliber
- Normal Configuration

**Ascending Aorta**

- Appropriate Caliber Without Tortuosity or Widening
- Normal Configuration
- No Atherosclerosis

**Major Arteries Arising From Aortic Arch**

- Normal Configuration
- Patent

**Thoracic Aorta**

- Appropriate Caliber Without Tortuosity or Widening
- Normal Configuration

FOR LAW ENFORCEMENT USE ONLY CONFIDENTIAL

- No Atherosclerosis

**Abdominal Aorta**

- Appropriate Caliber Without Tortuosity or Widening
- Normal Configuration
- No Atherosclerosis

**Venae Cavae**

- Patent
- Thin-Walled

## Respiratory System

**Epiglottis, Larynx, Trachea**

- Absent of Lesions
- Unobstructed

Other: See Evidence of Traumatic Injury section

**Lung Weight**

- Right Lung Weight: 360 gr
- Left Lung Weight: 300 gr

**Right Lung Parenchyma**

- Red/Purple or Tan/Pink

Other: Geographic / checkerboard-like blood staining of pulmonary parenchyma (hemoaspiration pattern)

**Left Lung Parenchyma**

- Red/Purple or Tan/Pink

Other: Geographic / checkerboard-like blood staining of pulmonary parenchyma (hemoaspiration pattern)

**Bronchi**

- Patent

**Bronchial Mucosa**

- Smooth and Glistening

## Digestive System

**Tongue**

- Absent of Trauma and Lesions

**Esophageal Mucosa**

- Intact

**Stomach**

- Contents: Absent
- Pill fragments: Absent

**Gastric Mucosa**

- Intact, with usual rugal folds without ulcers or mass lesions

**Appendix**

- Present
  - Normal

FOR LAW ENFORCEMENT USE ONLY CONFIDENTIAL

**Small Intestine**

- Without Significant Pathologic Findings

**Large Intestine**

- Without Significant Pathologic Findings

**Liver Weight**

- Liver Weight: 1740 gr

**Liver Capsule**

- Smooth
- Glistening

Other: See Evidence of Traumatic Injury section

**Liver Parenchyma**

- Consistency: Soft
- Color: Red-Brown

Other: Red-brown to slightly yellow-tan and slightly greasy

- Cirrhosis: Absent

**Gallbladder**

- Present
  - Normal
  - Bile Volume: Moderate
  - Calculi: Absent

**Pancreas**

- Tan, Lobulated Without Fibrosis

## Urinary Tract

- **Right Kidney Weight:** 150 gr
- **Left Kidney Weight:** 170 gr

**Kidneys**

- Surfaces: Smooth
- Color: Pale Tan

Other Color: Marked renal pallor

- Corticomedullary Junctions: Clearly Demarcated
- Calculi: Absent

**Bladder**

- Absent of Mucosal Lesions
- Volume and Color of Urine: 200 mL: clear, light yellow

## Male Reproductive Tract

**Prostate**

- Normal Size

**Testes**

- Present Within Scrotum

FOR LAW ENFORCEMENT USE ONLY CONFIDENTIAL

**Breast Tissue**

- Not Applicable

## Endocrine System

**Adrenal parenchyma**

- Uniform yellow cortices and good demarcation from the medulla

**Thyroid**

- Present
  - Color: Red-brown
  - Appearance: Symmetric

**Pituitary**

- Normal Size Without Lesions

## Lymphoreticular System

- **Spleen Weight:** 130 gr

**Spleen**

- Smooth, Intact, With Dark Red Parenchyma

Other: Slightly shriveled splenic capsule; see Evidence of Traumatic Injury section

**Bone Marrow**

- Dark Red and Trabeculated

**Lymph Nodes**

- Not enlarged

**Thymus**

- Involuted

## Musculoskeletal System

**Bony Framework**

- Normal

**Vertebral column and Ribs**

- Normal Curvature

**Ribs**

- Absent of Abnormalities

Other: See Evidence of Traumatic Injury section

**Vertebral Bodies**

Other: See Evidence of Traumatic Injury section

FOR LAW ENFORCEMENT USE ONLY
CONFIDENTIAL

## Head And Central Nervous System

**Scalp**

- Usual Thickness

**Calvarium**

- Normal thickness

**Brain Weight**

- Brain weight: 1300 gr

**Dura**

- Normal without subdural fluid collection

**Leptomeninges**

- Normal without lesions or discoloration

**Cerebral Hemispheres**

- Symmetrical without lesions

**Base of Brain**

- Absent of lesions

**Circle of Willis**

- Normal

**Cerebellum**

- Symmetrical without lesions

**Brainstem**

- No Lesions

**Spinal cord**

- Not Examined

FOR LAW ENFORCEMENT USE ONLY
CONFIDENTIAL

## Special Senses

**Eyes**

- Not Dissected

**Middle Ears**

- Not Dissected

## Examination Procedures and Ancillary Testing

**Photography Taken**

- Yes
  - Photos taken prior to the examination

**Special Dissection**

- **Extremities Dissection**
  - Choose Extremity: Left upper extremity
  - Trauma: Yes

    *See Evidence of Traumatic Injury for trauma.*

**Clothing Reviewed by DME**

- No

**Tissue retention**

- Stock Jar(s)
  - Quantity: 2

**Histology Key**

- Not Applicable

**Additional Samples Taken**

- Typing Blood - Heart, Vitreous, Urine, Liver, Femoral Blood, Heart Blood, Chest Blood, Bile

**Ancillary testing**

- Radiology

*Please see Prior Postmortem Procedures Radiology section for details.*

- Toxicology

Other Examination Procedures and Ancillary Testing Finding: Seven (7) projectile envelopes representing six (6) projectiles [six (6) penetrating gunshot wounds] recovered and submitted to Evidence Unit. Projectile from penetrating gunshot wound of right clavicular region "A" has separation of jacket and core and is submitted in two projectile envelopes to Evidence Unit.

Dr. Partovi, Edwin
Completed On: 12/17/2024 2:37 PM

CONFIDENTIAL
FOR LAW ENFORCEMENT USE ONLY

COUNTY OF LOS ANGELES DEPARTMENT OF MEDICAL EXAMINER

**20**

Decedent: DIAZ, LEONARDO

Case Number: 2024-18831

hair short, black, frontal + vertex balding
brown irides, clear, pale. good dentition



therapeutic: oral airway device,
R ant tib IO line
tattoo: LUE arm + forearm sleeve:
(person, map outline, face, skull...)
RUE arm + forearm (text, roses, cross).

08:45 am - 12:25 pm

Date: 12/04/2024

Edwin Partovi

Dr. Partovi, Edwin
Medical Examiner

(REV. 9/23)

FOR LAW ENFORCEMENT USE ONLY
CONFIDENTIAL

COUNTY OF LOS ANGELES | DEPARTMENT OF MEDICAL EXAMINER

# 20

Decedent: DIAZ, LEONARDO

Case Number: 2024-18831




All projectiles orange metal jacket w/ gray metallic core, deformed w/ mushroom deformity, except LT3, jacket only & except LT3 + T4 core only.

Date: 12/04/2024

Edwin Partovi

Dr. Partovi, Edwin
Medical Examiner

(REV. 9/23)

CONFIDENTIAL FOR LAW ENFORCEMENT USE ONLY

COUNTY OF LOS ANGELES

DEPARTMENT OF MEDICAL EXAMINER

# 21

Decedent: DIAZ, LEONARDO

Case Number: 2024-18831




FOR LAW ENFORCEMENT USE ONLY
CONFIDENTIAL

Date: 12/04/2024

Edwin Partovi

Dr. Partovi, Edwin
Medical Examiner

(REV. 9/23)

COUNTY OF LOS ANGELES

DEPARTMENT OF MEDICAL EXAMINER

# 16

Decedent: DIAZ, LEONARDO

Case Number: 2024-18831

FOR LAW ENFORCEMENT USE ONLY CONFIDENTIAL

**EXTERNAL EXAM**
- Sex
- Race
- Age
- Height
- Weight
- Hair
- Eyes
- Sclera
- Teeth
- Mouth
- Tongue
- Nose
- Chest
- Breasts
- Abdomen
- Scar
- Genitals
- Edema
- Skin
- Decubitus

**HEART Wt.** 400 sl. yrch dil.
- Pericardium — RV 1.3
- Hypertrophy — Septum 1.4
- Dilation (+) — LV 0.3
- Muscle — TV/PV/MV/AV:
- Valves
- Coronaries ø / 10 p.m.

**AORTA** no athero.

**VESSELS**

**LUNGS Wt.**
- R 360
- L 300 — L+R lung GSW defects.
- Adhesions ø
- Fluid R100, L 400
- Atelectasis (+)
- Oedema
- Congestion .. hemorrhage lungs.
- Consolidation
- Bronchi
- Nodes

**PHARYNX**

**TRACHEA** – Dist trach GSW m.

**THYROID** – nl

**THYMUS** ø

**LARYNX**

**HYOID** } no hyoid/fx

**ABDOMINAL WALL FAT**

**PERITONEUM** trace hemoperitoneum.
- Fluid
- Adhesions

**LIVER Wt.** 1740
- Capsule
- Lobules sl. greasy, soft.
- Fibros
- G B
- Calculus
- Bile ducts

**SPLEEN Wt.** 130 sl. shrunken.
- Color
- Consistency
- Capsule
- Malpigment

**PANCREAS** nl peripancreatic hem →

**ADRENALS** nl — bullet recovered

**KIDNEYS Wt.** ST/mesenteric
- R 150
- L 170
- Capsule
- Cortex markedly pale.
- Vessels
- Pelvis smooth.
- Ureters

**BLADDER** 200 ml

**GENITALIA**
- Prostate nl, not enlarged / nodules
- Testes
- Uterus ✗
- Tubes
- Ovaries

**OESOPHAGUS** nl.

**STOMACH**
- Contents ø

**DUOD. & SM. INT.** nl.

**APPENDIX** (+)

**LARGE INT.** nl

**ABDOM. NODES**

**SKELETON**
- Spine
- Marrow
- Rib Cage
- Long bones
- Pelvis

**SCALP** 1300 no fx / subscalp hem

**CALVARIUM** EDH/SDH/SAH/ IPH

**BRAIN Wt.**
- Dura
- Fluid
- Ventricles
- Vessels
- Middle ears
- Other

**PITUITARY** nl

**SPINAL CORD** ✓

**TOXICOLOGY SPECIMENS** ✓ submitted

**SECTIONS FOR HISTOPATHOLOGY** ✓

**MICROBIOLOGY** ø

**DIAGRAMS** ✓

**X-RAYS**

**OTHER PROCEDURES** ø

**GROSS IMPRESSIONS**

Multiple GSWs.

