JONES MAYER
Angela M. Powell, State Bar No. 191876
amp@jones-mayer.com
Thurgood M. Wynn, State Bar No. 345199
tmw@jones-mayer.com
Ryan M. Allein, State Bar No. 318078
rma@jones-mayer.com
3777 North Harbor Boulevard
Fullerton, CA 92835
Telephone: (714) 446-1400
Facsimile: (714) 446-1448

Attorneys for Defendants,
CITY OF TORRANCE; ARTURO CASTILLO; CODY WISSLER; JESUS GARCIA; JASON BERMUDEZ

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARIA GUADALUPE DIAZ; A.D., a minor by and through his Guardian Ad Litem, MARIA GUADALUPE DIAZ; A.D., a minor by and through his Guardian Ad Litem, MARIA GUADALUPE DIAZ; LEONARDO DIAZ; and RAMONA RAMIREZ DE DIAZ<br><br>Plaintiffs,<br><br>v.<br><br>CITY OF TORRANCE; ARTURO CASTILLO; CODY WISSLER; JESUS GARCIA; JASON BERMUDEZ; and DOES 6-10, inclusive<br><br>Defendants. | Case No. 2:25-cv-03389-JLS(AYPx)<br><br>Honorable Josephine L. Staton<br>Courtroom 8A<br><br>**NOTICE OF ERRATA TO EXHIBIT C ATTACHED TO THE DECLARATION OF RYAN M. ALLEIN IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT AND/OR PARTIAL SUMMARY JUDGMENT OF ISSUES**<br><br>Date: February 5, 2027<br>Time: 10:30 a.m.<br>Ctrm: 8A<br><br>Action filed: October 8, 2025 |

PLEASE TAKE NOTICE that an incorrect copy of Exhibit C was inadvertently attached to the Declaration of Ryan M. Allein in Support of Motion for Summary Judgment and/or Partial Summary Judgment of Issues [DOC 60] filed on August April 26, 2023.

Attached hereto is a correct copy of the relevant portions of the Deposition of Arturo Castillo, dated July 13, 2026, as **Exhibit C**.

Dated: August 31, 2026

JONES MAYER

By: s/*Ryan M. Allein*
Angela M. Powell,
Thurgood M. Wynn,
Ryan M. Allein,
Attorneys for Defendants,
CITY OF TORRANCE, et al.

# EXHIBIT C

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

--oOo--

MARIA GUADALUPE DIAZ; A.D., a minor by and through his Guardian Ad Litem, MARIA GUADALUPE DIAZ; A.D., a minor by and through his Guardian Ad Litem, MARIA GUADALUPE DIAZ; LEONARDO DIAZ; and RAMONA RAMIREZ DE DIAZ,

Plaintiff,

v. Case No. 2:25-cv-03389-JLS (JCx)

CITY OF TORRANCE; ARTURO CASTILLO; CODY WISSLER; JESUS GARCIA; JASON BERMUDEZ; and DOES 6-10, inclusive,

Defendants.

_________________________________/

STENOGRAPHIC REPORTER'S TRANSCRIPT OF

REMOTE VIDEO DEPOSITION OF

ARTURO CASTILLO

MONDAY, JULY 13, 2026

Reported Stenographically by:

KIMBERLY D'URSO, CSR 11372, RPR

Job No. 28993

APPEARANCES (Remote)

FOR THE PLAINTIFF:

LAW OFFICES OF DALE K. GALIPO
BY: ERIC VALENZUELA, ESQ.
21800 Burbank Boulevard, Suite 310
Woodland Hills, California 91367
818.347.3333
evalenzuela@galipolaw.com

FOR THE DEFENDANTS:

JONES MAYER
BY: ANGELA M. POWELL, ESQ.
3777 North Harbor Boulevard
Fullerton, California 92835
714.446.1400
amp@jones-mayer.com

ALSO PRESENT:

Jesus Garcia
Cody Wissler
Jason Bermudez

Karen Torres-Corona, Videographer

--oOo--

INDEX OF EXAMINATION

WITNESS: ARTURO CASTILLO

EXAMINATION BY PAGE

MR. VALENZUELA..................5, 91, 93

MS. POWELL......................90, 93

EXHIBITS FOR REFERENCE

EXHIBIT DESCRIPTION PAGE

(NONE MARKED.)

--oOo--

--oOo--

BE IT REMEMBERED, that set on Monday, the 13th day of July, 2026, commencing at the hour of 10:02 a.m., thereof, ARTURO CASTILLO, appeared remotely in Torrance, California, before me, Kimberly E. D'Urso, an RPR and Certified Shorthand Reporter of the State of California, the following deposition was stenographically reported by me:

(Whereby the Certified Shorthand Reporter introduced herself on the record and administered the oath to the deponent.)

THE VIDEOGRAPHER: Good morning. We're on the record at 10:02 a.m. Today's date is July 13th, 2026. This is the recorded remote video deposition of Arturo Castillo, in the matter of Maria Guadalupe Diaz, et al, versus City of Torrance.

This deposition is being held via Zoom. My name is Karen Torres-Corona. I'm the videographer with Focus Litigation Solutions. The court reporter is Kimberly D'Urso.

Counsel, please introduce yourselves and state whom you represent, after which the court reporter will swear in the witness.

MR. VALENZUELA: Eric Valenzuela, on behalf of

the plaintiffs.

MS. POWELL: Angela Powell, on behalf of the defendants.

(Whereby the Certified Shorthand Reporter introduced herself to the deponent and the oath was administered.)

THE WITNESS: I do.

EXAMINATION

BY MR. VALENZUELA:

Q. Good morning, Officer Castillo.

A. Good morning, sir. How are you?

Q. Doing good. Thank you.

Have you ever had your deposition taken before?

A. Yes, sir.

Q. Okay. So I'll kind of skip some of the admonishment rules. If I ask you a question that you don't understand, will you please let me know?

A. Yes, sir.

Q. And if you need to take a break at any time, will you please let me know?

A. Yes, sir.

Q. I usually go about an hour, and I'll take a break; but if you need to take one before that, just let me know and it shouldn't be an issue. Okay?

A. Okay. Thank you.

Q. And where are you located this morning?
A. Currently, at Torrance Police Station, in the city of Torrance.
Q. Okay. Did you review your -- strike that.
Did you review any documents in preparation for your deposition today?
A. Yes, sir. I reviewed my --
(Reporter clarification.)
THE WITNESS: -- my Internal Affairs testimony that was done, the call comments regarding about the incident that day, policies, as well.
BY MR. VALENZUELA:
Q. Did you review any videos?
A. Yes, I did review my body --
Q. What videos did you review?
A. Body-worn video, dash cam video, drone footage, as well.
Q. The body cam footage, did you just review your body cam footage or some of the other involved officers', as well?
A. My body cam footage.
Q. Okay. And the dash cam footage, was it from the vehicle you were in or also from other vehicles?
A. From other vehicles that had the camera on.
Q. Okay. And then you mentioned seeing some of

the drone footage?
A. Yes.
Q. Okay. Approximately how many times have you previously had your deposition taken before?
A. Approximately one time.
Q. Okay. And have you ever testified in court?
A. Yes, sir.
Q. Approximately how many times?
A. Over 20 times.
Q. Okay. Would that be in both criminal and civil cases or mainly criminal?
A. Mainly criminal, sir.
Q. Okay. Now, I want to ask you a little bit of background information about yourself. Okay?
A. Yes.
Q. I'm assuming you graduated high school?
A. Yes.
Q. Do you recall what year it was that you finished high school?
A. 2010.
Q. Did you go to college after high school?
A. Yes.
Q. I don't need to know what college you went to, but did you end up getting a degree?
A. I have an associate's degree.

Q. Okay. Is it in any specific subject, or is that more like a general degree?
A. Administrative justice.
Q. Okay.
MS. POWELL: Mr. Valenzuela, I'm just going to adjust the volume.
MR. VALENZUELA: Sure. Am I too low or high?
MS. POWELL: It's too low. It could be on our end.
(Pause.)
MS. POWELL: We're good now.
MR. VALENZUELA:
Q. If at any point you have trouble hearing me, just let me know. Okay?
A. Yes.
Q. Okay. After attending college at some point, do you attend the police academy?
A. Yes, I did.
Q. What year did you attend the police academy?
A. September of 2019.
Q. Okay. Prior to attending the police academy, were you ever in the military?
A. No, sir.
Q. Okay. Can you tell me a little bit about the different kind of jobs you had prior to going to the

academy, briefly?
A. Customer service was primarily the biggest one.
Q. Like, at different stores or something?
A. Insurance agents.
Q. Oh, okay.
Which academy did you attend?
A. Los Angeles Police Department.
Q. Okay. And was that approximately, like, six months?
A. Yes.
Q. Okay. After attending the academy, were you then hired by LAPD?
A. Yes, sir.
Q. Okay. How long did you work at LAPD before -- strike that.
How long did you work for LAPD for?
A. Approximately one year and three months.
Q. And what were your assignments while you were working for LAPD?
A. I was assigned to patrol, as a police officer.
Q. Okay. And then -- strike that.
Other than being assigned patrol, did you have any other assignments while with LAPD?
A. No, sir.
Q. Okay. At some point, do you then get hired by

Torrance P.D.?
A. Yes.
Q. Okay. You didn't go to any other departments between LAPD and Torrance P.D.; correct?
A. No, sir.
Q. Okay. And how long had you been with Torrance P.D. at the time of the incident?
A. At the time of the incident, would be just over three years.
Q. Okay. And I think I saw in your interview, you had a total approximately -- law enforcement experience of approximately five years at the time of the incident? Does that sound about right?
A. Yes.
Q. Okay. Take me through your different assignments with Torrance P.D. until the date of the incident?
A. Yes. I am currently assigned to patrol officer, where I am a field training officer. I am also assigned to our SWAT team, which also helps instruct other officers with tactics, such as high-risk traffic stops, building searches, also officer rapid deployment for active shooters.
Q. How long -- the microphone is getting a little weird on me.

How long were you assigned patrol with Torrance Police Department before you transitioned to SWAT?
A. It -- SWAT is a collateral, sir, so there is no permanent position there. It's just an assignment that we assist with, so it doesn't supercede patrol.
Q. Okay. How long were you with Torrance P.D. before you became a member of the SWAT team?
A. Just over one year.
Q. And in that year period of time, were you a patrol officer before joining SWAT?
A. Yes, sir.
Q. Okay. Have you had any other assignments with Torrance Police Department that we haven't covered yet?
A. No, sir.
Q. Okay. Do you have to go to a different academy after you transition from LAPD to Torrance P.D., or is it just that one academy?
A. It's just that one academy because it meets all POST standards.
Q. So there wasn't, like, a separate Torrance P.D. academy, for example?
A. No.
Q. Okay. Gotcha.
Let me talk about your training a little bit at the academy. Okay?

A. Okay.
Q. Were you trained on use of force, including both lethal and less-lethal?
A. Yes, we were.
Q. For example, were you trained on the use of the Taser?
A. Yes.
Q. Were you trained on the use of OC spray or pepper spray?
A. Yes.
Q. You were trained on the use of lethal force, as well; correct?
A. Yes.
Q. Okay. Did you also receive training on, like, use of the 40-milimeter?
A. Yes.
Q. Okay. At the academy, were you trained on the importance of tactics?
A. Yes.
Q. At the academy, were you trained on the importance of formulating a tactical plan when it's safe to do so?
A. When it's safe to do so, yes.
Q. Okay. At some point, did you give an interview related to this incident?

A. Yes.
Q. Do you recall the date of the incident?
A. Can you repeat that? I couldn't hear you.
Q. Sure. Do you recall the date of the incident?
A. Yes, sir. December 2nd of 2024.
Q. And do you recall how long after the incident that you gave your interview?
A. Approximately one week after that, or a little bit more than that.
Q. Did you give your interview on December 9th of 2024?
A. Yes.
Q. Okay. So, like you said, a week or seven days after the incident, you gave your interview; correct?
A. Yes.
Q. Do you know why it took seven days to give your interview after the incident? Do you know how that timing worked?
A. No, sir. I don't know how Internal Affairs does their interview timelines like that.
Q. They just basically contact you and say, "Hey, you're going to give an interview on this date," and then you go do it?
A. They contact my attorney.
Q. Okay. Did you have an attorney present with

you when you gave your interview?
A. Yes.
Q. Okay. Do you know if that's the same attorney that the other shooting officers have, if you know?
A. I believe so.
Q. Okay. Was your interview compelled or voluntary?
A. Compelled.
Q. Prior to the date of this incident, had you ever been involved in an officer-involved shooting where you, yourself, discharged your weapon in the line of duty?
A. No, sir.
Q. Do you know whether or not your shooting was found to be within policy?
A. Yes, it's within policy.
Q. Okay. Were you notified that there was a review and that it was found to be within policy?
MS. POWELL: I'm going to object. Calls for speculation.
Listen to his question.
MR. VALENZUELA:
Q. You may answer, if you know.
A. Can you repeat the question, again?
Q. Sure. Were you informed that your shooting was

reviewed and ultimately found to be within policy? Was that ever communicated to you?

A. From what I recall, I think it's still being reviewed right now.

Q. Oh, okay.

A. Yes.

Q. So as far as you understand, the -- the review board has not made a determination yet as to whether your shooting was in policy or not?

A. Yes. I still believe Internal Affairs is still conducting their investigation.

Q. Okay. You haven't been informed of any findings of that review; is that correct?

A. No.

Q. Okay. Now, let's talk a little bit about the incident. I first want to focus on the initial call, okay, the information you had about the initial call?

First of all, do you recall what the first information you received relating to this incident was?

A. Yes.

Q. Go ahead. What was that?

A. It was regarding a man with a gun in the area of 2909 Oregon Court. The caller stated that he, himself, is the man with the gun, and he is there to kill someone.

Q. Now, I take it you, yourself, did not hear the 911 call; is that correct?
A. Yes, sir.
Q. Does Dispatch communicate to you that they had received the 911 call and provide you with that information?
A. They provide us with limited information, but not all the details of the call.
Q. And the source of this information, would part of it be from the radio?
A. Yes.
Q. Would part of it also be from, like, an onboard computer in your vehicle?
A. Yes.
Q. Okay. Do you recall where you were when you first received information relating to this incident?
A. Yes, I do recall.
Q. And where were you?
A. I was in the area of Hawthorne and Fashion Avenue, which is by the Del Amo Mall.
Q. I don't know Torrance all that well. What distance would you say you were when you first received the call to the scene of where the actual shooting occurred? Like, how many miles, an estimate? I don't expect you to know exactly.

A. Approximately one mile, I would say.
Q. Okay. So relatively close?
A. Yes.
Q. Were you on another call when you first received information about this incident?
A. No, sir.
Q. Okay. Were you kind of doing patrol?
A. Yes. I was working with my partner at the time.
Q. And who was your partner?
A. Officer Bermudez.
Q. Was he training at that point?
A. Yes, he was.
Q. And were you his field training officer?
A. Yes, I was.
Q. Was this your partner's first day doing field training?
A. Yes.
Q. Do you recall approximately what time it was that you first received information regarding this incident?
A. It was possibly ten minutes before 1700 hours, which would be 5:00 p.m.
Q. And after receiving information about the call, do you begin to go to the area?

A. Yes. We start responding from the area of Hawthorne and Fashion, where I begin to talk tactics with my partner at the time.

Q. How much time would you estimate it took you to travel that approximate mile from where you were to the scene?

A. Just over five minutes, I would say.

Q. Okay. While you were traveling in this five-minute period of time, were there any updates regarding the call?

A. Yes, there was updates. The call-taker said that the caller hung up. They attempted to call back. There was no more information. But they worked on getting pings, and the phone ping that was being used was in the intersection of Maple and Oregon Court, where the potential man with a gun was at.

Q. Did you receive any information that anybody had been injured?

A. Not at the moment.

Q. Okay. Is there any other information that you had received about the call that we haven't discussed yet?

MS. POWELL: Objection. It's vague and ambiguous as to time.

You mean up until this point, Mr. Valenzuela?

BY MR. VALENZUELA:
Q. While you're traveling from where you received the call to the scene, have you told me so far the information about the incident?
A. Yes. He was just a man with a gun, and he was there to shoot someone.
Q. Okay. But you didn't -- the call did not indicate that somebody had actually been shot; would you agree?
A. Yes. He was there, looking to shoot someone.
Q. Okay. At some point did you receive information as to who the caller was?
A. While going to the call, our TPD communications -- which is the Torrance Police communications -- advised that the phone number possibly belonged to a Leonardo Diaz.
Q. Okay. Based on that information, did you recognize having ever dealt with Mr. Diaz in the past?
A. No.
Q. Okay. Did you have any information about Mr. Diaz's criminal history?
A. No.
Q. For example, you didn't know whether or not he had ever physically injured anyone in the past; correct?
A. No.

Q. Okay. Did you have any other background information about Mr. Diaz, other than his name?
A. The only other information, again, was provided by our communications division, saying that he worked in the area of 2909 Oregon Court. And he was involved -- I said, I guess, as an involved party to a burglary that happened at his place of employment.
Q. And this is information you are receiving from the dispatch?
A. Yes. It gets broadcasted over the radio.
Q. And what information did you have about his involvement in a burglary?
A. Just that, what I stated earlier.
Q. Can you please repeat that?
A. Yes. That he was just involved as an involved party. He wasn't the one that committed the crime. If you need me to clarify...
Q. Okay. Like, was he, like, a reporting party?
A. He didn't specify that part.
Q. Okay. So he was an involved party, but if I understand you correctly, he was not suspected of burglarizing the place of employment? Do I understand you correctly?
A. Yes, he was an employee there.
Q. Okay. Gotcha.

At some point, do you arrive in the location of -- of the scene?
A. Yes.
Q. Do you go to that place of employment?
A. Immediately when we arrive, based off the information that we got that this possible man with a gun was in the middle of the intersection, we searched the surrounding area. Once we received the information, then we responded to the former place of employment to see if there was anybody that was possibly shot or hurt there.
Q. When you're searching the area for an individual with a gun, you didn't see anybody with a gun; correct?
A. Not yet.
Q. Okay. And then after that, you go to search the place of employment?
A. Yes.
Q. Do you guys get out of your vehicle to search the place of employment, or do you kind of drive by it? Can you explain it?
A. No. We -- I -- in that area, we went to search the rear of the business. Yes, we got out of our vehicle. We went to check the doors to that location to make sure there was no burglary or possibly anybody that

broke into the business to commit a crime.

Q. Okay. Did you make contact with anybody while you were searching that business?

A. A neighboring business we did, who told us that that business had recently closed down.

Q. Okay. After you were told that that business had recently closed down, do you return to your vehicle?

A. Yes, I did.

Q. Okay. And then do you continue to search the surrounding areas, in your vehicle?

A. Yes. While we are doing that, our drone operators broadcasted over the radio, advising us that there was a male subject in a green Dodge Charger that was opening and closing his door, looking around in the area.

Q. Okay. Let me go back a little bit. You said that you had discussed tactics with your trainee while you were on the way to the location. Do you remember that?

A. Yes.

Q. Can you let me know what you discussed in relation to tactics?

A. Of course. So based on the fact that this was a man-with-a-gun call, we need to take things slowly while going there, and getting sufficient units. I

talked to him about requesting a drone, which helps us get an aerial view of the area before we even respond there.

I Talked to him about getting additional resources as well. By that, I mean getting additional officers to respond, to possibly deal with a man with such fire power, which is a gun.

Q. Okay. Going back, when you said you had joined SWAT, did you have to do, like, some additional training or an additional academy to become a member of SWAT?

A. Yes. It is through the Los Angeles County Sheriff's Department, SWAT school, which takes approximately two weeks.

Q. Okay. And what are some of the stuff you learned at the SWAT school?

A. Yes. Tactical decision-making. Tactical planning. Tactics. Firearms training with rifles, pistols, breaching shotguns.

Also, we learned different tactics about building searches, and responding to active shooter threats, and how to deal with such threats.

Q. Prior to the date of this incident, had you ever encountered suspects who were armed with guns?

A. Yes.

Q. Do you have an estimate as to approximately how

many times?
A. Approximately, over eight times.
Q. Prior to the date of this incident, had you ever encountered suspects who were armed with knives?
A. Yes.
Q. Do you have an estimate as to approximately how many times?
A. That one, I would say approximately over 15 times.
Q. So approximately eight times, prior calls with guns, and approximately 15 times prior calls with knives?
A. Yes.
Q. Prior to the date of this incident, had you ever encountered suspects who appeared to be suffering from mental illness or a mental health crisis?
A. Prior to this call, yes.
Q. And do you have an estimate as to approximately how many times?
A. Approximately, over 30 times.
Q. And I understand these are estimates. I'm not expecting you to know the exact number. I'm just trying to get a general understanding.
A. Of course.
Q. Based on your training, were you trained that

you could shoot somebody if they have a knife, based on that fact alone?

A. On that fact alone, we need more circumstances.

Q. Okay. And same thing with the gun. Based on your training, were you trained that if somebody has a gun, you can shoot them based on that fact alone?

A. Based on the totality of the circumstances, there will be options that, yes, we will have to shoot somebody with a gun.

MS. POWELL: Listen to his question.

MR. VALENZUELA:

Q. Let me try to ask it a little different. I'm trying to figure out, based on your training, were you trained that you could shoot somebody for merely having a gun?

A. No.

Q. Okay. Now, you had mentioned a little bit earlier that a drone had spotted a green Charger. Is that what you indicated?

A. Yes.

Q. Okay. And you're receiving this information from the dispatch still?

A. Yes, it gets broadcasted over the radio to myself and other officers in the area.

Q. Okay. And what, if anything, was communicated

to you about this green Charger?
A. That there was an individual possibly seated inside who kept manipulating his door and looking outside of it.
Q. Had you received any information that a weapon was seen on this individual at this time?
A. At that moment, no.
Q. Okay. At some point, do you -- do you locate the green Charger?
A. Yes. After searching the business, it was brought to my attention by my other partner officers who were there, that they wanted to go and contact this individual. Main reason why, because the phone pings had stated that the man with the gun was at the intersection of Maple and Oregon Court, just east of the intersection where that -- in the general area where that green Dodge Charger was at.
Q. Okay. And then at some point, you locate the green Charger?
A. Yes.
Q. Approximately how much time passed from when you're done searching the business, you get back in your car, start driving around, again, until you locate that green Charger?
A. Approximately five minutes, I would say, at

most.

Q. Okay. And you've told me you received an update on the call about the drone locating the green vehicle; correct?

A. Yes.

Q. Did you receive any other updates about the call, from the time you entered back in your vehicle until you locate the green Charger?

A. No. That's the most information we got.

Q. Okay. At some point, do you park your car near the green Charger after locating it?

A. I was -- yes. I was the secondary unit assisting the primary unit, who was doing the initial contact.

Q. Would you be considered the primary unit on the call, or would a different unit be the primary?

A. We were the first unit to be dispatched. However, there was a unit that was closer who ended up responding there, and they were the first ones to arrive.

