LAW OFFICES OF DALE K. GALIPO
Dale K. Galipo (Bar No. 144074)
dalekgalipo@yahoo.com
Eric Valenzuela (Bar No. 284500)
evalenzuela@galipolaw.com
21800 Burbank Boulevard, Suite 310
Woodland Hills, California 91367
Telephone: (818) 347-3333
Facsimile: (818) 347-4118

Attorneys for Plaintiffs

**UNITED STATES DISTRICT COURT FOR THE**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| MARIA GUADALUPE DIAZ, et al.,<br><br>Plaintiffs,<br><br>vs.<br><br>CITY OF TORRANCE, et al.,<br><br>Defendants. | Case No. 2:25-cv-03389-JLS (AYPx)<br><br>[*Honorable Josephine L. Staton*]<br><br>**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>[Declaration of Eric Valenzuela and Exhibits in Support thereof; *filed concurrently herewith*]<br><br>Date: November 6, 2026<br>Time: 10:30 a.m.<br>Ctrm: 8A |

# TABLE OF CONTENTS


I. INTRODUCTION ........ 1

II. STATEMENT OF FACTS ........ 3

III. LEGAL STANDARD ........ 9

A. Summary Judgment ........ 9

IV. ARGUMENT ........ 10

A. The Defendant Officers' Use of Deadly Force was Unreasonable ........ 10

1. Severity of the Crime ........ 10

2. Decedent Did Not Pose an Immediate Threat of Death or Serious Bodily Injury ........ 11

3. Whether Decedent was Resisting or Seeking to Evade Arrest ........ 15

4. Other Factors ........ 15

B. There Are Several Disputed Issues of Material Fact ........ 16

C. The Officers Are Not Entitled to Qualified Immunity ........ 18

D. Defendant Officers Violated Plaintiffs' Fourteenth Amendment Rights ........ 25

E. Plaintiffs' State Law Claims ........ 26

V. CONCLUSION ........ 28

# TABLE OF AUTHORITIES

Cases

*Ashcroft v. al–Kidd*
563 U.S. 731 (2011) .......... 19

*Brosseau v. Haugen*
543 U.S., 194 (2004) .......... 19

*Bryan v. MacPherson*
630 F.3d 805 (9th Cir. 2010) .......... 10, 12

*Cunningham v. City of Wenatchee*
345 F.3d 802 (9th Cir. 2003) .......... 19

*Deorle v. Rutherford*
272 F.3d 1272 (9th Cir. 2001) .......... 10, 12, 15, 16

*Espinosa v. City and County of San Francisco*
598 F.3d at 532 .......... 19

*Garlick v. Cnty. of Kern*
167 F. Supp. 3d 1117 (E.D. Cal. 2016) .......... 26

*George v. Morris*
736 F.3d 829 (9th Cir. 2013) .......... 11

*Glenn v. Washington*
673 F.3d 864 (9th Cir. 2011) .......... passim

*Gonzalez v. City of Anaheim*
747 F.3d 789 (9th Cir. 2014) .......... 9, 11

*Graham v. Connor*
490 U.S. 386 (1989) .......... 10, 21, 22

*Gravelet–Blondin v. Shelton*
728 F.3d 1086 (9th Cir. 2013) .......... 19

*Greer v. City of Hayward*
229 F. Supp. 3d 1091 (N.D. Cal. 2017) .......... 26

*Hart v. City of Redwood City*
99 F.4th 543 (9th Cir. 2024) .......... 24

*Hayes v. Cnty. of San Diego*
736 F.3d 1223 (9th Cir. 2013) .......... 12, 23, 27

*Johnson v. Jones*
515 U.S. 304 (1995) .......... 19

*Knox v. Southwest Airlines*
124 F.3d 1103 (9th Cir. 1997) .......... 19

*Lopez v. Gelhaus*
871 F.3d 998 (9th Cir. 2017) ........ 13

*Lowry v. City of San Diego*
858 F.3d 1248 (9th Cir. 2017) ........ 10

*Mattos v. Agorano*
661 F.3d 433 (9th Cir. 2011) ........ 11

*Morales v. City of Delano*
852 F. Supp. 2d 1253 (E.D. Cal. 2012) ........ 25

*N.E.M. v. City of Salinas*
761 F. App'x 698 (9th Cir. 2019) ........ 19

*Nehad v. Browder*
929 F.3d 1125 (9th Cir. 2019) ........ passim

*Newmaker v. City of Fortuna*
842 F.3d 1108 (9th Cir. 2016) ........ 13

*Ochoa v. City of Mesa*
26 F.4th 1050 (9th Cir. 2022) ........ 25

*Reese v. County of Sacramento*
888 F.3d 1030 (9th Cir. 2018) ........ 28

*Santos v. Gates*
287 F.3d 846, 855 (9th Cir. 2002) ........ 19

*Scott v. Harris*
550 U.S. 372 (2007) ........ 9

*Singh v. City of Phoenix*
124 F.4th 746 (9th Cir. 2024) ........ 24

*Tennessee v. Garner*
471 U.S. 1 (1985) ........ 10

*Torres v. City of Madera*
648 F.3d 1119 (9th Cir. 2011) ........ 10, 14

*United States v. Lanier*
520 U.S. 259 ........ 19

*Vos v. City of Newport Beach*
892 F.3d 1024 (9th Cir. 2018) ........ 9, 21, 22

*Wilkinson v. Torres*
610 F.3d 546 (9th Cir. 2010) ........ 25

*Williamson v. City of Nat'l City*
23 F.4th 1146 (9th Cir. 2022) ........ 28

## Statutes

California Penal Code § 148.3 .......... 11
California Penal Code § 148.5 .......... 11
California Penal Code § 653y .......... 11
California Penal Code § 835a .......... 26, 27

## Rules

Fed. R. Civ. P. 56(a) .......... 9, 16, 18

# MEMORANDUM OF POINTS AND AUTHORITIES

## I. INTRODUCTION

This civil rights action arises from the excessive and unreasonable officer involved shooting of Decedent, Leonardo Diaz, by Defendant Officers Castillo, Wissler, Garcia and Bermudez, of the Torrance Police Department ("TPD") on December 2, 2024. Decedent was fatally shot 9 times by the involved police officers, including 2 shots to his back and shots as he was falling to the ground and already down on the ground. The four involved officers created a firing line in the middle of the street as they stood behind cover from their ballistic vehicle doors and pointed their guns at Decedent, who was suffering from a mental health crisis.

The officers were responding to a man with a gun call and when they first located the Decedent seated inside of his vehicle. The four involved officers exited their police cruisers and began issuing commands to Decedent for approximately 2 minutes and 35 seconds, before Decedent exited out of his vehicle. Both TPD cruisers were equipped with a 40 millimeter less lethal launcher ("40mm"). 2 minutes and 35 seconds is sufficient time for the officers to have formulated a tactical plan which designated at least one of the trainee officers as a less lethal option and to retrieve the 40mm. See Ex. E, Harmening Decl. at ¶ 26.