Date: 12/04/2024

Edwin Partovi

Dr. Partovi, Edwin
Medical Examiner

(REV. 9/23)

Department of Medical Examiner, County of Los Angeles

# FORENSIC SCIENCE LABORATORIES

1104 North Mission Road, Los Angeles, CA 90033

## Laboratory Analysis Summary Report

Partovi, Edwin M.D.
Deputy Medical Examiner
1104 North Mission Road
Los Angeles, CA 90033

☐ PendingTox

FOR LAW ENFORCEMENT USE ONLY CONFIDENTIAL

**Case Number** 2024-18831 **Decedent:** DIAZ, LEONARDO

| SPECIMEN | SERVICE | DRUG | RESULT | ANALYST |
|---|---|---|---|---|
| **Alcohol Quantitation/Confirmation** | | | | |
| Blood, Heart | | | | |
| | Alcohol-GC/FID-HS | Ethanol | Negative | A. Kazaryan |
| **Drug Screen** | | | | |
| Blood, Heart | | | | |
| | ELISA-Immunoassay | Benzodiazepines | ND | A. Martinez |
| | ELISA-Immunoassay | Cocaine and Metabolites | ND | A. Martinez |
| | ELISA-Immunoassay | Fentanyl | ND | A. Martinez |
| | ELISA-Immunoassay | Methamphetamine & MDMA | ND | A. Martinez |
| | ELISA-Immunoassay | Opiates: Codeine & Morphine | ND | A. Martinez |
| | ELISA-Immunoassay | Opiates: Hydrocodone & Hydromorphone | ND | A. Martinez |
| | ELISA-Immunoassay | Phencyclidine | ND | A. Martinez |
| **Drug Screen/Confirmation** | | | | |
| Blood, Heart | | | | |
| | Bases-GC/NPD &/or MS | Basic Drugs | ND | A. Chavez |

**Legend:**

| | | | | | |
|---|---|---|---|---|---|
| | | ND | Not Detected | SNS | Specimen Not Suitable |
| g | Grams | ng/g | Nanograms per Gram | TNP | Test Not Performed |
| g% | Gram Percent | ng/mL | Nanograms per Milliliter | ug | Micrograms |
| Inc. | Inconclusive | PP | Presumptive Positive | ug/g | Micrograms per Gram |
| mg | Milligrams | QNS | Quantity Not Sufficient | ug/mL | Micrograms per Milliliter |

The alcohol analysis was performed in accordance to California Code of Regulations "Title 17" compliance by a qualified analyst in the Forensic Toxicology Laboratory, Forensic Laboratories Division, County of Los Angeles Department of Medical Examiner.

Enzyme-linked immunosorbant assay (ELISA) provides only a preliminary analytical result that is contingent upon a confirmatory test. A "presumptive positive" (PP) signifies a detection of a drug class and must be confirmed by additional testing for true identification and/or quantitation of specific drug(s) present in the specimen.

Per the Department's Evidence Retention Policy, the blood specimen(s) will be retained for one year (minimum) and all other specimens six months (minimum) from Postmortem Exam.

**Final Review By:** Sarah Buxton de Quintana — Digitally signed by Sarah Buxton de Quintana Date: 2025.01.05 10:40:47 -08'00'

**Sarah Buxton de Quintana**
**Supervising Criminalist II**

*The above results relate only to the items sampled and tested and have been technically and administratively reviewed and are the opinions and conclusions of the analysts noted. The final review has been certified by the noted Toxicologist to ensure that all standard operating procedures were followed as set by the Forensic Toxicology Laboratory, Forensic Sciences Laboratory Division, County of Los Angeles Department of Medical Examiner.*

"Enriching Lives"

# COUNTY OF LOS ANGELES
# DEPARTMENT OF MEDICAL EXAMINER

1104 N. MISSION RD, LOS ANGELES, CALIFORNIA 90033

Odey C. Ukpo, M.D., M.S.
Chief Medical Examiner

Case Number: **2024-18831** - Decedent's Name: **DIAZ, LEONARDO**

COUNTY OF LOS ANGELES

## INVESTIGATIVE SUMMARY REPORT

DEPARTMENT OF MEDICAL EXAMINER

CONFIDENTIAL FOR LAW ENFORCEMENT USE ONLY

| | | | |
|---|---|---|---|
| **1** | APPARENT MODE | Homicide | CASE NO 2024-18831 |
| | SPECIAL CIRCUMSTANCES Law Enforcement Related / Officer Involved Shooting / Media Interest / Victim of Crime | | CRYPT R-54 |

| LAST, FIRST MIDDLE | AKA | # |
|---|---|---|
| DIAZ, LEONARDO | | |

| ADDRESS | CITY | STATE | ZIP |
|---|---|---|---|
| 7717 South Figueroa Street | Los Angeles | California | 90003 |

| SEX | RACE APPEARS | DOB | AGE | HGT | WGT | EYES | HAIR | TEETH | FACIAL HAIR | ID VIEW | CONDITION |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Male | Hispanic/Latino | 2/8/1990 | 34 y | 73 in | 280 lb | Brown | Brown | Natural | Yes | Yes | TRAUMA |

| MARK TYPE | MARK LOCATION | MARK DESCRIPTION |
|---|---|---|
| Tattoo | Right Forearm | Inner-"Aaron", a cross with skulls, and Roman Numerals below. Top-Rolled up $100 bills. |
| Tattoo | Left Arm | Inner, lower-Unknow design. Outer, lower-2 1/2 skulls forming a heart with "MLD". |
| Tattoo | Left Forearm | Sleeved-"Alexandria", "LA", an outline of the state of California, 2 faces, "SC", and "Fuck Love". |

| NOK | ADDRESS | CITY | STATE | ZIP |
|---|---|---|---|---|
| Diaz, Maria | 7717 South Figueroa Street | Los Angeles | California | 90003 |

| RELATIONSHIP | PHONE | PENDING BY | DATE | TIME |
|---|---|---|---|---|
| Wife | (323)677-8676 | | 12/3/2024 | 02:10:00 |

| SSN | DL ID | STATE |
|---|---|---|
| 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 | D8633315 | CALIFORNIA |

| ID METHOD |
|---|
| Fingerprints-Livescan |

| L.A. # | MAIN # | CII # | FBI # | MILITARY # | POB |
|---|---|---|---|---|---|
| | 32708825 | A27410556 | 270172MC0 | | CALIFORNIA |

| IDENTIFIED BY NAME(PRINT) | RELATIONSHIP | PHONE | DATE | TIME |
|---|---|---|---|---|
| | | | 12/3/2024 | 02:20:00 |

| PLACE OF DEATH/PLACE FOUND | ADDRESS OR LOCATION | CITY | ZIP |
|---|---|---|---|
| Street | Oregon Court and Maple Avenue | Torrance | 90503 |

| PLACE OF INJURY | AT WORK | DATE | TIME | LOCATION OR ADDRESS | ZIP |
|---|---|---|---|---|---|
| Street | No | 12/2/2024 | 17:01:00 | Oregon Court and Maple Avenue, Torrance | 90503 |

| DOD | TIME | FOUND OR PRONOUNCED BY |
|---|---|---|
| 12/2/2024 | 17:15:00 | Paramedics, |

| OTHER AGENCY INV OFFICER | PHONE | REPORT No |
|---|---|---|
| TORRANCE PD | (310) 328-3456 | 240045785 |

| TRANSPORTED BY | DATE | TIME |
|---|---|---|
| Aque, Tami | 12/3/2024 | 01:50:00 |

| | | | |
|---|---|---|---|
| FINGERPRINTS? Yes | CLOTHING No | PA RPT No | MORTUARY |
| MED EV No | INVEST PHOTOS# 138 | SEAL TYPE NOT SEALED | HOSP RPT No |
| PHYS EV Yes | | PROPERTY? Yes | HOSP CHART No |
| SUICIDE NOTE No | | | PF NO |

"Enriching Lives"

# COUNTY OF LOS ANGELES
# DEPARTMENT OF MEDICAL EXAMINER

1104 N. MISSION RD, LOS ANGELES, CALIFORNIA 90033

Odey C. Ukpo, M.D., M.S.
Chief Medical Examiner

Case Number: **2024-18831** - Decedent's Name: **DIAZ, LEONARDO**

SYNOPSIS

According to the reported information, the decedent is a 34-year-old Hispanic male. Per the LANES Portal, he has a medical history of nitrous oxide abuse, causing him to be paranoid with delusions, and the decedent was seen at Los Angeles General Medical Center for an altered mental status on 11/30/2024. On Monday 12/02/2024 at 1641 hours, 911 was called stating that there was a man with a gun. Officers from the Torrance Police Department arrived on-scene, and began searching the area. They observed the decedent sitting in his vehicle, and asked him questions. The decedent then exited his vehicle with blood on his hands, and holding an unknown object. Officers gave the decedent multiple commands, and the decedent ignored all of the commands. The decedent then walked towards the Officers with the object, and Officers continued to give the decedent commands. The decedent continued to walk towards the Officers, and at 1701 hours, 4 Officers shot at the decedent approximately 9 times. Paramedics from the Torrance Fire Department were then summoned to the scene. On Monday 12/02/2024 at 1715 hours, Paramedics determined death. The unknown object that the decedent was holding was a screwdriver. It was later determined that the decedent was the person that called 911 regarding the man with a gun. Both Detective Chance and Detective Sanderson require a 2-hour notification prior to the examination. Please see case notes for their contact information.