Q. Okay. And was that unit already stopped when you located the green Charger?

A. No. They were still searching the area, prior to us making the contact.

Q. Okay. Was your unit the first one to park near

the green Charger, after locating it?
A. No. Second.
Q. Okay. And who was in the first unit that was parked there?
A. That would be 9 Adam 24, who is Officer Garcia and Officer Wissler.
Q. So let me see if I understand this correctly. Officer Garcia and Wissler's unit is already parked near the green Charger prior to you stopping and parking near the green Charger; correct?
A. No. We actually, before approaching the vehicle, we had talked over the radio, saying, like, "Hey, there might be a person inside of the Dodge green Charger. We could go and contact him."
So 9 Adam 24, which is Officer Garcia and Wissler, were the first ones to arrive there, and we were behind them within a couple of seconds.
Q. Oh, okay. So they arrive and stop a few seconds before your cruiser that you were driving?
A. Yes.
Q. Okay. Do you guys get out of your unit at approximately the same time as Officer Garcia and Wissler?
A. Yes, approximately the same time.
Q. Okay. Now, would you still be considered the

primary unit at this point, or would the other vehicle be considered the primary unit?

A. They are the primary unit. We were the backing officers.

Q. What changed to make them the primary unit? Because you were initially the primary, right, on the call? But what changed to make them the primary?

MS. POWELL: Objection. It's compound.

But you can answer.

THE WITNESS: So we were the first units that were dispatched to that area. With patrol, there are area designations; so that was outside of my area designation, but we are allowed to go and handle any type of call. Once 9 Adam 24 was free from their current call they were on, they self-dispatched and arrived there before, because that was their designated area.

Q. All right. So do they become the primary, in part, because it's their designated area?

A. Yes. And they were -- they arrived before we did.

Q. Okay. And another factor or reason that they become the primary is they got there before you did?

A. Yes.

Q. Okay. So if I understand you correctly, when you guys get out of your vehicle, would it be you and

Bermudez and Garcia and Wissler at that point; or are there additional officers when you guys exit out of your vehicles?

A. When we exited our vehicles, yes, we were the first four officers. There was a third unit that was still in the area, checking the other neighboring businesses.

Q. Do you know if that third unit arrived prior to the shooting?

A. They arrived as the shooting was occurring.

Q. Would that be Officers Choi and High?

A. Yes.

Q. Now, between Officer Garcia, Wissler, yourself, and Bermudez, who would be considered the senior officer between the four of you?

A. Based on time on the job and experience, it would be Officer Garcia.

Q. So, in addition to being the primary unit, Officer Garcia would be considered, like, the supervisor out of you four; is that fair?

A. He would be the senior officer.

Q. Now, as the senior officer, would Officer Garcia be the one to designate roles, such as lethal, less-lethal, contact, cover; or would it be somebody else?

A. He could do that, but we also planned that within ourselves. Especially as him and I are field training officers, we assigned those roles with our trainees at the time, who were Officer Wissler and Officer Bermudez.

Q. Okay. And did you assign a role to Bermudez in this incident?

A. Yes. He was a cover officer.

Q. What does the cover officer do?

A. In this situation, because it was with a man with a gun, and we were within the general area, and a reasonable suspicion left us to believe that this person in the vehicle could be possibly the man with the gun, we transitioned over to high-risk tactics, which, in that situation, it requires four officers who are assigned as lethal coverage, one officer being the contact officer who starts the commands.

And the other officers who gets different vantage points, based on the configuration of the cars, to get a better visual of inside the vehicle. Once that configuration is done, we try to utilize time, distance, and cover, to get more resources there to help assist us with the problem.

Q. Okay. So if I understand you correctly, you designated Bermudez as a lethal-cover officer; correct?

A. Yes.
Q. Okay. Did you ever hear Officer Garcia designate a role to Wissler?
A. No, sir.
Q. Okay. And who was designated -- I understand you said there's four lethal officers. Who was designated as the contact?
A. That would be the first vehicle that arrives there, that positions itself closest to the suspect vehicle, which would be Officer Wissler and Officer Garcia.
Q. Okay. Then, do you know which of those two had been designated as the contact?
A. At that point it would be Officer Wissler, who was the first vehicle there, and the driver of that vehicle.
Q. Okay. And it was your understanding that Wissler was the one driving that vehicle, and Garcia would have been the passenger?
A. Yes.
Q. So Wissler would be both lethal cover and the contact; correct?
A. Yes.
Q. Is -- is part of the reason why you designate a contact officer, so that multiple officers are not

giving conflicting commands?
A. Yes. Especially during high-risk tactics, we want to keep it to one voice, that way so other officers can start requesting other resources over the radio, such as getting more responding units there to bring us necessary tools, such as less-lethal options, shield options, or if it gets to a higher-level threat, maybe more pieces of armor.
Q. Did you, yourself, ever designate Bermudez to be a less-lethal officer?
A. No. Based on the high-risk tactics, he has to be assigned as lethal coverage until sufficient units get there.
Q. Okay. And at any point, did you ever hear Garcia designate Wissler as a less-lethal officer?
A. No. Based on the high-risk tactics that we transitioned over to, Officer Wissler was a lethal and contact officer.
Q. Okay. I want to ask you about the different equipment you had on you that day. Okay?
A. Yes, sir.
Q. Did you have a handgun on you?
A. Yes.
Q. What kind of gun did you have?
A. It's a Staccato P 2011, which is a 9-millimeter

pistol.
Q. Did you have OC spray on your belt?
A. I had that on my exterior vest.
Q. Okay. And how about a Taser? Did you have a Taser on your person?
A. Yes, I did.
Q. Okay. What about a baton or, like, a collapsible baton?
A. I had a baton that was readily accessible in my vehicle.
Q. Okay. The baton was in your vehicle, though, not on your person; correct?
A. Yes.
Q. But on your person, you had the OC spray and the Taser?
A. Yes.
Q. Do you know what model of Taser it is?
A. The Taser 7.
Q. Okay. Does that fire probes?
A. Yes. It has two sets of probes, which have a maximum effective range of about 22 feet.
Q. Okay. And that Taser could be used in the drive-stun mode, where you actually touch them with it, also?
A. You could do that, but there has to be two

points of contact with that Taser. So there has to be one probe on the upper half of the body; and if you do it drive-stun, it would have to be on the lower half to have a positive outcome.

Q. And that particular Taser, does it have two separate cartridges of the prongs?

A. Yes.

Q. So you could fire one set of prongs and then fire another cartridge with the other set of prongs; is that correct?

A. Yes. The first cartridge is actually a close quarter cartridge, which only has a maximum effective range of 12 feet. The second will have a maximum effective range of 22 to 25 feet.

Q. Okay. Had you ever used your Taser in the line of duty prior to the date of this incident?

A. No, sir.

Q. Had you ever used OC spray prior to the date of this incident?

A. No, sir.

Q. Based on your training, do you have an understanding as to the effective range to use OC spray?

A. It's approximately 12 feet.

Q. Okay. And are you trained, with regards to OC spray, it's better to use it outdoors as opposed to

indoors?

A. It is better to do it outdoors, but it is limited based on distance.

Q. Okay. And that the distance --

(Simultaneous speakers.)

BY MR. VALENZUELA:

Q. Sorry. Go ahead. I didn't mean to cut you off.

A. And wind effects, as well. If the wind is blowing the opposite direction, then it could be counterintuitive and affect officers instead of a potential subject.

Q. And I think you had indicated the effective range being approximately 12 feet for the OC spray; is that correct?

A. Yes.

Q. Did you ever try to use the OC spray during this incident?

A. During this incident and the distance we were at, it would be ineffective. We were approximately 30 feet away from the vehicle that was involved in this incident.

Q. What about when Mr. Diaz was a closer distance? At some point, was Mr. Diaz within 12 feet of you?

A. At some point it was. But it would be

ineffective, because Mr. Diaz, at the time, also had glasses, which would be another challenge that we would have to consider in that situation.

Q. Based on your training, if an individual is wearing glasses, are you trained that OC spray won't have an effect on them?

A. It's not going have the desired effect that we would want.

Q. But just so I understand you correctly, you, yourself, did not deploy OC spray during this incident; is that correct?

A. Yes, sir.

Q. Okay. And you, yourself, did not deploy a Taser during this incident; is that correct?

A. Yes, sir.

Q. Okay. In your vehicle, at some point, you transition to what was the M4 rifle?

A. Yes, I did.

Q. And that's stored in your trunk?

A. Yes, it is.

Q. Do you have any other weapons in your vehicle, other than the -- the M4?

A. Any other lethal weapons, it's just the M4 rifle that we have in the vehicle.

Q. Did you have any other less-lethal weapons in

your vehicle, like a 40?
A. Yes.
Q. You had a 40-millimeter less-lethal in your trunk?
A. We did. But based off of the --
MS. POWELL: You answered his question. Listen to his question.
THE WITNESS: Okay.
MR. VALENZUELA:
Q. So, just so I understand, you did have a 40-millimeter in the trunk of your cruiser; correct?
A. Yes.
Q. At any point, did you ever designate Bermudez to use the 40-millimeter?
A. No, sir.
Q. Okay. So, going back to when you first stopped your cruiser near the green Charger -- going back to that point. Okay?
A. Okay.
Q. You had some information that the individual in the green Charger was, like, opening and closing the door?
A. Yes. We observed that as we were going to attempt to talk to this individual.
Q. So could you see the individual inside of the

vehicle when he would open and close the door?
A. No. And the windows were heavily tinted, as well.
Q. So you saw the door opening and closing, but you couldn't see anybody inside of the vehicle?
A. No. And then, based off prior training that I've received, a man with a gun that's inside a vehicle, tend to use that as a method to fire from a very concealed position.
The opening and closing of the door could be used as a method to gauge and observe where officers' positions are at.
MS. POWELL: Listen to his question, because that wasn't his question.
BY MR. VALENZUELA:
Q. When the door was opening and closing, did you ever see a gun?
A. Not at the moment.
Q. Okay. When the door was opening and closing, could you see the individual's hands?
A. Yes. And they had blood on them.
Q. Okay. When he's opening and closing the door, could you just basically see the hands, or can you see any other part of the body?
A. I would say up to the forearms, which were also

filled with blood.

Q. Okay. And this individual would have been in the driver's seat?

A. Yes, in the driver's seat.

Q. Okay. Up until the point where the door is opening and closing the various times, do you ever see anybody else in the vehicle?

A. Not at that moment.

Q. Okay. How long would you estimate from when you parked your cruiser and got out of your car, until the individual in the green Charger actually exited out of his vehicle? So from when you exit your car to when the individual in the green Charger exits his car, do you have an estimate as to how much time passed?

A. I would say over two minutes, just over.

Q. During this two-minute time, there would be four officers outside of their vehicle, correct; yourself, Bermudez, Garcia, and Wissler?

A. Yes.

Q. Okay. During this approximate two-minute period of time, was there a tactical plan ever formulated?

A. Yes, which is why we transitioned to high-risk tactics.

Q. Who formulated this tactical plan? Was it

yourself or somebody else?
A. Myself and Officer Garcia.
Q. You guys kind of did it in conjunction together?
A. Yes.
Q. Okay. And what was the tactical plan that was formulated?
A. The tactical plan was to conduct a high-risk stop, because if this person was the man with the gun, we want to make sure we get the possible resources, and we created time, distance, and cover.
Q. And I think we discussed the different roles of the tactical plan; correct? Everybody was a lethal cover, and one individual was a contact; correct?
A. Yes.
Q. Other than those roles or designations, was there any other roles designated at that point?
A. At that point, we were also requesting backup to get more units to us with lights and sirens.
Q. Okay. But other than the designations we discussed of the four officers that were present, there were no other roles assigned? For example, nobody was assigned less-lethal; correct?
A. No. Based off high-risk tactics, no.
Q. At some point, did you order one of the

vehicles to be repositioned?
A. Yes. That was when we transitioned to high-risk tactics.
Q. Was it you that ordered the vehicle to be repositioned, or somebody else did that?
A. That was Officer Garcia.
Q. Okay. And was he repositioning his vehicle or your vehicle?
A. He -- my partner, Officer Bermudez, was the one that repositioned our patrol vehicle.
Q. Okay. So if I understand you correctly, Garcia told Bermudez to reposition the cruiser that you guys had arrived in?
A. Yes, so we could configure our vehicles to the high-risk tactics we use.
Q. Were -- were you guys going to be conducting a felony stop at this point?
A. Yes, which is what we consider as high-risk -- a high-risk stop, which is used to deal with armed suspects.
Q. And what do you do to do a high-risk stop? In other words, what does that entail, doing a "high-risk stop"?
A. We are doing a detention of a potential man-with-a-gun call.

Q. Okay. And during one of these high-risk stops, you give commands to the individual in the car?
A. That would be the contact officer.
Q. Okay. And do you recall what commands were given to the individual in the car?
A. To open the car door and let us see their hands.
Q. Okay. Other than that, do you recall any other commands?
A. No. Just to let -- just to let us see his hands and open the car door. Never to step out of the vehicle.
Q. Okay. And after the command was given to open the car door and show your hands, do you ever see the car door open after that?
A. Yes.
Q. And are you able to see the individual's hands when the car door opens?
A. Yes. And he was armed with a knife and had large amounts of blood on both hands.
Q. Okay. Did you make a communication to the dispatch at some point, that the individual had a knife and was bleeding from his wrist?
A. Yes.
Q. That's a -- you made that communication over

the radio; correct?
A. Yes.
Q. Okay. Did you think, at that point, that it was at least a possibility that the individual may have cut his wrist with that knife?
A. Based on the information we had, and that this individual wanted to shoot somebody, at that point I believed that this possibly was a disgruntled employee that possibly killed his former employer and had him in the vehicle. The large -- the large amounts of blood, led me to believe that this was possibly somebody else's blood.
Q. Had you -- up until that point, had you received any information that anybody had been killed?
A. Not at that moment, because the caller would not answer any phone calls after the initial statements.
Q. Up until that point, did you have any information that any of his employees were missing?
A. There was only one caller at that time.
Q. So, you did not have any information that an employer or an employee at his work was missing at that point; correct?
A. Not at that point.
Q. Okay. So, just so I understand your testimony, when you saw him with the knife, the injuries to his

wrist and the blood, it never crossed your mind that he may have inflicted that on himself?

A. No.

Q. Okay. And at least up until this point, you don't see anybody else in the car; correct?

A. The heavy window tint prevented us to see in the vehicle.

Q. So when I say you didn't see anybody else in the car, would that be a correct statement?

A. Based on my observations, no.

Q. Okay.

MS. POWELL: I think that was a double negative, Counsel. I'm not sure if the answer will be clear.

BY MR. VALENZUELA:

Q. Just so we're clear, you only saw, at least up until this point, one individual in the car in the driver's seat; is that correct?

A. Just the driver's seat.

Q. Okay. And why did you dispatch over the radio that you had seen the individual with the knife and blood on his wrist?

A. I requested a backup, based on the informa- -- based on the facts that we had seen, the large pool of blood that was on the arms and that actually dripped out

the vehicle door, to get more units to us as fast as possible.

I was under the impression that there was possibly somebody that was severely hurt in the vehicle or possibly dead. When I made that request, as well, I also requested for the Torrance Fire Department to stage as closely as possible, in case we need to administer first aid during this rapidly-evolving situation.

Q. Did you request the fire department, at least in part, in the event that Mr. Diaz needed treatment for injuries to his wrist?

A. The fire department is there to treat Mr. Diaz or anybody that's down, inside of the vehicle.

Q. Correct. I'm wondering, is part of the reason you requested the fire department, at least in part, in the event that he Mr. Diaz had injured wrists?

A. Yes.

MR. VALENZUELA: Okay. We've been going for about an hour. Why don't we take about a ten-minute break, if that's okay with everyone, and we'll get started again.

THE WITNESS: Yes.

MR VALENZUELA: Great.

THE VIDEOGRAPHER: We're off the record at 10:56 a.m.

(Break taken.)

THE VIDEOGRAPHER: We're back on the record at 11:07 a.m.

MR. VALENZUELA:

Q. Okay. Going back a little bit, when you had first arrived on scene and went to check his prior place of business -- do you remember that?

A. Yes, sir.

Q. What was it that one of the neighbors had told you?

A. That the business had closed down approximately a week ago.

Q. And despite being told that the business had been closed down approximately a week ago, you thought there was a possibility that Mr. Diaz had killed his employer or an employee?

A. Yes. He could have been a disgruntled employee that possibly got terminated.

Q. But even though they told you that the business moved out a week ago, you thought he may have killed an employer or an employee? Do I understand you correctly?

A. Yes.

Q. Okay. Now, we were at the point where you were saying he's opening and closing the door, and you can see the -- I think you said the forearm, approximately,

at this point?
A. Yes. We saw the knife, blood on the arms.
Q. Okay. And when you made the dispatch regarding this, you specifically referenced blood on the wrist, specifically; correct?
A. Yes.
Q. Okay. After this is going on for a little while, does he eventually get out of the car?
A. Yes.
Q. Was he ever ordered to get out of the car?
A. No. He was specifically told to stay in the car by Officer Wissler.
Q. Okay. You heard Officer Wissler command him to stay in the vehicle?
A. Yes.
Q. And approximately how many times did you hear this command?
A. Approximately one time.
Q. And the other commands, I think you had indicated, were, "Show your hands"?
A. Yes.
Q. Do you have an estimate as to how many times you heard that, prior to him exiting out of the vehicle?
A. Approximately three times.
Q. Is there any other commands that you heard that

we haven't discussed?

A. When he exited the car, after Officer Wissler told him to get back into the car, he did also tell him to face away from us.

Q. Prior to Mr. Diaz exiting out of the vehicle, is there any other commands that you heard that were given to him that you haven't mentioned yet?

A. Not that I recall.

Q. Okay. Do you ever run the plates on the car of the green Charger?

A. Yes. Prior to contacting the vehicle, Officer Wissler broadcasted the license plate over the radio.

Q. Do you recall what, if any, information came back to that license plate?

A. I don't recall the registered owner of that vehicle.

Q. Okay. Now, prior to Mr. Diaz getting out of the vehicle, it's still just the two cruisers; correct?

A. Yes. And a request was made for a third unit to respond to the scene.

Q. Okay. And you went and got the M4 out of your trunk, prior to Mr. Diaz exiting the vehicle; correct?

A. Yes, sir.

Q. And do you take a position on the passenger side of the vehicle?

A. I take the passenger side position of Officer Wissler's vehicle.

Q. Okay. Are you kind of like in the V of the passenger front door?

A. I would say just a step or two back, yeah.

Q. Okay. Do you have some training that a vehicle could be used for cover sometimes?

A. Yes, I do.

Q. And why did you take that position in that particular area with your rifle?

A. Because the suspect could also utilize their vehicle as cover. In this situation, we were dealing with a man with a gun; so we are allowed to deploy our rifle if we are going to be dealing with an armed suspect, or to meet their fire power or exceed it, as well.

Q. Generally speaking, when you receive information about a call, is one of the things that you try to do is respond to the call and to investigate?

A. Yes.

Q. And in your experience, sometimes the information you receive about the call is accurate, and other times it's not?

A. Yes.

Q. And one of the duties you do when you arrive is

to investigate, to gather information; correct?
A. Yes.
Q. Okay. When you took your position near the front passenger door of Wissler's vehicle, was there anybody to the right of you?
A. Prior to moving to the high-risk tactics, yes, my partner, Officer Bermudez, and also Officer Garcia.
Q. Okay. Both of them were near the front passenger door of Wissler's vehicle?
A. Yes, before we changed the configuration of the patrol vehicles to high-risk tactics.
Q. I think you indicated earlier, one of the documents or videos you reviewed in preparation for your deposition today was the body cam. Do you remember that?
A. Yes.
Q. In your body camera video, can you hear yourself -- I believe it's Garcia that you're talking to, say something to effect, "Do you want to quarterback this? I've got the rifle," or words to that effect?
A. Yes, I do.
Q. Was that Garcia that you were talking to?
A. Yes.
Q. Okay. Explain to me a little bit, what does it mean when you say, "Do you want to quarterback this"?

Can you explain that to me a bit?
A. Yes. In that situation, since we have two lethal coverage, the next unit available will help us start adjusting roles for a high-risk stop.
Based on the information that, hey, we're possibly dealing with a man with a gun, the best tactics used is going to be high-risk tactics to create that time, distance, and cover.
While that is going on as well, Officer Garcia also requested over the radio, to get a less-lethal launcher to respond to our location, in case we need to utilize that. And while we do that, we're awaiting for more units to arrive before we even ask a suspect to get out of a vehicle.
Q. And when you say, "Do you want to quarterback this?", or words to that effect, is the person that you've now indicated, "Hey, do you want to quarterback this?", would that be the individual now who would assign different roles to the different officers since they're taking the quarterback position?
A. Yes. That would be an officer that starts assigning roles.
Q. Okay. So, since you're not quarterbacking this, you kind of designated Garcia, or asked him to quarterback it. You, yourself, would not be assigning

roles at that point, if somebody else is acting as quarterback; is that true?
A. We could help each other out in those situations.
Q. But when you say, "Do you want to quarterback this?", you're kind of giving that responsibility to Garcia; is that fair?
A. Yes.
Q. And you've kind of taken the role of the lethal with the rifle at this point? That's going to be either your role or designation; correct?
A. Yes.
Q. Okay. After your vehicle is moved, it was your vehicle that was repositioned; correct?
A. Yes.
Q. And I think you said Bermudez repositioned it?
A. Yes, sir.
Q. After Bermudez repositions the vehicle, what is, now, the configuration of the officers now? You're still at the front passenger door of Wissler's vehicle; correct?
A. Yes.
Q. Are the other officers now at different locations, now that your vehicle has been repositioned?
A. Yes. Based off the high-risk tactics, our

vehicle is just offset to the left, which would be the driver's side of the suspect's vehicle. So it would be Officer Wissler on the driver's side door, and myself was on the passenger door, and Officer Bermudez moved his patrol vehicle.

He moved it to offset, to the left, which would be just north of Officer Wissler's vehicle, angled towards more of the driver door of the suspect vehicle.

Q. Okay. So at -- would Wissler now be at -- near the driver's door of his vehicle after the -- your vehicle is repositioned?

A. He never moved from that position. That was where the initial stop was at.

Q. Okay. And then after your vehicle is positioned, would Bermudez be at the passenger front door or at a different location?

A. No. He would be at the driver door of our vehicle, after he moved it. That's where he would remain, in order to get a visual -- a better visual of the suspect vehicle that had, like, the heavy window tint.

Q. Okay. And would Garcia be at the passenger of your vehicle, the front passenger?

A. Yes. That configuration allows for us to create a space between the passenger door of my vehicle

and the driver door of Wissler's vehicle. And once we are ready, we could take the suspect into custody within that open space that we created.