After Decedent exited his vehicle, the officers could clearly see that he was bleeding from his wrist in what they believed were self-inflicted wounds and that he may be suicidal. In Decedent's right hand he held a flathead screwdriver which the officers should have been able to identify as not being a knife. Decedent was 25 to 30 feet from the officers upon exiting his car. Decedent never had a gun during the incident. All the officers were equipped with tasers and OC spray. Prior to the shooting, the officers never formulated a tactical plan and never designated anyone as a less lethal option. The officers also never transitioned to a less-lethal option during the incident. Approximately 17 seconds elapsed between Decedent exiting his car and

the first shot being fired. This is sufficient time for an officer to transition to their taser, which only takes about two seconds. See Ex. E, Harmening Decl. at ¶ 27.

As Decedent slowly walked in the direction of the officers, all four officers began to shoot at Decedent, including shots to his back and shots as he was stopped and falling to the ground and already down on the ground. None of the officers ever gave Decedent a verbal warning that deadly force would be used prior to the shooting, despite being feasible. Further, none of the involved officers ever tried to tactically reposition and increase the distance from Decedent. Decedent never tried to physically injure anyone during the incident and there was no information that anyone (other than the Decedent) had been injured. Decedent never verbally threatened the officers and he never made a slashing or stabbing motion with the flathead screwdriver, he never tried to throw it and he never ran, jogged or lunged towards the officers.

This appears to be a contagious fire situation where one officer began to fire immediately followed by shots from the remaining officers. The officers also didn't reassess in between shots resulting in shots to Decedent's back and shots as he fell to the ground and while on the ground. The Defendant officers admit that Decedent did not pose an immediate/imminent threat of death or serious bodily injury as he was stopped and falling to the ground or down on the ground.

Plaintiffs First Amended Complaint (ECF No. 36) asserted six claims for relief: excessive force, denial of medical care, denial of familial relationship, battery, negligence, and violation of the Bane Act. Plaintiffs have agreed to dismiss their denial of medical care claim (Claim 2). Defendants' Motion should be denied because ample evidence shows that the Defendant Officers used unreasonable and excessive deadly force, acted with deliberate indifference or reckless disregard for Decedent's rights, they were negligent and because there are several disputed issues of material fact.

## II. STATEMENT OF FACTS

Decedent was 34 years old when he was shot by Castillo, Garcia, Bermudez and Wissler of the TPD. Plaintiffs' Additional Uncontroverted Facts ("PAUF") No. 48. Decedent sustained 9 gunshot wounds, including 2 to his back. PAUF No. 49.

The officers received information relating to the call for service over their radios and onboard computers. PAUF No. 50. The call for service did not indicate that anyone had been injured, shot or killed or that shots had been fired in the area. There was also no information that anyone from Decedent's former place of employment had been killed or was missing. Other than the Decedent, the officers never saw anyone else injured. PAUF No. 51. When the officers receive information about a call they respond to investigate. Based on prior experience, sometimes that information is accurate other times it is not, so they investigate to confirm. PAUF No. 52.

Castillo has been a police officer for about 5 years (3 with TPD) at the time of the incident and was a member of the SWAT team. Garcia was a field training officer (FTO) for Wissler at the time of the incident. Garcia has been a police officer for 20 years and was the most senior officer on scene at the time of the incident. Wissler had been in field training for approximately two months at the time of the incident and it was his first time working with Garcia. Castillo was the training officer for Bermudez at the time of the incident. This was Bermudez's first day on patrol/field training as a police officer. This was the first time that Garcia rode with Wissler and acted as his FTO. PAUF No. 53. It was Castillo and Garcia responsibility to assign different roles to the rookie officers who were still doing their training. PAUF No. 54.

The Officers had never seen or dealt with Decedent prior to the date of the incident. Other than the information provided by dispatch, the officers had no other background or knowledge of Decedent. The officers did not have any information about Decedent's criminal history or having previously physically injured anyone.

PAUF No. 55. The Business where Decedent previously worked was no longer there and had been vacated for approximately a week. PAUF No. 56.

The officers had OC spray and a taser on their person. There was also a 40mm in every TPD police cruiser on patrol. These forms of less lethal are also considered forms of deescalation. However, the involved officers failed to reasonably deescalate the incident. PAUF No. 57. The taser in probe mode has an effective range of about 12-25 feet. OC spray has an effective range of about 5-15 feet and is best used outdoors. The effective range of the 40mm is up to 120 feet. During this incident, all these less lethal tools were reasonable/feasible alternatives to the use of deadly force. PAUF No. 58.

All the officers exited their cars within seconds of each other. PAUF No. 59. The officers were trained on the importance of tactics and formulating a tactical plan when safe to do so. It was improper in the context of accepted standards of policing and police training for all four of the initially responding officers to maintain lethal coverage and not formulate a tactical plan that included the deployment of less lethal alternatives. PAUF No. 60. While Decedent was still in his car, he was opening and closing the door, allowing the officers to see inside of the car. The officers did not see a gun in the car when the door was opening and closing or when a check of the car was done afterwards. PAUF No. 61. While Decedent was still in the car, the officers saw that Decedent was bleeding from his wrist and saw a knife in his hand and broadcast this information over the radio. The officers also saw that Decedent was bleeding from his wrist when he exited the car. PAUF No. 62. Because Decedent was bleeding from his wrist, the officers believed Decedent may have cut himself, that his wounds were self-inflicted and that he may be suicidal. PAUF No. 63. Garcia wanted to help Decedent by taking him to the hospital to get a psychiatric evaluation. PAUF No. 64.

According to the officers’ interviews, commands were given to Decedent to come out with his hands up and to step out of the vehicle which were all appropriate

commands. The officers did not want to walk up on a vehicle if it's a man with a gun, so they wanted Decedent to exit the car. The Officers' intent or perception of the commands was to get Decedent out of the vehicle to further investigate. PAUF No. 65. After the officers exited their police cruisers, Decedent was in his car for another 2 minutes and 36 seconds before he exited. After exiting his car, the officers shot Decedent in approximately 17 seconds. 2 minutes and 36 seconds is sufficient time to formulate a tactical plan and transition to less lethal, including the 40mm. 17 seconds is sufficient time for the officers to transition to their taser or OC spray. It takes approximately 2 seconds to transition to their taser or OC spray. PAUF No. 66.

Decedent was 25-35 feet away from the officers when he exited out of his vehicle. PAUF No. 67. There were good lighting conditions at the time of the incident. PAUF No. 68. When Decedent exited out of his vehicle, the officers could see Decedent's whole body, from the top of his head to the bottom of his feet. The officers never saw a gun on Decedent's person or a bulge or anything sticking out that might be a concealed weapon. PAUF No. 69. Decedent never reached into his waistband or his pockets during the incident. PAUF No. 70. During the incident, Decedent was slowly walking towards the officers with his arms down by his side. Decedent never walked fast and he never jogged or ran. PAUF No. 71. Decedent had a flathead screwdriver in his right hand which was off to the side of his hip and it never moved or raised from that position prior to the shots. PAUF No. 72.