CONFIDENTIAL
FOR LAW ENFORCEMENT USE ONLY

"Enriching Lives"

# COUNTY OF LOS ANGELES
# DEPARTMENT OF MEDICAL EXAMINER

1104 N. MISSION RD, LOS ANGELES, CALIFORNIA 90033

Odey C. Ukpo, M.D., M.S.
Chief Medical Examiner

Case Number: **2024-18831** - Decedent's Name: **DIAZ, LEONARDO**

COUNTY OF LOS ANGELES **Investigator's Narrative** DEPARTMENT OF MEDICAL EXAMINER

**Information Sources:**

| | | |
|---|---|---|
| (1) | Torrance Police Department<br>Detective Chance | (310)328-3456<br>Report #240045785 |
| (2) | LANES Portal | |

**Investigation:**

On Monday 12/02/2024 at 2247 hours, Officer David from the Torrance Police Department called the Los Angeles County Medical Examiner's Office to report a homicidal death of a 34-year-old Hispanic male that was involved in an Officer involved shooting. On Monday 12/02/2024 ay 2300 hours, Lieutenant Kelly Yagerlener assigned this case to me. I arrived on-scene at 2345 hours, and I cleared the scene on Tuesday 12/03/2024 at 0135 hours. Forensic Attendant Tami Aque transported the decedent from the scene to the Decedent Services Unit. Per the decedent's Federal Bureau of Investigations fingerprint returns, the decedent has been arrested twice for possession of nitrous oxide. Two weapons are in custody, a screwdriver, and a razor blade. The investigation regarding this incident is still on-going.

**Location:**

Location of Death: Oregon Court and Maple Avenue, Torrance, California 90503 County Los Angeles Location of Injury: Oregon Court and Maple Avenue, Torrance, California 90503 County Los Angeles

CONFIDENTIAL
FOR LAW ENFORCEMENT USE ONLY

**Informant/Witness Statements:**

I spoke with Detective Chance at the scene, and she told me the following:

On Monday 12/02/2024 at 1641 hours, 911 was called with the caller stating that there was a man with a gun in the area of Oregon Court and Maple Avenue. Officers arrived on-scene, and located the decedent sitting inside the vehicle. They knocked on the car window to ascertain if he saw a man with a gun. They then observed that the decedent had blood on both of his hands, and was holding an unknown object in his right hand. The decedent exited the vehicle, and the Officers gave commands to drop the object, and to turn around. The decedent continued walking towards the Officers with the object in his hand. The Officers then again told the decedent to drop the object, to stop walking towards them, and to turn around. The decedent refused and continued to walk towards the Officers with the object in his right hand. The Officers told the decedent again to drop the object, and to turn around, and if he does not, they are going to shoot him. The decedent continued to walk towards the Officers, and at approximately 1701 hours, four Officers shot at the decedent approximately 9 times. Paramedics from the Torrance Fire Department were then summoned to the scene. On Monday 12/02/2024 at 1715 hours, Paramedics determined death. Six 9mm and three 223 caliber cases were located at the scene. A screwdriver with blood on it was collected from the scene. A bloody razor blade was located inside the decedent's vehicle, and was later collected. Their investigation is still on-going.

Inside the decedent's wallet, I found 2 healthnet ID cards for the decedent, stating that his primary doctor is Dr. Daniel Matemotja located at 711 East Rosecrans Avenue, East Rancho Dominguez CA, 90221 with a phone # of (310)635-5223. I also found a patient identification card for the decedent for Los Angeles General Medical Center, and his medical record # is 102964744.

Per the LANES Portal, the decedent seen on 11/30/2024 at Los Angeles General Medical Center. He was discharged the same day, and his discharge diagnosis was drug induced psychosis, and illicit substance abuse. On 08/07/2024, the decedent as seen regarding a toxicology consultation. The decedent uses nitrous oxide 6-7 times a day, and has been using for the past couple of years. On 08/07/2024, the decedent was seen for numbness and tingling around his mouth and in both of his feet. And on Monday 08/05/2024, the decedent was paranoid with delusions. He believed that the police were watching him, and there were police cars parked outside of his residence. When he was seen in the emergency department, the decedent was intermittently tachycardic and was anxious/agitated. His WBC was 12.9 (high), his Hgb was 17.3 (high), and his Hct was 50.7 (high). His Vitamin B12 level was >2000 (high), caused by the nitrous oxide. A chest X-ray was completed on the decedent, and it showed "No focal consolidation. No pulmonary edema or pleural effusion. No pneumothorax...No acute osseous abnormality." The decedent then left against medical advice. On 08/08/2024, the decedent returned to the emergency room. At 1648 hours, his HRMo was 150 (critical). On 08/08/2024, a CT scan was completed on the decedent's head, and it showed "No acute intracranial process." On 08/10/2024, the decedent was transferred to UCLA. An MRI was completed on the decedent's brain and spine, and it showed "1. No acute intracranial abnormality. Specifically, no evidence of active demyelination. 2. No evidence of demyelinating lesions in the cervical and thoracic spine. 3. No significant canal stenosis or neural foraminal narrowing in the cervical and thoracic spine." The decedent was discharged on 08/12/2024.

CONFIDENTIAL
FOR LAW ENFORCEMENT USE ONLY

**Scene Description:**

The incident occurred on Oregon Court, just east of Maple Avenue in Torrance. Maple Avenue was a thoroughfare that ran north and south with 1 lane of travel in each direction. There was a painted center lane separating the northbound lanes from the southbound lanes. The east side was bordered by a parking lane, then a sidewalk, and then businesses. The west side was bordered by a parking lane, then a sidewalk, and then businesses. Oregon Court was a thoroughfare that ran east and west with 1 lane of travel in each direction. Eastbound Oregon Court eventually became a cul-de-sac. Westbound Oregon Court terminated at Maple Avenue, and it was controlled by a stop sign. The north side was bordered by a few parked vehicles, then a sidewalk with driveways and planters, and businesses. The south side was bordered by a few parked vehicles, then a sidewalk with driveways and planters, and businesses.

The green 4-door Dodge with California license plate #7ZWB237 was parked along the south curb on Oregon Court, east of Maple Avenue. The front of the vehicle was facing east, and the rear of the vehicle was facing west. The trunk, and both driver doors were open. Located on the center console was blood and a bloody razor blade. There was blood on the steering wheel and on the dash. There was a pool of blood on the driver's floor, there was blood on the front of the driver's seat, there was blood on the driver's door frame, and there was blood on the interior driver's door. There were blood drops on the ground just north of the driver's door, and the blood drops continued eastbound on the ground around the front of the vehicle. There was also some blood on the driver's side of the front bumper.

A black and white marked Ford Explorer from the Torrance Police Department with California exempt license plate #1538569 was located on all 4 of its wheels in the central portion of Oregon Court, just east of Maple Avenue. The front of the vehicle was facing east, and the rear of the vehicle was facing west. Located just north of the open driver's door was a case. Located a few feet north of the open driver's door, in the westbound lane, was another case.
Located a few feet southeast of that unit was another black and white marked Ford Explorer from the Torrance Police Department with California exempt license plate #1597742. It was located on all 4 of its wheels in the eastbound lane on Oregon Court. The front of the vehicle was facing east, and the rear of the vehicle was facing west. Located a few feet south of the rear passenger side of this unit were 2 cases. Located just east of the front of this unit were 3 more cases. Located a few feet northeast of the unit with California exempt license plate #1538569 was another black and white marked Ford Explorer from the Torrance Police Department with California exempt license plate #1663629. It was located on all 4 of its wheels in the westbound lane on Oregon Court. The front of the vehicle was facing east, and the rear of the vehicle was facing west. Located just south of its rear passenger tire was a screwdriver with blood on the handle and on the tip. Located just south of its front passenger tire was blood and another case. Located a few feet southeast of the front of this unit, in the central portion of Oregon Court were 2 more cases. The decedent was located lying supine in between the black and white marked Ford Explorer from the Torrance Police Department with California exempt license plate #1597742 and the black and white marked Ford Explorer from the Torrance Police Department with California exempt license plate #1663629.