Q. Okay. And just so I'm clear on the position, so Bermudez would be at the front driver of your vehicle now; correct?

A. Yes.

Q. Garcia would be at the front passenger of your vehicle now; correct?

A. Yes.

Q. Okay. Wissler would now be -- or remain at the front driver of his vehicle; correct?

A. Yes.

Q. And you remained at the front passenger of Wissler's vehicle?

A. Yes.

Q. Okay. Thank you for clarifying that.

Okay. Now, at some point, Mr. Diaz exits out his vehicle; correct?

A. Yes, he does.

Q. And I think you told me -- and correct me if I'm wrong -- you guys were there for approximately two minutes, stopped in that area before he exited out of the green Charger; correct?

A. Yes.

Q. Okay. And I understand you're not staring at your watch. This is an estimate of time. Understood?
A. Yes.
Q. At some point, you see Mr. Diaz exit out of the vehicle?
A. Yes.
Q. Okay. And what, if anything, does Mr. Diaz do after he exits out of his vehicle?
A. When he exits out of his vehicle, he has the knife on his right hand, staring at every single one of us, with the -- what I would describe as a "thousand-mile stare," where he has no remorse, and just identifies each one of us from left to right, before proceeding to advance to us.
Q. Did you ever make eye contact with Mr. Diaz at this point?
A. Yes.
Q. Okay. Do you, yourself, ever give any commands to Mr. Diaz when he exits out of the vehicle?
A. I do.
Q. And what commands do you give?
A. To get on the ground and drop the knife.
Q. And approximately how many times do you give those commands to get on the ground and drop the knife?
A. Approximately three times.

Q. Okay. And while you're giving these commands, does Mr. Diaz say anything in response?
A. He nods his head left to right, gesturing as, "No."
Q. Okay. Do you ever hear him say anything verbally, Mr. Diaz, at this point?
A. No.
Q. Did you ever hear him make any sounds?
A. No.
Q. Okay. Is Mr. Diaz walking towards -- strike that.
Is Mr. Diaz walking at this point?
A. Yes.
Q. And does that street run north and south?
A. East and west.
Q. Okay. What cardinal direction is Mr. Diaz walking at this point when he exits out of the vehicle?
A. He is walking east to west, towards us.
Q. Okay. From east to west.
And as he's walking, where is this knife now? Is it on his side? Is it up? How would you describe it?
A. He has it off to his side of the hip, pointed towards us.
Q. Okay. And it would have been off to his side,

near his hip area?
A. Yes.
Q. Okay. Other than seeing that knife off to his side in his hip area -- near the hip area, do you ever see that knife in any other position?
A. No.
Q. Prior to the gunshots?
A. No.
Q. Okay. For example, you never saw Mr. Diaz raise the knife above the hip level; correct?
A. No.
Q. Okay. You never saw that?
A. No.
Q. Okay. Did you ever see Mr. Diaz make a stabbing motion with that knife?
A. No.
Q. Did you ever see him make, like, a slashing movement with that knife?
A. No. It was just pointed towards us.
Q. Now, Mr. Diaz continues to walk in a westerly direction; is that correct?
A. Yes.
Q. Okay. Did you ever see Mr. Diaz, other than walking in this westerly direction; for example, did you ever see him running?

A. No.
Q. Did you ever see him jogging?
A. No.
Q. Okay. When Mr. Diaz exits out of his vehicle, is he bleeding?
A. Yes.
Q. And where do you see blood on Mr. Diaz?
A. He had it on his arms, wrist, shirt, pants, hands.
Q. When Mr. Diaz exits out of his vehicle -- when he exits out of the vehicle, is the door to the green Charger left open, or does he close it?
A. He closes it.
Q. So after he exits out, he closes the door behind him?
A. Yes.
Q. Okay. Prior to him closing the door behind him, do you ever see any other occupants in that vehicle?
A. No.
Q. Okay. At some point while Mr. Diaz is walking in a westerly direction, are you able to see his full body?
A. Can you repeat that?
Q. Sure. It was a bad question. If I ask a

question you don't understand, let me know and I'll try to rephrase it.
A. Thank you.
Q. When he's walking in a westerly direction, can you see the front of his person?
A. Yes. He's wearing baggy clothing.
Q. In other words, you're not looking at his back at this point, you're looking more at the front side of his person?
A. Yes.
Q. Can you see both of his hands?
A. Yes.
Q. Okay. And you can see from the top of his head to the bottom of his feet?
A. Yes.
Q. Okay. Do you ever see a gun at this point?
A. He was wearing baggy clothing, and I wasn't able to see if he had a firearm concealed in his person.
Q. How about the part that wasn't concealed? Did you ever see a firearm?
A. In his hands, no.
Q. Okay. Did you ever see a firearm sticking out his pockets?
A. The pants were -- the shorts that he was wearing were very baggy. It was easy to conceal a gun

in there.

Q. Did you ever see a bulge or anything sticking out which you thought may be a weapon concealed on his person?

A. No.

Q. Did you ever see him reach in his waistband at any point, prior to the gunshots?

A. No.

Q. Did you ever see him stick his hands in his pockets like he was going to retrieve a weapon?

A. No.

Q. Okay. At some point, Mr. Diaz continues to walk in a westerly direction, towards the officers; correct?

A. Yes.

Q. Is he walking kind of like in a straight line, or do you see him kind of like zigzagging in different directions? How would you describe that?

A. Yes. He's walking at an angle, after he looked at every single one of us, and walked towards the closest officer that he set his mind to, which would be towards Officer Wissler and Officer Garcia's direction.

Q. Okay. So that would be more towards, like, the middle of where the two cruisers are positioned; correct?

A. Yes.
Q. Okay. At some point, you discharge your weapon?
A. I do.
Q. Okay. How many shots did you fire?
A. Two shots.
Q. Okay. Do you know if a round count was ever done on your gun?
A. Yes.
Q. Did you say in your interview that you fired three shots?
A. I did.
Q. Okay. But as you sit here today, you say you fired two shots?
A. Yes. After reviewing, I discovered it was only a volley of two shots.
Q. Is that, in part, after having done a round count?
A. After reviewing our body-worn and documents, yes.
Q. How many bullets fit in the magazine of your M4?
A. Maximum capacity is 30 rounds, but we remove up to one or two rounds from the maximum capacity.
Q. What is your custom and habit? How many do you

usually load? Do you usually load 28?
A. Yes.
Q. Okay. Do you also keep one in the chamber when you have the magazine with 28, or do you just not have one in the chamber, as well?
A. No. Patrol ready is magazine inserted. However, the chamber is empty until it gets deployed. Then we chamber one round.
Q. Okay. So you would have -- in order to first fire, you would have to rack a round in, basically?
A. Yes.
Q. Okay. And after a round count was conducted on your gun, were there 26 rounds in the magazine after the round count?
A. Twenty-five in the magazine, one in the chamber --
Q. Okay.
A. -- which will equal the 26.
Q. I'm not a mathematician, but that sounds like it would be two, then; correct?
A. Yes.
Q. Okay. Gotcha.
Now, did you, yourself, ever give a verbal warning that deadly force would be used before firing?
A. No, but my partners did.

Q. Okay. Based on your training, are you trained to give a verbal warning before using deadly force, when feasible?

A. When feasible, yes.

Q. Okay. Did you hear any gunshots prior to you firing your weapon?

A. No.

Q. Okay. How about after you fired your two shots, did you hear any additional shots being fired?

A. I would say it was simultaneously.

Q. Okay. Did you fire your two shots in rapid succession, or was there a pause in between your two shots?

A. A pause between rounds.

Q. Okay. Do you have an estimate as to how long you paused in between the two rounds?

A. I would say half a second.

Q. Did you reassess in between firing your two rounds?

A. Yes.

Q. As you're firing, do you hear other officers also firing their weapons?

A. Yes, I do.

Q. Okay. Do you know which other officers were firing their weapons at that point? I'm not talking

about what you learned later down the road. While you're actually firing, like, were you cognizant of which of the other officers were firing?

A. At that point, only Officer Wissler and Officer Garcia. Yeah.

Q. Okay. You -- you didn't know whether or not your trainee, Bermudez, had fired yet; correct?

A. Yes. He was further away from me.

Q. At some point, did you later learn from Bermudez that he also had fired his weapon?

A. Yes.

Q. Okay. And I think you said this earlier -- sorry for asking again -- did you hear anybody else give a verbal warning that deadly force would be used prior to firing?

A. Yes, I did.

Q. Do you know who it was that gave that verbal warning?

A. I believe it was Officer Garcia.

Q. Okay. And what do you recall him saying in regards to that verbal warning?

A. To "Stop, we don't want to shoot you."

Q. And you think, "Stop, we don't want to shoot you" is the verbal warning that deadly force would be used?

A. Yes. A reasonable person would believe that.
Q. Based on your training, isn't your training when you give a verbal warning, "Stop or I'll shoot," words to that effect?
A. I'm sorry. Can you rephrase that part?
Q. Sure. When you're trained with regards to giving a verbal warning before using deadly force, are you trained to tell the individual to do something or that they will be shot?
A. Yes.
Q. Okay. When fired your first round, was Mr. Diaz walking still?
A. Yes. He was still walking towards the officers.
Q. In that western direction you described earlier?
A. Yes.
Q. Okay. When you fired that first round, was Mr. Diaz still standing, like, upright?
A. Yes, he was.
Q. Okay. And what about when you fired the second shot? Was Mr. Diaz still walking when you fired the second round?
A. "The second round," you said?
Q. Yes.

A. After the second round, he falls down to the ground.
Q. When you actually fired the second round, is he still walking, or is he stopped at that point?
A. No. He's still proceeding forward.
Q. Okay. Was Mr. Diaz stopped during any of the rounds that you fired?
A. No.
Q. Okay. Was Mr. Diaz falling to the ground during any of the shots that you fired?
A. No.
Q. Was Mr. Diaz on the ground during any of the shots that you fired?
A. No.
Q. Okay. And where were you aiming when you fired your shots?
A. Center mass.
Q. And what was center mass, based on what you could see?
A. From that angle, would be the upper chest to midsection of his body.
Q. Was his back ever exposed to you during any of your shots?
A. No.
Q. Based on your training, do you have training

that if you shoot somebody center mass, it could cause them death or serious bodily injury?

A. Yes, it's to stop a threat.

Q. And your training is shooting somebody center mass could cause death or serious bodily injury; correct?

A. Yes, to stop a threat.

Q. Did you intentionally press the trigger twice on your M4 rifle?

A. Yes.

Q. For example, you didn't have, like, an accidental discharge or something like that; correct?

A. No.

Q. Okay. At some point, do you see Mr. Diaz stop walking -- stop walking in that westerly direction?

A. Prior to the shooting?

Q. At any time, prior to, during, or after.

A. No. He continued to walk until the threat was stopped.

Q. And based on what you observed, he was walking while all the gunshots were being fired at him still?

A. Yes. He was still proceeding forward.

Q. At any point, do you see Mr. Diaz going to the ground, like, falling to the ground?

A. Yes, after.

Q. Okay. But it's your testimony today, as he's falling to the ground, you don't recall any gunshots going off at that point, if I understand you correctly?
A. Yes.
Q. Okay. Did you ever hear Mr. Diaz verbally threaten anybody from when you first encountered him in the green Charger?
A. No. Just pointing the weapon towards us and not obeying commands.
Q. Okay. Were you, yourself, physically injured during this incident?
A. No.
Q. Did you ever see any of the other officers be physically injured during this incident?
A. No, because the threat was stopped.
Q. Okay. And again, at no point did you ever see a gun on Mr. Diaz's person; is that correct?
A. Not at the moment because it was -- it could be easily concealed with the baggy clothing he had on.
Q. Correct. But at least up to until the time you shot him, you never saw an actual gun with your own eyes, did you?
A. Yes.
Q. At some point after Mr. Diaz went to the ground, was he patted down?

A. Yes.
Q. And you would agree no gun was recovered from his person after he was patted down; correct?
A. At that moment, I did not know, because I transitioned to clearing the vehicle for any possible downed victim.
Q. When you went and cleared the vehicle, did you see anybody inside of the vehicle?
A. No. Just a large amount of blood on both of the driver and passenger seat.
Q. Okay. Did you ever see a gun inside the vehicle?
A. No. I didn't finish searching the vehicle, before -- plain view, no.
Q. Did you ever see, like, a bloody razor blade or anything in the vehicle?
A. A razor blade? No, not that I recall.
Q. Or any edged weapon?
A. Just the one that he had in his hand.
Q. At some point when Mr. Diaz goes to the ground, do you guys eventually put a tactical plan together to approach him?
A. Yes.
Q. Okay. At some point -- did he still have that object in his hand when he went to the ground?

A. Yes. That's when we came up with a tactical plan to safely apprehend him and administer first aid.
Q. Do you have an estimate as to -- after Mr. Diaz went to ground, as to how much time passed before you guys did the approach?
A. I would say approximately one minute.
Q. Okay. At some point is the item removed from Mr. Diaz's hand?
A. Yes.
Q. Did you do that or somebody else?
A. That was an assisting officer who did that.
Q. Do you know the name of that officer?
A. Officer Choi.
Q. At some point prior leaving the scene, are you able to see that that was a flathead screwdriver that he was holding?
A. No.
Q. So before you left the scene, you were still under the impression that it was a knife?
A. Yes.
Q. When did you first learn that it was, in fact, a screwdriver that he had?
A. That was after the incident was done and there was the review that the department does.
Q. Okay. But while you were at the scene, you

were still under the belief that it was a knife?

A. Yes, I was.

Q. Okay. At some point, is medical aid rendered to Mr. Diaz?

A. Yes. During the tactical plan, that was what I discussed with Officer Choi and Officer Bermudez: "Once we safely apprehend him, we have to administer first aid immediately."

Q. Did you participate in that, or no?

A. No. I directed officers on how to do it, which was to do immediate pressure on any puncture wounds or exit wounds.

Q. When you fired your first shot, did you have the impression that your shot struck him?

A. Yes.

Q. And what gave you that impression?

A. I visually observed it.

Q. And where did you see it strike him?

A. The upper chest area, on the left side.

Q. Okay. The same question with regards to your second shot. Were you under the impression that that one also struck him?

A. Yes, sir.

Q. And where do you believe that one struck him?

A. Similar area, just on the upper, left side of

his chest.

Q. Have you ever had a chance to see the autopsy report of Mr. Diaz?

A. No, sir.

Q. Do you -- did you ever receive any information that some of the shots struck him in the back?

A. No.

Q. Okay. You had requested for Torrance Fire Department prior to the gunshots; correct?

A. Yes.

Q. At some point was the clearance given to allow the Torrance Fire Department to begin rendering aid, as well?

A. Yes. After Mr. Diaz was apprehended, and then we cleared the vehicle and made sure that the entire scene was safe, we requested for the fire department to enter the area so they could administer first aid.

Q. And do you have an estimate as to how long after the shooting they were given the clearance to begin rendering aid?

A. Approximately three minutes; but our officers were administering first aid, and so they were relieved.

Q. When -- when the officers you had designated to provide medical aid to Mr. Diaz were doing so, did Mr. Diaz appear to still be alive?

MS. POWELL: Objection. Calls for a medical conclusion, and calls for speculation.

MR. VALENZUELA:

Q. Based on what you observed, were you under the impression that he was still alive at that point?

A. I believe he was still alive.

Q. Okay. At any point while you were at the scene, did you get the impression that Mr. Diaz had passed away?

A. Not until after.

Q. Not until you left the scene?

A. Yes.

Q. Okay. How long were you at the scene after the shooting before you left?

A. Approximately five minutes.

Q. Do they then, like, separate you and escort you out of there?

A. Yes.

Q. Okay. In reviewing your body camera, you keep yelling out for somebody to use the 40, prior to discharging your weapon. Do you remember that?

A. Yes, I do.

Q. And you keep yelling out, like, "40. 40. Hurry up. Somebody use the 40," or words to that effect. Do you remember that?

A. I do.
Q. Were you under the impression that somebody had the 40-millimeter out at that point?
A. At that point, we had requested for the next responding unit, which would be the third unit that was there, to grab the 40, so we could have a less-lethal option, as Mr. Diaz was advancing towards us.
And from my recollection, I do recall that those officers, once they arrived, they were getting the less-lethal launcher, but there was insufficient time because Mr. Diaz continued to advance towards us, prior to that unit getting the 40-millimeter launcher.
Q. But when you're yelling out "40, 40," did you think somebody had the 40-millimeter out, ready to go?
A. No. That was me for telling them to hurry up.
Q. Okay. You didn't think somebody had already brought out the 40-millimeter and was ready to use it; you were saying that for them to hurry up?
A. Yes. "Hurry," as we need this, because Mr. Diaz was continuing to advance on us, limiting our distance and time to react.
Q. When you yelled out, "40-millimeter, hurry up," or "40-millimeter," or words to that effect, at least at that point, did you think it was appropriate to shoot with the 40-millimeter?

A. Yes.
Q. At some point, you had indicated that you saw Mr. Diaz stop and fall to the ground; correct?
A. Yes.
Q. When Mr. Diaz stopped and began to fall to the ground, did you still believe that Mr. Diaz posed an imminent threat of death or serious bodily injury at that point?
A. When he falls to the ground, no.
Q. What about when he stopped and begins to fall on the ground?
A. No.
Q. Okay. And is that, in part, why you stopped shooting?
A. Yes.
Q. Did you, yourself, at any point, try to tactically reposition yourself while he was walking in this westerly direction?
A. No.
Q. Okay. Was there anything physically obstructing you from backing up and increasing the distance between Mr. Diaz and yourself?
A. No.
Q. Okay. Do you have training that you should try to tactically reposition yourself when it's safe to do

so?

A. When it's safe to do so, yes.

Q. When you fired your weapon at Mr. Diaz, the first shot, approximately what distance was Mr. Diaz to you at that point?

A. Less than 5 feet.

Q. Okay. And what distance do you believe he was to Officer Wissler?

A. Approximately 3 feet.

Q. Would he have -- would Mr. Diaz have been the closest to Wissler when you fired your shot, or to another officer?

A. From that angle, it would be Officer Wissler and Officer Garcia.

Q. Okay. And that distance you believe to be approximately 3 feet?

A. Yes.

Q. Okay. And was he also approximately -- and 5 feet from you; did I understand you correctly?

A. Yes.

Q. Okay. And was he still that approximate 3 feet from Garcia and Wissler when you fired your second shot?

A. Yes, he still was.

Q. Okay. Okay. I want to show you, briefly, the body cam footage, just to confirm whether this is your

body cam or not. Okay?
A. Yes, sir.
Q. Can you see this video on your screen?
A. Yes, I do.
Q. Let me play it.
(Video being played.)
BY MR. VALENZUELA:
Q. Okay. Is this your body cam?
A. Yes, it is.
MR. VALENZUELA: And just for the record, it's Bates-stamped TPD 00040.
THE CERTIFIED STENOGRAPHER: Will this be marked as an exhibit?
MR. VALENZUELA: No, I don't think so. There's a lot of body camera footage.
BY MR. VALENZUELA:
Q. Let me show you this drone really quick. Can you still see the screen?
A. Yes, sir.
(Drone footage being played.)
BY MR. VALENZUELA:
Q. Okay. Do you see where my cursor is, up to the right?
A. Yes.
Q. Who would that officer be?

A. That is retired Officer High.
(Reporter clarification.)
MR. VALENZUELA: High, H-I-G-H.
BY MR. VALENZUELA:
Q. And would that be you immediately to the left of him?
A. Yes.
Q. And here, where my cursor is in the driver door of unit 347, would that be Wissler?
A. That's Officer Wissler.
Q. And here, at the open door of the passenger side of the other unit, which I believe is your unit, would that be Garcia?
A. Yes.
Q. And then would this be your training officer, here in the driver's side of the cruiser?
A. That's my trainee.
Q. That's Bermudez; right?
A. Bermudez, yes.
Q. Thank you.
MR. VALENZUELA: And just for the record, that was Bates TPD 00099.
BY MR. VALENZUELA:
Q. Okay. We're getting close to done. I'm just going to go over my notes, and then I'm going to ask you

a couple questions from your interview, and then I think we'll be finished. Okay?

A. Yes, sir.

Q. And you had training with regards to interacting with people who may be suffering from a mental health crisis; is that correct?

A. Yes.

Q. Part of that training is de-escalation tactics?

A. Yes.

Q. And was this Bermudez's first day doing training?

A. Yes, sir.

Q. Had you trained other officers prior to the date of this incident?

A. I have.

Q. You're like a designated field training officer?

A. Yes, I am.

Q. Is that part of your training, to reassess in between shots, if it's safe to do so?

A. Yes.

Q. And is that what you were trying to do in this incident?

A. I did.

Q. Is it part of your training on deadly force

that you're responsible to justify every shot?
A. Yes.
Q. Did you ever see the decedent try to flee from you during the incident?
A. Can you repeat that? You sounded further away.
Q. I'm sorry. I'll get closer to my microphone.
Did you ever see the decedent try to flee from you during the incident?
A. No, just advance towards us.
Q. Do you recall how many shots you heard the other officers fire?
A. I don't recall the exact number.
Q. And I think you indicated you didn't hear any shots prior to you firing; correct?
A. Yes.
Q. And you didn't hear any shots after you stopped firing?
A. After I stopped firing, no.
Q. Okay. Do you know if you fired the first shot?
A. Yes.
Q. Do you believe you did?
A. Yes.
Q. Do you know if you fired the last shot?
A. No.
Q. Do you believe it was a different officer that

fired the last shot?
A. Yes.
Q. Do you recall how the decedent fell to the ground? In other words, did he fall on his butt? His back? Prone? On his chest? Do you recall how he went down to the ground?
A. Yes. He fall -- he fell to his buttocks, and his back landed on the wheel well of my patrol vehicle, on the passenger side.
Q. The front wheel well of the passenger side?
A. Yes, which would be the front passenger tire.
Q. Okay. Gotcha.
Did you notice where he was struck with the gunfire, after the shooting?
A. I believe center mass.
Q. You saw shots to his, like, chest and torso area?
A. When we were administering first aid, yes.
Q. Okay. Did you see shots to any other part of his body?
A. No.
Q. Okay. While they're rendering medical aid on Mr. Diaz, did you hear him make any sounds?
A. "Sounds," no.
Q. You didn't hear him say anything, did you?

A. No.
Q. After you saw decedent, after he got out of the car, did you recognize having ever dealt with him in the past?
A. No, sir.
Q. When he got out of the car, you could see a clear view of his face; correct?
A. Yes.
Q. And you don't recall ever having any interaction with him, if I understand you correctly?
A. No, sir.
Q. Did you have any information he was under the influence of drugs or alcohol prior to the shooting?
A. No, sir.
Q. Where did you go when you left the scene?
A. We responded back to the station.
Q. How did you get to the station? Did somebody drive you?
A. Yes, sir.
Q. Who was it that drove you?
A. Officer Lassak.
Q. Was it just you and Lassak in the vehicle when you were transported?
I'm sorry. I didn't hear that. Can you repeat that?