Castillo told his partner Bermudez to assist Garcia with whatever necessary tools he might need to deescalate the situation (such as the 40mm) and to do what he says. The purpose of this was for Garcia to start delegating roles, start delegating a game-plan how to safely detain Decedent and make sure they had every possible resource out there to detain Decedent. Garcia was "quarterbacking" the situation meaning he would be the incident commander of the whole scene and delegating all the necessary roles. Castillo instructed Bermudez to follow his lead regarding any

instructions. PAUF No. 73. Castillo screamed for his partners (Garcia, Wissler and Bermudez) to deploy the 40mm because they needed that tool now. Castillo was thinking/hoping that one of his partners had the 40mm launcher up and running at that point because he had requested it. Both Castillo and Garcia yelled out for the 40mm during the incident. The request for the 40mm was a last ditch effort to utilize a less lethal option. Garcia was pleading/praying for the 40mm to get deployed. PAUF No. 74. When Castillo yelled for the 40mm, he thought that it was appropriate to shoot Decedent with it. PAUF No. 75.

Castillo claims his role was lethal coverage with his rifle. Castillo designated Bermudez as a lethal cover officer. Wissler was also assigned as lethal cover. Garcia never designated Castillo to grab the long rifle (that was Castillo's decision). PAUF No. 76. During the incident, there were no less lethal options that were up and running. None of the officers on scene were ever designated as less lethal during the incident nor did they volunteer for it. None of the officers ever attempted to use less lethal and they never assumed that anyone had less lethal up and running. Wissler never inquired whether anyone was designated less lethal. PAUF No. 77. When the officers exited out their vehicles, they never formulated a tactical plan nor assigned various roles. Other than telling Bermudez to move his car for a felony stop, no other plans were formulated. The officers were also never designated as less lethal prior to exiting their vehicles. They also did not discuss anyone being designated as less lethal cover prior to or during the vehicle stop. Castillo nor Garcia ever designated Bermudez to use the 40mm, even though Bermudez entered the police vehicle to reposition it prior to the shooting. PAUF No. 78.

Before Bermudez repositioned his vehicle, Garcia and Castillo already had their rifles out, Wissler also had his gun out and Bermudez pulled his gun out after repositioning the car. PAUF No. 79. Garcia went for his taser (that was stored on his chest/vest) and began to transition to it because he wanted a non-deadly force option. It would only take approximately 2 seconds to transition to his taser. PAUF

No. 80. Officers Choi and High were never designated as less lethal upon arriving on scene. PAUF No. 81.

The officers were standing behind their ballistic police car doors, which were designed to stop bullets in the event Decedent had a gun. PAUF No. 82. Decedent never made a stabbing or slashing motion with the screwdriver he was holding and he never tried to throw it. PAUF No. 83. Bermudez saw that it was a screwdriver in Decedent's hand before the police removed it. PAUF No. 84. Decedent never tried to lunge at any of the officers. PAUF No. 85. At no point did Decedent try to flee. PAUF No. 86. The officers never gave Decedent a verbal warning that deadly force would be used prior to firing, despite being feasible. Officers are trained to give a verbal warning before firing when feasible. Based on officer training, a verbal warning is a command to do something with a warning that deadly force will be used if not complied with. PAUF No. 87.

Contagious fire is when one officer fires for his own reasons then another officer fires based on hearing his fellow officer's gunshots. This appears to be a case of contagious fire. PAUF No. 88. Castillo fired three rounds at Decedent. Garcia fired two shots at Decedent. Bermudez fired three rounds at Decedent simultaneously. Wissler fired three rounds. PAUF No. 89. Wissler and Bermudez heard gunshots go off before they fired. Castillo and Garcia did not hear any shots being fired prior to or after firing their shots but did hear shots being fired simultaneously. Bermudez did not hear any shots fired after he fired his shots. Castillo believes he fired the first shot but not the last shot. PAUF No. 90.

Castillo was under the impression that his first two shots struck Decedent. PAUF No. 91. Some of the gunshots occurred while Decedent was stopped and falling down to the ground and while down on the ground. Some of the gunshots struck Decedent in his back. PAUF No. 92. When Decedent was stopped and falling to the ground or on the ground, the shooting officers did not feel that Decedent posed an imminent/immediate threat of death or serious bodily injury. PAUF No.

93. During the incident, Decedent did not pose an immediate/imminent threat of death or serios bodily injury. PAUF No. 116.

The officers never tried to tactically reposition and increase the distance from Decedent while he slowly walked towards them. There was nothing physically obstructing the officers from backing up and increasing their distance from the Decedent. The street behind the officers was approximately 20 feet away. The officers are trained to tactically reposition and increase the distance from an armed subject when it is safe to do so. Here, the officers should have tactically repositioned and increased their distance from Decedent. PAUF No. 94. Wissler actually did tactically back up after the shooting. PAUF No. 95. Based on the officer's training, one of the factors an officer is to consider in deciding to use deadly force is whether or not it is safe to tactically reposition. PAUF No. 96.

During the incident, Decedent never communicated with the officers verbally or non-verbally, including never verbally threatening them. PAUF No. 97. Prior to the shooting, the officers had no information that Decedent was under the influence of drugs or alcohol. PAUF No. 98. There were never other occupants in Decedent's car. PAUF No. 99. The officers were not physically injured during the incident. PAUF No. 100. The officers did not see Choi and High exit their vehicles prior to the gunshots. PAUF No. 101. The officers formulated a tactical plan after the shooting. PAUF No. 102. After the shooting Bermudez was stunned and shocked. PAUF No. 103.

The officers were trained on the importance of less lethal alternatives to see if it could be utilized before using deadly force when feasible and that its availability is a factor to consider in deciding to use deadly force. PAUF Nos. 104-05. Officers are trained they can use a taser or 40mm on a subject with a knife, especially if there is lethal cover. When Garcia saw Decedent exit the car with what he thought was a knife, he requested and was expecting someone to come up with the 40mm. PAUF No. 106. Officers are trained the taser could cause neuro-muscular incapacitation,

causing an individual's muscles to lock up and fall down. PAUF No. 107. The officers were trained that they cannot shoot someone for simply having a knife in their hand. PAUF No. 108. The officers had training regarding interacting with people who may be suffering from a mental health crisis and to use deescalation tactics with them. PAUF No. 109.

The officers were trained to reassess in between shots if safe to do so and that they are responsible to justify every shot. Here, it was safe to do so and had they done so they would have seen that Decedent had stopped, was falling to the ground or on the ground, during some of the gunshots. PAUF No. 110. The officers are trained to only use deadly force when there is an imminent/immediate threat of death or serious bodily injury. PAUF No. 111. The officers are also trained there has to be an ability, opportunity or apparent intent to immediately cause death or serious bodily injury to justify the use of deadly force and that it must be necessary to defend human life. PAUF Nos. 112-13. The officers are also trained that deadly force should only be used when there are no other reasonable options available and fear of future harm is insufficient to justify its use. PAUF Nos. 114-15.

## III. LEGAL STANDARD

### *A. Summary Judgment*

Summary judgment is only appropriate when there is no genuine dispute as to any material fact, then the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When considering the propriety of summary judgment, the court views all facts and draws all inferences in the light most favorable to the non-moving party. *Gonzalez v. City of Anaheim*, 747 F.3d 789, 793 (9th Cir. 2014).