CONFIDENTIAL FOR LAW ENFORCEMENT USE ONLY

COUNTY OF LOS ANGELES
DEPARTMENT OF MEDICAL EXAMINER
1104 N. MISSION RD, LOS ANGELES, CALIFORNIA 90033
"Enriching Lives"
Odey C. Ukpo, M.D., M.S.
Chief Medical Examiner

Case Number: **2024-18831** - Decedent's Name: **DIAZ, LEONARDO**

CONFIDENTIAL
FOR LAW ENFORCEMENT USE ONLY

**Body Examination:**

The decedent is a 34-year-old Hispanic male with short brown hair, brown eyes, and he has a mustache with a beard. He has all of his upper and all of his lower natural teeth. Tattooed on his inner right forearm is "Aaron", a cross with skulls, and Roman numerals. Tattooed down the top of his right forearm are rolled $100 bills. Tattooed on his inner lower left arm is an unknown design. Tattooed on his outer lower left arm are 2 1/2 skulls forming a heart with "MLD". His left forearm is sleeved with tattoos of "Alexandria", "LA", an outline of the state of California, 2 faces, "SC", and "Fuck Love". No scars and no other tattoos were noted. The decedent was wearing a black short sleeve T-shirt, a pair of gray shorts, a pair of gray underwear, a pair of black socks, and a pair of black sneakers. The decedent also had a pair of handcuffs secured around both of his wrists. The decedent was located lying supine on the central portion of Oregon Court, east of Maple Avenue. The top of his head was facing southwest. Both of his arms were bent at the elbows, with both of his hands resting on the ground, above his head. Both of his legs were straight, with both of his heels resting on the ground. His right foot was pointing south, and his left foot was pointing north. The decedent was intubated. There was a defibrillator patch on the right side of his chest, there was another defibrillator patch on the central portion of his chest, and there was another defibrillator patch on the lower left side of his torso. There was an IV in the front upper portion of his right leg.

There were multiple apparent puncture wounds to the upper central portion of his abdomen, and there were a couple of apparent puncture wounds to the upper left portion of his abdomen. There were a plethora of apparent puncture wounds to the central portion of the right side of his torso, and there were a plethora of apparent puncture wounds to the central portion of the left side of his torso. There were 2 apparent puncture wounds to his inner right elbow, and there were multiple apparent puncture wounds to his inner right wrist. There were multiple apparent puncture wounds to his inner left elbow, and there were multiple horizontal lacerations to his inner left wrist. There was a vertical laceration to the top central portion of his left hand, and there was a vertical laceration to the top central portion of his right hand.

The decedent sustained an apparent gunshot wound to the front of his right shoulder, and there were 2 apparent gunshot wounds to the back of his right shoulder. The decedent sustained an apparent gunshot wound to the central portion of the left side of his chest, and there was another apparent gunshot wound to his left nipple. There was an apparent gunshot wound to the upper left side of his torso. The decedent sustained an apparent gunshot wound to the top of his left shoulder, and there were 2 apparent gunshot wounds to his left armpit. The decedent sustained an apparent gunshot wound to his inner upper left arm, and there was another apparent gunshot wound to his inner central left arm. His left arm was also fractured. The decedent sustained an apparent gunshot wound to the outer upper right portion of his abdomen. The decedent sustained an apparent gunshot wound to the lower right central portion of back. Rigor mortis was a 2 throughout the body. Lividity was not observed.

**Identification:**

On Tuesday 12/03/2024 at 0220 hours, the Los Angeles County Regional Identification System positively identified the decedent as Leonardo Diaz with a DOB of 02/08/1990 by his fingerprints through Livescan. On Tuesday 12/03/2024 at 0224 hours, the Department of Justice confirmed the decedent's identification as Leonardo Diaz with the same DOB by his fingerprints through Livescan. On Tuesday 12/03/2024 at 0239 hours, the Federal Bureau of Investigations confirmed the decedent's identification as Leonardo Diaz with the same DOB by his fingerprints through Livescan. Per his California driver's license, and California identification card, his name is Leonardo Diaz with the same DOB of 02/08/1990.

**Next of Kin Notification:**

On Tuesday 12/03/0224 at 0210 hours, I notified Maria Diaz, the decedent's wife, of her husband's death, via telephone. She stated that the decedent does not have a will/Durable Power of Attorney/pre-need/Advanced Directive/living trust, and she is legally married to the decedent.

**Tissue Donation:**

I did not discuss tissue and organ donation with the decedent's family.

**Autopsy Notification:**

Both Detective Chance and Detective Sanderson require a 2-hour notification prior to the examination. Please see case notes for their contact information.

# COUNTY OF LOS ANGELES
# DEPARTMENT OF MEDICAL EXAMINER

"Enriching Lives"

1104 N. MISSION RD, LOS ANGELES, CALIFORNIA 90033

Odey C. Ukpo, M.D., M.S.
Chief Medical Examiner

Case Number: **2024-18831** - Decedent's Name: **DIAZ, LEONARDO**

| **Evidence:** |
|---|
| Underwear collected on 2024-12-03, at approximately 07:42:00 hours - Forensic Technician - Gutierrez, Rodrigo |
| T-shirt collected on 2024-12-03, at approximately 07:42:00 hours - Forensic Technician - Gutierrez, Rodrigo |
| Socks x2 collected on 2024-12-03, at approximately 07:42:00 hours - Forensic Technician - Gutierrez, Rodrigo |
| Shoes x2 collected on 2024-12-03, at approximately 07:42:00 hours - Forensic Technician - Gutierrez, Rodrigo |
| Shorts collected on 2024-12-03, at approximately 07:42:00 hours - Forensic Technician - Gutierrez, Rodrigo |
| Fingernail Kit collected on 2024-12-03, at approximately 00:30:00 hours - Investigator - McCracken, Kristy |
| GSR Kit collected on 2024-12-03, at approximately 00:25:00 hours - Investigator - McCracken, Kristy |
| Projectile collected on 2024-12-04, at approximately 09:54:00 hours - Deputy Medical Examiner - Dr. Partovi, Edwin |
| Projectile collected on 2024-12-04, at approximately 10:13:00 hours - Deputy Medical Examiner - Dr. Partovi, Edwin |
| Projectile collected on 2024-12-04, at approximately 10:26:00 hours - Deputy Medical Examiner - Dr. Partovi, Edwin |
| Projectile collected on 2024-12-04, at approximately 10:38:00 hours - Deputy Medical Examiner - Dr. Partovi, Edwin |
| Projectile collected on 2024-12-04, at approximately 10:43:00 hours - Deputy Medical Examiner - Dr. Partovi, Edwin |
| Projectile collected on 2024-12-04, at approximately 11:12:00 hours - Deputy Medical Examiner - Dr. Partovi, Edwin |
| Projectile collected on 2024-12-04, at approximately 11:45:00 hours - Deputy Medical Examiner - Dr. Partovi, Edwin |

Investigator: McCracken, Kristy
Inv. Report Date/Time: 12/9/2024 at 05:02:17.4866667

Reviewed By: Chao, Mason
Reviewed Date/Time:12/15/2024 at 23:48:59.1900000

CONFIDENTIAL FOR LAW ENFORCEMENT USE ONLY

# EXHIBIT "S"

LAW OFFICES OF DALE K. GALIPO
Dale K. Galipo (Bar No. 144074)
dalekgalipo@yahoo.com
Eric Valenzuela (Bar No. 284500)
evalenzuela@galipolaw.com
21800 Burbank Boulevard, Suite 310
Woodland Hills, California 91367
Telephone: (818) 347-3333
Facsimile: (818) 347-4118

Attorneys for Plaintiffs

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

MARIA GUADALUPE DIAZ; A.D., a minor by and through his Guardian Ad Litem, MARIA GUADALUPE DIAZ; A.D., a minor by and through his Guardian Ad Litem, MARIA GUADALUPE DIAZ; LEONARDO DIAZ; and RAMONA RAMIREZ DE DIAZ,

Plaintiffs,

vs.

CITY OF TORRANCE; ARTURO CASTILLO; CODY WISSLER; JESUS GARCIA; JASON BERMUDEZ; and DOES 6-10, inclusive,

Defendants.

Case No. 2:25-cv-03389-JLS (JCx)

**FIRST AMENDED COMPLAINT FOR DAMAGES**

1. Unreasonable Search and Seizure—Excessive Force (42 U.S.C. § 1983)
2. Unreasonable Search and Seizure—Denial of Medical Care (42 U.S.C. § 1983)
3. Substantive Due Process (42 U.S.C. § 1983)
4. Battery (Wrongful Death and Survival Damages)
5. Negligence (Wrongful Death and Survival Damages)
6. Violation of Bane Act (Cal. Civil Code § 52.1)

**DEMAND FOR JURY TRIAL**

**<u>COMPLAINT FOR DAMAGES</u>**

1. Plaintiffs MARIA GUADALUPE DIAZ; A.D., a minor by and through his Guardian Ad Litem, MARIA GUADALUPE DIAZ; A.D., a minor by and through

his Guardian Ad Litem, MARIA GUADALUPE DIAZ; LEONARDO DIAZ; and RAMONA RAMIREZ DE DIAZ, for their complaint against Defendants CITY OF TORRANCE, ARTURO CASTILLO, CODY WISSLER, JESUS GARCIA, JASON BERMUDEZ and Does 6-10, inclusive, allege as follows:

**INTRODUCTION**

2. This civil rights action seeks compensatory and punitive damages from Defendants for violating various rights under state law and the United States Constitution in connection with the fatal officer involved shooting of Leonardo Diaz (“DECEDENT”), by members of the Torrance Police Department (“TPD”).

**PARTIES**

3. At all relevant times, Leonardo Diaz (“DECEDENT”), was an individual residing in the County of Los Angeles, California.

4. Plaintiff MARIA GUADALUPE DIAZ is an individual residing in the County of Los Angeles, and was the wife of the DECEDENT. MARIA GUADALUPE DIAZ sues both in her individual capacity as the wife of DECEDENT and in a representative capacity as a successor-in-interest to DECEDENT. Plaintiff MARIA GUADALUPE DIAZ seeks both survival damages, including DECEDENT’s pain and suffering and loss of enjoyment of life and wrongful death damages under state and federal law.

5. Plaintiff A.D. is a minor individual residing in the County of Los Angeles, California, and is the natural born son to DECEDENT. A.D. sues by and through his natural mother and Guardian Ad Litem, MARIA GUADALUPE DIAZ. A.D. sues both in his individual capacity as the son of DECEDENT and in a representative capacity as a successor-in-interest to DECEDENT. A.D. seeks both survival and wrongful death damages under federal and state law.