A. Yes.

Q. Okay. Thank you.

With respect to the use of deadly force, are you generally trained that you can only use deadly force if there is an imminent or immediate threaten of death or serious bodily injury?

A. Yes.

Q. And are you generally trained that if there's not an immediate or imminent threat of death of serious bodily injury, you should not use deadly force?

A. That is correct.

Q. Do you have that there has to be an ability, opportunity, and apparent intent to immediately cause death or serious bodily injury to justify the use of deadly force?

A. Yes.

Q. Are you generally trained that deadly force should only be used when there are no other reasonable options available?

A. Yes.

Q. Do you have a copy of your recorded interview handy?

A. "Handy"? No, sir.

Q. Well, let me ask you this and then --

MR. VALENZUELA: Do you have a copy, Angela?

MS. POWELL: I'm looking. Give me one second.
(Pause.)
MR. VALENZUELA: Let me just ask you this while you're trying to find the statement. If not, I can bring it up on the shared screen.
BY MR. VALENZUELA:
Q. But you reviewed your statement in preparation for your deposition today?
A. Yes.
MS. POWELL: I have it.
BY MR. VALENZUELA:
Q. Okay. Do you recall indicating in your interview that you thought he may have been harming himself, based on the cuts to the wrist and having a knife?
A. I do.
Q. Okay. You recall stating that in your interview?
A. Yes.
Q. Okay. Do you recall stating in your interview that you thought someone had the 40-millimeter up and running?
A. If I could refer back to the --
Q. Sure.
MS. POWELL: Eric, do you have a page that --

MR. VALENZUELA: Yeah, it's on page 52. It looks like it's at lines 16 through 19.

MS. POWELL: He has it.

MR. VALENZUELA:

Q. Okay. So you're asked in your interview: "Do you think any of the officers did have the 40-millimeter launcher up and running at that point?"

And your response was: "I would hope so because we made the request."

Do you see that?

A. Yes, I do.

Q. So were you hoping that another officer at the scene had the 40-millimeter up and running at that point?

A. Yes. But it does take time for an officer to disengage that firing system from the patrol vehicle and get themselves prepared with it.

Q. Well, I guess based on the statement that you gave in your interview, did you think that another officer had the launcher up and running at that point, because had you already made the request?

A. Yes. Again, they have to prepare themselves for that.

MR. VALENZUELA: Okay. Why don't we take another, like, five-minute break. I think I'm just

about done. I just need to confer with my co-counsel to see if there is anything else, but why don't we take another five-minute break. But just to give you guys a heads up, I'm just about done. Okay?

MS. POWELL: Okay.

THE WITNESS: Thank you, sir.

THE VIDEOGRAPHER: We're off the record at 12:02 p.m.

(Break taken.)

THE VIDEOGRAPHER: We're back on the record at 12:12 p.m.

MR. VALENZUELA:

Q. Okay. Going back to your interview, can you turn to page 53, please. I'm looking at the top, basically, of lines 1 through 11, on page 53.

Have you had a chance to read that to yourself?

A. Okay.

Q. Okay. You were asked in your interview: "Was there any other less-lethal options at this point in the scenario that were already up and running, like a less-lethal cover option that was already assigned or" --

And your response was: "Not that I recall."

And then the investigator says: "Okay. Do you know why that would be?"

And your response was: "No, sir."

Do you see that?

A. Yes, I do.

Q. Okay. So you were basically asked why wasn't there a less-lethal assigned, and you said you didn't know why that was; correct?

MS. POWELL: I think that misstates the statement.

But you can go ahead and answer.

THE WITNESS: Yes. That question, if I recall correctly, it was regarding about at that position, we were using high-risk tactics. Us, being as the first four officers, we are the ones that are assigned lethal coverage to deal with an armed threat. That's why we made the request to get more units there, so they could bring over less-lethal options for us.

BY MR. VALENZUELA:

Q. And to be fair, if you look at page 52, I think it starts there at line 36. You see line 36 and -7, it says: "Was there any other less-lethal cover options provided at this point in the scenario?"

And then you say -- going back to page 53: "Can you repeat that?"

And they ask you: "Was there any less-lethal options at this point in the scenario that were already

up and running, like a less-lethal cover option that was already assigned?"

And your response was: "Not that I recall." Correct?

A. Yes.

Q. And then they asked you: "Do you know why that would be?"

And your response was: "No, sir." Correct?

A. Yes.

Q. Okay. Based on your training, is less-lethal one form of a de-escalation?

A. Yes, it is.

Q. And are you trained that the importance of less-lethal is to see if you could utilize that before resorting to the use of deadly force? Is that your understanding?

A. Yes.

Q. Okay. Did you ever see the decedent lunging at anybody?

A. No.

MR. VALENZUELA: Okay. I think that's all I have.

Counsel, do you have any questions today for your client?

MS. POWELL: I actually do, Mr. Valenzuela.

MR. VALENZUELA: Okay.

MS. POWELL: Just a couple, with respect to the less-lethal option that was available.

EXAMINATION

BY MS. POWELL:

Q. Officer Castillo, was it your understanding that Officers High and Choi would be designated less-lethal coverage?

A. Yes. As a third responding unit, yes.

Q. And was that part of the tactical plan when you and Officer Garcia decided to engage in high-risk -- or deploy high-risk tactics in confronting the person in the green Charger?

A. Yes. And over the radio, it was requested by Officer Garcia to next unit responding, which would be the third, to get less -- a less-lethal option, which would be the 40.

Q. And so in this portion of your interview that Mr. Valenzuela has gone over, when you say that you don't know why at the time less-lethal coverage was not available, is it because it was your understanding that Officers High and Choi were responding, and you did not know at the time why they had not deployed the 40-millimeter?

MR. VALENZUELA: I'm going to object as

leading.

BY MS. POWELL:

Q. You can answer.

A. Yes. At that point, I did not know where exactly they were at and who was getting the 40-millimeter launcher.

Q. Why did you not wait for Officers High and Choi to respond and position with the 40-millimeter before engaging Mr. Diaz?

A. Mr. Diaz exited the vehicle on his own, without being told so, and began to close the distance on us, limiting the effective range for that 40-milimeter launcher.

MS. POWELL: All right. I have nothing further, Mr. Valenzuela.

MR. VALENZUELA: Really briefly.

FURTHER EXAMINATION

BY MR. VALENZUELA:

Q. There's initially four officers there, right? You, Bermudez, Garcia, and Wissler; correct?

A. Yes, sir.

Q. Before Mr. Diaz ever exits out of his vehicle, none of those officers were ever designated as less-lethal; is that correct?

A. Yes, sir.

Q. Did you ever hear anybody tell Officer High or Choi that they were going to be designated less-lethal? Did you, yourself, ever hear that?
A. I heard the request that next unit responding to grab a less-lethal option --
Q. Okay.
A. -- over the radio.
Q. But did you ever hear anyone specifically tell High or Choi, any of those two officers, while they were at the scene, "You're designated less-lethal"?
A. No.
Q. I think I may have asked this, and I apologize. Did you ever hear any of the officers command Mr. Diaz to walk backwards towards you guys?
A. No. We told him to face away from us, before we told him to get back into the car -- after we told him to get back into car.
Q. Okay. And nobody that you heard ever told him to walk back towards you guys; is that correct?
A. Yes. He began to walk towards us on his own, not obeying commands.
Q. Okay.
MR. VALENZUELA: Nothing further, counsel.
MS. POWELL: I have one follow-up, Mr. Valenzuela.

FURTHER EXAMINATION

BY MS. POWELL:

Q. As part of your training as a Torrance Police, officer, when you engage or employ high-risk tactics, what is your understanding of which officers would be designated lethal coverage and which officers would be designated less-lethal?

A. So, the first four officers that arrive are going to be assigned as lethal coverage. Their duties is to deal with the threat, which will possibly, in this situation, would be the vehicle.

From there, we are requesting resources, which we did in this situation, for the next responding units to bring less-lethal options, and also be part of an arrest team.

Q. And that's the training that you assume that Officers High and Choi received, as well; correct?

A. Yes.

MS. POWELL: Nothing further.

MR. VALENZUELA: Really briefly.

FURTHER EXAMINATION

BY MR. VALENZUELA:

Q. Do you have normally a 40-millimeter on your car when you do patrol?

A. Yes. It's secured.

Q. Okay. So you -- you have both the M4 rifle and the 40-millimeter when you're out doing patrol?
A. Yes.
Q. Does Officer Garcia, if you know, also have or is also assigned a 40-millimeter when he does patrol?
A. Yes. All vehicles are equipped with a 40-millimeter launcher and secured into the vehicle.
Q. That was going to be my next question.
Every vehicle has its own 40-millimeter assigned to it when they go do patrol?
A. Yes. And we are -- we inspect the vehicles to make sure it has that equipment on there.
Q. Okay. And in this situation, none of the four initial officers were assigned the 40-millimeter, despite there being two of them in two different cruisers; is that correct?
A. Yes. Based off the high-risk tactics, we were assigned as lethal coverage until the third unit gets there to be assigned less-lethal coverage.
MR. VALENZUELA: Okay. Nothing further.
MS. POWELL: All right.
THE CERTIFIED STENOGRAPHER: Ms. Powell, are you ordering a copy?
MS. POWELL: Yes.
THE VIDEOGRAPHER: Off the record at 12:21.

(12:21 p.m., deposition concluded.)

--oOo--

STATE OF CALIFORNIA)
) ss:
COUNTY OF BUTTE )

I, KIMBERLY E. D'URSO, do hereby certify:

That the witness named in the foregoing deposition was present remotely and duly sworn to testify to the truth in the within-entitled action on the day and date and at the time and place therein specified;

That the testimony of said witness was reported by me in shorthand and was thereafter transcribed through computer-aided transcription;

That the foregoing constitutes a full, true and correct transcript of said deposition and of the proceedings which took place;

Further, that if the foregoing pertains to the original transcript of a deposition in a federal case, before completion of the proceedings, review of the transcript [ ] was [ ] was not requested.

That I am a certified stenographic reporter and a disinterested person to the said action;

IN WITNESS WHEREOF, I have hereunder subscribed my hand this 26th day of July, 2026.

Kimberly D'Urso
______________________________________________

KIMBERLY D'URSO, CSR NO. 11372, RPR

ERRATA SHEET

PAGE/LINE CHANGE REASON

DECLARATION OF DEPONENT

I, ____________________, say I have read the foregoing deposition and declare under penalty of perjury under the laws of the State of California and all federal laws that my answers as indicated are true and correct.

Dated this _____ day of ______________, 2026, at ______________________, California.

______________________________

ARTURO CASTILLO

Focus Litigation Solutions

400 Capitol Mall, Suite 1450

Sacramento, CA 95814

Telephone (916) 228-4593
Production@FocusLitigationSolutions.com

July 27, 2026

Arturo Castillo
c/o Angela M. Powell, Esq.
amp@jones-mayer.com

Re:Maria Guadalupe Diaz; et al. v. City of Torrance
Date of Deposition: July 13, 2026

The transcript of your deposition taken in the above-entitled matter has been transcribed. The original transcript will be held for 30 days from the date of this letter before it is sealed and forwarded to the noticing attorney.

You have the right to review, sign and make corrections to your transcript within the 30-day period. Please call the above number, or e-mail to make an appointment for your review. It is our policy not to release the original transcript and complimentary copies are not provided.

If you are represented by an attorney, we advise that you contact your attorney to discuss this matter. If you are an independent witness and have questions, please contact the attorney who requested you to testify or this office for further instructions.

If you wish to waive signature, please sign and date below and return this letter to the above address. In the event you have not read, corrected, and signed your deposition within (30) days of receipt of this letter, it may be used with the full force and effect as though it had been read, corrected, and signed.

Cc: All counsel

______________________ ______________________________

Date Arturo Castillo

WORD INDEX

< 0 >
**00040** 78:11
**00099** 79:22

< 1 >
**1** 87:15
**10:02** 4:4, 14
**10:56** 46:25
**11** 87:15
**11:07** 47:3
**11372** 1:23 96:24
**12** 35:13, 23 36:14, 24
**12:02** 87:8
**12:12** 87:11
**12:21** 94:25 95:1
**13** 1:20
**13th** 4:3, 14
**15** 24:8, 11
**16** 86:2
**1700** 17:22
**19** 86:2

< 2 >
**2:25-cv-03389-JLS** 1:10
**20** 7:9
**2010** 7:20
**2011** 33:25
**2019** 8:20
**2024** 13:5, 11
**2026** 1:20 4:3, 14 96:22 98:8
**21800** 2:4
**22** 34:21 35:14
**24** 28:5, 15 29:14
**25** 35:14
**26** 63:13, 18
**26th** 96:22
**28** 63:1, 4
**28993** 1:24
**2909** 15:23 20:5
**2nd** 13:5

< 3 >
**3** 77:9, 16, 21
**30** 24:20 36:20 62:23
**310** 2:4
**347** 79:9
**36** 88:19
**3777** 2:9

< 4 >
**40** 38:1 74:20, 23, 24 75:6, 13 90:17
**40-milimeter** 12:15 91:12
**40-millimeter** 38:3, 11, 14 75:3, 12, 14, 17, 22, 23, 25 85:21 86:6, 13 90:24 91:6, 8 93:23 94:2, 5, 7, 9, 14

< 5 >
**5** 77:6, 18
**5:00** 17:23
**52** 86:1 88:18
**53** 87:14, 15 88:22

< 6 >
**6-10** 1:12

< 7 >
**7** 34:18 88:19
**714.446.1400** 2:10

< 8 >
**818.347.3333** 2:5

< 9 >
**9** 28:5, 15 29:14
**91** 3:4
**911** 16:2, 5
**91367** 2:4
**92835** 2:9
**93** 3:4, 5
**9-millimeter** 33:25
**9th** 13:10

< A >
**A.D** 1:5, 6
**a.m** 4:4, 14 46:25 47:3
**ability** 84:12
**able** 43:17 59:22 60:18 71:15
**academy** 8:17, 19, 21 9:1, 6, 11 11:15, 17, 18, 21, 25 12:17, 20 23:10
**accessible** 34:9
**accidental** 68:12
**accurate** 50:22
**acting** 53:1
**action** 96:7, 20
**active** 10:23 23:20
**actual** 16:23 69:21
**Ad** 1:5, 7
**Adam** 28:5, 15 29:14
**addition** 30:18
**additional** 23:4, 5, 9, 10 30:2 64:9
**adjust** 8:6
**adjusting** 52:4
**administer** 46:7 71:2 72:7 73:17
**administered** 4:11 5:6
**administering** 73:22 82:18
**Administrative** 8:3
**admonishment** 5:16
**advance** 56:14 75:11, 20 81:9
**advancing** 75:7
**advised** 19:15
**advising** 22:12
**aerial** 23:2
**Affairs** 6:9 13:19 15:10
**affect** 36:11
**agents** 9:4
**ago** 47:12, 14, 20
**agree** 19:9 70:2
**ahead** 15:21 36:7 88:9
**aid** 46:8 71:2 72:3, 7 73:12, 17, 20, 22, 24 82:18, 22
**aiming** 67:15
**al** 4:16
**alcohol** 83:13
**alive** 73:25 74:5, 6
**allow** 73:11
**allowed** 29:13 50:13
**allows** 54:24
**ambiguous** 18:24
**Amo** 16:20
**amount** 70:9
**amounts** 43:20 44:10
**amp@jones-mayer.com** 2:10
**ANGELA** 2:8 5:2 84:25
**Angeles** 9:7 23:11
**angle** 61:19 67:20 77:13
**angled** 54:7
**answer** 14:23 29:9 44:16 45:13 88:9 91:3
**answered** 38:6
**answers** 98:6
**anybody** 18:17 21:10, 13, 25 22:2 39:5 40:7 44:14 45:5, 8 46:13 51:5 65:13 69:6 70:8 89:19 92:1
**apologize** 92:12
**apparent** 84:13
**appear** 73:25
**APPEARANCES** 2:1
**appeared** 4:4 24:15
**apprehend** 71:2 72:7
**apprehended** 73:14
**approach** 70:22 71:5
**approaching** 28:11
**appropriate** 75:24
**approximate** 18:5 40:20 77:21
**Approximately** 7:3, 5, 8 9:8, 17 10:11, 12 13:8 17:1, 19 23:13, 25 24:2, 6, 8, 10, 11, 18, 20 26:21, 25 28:22, 24 35:23 36:14, 20 47:11, 14, 25 48:16, 18, 24 55:22 56:23, 25 71:6 73:21 74:15 77:4, 9, 16, 18
**area** 15:22 16:19 17:25 18:1 20:5 21:8, 12, 22 22:15

23:2 25:24 26:16 27:23 29:11, 12, 16, 18 30:6 31:11 50:10 55:23 58:1, 4 72:19, 25 73:17 82:17
**areas** 22:10
**armed** 23:23 24:4 42:19 43:19 50:14 88:14
**armor** 33:8
**arms** 45:25 48:2 59:8
**arrest** 93:15
**arrive** 21:1, 5 27:20 28:16, 18 50:25 52:13 93:8
**arrived** 29:15, 19 30:8, 10 42:13 47:6 75:9
**arrives** 32:8
**ARTURO** 1:11, 19 3:2 4:4, 15 98:12
**asked** 52:24 86:5 87:18 88:4 89:6 92:12
**asking** 65:13
**assign** 31:6 52:19
**assigned** 9:20, 22 10:18, 20 11:1 31:3, 16 33:12 41:22, 23 87:21 88:5, 13 89:2 93:9 94:5, 10, 14, 18, 19
**assigning** 52:22, 25
**assignment** 11:4
**assignments** 9:18, 23 10:16 11:12
**assist** 11:5 31:22
**assisting** 27:13 71:11
**associate's** 7:25
**assume** 93:16
**assuming** 7:16
**attempt** 38:24
**attempted** 18:12
**attend** 8:17, 19 9:6
**attending** 8:16, 21 9:11
**attention** 26:11
**attorney** 13:24, 25 14:3
**autopsy** 73:2
**available** 52:3 84:19 90:3, 21
**Avenue** 16:20
**awaiting** 52:12

**< B >**
**back** 18:12 22:16 23:8 26:22 27:7 38:16, 17 47:2, 5 49:3, 14 50:5 60:7 67:22 73:6 82:5, 8 83:16 85:23 87:10, 13 88:22 92:16, 17, 19
**background** 7:14 20:1
**backing** 29:3 76:21
**backup** 41:18 45:23
**backwards** 92:14
**bad** 59:25
**baggy** 60:6, 17, 25 69:19
**Based** 19:17 21:5 22:23 24:25 25:1, 4, 6, 7, 13 30:16 31:19 33:11, 16 35:21 36:3 37:4 38:5 39:6 41:24 44:6 45:10, 23, 24 52:5 53:25 64:1 66:2 67:18, 25 68:20 74:4 85:14 86:18 89:10 94:17
**basically** 13:21 39:23 63:10 87:15 88:4
**Bates** 79:22
**Bates-stamped** 78:11
**baton** 34:7, 8, 9, 11
**began** 76:5 91:11 92:20
**begins** 76:10
**behalf** 4:25 5:2
**belief** 72:1
**believe** 14:5 15:10 31:12 44:11 51:18 65:19 66:1 72:24 74:6 76:6 77:7, 15 79:12 81:21, 25 82:15
**believed** 44:8
**belonged** 19:16
**belt** 34:2
**BERMUDEZ** 1:12 2:14 17:11 30:1, 14 31:5, 6, 25 33:9 38:13 40:18 42:9, 12 51:7 53:16, 18 54:4, 15 55:5 65:7, 10 72:6 79:18, 19 91:20
**Bermudez's** 80:10
**best** 52:6
**better** 31:20 35:25 36:2 54:19
**biggest** 9:2
**bit** 7:13 8:24 11:24 13:9 15:15 22:16 25:17 47:5 51:24 52:1
**blade** 70:15, 17
**bleeding** 43:23 59:5
**blood** 39:21 40:1 43:20 44:10, 12 45:1, 22, 25 48:2, 4 59:7 70:9
**bloody** 70:15
**blowing** 36:10
**board** 15:8
**bodily** 68:2, 5 76:7 84:6, 10, 14
**body** 6:14, 18, 19, 21 35:2 39:24 51:14, 17 59:23 67:21 74:19 77:25 78:1, 8, 15 82:20
**Body-worn** 6:16 62:19
**bottom** 60:14
**Boulevard** 2:4, 9
**breaching** 23:18
**break** 5:19, 23 46:20 47:1 86:25 87:3, 9
**briefly** 9:1 77:24 91:16 93:20
**bring** 33:5 85:4 88:16 93:14
**broadcasted** 20:10 22:12 25:23 49:12
**broke** 22:1
**brought** 26:11 75:17
**building** 10:22 23:20
**bulge** 61:2
**bullets** 62:21
**Burbank** 2:4
**burglarizing** 20:22
**burglary** 20:6, 12 21:25
**business** 21:23 22:1, 3, 4, 5, 6 26:10, 22 47:7, 11, 13, 19
**businesses** 30:7
**butt** 82:4
**BUTTE** 96:2
**buttocks** 82:7

**< C >**
**CALIFORNIA** 1:2 2:4, 9 4:5, 7 96:1 98:5, 9
**call** 6:10 15:16, 17 16:2, 5, 8, 23 17:4, 24 18:10, 12, 21 19:3, 7, 13 22:24 24:17 27:3, 7, 16 29:7, 14 42:25 50:18, 19, 22
**caller** 15:23 18:12 19:12 44:15, 19
**Calls** 14:19 24:10, 11 44:16 74:1, 2
**call-taker** 18:11
**cam** 6:16, 18, 19, 21, 22 51:14 77:25 78:1, 8
**camera** 6:24 51:17 74:19 78:15
**capacity** 62:23, 24
**car** 26:23 27:10 40:10, 12, 13 43:2, 5, 6, 11, 14, 15, 18 45:5, 9, 17 48:8, 10, 12 49:2, 3, 9 83:3, 6 92:16, 17 93:24
**cardinal** 57:16
**cars** 31:19
**cartridge** 35:9, 11, 12
**cartridges** 35:6