Where there is video of the use of excessive force, the Court must view the facts in the light depicted by the videotape. *Scott v. Harris*, 550 U.S. 372, 380–81 (2007); *Vos v. City of Newport Beach*, 892 F.3d 1024, 1028 (9th Cir. 2018) ("The record is viewed in light most favorable to the nonmovants..., so long as their version of the facts is not blatantly contradicted by the video evidence." (Citations

omitted)). Even where video evidence exists, the circumstances may be such that reasonable factfinders could draw divergent conclusions from what the video evidence shows. See *Nehad v. Browder*, 929 F.3d 1125, 1132–39 (9th Cir. 2019).

## IV. ARGUMENT

### A. The Defendant Officers' Use of Deadly Force was Unreasonable

An excessive force claim is adjudicated under the Fourth Amendment's "objective reasonableness" standard. *Graham v. Connor*, 490 U.S. 386, 388 (1989). Among the factors a court must consider are "the severity of the crime at issue, whether the suspect pose[d] an immediate threat to the safety of the officers or others, and whether he [was] actively resisting arrest or attempting to evade arrest by flight." *Id*. (quoting *Tennessee v. Garner*, 471 U.S. 1, 8–9 (1985)). The *Graham* factors are not exclusive. Other relevant factors include the availability of less intrusive force, whether proper warnings were given, and whether it should have been apparent to the officers that the subject of the force used was mentally disturbed. See *Bryan v. MacPherson,* 630 F.3d 805, 831 (9th Cir. 2010); *Deorle v. Rutherford*, 272 F.3d 1272, 1282–83 (9th Cir. 2001). A "simple statement by an officer that he fears for his safety or the safety of others is not enough; there must be objective factors to justify such a concern." *Deorle* 272 F.3d at 1281. Nor does "[a] desire to resolve quickly a potentially dangerous situation." *Id.* at 1281. "Not all errors in perception or judgment [] are reasonable" and while courts "do not judge the reasonableness of an officer's actions 'with the 20/20 vision of hindsight,' nor does the Constitution forgive an officer's every mistake." *Glenn v. Washington*, 673 F.3d 864, 871 (9th Cir. 2011) (quoting *Graham*, 490 U.S. at 396); see also *Torres v. City of Madera*, 648 F.3d 1119, 1124 (9th Cir. 2011).

#### 1. Severity of the Crime

The Ninth Circuit has interpreted the "severity of the crime" factor as relating to the initial crime prompting a response by law enforcement. See *Lowry v. City of San Diego*, 858 F.3d 1248, 1257-58 (9th Cir. 2017) (en banc), *cert. denied*, 138

S.Ct. 1283 (2018). Here, the incident began with Decedent calling 911 claiming to have a gun and wanting to shoot someone. Decedent was never actually armed with a gun. This conduct could constitute crimes like Falsely Reporting an Emergency (California Penal Code ("PC") § 148.3, Falsely Reporting a Crime (PC § 148.5 PC), and Misuse of the 911 System (PC § 653y), all of which are misdemeanors. This factor weighs against finding that the use of deadly force was reasonable. See *Nehad,* 929 F.3d 1125, 1136 (9th Cir. 2019) (holding that a particular use of force would be more reasonable when applied against a felony suspect than when applied against a person suspected of only a misdemeanor).

**2. Decedent Did Not Pose an Immediate Threat of Death or Serious Bodily Injury**

"[T]he most important Graham factor is whether the suspect posed an immediate threat" to anyone's safety. *Mattos v. Agorano*, 661 F.3d 433, 441 (9th Cir. 2011) (en banc) (cleaned up). Use of deadly force is reasonable only if an officer has probable cause to believe the suspect poses an immediate threat of death or serious bodily harm to himself or others. *See Gonzalez* at 793; *George v. Morris*, 736 F.3d 829, 838 (9th Cir. 2013). "[S]ummary judgment is not appropriate in §1983 deadly force cases that turn on the officer's credibility that is genuinely in doubt." *Nehad*, 929 F.3d at 1133.

Here, Decedent did not pose an immediate threat of death or serious bodily injury to anyone at the time of the shooting. Decedent slowly walked towards the officers with a flathead screwdriver down by his side, he never tried to stab any of the officers or even make a stabbing or slashing motion, he never tried to throw it, he never ran, jogged or lunged towards the officers and he never verbally threatened them. As Decedent slowly walked towards the officers, they had plenty of room to tactically reposition and increase the distance from Decedent because there was nothing physically obstructing them from maneuvering, they all had bullet-proof vests and were behind cover from the ballistic doors of their vehicles. Decedent

never injured or attempted to injure anyone (other than himself) and he was outnumbered four to one.

The availability of tactical repositioning reinforces the absence of immediacy of the threat. Where the subject is slowly walking, has not made any threatening gestures, and officers have room to maneuver, supports that no immediate threat of death or serious bodily injury existed at the time of the shooting. The Officers did not confront a situation involving an immediate/imminent risk of death or serious bodily injury. Moreover, some shots were fired after Decedent had stopped and was falling to the ground or on the ground. The officers admit that Decedent posed no immediate threat of death or serious bodily injury once he had stopped, was falling or had fallen to the ground. PAUF 93. Under these circumstances, a rational jury could find that Decedent did not pose an immediate/imminent threat sufficient to justify deadly force.

Since Decedent was walking slowly toward the officers, there was time and opportunity to reassess the situation and recognize that Decedent had collapsed and was no longer advancing after the initial shots yet failed to do so. "A desire to resolve quickly a potentially dangerous situation is not the type of governmental interest that, standing alone, justifies the use of force that may cause serious injury." *Bryan*, 630 F.3d at 826. It was incumbent on the officers to control their emotions and not to use deadly force unnecessarily. The fact that a suspect has a weapon—here a flathead screwdriver—does not render the use of deadly force reasonable. *Hayes v. Cnty. of San Diego*, 736 F.3d 1223, 1233 (9th Cir. 2013); see also *Nehad*, 929 F.3d at 1134.

Decedent was shot while walking slowly towards the officers with a flathead screwdriver down by his side, including shots after he stopped and was falling to the ground and while on the ground. There are no objective factors to justify the officers' claim that Decedent posed an immediate or imminent threat of death or serious bodily injury. See *Deorle*, 272 F.3d at 1281 ("a simple statement by an

officer that he fears for his safety or the safety of others is not enough; there must be objective factors to justify such a concern."); *Lopez v. Gelhaus*, 871 F.3d 998, 1008-10 (9th Cir. 2017) (finding the armed subject's position and movement immediately prior to the shooting did not support a reasonable belief of a threat). Here, Decedent did not present an immediate threat of death or serious bodily harm to anyone when he was shot. Where a subject merely holds a weapon while walking toward officers, without swinging it or making stabbing motions, the Ninth Circuit has repeatedly found that a jury question exists as to whether an immediate threat was present. See *Glenn*, 673 F.3d at 874; see also *Nehad*, 929 F.3d at 1133.