6. Plaintiff A.D. is a minor individual residing in the County of Los Angeles, California, and is the natural born son to DECEDENT. A.D. sues by and through his natural mother and Guardian Ad Litem, MARIA GUADALUPE DIAZ. A.D.

sues both in his individual capacity as the son of DECEDENT and in a representative capacity as a successor-in-interest to DECEDENT. A.D. seeks both survival and wrongful death damages under federal and state law.

7. Plaintiff LEONARDO DIAZ is an individual residing in the County of Los Angeles, California, and is the natural father to DECEDENT. LEONARDO DIAZ sues in his individual capacity as the father of DECEDENT. LEONARDO DIAZ seeks wrongful death damages under state and federal law.

8. Plaintiff RAMONA RAMIREZ DE DIAZ is an individual residing in Los Angeles County, Los Angeles, and is the natural mother to DECEDENT. RAMONA RAMIREZ DE DIAZ sues in her individual capacity as the mother of DECEDENT. RAMONA RAMIREZ DE DIAZ seeks wrongful death damages under state and federal law.

9. At all relevant times, Defendant CITY OF TORRANCE ("CITY") is and was a duly organized public entity, form unknown, existing under the laws of the State of California. At all relevant times, CITY was the employer of Defendants ARTURO CASTILLO, CODY WISSLER, JESUS GARCIA, and JASON BERMUDEZ, who were CITY police officers, DOES 5-6, who were CITY police officers' supervisorial officers, and DOES 7-10, who were managerial, supervisorial, and policymaking employees of the CITY's police department. On information and belief, at all relevant times, ARTURO CASTILLO, CODY WISSLER, JESUS GARCIA, JASON BERMUDEZ, and DOES 6-10 were residents of the County of Los Angles, California. ARTURO CASTILLO, CODY WISSLER, JESUS GARCIA, JASON BERMUDEZ and DOES 6-10 are sued in their individual capacity for damages only.

10. At all relevant times, Defendants Arturo Castillo, Cody Wissler, Jesus Garcia, Jason Bermudez and DOES 6-10 were duly authorized employees and agents of CITY, who were acting under color of law within the course and scope of

their respective duties as sheriff's deputies and with the complete authority and ratification of their principal, Defendant CITY.

11. At all relevant times, Defendants Arturo Castillo, Cody Wissler, Jesus Garcia, Jason Bermudez and DOES 6-10 were duly appointed officers and/or employees or agents of CITY, subject to oversight and supervision by CITY's elected and non-elected officials.

12. In doing the acts and failing and omitting to act as hereinafter described, Defendants Arturo Castillo, Cody Wissler, Jesus Garcia, Jason Bermudez and DOES 6-10 were acting on the implied and actual permission and consent of CITY.

13. At all times mentioned herein, each and every CITY defendant was the agent of each and every other CITY defendant and had the legal duty to oversee and supervise the hiring, conduct and employment of each and every CITY defendant.

14. The true names of defendants DOES 6 through 10, inclusive, are unknown to PLAINTIFFS, who therefore sue these defendants by such fictitious names. PLAINTIFFS will seek leave to amend this complaint to show the true names and capacities of these defendants when they have been ascertained. Each of the fictitious named defendants is responsible in some manner for the conduct and liabilities alleged herein.

15. On January 28, 2025, PLAINTIFFS served their claims for damages with CITY pursuant to applicable sections of the California Government Code.

16. On February 13, 2025, CITY rejected PLAINTIFFS' claims for damages.

## JURISDICTION AND VENUE

17. This civil action is brought for the redress of alleged deprivations of constitutional rights as protected by 42 U.S.C. §§ 1983, 1985, 1986, 1988, and the Fourth and Fourteenth Amendments of the United States Constitution. Jurisdiction is founded on 28 U.S.C. §§ 1331, 1343, and 1367.

18. Venue is proper in this Court under 28 U.S.C. § 1391(b), because Defendants reside in, and all incidents, events, and occurrences giving rise to this action occurred in, the County of Los Angeles, California.

**FACTS COMMON TO ALL CLAIMS FOR RELIEF**

19. Plaintiffs repeat and reallege each and every allegation in paragraphs 1 through 18 of this Complaint with the same force and effect as if fully set forth herein.

20. On December 2, 2024, DECEDENT was on the 2900 Block of Oregon Court, in Torrance. While at this location, Arturo Castillo, Cody Wissler, Jesus Garcia, and Jason Bermudez discharged their firearms at DECEDENT, striking him, causing serious physical injury and eventually killing him.

21. Arturo Castillo, Cody Wissler, Jesus Garcia, Jason Bermudez and saw that DECEDENT was injured and bleeding, including from the wrist, prior to the shooting DECEDENT. These injuries may have been self-inflicted and should have put the involved officers on notice that DECEDENT likely suffered from mental illness and was probably having a mental health crisis. It was obvious, or should have to an objectively reasonable officer, that DECEDENT that may have been experiencing a mental health crisis prior to the shooting.

22. DECEDENT had a flat head screwdriver at the time of the incident and he was not armed with a knife or gun, during the encounter with police. The screwdriver in Decedent's hand did not resemble a knife or a gun, and was, or should have been, easily distinguishable from a knife or a gun, especially since this incident happened in broad daylight. This screwdriver remained down by DECEDENT's side and DECEDENT never make any slashing or stabbing motions with the screwdriver. Further, DECEDENT never physically injured any other person with the screwdriver, nor did he attempt to do so.

23. The DECEDENT was walking at a slow pace at the time of the incident and he never ran or charged at the involved officers. Further, the officers were behind cover and were positioned out in the open with plenty of space to safely tactically reposition themselves if necessary.

24. Multiple officers fired their weapons at DECEDENT during the incident supporting that this was a contagious/sympathetic fire situation.

25. DECEDENT never attempted to attack or physically injure any of the involved officers or anyone else during the incident.

26. There were less than lethal alternatives to using deadly force against DECEDENT, especially since he only had a screwdriver and the involved officers greatly outnumbered DECEDENT. On information and belief, some of the involved officers were armed with less-than-lethal weapons such as the beanbag shotgun and/or the 40mm launcher, taser guns, pepper spray and could have maintained cover, distance from the DECEDENT and safely tactically repositioning themselves. DECEDENT was also significantly outnumbered by the involved officers and he did not physically injure anyone, including the involved officers, during the incident nor did he attempt to do so.

27. DECEDENT did not pose an immediate or imminent threat of death or serious physical injury to either the involved officers or any other person at the time of the shooting. DECEDENT was not about to kill or cause serious bodily injury to anyone when he was fatally shot by the involved officers and DECEDENT never attempted to disarm or grab any of the officers' weapons. The conduct of DECEDENT was not immediately life threatening, making the use of deadly force against him unnecessary.

28. On information and belief, after shooting DECEDENT, the involved officers waited for a significant amount of time before approaching DECEDENT and providing and/or summonsing medical attention for DECEDENT, despite DECEDENT visibly bleeding profusely from his injuries. The involved officers

did not provide timely medical care to DECEDENT, they did not timely summons medical assistance for DECEDENT, and/or they prevented medical assistance from being timely provided to DECEDENT.

## FIRST CLAIM FOR RELIEF

**Unreasonable Search and Seizure—Excessive Force (42 U.S.C. § 1983)**

(By Plaintiffs Maria Guadalupe Diaz, A.D. and A.D. against Defendants Arturo Castillo, Cody Wissler, Jesus Garcia and Jason Bermudez)

29. Plaintiffs repeat and reallege each and every allegation in paragraphs 1 through 28 of this Complaint with the same force and effect as if fully set forth herein.

30. The involved officers unjustified shooting deprived DECEDENT of his right to be secure in his persons against unreasonable searches and seizures as guaranteed to DECEDENT under the Fourth Amendment to the United States Constitution and applied to state actors by the Fourteenth Amendment.

31. The unreasonable use of force by Arturo Castillo, Cody Wissler, Jesus Garcia and Jason Bermudez deprived DECEDENT of his right to be secure in his person against unreasonable searches and seizures as guaranteed to him under the Fourth Amendment to the United States Constitution and applied to state actors by the Fourteenth Amendment. This unreasonable and excessive use of force includes fatally shooting an individual holding a flat-head screwdriver, who was already visibly injured and bleeding, including bleeding from the wrist from possibly self-inflicted wounds and displaying obvious signs of possibly suffering from a mental health crisis. There were also several less than lethal alternatives such as the bean bag shotgun or 40mm launcher, tasers and pepper spray, maintaining cover and distance from DECEDENT and tactically re-positioning themselves. DECEDENT was also significantly outnumbered by the involved police officers and some of the involved officers did not fire their guns, which further supports that a reasonable officer under similar circumstances would not have found it appropriate to use

deadly force under against DECEDENT.

32. As a result, DECEDENT suffered extreme mental and physical pain and suffering, loss of enjoyment of life and eventually suffered a loss of life and of earning capacity. Plaintiffs have also been deprived of the life-long love, companionship, comfort, support, society, care, and sustenance of DECEDENT, and will continue to be so deprived for the remainder of her natural life.

33. As a result of the conduct of Arturo Castillo, Cody Wissler, Jesus Garcia and Jason Bermudez, they are liable for DECEDENT's injuries, either because they were integral participants in the excessive force, or because they failed to intervene to prevent these violations.

34. This use of deadly force was excessive and unreasonable under the circumstances, especially since DECEDENT was only holding a screwdriver, he never made any slashing or stabbing motions with the screwdriver, he never physically injured anyone, including with the screwdriver, nor did he attempt to do so, he did take or try to obtain any of the officers' guns and he did not pose an immediate threat of death or serious bodily injury at the time of the shooting. Defendants' actions thus deprived DECEDENT of his right to be free from unreasonable searches and seizures under the Fourth Amendment and applied to state actors by the Fourteenth Amendment.