**Case** 1:10 46:7 52:11 96:16
**cases** 7:11
**CASTILLO** 1:11, 19 3:2 4:4, 16 5:10 90:6 98:12
**cause** 68:1, 5 84:13
**Center** 67:17, 18 68:1, 4 82:15
**CENTRAL** 1:2
**Certified** 4:6, 9 5:4 78:12 94:22 96:19
**certify** 96:2
**challenge** 37:2
**chamber** 63:3, 5, 7, 8, 16
**chance** 73:2 87:16
**CHANGE** 97:2
**changed** 29:5, 7 51:10
**Charger** 22:13 25:18 26:1, 9, 17, 19, 24 27:8, 11, 22 28:1, 9, 10, 14 38:17, 21 40:11, 13 49:10 55:24 59:12 69:7 90:13
**check** 21:24 47:6
**checking** 30:6
**chest** 67:20 72:19 73:1 82:5, 16
**Choi** 30:11 71:13 72:6 90:7, 22 91:7 92:2, 9 93:17
**circumstances** 25:3, 7
**CITY** 1:11 4:17 6:3
**civil** 7:10
**clarification** 6:8 79:2
**clarify** 20:17
**clarifying** 55:17
**clear** 45:14, 16 55:4 83:7
**clearance** 73:11, 19
**cleared** 70:7 73:15
**clearing** 70:5
**client** 89:24
**close** 17:2 35:11 39:1 59:12 79:24 91:11
**closed** 22:5, 7 47:11, 14
**closely** 46:7
**closer** 27:18 36:23 81:6
**closes** 59:13, 14
**closest** 32:9 61:21 77:11
**closing** 22:14 38:21 39:4, 10, 16, 19, 22 40:6 47:24 59:17
**clothing** 60:6, 17 69:19
**co-counsel** 87:1
**CODY** 1:11 2:13
**cognizant** 65:2
**collapsible** 34:8
**collateral** 11:3
**college** 7:21, 23 8:16
**command** 43:13 48:13, 17 92:13
**commands** 31:17 33:1 43:2, 4, 9 48:19, 25 49:6 56:18, 21, 24 57:1 69:9 92:21
**commencing** 4:3
**comments** 6:10
**commit** 22:1
**committed** 20:16
**communicate** 16:4
**communicated** 15:2 25:25
**communication** 43:21, 25
**communications** 19:14, 15 20:4
**compelled** 14:6, 8
**completion** 96:17
**compound** 29:8
**computer** 16:13
**computer-aided** 96:11
**conceal** 60:25
**concealed** 39:9 60:18, 19 61:3 69:19
**concluded** 95:1
**conclusion** 74:2
**conduct** 41:8
**conducted** 63:12
**conducting** 15:11
42:16
**confer** 87:1
**configuration** 31:19, 21 51:10 53:19 54:24
**configure** 42:14
**confirm** 77:25
**conflicting** 33:1
**confronting** 90:12
**conjunction** 41:3
**consider** 37:3 42:18
**considered** 27:15 28:25 29:2 30:14, 19
**constitutes** 96:12
**contact** 13:21, 24 22:2 26:12 27:14, 24 28:14 30:24 31:17 32:7, 13, 22, 25 33:18 35:1 41:14 43:3 56:15
**contacting** 49:11
**continue** 22:9
**continued** 68:18 75:11
**continues** 58:20 61:12
**continuing** 75:20
**copy** 84:21, 25 94:23
**correct** 10:4 12:12 13:14 15:13 16:2 19:24 21:14 27:4 28:10 31:25 32:22 34:12 35:10 36:15 37:11, 14 38:11 40:17 41:13, 14, 23 44:1, 22 45:5, 9, 18 46:14 48:5 49:18, 22 51:1 53:11, 14, 21 55:6, 9, 12, 19, 21, 24 58:10, 21 61:14, 25 63:20 65:7 68:6, 12 69:17, 20 70:3 73:9 76:3 80:6 81:14 83:7 84:11 88:6 89:4, 8 91:20, 24 92:19 93:17 94:16 96:13 98:6
**correctly** 20:21, 23 28:7 29:24 31:24 37:9 42:11 47:21
69:3 77:19 83:10 88:11
**Counsel** 4:22 45:13 89:23 92:23
**count** 62:7, 18 63:12, 14
**counterintuitive** 36:11
**County** 23:11 96:2
**couple** 28:17 80:1 90:2
**course** 22:23 24:24
**COURT** 1:1 4:20, 23 7:6 15:23 18:15 20:5 26:15
**cover** 30:24 31:8, 9, 22 32:21 41:11, 14 50:7, 12 52:8 87:21 88:20 89:1
**coverage** 31:16 33:12 52:3 88:14 90:8, 20 93:6, 9 94:18, 19
**covered** 11:13
**create** 52:7 54:25
**created** 41:11 55:3
**crime** 20:16 22:1
**criminal** 7:10, 11, 12 19:21
**crisis** 24:16 80:6
**crossed** 45:1
**cruiser** 28:19 38:11, 17 40:10 42:12 79:16
**cruisers** 49:18 61:24 94:16
**CSR** 1:23 96:24
**current** 29:14
**Currently** 6:2 10:18
**cursor** 78:22 79:8
**custody** 55:2
**custom** 62:25
**Customer** 9:2
**cut** 36:7 44:5
**cuts** 85:14

**< D >**
**DALE** 2:3
**dash** 6:16, 22
**date** 4:14 10:16 13:2, 4, 22 14:9

23:22 24:3, 14 35:16, 18 80:14 96:8
**Dated** 98:8
**day** 4:3 6:11 17:16 33:20 80:10 96:7, 22 98:8
**days** 13:13, 16
**DE** 1:8
**dead** 46:5
**deadly** 63:24 64:2 65:14, 24 66:7 80:25 84:3, 4, 10, 15, 17 89:15
**deal** 23:6, 21 42:19 88:14 93:10
**dealing** 50:12, 14 52:6
**dealt** 19:18 83:3
**death** 68:2, 5 76:7 84:5, 9, 14
**decedent** 81:3, 7 82:3 83:2 89:18
**December** 13:5, 10
**decided** 90:11
**decision-making** 23:16
**DECLARATION** 98:1
**declare** 98:4
**de-escalation** 80:8 89:11
**Defendants** 1:14 2:7 5:3
**degree** 7:24, 25 8:2
**Del** 16:20
**Department** 9:7 11:2, 13 23:12 46:6, 9, 12, 15 71:24 73:9, 12, 16
**departments** 10:3
**deploy** 37:10, 13 50:13 90:12
**deployed** 63:7 90:23
**deployment** 10:22
**deponent** 4:11 5:5 98:1
**DEPOSITION** 1:18 4:7, 15, 18 5:13 6:6 7:4 51:14 85:8 95:1 96:6, 13, 16 98:4
**describe** 56:11 57:21 61:18
**described** 66:15
**DESCRIPTION** 3:5
**designate** 30:23 32:3, 24 33:9, 15 38:13
**designated** 29:16, 18 31:25 32:5, 7, 13 41:17 52:24 73:23 80:16 90:7 91:23 92:2, 10 93:6, 7
**designation** 29:13 53:11
**designations** 29:12 41:16, 20
**desired** 37:7
**despite** 47:13 94:15
**details** 16:8
**detention** 42:24
**determination** 15:8
**DIAZ** 1:5, 6, 7, 8 4:16 19:16, 18 20:2 36:23, 24 37:1 46:10, 12, 16 47:15 49:5, 17, 22 55:18 56:4, 7, 15, 19 57:2, 6, 10, 12, 16 58:9, 14, 20, 23 59:4, 7, 10, 21 61:12 66:12, 19, 22 67:6, 9, 12 68:14, 23 69:5, 24 70:20 71:3 72:4 73:3, 14, 24, 25 74:8 75:7, 11, 20 76:3, 5, 6, 22 77:3, 4, 10 82:23 91:9, 10, 22 92:13
**Diaz's** 19:21 69:17 71:8
**different** 8:25 9:3 10:15 11:15 23:19 25:12 27:16 31:18 33:19 41:12 52:19 53:23 54:16 61:17 81:25 94:15
**directed** 72:10
**direction** 36:10 57:16 58:21, 24 59:22 60:4 61:13, 22 66:15 68:15 76:18
**directions** 61:18
**discharge** 62:2 68:12
**discharged** 14:11
**discharging** 74:21
**discovered** 62:15
**discussed** 18:21 22:17, 21 41:12, 21 49:1 72:6
**disengage** 86:16
**disgruntled** 44:8 47:17
**disinterested** 96:20
**Dispatch** 16:4 20:9 25:22 43:22 45:20 48:3
**dispatched** 27:17 29:11
**distance** 16:22 31:21 36:3, 4, 19, 23 41:11 52:8 75:21 76:22 77:4, 7, 15 91:11
**DISTRICT** 1:1, 2
**division** 20:4
**documents** 6:5 51:13 62:19
**Dodge** 22:13 26:17 28:13
**Doing** 5:12 17:7, 16 22:11 27:13 42:22, 24 73:24 80:10 94:2
**door** 22:14 26:3 38:22 39:1, 4, 10, 16, 19, 22 40:5 43:6, 11, 14, 15, 18 46:1 47:24 50:4 51:4, 9 53:20 54:3, 4, 8, 10, 16, 17, 25 55:1 59:11, 14, 17 79:8, 11
**doors** 21:24
**double** 45:12
**downed** 70:6
**dripped** 45:25
**drive** 21:20 83:18
**driver** 32:15 54:8, 17 55:1, 5, 12 70:10 79:8
**driver's** 40:3, 4 45:18, 19 54:2, 3, 10 79:16
**drive-stun** 34:23 35:3
**driving** 26:23 28:19 32:18
**drone** 6:16 7:1 22:11 23:1 25:18 27:3 78:17, 20
**drop** 56:22, 24
**drove** 83:20
**drugs** 83:13
**duly** 96:6
**D'URSO** 1:23 4:5, 21 96:2, 24
**duties** 50:25 93:9
**duty** 14:12 35:16

**< E >**
**earlier** 20:13 25:18 51:12 65:12 66:16
**easily** 69:19
**east** 26:15 57:15, 18, 19
**easy** 60:25
**edged** 70:18
**effect** 37:6, 7 51:19, 20 52:16 66:4 74:25 75:23
**effective** 34:21 35:12, 14, 22 36:13 91:12
**effects** 36:9
**eight** 24:2, 10
**either** 53:10
**else's** 44:11
**employ** 93:4
**employee** 20:24 44:8, 21 47:16, 17, 21
**employees** 44:18
**employer** 44:9, 21 47:16, 21
**employment** 20:7, 22 21:4, 9, 17, 20
**empty** 63:7
**encountered** 23:23 24:4, 15 69:6
**ended** 27:18
**enforcement** 10:11
**engage** 90:11 93:4
**engaging** 91:9
**entail** 42:22
**enter** 73:17
**entered** 27:7

**entire** 73:15
**equal** 63:18
**equipment** 33:20 94:12
**equipped** 94:6
**ERIC** 2:3 4:25 85:25
**ERRATA** 97:1
**escort** 74:16
**Especially** 31:2 33:2
**ESQ** 2:3, 8
**estimate** 16:24 18:4 23:25 24:6, 18 40:9, 14 48:22 56:2 64:15 71:3 73:18
**estimates** 24:21
**et** 4:16
**evalenzuela@galipolaw.com** 2:5
**event** 46:10, 16
**eventually** 48:8 70:21
**Everybody** 41:13
**exact** 24:22 81:12
**exactly** 16:25 91:5
**EXAMINATION** 3:1, 3 5:8 90:4 91:17 93:1, 21
**example** 11:21 12:5 19:23 41:22 58:9, 24 68:11
**exceed** 50:15
**EXHIBIT** 3:5 78:13
**EXHIBITS** 3:5
**exit** 30:2 40:12 56:4 72:12
**exited** 30:4 40:11 49:2 55:23 91:10
**exiting** 48:23 49:5, 22
**exits** 40:13 55:18 56:8, 9, 19 57:17 59:4, 10, 11, 14 91:22
**expect** 16:25
**expecting** 24:22
**experience** 10:11 30:16 50:21
**explain** 21:21 51:24 52:1
**exposed** 67:22
**exterior** 34:3
**eye** 56:15
**eyes** 69:22

**< F >**
**face** 49:4 83:7 92:15
**fact** 22:23 25:2, 3, 6 71:21
**factor** 29:21
**facts** 45:24
**fair** 30:20 53:7 88:18
**fall** 76:3, 5, 10 82:4, 7
**falling** 67:9 68:24 69:2
**falls** 67:1 76:9
**far** 15:7 19:3
**Fashion** 16:19 18:2
**fast** 46:1
**feasible** 64:3, 4
**federal** 96:16 98:5
**feet** 34:21 35:13, 14, 23 36:14, 21, 24 60:14 77:6, 9, 16, 19, 21
**fell** 82:3, 7
**felony** 42:17
**field** 10:19 17:14, 16 31:2 80:16
**figure** 25:13
**filled** 40:1
**find** 85:4
**findings** 15:13
**finish** 70:13
**finished** 7:19 80:2
**fire** 23:7 34:19 35:8, 9 39:8 46:6, 9, 12, 15 50:15 62:5 63:10 64:11 73:8, 12, 16 81:11
**firearm** 60:18, 20, 22
**Firearms** 23:17
**fired** 62:10, 14 64:8, 9 65:7, 10 66:11, 18, 21, 22 67:3, 7, 10, 13, 15 68:21 72:13 77:3, 11, 22 81:19, 23 82:1
**firing** 63:24 64:6, 18, 21, 22, 25 65:2, 3, 15 81:14, 17, 18 86:16
**first** 15:16, 18 16:16, 22 17:4, 16, 20 27:17, 19, 25 28:3, 16 29:10 30:5 32:8, 15 35:11 38:16 46:8 47:6 63:9 66:11, 18 69:6 71:2, 21 72:7, 13 73:17, 22 77:4 80:10 81:19 82:18 88:12 93:8
**fit** 62:21
**five** 10:12 18:7 26:25 74:15
**five-minute** 18:9 86:25 87:3
**flathead** 71:15
**flee** 81:3, 7
**Focus** 4:20 15:16
**following** 4:7
**follow-up** 92:24
**footage** 6:16, 18, 19, 21, 22 7:1 77:25 78:15, 20
**force** 12:2, 11 63:24 64:2 65:14, 24 66:7 80:25 84:3, 4, 10, 15, 17 89:15
**forearm** 47:25
**forearms** 39:25
**foregoing** 96:5, 12, 15 98:4
**form** 89:11
**former** 21:9 44:9
**formulated** 40:22, 25 41:7
**formulating** 12:21
**forward** 67:5 68:22
**found** 14:15, 18 15:1
**four** 30:5, 15, 20 31:15 32:6 40:17 41:21 88:13 91:19 93:8 94:13
**free** 29:14
**front** 50:4 51:4, 8 53:20 54:15, 23 55:5, 8, 12, 14 60:5, 8 82:10, 11
**full** 59:22 96:12
**Fullerton** 2:9
**further** 65:8 81:5 91:15, 17 92:23 93:1, 19, 21 94:20 96:15

**< G >**
**GALIPO** 2:3
**GARCIA** 1:12 2:13 28:5, 8, 15, 22 30:1, 13, 17, 19, 23 32:2, 11, 18 33:15 40:18 41:2 42:6, 11 51:7, 18, 22 52:9, 24 53:7 54:22 55:8 65:5, 19 77:14, 22 79:13 90:11, 15 91:20 94:4
**Garcia's** 61:22
**gather** 51:1
**gauge** 39:11
**general** 8:2 24:23 26:16 31:11
**Generally** 50:17 84:4, 8, 17
**gesturing** 57:3
**getting** 7:24 10:24 18:14 22:25 23:4, 5 33:5 49:17 75:9, 12 79:24 91:5
**give** 12:24 13:10, 16, 22 43:2 56:18, 21, 23 63:23 64:2 65:13 66:3 85:1 87:3
**given** 43:5, 13 49:7 73:11, 19
**giving** 33:1 53:6 57:1 66:7
**glasses** 37:2, 5
**go** 5:22 7:21 10:3 11:15 13:23 15:21 17:25 21:4, 16 22:16 26:12 28:14 29:13 36:7 75:14 79:25 83:15 88:9 94:10
**goes** 70:20
**going** 8:5, 25 13:22 14:19 19:13 22:25 23:8 37:7 38:16, 17, 23 42:16 46:18 47:5

48:7 50:14 52:7, 9 53:10 61:10 68:23 69:3 79:25 87:13 88:22 90:25 92:2 93:9 94:8
**Good** 4:13 5:10, 11, 12 8:11
**Gotcha** 11:23 20:25 63:22 82:12
**grab** 75:6 92:5
**graduated** 7:16
**Great** 46:23
**green** 22:13 25:18 26:1, 9, 17, 19, 24 27:3, 8, 11, 22 28:1, 9, 10, 13 38:17, 21 40:11, 13 49:10 55:24 59:11 69:7 90:13
**ground** 56:22, 24 67:2, 9, 12 68:24 69:2, 25 70:20, 25 71:4 76:3, 6, 9, 11 82:4, 6
**GUADALUPE** 1:5, 6, 7 4:16
**Guardian** 1:5, 7
**guess** 20:6 86:18
**gun** 15:22, 24 18:16 19:5 21:7, 13, 14 23:7 25:4, 6, 9, 15 26:14 31:11, 13 33:24 39:7, 17 41:9 50:13 52:6 60:16, 25 62:8 63:13 69:17, 21 70:2, 11
**gunfire** 82:14
**guns** 23:23 24:11
**gunshots** 58:7 61:7 64:5 68:21 69:2 73:9
**guys** 21:19 28:21 29:25 30:2 41:3 42:12, 16 55:22 70:21 71:5 87:3 92:14, 19

**< H >**
**habit** 62:25
**half** 35:2, 3 64:17
**hand** 56:10 70:19, 25 71:8 96:22
**handgun** 33:22
**handle** 29:13
**hands** 39:20, 23 43:7, 11, 14, 17, 20 48:20 59:9 60:11, 21 61:9
**handy** 84:22, 23
**happened** 20:7
**Harbor** 2:9
**harming** 85:13
**Hawthorne** 16:19 18:2
**head** 57:3 60:13
**heads** 87:4
**health** 24:16 80:6
**hear** 13:3 16:1 32:2 33:14 48:16 51:17 57:5, 8 64:5, 9, 21 65:13 69:5 81:13, 16 82:23, 25 83:24 92:1, 3, 8, 13
**heard** 48:13, 23, 25 49:6 81:10 92:4, 18
**hearing** 8:13
**heavily** 39:2
**heavy** 45:6 54:20
**held** 4:18
**help** 31:22 52:3 53:3
**helps** 10:20 23:1
**hereunder** 96:21
**Hey** 13:21 28:13 52:5, 17
**high** 7:16, 19, 21 8:7 30:11 79:1, 3 90:7, 22 91:7 92:1, 9 93:17
**H-I-G-H** 79:3
**higher-level** 33:7
**high-risk** 10:21 31:14 33:2, 11, 16 40:23 41:8, 24 42:3, 15, 18, 19, 21, 22 43:1 51:6, 11 52:4, 7 53:25 88:12 90:11, 12 93:4 94:17
**Hills** 2:4
**hip** 57:23 58:1, 4, 10
**hired** 9:12, 25
**history** 19:21
**holding** 71:16
**hope** 86:8
**hoping** 86:12
**hour** 4:3 5:22 46:19
**hours** 17:22
**hung** 18:12
**Hurry** 74:24 75:15, 18, 19, 22
**hurt** 21:10 46:4

**< I >**
**identifies** 56:13
**illness** 24:16
**immediate** 72:11 84:5, 9
**Immediately** 21:5 72:8 79:5 84:13
**imminent** 76:7 84:5, 9
**importance** 12:18, 21 89:13
**impression** 46:3 71:19 72:14, 16, 21 74:5, 8 75:2
**incident** 6:11 10:7, 8, 12, 17 12:25 13:2, 4, 6, 14, 17 14:9 15:16, 19 16:16 17:5, 21 19:4 23:22 24:3, 14 31:7 35:16, 19 36:18, 19, 22 37:10, 14 69:11, 14 71:23 80:14, 23 81:4, 8
**including** 12:2
**inclusive** 1:13
**increasing** 76:21
**INDEX** 3:1
**indicate** 19:8
**indicated** 25:19 36:13 48:20 51:12 52:17 76:2 81:13 98:6
**indicating** 85:12
**individual** 21:13 26:2, 6, 13 37:4 38:20, 24, 25 40:2, 11, 13 41:14 43:2, 5, 22 44:4, 7 45:17, 21 52:18 66:8
**individual's** 39:20 43:17
**indoors** 36:1
**ineffective** 36:20 37:1
**inflicted** 45:2
**influence** 83:13
**informa** 45:23
**information** 7:14 15:17, 19 16:6, 7, 9, 16 17:5, 20, 24 18:13, 17, 20 19:4, 12, 17, 20 20:2, 3, 8, 11 21:6, 8 25:21 26:5 27:9 38:20 44:6, 14, 18, 20 49:13 50:18, 22 51:1 52:5 73:5 83:12
**informed** 14:25 15:12
**initial** 15:16, 17 27:13 44:16 54:13 94:14
**initially** 29:6 91:19
**injured** 18:18 19:24 46:16 69:10, 14
**injuries** 44:25 46:11
**injury** 68:2, 5 76:7 84:6, 10, 14
**inserted** 63:6
**inside** 26:3 28:13 31:20 38:25 39:5, 7 46:13 70:8, 11
**inspect** 94:11
**instruct** 10:20
**insufficient** 75:10
**Insurance** 9:4
**intent** 84:13
**intentionally** 68:8
**interacting** 80:5
**interaction** 83:10
**Internal** 6:9 13:19 15:10
**intersection** 18:15 21:7 26:15, 16
**interview** 10:10 12:24 13:7, 10, 14, 17, 20, 22 14:1, 6 62:10 80:1 84:21 85:13, 18,

20 86:5, 19 87:13, 18 90:18
**introduce** 4:22
**introduced** 4:10 5:5
**investigate** 50:19 51:1
**investigation** 15:11
**investigator** 87:24
**involved** 6:19 14:10 20:5, 6, 15, 20 36:21
**involvement** 20:12
**issue** 5:24
**item** 71:7
**its** 94:9

< J >
**JASON** 1:12 2:14
**JCx** 1:10
**JESUS** 1:12 2:13
**Job** 1:24 30:16
**jobs** 8:25
**jogging** 59:2
**joined** 23:8
**joining** 11:10
**JONES** 2:8
**JULY** 1:20 4:3, 14 96:22
**justice** 8:3
**justify** 81:1 84:14

< K >
**Karen** 2:15 4:19
**keep** 33:3 63:3 74:19, 23
**kept** 26:3
**kill** 15:25
**killed** 44:9, 14 47:15, 20
**KIMBERLY** 1:23 4:5, 21 96:2, 24
**kind** 5:15 8:25 17:7 21:20 33:24 41:3 50:3 52:24 53:6, 9 61:16, 17
**knife** 25:1 43:19, 22 44:5, 25 45:21 48:2 56:10, 22, 24 57:20 58:3, 5, 10, 15, 18 71:19 72:1 85:15
**knives** 24:4, 12
**know** 5:17, 20, 24 7:23 8:14 13:16, 17, 19 14:3, 4, 14, 23 16:21, 25 19:23 22:21 24:22 30:8 32:12 34:17 60:1 62:7 64:24 65:6, 17 70:4 71:12 81:19, 23 87:25 88:6 89:6 90:20, 23 91:4 94:4