There was no evidence that Decedent "hurt someone else prior to exiting the vehicle." Mot. at 22:12-15. The officers saw no one else in Decedent's vehicle or injured nearby, had no information that anyone other than Decedent had been injured, and believed the blood on his hand and arm resulted from self-inflicted wounds. PAUF Nos. 51, 63.

**a. The Officers' Credibility**

There are significant credibility issues with the officers' version of events including their contention that "[o]fficers had been trained to designate 4 officers as lethal coverage and one officer as less lethal coverage." Mot. at 11:24-26. Defendants never included this contention in their statement of facts because there is no evidence to support this baseless and false contention. "Summary judgment is not appropriate in § 1983 deadly force cases that turn on the officer's credibility that is genuinely in doubt." *Newmaker v. City of Fortuna*, 842 F.3d 1108, 1116 (9th Cir. 2016).

The Defendant Officers never indicated in their recorded interviews that they did not assign a less-lethal role because their training required the first four officers to provide lethal coverage and a fifth officer to serve as the less-lethal option. Ex. E, Harmening Decl. at ¶ 30. The officers first advanced this unsupported claim during their depositions—more than a year and a half after the incident and after having

been prepped by their current counsel. Plaintiffs also served discovery on all Defendants seeking documents supporting the contention, but none was ever produced in responses. "These possible inconsistencies, along with video, eyewitness, and expert evidence that belies [the officers]' claim[s]…are sufficient to give rise to genuine doubts about the Defendant Officers' credibility." *Nehad*, 929 F.3d at 1133.

**b. The Reasonableness of the Officers' Beliefs**

When "an officer's particular use of force is based on a mistake of fact," the Court is to "ask whether a reasonable officer would have or should have accurately perceived that fact." *See Torres v. City of Madera*, 648 F.3d 1119, 1124 (9th Cir. 2011). "[W]hether the mistake was an honest one is not the concern, only whether it was a reasonable one." *Id*. at 1127. Here, the Officers allege they believed Decedent was armed with a knife, not a flathead screwdriver. "A reasonable trier of fact could, however, conclude that [the officers]' mistake was not reasonable." *Nehad*, 929 F.3d at 1134. A flathead screwdriver does not resemble a knife. Especially since there was good lighting outside at the time of the incident, Decedent slowly walked towards the officers and he continuously kept the screwdriver down by his side. Officers are also trained to recognize what suspects are carrying and to distinguish if those items are weapons or not. PAUF No. 117. Here, the Officers "had very sufficient time to determine that it was not a knife in Decedent's hand" since they saw item in Decedent's hands for approximately seventeen seconds continuously, the officers "testified that the lighting in the [street] was well lit" which is "sufficient to enable an observer to identify the color [of] the [screwdriver], [and] taking into account the distance between [the officers] and [Decedent]". *Nehad*, 929 F.3d at 1134. A rational jury could find that it was unreasonable for the Defendant Officers to perceive the flathead screwdriver as a knife, or at minimum, "[w]hether [the officers] reasonably mistook the [flathead screwdriver] for a knife is [] a triable question of fact." *Nehad*, 929 F.3d at 1134.

**3. Whether Decedent was Resisting or Seeking to Evade Arrest**

Here, "video of the incident clearly shows that [Decedent] made no attempt to flee from [the officers]. *Id*. at 1137. Although, Decedent did not obey the officers' commands to stop and drop the knife. A reasonable jury could find that any resistance on Decedent's behalf was insufficient to justify the use of deadly force. "Thus, whether [Decedent] resisted arrest by ignoring [the officers'] commands is, at best, a disputed issue of fact." *Id*.

**4. Other Factors**

The absence of a warning prior to using force may suggest that the force was unreasonable. *Deorle*, 272 F.3d at 1283–84. Here, the videos of the incident confirm that the Officers never gave Decedent a verbal warning that deadly force would be used against him, prior to the shooting, despite being feasible to do so. PAUF No. 87. "A jury could consider [the officers'] failure to provide such a warning as evidence of objective unreasonableness." *Nehad*, 929 F.3d at 1138.

Another relevant factor is "the availability of alternative methods of capturing or subduing a suspect. *Id*. (internal quotations and citations omitted). Police are required to consider what other tactics, if any, were available and if there were clear, reasonable and less intrusive alternatives to the force employed, that militates against finding the use of force reasonable." *Glenn*, 673 F.3d at 876. Here, the officers carried tasers, OC spray and their cruisers were equipped with 40mms. The officers also had sufficient time to retrieve the 40mm from their vehicles police while Decedent was inside his car for 2 minutes and 35 seconds, before exiting. The officers also could have transitioned to their tasers in the 17 seconds it took from when Decedent exited his car, until the gunshots began. Because Decedent slowly walked in the officers' direction, they had more than sufficient time to transition to the 40mm, the taser or their OC spray. PAUF No. 66.

The officers outnumbered Decedent four to one, they could have tactically re-positioned and increased their distance from Decedent since there was sufficient

space with nothing physically obstructing them. The nearest street was 20 feet behind them. Videos show some of the officers take a few steps back after the shooting. The availability of numerous less-lethal options militates against finding the use of deadly force reasonable. *Glenn*, 673 F.3d at 876. At a minimum, this is a "question of fact best resolved by a jury. *Nehad*, 929 F.3d at 1138.

Another relevant factor is whether it should have been apparent to the officers that the subject of the force used was mentally disturbed. *Deorle,* 272 F.3d at 1282-83 (holding that the governmental interest in using deadly force is diminished by the fact that the officers are confronted, not with a person who has committed a serious crime against others, but with a mentally ill individual."). It was obvious that Decedent was experiencing a mental health crisis since he had slit his own wrist, was bleeding profusely and they admit to believing Decedent's wounds were self-inflicted and that he may be suicidal. PAUF No. 63. Based on all of these factors, a rational trier of fact could find that the use of deadly force was unreasonable.

### B. There Are Several Disputed Issues of Material Fact

There are several disputed issues of material fact and summary judgment should be denied on this ground alone. Fed. R. Civ. P. 56(a). It is disputed whether the officers ever had information that Decedent was going to stab someone. See Def.s' Mot. at 10:1-6. The officers never heard the 911 call prior to the shooting and none of the radio dispatches or information relayed through the officers' onboard computers in their vehicles ever communicated this information prior to the shooting. It is also disputed whether it was reasonable for the "Defendant Officers believed that [Decedent] had a gun". See Mot. at 11:13-15. When Decedent exited his car, the officers could see him from head to toe and they never saw a gun in his hands or on his person, nor did they observe any bulge in his clothing that they believed was a gun. Decedent also never reached toward his waistband or into his pockets.