35. The conduct of Arturo Castillo, Cody Wissler, Jesus Garcia and Jason Bermudez was willful, wanton, malicious, and done with reckless disregard for the rights and safety of DECEDENT and therefore warrants the imposition of exemplary and punitive damages as to the involved officers.

36. Plaintiffs bring this claim as successor-in-interest to the DECEDENT, and seek both survival damages, including DECEDENT's pain and suffering and loss of life/enjoyment of life and wrongful death damages for the violation of DECEDENT's rights.

37. Plaintiffs also seek attorney fees under this claim.

## SECOND CLAIM FOR RELIEF

**Unreasonable Search and Seizure—Denial of Medical Care (42 U.S.C. § 1983)**

(By Plaintiffs Maria Guadalupe Diaz, A.D. and A.D. against Defendants Arturo Castillo, Cody Wissler, Jesus Garcia and Jason Bermudez)

38. Plaintiffs repeat and reallege each and every allegation in paragraphs 1 through 37 of this Complaint with the same force and effect as if fully set forth herein.

39. The denial of medical care by Arturo Castillo, Cody Wissler, Jesus Garcia and Jason Bermudez deprived DECEDENT of his right to be secure in his person against unreasonable searches and seizures as guaranteed to DECEDENT under the Fourth Amendment to the United States Constitution and applied to state actors by the Fourteenth Amendment.

40. As a result, DECEDENT suffered extreme mental and physical pain and suffering and eventually suffered a loss of life and earning capacity. Plaintiffs have also been deprived of the life-long love, companionship, comfort, support, society, care, and sustenance of DECEDENT, and will continue to be so deprived for the remainder of their natural lives. Plaintiffs are also claiming funeral and burial expenses and a loss of financial support.

41. Defendants Arturo Castillo, Cody Wissler, Jesus Garcia and Jason Bermudez knew that failure to provide timely medical treatment to DECEDENT could result in further significant injury or the unnecessary and wanton infliction of pain, but disregarded that serious medical need, causing DECEDENT great bodily harm and death.

42. After shooting DECEDENT multiple times, Arturo Castillo, Cody Wissler, Jesus Garcia and Jason Bermudez did not timely summon medical attention for DECEDENT, who was bleeding profusely and had obvious serious injuries. Arturo Castillo, Cody Wissler, Jesus Garcia and Jason Bermudez also did

not allow and prevent responding medical personnel on-scene to timely render medical aid/assistance to DECEDENT.

43. The conduct of Arturo Castillo, Cody Wissler, Jesus Garcia and Jason Bermudez was willful, wanton, malicious, and done with reckless disregard for the rights and safety of DECEDENT and therefore warrants the imposition of exemplary and punitive damages as to Defendants Arturo Castillo, Cody Wissler, Jesus Garcia and Jason Bermudez.

44. Plaintiffs bring this claim as a successors-in-interest to DECEDENT, and seek both survival and wrongful death damages for the violation of DECEDENT's rights.

45. Plaintiffs also seek attorney's fees under this claim.

**THIRD CLAIM FOR RELIEF**

**Substantive Due Process (42 U.S.C. § 1983)**

(By All Plaintiffs Against Defendants Arturo Castillo, Cody Wissler, Jesus Garcia and Jason Bermudez)

46. Plaintiffs repeat and reallege each and every allegation in paragraphs 1 through 44 of this Complaint with the same force and effect as if fully set forth herein.

47. MARIA GUADALUPE DIAZ and had a cognizable interest under the Due Process Clause of the Fourteenth Amendment of the United States Constitution to be free from state actions that deprive her of life, liberty, or property in such a manner as to shock the conscience, including but not limited to, unwarranted state interference in Plaintiff's familial relationship with her husband, DECEDENT.

48. A.D. had a cognizable interest under the Due Process Clause of the Fourteenth Amendment of the United States Constitution to be free from state actions that deprive him of life, liberty, or property in such a manner as to shock the conscience, including but not limited to, unwarranted state interference in Plaintiff's familial relationship with his father, DECEDENT.

49. A.D. had a cognizable interest under the Due Process Clause of the Fourteenth Amendment of the United States Constitution to be free from state actions that deprive him of life, liberty, or property in such a manner as to shock the conscience, including but not limited to, unwarranted state interference in Plaintiff's familial relationship with his father, DECEDENT.

50. LEONARDO DIAZ had a cognizable interest under the Due Process Clause of the Fourteenth Amendment of the United States Constitution to be free from state actions that deprive him of life, liberty, or property in such a manner as to shock the conscience, including but not limited to, unwarranted state interference in Plaintiff's familial relationship with his son, DECEDENT.

51. RAMONA RAMIREZ DE DIAZ had a cognizable interest under the Due Process Clause of the Fourteenth Amendment of the United States Constitution to be free from state actions that deprive her of life, liberty, or property in such a manner as to shock the conscience, including but not limited to, unwarranted state interference in Plaintiff's familial relationship with her son, DECEDENT.

52. As a result of the excessive force by Arturo Castillo, Cody Wissler, Jesus Garcia and Jason Bermudez and their failure to intervene, DECEDENT died. Plaintiffs MARIA GUADALUPE DIAZ; A.D., A.D., LEONARDO DIAZ and RAMONA RAMIREZ DE DIAZ were thereby deprived of their constitutional right of familial relationship with DECEDENT.

53. Arturo Castillo, Cody Wissler, Jesus Garcia and Jason Bermudez, acting under color of state law, thus violated the Fourteenth Amendment rights of MARIA GUADALUPE DIAZ; A.D., A.D., LEONARDO DIAZ and RAMONA RAMIREZ DE DIAZ to be free from unwarranted interference with their familial relationship with DECEDENT.

54. The aforementioned actions of Arturo Castillo, Cody Wissler, Jesus Garcia and Jason Bermudez, along with other undiscovered conduct, shock the conscience, in that they acted with deliberate indifference to the constitutional rights

of DECEDENT and Plaintiffs MARIA GUADALUPE DIAZ; A.D., A.D., LEONARDO DIAZ and RAMONA RAMIREZ DE DIAZ and with purpose to harm unrelated to any legitimate law enforcement objective.

55. Defendants Arturo Castillo, Cody Wissler, Jesus Garcia and Jason Bermudez, acting under color of state law, thus violated the Fourteenth Amendment rights of DECEDENT and Plaintiffs.

56. As a direct and proximate cause of the acts of Arturo Castillo, Cody Wissler, Jesus Garcia and Jason Bermudez, DECEDENT experienced severe pain and suffering and lost his life and earning capacity. Plaintiffs suffered extreme and severe mental anguish and pain and have been injured in mind and body. Plaintiffs have also been deprived of the life-long love, companionship, comfort, support, society, care and sustenance of DECEDENT, and will continue to be so deprived for the remainder of their natural lives. Plaintiffs are also claiming funeral and burial expenses.

57. As a result of the conduct of Arturo Castillo, Cody Wissler, Jesus Garcia and Jason Bermudez, they are liable for DECEDENT'S injuries, either because they were integral participants in the denial of due process, or because they failed to intervene to prevent these violations.

58. The conduct of Arturo Castillo, Cody Wissler, Jesus Garcia and Jason Bermudez was willful, wanton, malicious, and done with reckless disregard for the rights and safety of DECEDENT and Plaintiffs and therefore warrants the imposition of exemplary and punitive damages as to Defendants Arturo Castillo, Cody Wissler, Jesus Garcia and Jason Bermudez.

59. Plaintiffs brings this claim individually and seek wrongful death damages for the violation of Plaintiffs' rights.

60. Plaintiffs also seek attorney fees under this claim.

**FOURTH CLAIM FOR RELIEF**

**Battery (Cal. Govt. Code § 820)**

(Survival and Wrongful Death)

(By All Plaintiffs Against Defendants Arturo Castillo, Cody Wissler and Jesus Garcia, Jason Bermudez and CITY)

61. Plaintiffs repeat and realleges each and every allegation in paragraphs 1 through 60 of this Complaint with the same force and effect as if fully set forth herein.

62. Arturo Castillo, Cody Wissler, Jesus Garcia and Jason Bermudez, while working as police officers for the CITY's police department, and while acting within the course and scope of their duties, intentionally shot DECEDENT. As a result of the actions of Arturo Castillo, Cody Wissler, Jesus Garcia and Jason Bermudez, DECEDENT suffered severe pain and suffering and ultimately died from his injuries and lost earning capacity. Arturo Castillo, Cody Wissler, Jesus Garcia and Jason Bermudez had no legal justification for using force against DECEDENT and said defendants' use of force while carrying out their police officer duties was an unreasonable use of force. DECEDENT was walking at a slow pace during the incident, he never ran or charged at the involved officers, DECEDENT was already injured and appeared to be suffering from self-inflicted wounds, including bleeding from the wrist, when police encountered DECEDENT, and the involved officers saw DECEDENT displaying obvious signs of suffering from a possible mental health crisis prior to the shooting. Further, DECEDENT never physically injured another person during the incident, nor did he attempt to do so, and there were several less than lethal alternatives to using deadly force against DECEDENT.

63. As a direct and proximate result of Defendants' conduct as alleged above, Plaintiffs suffered extreme and severe mental anguish and pain and have been injured in mind and body. Plaintiffs also have been deprived of the life-long love, companionship, comfort, support, society, care and sustenance of the DECEDENT, and will continue to be so deprived for the remainder of their natural

Case 2:25-cv-03389-JLS-JCP Document 36 Filed 08/22/26 Page 268 of 282 Page ID #:2071

lives. Plaintiffs are also claiming funeral and burial expenses and loss of financial support.