< L >
**landed** 82:8
**LAPD** 9:12, 14, 16, 19, 23 10:4 11:16
**large** 43:20 44:10 45:24 70:9
**Lassak** 83:21, 22
**launcher** 52:11 75:10, 12 86:7, 20 91:6, 13 94:7
**LAW** 2:3 10:11
**laws** 98:5, 6
**leading** 91:1
**learn** 65:9 71:21
**learned** 23:15, 19 65:1
**leaving** 71:14
**led** 44:11
**left** 31:12 54:1, 6 56:13 57:3 59:12 71:18 72:19, 25 74:11, 14 79:5 83:15
**LEONARDO** 1:7 19:16
**less-lethal** 12:3 30:24 33:6, 10, 15 37:25 38:3 41:23 52:10 75:6, 10 87:19, 21 88:5, 16, 20, 24 89:1, 10, 14 90:3, 8, 16, 20 91:24 92:2, 5, 10 93:7, 14 94:19
**lethal** 12:3, 11 30:24 31:16 32:6, 21 33:12, 17 37:23 41:13 52:3 53:9 88:13 93:6, 9 94:18
**lethal-cover** 31:25
**level** 58:10
**license** 49:12, 14
**lights** 41:19
**limited** 16:7 36:3
**limiting** 75:20 91:12
**line** 14:11 35:15 61:16 88:19
**lines** 86:2 87:15
**Listen** 14:21 25:10 38:6 39:13
**Litem** 1:6, 7
**Litigation** 4:20
**little** 7:13 8:24 10:24 11:24 13:8 15:15 22:16 25:12, 17 47:5 48:7 51:24
**load** 63:1
**locate** 26:8, 18, 23 27:8
**located** 6:1 27:22
**locating** 27:3, 11 28:1
**location** 21:1, 24 22:18 52:11 54:16
**locations** 53:24
**long** 9:14, 16 10:6, 24 11:1, 6 13:6 40:9 64:15 73:18 74:13
**look** 88:18
**looked** 61:19
**looking** 19:10 22:14 26:3 60:7, 8 85:1 87:14
**looks** 86:2
**Los** 9:7 23:11
**lot** 78:15
**low** 8:7, 8
**lower** 35:3
**lunging** 89:18

< M >
**M4** 37:17, 22, 23 49:21 62:22 68:9 94:1
**magazine** 62:21 63:4, 6, 13, 15
**Main** 26:13
**making** 27:24
**male** 22:13
**Mall** 16:20
**man** 15:22, 24 18:16 19:5 21:6 23:6 26:14 31:10, 13 39:7 41:9 50:13 52:6
**manipulating** 26:3
**man-with-a-gun** 22:24 42:25
**Maple** 18:15 26:15
**MARIA** 1:5, 6, 7 4:16
**MARKED** 3:9 78:13
**mass** 67:17, 18 68:1, 5 82:15
**mathematician** 63:19
**matter** 4:16
**maximum** 34:21 35:12, 13 62:23, 24
**MAYER** 2:8
**mean** 18:25 23:5 36:7 51:25
**medical** 72:3 73:24 74:1 82:22
**meet** 50:15
**meets** 11:18
**member** 11:7 23:10
**mental** 24:16 80:6
**mentioned** 6:25 25:17 49:7
**merely** 25:14
**method** 39:8, 11
**microphone** 10:24 81:6
**middle** 21:7 61:24
**midsection** 67:21
**mile** 17:1 18:5
**miles** 16:24
**military** 8:22
**mind** 45:1 61:21
**minor** 1:5, 6
**minute** 71:6
**minutes** 17:22 18:7 26:25 40:15 55:23 73:21 74:15
**missing** 44:18, 21
**misstates** 88:7
**mode** 34:23
**model** 34:17
**moment** 18:19 26:7 39:18 40:8 44:15

69:18 70:4
**MONDAY** 1:20 4:2
**months** 9:9, 17
**morning** 4:13 5:10, 11 6:1
**motion** 58:15
**moved** 47:20 53:13 54:4, 6, 12, 18
**movement** 58:18
**moving** 51:6
**multiple** 32:25

< N >
**name** 4:19 20:2 71:12
**named** 96:5
**near** 27:10, 25 28:8, 9 38:17 51:3, 8 54:9 58:1, 4
**necessary** 33:6
**need** 5:19, 23 7:23 20:17 22:24 25:3 46:7 52:11 75:19 87:1
**needed** 46:10
**negative** 45:13
**neighboring** 22:4 30:6
**neighbors** 47:9
**Never** 43:11 45:1 54:12 58:9, 12 69:21
**nods** 57:3
**normally** 93:23
**North** 2:9 54:7 57:14
**notes** 79:25
**notice** 82:13
**notified** 14:17
**number** 19:15 24:22 81:12

< O >
**oath** 4:11 5:6
**obeying** 69:9 92:21
**object** 14:19 70:25 90:25
**Objection** 18:23 29:8 74:1
**observations** 45:10
**observe** 39:11
**observed** 38:23 68:20 72:17 74:4
**obstructing** 76:21
**OC** 12:8 34:2, 14 35:18, 22, 24 36:14, 17 37:5, 10
**occupants** 59:18
**occurred** 16:24
**occurring** 30:10
**Officer** 5:10 9:20 10:19, 22 11:10 17:11, 14 28:5, 6, 8, 15, 22 30:13, 14, 17, 19, 21, 22, 23 31:4, 5, 8, 9, 16, 17, 25 32:2, 10, 14, 25 33:10, 15, 17, 18 41:2 42:6, 9 43:3 48:12, 13 49:2, 11 50:1 51:7 52:9, 21 54:3, 4, 7 61:21, 22 65:4, 19 71:11, 12, 13 72:6 77:8, 12, 13, 14 78:25 79:1, 10, 15 80:17 81:25 83:21 86:12, 15, 20 90:6, 11, 15 92:1 93:4 94:4
**officer-involved** 14:10
**officers** 6:20 10:21 14:4 23:6 25:24 26:11 29:4 30:2, 5, 11 31:3, 15, 18 32:6, 25 33:3 36:11 39:11 40:17 41:21 52:19 53:19, 23 61:13 64:21, 24 65:3 66:14 69:13 72:10 73:21, 23 75:9 80:13 81:11 86:6 88:13 90:7, 22 91:7, 19, 23 92:9, 13 93:5, 6, 8, 17 94:14
**OFFICES** 2:3
**offset** 54:1, 6
**Oh** 9:5 15:5 28:18
**Okay** 5:15, 24, 25 6:4, 22, 25 7:3, 6, 10, 13, 14 8:1, 4, 14, 16, 21, 24 9:5, 8, 11, 14, 21, 25 10:3, 6, 10, 15 11:6, 12, 15, 23, 25 12:1, 14, 17, 24 13:13, 25 14:3, 6, 17 15:5, 12, 15, 17 16:15 17:2, 7 18:8, 20 19:7, 11, 17, 20 20:1, 18, 20, 25 21:16 22:2, 6, 9, 16 23:8, 14 25:4, 17, 21, 25 26:8, 18 27:2, 10, 21, 25 28:3, 18, 21, 25 29:21, 24 31:6, 24 32:2, 5, 12, 17 33:14, 19, 20 34:4, 7, 11, 19, 22 35:15, 24 36:4 37:13, 16 38:8, 16, 18, 19 39:19, 22 40:2, 5, 9, 20 41:6, 20 42:7, 11 43:1, 4, 8, 13, 21 44:3, 24 45:4, 11, 20 46:18, 20 47:5, 23 48:3, 7, 13 49:9, 17, 21 50:3, 6 51:3, 8, 24 52:23 53:13 54:9, 14, 22 55:4, 11, 17, 18 56:1, 7, 18 57:1, 5, 10, 16, 19, 25 58:3, 9, 12, 14, 23 59:4, 17, 21 60:13, 16, 22 61:12, 23 62:2, 5, 7, 13 63:3, 9, 12, 17, 22 64:1, 5, 8, 11, 15, 24 65:6, 12, 20 66:11, 18, 21 67:6, 9, 15 68:14 69:1, 5, 10, 16 70:11, 24 71:7, 25 72:3, 20 73:8 74:7, 13, 19 75:16 76:13, 20, 24 77:7, 15, 18, 21, 24 78:1, 8, 22 79:24 80:2 81:19 82:12, 19, 22 84:2 85:12, 17, 20 86:5, 24 87:4, 5, 13, 17, 18, 24 88:4 89:10, 18, 21 90:1 92:6, 18, 22 94:1, 13, 20
**onboard** 16:12
**Once** 21:8 29:14 31:20 55:1 72:6 75:9
**ones** 27:19 28:16 88:13
**oOo** 1:3 2:15 3:10 4:1 95:2
**open** 39:1 43:6, 11, 13, 15 55:3 59:12 79:11
**opening** 22:14 38:21 39:4, 10, 16, 19, 22 40:6 47:24
**opens** 43:18
**operators** 22:12
**opportunity** 84:13
**opposed** 35:25
**opposite** 36:10
**option** 75:7 87:21 89:1 90:3, 16 92:5
**options** 25:8 33:6, 7 84:19 87:19 88:16, 20, 25 93:14
**order** 41:25 54:19 63:9
**ordered** 42:4 48:10
**ordering** 94:23
**Oregon** 15:23 18:15 20:5 26:15
**original** 96:16
**outcome** 35:4
**outdoors** 35:25 36:2
**outside** 26:4 29:12 40:17
**owner** 49:15

< P >
**P.D** 10:1, 4, 7, 16 11:6, 16, 20
**p.m** 17:23 87:8, 11 95:1
**PAGE** 3:3, 5 85:25 86:1 87:14, 15 88:18, 22
**PAGE/LINE** 97:2
**pants** 59:8 60:24
**park** 27:10, 25
**parked** 28:4, 8 40:10
**parking** 28:9
**part** 16:9, 12 20:19 29:18 32:24 39:24 46:10, 14, 15 60:19 62:17 66:5 76:13 80:8, 19, 25 82:19 90:10 93:3, 14
**participate** 72:9
**particular** 35:5 50:10

**partner** 17:8, 10 18:3 26:11 42:9 51:7
**partners** 63:25
**partner's** 17:16
**party** 20:6, 16, 18, 20
**passed** 26:21 40:14 71:4 74:9
**passenger** 32:19 49:24 50:1, 4 51:4, 9 53:20 54:4, 15, 22, 23, 25 55:8, 14 70:10 79:11 82:9, 10, 11
**patrol** 9:20, 22 10:18 11:1, 5, 10 17:7 29:11 42:10 51:11 54:5 63:6 82:8 86:16 93:24 94:2, 5, 10
**patted** 69:25 70:3
**Pause** 8:10 64:12, 14 85:2
**paused** 64:16
**penalty** 98:4
**people** 80:5
**pepper** 12:9
**period** 11:9 18:9 40:21
**perjury** 98:4
**permanent** 11:4
**person** 28:13 31:12 34:5, 12, 14 41:9 52:16 60:5, 9, 18 61:4 66:1 69:17 70:3 90:12 96:20
**pertains** 96:15
**phone** 18:14 19:15 26:13 44:16
**physically** 19:24 69:10, 14 76:20
**pieces** 33:8
**ping** 18:14
**pings** 18:14 26:13
**pistol** 34:1
**pistols** 23:18
**place** 20:7, 22 21:4, 9, 17, 20 47:6 96:8, 14
**plain** 70:14
**Plaintiff** 1:9 2:2
**plaintiffs** 5:1
**plan** 12:21 40:21, 25 41:6, 8, 13 70:21 71:2 72:5 90:10
**planned** 31:1
**planning** 23:17
**plate** 49:12, 14
**plates** 49:9
**play** 78:5
**played** 78:6, 20
**please** 4:22 5:17, 20 20:14 87:14
**pockets** 60:23 61:10
**point** 8:13, 16 9:25 12:24 17:12 18:25 19:11 21:1 26:8, 18 27:10 29:1 30:1 32:14 33:14 36:24, 25 37:16 38:13, 18 40:5 41:17, 18, 25 42:17 43:22 44:3, 7, 13, 17, 22, 23 45:4, 17 47:23 48:1 53:1, 10 55:18 56:4, 16 57:6, 12, 17 59:21 60:8, 16 61:7, 12 62:2 64:25 65:4, 9 67:4 68:14, 23 69:3, 16, 24 70:20, 24 71:7, 14 72:3 73:11 74:5, 7 75:3, 4, 24 76:2, 8, 16 77:5 86:7, 14, 20 87:19 88:21, 25 91:4
**pointed** 57:23 58:19
**pointing** 69:8
**points** 31:19 35:1
**Police** 6:2 8:17, 19, 21 9:7, 20 11:2, 13 19:14 93:3
**policies** 6:11
**policy** 14:15, 16, 18 15:1, 9
**pool** 45:24
**portion** 90:18
**posed** 76:6
**position** 11:4 39:9 49:24 50:1, 9 51:3 52:20 54:12 55:4 58:5 88:11 91:8
**positioned** 54:15 61:24
**positions** 32:9 39:12
**positive** 35:4
**possibility** 44:4 47:15
**possible** 21:6 41:10 46:2, 7 70:5
**possibly** 17:22 19:15 21:10, 25 23:6 26:2 31:13 44:8, 9, 11 46:4, 5 47:18 52:6 93:10
**POST** 11:19
**potential** 18:16 36:12 42:24
**POWELL** 2:8 5:2 8:5, 8, 11 14:19 18:23 25:10 29:8 38:6 39:13 45:12 74:1 85:1, 10, 25 86:3 87:5 88:7 89:25 90:2, 5 91:2, 14 92:24 93:2, 19 94:21, 22, 24
**POWELL....................** **...90** 3:5
**power** 23:7 50:15
**preparation** 6:5 51:13 85:7
**prepare** 86:22
**prepared** 86:17
**PRESENT** 2:12 13:25 41:21 96:6
**press** 68:8
**pressure** 72:11
**prevented** 45:6
**previously** 7:4
**primarily** 9:2
**primary** 27:13, 15, 16 29:1, 2, 3, 5, 6, 7, 17, 22 30:18
**Prior** 8:21, 25 14:9 23:22 24:3, 10, 11, 14, 17 27:23 28:9 30:8 35:16, 18 39:6 47:6 48:23 49:5, 11, 17, 22 51:6 58:7 59:17 61:7 64:5 65:14 68:16, 17 71:14 73:9 74:20 75:11 80:13 81:14 83:13
**probe** 35:2
**probes** 34:19, 20
**problem** 31:23
**proceeding** 56:14 67:5 68:22
**proceedings** 96:14, 17
**Prone** 82:5
**prongs** 35:6, 8, 9
**provide** 16:5, 7 73:24
**provided** 20:3 88:21
**puncture** 72:11
**put** 70:21

**< Q >**
**quarter** 35:12
**quarterback** 51:19, 25 52:15, 17, 20, 25 53:2, 5
**quarterbacking** 52:23
**question** 5:16 14:21, 24 25:10 38:6, 7 39:13, 14 59:25 60:1 72:20 88:10 94:8
**questions** 80:1 89:23
**quick** 78:17

**< R >**
**rack** 63:10
**radio** 16:10 20:10 22:12 25:23 28:12 33:4 44:1 45:20 49:12 52:10 90:14 92:7
**raise** 58:10
**RAMIREZ** 1:8
**RAMONA** 1:8
**range** 34:21 35:13, 14, 22 36:14 91:12
**rapid** 10:22 64:11
**rapidly-evolving** 46:8
**razor** 70:15, 17
**reach** 61:6
**react** 75:21
**read** 87:16 98:3
**readily** 34:9
**ready** 55:2 63:6 75:14, 17

**really** 78:17 91:16 93:20
**rear** 21:23
**reason** 26:13 29:21 32:24 46:14 97:2
**reasonable** 31:12 66:1 84:18
**reassess** 64:18 80:19
**recall** 7:18 13:2, 4, 6 15:3, 18 16:15, 17 17:19 43:4, 8 49:8, 13, 15 65:20 69:2 70:17 75:8 81:10, 12 82:3, 5 83:9 85:12, 17, 20 87:23 88:10 89:3
**receive** 12:14 18:17 19:11 27:6 50:17, 22 73:5
**received** 15:19 16:5, 16, 22 17:5, 20 18:21 19:2 21:8 26:5 27:2 39:7 44:14 93:17
**receiving** 17:24 20:8 25:21
**recognize** 19:18 83:3
**recollection** 75:8
**record** 4:10, 14 46:24 47:2 78:10 79:21 87:7, 10 94:25
**recorded** 4:15 84:21
**recovered** 70:2
**refer** 85:23
**REFERENCE** 3:5
**referenced** 48:4
**regarding** 6:10 15:22 17:20 18:10 48:3 88:11
**regards** 35:24 65:21 66:6 72:20 80:4
**registered** 49:15
**related** 12:25
**relating** 15:19 16:16
**relation** 22:22
**relatively** 17:2
**relieved** 73:22
**remain** 54:19 55:11
**remained** 55:14
**remember** 22:18 47:7 51:14 74:21, 25
**REMEMBERED** 4:2
**remorse** 56:12
**REMOTE** 1:18 2:1 4:15
**remotely** 4:4 96:6
**remove** 62:23
**removed** 71:7
**rendered** 72:3
**rendering** 73:12, 20 82:22
**repeat** 13:3 14:24 20:14 59:24 81:5 83:24 88:23
**rephrase** 60:2 66:5
**report** 73:3
**Reported** 1:22 4:8 96:9
**Reporter** 4:6, 9, 20, 23 5:4 6:8 79:2 96:19
**REPORTER'S** 1:17
**reporting** 20:18
**reposition** 42:12 76:17, 25
**repositioned** 42:1, 5, 10 53:14, 16, 24 54:11
**repositioning** 42:7
**repositions** 53:18
**represent** 4:23
**request** 46:5, 9 49:19 86:9, 21 88:15 92:4
**requested** 45:23 46:6, 15 52:10 73:8, 16 75:4 90:14 96:18
**requesting** 23:1 33:4 41:18 93:12
**requires** 31:15
**resorting** 89:15
**resources** 23:5 31:22 33:4 41:10 93:12
**respect** 84:3 90:2
**respond** 23:2, 6 49:20 50:19 52:11 91:8
**responded** 21:9 83:16
**responding** 18:1 23:20 27:19 33:5 75:5 90:9, 15, 22 92:4 93:13
**response** 57:2 86:8 87:23 88:1 89:3, 8
**responsibility** 53:6
**responsible** 81:1
**retired** 79:1
**retrieve** 61:10
**return** 22:7
**review** 6:4, 5, 13, 14, 15, 18 14:18 15:7, 13 71:24 96:17
**reviewed** 6:7 15:1, 4 51:13 85:7
**reviewing** 62:15, 19 74:19
**rifle** 37:17, 24 50:10, 14 51:20 53:10 68:9 94:1
**rifles** 23:17
**right** 10:13 15:4 29:6, 17 51:5 56:10, 13 57:3 78:23 79:18 91:14, 19 94:21
**road** 65:1
**role** 31:6 32:3 53:9, 11
**roles** 30:23 31:3 41:12, 16, 17, 22 52:4, 19, 22 53:1
**round** 62:7, 17 63:8, 10, 12, 14 66:11, 18, 23, 24 67:1, 3
**rounds** 62:23, 24 63:13 64:14, 16, 19 67:7
**RPR** 1:23 4:6 96:24
**rules** 5:16
**run** 49:9 57:14
**running** 58:25 85:22 86:7, 13, 20 87:20 89:1

**< S >**
**safe** 12:21, 23 73:16 76:25 77:2 80:20
**safely** 71:2 72:7
**saw** 10:10 39:4 44:25 45:16 48:2 58:9, 12 69:21 76:2 82:16 83:2
**saying** 20:4 28:12 47:24 65:20 75:18
**says** 87:24 88:20
**scenario** 87:20 88:21, 25
**scene** 16:23 18:6 19:3 21:2 47:6 49:20 71:14, 18, 25 73:16 74:8, 11, 13 83:15 86:13 92:10
**school** 7:16, 19, 21 23:12, 15
**screen** 78:3, 18 85:5
**screwdriver** 71:15, 22
**search** 21:16, 19, 22 22:9
**searched** 21:7
**searches** 10:22 23:20
**searching** 21:12 22:3 26:10, 22 27:23 70:13
**seat** 40:3, 4 45:18, 19 70:10
**seated** 26:2
**Second** 28:2 35:13 64:17 66:21, 23, 24 67:1, 3 72:21 77:22 85:1
**secondary** 27:12
**seconds** 28:17, 19
**secured** 93:25 94:7
**see** 21:10, 13 28:7 38:25 39:5, 17, 20, 23 40:6 43:6, 10, 14, 17 45:5, 6, 8 47:25 56:4 58:5, 14, 17, 23, 25 59:2, 7, 18, 22 60:5, 11, 13, 16, 18, 20, 22 61:2, 6, 9, 17 67:19 68:14, 23 69:13, 16 70:8, 11, 15 71:15 72:18 73:2 78:3, 18, 22 81:3, 7 82:19 83:6 86:10 87:2 88:2, 19 89:14, 18