It is also disputed whether the officers formulated a tactical plan prior to the shooting. See Mot. at 11:19-21. Videos of the incident clearly show that the officers did not formulate a tactical plan until after the shooting, but not prior to. It is also disputed that "Defendant Officers had been trained to designate 4 officers as lethal coverage and one officer as less lethal." See Mot. at 11:24-26. After the shooting, all the officers gave recorded interviews to TPD investigators and none of them ever mentioned that no officer had been assigned a less-lethal role because their training required the first four officers to provide lethal coverage and a fifth officer to serve as the less-lethal option. See Ex. E, Harmening Decl. at ¶ 30. The officers first advanced this unsupported claim during their depositions—more than a year and a half after the incident and after having been prepped for the deposition by their current counsel. Interestingly, this false claim is not included in their Statement of Facts, probably because they have no evidence to support this baseless claim. Plaintiffs also served discovery requests on all Defendants seeking documents supporting this contention, but no responsive documents were produced. PAUF No. 118. Requiring a fifth officer before designating a less-lethal option defies common sense because most high-risk stops do not have the luxury of involving four or five officers. See Ex. E, Harmening Decl. at ¶ 19.

It is disputed whether the officers had sufficient time to get the 40mm from their police cruiser. Defendants contend that they had insufficient time. However, approximately 2 minutes and 35 seconds passed from when the officers exited their vehicles until Decedent exited his car. This is sufficient time for at least one of the officers to grab the 40mm. PAUF No. 66. It is also disputed whether the officers had sufficient time to transition to their tasers or OC spray. The officers claim they did not. However, 17 seconds passed from Decedent exiting his vehicles and slowly walking in their direction, until they began to fire. This was sufficient time for the officers to transition to their taser or OC spray which they carried on their person. PAUF No. 66.

It is disputed whether it was reasonable for the officers to believe that Decedent had injured another person since there was blood on his hands. The involved officers had no information anyone other than Decedent had been injured, they never saw another injured person and the officers admit they believed Decedent was bleeding from self-inflicted wounds having slit his wrist because he was suicidal. PAUF No. 63. It is also disputed whether the officers had sufficient space to tactically reposition and increase the distance between themselves and Decedent. Some of the officers actually took a few steps back after the shooting, the nearest street was approximately 20 feet behind them and there was nothing physically obstructing them from backing up as Decedent slowly walked towards them. Under these circumstances, a rational jury could find that it was safe for the officers to tactically reposition and increase their distance from the Decedent. PAUF No. 94.

It is disputed whether Decedent ever communicated with the officers prior to the shooting. Defendants allege that Decedent shook his head towards the officers as if to say “no”. See Defendants’ Statement of Uncontroverted Facts (“DSUF”) No. 31. However, numerous officers stated in their interviews to TPD investigators that Decedent never communicated with them verbally or non-verbally, prior to the shooting. PAUF No. 97. It is also disputed as to whether it was reasonable for the officers to mistake a flathead screwdriver for a knife. There was good lighting outside during the incident, a screwdriver does not look like a knife and Decedent slowly walked towards the officers while keeping the screwdriver down by his side. He never made a slashing a stabbing motion with the it, nor did he ever try to throw it. Under these facts, a rational jury could find that it was unreasonable to mistake the flathead screwdriver for a knife. Due to the numerous disputed issues of material fact, summary judgment must be denied. Fed. R. Civ. P. 56(a).

### C. The Officers Are Not Entitled to Qualified Immunity

The officers are not entitled to qualified immunity for several reasons. First, as discussed above, there are disputed issues of material fact that preclude qualified

immunity at this stage (see Section IV (B), *supra*). See *Johnson v. Jones*, 515 U.S. 304, 313 (1995); *Glenn*, 673 F.3d at 870, fn. 7 (citing *Espinosa v. City and County of San Francisco*, 598 F.3d at 532); *Cunningham v. City of Wenatchee*, 345 F.3d 802, 809 (9th Cir. 2003); *Santos v. Gates*, 287 F.3d 846, 855 n.12 (9th Cir. 2002) (declining to decide the qualified immunity issue "because whether the officers may be said to have made a 'reasonable mistake' of fact or law may depend on the jury's resolution of disputed facts and the inferences it draws therefrom"); *Knox v. Southwest Airlines*, 124 F.3d 1103, 1109 (9th Cir. 1997) (no qualified immunity where there are triable issues of fact).

Further, even setting aside the above precedents, in some circumstances, "a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though the very action in question has [not] previously been held unlawful." *United States v. Lanier*, 520 U.S. 259, 271 (internal quotation marks omitted). Viewing the facts in the light most favorable to Plaintiffs, the officers' use of deadly force against Decedent was obviously excessive because Decedent was not armed with a knife and he was shot while slowly walking towards the officers with the screwdriver down by his side.

Importantly, at the time of the shooting, "it was clearly established that officers may not use deadly force against a person who is armed but cannot reasonably be perceived to be taking any furtive, harrowing, or threatening actions," especially when less-lethal options are available and potentially effective. *N.E.M. v. City of Salinas*, 761 F. App'x 698, 700 (9th Cir. 2019). To determine whether the officer violated clearly established law, courts look to "cases relevant to the situation [the officers] confronted," *Brosseau v. Haugen*, 543 U.S., 194, 200 (2004) (quotation marks omitted), mindful that there need not be a case "directly on point." *Gravelet–Blondin v. Shelton*, 728 F.3d 1086, 1093 (9th Cir. 2013) (quoting *Ashcroft v. al–Kidd*, 563 U.S. 731, 741 (2011).

The most analogous Ninth Circuit case is *Nehad v. Browder*, 929 F.3d 1125 (9th Cir. 2019). In *Nehad*, the Ninth Circuit reversed summary judgment for an officer who fatally shot a man walking at a slow, steady pace, without saying anything, without making any sudden movements, or moving the supposed knife in any way; the court held a reasonable factfinder could conclude the decedent posed no danger and that the prohibition on deadly force under these circumstances was clearly established. *Id*. at 1131, 1134. Here, just as in *Nehad*, there was information that Decedent indicated that he wanted to hurt people, the shooting officer did not give a verbal warning that deadly force would be used before firing and the officer gave commands to "stop" and "drop it" prior to the shooting. *Id*. at 1131. Further, like in *Nehad*, the officers thought that Decedent was carrying a knife and was going to stab them and Decedent was not actually carrying a knife, but a flathead screwdriver (in *Nehad* he was carrying a metallic pen). *Id*.

Here, just like *Nehad*, Decedent never injured the officer or anyone else, there was sufficient lighting to identify the object in Decedent's hand taking into account the distance between the officer and the Decedent and Decedent walked at a "relatively slow pace". *Id*. at 1134. This case is also similar to *Nehad* because in both cases the decedent never attempted to flee, he disobeyed the officer's commands to "stop" and "drop it" and the officer was armed with less lethal options such as a taser and mace/OC spray. *Id*. at 1137-38. The Court in *Nehad* found that a rational trier of fact could find that the officer's use of deadly force was objectively unreasonable. *Id*. at 1139. The facts in *Nehad* are even more egregious than the facts in this case because in *Nehad* it was just one officer versus the decedent, whereas here, there were four officers versus the one Decedent. *Nehad*, which was decided over five years prior to the date of this incident, would have provided fair warning to the Defendant Officers that their use of deadly force under these circumstances was clearly established as unconstitutional.