64. CITY is vicariously liable for the wrongful acts of Arturo Castillo, Cody Wissler, Jesus Garcia and Jason Bermudez pursuant to section 815.2(a) of the California Government Code, which provides that a public entity is liable for the injuries caused by its employees within the scope of the employment if the employee's act would subject him or her to liability.

65. The conduct of Arturo Castillo, Cody Wissler, Jesus Garcia and Jason Bermudez was malicious, wanton, oppressive, and accomplished with a conscious disregard for the rights of Plaintiffs and DECEDENT, entitling Plaintiffs, individually and as successors-in-interest to DECEDENT, to an award of exemplary and punitive damages.

66. Plaintiffs bring this claim both individually and as a successors-in-interest to DECEDENT, and seek both survival damages, including pre-death pain and suffering, loss of life/enjoyment of life and wrongful death damages under this claim.

**FIFTH CLAIM FOR RELIEF**
**Negligence (Cal. Govt. Code § 820)**
(Survival and Wrongful Death)
(By All Plaintiffs Against All Defendants)

67. Plaintiffs repeat and reallege each and every allegation in paragraphs 1 through 59 of this Complaint with the same force and effect as if fully set forth herein.

68. The actions and inactions of the Defendants were negligent and reckless, including but not limited to:

(a) the failure to properly and adequately assess the need to detain, arrest, and use force or deadly force against DECEDENT;

(b) the negligent tactics and handling of the situation with DECEDENT, including pre-shooting negligence;

(c) the negligent detention, arrest, and use of force, including deadly force, against DECEDENT;

(d) the failure to recognize that DECEDENT was possibly suffering from a mental health crisis;

(d) failure to recognize that DECEDENT was holding a flathead screwdriver and not a weapon such as a knife or a gun;

(e) the failure to use less than lethal alternatives to deadly force that were readily available to the involved officers;

(e) the failure to summons and provide prompt medical care to Decedent;

(f) the failure to properly train and supervise employees, both professional and non-professional, including Arturo Castillo, Cody Wissler, Jesus Garcia and Jason Bermudez;

(g) the failure to ensure that adequate numbers of employees with appropriate education and training were available to meet the needs of and protect the rights of DECEDENT; and

(h) the negligent handling of evidence and witnesses.

69. As a direct and proximate result of Defendants' conduct as alleged above, and other undiscovered negligent conduct, DECEDENT was caused to suffer severe pain and suffering and ultimately died and lost earning capacity. Further, as a direct and proximate result of Defendants' conduct as alleged above, Plaintiffs suffered extreme and severe mental anguish and pain and have been injured in mind and body. Plaintiffs also have been deprived of the life-long love, companionship, comfort, support, society, care and sustenance of DECEDENT, and will continue to be so deprived for the remainder of their natural lives. Plaintiffs also are claiming funeral and burial expenses and loss of financial support.

70. CITY is vicariously liable for the wrongful acts of Arturo Castillo, Cody Wissler, Jesus Garcia and Jason Bermudez pursuant to section 815.2 of the California Government Code, which provides that a public entity is liable for the injuries caused by its employees within the scope of the employment if the employee's act would subject him or her to liability.

71. Plaintiffs bring this claim both individually and as successor in interest to DECEDENT and seek both wrongful death damages and survival damages under this claim, including pre-death pain and suffering.

## <u>SIXTH CLAIM FOR RELIEF</u>

**Violation of Bane Act (Cal. Civil Code § 52.1)**

(By All Plaintiffs Against Arturo Castillo, Cody Wissler, Jesus Garcia, Jason Bermudez and City)

72. Plaintiffs repeat and reallege each and every allegation in paragraphs 1 through 64 of this Complaint with the same force and effect as if fully set forth herein.

73. California Civil Code, Section 52.1 (the Bane Act), prohibits any person from interfering with another person's exercise or enjoyment of his constitutional rights by threats, intimidation, or coercion.

74. Conduct that violates the Fourth Amendment can also amount to conduct that violates the California Bane Act. The involved officers' conduct, including the use of deadly force, constitutes threatening and intimidating behavior, meant to prevent DECEDENT from exercising both her federal and state rights.

75. Defendants' Arturo Castillo, Cody Wissler, Jesus Garcia and Jason Bermudez use of deadly force was excessive and unreasonable under the circumstances, especially since DECEDENT was only holding a flathead screwdriver and was not armed with a weapon like a knife or a gun and was walking at a slow pace and never ran or charged at the involved officers. DECEDENT also

never made any slashing or stabbing motions with the screwdriver nor did he try to injury any other person with the screwdriver. Further, DECEDENT never caused or attempted to cause bodily harm to anyone else, including the involved officers during the incident and he never attempted to obtain any of the involved officers' equipment or guns. Further, DECEDENT did not pose an imminent threat of death or serious bodily injury towards anyone when he was fatally shot and there were less than lethal alternatives available which were not utilized before resorting to the use of deadly force. DECEDENT was also displaying obvious signs of suffering from a mental health crisis, including bleeding from what appeared to be self-inflicted wounds to his wrist, Defendants' actions thus deprived DECEDENT of his right to be free from unreasonable searches and seizures and to be free from having unreasonable and excessive force used against him. Defendants' actions violated DECEDENT's state and federal rights, including the right to be free from the use of excessive and unreasonable force. Further, the involved officers acted with a reckless disregard of constitutional and statutory rights of the DECEDENT, including the right to be free from having unreasonable and excessive deadly force used against him.

76. The involved officers intentionally used excessive and unreasonable deadly force against DECEDENT by recklessly disregarding the DECEDENT's right to be free from excessive force.

77. Arturo Castillo, Cody Wissler, Jesus Garcia and Jason Bermudez , while working as police officers for the CITY's police department, and acting within the course and scope of their duties, interfered with or attempted to interfere with the rights of DECEDENT to be free from unreasonable searches and seizures, to equal protection of the laws, to access to the courts, and to be free from state actions that shock the conscience, by threatening or committing acts involving violence, threats, coercion, or intimidation.

78. On information and belief, DECEDENT reasonably believed that if he exercised his rights, including his federal civil rights and state law rights, Arturo Castillo, Cody Wissler, Jesus Garcia and Jason Bermudez would commit acts involving violence, threats, coercion, or intimidation against him.

79. On information and belief Defendants Arturo Castillo, Cody Wissler, Jesus Garcia and Jason Bermudez injured DECEDENT to prevent him from exercising his rights or retaliated against Decedent for having exercised his rights.

80. DECEDENT was caused to suffer extreme pain and suffering and eventually suffered a loss of life and of earning capacity. Plaintiffs have also been deprived of the life-long love, companionship, comfort, support, society, care, and sustenance of DECEDENT, and will continue to be so deprived for the remainder of her natural life. Plaintiffs are also claiming funeral and burial expenses and a loss of financial support.

81. The conduct of Arturo Castillo, Cody Wissler, Jesus Garcia and Jason Bermudez was a substantial factor in causing the harms, losses, injuries, and damages of DECEDENT and Plaintiffs.

82. CITY is vicariously liable for the wrongful acts of Arturo Castillo, Cody Wissler, Jesus Garcia and Jason Bermudez pursuant to section 815.2(a) of the California Government Code, which provides that a public entity is liable for the injuries caused by its employees within the scope of the employment if the employee's act would subject him or her to liability.

83. The conduct of Arturo Castillo, Cody Wissler, Jesus Garcia and Jason Bermudez was malicious, wanton, oppressive, and accomplished with a conscious disregard for the rights of DECEDENT entitling Plaintiffs to an award of exemplary and punitive damages.

84. Plaintiffs bring this claim in a representative capacity as the successors-in-interest to DECEDENT, and seek survival damages, including for pre-death pain

and suffering and loss of life/enjoyment of life for the violation of DECEDENT's rights.

85. The Plaintiffs also seek statutory attorney's fees under this claim, including a multiplier as permitted by law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request entry of judgment in her favor and against Defendants City of Torrance, Arturo Castillo, Cody Wissler, Jesus Garcia, Jason Bermudez and Does 6-10, inclusive, as follows:

A. For compensatory damages, including both survival damages, including pain and suffering and loss of life/enjoyment of life and wrongful death damages under state law and federal law, in the amount to be proven at trial;

B. For funeral and burial expenses and loss of financial support;

C. For punitive damages against the individual defendants in an amount to be proven at trial;

D. For interest;

E. For treble damages under Civil Code Section 52.1.

F. For reasonable costs of this suit and attorneys' fees; and

G. For such further other relief as the Court may deem just, proper, and appropriate.

DATED: October 8, 2025 LAW OFFICES OF DALE K. GALIPO

By /s/ *Eric Valenzuela*
Dale K. Galipo
Eric Valenzuela
Attorneys for Plaintiffs

**DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand a trial by jury.

DATED: October 8, 2025 LAW OFFICES OF DALE K. GALIPO

By /s/ *Eric Valenzuela*
Dale K. Galipo
Eric Valenzuela
Attorneys for Plaintiffs

# EXHIBIT “T”

JONES MAYER
LAW

www.jones-mayer.com

August 11, 2026

**VIA EMAIL: dalekgalipo@yahoo.com; evalenzuela@galipolaw.com**

LAW OFFICES OF DALE K. GALIPO
Dale K. Galipo, Esq.
Eric Valenzuela, Esq.
21800 Burbank Blvd., Suite 310
Woodland Hills, California 91367

**Re:** ***Diaz et al. v. City of Torrance, et al.***
***USDC # 2:25-cv-03389-JLS (JCx)***

**Subject:** **Meet and Confer Re: Motion for Summary Judgment / Partial Summary Adjudication (L.R. 7-3)**

Mr. Galipo/Mr. Valenzuela:

This letter is intended to inform counsel regarding the City of Torrance's ("City") intention to file a Motion for Summary Judgment / Partial Summary Adjudication ("Motion") pursuant to Federal Rules of Civil Procedure, Rule 56 and to calendar a meet and confer pursuant to L.R. 7-3. This letter is to provide an overview of our positions as it relates to each claim, but it is not a limitation on our arguments in support of the Motion.