**seeing** 6:25 58:3
**seen** 26:6 45:21, 24
**self-dispatched** 29:15
**senior** 30:14, 21, 22
**separate** 11:20 35:6 74:16
**September** 8:20
**serious** 68:2, 5 76:7 84:6, 9, 14
**service** 9:2
**set** 4:2 35:8, 9 61:21
**sets** 34:20
**seven** 13:13, 16
**severely** 46:4
**shared** 85:5
**SHEET** 97:1
**Sheriff's** 23:12
**shield** 33:6
**shirt** 59:8
**shoot** 19:6, 10 25:1, 6, 8, 14 44:7 65:22, 23 66:3 68:1 75:24
**shooter** 23:20
**shooters** 10:23
**shooting** 14:4, 10, 14, 25 15:9 16:23 30:9, 10 68:4, 16 73:19 74:14 76:14 82:14 83:13
**Shorthand** 4:6, 9 5:4 96:10
**shorts** 60:24
**shot** 19:8 21:10 66:9, 22 69:21 72:13, 14, 21 77:4, 11, 22 81:1, 19, 23 82:1
**shotguns** 23:18
**shots** 62:5, 6, 11, 14, 16 64:9, 11, 13 67:10, 13, 16, 23 73:6 80:20 81:10, 14, 16 82:16, 19
**show** 43:14 48:20 77:24 78:17
**side** 49:25 50:1 54:2, 3 57:21, 23, 25 58:4 60:8 72:19, 25 79:12, 16 82:9, 10
**Similar** 72:25
**Simultaneous** 36:5
**simultaneously** 64:10
**single** 56:10 61:20
**sir** 5:11, 14, 18, 21 6:7 7:7, 12 8:23 9:13, 24 10:5 11:3, 11, 14 13:5, 19 14:13 16:3 17:6 32:4 33:21 35:17, 20 37:12, 15 38:15 47:8 49:23 53:17 72:23 73:4 78:2, 19 80:3, 12 83:5, 11, 14, 19 84:23 87:6 88:1 89:8 91:21, 25
**sirens** 41:19
**sit** 62:13
**situation** 31:10, 15 37:3 46:8 50:12 52:2 93:11, 13 94:13
**situations** 53:4
**six** 9:8
**skip** 5:15
**slashing** 58:17
**slowly** 22:24
**Solutions** 4:20
**somebody** 19:8 25:1, 5, 9, 14 30:25 41:1 42:5 44:7, 11 46:4 53:1 68:1, 4 71:10 74:20, 24 75:2, 14, 16 83:17
**Sorry** 36:7 65:13 66:5 81:6 83:24
**sound** 10:13
**sounded** 81:5
**sounds** 57:8 63:19 82:23, 24
**source** 16:9
**south** 57:14
**space** 54:25 55:3
**speakers** 36:5
**speaking** 50:17
**specific** 8:1
**specifically** 48:4, 5, 11 92:8
**specified** 96:8
**specify** 20:19
**speculation** 14:20 74:2
**spotted** 25:18
**spray** 12:8, 9 34:2, 14 35:18, 22, 25 36:14, 17 37:5, 10
**ss** 96:1
**stabbing** 58:15
**Staccato** 33:25
**stage** 46:6
**standards** 11:19
**standing** 66:19
**stare** 56:12
**staring** 56:1, 10
**start** 18:1 26:23 33:4 52:4
**started** 46:21
**starts** 31:17 52:21 88:19
**State** 4:6, 22 96:1 98:5
**stated** 15:23 20:13 26:14
**statement** 45:9 85:4, 7 86:18 88:8
**statements** 44:16
**STATES** 1:1
**stating** 85:17, 20
**Station** 6:2 83:16, 17
**stay** 48:11, 14
**STENOGRAPHER** 78:12 94:22
**STENOGRAPHIC** 1:17 96:19
**Stenographically** 1:22 4:7
**step** 43:11 50:5
**stick** 61:9
**sticking** 60:22 61:2
**stop** 28:18 41:9 42:17, 19, 21, 23 52:4 54:13 65:22, 23 66:3 68:3, 7, 14, 15 76:3
**stopped** 27:21 38:16 55:23 67:4, 6 68:19 69:15 76:5, 10, 13 81:16, 18
**stopping** 28:9
**stops** 10:22 43:1
**stored** 37:19
**stores** 9:3
**straight** 61:16
**street** 57:14
**strike** 6:4 9:15, 21 57:10 72:18
**struck** 72:14, 22, 24 73:6 82:13
**stuff** 23:14
**subject** 8:1 22:13 36:12
**subscribed** 96:21
**succession** 64:12
**suffering** 24:15 80:5
**sufficient** 22:25 33:12
**Suite** 2:4
**supercede** 11:5
**supervisor** 30:19
**Sure** 8:7 13:4 14:25 21:25 41:10 45:13 59:25 66:6 73:15 85:24 94:12
**surrounding** 21:8 22:10
**suspect** 32:9 50:11, 15 52:13 54:8, 20 55:2
**suspected** 20:21
**suspects** 23:23 24:4, 15 42:20
**suspect's** 54:2
**suspicion** 31:12
**SWAT** 10:20 11:2, 3, 7, 10 23:9, 10, 12, 15
**swear** 4:24
**sworn** 96:6
**system** 86:16

**< T >**
**tactical** 12:21 23:16 40:21, 25 41:6, 8, 13 70:21 71:1 72:5 90:10
**tactically** 76:17, 25
**tactics** 10:21 12:18 18:2 22:17, 22 23:17, 19 31:14 33:2, 11, 16 40:24 41:24 42:3, 15 51:6, 11 52:6, 7

53:25 80:8 88:12 90:12 93:4 94:17
**take** 5:19, 22, 23 10:15 16:1 22:24 46:19 49:24 50:1, 9 55:2 86:15, 24 87:2
**taken** 5:13 7:4 47:1 53:9 87:9
**takes** 23:12
**talk** 11:24 15:15 18:2 38:24
**talked** 23:1, 4 28:12
**talking** 51:18, 22 64:25
**Taser** 12:6 34:4, 5, 15, 17, 18, 22 35:1, 5, 15 37:14
**team** 10:20 11:7 93:15
**tell** 8:24 49:3 66:8 92:1, 8
**telling** 75:15
**ten** 17:22
**tend** 39:8
**ten-minute** 46:19
**terminated** 47:18
**testified** 7:6
**testify** 96:6
**testimony** 6:9 44:24 69:1 96:9
**Thank** 5:12, 25 55:17 60:3 79:20 84:2 87:6
**thereof** 4:4
**thing** 25:4
**things** 22:24 50:18
**think** 10:10 15:3 36:13 41:12 44:3 45:12 47:25 48:19 51:12 53:16 55:21 65:12, 23 75:14, 16, 24 78:14 80:1 81:13 86:6, 19, 25 88:7, 18 89:21 92:12
**third** 30:5, 8 49:19 75:5 90:9, 16 94:18
**thought** 47:14, 20 61:3 85:13, 21
**thousand-mile** 56:12
**threat** 33:7 68:3, 7, 18 69:15 76:7 84:9 88:14 93:10
**threaten** 69:6 84:5
**threats** 23:21
**three** 9:17 10:9 48:24 56:25 62:11 73:21
**time** 5:19 7:5 10:7, 8, 12 11:9 17:9, 19 18:3, 4, 9, 24 26:6, 21 27:7 28:22, 24 30:16 31:4, 21 37:1 40:14, 16, 21 41:11 44:19 48:18 52:8 56:2 68:17 69:20 71:4 75:10, 21 86:15 90:20, 23 96:8
**timelines** 13:20
**times** 7:3, 8, 9 24:1, 2, 7, 9, 10, 11, 19, 20 40:6 48:16, 22, 24 50:23 56:23, 25
**timing** 13:18
**tint** 45:6 54:21
**tinted** 39:2
**tire** 82:11
**today** 6:6 51:14 62:13 69:1 85:8 89:23
**Today's** 4:14
**told** 19:3 22:4, 6 27:2 42:12 47:9, 13, 19 48:11 49:3 55:21 91:11 92:15, 16, 18
**tools** 33:6
**top** 60:13 87:14
**TORRANCE** 1:11 4:5, 17 6:2, 3 10:1, 4, 6, 16 11:1, 6, 13, 16, 20 16:21 19:14 46:6 73:8, 12 93:3
**Torres-Corona** 2:15 4:19
**torso** 82:16
**total** 10:11
**totality** 25:7
**touch** 34:23
**TPD** 19:13 78:11
79:22
**traffic** 10:21
**trained** 12:2, 5, 8, 11, 17, 20 24:25 25:5, 14 35:24 37:5 64:1 66:6, 8 80:13 84:4, 8, 17 89:13
**trainee** 22:17 65:7 79:17
**trainees** 31:4
**training** 10:19 11:24 12:14 17:12, 14, 17 23:9, 17 24:25 25:5, 13 31:3 35:21 37:4 39:6 50:6 64:1 66:2 67:25 68:4 76:24 79:15 80:4, 8, 11, 16, 19, 25 89:10 93:3, 16
**transcribed** 96:10
**TRANSCRIPT** 1:17 96:13, 16, 18
**transcription** 96:11
**transition** 11:16 37:17
**transitioned** 11:2 31:14 33:17 40:23 42:2 70:5
**transported** 83:23
**travel** 18:5
**traveling** 18:8 19:2
**treat** 46:12
**treatment** 46:10
**trigger** 68:8
**trouble** 8:13
**true** 53:2 96:12 98:6
**trunk** 37:19 38:4, 11 49:22
**truth** 96:7
**try** 25:12 31:21 36:17 50:19 60:1 76:16, 24 81:3, 7
**trying** 24:22 25:13 80:22 85:4
**turn** 87:14
**Twenty-five** 63:15
**twice** 68:8
**two** 23:13 32:12 34:20, 25 35:5 40:15 49:18 50:5 52:2 55:22 61:24 62:6, 14, 16, 24 63:20 64:8, 11, 12, 16, 18 92:9 94:15
**two-minute** 40:16, 20
**type** 29:13

**< U >**
**ultimately** 15:1
**understand** 5:17 15:7 20:21, 22 24:21 28:7 29:24 31:24 32:5 37:9 38:10 42:11 44:24 47:21 56:1 60:1 69:3 77:19 83:10
**understanding** 24:23 32:17 35:22 89:16 90:6, 21 93:5
**Understood** 56:2
**unit** 27:12, 13, 15, 16, 17, 18, 21, 25 28:3, 8, 21 29:1, 2, 3, 5 30:5, 8, 18 49:19 52:3 75:5, 12 79:9, 12 90:9, 15 92:4 94:18
**UNITED** 1:1
**units** 22:25 29:10 33:5, 12 41:19 46:1 52:13 88:15 93:13
**update** 27:3
**updates** 18:9, 11 27:6
**upper** 35:2 67:20 72:19, 25
**upright** 66:19
**use** 12:2, 5, 8, 11, 15 35:22, 25 36:17 38:14 39:8 42:15 74:20, 24 75:17 84:3, 4, 10, 14 89:15
**usually** 5:22 63:1
**utilize** 31:21 50:11 52:12 89:14

**< V >**
**vague** 18:23
**VALENZUELA** 2:3 4:25 5:9 6:12 8:5, 7, 12 14:22 18:25 19:1 25:11 36:6 38:9 39:15 45:15 46:18, 23 47:4 74:3 78:7,

10, 14, 16, 21 79:3, 4, 21, 23 84:25 85:3, 6, 11 86:1, 4, 24 87:12 88:17 89:21, 25 90:1, 19, 25 91:15, 16, 18 92:23, 25 93:20, 22 94:20
**VALENZUELA..................5** 3:4
**vantage** 31:19
**various** 40:6
**vehicle** 6:23 16:13 21:19, 24 22:7, 10 27:4, 7 28:12 29:1, 25 31:13, 20 32:8, 10, 15, 16, 18 34:10, 11 36:21 37:16, 21, 24 38:1 39:1, 5, 7 40:7, 12, 17 42:4, 7, 8, 10 43:12 44:10 45:7 46:1, 4, 13 48:14, 23 49:5, 11, 16, 18, 22, 25 50:2, 6, 12 51:4, 9 52:14 53:13, 14, 18, 20, 24 54:1, 2, 5, 7, 8, 10, 11, 14, 18, 20, 23, 25 55:1, 5, 9, 12, 15, 19 56:5, 8, 9, 19 57:17 59:4, 10, 11, 19 70:5, 7, 8, 12, 13, 16 73:15 82:8 83:22 86:16 91:10, 22 93:11 94:7, 9
**vehicles** 6:23, 24 30:3, 4 42:1, 14 51:11 94:6, 11
**verbal** 63:23 64:2 65:14, 17, 21, 24 66:3, 7
**verbally** 57:6 69:5
**versus** 4:17
**vest** 34:3
**victim** 70:6
**VIDEO** 1:18 4:15 6:16 51:17 78:3, 6
**Videographer** 2:15 4:13, 19 46:24 47:2 87:7, 10 94:25
**videos** 6:13, 15 51:13
**view** 23:2 70:14 83:7
**visual** 31:20 54:19
**visually** 72:17
**voice** 33:3
**volley** 62:16
**volume** 8:6
**voluntary** 14:7

**< W >**
**waistband** 61:6
**wait** 91:7
**walk** 58:20 61:13 68:18 92:14, 19, 20
**walked** 61:20
**walking** 57:10, 12, 17, 18, 20 58:24 59:21 60:4 61:16, 19 66:12, 13, 22 67:4 68:15, 20 76:17
**want** 7:13 15:16 33:3, 19 37:8 41:10 51:19, 25 52:15, 17 53:5 65:22, 23 77:24
**wanted** 26:12 44:7
**warning** 63:24 64:2 65:14, 18, 21, 24 66:3, 7
**watch** 56:2
**way** 22:18 33:3
**weapon** 14:11 26:5 61:3, 10 62:3 64:6 65:10 69:8 70:18 74:21 77:3
**weapons** 37:21, 23, 25 64:22, 25
**wearing** 37:5 60:6, 17, 25
**week** 13:8, 13 47:12, 14, 20
**weeks** 23:13
**weird** 10:25
**well** 6:11, 17, 20 12:12 16:21 23:5 36:9 39:3 46:5 50:16 52:9 63:5 73:13 82:8, 10 84:24 86:18 93:17
**went** 7:23 21:22, 24 47:6 49:21 69:24 70:7, 25 71:4 82:5
**We're** 4:13 8:11 45:16 46:24 47:2 52:5, 12 79:24 87:7, 10
**west** 57:15, 18, 19
**westerly** 58:20, 24 59:22 60:4 61:13 68:15 76:18
**western** 66:15
**We've** 46:18
**wheel** 82:8, 10
**WHEREOF** 96:21
**wind** 36:9
**window** 45:6 54:20
**windows** 39:2
**WISSLER** 1:11 2:13 28:6, 16, 23 30:1, 13 31:4 32:3, 10, 14, 18, 21 33:15, 17 40:18 48:12, 13 49:2, 12 54:3, 9 55:11 61:22 65:4 77:8, 11, 13, 22 79:9, 10 91:20
**Wissler's** 28:8 50:2 51:4, 9 53:20 54:7 55:1, 15
**within-entitled** 96:7
**WITNESS** 3:2 4:24 5:7 6:9 29:10 38:8 46:22 87:6 88:10 96:5, 9, 21
**wondering** 46:14
**Woodland** 2:4
**words** 42:22 51:20 52:16 60:7 66:4 74:24 75:23 82:4
**work** 9:14, 16 44:21
**worked** 13:18 18:13 20:4
**working** 9:19 17:8
**wounds** 72:11, 12
**wrist** 43:23 44:5 45:1, 22 46:11 48:4 59:8 85:14
**wrists** 46:16
**wrong** 55:22

**< Y >**
**yeah** 50:5 65:5 86:1
**year** 7:18 8:19 9:17 11:8, 9
**years** 10:9, 12
**yelled** 75:22
**yelling** 74:20, 23 75:13

**< Z >**
**zigzagging** 61:17
**Zoom** 4:18

WORD LIST

< 0 >
00040 (1)
00099 (1)

< 1 >
1 (1)
10:02 (2)
10:56 (1)
11 (1)
11:07 (1)
11372 (2)
12 (4)
12:02 (1)
12:12 (1)
12:21 (2)
13 (1)
13th (2)
15 (2)
16 (1)
1700 (1)
19 (1)

< 2 >
2:25-cv-03389-JLS (1)
20 (1)
2010 (1)
2011 (1)
2019 (1)
2024 (2)
2026 (5)
21800 (1)
22 (2)
24 (3)
25 (1)
26 (2)
26th (1)
28 (2)
28993 (1)
2909 (2)
2nd (1)

< 3 >
3 (3)
30 (3)
310 (1)
347 (1)
36 (2)
3777 (1)

< 4 >
40 (9)
40-milimeter (2)
40-millimeter (22)

< 5 >
5 (2)
5:00 (1)
52 (2)
53 (3)

< 6 >
6-10 (1)

< 7 >
7 (2)
714.446.1400 (1)

< 8 >
818.347.3333 (1)

< 9 >
9 (3)
91 (1)
911 (2)
91367 (1)
92835 (1)
93 (2)
9-millimeter (1)
9th (1)

< A >
A.D (2)
a.m (4)
ability (1)
able (4)
academy (14)
accessible (1)
accidental (1)
accurate (1)
acting (1)
action (2)
active (2)
actual (2)
Ad (2)
Adam (3)
addition (1)
additional (6)
adjust (1)
adjusting (1)
administer (4)
administered (2)
administering (2)
Administrative (1)
admonishment (1)
advance (4)
advancing (1)
advised (1)
advising (1)
aerial (1)
Affairs (3)
affect (1)
agents (1)
ago (3)
agree (2)
ahead (3)
aid (11)
aiming (1)
al (1)
alcohol (1)
alive (3)
allow (1)
allowed (2)
allows (1)
ambiguous (1)
Amo (1)
amount (1)
amounts (2)
amp@jones-mayer.com (1)
ANGELA (3)
Angeles (2)
angle (3)
angled (1)
answer (6)
answered (1)
answers (1)
anybody (17)
apologize (1)
apparent (1)
appear (1)
APPEARANCES (1)
appeared (2)
apprehend (2)
apprehended (1)
approach (2)
approaching (1)
appropriate (1)
approximate (3)
Approximately (42)
area (29)
areas (1)
armed (6)
armor (1)
arms (3)
arrest (1)
arrive (8)
arrived (7)
arrives (1)
ARTURO (6)
asked (6)
asking (1)
assign (2)
assigned (20)
assigning (2)
assignment (1)
assignments (4)
assist (2)
assisting (2)
associate's (1)
assume (1)
assuming (1)
attempt (1)
attempted (1)
attend (3)
attending (3)
attention (1)
attorney (3)
autopsy (1)
available (4)
Avenue (1)
awaiting (1)

< B >
back (25)
background (2)
backing (2)
backup (2)
backwards (1)
bad (1)
baggy (4)
Based (35)
basically (5)
Bates (1)
Bates-stamped (1)

**baton** (4)
**began** (3)
**begins** (1)
**behalf** (2)
**belief** (1)
**believe** (16)
**believed** (1)
**belonged** (1)
**belt** (1)
**BERMUDEZ** (25)
**Bermudez's** (1)
**best** (1)
**better** (4)
**biggest** (1)
**bit** (10)
**blade** (2)
**bleeding** (2)
**blood** (12)
**bloody** (1)
**blowing** (1)
**board** (1)
**bodily** (6)
**body** (16)
**Body-worn** (2)
**bottom** (1)
**Boulevard** (2)
**breaching** (1)
**break** (7)
**briefly** (4)
**bring** (4)
**broadcasted** (4)
**broke** (1)
**brought** (2)
**building** (2)
**bulge** (1)
**bullets** (1)
**Burbank** (1)
**burglarizing** (1)
**burglary** (3)
**business** (12)
**businesses** (1)
**butt** (1)
**BUTTE** (1)
**buttocks** (1)

**< C >**
**CALIFORNIA** (8)
**call** (27)
**caller** (5)
**Calls** (6)
**call-taker** (1)
**cam** (9)
**camera** (4)
**capacity** (2)
**car** (26)
**cardinal** (1)
**cars** (1)
**cartridge** (3)
**cartridges** (1)
**Case** (4)
**cases** (1)
**CASTILLO** (8)
**cause** (3)
**Center** (5)
**CENTRAL** (1)
**Certified** (6)
**certify** (1)
**challenge** (1)
**chamber** (5)
**chance** (2)
**CHANGE** (1)
**changed** (3)
**Charger** (23)
**check** (2)
**checking** (1)
**chest** (5)
**Choi** (9)
**circumstances** (2)
**CITY** (3)
**civil** (1)
**clarification** (2)
**clarify** (1)
**clarifying** (1)
**clear** (4)
**clearance** (2)
**cleared** (2)
**clearing** (1)
**client** (1)
**close** (6)
**closed** (4)
**closely** (1)
**closer** (3)
**closes** (2)
**closest** (3)
**closing** (10)
**clothing** (3)
**co-counsel** (1)
**CODY** (2)
**cognizant** (1)
**collapsible** (1)
**collateral** (1)
**college** (3)
**command** (4)
**commands** (14)
**commencing** (1)
**comments** (1)
**commit** (1)
**committed** (1)
**communicate** (1)
**communicated** (2)
**communication** (2)
**communications** (3)
**compelled** (2)
**completion** (1)
**compound** (1)
**computer** (1)
**computer-aided** (1)
**conceal** (1)
**concealed** (5)
**concluded** (1)
**conclusion** (1)
**conduct** (1)
**conducted** (1)
**conducting** (2)
**confer** (1)
**configuration** (5)
**configure** (1)
**confirm** (1)
**conflicting** (1)
**confronting** (1)
**conjunction** (1)
**consider** (2)
**considered** (5)
**constitutes** (1)
**contact** (18)
**contacting** (1)
**continue** (1)
**continued** (2)
**continues** (2)
**continuing** (1)
**copy** (3)
**correct** (67)
**correctly** (12)
**Counsel** (4)
**count** (4)
**counterintuitive** (1)
**County** (2)
**couple** (3)
**course** (2)
**COURT** (8)
**cover** (13)
**coverage** (10)
**covered** (1)
**create** (2)
**created** (2)
**crime** (2)
**criminal** (4)
**crisis** (2)
**crossed** (1)
**cruiser** (6)
**cruisers** (3)
**CSR** (2)
**current** (1)
**Currently** (2)
**cursor** (2)
**custody** (1)
**custom** (1)
**Customer** (1)
**cut** (2)
**cuts** (1)

**< D >**
**DALE** (1)
**dash** (2)
**date** (13)
**Dated** (1)
**day** (8)
**days** (2)
**DE** (1)
**dead** (1)
**deadly** (12)
**deal** (5)
**dealing** (3)
**dealt** (2)
**death** (6)
**decedent** (5)
**December** (2)
**decided** (1)
**decision-making** (1)
**DECLARATION** (1)
**declare** (1)
**de-escalation** (2)
**Defendants** (3)
**degree** (3)
**Del** (1)
**Department** (12)

**departments** (1)
**deploy** (4)
**deployed** (2)
**deployment** (1)
**deponent** (3)
**DEPOSITION** (14)
**describe** (3)
**described** (1)
**DESCRIPTION** (1)
**designate** (6)
**designated** (16)
**designation** (2)
**designations** (3)
**desired** (1)
**despite** (2)
**details** (1)
**detention** (1)
**determination** (1)
**DIAZ** (71)
**Diaz's** (3)
**different** (17)
**directed** (1)
**direction** (11)
**directions** (1)
**discharge** (2)
**discharged** (1)
**discharging** (1)
**discovered** (1)
**discussed** (7)
**disengage** (1)
**disgruntled** (2)
**disinterested** (1)
**Dispatch** (6)
**dispatched** (2)
**distance** (14)
**DISTRICT** (2)
**division** (1)
**documents** (3)
**Dodge** (3)
**Doing** (10)
**door** (34)
**doors** (1)
**double** (1)
**downed** (1)
**dripped** (1)
**drive** (2)
**driver** (8)
**driver's** (8)
**drive-stun** (2)
**driving** (3)
**drone** (8)
**drop** (2)
**drove** (1)
**drugs** (1)
**duly** (1)
**D'URSO** (5)
**duties** (2)
**duty** (2)