Another analogous Ninth Circuit case is *Vos v. City of Newport Beach*, where a mentally unstable man was shot from 20 feet away while running towards eight officers with an object, believed to be scissors, raised above his head. 892 F.3d at 1033–34. The officers were responding to a 911 call reporting Vos's erratic behavior in a 7-Eleven convenience store. *Id.* at 1028. Vos, behaving violently and threateningly, threatened to take a hostage and injured a person with scissors. *Id.* at 1129. Upon arrival, officers quickly realized Vos was potentially mentally unstable or under the influence of drugs. *Id*. at 1029. The officer called for backup, leading to a standoff between Vos and eight officers. *Id.* at 1029–30. The officers were armed with various levels of force: one 40-mm less-lethal firearm, tasers, and lethal weapons. *Id.* at 1033. They positioned their vehicles in formation and used the doors for cover. *Id.* at 1029.

Minutes later, Vos ran out and towards the officers. *Id.* at 1030. Brandishing a metal object above his head, Vos ignored the officers' commands to "Drop the weapon." *Id.* at 1029. As he ran at officers, Vos was shot first with a less-lethal round and then almost immediately with lethal shots from two officers. *Id.* at 1029. When shot, Vos was within 20 feet of the officers. *Id.* at 1033. Despite being struck, he continued to charge, ultimately collapsing in front of them. *Id*. at 1030, 1033.

The Court found that a reasonable jury could conclude that the officers' use of deadly force was objectively unreasonable in violation of the Fourth Amendment. *Id*. at 1034. The analysis centered on the second *Graham* factor: whether Vos posed an immediate threat. The court considered that: the officers' position behind cover; outnumbering Vos eight to one; as Vos charged the officers, he had something raised in his hand, but he was not armed with a gun; and the officers had less-lethal methods available to stop Vos. The Court found, based on these factors and "construing the facts as they are presented by [Plaintiffs] and depicted in the video footage, a reasonable jury could conclude that Vos was not an immediate threat such that the use of deadly force was warranted." *Id.* at 1032.

The Court rejected the defendant's argument that deadly force was reasonable because Vos "forced the confrontation" by charging the officers. *Id.* The court found that the availability of less-lethal options was critical. *Id*. at 1033. Given that less-lethal force options were available to the officers and could have been effective in stopping Vos and ending the threat, the use of deadly force was not objectively reasonable. *Id*. at 1034.

This case closely parallels *Vos*. In both cases, the suspects claimed to have guns but were not armed with them; officers requested a 40mm launcher; multiple officers confronted a single suspect; two police vehicles were positioned so their doors provided cover to the officers standing behind them; some officers were trainees; two officers carried and fired rifles while others carried handguns; the suspect was believed to be mentally unstable; neither suspect ever attempted to flee; the suspect possessed an object other than a knife—scissors in *Vos* and a flathead screwdriver here; and officers repeatedly ordered the suspect to drop the object. *Id*. at 1029, 1031. In *Vos*, eight seconds elapsed between the decedent's exit through the back door and the shooting; here, seventeen seconds elapsed between Decedent's exit from the car and the shooting, and the officers had both Tasers and a 40mm launcher. *Id*. at 1030–33. In both cases, the decedent was shot from within approximately 20 feet, a distance within the effective range of a Taser or 40mm launcher. *Id*.

The circumstances here are less threatening than those in *Vos*. In *Vos*, the decedent injured another person; here, Decedent injured only himself. *Id*. at 1029. Moreover, unlike the decedent in *Vos*, Decedent walked slowly toward the officers and never ran at them. *Id*. Thus, the facts in *Vos* were more egregious than those presented here. Nevertheless, the *Vos* court held that a jury could find the use of deadly force unjustified and unreasonable. *Id*. at 1031, 1034. Although the *Vos* court granted the officers qualified immunity because the governing law was not clearly established when that incident occurred, *id*. at 1036, *Vos*—published in June 2018—

clearly established that deadly force under comparable circumstances is unlawful. That precedent had been established for more than six years when this incident occurred in December 2024.

The Ninth Circuit case of *Hayes v. Cnty. of San Diego*, 736 F.3d 1223 (9th Cir. 2013), is also instructive. In *Hayes*, the Ninth Circuit held that summary judgment was barred where officers shot a suicidal man who raised a knife tip-down while taking one to two steps toward an officer, because the evidence did not clearly establish that he was threatening the deputies, and no verbal warning that deadly force would be used was given prior to the shots. *Hayes*, 736 F.3d at 1227–28, 1233–35 (9th Cir. 2013). Here, just as in *Hayes*, the Decedent was believed to be suicidal and experiencing a mental health crisis, there was no information that Decedent was on drugs or alcohol prior to the shooting, the officers had less lethal options such as the taser, Decedent was not charging, Decedent had taken some steps towards the officers and was shot from approximately six feet away by multiple officers "because he was not stopping". *Id*. at 1227-28.

Another analogous Ninth Circuit case is *Glenn*, 673 F.3d 864, in which a man was shot in his driveway by police officers. Police received a report of an agitated, intoxicated man carrying a knife and threatening to kill himself. When police saw him holding the knife to his own neck, they drew their guns and screamed for him to drop it. Additional officers arrived, one of whom shot the man with several beanbags causing the man to move away and toward the house in which his parents were standing. As police had determined that if the man "made a move toward the house with his parents inside, they would use deadly force," they opened fire and killed him. *Glenn*, 673 F.3d at 869. Here, as in *Glenn*, Decedent had not threatened the involved officers, attacked, or injured anyone but himself; he had not committed a serious crime; he made no effort to resist or evade arrest aside from failing to stop and put down what the officers believed was a knife. Thus, as in *Glenn*, there are triable issues of fact as to whether rapidly resorting to deadly force was reasonable

in light of the availability of less-lethal force alternatives. *Id.* at 879–880. See also *Singh v. City of Phoenix*, 124 F.4th 746, 750-54 (9th Cir. 2024) (same).

Defendants rely on *Hart v. City of Redwood City*, 99 F.4th 543 (9th Cir. 2024) to argue that the Officers are entitled to qualified immunity. See Mot. at 28:23-29:21. However, Defendants reliance on *Hart* is misplaced because that case is significantly factually distinguishable from the facts of this case. In *Hart*, the decedent's wife was covered in blood when the officers arrived, the decedent did have a large knife in his hand which he raised near his shoulder level, there were only two officers on the scene, the officers were in the decedent's backyard and one of the officers deployed the taser prior to the gunshots. *Id*. at 545-46. Further, the decedent in *Hart* ran towards the officers holding the knife out towards them and decreased the distance to the officers by approximately 20 feet in 5 seconds. Further, in *Hart* there was no evidence that decedent's back was turned towards the officers for any of the shots and the plaintiff's expert admitted that the decedent posed an immediate threat to the involved officers. Id. at 551-52

By contrast, in the instant case, no one other than the Decedent had blood on them. Decedent had a flathead screwdriver and not a knife and Decedent kept the screwdriver down by his side the entire time and never raised it to shoulder level like the suspect in *Hart*. Further, here, the officers outnumbered the Decedent four to one, double the number of officers in *Hart*. The officers were not confined to a backyard and had plenty of room to tactically reposition. Moreover, none of the officers ever tried to deploy a taser or any other form of less lethal during the incident. Importantly, Decedent slowly walked towards the officers and never ran or jogged towards them. Here, Decedent moved approximately 25 feet in about 17 seconds before he was shot by the officers, which is more than triple the time that the officers in *Hart* began to fire (20 feet in approximately 5 seconds). Decedent also sustained two gunshots to his back, while his back was turned towards at least some of the officers. See PAUF Nos. 49, 92. Plaintiffs' expert also denies that the

Decedent posed an imminent threat of death or serious bodily injury at the time of the shooting. PAUF No. 116.