## I. 42 U.S.C. § 1983 Claims (Counts One through Three)

Plaintiffs allege three separate claims under 42 U.S.C. § 1983: excessive force (count one); denial of medical care (count two); and interference with familial relations (count three). As discussed below, Defendant Officers conduct in this case was reasonable under both the Fourth and Fourteenth Amendments, and even assuming the conduct constituted a constitutional violation, each individual Defendant Officer is entitled to qualified immunity because the law was not clearly established at the time of the underlying incident. Further, Plaintiffs allege three separate state law claims, which we discuss in detail below as well.

### A. *Defendant Officers Did Not Use Excessive Force (Count One)*

As it relates to the Fourth Amendment claim, the analysis is governed by the "objective reasonableness" standard. *Graham v. Connor*, 490 U.S. 386, 396 (1989). Determining whether an officer's use of force was reasonable requires consideration of all the circumstances known to the officer, including "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id*. Moreover, the reasonableness of the force used "must be judged

from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Jackson v. City of Bremerton*, 268 F.3d 646, 651 (9th Cir. 2001). The court must allow for the fact that "police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396-97.

The Ninth Circuit's decision in *Hart v. City of Redwood City*, 99 F.4th 543 (9th Cir. 2024) is instructive. In *Hart*:

> [O]fficers [] responded to a tragic call involving a man attempting suicide with a knife in his backyard. When they arrived, they found the man's wife covered in blood and frantically pleading for help. At her urging, the officers went to the backyard, where they found Hart holding a knife. They told him to drop the knife, but instead of doing so he began moving towards them while raising the knife. As Hart neared the officers, [an officer] deployed her taser, but it was ineffective. With Hart approaching closely and wielding a knife, [another officer] took action to protect himself and his partner, shooting Hart.

*Hart*, 99 F.4th at 545.

In concluding the officers' conduct was objectively reasonable, the Ninth Circuit focused on several key circumstances. Notably, Hart briskly walked towards the officers with a knife, going from "thirty feet away to eight or ten feet away" in around 6 seconds. *Id*. at 546. Hart failed to respond to or comply with the officer's command to "drop the knife" and instead continued to approach the officers, holding the knife out towards them. *Id*. at 550. The Ninth Circuit found the "immediacy of the threat posed by Hart as he approached with a knife [was] dispositive." *Id*. at 552.

Here, Diaz similarly posed an immediate threat to Defendant Officers when he continued to approach and close in on the officers while holding what appeared to be a knife at the time at his side. The undisputed facts establish that: (1) Diaz wielded a weapon from the moment he exited his vehicle and his left hand/wrist was covered in blood – indicating he may have hurt someone else prior to exiting the vehicle; (2) Diaz closed the gap and came within three to five feet of Officer Wissler and Sergeant Garcia in a short period of time; (3) Diaz failed to comply with Defendant Officers' repeated commands to stop and drop the knife; and (4) while approaching Defendant Officers, Diaz held the weapon in his hand with the object pointed towards the officers. A reasonable officer in these circumstances would have perceived Diaz's conduct as an immediate threat. In *Hart*, the Ninth Circuit found "a non-responsive individual approaching while holding out a knife[1] is *unarguably* an immediate threat." *Id*. at 552 (emphasis in original). This factor,

---

1 A screwdriver has also been held to be a deadly weapon for purposes of California Penal Code § 245(a)(1). *See Grandison v. Hense*, 2012 U.S. Dist. LEXIS 63499, at *29-30 (C.D. Cal. Mar. 26, 2012) (citing to *People v. Simons*, 42 Cal.App.4th 1100, 1107-08 (1996) (screwdriver, while not inherently a deadly weapon, constituted

"which is the most important single element of the three specific [*Graham*] factors," supports a finding the officers' conduct was objectively reasonable under the circumstances. *Id*.

### B. *Denial of Medical Care Claim (Count Two)*

"[S]uspects have a Fourth Amendment right to 'objectively reasonable post arrest medical care' until the end of the seizure." *Estate of Cornejo ex rel. Solis v. City of Los Angeles*, 618 F. App'x 917, 920 (9th Cir. 2015) (citing *Tatum v. City & Cnty. of San Francisco*, 441 F.3d 1090, 1099 (9th Cir. 2006)). "This means that officers must 'seek the necessary medical attention for a detainee when he or she has been injured while being apprehended by either promptly summoning the necessary medical help or by taking the injured detainee to a hospital.' " *Maddox v. City of Los Angeles*, 792 F.2d 1408, 1415 (9th Cir. 1986). "But this does not 'require an officer to provide what hindsight reveals to be the most effective medical care for an arrested suspect.' " *D'Braunstein v. Diaz-Durazo*, 131 F.4th 764, 768 (9th Cir. 2025).

Here, the uncontroverted facts establish that after Officer Choi removed the weapon and Diaz was secured in handcuffs, Defendant Officers administered CPR within one minute and fifty seconds of the gunshots. Further, Defendant Officers delayed EMS's arrival on scene due to the potential dangerousness of the scene. Specifically, Defendant Officers had to remove the weapon from Diaz's hand; secure Diaz in handcuffs; and clear Diaz's vehicle of people/weapons before EMS was permitted to arrive and render aid. This delay accounted for only four minutes after the gunshots were fired.

### C. *Interference with Familial Relations Claim (Count Three)*

"The Ninth Circuit has recognized that parents and children have a Fourteenth Amendment substantive due process right to the companionship and society of one another." *Moreno v. City of San Bernardino*, 2022 U.S. Dist. LEXIS 137863, at *9 (C.D. Cal. Jun. 2, 2022) (referring to *Wilkinson v. Torres*, 610 F.3d 546, 554 (9th Cir. 2010)). If Defendant Officers' conduct, when viewed in the light most favorable to Plaintiffs, deprived Plaintiffs of their familial interest in a manner that "shocks the conscience," then Defendant Officers' conduct "is cognizable as a violation of due process." *Hayes v. Cnty. of San Diego*, 736 F.3d 1223, 1230 (9th Cir. 2013) (quoting *Wilkinson*, 610 F.3d at 554).

When an officer "makes a snap judgment because of an escalating situation, his conduct may only be found to shock the conscience if he acts with a purpose to harm unrelated to legitimate law enforcement objectives." *Id*. "Legitimate law enforcement objectives [include] arrest, self-defense, or the defense of others." *A.D. v. Cal. Highway Patrol*, 712 F.3d 446, 454 (9th Cir. 2013). Under the "purpose to harm" standard, an officer "violates the due process clause if he uses force with only an illegitimate purpose in mind." *Id*. at 453. "The purpose to harm standard

---

"deadly weapon" for purposes of defendant's conviction where defendant used screwdriver to hold police officers at bay, daring them to kill him)

is a subjective standard of culpability." *Id*. Under this standard, a plaintiff must submit non-speculative evidence that demonstrates an officer's improper motive. *See Jeffers v. Gomez*, 267 F.3d 895, 907 (9th Cir. 2001).

Here, there is no evidence that Officer Defendants acted "with a purpose to harm [Diaz] unrelated to legitimate law enforcement objectives." *Wilkinson*, 610 F.3d at 554. Rather, the evidence supports a finding Defendant Officers utilized deadly force in "self-defense, or the defense of others" based on Diaz waking toward them with a weapon in hand.

## II. <u>State Law Claims</u>

### A. *Battery and Negligence Claims (Count Four & Five)*

"A state law battery claim is a counterpart to a federal claim of excessive use of force. In both a plaintiff must prove that the peace officer's use of force was unreasonable." *Brown v. Ransweiler*, 171 Cal.App.4th 516, 527 (2009). Further, in *Hayes v. County of San Diego*, 57 Cal.4th 622 (2013), the California Supreme Court observed that California "negligence law, which considers the totality of the circumstances surrounding any use of deadly force [citation], is broader than federal Fourth Amendment law, which tends to focus more narrowly on the moment when deadly force is used." Here, as discussed *ante* in section IV(A), Defendant Officers' use of force against Diaz was reasonable based on conduct alleged pre-shooting and during the shooting itself.

### B. *Bane Act Claim (Count Six)*

The Tom Bane Civil Rights Act, codified as California Civil Code section 52.1, was enacted in 1987 to address hate crimes. The Bane Act civilly protects individuals from conduct aimed at interfering with rights that are secured by federal or state law, where the interference is carried out "by threats, intimidation or coercion." *See Venegas v. Cnty. of Los Angeles*, 153 Cal.App.4th 1230, 1239 (2007). Notably, the Bane Act imposes an additional requirement beyond a finding a constitutional violation (i.e., a plaintiff must show the officer has the specific intent to violate the suspect's rights). *Cornell v. City & Cnty. of San Francisco*, 17 Cal.App.5th 766, 801-02 (2017).

Here, not only was there no constitutional violation, even if there was, the facts establish Defendant Officers were attempting to protect themselves and others with no specific intent to violate Diaz's constitutional rights.

Based on the foregoing, please advise as to your availability to meet and confer. I am available Monday (August 17) afternoon, Tuesday (August 18) morning, and Thursday (August 20) afternoon. Please let me know if any of these timeframes work with your schedule. Once a date/time is finalized, we can meet via telephone. My phone number is 714-446-1400.

Regards,

*/s/ Ryan Allein*
Ryan M. Allein, Esq.

# EXHIBIT “U”


B
A