**< E >**
**earlier** (5)
**easily** (1)
**east** (4)
**easy** (1)
**edged** (1)
**effect** (8)
**effective** (6)
**effects** (1)
**eight** (2)
**either** (1)
**else's** (1)
**employ** (1)
**employee** (6)
**employees** (1)
**employer** (4)
**employment** (6)
**empty** (1)
**encountered** (4)
**ended** (1)
**enforcement** (1)
**engage** (2)
**engaging** (1)
**entail** (1)
**enter** (1)
**entered** (1)
**entire** (1)
**equal** (1)
**equipment** (2)
**equipped** (1)
**ERIC** (3)
**ERRATA** (1)
**escort** (1)
**Especially** (2)
**ESQ** (2)
**estimate** (12)
**estimates** (1)
**et** (1)
**evalenzuela@galipola**
**w.com** (1)
**event** (2)
**eventually** (2)
**Everybody** (1)
**exact** (2)
**exactly** (2)
**EXAMINATION** (7)
**example** (7)
**exceed** (1)
**EXHIBIT** (2)
**EXHIBITS** (1)
**exit** (4)
**exited** (5)
**exiting** (3)
**exits** (11)
**expect** (1)
**expecting** (1)
**experience** (3)
**explain** (3)
**exposed** (1)
**exterior** (1)
**eye** (1)
**eyes** (1)

**< F >**
**face** (3)
**fact** (5)
**factor** (1)
**facts** (1)
**fair** (3)
**fall** (5)
**falling** (3)
**falls** (2)
**far** (2)
**Fashion** (2)
**fast** (1)
**feasible** (2)
**federal** (2)
**feet** (13)
**fell** (2)
**felony** (1)
**field** (5)
**figure** (1)
**filled** (1)
**find** (1)
**findings** (1)
**finish** (1)
**finished** (2)
**fire** (17)
**firearm** (3)
**Firearms** (1)
**fired** (23)
**firing** (13)
**first** (37)
**fit** (1)
**five** (4)
**five-minute** (3)
**flathead** (1)
**flee** (2)
**Focus** (2)
**following** (1)
**follow-up** (1)
**footage** (9)
**force** (14)
**forearm** (1)
**forearms** (1)
**foregoing** (4)
**form** (1)
**former** (2)
**formulated** (3)
**formulating** (1)
**forward** (2)
**found** (3)
**four** (11)
**free** (1)
**front** (14)
**full** (2)
**Fullerton** (1)
**further** (10)

**< G >**
**GALIPO** (1)
**GARCIA** (36)
**Garcia's** (1)
**gather** (1)
**gauge** (1)
**general** (4)
**Generally** (4)
**gesturing** (1)
**getting** (12)
**give** (14)
**given** (5)
**giving** (4)
**glasses** (2)
**go** (19)
**goes** (1)
**going** (30)
**Good** (5)

**Gotcha** *(4)*
**grab** *(2)*
**graduated** *(1)*
**Great** *(1)*
**green** *(24)*
**ground** *(18)*
**GUADALUPE** *(4)*
**Guardian** *(2)*
**guess** *(2)*
**gun** *(29)*
**gunfire** *(1)*
**guns** *(2)*
**gunshots** *(6)*
**guys** *(13)*

< H >
**habit** *(1)*
**half** *(3)*
**hand** *(5)*
**handgun** *(1)*
**handle** *(1)*
**hands** *(12)*
**handy** *(2)*
**happened** *(1)*
**Harbor** *(1)*
**harming** *(1)*
**Hawthorne** *(2)*
**head** *(2)*
**heads** *(1)*
**health** *(2)*
**hear** *(22)*
**heard** *(7)*
**hearing** *(1)*
**heavily** *(1)*
**heavy** *(2)*
**held** *(1)*
**help** *(3)*
**helps** *(2)*
**hereunder** *(1)*
**Hey** *(4)*
**high** *(13)*
**H-I-G-H** *(1)*
**higher-level** *(1)*
**high-risk** *(25)*
**Hills** *(1)*
**hip** *(5)*
**hired** *(2)*
**history** *(1)*
**holding** *(1)*
**hope** *(1)*
**hoping** *(1)*
**hour** *(3)*
**hours** *(1)*
**hung** *(1)*
**Hurry** *(5)*
**hurt** *(2)*

< I >
**identifies** *(1)*
**illness** *(1)*
**immediate** *(3)*
**Immediately** *(4)*
**imminent** *(3)*
**importance** *(3)*
**impression** *(8)*
**incident** *(36)*
**including** *(1)*
**inclusive** *(1)*
**increasing** *(1)*
**INDEX** *(1)*
**indicate** *(1)*
**indicated** *(8)*
**indicating** *(1)*
**individual** *(21)*
**individual's** *(2)*
**indoors** *(1)*
**ineffective** *(2)*
**inflicted** *(1)*
**influence** *(1)*
**informa** *(1)*
**information** *(38)*
**informed** *(2)*
**initial** *(6)*
**initially** *(2)*
**injured** *(5)*
**injuries** *(2)*
**injury** *(6)*
**inserted** *(1)*
**inside** *(9)*
**inspect** *(1)*
**instruct** *(1)*
**insufficient** *(1)*
**Insurance** *(1)*
**intent** *(1)*
**intentionally** *(1)*
**interacting** *(1)*
**interaction** *(1)*
**Internal** *(3)*
**intersection** *(4)*
**interview** *(21)*
**introduce** *(1)*
**introduced** *(2)*
**investigate** *(2)*
**investigation** *(1)*
**investigator** *(1)*
**involved** *(8)*
**involvement** *(1)*
**issue** *(1)*
**item** *(1)*
**its** *(1)*

< J >
**JASON** *(2)*
**JCx** *(1)*
**JESUS** *(2)*
**Job** *(2)*
**jobs** *(1)*
**jogging** *(1)*
**joined** *(1)*
**joining** *(1)*
**JONES** *(1)*
**JULY** *(4)*
**justice** *(1)*
**justify** *(2)*

< K >
**Karen** *(2)*
**keep** *(4)*
**kept** *(1)*
**kill** *(1)*
**killed** *(4)*
**KIMBERLY** *(5)*
**kind** *(12)*
**knife** *(19)*
**knives** *(2)*
**know** *(36)*

< L >
**landed** *(1)*
**LAPD** *(7)*
**large** *(5)*
**Lassak** *(2)*
**launcher** *(8)*
**LAW** *(2)*
**laws** *(2)*
**leading** *(1)*
**learn** *(2)*
**learned** *(3)*
**leaving** *(1)*
**led** *(1)*
**left** *(13)*
**LEONARDO** *(2)*
**less-lethal** *(31)*
**lethal** *(16)*
**lethal-cover** *(1)*
**level** *(1)*
**license** *(2)*
**lights** *(1)*
**limited** *(2)*
**limiting** *(2)*
**line** *(5)*
**lines** *(2)*
**Listen** *(4)*
**Litem** *(2)*
**Litigation** *(1)*
**little** *(12)*
**load** *(2)*
**locate** *(4)*
**located** *(2)*
**locating** *(3)*
**location** *(5)*
**locations** *(1)*
**long** *(11)*
**look** *(1)*
**looked** *(1)*
**looking** *(7)*
**looks** *(1)*
**Los** *(2)*
**lot** *(1)*
**low** *(2)*
**lower** *(1)*
**lunging** *(1)*

< M >
**M4** *(7)*
**magazine** *(5)*
**Main** *(1)*
**making** *(1)*
**male** *(1)*
**Mall** *(1)*
**man** *(13)*
**manipulating** *(1)*
**man-with-a-gun** *(2)*
**Maple** *(2)*
**MARIA** *(4)*
**MARKED** *(2)*

**mass** *(5)*
**mathematician** *(1)*
**matter** *(1)*
**maximum** *(5)*
**MAYER** *(1)*
**mean** *(4)*
**medical** *(4)*
**meet** *(1)*
**meets** *(1)*
**member** *(2)*
**mental** *(3)*
**mentioned** *(3)*
**merely** *(1)*
**method** *(2)*
**microphone** *(2)*
**middle** *(2)*
**midsection** *(1)*
**mile** *(2)*
**miles** *(1)*
**military** *(1)*
**mind** *(2)*
**minor** *(2)*
**minute** *(1)*
**minutes** *(7)*
**missing** *(2)*
**misstates** *(1)*
**mode** *(1)*
**model** *(1)*
**moment** *(7)*
**MONDAY** *(2)*
**months** *(2)*
**morning** *(4)*
**motion** *(1)*
**moved** *(6)*
**movement** *(1)*
**moving** *(1)*
**multiple** *(1)*

**< N >**
**name** *(3)*
**named** *(1)*
**near** *(10)*
**necessary** *(1)*
**need** *(10)*
**needed** *(1)*
**negative** *(1)*
**neighboring** *(2)*
**neighbors** *(1)*
**Never** *(6)*
**nods** *(1)*
**normally** *(1)*
**North** *(3)*
**notes** *(1)*
**notice** *(1)*
**notified** *(1)*
**number** *(3)*

**< O >**
**oath** *(2)*
**obeying** *(2)*
**object** *(3)*
**Objection** *(3)*
**observations** *(1)*
**observe** *(1)*
**observed** *(4)*
**obstructing** *(1)*
**OC** *(10)*
**occupants** *(1)*
**occurred** *(1)*
**occurring** *(1)*
**Officer** *(83)*
**officer-involved** *(1)*
**officers** *(49)*
**OFFICES** *(1)*
**offset** *(2)*
**Oh** *(3)*
**Okay** *(251)*
**onboard** *(1)*
**Once** *(6)*
**ones** *(3)*
**oOo** *(5)*
**open** *(8)*
**opening** *(9)*
**opens** *(1)*
**operators** *(1)*
**opportunity** *(1)*
**opposed** *(1)*
**opposite** *(1)*
**option** *(6)*
**options** *(9)*
**order** *(3)*
**ordered** *(2)*
**ordering** *(1)*
**Oregon** *(4)*
**original** *(1)*
**outcome** *(1)*
**outdoors** *(2)*
**outside** *(3)*
**owner** *(1)*

**< P >**
**P.D** *(7)*
**p.m** *(4)*
**PAGE** *(8)*
**PAGE/LINE** *(1)*
**pants** *(2)*
**park** *(2)*
**parked** *(3)*
**parking** *(1)*
**part** *(20)*
**participate** *(1)*
**particular** *(2)*
**partner** *(6)*
**partners** *(1)*
**partner's** *(1)*
**party** *(4)*
**passed** *(4)*
**passenger** *(19)*
**patrol** *(18)*
**patted** *(2)*
**Pause** *(4)*
**paused** *(1)*
**penalty** *(1)*
**people** *(1)*
**pepper** *(1)*
**period** *(3)*
**perjury** *(1)*
**permanent** *(1)*
**person** *(16)*
**pertains** *(1)*
**phone** *(4)*
**physically** *(4)*
**pieces** *(1)*
**ping** *(1)*
**pings** *(2)*
**pistol** *(1)*
**pistols** *(1)*
**place** *(9)*
**plain** *(1)*
**Plaintiff** *(2)*
**plaintiffs** *(1)*
**plan** *(10)*
**planned** *(1)*
**planning** *(1)*
**plate** *(2)*
**plates** *(1)*
**play** *(1)*
**played** *(2)*
**please** *(5)*
**pockets** *(2)*
**point** *(81)*
**pointed** *(2)*
**pointing** *(1)*
**points** *(2)*
**Police** *(10)*
**policies** *(1)*
**policy** *(5)*
**pool** *(1)*
**portion** *(1)*
**posed** *(1)*
**position** *(12)*
**positioned** *(2)*
**positions** *(2)*
**positive** *(1)*
**possibility** *(2)*
**possible** *(5)*
**possibly** *(15)*
**POST** *(1)*
**potential** *(3)*
**POWELL** *(31)*
**POWELL......................**
**...90** *(1)*
**power** *(2)*
**preparation** *(3)*
**prepare** *(1)*
**prepared** *(1)*
**PRESENT** *(4)*
**press** *(1)*
**pressure** *(1)*
**prevented** *(1)*
**previously** *(1)*
**primarily** *(1)*
**primary** *(12)*
**Prior** *(36)*
**probe** *(1)*
**probes** *(2)*
**problem** *(1)*
**proceeding** *(3)*
**proceedings** *(2)*
**Prone** *(1)*
**prongs** *(3)*
**provide** *(3)*
**provided** *(2)*
**puncture** *(1)*
**put** *(1)*

**< Q >**
**quarter** *(1)*
**quarterback** *(8)*
**quarterbacking** *(1)*
**question** *(13)*
**questions** *(2)*
**quick** *(1)*

**< R >**
**rack** *(1)*
**radio** *(12)*
**raise** *(1)*
**RAMIREZ** *(1)*
**RAMONA** *(1)*
**range** *(6)*
**rapid** *(2)*
**rapidly-evolving** *(1)*
**razor** *(2)*
**reach** *(1)*
**react** *(1)*
**read** *(2)*
**readily** *(1)*
**ready** *(4)*
**really** *(3)*
**rear** *(1)*
**reason** *(5)*
**reasonable** *(3)*
**reassess** *(2)*
**recall** *(29)*
**receive** *(7)*
**received** *(14)*
**receiving** *(3)*
**recognize** *(2)*
**recollection** *(1)*
**record** *(9)*
**recorded** *(2)*
**recovered** *(1)*
**refer** *(1)*
**REFERENCE** *(1)*
**referenced** *(1)*
**regarding** *(6)*
**regards** *(5)*
**registered** *(1)*
**related** *(1)*
**relating** *(2)*
**relation** *(1)*
**relatively** *(1)*
**relieved** *(1)*
**remain** *(2)*
**remained** *(1)*
**remember** *(5)*
**REMEMBERED** *(1)*
**remorse** *(1)*
**REMOTE** *(3)*
**remotely** *(2)*
**remove** *(1)*
**removed** *(1)*
**rendered** *(1)*
**rendering** *(3)*
**repeat** *(7)*
**rephrase** *(2)*
**report** *(1)*
**Reported** *(3)*
**Reporter** *(8)*
**REPORTER'S** *(1)*
**reporting** *(1)*
**reposition** *(3)*
**repositioned** *(7)*
**repositioning** *(1)*
**repositions** *(1)*
**represent** *(1)*
**request** *(7)*
**requested** *(9)*
**requesting** *(4)*
**requires** *(1)*
**resorting** *(1)*
**resources** *(5)*
**respect** *(2)*
**respond** *(6)*
**responded** *(2)*
**responding** *(10)*
**response** *(6)*
**responsibility** *(1)*
**responsible** *(1)*
**retired** *(1)*
**retrieve** *(1)*
**return** *(1)*
**review** *(11)*
**reviewed** *(5)*
**reviewing** *(3)*
**rifle** *(8)*
**rifles** *(1)*
**right** *(13)*
**road** *(1)*
**role** *(4)*
**roles** *(10)*
**round** *(12)*
**rounds** *(7)*
**RPR** *(3)*
**rules** *(1)*
**run** *(2)*
**running** *(7)*

**< S >**
**safe** *(6)*
**safely** *(2)*
**saw** *(11)*
**saying** *(5)*
**says** *(2)*
**scenario** *(3)*
**scene** *(16)*
**school** *(5)*
**screen** *(3)*
**screwdriver** *(2)*
**search** *(4)*
**searched** *(1)*
**searches** *(2)*
**searching** *(6)*
**seat** *(5)*
**seated** *(1)*
**Second** *(11)*
**secondary** *(1)*
**seconds** *(2)*
**secured** *(2)*
**see** *(63)*
**seeing** *(2)*
**seen** *(3)*
**self-dispatched** *(1)*
**senior** *(3)*
**separate** *(3)*
**September** *(1)*
**serious** *(6)*
**service** *(1)*
**set** *(4)*
**sets** *(1)*
**seven** *(2)*
**severely** *(1)*
**shared** *(1)*
**SHEET** *(1)*
**Sheriff's** *(1)*
**shield** *(1)*
**shirt** *(1)*
**shoot** *(12)*
**shooter** *(1)*
**shooters** *(1)*
**shooting** *(15)*
**Shorthand** *(4)*
**shorts** *(1)*
**shot** *(15)*
**shotguns** *(1)*
**shots** *(20)*
**show** *(4)*
**side** *(15)*
**Similar** *(1)*
**Simultaneous** *(1)*
**simultaneously** *(1)*
**single** *(2)*
**sir** *(45)*
**sirens** *(1)*
**sit** *(1)*
**situation** *(9)*
**situations** *(1)*
**six** *(1)*
**skip** *(1)*
**slashing** *(1)*
**slowly** *(1)*
**Solutions** *(1)*
**somebody** *(21)*
**Sorry** *(5)*
**sound** *(1)*
**sounded** *(1)*
**sounds** *(4)*
**source** *(1)*
**south** *(1)*
**space** *(2)*
**speakers** *(1)*
**speaking** *(1)*
**specific** *(1)*
**specifically** *(4)*
**specified** *(1)*
**specify** *(1)*
**speculation** *(2)*
**spotted** *(1)*
**spray** *(11)*
**ss** *(1)*
**stabbing** *(1)*
**Staccato** *(1)*
**stage** *(1)*
**standards** *(1)*
**standing** *(1)*
**stare** *(1)*
**staring** *(2)*
**start** *(4)*
**started** *(1)*
**starts** *(3)*
**State** *(4)*

**stated** *(3)*
**statement** *(5)*
**statements** *(1)*
**STATES** *(1)*
**stating** *(2)*
**Station** *(3)*
**stay** *(2)*
**STENOGRAPHER** *(2)*
**STENOGRAPHIC** *(2)*
**Stenographically** *(2)*
**step** *(2)*
**stick** *(1)*
**sticking** *(2)*
**stop** *(16)*
**stopped** *(12)*
**stopping** *(1)*
**stops** *(2)*
**stored** *(1)*
**stores** *(1)*
**straight** *(1)*
**street** *(1)*
**strike** *(5)*
**struck** *(5)*
**stuff** *(1)*
**subject** *(3)*
**subscribed** *(1)*
**succession** *(1)*
**suffering** *(2)*
**sufficient** *(2)*
**Suite** *(1)*
**supercede** *(1)*
**supervisor** *(1)*
**Sure** *(11)*
**surrounding** *(2)*
**suspect** *(7)*
**suspected** *(1)*
**suspects** *(4)*
**suspect's** *(1)*
**suspicion** *(1)*
**SWAT** *(9)*
**swear** *(1)*
**sworn** *(1)*
**system** *(1)*

**< T >**
**tactical** *(12)*
**tactically** *(2)*
**tactics** *(25)*
**take** *(14)*
**taken** *(5)*
**takes** *(1)*
**talk** *(4)*
**talked** *(3)*
**talking** *(3)*
**Taser** *(11)*
**team** *(3)*
**tell** *(5)*
**telling** *(1)*
**ten** *(1)*
**tend** *(1)*
**ten-minute** *(1)*
**terminated** *(1)*
**testified** *(1)*
**testify** *(1)*
**testimony** *(4)*
**Thank** *(7)*
**thereof** *(1)*
**thing** *(1)*
**things** *(2)*
**think** *(26)*
**third** *(7)*
**thought** *(5)*
**thousand-mile** *(1)*
**threat** *(9)*
**threaten** *(2)*
**threats** *(2)*
**three** *(6)*
**time** *(38)*
**timelines** *(1)*
**times** *(18)*
**timing** *(1)*
**tint** *(2)*
**tinted** *(1)*
**tire** *(1)*
**today** *(6)*
**Today's** *(1)*
**told** *(16)*
**tools** *(1)*
**top** *(2)*
**TORRANCE** *(20)*
**Torres-Corona** *(2)*
**torso** *(1)*
**total** *(1)*
**totality** *(1)*
**touch** *(1)*
**TPD** *(3)*
**traffic** *(1)*
**trained** *(19)*
**trainee** *(3)*
**trainees** *(1)*
**training** *(33)*
**transcribed** *(1)*
**TRANSCRIPT** *(4)*
**transcription** *(1)*
**transition** *(2)*
**transitioned** *(6)*
**transported** *(1)*
**travel** *(1)*
**traveling** *(2)*
**treat** *(1)*
**treatment** *(1)*
**trigger** *(1)*
**trouble** *(1)*
**true** *(3)*
**trunk** *(4)*
**truth** *(1)*
**try** *(9)*
**trying** *(4)*
**turn** *(1)*
**Twenty-five** *(1)*
**twice** *(1)*
**two** *(24)*
**two-minute** *(2)*
**type** *(1)*

**< U >**
**ultimately** *(1)*
**understand** *(19)*
**understanding** *(7)*
**Understood** *(1)*
**unit** *(30)*
**UNITED** *(1)*
**units** *(9)*
**update** *(1)*
**updates** *(3)*
**upper** *(4)*
**upright** *(1)*
**use** *(19)*
**usually** *(3)*
**utilize** *(4)*

**< V >**
**vague** *(1)*
**VALENZUELA** *(51)*
**VALENZUELA.................5** *(1)*
**vantage** *(1)*
**various** *(1)*
**vehicle** *(102)*
**vehicles** *(9)*
**verbal** *(8)*
**verbally** *(2)*
**versus** *(1)*
**vest** *(1)*
**victim** *(1)*
**VIDEO** *(7)*
**Videographer** *(8)*
**videos** *(3)*
**view** *(3)*
**visual** *(3)*
**visually** *(1)*
**voice** *(1)*
**volley** *(1)*
**volume** *(1)*
**voluntary** *(1)*

**< W >**
**waistband** *(1)*
**wait** *(1)*
**walk** *(6)*
**walked** *(1)*
**walking** *(18)*
**want** *(14)*
**wanted** *(2)*
**warning** *(8)*
**watch** *(1)*
**way** *(2)*
**weapon** *(11)*
**weapons** *(5)*
**wearing** *(4)*
**week** *(5)*
**weeks** *(1)*
**weird** *(1)*
**well** *(18)*
**went** *(10)*
**We're** *(10)*
**west** *(3)*
**westerly** *(7)*
**western** *(1)*
**We've** *(1)*
**wheel** *(2)*
**WHEREOF** *(1)*
**wind** *(2)*
**window** *(2)*

**windows** (*1*)
**WISSLER** (*32*)
**Wissler's** (*8*)
**within-entitled** (*1*)
**WITNESS** (*12*)
**wondering** (*1*)
**Woodland** (*1*)
**words** (*8*)
**work** (*3*)
**worked** (*3*)
**working** (*2*)
**wounds** (*2*)
**wrist** (*8*)
**wrists** (*1*)
**wrong** (*1*)

**< Y >**
**yeah** (*3*)
**year** (*5*)
**years** (*2*)
**yelled** (*1*)
**yelling** (*3*)

**< Z >**
**zigzagging** (*1*)
**Zoom** (*1*)