### D. Defendant Officers Violated Plaintiffs' Fourteenth Amendment Rights

Under the Fourteenth Amendment, "official conduct that 'shocks the conscience' in depriving [family members] of [a liberty interest in the companionship and society of a family member] is cognizable as a violation of due process." *Wilkinson v. Torres*, 610 F.3d 546, 554 (9th Cir. 2010). As the wife, children and parents of Decedent, Plaintiffs possess constitutionally protected liberty interests in the companionship and society of their husband, father and son, respectively. *Morales v. City of Delano*, 852 F. Supp. 2d 1253, 1273–74 (E.D. Cal. 2012) (finding that spouses and children possess a constitutional interest in familial companionship with their spouse and parents). "There are two tests used to decide whether officers' conduct shocks the conscience, turning "on whether the officers had time to deliberate their conduct." *Ochoa v. City of Mesa,* 26 F.4th 1050, 1056 (9th Cir. 2022). "On one hand, the deliberate-indifference test applies if the situation at issue evolve[d] in a time frame that permits the officer to deliberate before acting." *Id*. "On the other hand, the purpose-to-harm test applies if the situation at issue escalate[d] so quickly that the officer [had to] make a snap judgment." *Id*.

Here, the involved officers had time to deliberate because they were at the scene for multiple minutes prior to the shooting, Decedent slowly walked towards the officers while holding a flathead screwdriver that remained down by his side the entire time. Further, the flathead screwdriver does not look like a knife, especially under the lighting conditions and distances the officers faced. Approximately 2 minutes and 35 seconds passed from when the officers exited their vehicles to when the Decedent exited out of his vehicle. Approximately 17 seconds passed from when Decedent exited his car until the shooting began and during that time Decedent slowly walked in the direction of the officers, while never changing his pace. A

rational jury could find that this was sufficient time for the officers to deliberate prior to firing. At a minimum, there is a genuine dispute as to whether the officers had time to deliberate and this issue should be resolved by a jury. See *Garlick v. Cnty. of Kern*, 167 F. Supp. 3d 1117, 1168 (E.D. Cal. 2016) ("In the face of genuine disputes of material fact, the Court is not compelled to find which of the standards applies as a matter of law."); *Greer v. City of Hayward*, 229 F. Supp. 3d 1091, 1108 (N.D. Cal. 2017) ("Here, there is evidence to support both standards, and the determination should be left to the jury.").

Even if the trier of fact were to find the purpose to harm standard to be appropriate, based on Plaintiffs' facts, a reasonable jury could still find that the officers' use of deadly force was unlawful, especially when the evidence is viewed in the light most favorable to Plaintiffs, including all reasonable inferences therefrom[1]. Accordingly, Defendants are not entitled to summary judgment or qualified immunity under this claim.

**E. Plaintiffs' State Law Claims**

Defendants' Motion for summary judgment should also be denied as to Plaintiffs' state law claims for battery, negligence and violation of the Bane Act. Contrary to the Defendants' Motion, state law battery is no longer the same standard as "a federal claim of excessive force". Mot. at 30:25-28. Pursuant to California Penal Code section 835a (PC 835a), the standard now differs. Officers are to use deadly force only when it is necessary in defense of human life and shall use other available resources and techniques if reasonably safe and feasible to do so. Cal. Pen. Code § 835a(a)(2). An officer is justified in using deadly force upon another person only when the officer reasonably believes that such force is necessary to defend against an imminent threat of death or serious bodily injury to the officer or to

another person. Cal. Pen. Code § 835a(c)(1)(A). A threat of death or serious bodily injury is "imminent" when the subject has the present ability, opportunity, and apparent intent to immediately cause death or serious bodily injury to the peace officer or another person. Cal. Pen. Code § 835a(e)(2). An imminent harm is not merely a fear of future harm, no matter how great the fear and no matter how great the likelihood of the harm. *Id*.

A rational jury could find that Decedent lacked the ability, opportunity, and apparent intent to immediately cause death or serious bodily injury. While experiencing a mental health crisis after slitting his wrist, he walked slowly toward the officers with the screwdriver lowered at his side, made no stabbing or slashing motion, and did not attempt to injure anyone other than himself. That conclusion is further supported by the officers' four-to-one numerical advantage, the availability of several less-lethal alternatives, their failure to verbally warn Decedent that deadly force would be used prior to firing and their failure to tactically reposition to increase their distance from Decedent.

A police officer's pre-shooting conduct is taken into consideration as part of the totality of the circumstances and police officers have a duty to act reasonably when using deadly force. *Hayes v. County of San Diego*, 57 Cal. 4th 622, 637 (2013). Here, the Defendant Officers were negligent in their pre-shooting conduct, including not recognizing that Decedent was holding a flathead screwdriver as opposed to a knife, not formulating a tactical plan which designated someone as less lethal, not using less lethal such as a taser, OC spray or the 40mm, not giving a verbal warning that deadly force would be used and not tactically repositioning to increase the distance from the Decedent, even though it was safe to do so. The

---

[1] Defendants' Motion is void of any argument regarding the deliberate indifference standard and have therefore waived any such argument. See Mot. at 25:7-26:6.

officers were also negligent in their use of deadly force, including shots as Decedent was falling to the ground and while he was on the ground.

As discussed above (see Section IV(A), *supra*), a jury could find that the Defendant Officers violated Decedent's constitutional rights by using excessive and unreasonable deadly force against him. See *Williamson v. City of Nat'l City*, 23 F.4th 1146, 1155 (9th Cir. 2022) (holding that the Bane Act requires proof of an underlying constitutional violation). A reasonable jury could also find that Defendant Officers showed a "reckless disregard" for Decedent's Fourth Amendment rights when they shot the Decedent, who appeared to be experiencing a mental health crisis, while he was holding a flathead screwdriver, and slowly walking in the direction of the officers with the screwdriver down by his side, without ever giving a verbal warning that deadly force would be used prior to shooting. *Reese v. County of Sacramento*, 888 F.3d 1030, 1045 (9th Cir. 2018) (holding that reckless disregard for a person's constitutional rights is evidence of a specific intent to deprive that person of their rights). Accordingly, the Court should deny summary judgment as to Plaintiffs' Bane Act claim.

## V. CONCLUSION

For the reasons above stated, the Court should deny Defendants' Motion for Summary Judgment.

Respectfully submitted,

DATED: October 16, 2026

THE LAW OFFICES OF DALE K. GALIPO

By: /s/ Eric Valenzuela

Eric Valenzuela
Dale K. Galipo
Attorneys for Plaintiffs