LAW OFFICES OF DALE K. GALIPO
Dale K. Galipo (Bar No. 144074)
dalekgalipo@yahoo.com
Eric Valenzuela (Bar No. 284500)
evalenzuela@galipolaw.com
21800 Burbank Boulevard, Suite 310
Woodland Hills, California 91367
Telephone: (818) 347-3333
Facsimile: (818) 347-4118

Attorneys for Plaintiffs

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| MARIA GUADALUPE DIAZ, et al.,<br><br>Plaintiffs,<br><br>vs.<br><br>CITY OF TORRANCE, et al.,<br><br>Defendants. | Case No. 2:25-cv-03389-JLS(AYPx)<br><br>Honorable Josephine L. Staton<br>Courtroom 8A<br><br>**PLAINTIFFS' STATEMENT OF GENUINE DISPUTES OF MATERIAL FACT AND ADDITIONAL MATERIAL FACTS**<br><br>Date: November 6, 2026<br>Time: 10:30 a.m.<br>Ctrm: 8A |

**TO THE HONORABLE COURT, ALL PARTIES, AND THEIR ATTORNEYS OF RECORD**:

Pursuant to Local Rules 56-1, 56-2 and the Court's Initial Standing Order, Plaintiffs respectfully submit their Statement of Genuine Disputes of Material Fact and Additional Material Facts.

DATED: October 16, 2026 LAW OFFICES OF DALE K. GALIPO

By /s/ Eric Valenzuela
Eric Valenzuela
Attorneys for Plaintiffs

## PLAINTIFFS' STATEMENT OF GENUINE DISPUTES OF MATERIAL FACTS

| Defs' SUF No. | DEFENDANTS' UNCONTROVERTED FACTS | PLAINTIFFS' RESPONSES AND SUPPORTING EVIDENCE |
|---|---|---|
| **1.** | On December 2, 2024, at approximately 4:35 p.m., TPD received a 911 call whereby the caller stated, "[T]here's a man with a gun at 2909 Oregon Court" in Torrance. (Declaration of Ryan M. Allein ("Allein Declaration"), at ¶ 2-3; 911 Audio, at 0:00-0:06, Exhibit A; Dispatch Audio Transcript, at 1:10-12, Exhibit B). | Undisputed. |
| **2.** | The 911 caller further stated he was the individual with the gun and that he was "gonna shoot somebody, [and] gonna stab somebody." (Allein Declaration, at ¶ 2-3; 911 Audio, at 0:00-0:25, Exhibit A; Dispatch Audio Transcript, at 1:22-38, Exhibit B). | Disputed to the extent that none of the shooting officers heard the 911 call prior to shooting Decedent. The shooting officers received the information regarding the incident from the radio dispatch communications and from the police car onboard computer and none of that information indicated that Decedent was "gonna shoot somebody". (See Defendants' Undisputed Facts No. 4; see also Exhibit A, Castillo Depo. at 16:1-14; Exhibit B, Garcia Depo. at 32:3-22; Exhibit C, Bermudez Depo. at 27:13-28:16; Exhibit D, Wissler Depo. at 14:19-15:4). |
| **3.** | The dispatcher asked the 911 caller, "How come? What's going on? Why do you want to?"; however, the 911 caller hung up the phone. (Allein Declaration, at ¶ 2-3; 911 Audio, at 0:28-0:33, Exhibit A; Dispatch Audio Transcript, at 2:2, Exhibit B). | Disputed to the extent that none of the shooting officers heard the 911 call prior to shooting Decedent. The shooting officers received the information regarding the incident from the radio dispatch communications and from the police car onboard computer. (See Defendants' Undisputed Facts No. 4; see also Exhibit A, Castillo Depo. at |

| | | |
|---|---|---|
| | | 16:1-14; Exhibit B, Garcia Depo. at 32:3-22; Exhibit C, Bermudez Depo. at 27:13-28:16; Exhibit D, Wissler Depo. at 14:19-15:4). |
| **4.** | Subsequently, at approximately 4:41 p.m., dispatch informed TPD officers that "RP states there is a man with a gun [at 2909 Oregon Court]. States he wants to shoot someone. We have one caller only." (Allein Declaration, at ¶ 3; Dispatch Audio Transcript, at 2:29-31, Exhibit B). | Undisputed. |
| **5.** | Officer Bermudez responded, "[C]opy from Hawthorne and Fashion." (Allein Declaration, at ¶ 3; Dispatch Audio Transcript, at 2:35-36, Exhibit B). | Undisputed. |
| **6.** | At or around this same time, Officer Castillo requested to "get a drone up[.]" (Allein Declaration, at ¶ 3; Dispatch Audio Transcript, at 3:9-11, Exhibit B). | Undisputed. |
| **7.** | Dispatch eventually told officers the 911 caller's phone number belonged "to a Leonardo Diaz, 34 year old Hispanic male, 6"1', 285, brown over black, black over brown" and that he "possibl[y] work[ed] at the Apollo Scooters at 2909 Oregon Court." (Allein Declaration, at ¶ 3-5; Dispatch Audio Transcript, at 6:5-6, 8:31-32, Exhibit B; Deposition of Arturo Castillo ("Castillo Deposition"), at 19:11-16, Exhibit C; Deposition of Jason Bermudez ("Bermudez Deposition"), at 29:7-17, Exhibit D). | Undisputed. |

| | | |
|---|---|---|
| **8.** | It was later confirmed Diaz worked at the Apollo Scooters shop as a repair technician, but that the store moved out of the location approximately a week ago prior to the incident. (Allein Declaration, at ¶ 3; Dispatch Audio Transcript, at 9:26-28, 10:11-13, Exhibit B). | Undisputed. |
| **9.** | Based on Diaz being near his old place of employment, Officer Castillo "believed that this possibly was a disgruntled employee that possibly killed his former employer and had him in the vehicle."(Allein Declaration, at ¶ 4; Castillo Deposition, at 44:3-12, Exhibit C). | Disputed to the extent that it was unreasonable for Castillo to "believe[] that this possibly was a disgruntled employee that possibly killed his former employer and had him in the vehicle for several reasons. The call for service did indicate that anyone had been injured or shot and Castillo had information that the business where Decedent had worked at had closed down a week prior. Further, Castillo never saw anyone else in Decedent's vehicle, he had no information that anyone had been killed or that any employee or employer was missing. (Ex. A, Castillo Depo. at 18:17-19, 19:7-10, 22:2-5, 40:5-8, 44:13-23, 45:4-10, 47:9-12, 59:17-20; Exhibit E, Harmening Declaration at ¶¶ 20, 24) |
| **10.** | Further, it was discovered "the phone ping that was being used was in the intersection of Maple and Oregon Court, where the potential man with a gun was at." (Allein Declaration, at ¶ 4-5; Castillo Deposition, at 18:8-16, Exhibit C; Bermudez Deposition, at 29:7-12, Exhibit D). | Undisputed. |

| | | |
|---|---|---|
| **11.** | At or around this time, the drone operator – Officer J. Clark ("Officer Clark") – "advis[ed] | Undisputed. |

| | | |
|---|---|---|
| | [officers] that there was a male subject in a green Dodge Charger that was opening and closing his door, looking around in the area."<br><br>Evidentiary Support:<br>Allein Declaration, at ¶ 3-4; Castillo Deposition, at 22:9-15, 25:25-26:4, Exhibit C; Dispatch Audio Transcript, at 11:2-4, Exhibit B; Declaration of Arturo Castillo ("Castillo Declaration"), at ¶ 6; Drone Video #1, at 8:40-14:13, Exhibit G. | |
| **12.** | The male subject was later determined to be Diaz. (Allein Declaration, at ¶ 8; Los Angeles County Department of Medical Examiner, Autopsy Report ("Autopsy Report"), at 1, Exhibit M). | Undisputed. |
| **13.** | At this point, Officer Wissler and Sergeant Garcia "continued to the intersection of Oregon Court and Maple, conducted a U-turn, and then proceeded to conduct a traffic stop on the green Charger." (Allein Declaration, at ¶ 6-7; Deposition of Cody Wissler ("Wissler Deposition"), at 21:16-23, Exhibit E; Deposition of Jesus Garcia ("Garcia Deposition"), at 42:10-19, Exhibit F). | Undisputed. |
| **14.** | Officer Garcia testified there was a malfunction with his body camera causing it not to activate during the incident. (Allein Declaration, at ¶ 7; Garcia Deposition, at 98:12-17). | Disputed. Garcia's body cam did not malfunction. Garcia simply failed to properly press the button on the camera to activate it. (Ex. B, Garcia Depo. at 99:3-12.) |

| | | |
|---|---|---|
| **15.** | Officers Castillo and Bermudez then arrived in their vehicle and parked their vehicle "southwest . . . just a bit offset" of where Officer Wissler and Sergeant Garcia were parked. (Allein Declaration, at ¶ 4, 6-7; Castillo Deposition, at, 27:25-28:24, Exhibit C; Bermudez Deposition, at 34:16-25, Exhibit D; Garcia Deposition, at 43:5-44:1, Exhibit F). | Undisputed. |
| **16.** | "Initially, when [the officers] exited the[ir] vehicle[s], Officer Wissler was tasked with saying commands" – specifically, for Diaz "to lower [his] windows [and] '[l]et me see your hands.'" (Allein Declaration, at ¶ 6-7; Garcia Deposition, at 47:3-10, Exhibit F; Wissler Deposition, at 26:9-13, Exhibit E). | Disputed to the extent that in Wissler's interview he indicated that he gave commands for Decedent to slowly open the door with his left hand. (Exhibit F, Wissler Interview at 13:28-32, 14:7-11). |
| **17.** | During this time, drone operator Officer Clark "continued to notify [the officers] that the driver in the green Charger began to open and close his door." (Allein Declaration, at ¶ 4, 6-7; Wissler Deposition, at 26:19-23, Exhibit E; Garcia Deposition, at 47:14-17, Exhibit F; Castillo Deposition, at 38:20-24, Exhibit C). | Undisputed. |
| **18.** | Sergeant Garcia then "told Officer Bermudez to move his vehicle from its current position and position it [like a felony stop] north of Officer Wissler and [Sergeant Garcia's] vehicle; Officer Bermudez then "moved his vehicle and parked it just north of | Undisputed. |

| | | |
|---|---|---|
| | Officer Wissler and [Sergeant Garcia's] vehicle [("WG Vehicle")]." (Allein Declaration, at ¶ 4-5, 7; Garcia Deposition, at 47:23-48:8, Exhibit F, Castillo Deposition, at 41:25-42:3, Exhibit C; Bermudez Deposition, at 39:5-11, Exhibit D). | |
| **19.** | A plan was developed to conduct a high-risk stop, to create time, distance, and cover while safely detaining Diaz; Officer Bermudez positioned himself on the driver's side of Castillo/Bermudez's vehicle ("CB Vehicle"); Sergeant Garcia positioned himself on the passenger side of CB's vehicle; and Officer Wissler positioned himself to the driver's side of WG's vehicle. (Allein Declaration, at ¶ 4, 7; Castillo Deposition, at 31:10-23, 33:2-13, 41:8-11, Exhibit C; Garcia Deposition, at 48:9-15, Exhibit F). | Disputed to the extent other than Castillo telling Bermudez to reposition his car to do a felony stop, no plan or tactical plan was ever developed prior to the gunshots. (Ex. B, Garcia Depo at 49:7-12, Ex. C, Bermudez Depo. at 91:13-92:10; Exhibit G, Officer Body Cam Bates TPD 00040 at 0:00:12-0:02:58). |
| **20.** | Behind Defendant Officers was Maple Avenue, which was full of "a lot of cars . . . leaving work." (Allein Declaration, at ¶ 5; Bermudez Deposition, at 60:3-10, Exhibit D). | Disputed. The street behind the officer was approximately 20 feet away and there was nothing physically obstructing the officers from backing up. There was sufficient room to back up and increase the distance from the officers and Decedent. (Ex. C, Bermudez Depo. at 60:11-17; Ex. E, Harmening Decl. at ¶¶ 14, 15, 21-22). |
| **21.** | Officer Castillo grabbed the M4 rifle from his trunk and positioned himself on the passenger side of WG's vehicle. (Allein Declaration, at ¶ 4, 7; Castillo Deposition, at 37:16-20, Exhibit C; Garcia Deposition, at 47:18-21, Exhibit | Undisputed. |

| | | |
|---|---|---|
| | F). | |
| **22.** | Prior to Sergeant Garcia repositioning himself, Officer Castillo had told Sergeant Garcia, "Why don't you quarterback this? I got the long gun[.]" (Allein Declaration, at ¶ 4, 7; Garcia Deposition, at 52:16-21, Exhibit F; Castillo Deposition, at 51:17-23, Exhibit C; Castillo Declaration, at ¶ 5; Castillo Body Cam, at 1:27-1:31). | Undisputed. |
| **23.** | Sergeant Garcia understood Officer Castillo's statement to "basically . . . take charge and designate any – any roles . . . [to] basically take over . . . giving any instructions to [Officer Castillo's] partner who was on his first day of patrol." (Allein Declaration, at ¶ 7; Garcia Deposition, at 52:22-53:5, Exhibit F). | Undisputed. |
| **24.** | Sergeant Garcia "also asked for less lethal" – specifically, "for the next unit arriving on scene – to bring less-lethal option with them[.]" (Allein Declaration, at ¶ 3, 7; Garcia Deposition, at 49:1-6, Exhibit F; Dispatch Audio Transcript, at 12:36-13:2, Exhibit B). | Undisputed. |
| **25.** | Subsequently, Officer Wissler commanded Diaz to open the door and told Diaz on seven separate occasions, "Let me see your hands." (Allein Declaration, at ¶ 4-7; Wissler Deposition, at 41:7-12, Exhibit E; Declaration of Cody Wissler ("Wissler Declaration"), at | Undisputed. |

| | | |
|---|---|---|
| | ¶ 5; Cody Wissler Body Worn Camera ("Wissler Body Cam"), at 0:37-3:02, Exhibit H; Garcia Deposition, at 48:16-21, Exhibit F; Castillo Deposition, at 48:10-24, Exhibit C; Castillo Declaration, at ¶ 5; Arturo Castillo Body Worn Camera ("Castillo Body Cam"), at 0:37-2:45, Exhibit I; Bermudez Deposition, at 49:21-50:4, Exhibit D; Declaration of Jason Bermudez ("Bermudez Declaration"), at ¶ 5; Jason Bermudez Body Worn Camera ("Bermudez Body Cam"), at 1:50-2:00, Exhibit J). | |
| **26.** | Diaz partially opened the door and Officer Wissler stated, "He's got a knife. He's bleeding." (Allein Declaration, at ¶ 6; Wissler Deposition, at 31:12-18, Exhibit E; Wissler Declaration, at ¶ 5; Wissler Body Cam, at 2:29-2:31, Exhibit H; Castillo Declaration, at ¶ 6; Drone Video #2, at 0:46-0:50, Exhibit K; Declaration of Jesus Garcia ("Garcia Declaration"), at ¶ 5; Patrol Vehicle Camera, at 1:33-1:35, Exhibit L). | Undisputed. |
| **27.** | It was later determined the weapon in Diaz's right hand was not a knife, but rather a flathead screwdriver. (Allein Declaration, at ¶ 4-5, 7; Castillo Deposition, at 71:21-24, Exhibit C; Bermudez Deposition, at 73:17-21, Exhibit D; Garcia Deposition, at 109:8-10). | Disputed as to when the officers were able to determine that it was a flathead screwdriver. A flathead screwdriver does not look like a knife. Further, Decedent was walking at a slow pace, Decedent remained holding the screwdriver in the same general place down by his side, right before and at the time of the shooting Decedent was at a distance where the officers should have been able to see that the item was a screwdriver and not a knife and there |

| | | |
|---|---|---|
| | | was good lighting outside at the time of the incident. (Ex. G, Officer Body Cam Bates TPD 00040 at 0:00:12-0:02:58; Exhibit H, Castillo Interview at 24:32-34; Ex. F, Wissler Interview at 22:16-25). |
| **28.** | At this point, Officer Wissler again told Diaz to "Let me see your hands[,]" but also told him to "Open the door" and "Drop the knife." (Wissler Declaration, at ¶ 5; Wissler Body Cam, at 2:36-2:58, Exhibit H; Garcia Declaration, at ¶ 5; Patrol Vehicle Camera, at 1:35-2:02, Exhibit L). | Undisputed. |
| **29.** | Diaz then exited the vehicle and began walking towards the officers while holding what appeared to be a knife "off to his side of the hip, pointed toward[s] [them]" and his left hand/wrist were covered in blood. (Allein Declaration, at ¶ 4-7; Castillo Deposition, at 57:20-24, Exhibit C; Bermudez Deposition, at 53:24-54:6, Exhibit D; Wissler Deposition, at 37:11-16, Exhibit E; Garcia Deposition, at 63:21-23, 65:22-66:7, Exhibit F; Castillo Declaration, at ¶ 6; Drone Video #2, at 0:52-1:07, Exhibit K; Garcia Declaration, at ¶ 5; Patrol Vehicle Camera, at 2:02-2:19, Exhibit L). | Disputed. A flathead screwdriver does not look like a knife. Further, Decedent was walking at a slow pace, Decedent remained holding the screwdriver in the same general place down by his side, right before and at the time of the shooting Decedent was at a distance where the officers should have been able to see that the item was a screwdriver and not a knife and there was good lighting outside at the time of the incident. Further disputed that Decedent was pointed the screwdriver towards the officers. Videos of the incident do not show Decedent pointing the screwdriver directly at the officers. (Ex. G, Officer Body Cam Bates TPD 00040 at 0:00:12-0:02:58; Ex. I, Officer Body Cam Bates TPD 00039 at 0:00:25-0:03:16; Exhibit H, Castillo Interview at 24:19-34; Ex. F, Wissler Interview at 22:16-25). |
| **30.** | Officers commanded Diaz to "turn around," "get on the ground," and "drop the knife"; however, Diaz continued to walk towards officers | Disputed that the screwdriver was pointed at the officers. Videos of the incident do not show Decedent pointing the screwdriver directly at the officers. |

| | | |
|---|---|---|
| | with the weapon in his hand pointed at the officers. (Allein Declaration, at ¶ 4-5, 7; Wissler Deposition, at 41:13-42:3, Exhibit E; Wissler Declaration, at ¶ 5; Wissler Body Cam, at 3:00-3:15, Exhibit H; Castillo Deposition, at 56:21-25, Exhibit C; Castillo Declaration, at ¶ 5; Castillo Body Cam, at 2:48-2:58, Exhibit I; Bermudez Deposition, at 57:2-15, Exhibit D; Bermudez Declaration, at ¶ 5; Bermudez Body Cam, at 2:12-2:21, Exhibit J; Garcia Deposition, at 70:5-23, Exhibit F; Garcia Declaration, at ¶ 5; Patrol Vehicle Camera, at 2:02-2:19, Exhibit L). | (Ex. G, Officer Body Cam Bates TPD 00040 at 0:00:12-0:02:58; Ex. I, Officer Body Cam Bates TPD 00039 at 0:00:25-0:03:16) |
| **31.** | As Sergeant Garcia and Officer Castillo instructed Diaz to "Stop; get on the ground; [and] drop the knife," Diaz "nodded his head in a side-to-side motion . . . as if to say, 'No, I'm not going to do what you ask.'" (Allein Declaration, at ¶ 4, 7; Garcia Deposition, at 96:1-6, Exhibit F; Castillo Deposition, at 57:1-4, Exhibit C; Wissler Declaration, at ¶ 5; Wissler Body Cam, at 3:07-3:08, Exhibit H; Castillo Declaration, at ¶ 6; Drone Video #2, at 0:56-0:58, Exhibit K; Garcia Declaration, at ¶ 5; Patrol Vehicle Camera, at 2:09-2:11, Exhibit L). | Disputed that Decedent "nodded his head in as side-to-side motion…as if to say, 'No, I'm not going to do what you ask.'". As an initial matter, Defendants are speculating as to what Decedent was thinking. Further, during his interview, Bermudez told investigators that Decedent never did anything to communicate verbally or non-verbally. (Exhibit J, Bermudez Interview at 31:38-32:2, 32:28-31). |
| **32.** | "Initially, once [Diaz] began walking, he walked diagonally in a northwest position. He maybe did that for 7 or 8 feet, and then he did what [Sergeant Garcia] would | Disputed that Decedent did "like a quarter turn". Decedent appears to be walking in the same general direction during the incident and does not appear to do a turn. (Ex. K, Drone Video Bates |

| | | |
|---|---|---|
| | describe as like a quarter turn and then continued westbound in a straight . . . line." (Allein Declaration, at ¶ 7; Garcia Deposition, at 68:21-69-7, Exhibit F; Wissler Declaration, at ¶ 5; Wissler Body Cam, at 3:01-3:15, Exhibit H; Castillo Declaration, at ¶ 6; Drone Video #2, at 0:52-1:03, Exhibit K; Garcia Declaration, at ¶ 5; Patrol Vehicle Camera, at 2:02-2:12, Exhibit L). | TPD 00099 at 0:00:50-0:01:07). |
| **33.** | Prior to the officers' firing their weapons, Diaz was: "[l]ess than 5 feet" away from Officer Castillo; "[a]pproximately 3 feet" away from Officer Wissler; and "4 to 5 feet" away from Sergeant Garcia. (Allein Declaration, at ¶ 4, 6-7; Castillo Deposition, at 77:3-6, Exhibit C; Castillo Declaration, at ¶ 5; Castillo Body Cam, at 2:44-3:00, Exhibit I; Wissler Deposition, at 45:7-9, Exhibit E; Wissler Declaration, at ¶ 5; Wissler Body Cam, at 3:15-3:16, Exhibit H; Garcia Deposition, at 81:4-6, Exhibit F; Castillo Declaration, at ¶ 6; Drone Video #2, at 1:07, Exhibit K; Garcia Declaration, at ¶ 5; Patrol Vehicle Camera, at 2:19, Exhibit L). | Disputed. Based on video of the incident, Decedent appears to be further than 3-5 feet from the officers at the time of the shooting. Wissler estimated that Decedent was approximately 7 feet away from Garcia when the shooting began. (Ex. K, Drone Video Bates TPD 00099 at 0:00:50-0:01:07; Ex. D., Wissler Depo. at 60:16-19). |
| **34.** | Officer Bermudez testified the nearest officer was approximately 5 feet away from Diaz before he fired. (Allein Declaration, at ¶ 5; Bermudez Deposition, at 61:2-9, Exhibit D). | Disputed. Based on video of the incident, Decedent appears to be further than 5 feet from the nearest officer before Bermudez fired. (Ex. K, Drone Video Bates TPD 00099 at 0:00:50-0:01:07). |
| **35.** | Specifically, Diaz walked past the front of the two patrol vehicles | Disputed. As an initial matter it is vague as to what point in time Defendants are |

| | | |
|---|---|---|
| | directly in front of Sergeant Garcia. (Allein Declaration, at ¶ 7; Wissler Declaration, at ¶ 5; Wissler Body Cam, at 3:15-3:20, Exhibit H; Garcia Deposition, at 87:15-88:11, Exhibit F; Castillo Declaration, at ¶ 6; Drone Video #2, at 1:07, Exhibit K). | referring to. Disputed that Decedent "walked past the front of the patrol vehicles" prior to the gunshots. (Ex. K, Drone Video Bates TPD 00099 at 0:00:50-0:01:07). |
| **36.** | Officer Castillo then fired two shots; Officer Bermudez fired three shots; Officer Wissler fired three shots; and Sergeant Garcia fired two shots. (Allein Declaration, at ¶ 4-7; Castillo Deposition, at 62:5-6, Exhibit C; Castillo Declaration, at ¶ 5; Castillo Body Cam, at 2:58-3:00, Exhibit I; Bermudez Deposition, at 23:17-19, Exhibit D; Bermudez Declaration at ¶ 5; Bermudez Body Cam, at 2:20-2:22, Exhibit J; Wissler Deposition, at 47:5-6, Exhibit E; Wissler Declaration, at ¶ 5; Wissler Body Cam, at 3:16-3:18, Exhibit H; Garcia Deposition, at 81:10-12, Exhibit F). | Disputed that Decedent "walked past the front of the two patrol vehicles" and then was shot by the four officers. Disputed that Castillo fired "fired two shots". During his interview, Castillo told investigators he fired three shots.<br>(Ex. K, Drone Video Bates TPD 00099 at 0:00:50-0:01:07; Ex. H, Castillo Int. at 60:7-9) |
| **37.** | Immediately prior to firing his two shots, Officer Castillo yelled, "40, 40, 40, c'mon[,]" which was in reference to the 40-millimeter less lethal weapon. However, at this time, the 40-millimiter was locked in the trunk and an officer "would then [have to] locate . . . a small bag that contain[ed] the rounds that's used for the 40 millimeter, which would be the sponge rounds [and] [¶] would then have to remove the correct round to load | Disputed. Officers Choi and High were never designated as less lethal. Officers Castillo, Garcia, Bermudez and Wissler never designated anyone as less lethal prior to the shooting. During the incident, Castillo yelled out to Garcia, Bermudez and Wissler, his partners on scene, to "get the 40 up" and "40,40, 40, come on) so they could deploy the 40mm less lethal against Decedent. Castillo was not communicating this over the radio for Officers Choi and High to hear. Instead, Castillo was |

| | | |
|---|---|---|
| | into the 40-millimeter weapon." Further, although Officers Samuel Choi ("Officer Choi") and Kevin High ("Officer High") were designated as less-lethal coverage, they were unable to respond and position with the 40-millimeter before engaging Diaz because: (1) they arrived as the shooting was occurring; (2) Diaz "exited the vehicle on his own, without being told so, and began to close the distance on [the Defendant Officers], limiting the effective range for that 40-millimeter launcher"; and as described by Officer Choi in his declaration, the 40-millimeter required an extensive process before he could have it ready for use. (Allein Declaration, at ¶4, 7; Declaration of Samuel Choi, at ¶¶ 1-13; Castillo Deposition, at 30:4-12, 74:19-75:1, 90:6-9, 91:7-13, Exhibit C; Castillo Declaration, at ¶ 5; Castillo Body Cam, at 2:54-2:57, Exhibit I; Garcia Deposition, at 26:3-19, Exhibit F; Garcia Declaration, at ¶ 5; Patrol Vehicle Camera, at 2:14-2:16, Exhibit L). | yelling it out to Garcia, Bermudez and Wissler, who were directly to his left, within yelling distance. Castillo also testified that no one ever designated Officers Choi or High as less lethal while they were at the scene. Further disputed that Decedent was not within the "effective range for that 40-millimeter launcher". The effective range of the 40mm is up to 120 feet. Further disputed to the extent that there was sufficient time to designate an officer as less lethal and to retrieve the 40mm and ammo from the back of the patrol cruiser. There was approximately 2 minutes and 35 seconds from when the officers exited their vehicles, until the Decedent exited out of his vehicle. This was sufficient time for the officers to designate someone as less lethal and retrieve the 40mm and ammo from the police cruiser. Especially for Bermudez who had entered the car to reposition it during this time period. (Ex. G, Officer Body Cam Bates TPD 00040 at 0:00:12-0:02:58; Ex. A, Castillo Depo. at 92:8-11; Ex. B, Garcia Depo. at 16:11-14; Exhibit L, Officer Body Cam Bates TPD 00041 at 0:00:25-0:02:21; Exhibit M, Officer Body Cam Bates TPD 00047 at 0:00:24-0:03:16; Exhibit N, Officer Body Cam Bates TPD 00050 at 0:00:23-0:03:15; Ex. I, Officer Body Cam Bates TPD 00039 at 0:00:00-0:03:16; Exhibit H, Castillo Interview at 17:10-13; Ex. E, Harmening Decl. at ¶ 26) |
| **38.** | Diaz fell right up against the front passenger wheel of WG's vehicle – directly in front of Sergeant Garcia and between both patrol | Undisputed. |

| | | |
|---|---|---|
| | vehicles. (Allein Declaration, at ¶ 4-7; Castillo Deposition, at 82:3-9, Exhibit C; Castillo Declaration, at ¶ 5; Castillo Body Cam, at 4:35, Exhibit I; Bermudez Deposition, at 70:11-18, Exhibit D; Bermudez Declaration, at ¶ 5; Bermudez Body Cam, at 2:41-2:43, Exhibit J; Wissler Deposition, at 55:6-56:2, Exhibit E; Wissler Declaration, at ¶ 5; Wissler Body Cam, at 3:23, Exhibit H; Garcia Deposition, at 87:16-88:11, Exhibit F; Castillo Declaration, at ¶ 6; Drone Video #2, at 1:07, 1:12, Exhibit K). | |
| **39.** | TPD Officers Castillo, Wissler, Garcia, and Bermudez completed the Los Angeles County Sheriff's Department Academy and the "Basic Course – Intensive" before becoming patrol officers. (Declaration of Ryan Schmitz ("Schmitz Declaration"), at ¶¶ 5-8; Officer Castillo's California Commission on POST Profile ("POST Profile"), "Basic Course – Intensive," completed on March 13, 2020, at 1, Exhibit O; Officer Wissler's POST Profile, "Basic Course – Intensive," completed on August 30, 2024, at 1, Exhibit P; Sergeant Garcia's POST Profile, "Basic Course – Intensive," completed on July 28, 2004, at 1, Exhibit Q; Officer Bermudez's POST Profile, "Basic Course – Intensive," completed on November 8, 2024, at 1, Exhibit R). | Undisputed. |

| | | |
|---|---|---|
| **40.** | Further, TPD Officers Castillo, Wissler, Garcia, and Bermudez received training on the use of force. (Schmitz Declaration, at ¶¶ 5-8; Officer Castillo's POST Profile, "Use of Force (PSP)/Force Options Use of Force/De-Esc", completed on February 24, 2022, July 27, 2023, February 15, 2024, February 29, 2024, January 30, 2025, February 12, 2025, at 1-2, Exhibit O; Officer Wissler's POST Profile, "Force Options Use of Force/De-Esc", completed on October 2, 2024, at 1, Exhibit P; Sergeant Garcia's POST Profile, "Use of Force (PSP)/De-Escalation Awareness/Use of Force Instructor", completed on January 20, 2022, March 9, 2023, July 27, 2023, October 23, 2024, July 11, 2025, at 1-4, Exhibit Q; Officer Bermudez's POST Profile, "Use of Force (PSP)/Force Options Use of Force/De-Esc", completed on July 30, 2025, September 11, 2025, at 1, Exhibit R). | Undisputed. |
| **41.** | The TPD trains its officers that officers shall use only that amount of force that reasonably appears necessary given the facts and totality of the circumstances known to or perceived by the officer at the time of the event to accomplish a legitimate law enforcement purpose. (Schmitz Declaration, at ¶ 4; Torrance Police Department Policy Manual ("Policy Manual"), 300.3, at 63- | Undisputed. |

| | | |
|---|---|---|
| | 64, Exhibit N). | |
| **42.** | The TPD's policy requires officers to use only the level of force that is objectively reasonable and to consider actions that may increase officer safety and may decrease the need for using force and that "[i]f the officer reasonably believes that a threat exists based on the totality of circumstances presented at the time (e.g., high-risk stop, tactical entry, armed encounter), firearms may be directed toward such threat until the officer no longer perceives such threat." (Schmitz Declaration, at ¶ 4; Policy Manual, 300.3, 300.3.2, 300.4.2, at 63-64, 68, Exhibit N). | Undisputed. |
| **43.** | Further, the TPD's policy states an officer is justified to use deadly force when the officer reasonably believes it is necessary "to protect themself or others from what the officer reasonably believes is an imminent threat of death or serious bodily injury to the officer or another person." (Schmitz Declaration, at ¶ 4; Policy Manual, 300.4, at 67, Exhibit N). | Undisputed. |
| **44.** | The TPD's policy also states that an officer should consider actions that may increase officer safety and may decrease the need for using force only if "time and circumstances reasonably permit, and when community and officer safety would not be compromised[.]" (Schmitz | Undisputed. |

| | | |
|---|---|---|
| | Declaration, at ¶ 4; Policy Manual, 300.3.6, at 66, Exhibit N). | |
| **45.** | Finally, officers are trained that "[o]nce it is reasonably safe to do so, properly trained officers should promptly provide or procure medical assistance for any person injured or claiming to have been injured in a use of force incident[.]" (Schmitz Declaration, at ¶ 4; Policy Manual, 300.6, at 69, Exhibit N). | Undisputed. |
| **46.** | Officers Castillo, Wissler, Garcia, and Bermudez received adequate training on the use of force and use of deadly force. (Schmitz Declaration, at ¶¶ 5-8; Officer Castillo's POST Profile, "Use of Force (PSP)/Force Options Use of Force/De-Esc", completed on February 24, 2022, July 27, 2023, February 15, 2024, February 29, 2024, January 30, 2025, February 12, 2025, at 1-2, Exhibit O; Officer Wissler's POST Profile, "Force Options Use of Force/De-Esc", completed on October 2, 2024, at 1, Exhibit P; Sergeant Garcia's POST Profile, "Use of Force (PSP)/De-Escalation Awareness/Use of Force Instructor", completed on January 20, 2022, March 9, 2023, July 27, 2023, October 23, 2024, July 11, 2025, at 1-4, Exhibit Q; Officer Bermudez's POST Profile, "Use of Force (PSP)/Force Options Use of Force/De-Esc", completed on July 30, 2025, September 11, | Undisputed. |

| | | |
|---|---|---|
| | 2025, at 1, Exhibit R). | |
| **47.** | As a result of this incident, Plaintiffs filed the underlying First Amended Complaint in this Court. (Allein Declaration, at ¶ 9; First Amended Complaint, Exhibit S). | Undisputed. |

**PLAINTIFFS' ADDITIONAL UNCONTROVERTED FACTS**

| | | |
|---|---|---|
| 48. | Leonardo Diaz ("Decedent") was 34 years old when he was fatally shot by Officers Castillo, Garcia, Bermudez and Wissler of the Torrance Police Department. | Exhibit O, Autopsy Report at Cover page and page 1 (top right hand corner). |
| 49. | Decedent sustained nine (9) gunshot wounds, including two (2) shots to the back (gunshot wounds "E" and "F"). | Ex. O, Autopsy Report at 6-8 |
| 50 | The officers received the information relating to the call for service over the radio or from their onboard computer (they do not hear the actual 911 call). | Ex. C, Bermudez Depo. at 27:13-28:16; Ex. D, Wissler Depo. at 14:19-15:4 |
| 51. | The call for service did not indicate that anyone had been injured, shot or killed or that shots had been fired in the area. There was also no information that any employee or employer had been killed or (of where Decedent worked) was missing. The involved officers also never saw anyone else injured other than the Decedent. | Ex. A, Castillo Depo. at 18:17-19:10, 44:13-16; Ex. B, Garcia Depo. at 32:20-22, 39:6-8, 61:23-62:12, 114:23-115:1, 119:12-14; Ex. C, Bermudez Depo. at 29:21-30:1, 49:8-18; Ex. D, Wissler Depo. at 16:18-20, 39:14-17 |
| 52. | When the involved officers receive information about a call, they respond to the call to investigate. Based on the involved officers prior experience, sometimes that information is accurate other times it is not or is false, so they investigate to confirm. | Ex. A, Castillo Depo. at 50:17-51:2;<br>Ex. B, Garcia Depo. at 34:7-21, 112:15-18 |

| | | |
|---|---|---|
| 53. | Castillo has been a police officer for about 5 years at the time of the incident and was a member of the SWAT team, 3 of those years were with Torrance PD. Garcia was a field training officer (FTO) for Wissler at the time of the incident. Garcia has been a police officer for 20 years was the most senior officer on scene at the time of the incident. Wissler had been in field training for approximately two months at the time of the incident and it was his first time working with Garcia. Castillo was the training officer for Bermudez at the time of the incident. This was Bermudez's first day on patrol/field training as a police officer. This was Garcia's first time riding with Wissler and first time acting as his FTO. | Ex. H, Castillo Int. at 6:18-38; Ex. A, Castillo Depo. at 10:6-23, 17:10-18, 30:13-21, 80:10-18; Ex. B, Garcia Depo. at 7:5-7,13:4-9, 28:19-29:9, 46:18-23; Ex. C, Bermudez Depo. at 10:18-20, 22:20-23:1; Ex. D, Wissler Depo. at 9:18-10:11; Ex. H, Castillo Interview at 6:25-38, 21:12-19; Ex. J. Bermudez Int. at 5:26-31; Ex. D, Wissler Depo. at 9:18-10:5 |
| 54. | It was Officers Castillo and Garcia responsibility to assign different roles to the rookie officers (Wissler and Bermudez) who were still doing their training. | Ex. A, Castillo Depo. at 30:22-31:5 |
| 55. | The Defendant Officers have never seen or dealt with Decedent prior to the date of the incident. Other than the information provided by dispatch, the officers had no other background or knowledge of the Decedent. The officers did not have any information about Decedent's criminal history or if he ever physically injured anyone. | Ex. H, Castillo Int. at 42:31-43:7<br>Ex. J. Bermudez Int. at 29:33-30:3<br>Ex. F, Wissler Int. at 38:24-31<br>Ex. A, Castillo Depo. at 19:17-25, 83:9:14<br>Ex. B, Garcia Depo. at 40:7-10, 41:8-11, 115:17-116:3; Ex. C, Bermudez Depo. at 90:16-91:8; Ex. D, Wissler Depo. at 16:4-17 |

| | | |
|---|---|---|
| 56. | Business where Decedent previously worked was no longer there and had been vacated for approximately a week. | Ex. H, Castillo Int. at 12:30-13:2; Ex. J, Bermudez Int. at 10:27-32, 17:16-24; Ex. B, Garcia Depo. at 36:10-12; Ex. C, Bermudez Depo. at 32:7-13; Ex. D, Wissler Depo. at 19:5-20:1 |
| 57. | The officers had OC spray and a taser on their person. There was also a 40 millimeter (40mm) gun (less lethal) in every TPD police cruiser that is on patrol. These forms of less lethal are also considered forms of deescalation. The involved officers failed to reasonably deescalate the incident. | Ex. H, Castillo Int. at 17:1-3, 51:6-8, 53:13-25; Ex. J, Bermudez Int. at 35:15-26; Ex. A, Castillo Depo. at 34:2-16, 37:25-38:2, 89:10-17, 93:23-94:3; Ex. B, Garcia Depo. at 18:1-3, 24:11-22, 25:2-12; Ex. C, Bermudez Depo. at 18:9-11, 24:2-22; Ex. D, Wissler Depo. at 12:6-8, 13:12-21; Ex. E, Harmening Decl. at ¶ 17 |
| 58. | The taser in the probe mode has a maximum effective range of about 12-25 feet. OC spray has a maximum effective range of about 5-15 feet and is preferable to use outdoors. The maximum effective range of the 40mm is 120 feet. During this incident, all of these less lethal tools were reasonable/feasible alternatives to the use of deadly force. | Ex. A, Castillo Depo. at 34:19-21<br>Ex. B, Garcia Depo. at 14:21-16:16<br>Ex. C, Bermudez Depo. at 11:17-12:20; Ex. D, Wissler Depo. at 12:3-14; Ex. E, Harmening Decl. at ¶ 15 |
| 59. | All of the officers exited their car within seconds of each other. | Ex. C, Bermudez Depo. at 37:5-12 |
| 60. | The shooting officers were trained on the importance of tactics and formulating a tactical plan when safe to do so. It was improper in the context of accepted standards of policing and police training for all four of the initially responding officers to maintain lethal coverage and not formulate a tactical plan that included the deployment of less lethal alternatives. | Ex. A, Castillo Depo. at 12:20-23<br>Ex. B, Garcia Depo. at 13:21-24<br>Ex. C, Bermudez Depo. at 16:20-17:1<br>Ex. D, Wissler Depo. at 10:23-11:5; Ex. E, Harmening Decl. at ¶ 25 |

| | | |
|---|---|---|
| 61. | While Decedent was still in his car, he was opening and closing the door allowing the officers to see Decedent in the car. The officers did not see a gun in the car when Decedent was opening and closing the door or when a check of the car was done afterwards. | Ex. A, Castillo Depo. at 39:16-18, 70:7-14<br>Ex. B, Garcia Depo. at 107:17-108:3; Ex. D, Wissler Depo. at 54:8-24 |
| 62. | While Decedent was still in the car, the officers saw that Decedent was bleeding from his wrist and saw a knife in his hand and broadcast this information over the radio. The officers also saw that Decedent was bleeding from his wrist when he exited out of the car. | Ex. H, Castillo Int. at 15:1-15<br>Ex. J. Bermudez Int. at 11:20-25, 27:2-8<br>Ex. A, Castillo Depo. at 39:19-21, 59:4-9<br>Ex. B, Garcia Depo. at 55:10-19<br>Ex. C, Bermudez Depo. at 44:12-45:10, 46:3-13 |
| 63. | Because Decedent was bleeding from his wrist, the officers thought that Decedent may have been harming/cutting himself and that those were self-inflicted wounds. The officers also thought that Decedent may be suicidal. | Ex. H, Castillo Int. at 15:19-32, 44:1-3, 79:1-8; Ex. P, Garcia Int. at 20:25-30; Ex. J. Bermudez Int. at 11:26-27; Ex. B, Garcia Depo. at 101:24-102:11, 119:15-19; Ex. C, Bermudez Depo. at 45:3-13, 46:3-13, 87:14-23 |
| 64. | Garcia wanted to take Decedent to the hospital to get a psychiatric evaluation and get him help. | Exhibit P, Garcia Interview at 64:37-65:2 |
| 65. | According to the officers’ interviews, commands were given to Decedent to come out with his hands up and to step out of the vehicle which were all appropriate commands. The officers did not want to walk up on a vehicle if it’s a man with a gun so they wanted Decedent to come out of the car. The intent or perception of the commands was to get Decedent out of the vehicle so they could further investigate. | Exhibit P, Garcia Interview at 18:23-26, 42:14-31, 48:16-20, 52:20-53:19; Ex. J. Bermudez Int. at 11:35-36, 25:17-26:2; Ex. F, Wissler Int. at 13:28-32, 14:7-11; Ex. B, Garcia Depo. at 114:13-18; 115:7-16; Ex. C, Bermudez Depo. at 86:14-87:3 |

| | | |
|---|---|---|
| 66. | After the involved officers exited out of their police cruisers, Decedent was in his car for approximately two minutes and thirty six seconds before exiting. After Decedent exited out of his car, the involved officers shot him in approximately seventeen seconds. Two minutes and thirty six seconds is more than enough time to formulate a tactical plan and transition to less lethal, including the 40mm in the back of the police cruiser. Seventeen seconds is more than enough time to transition to a taser or OC spray that was stored on the involved officers person. It takes approximately two seconds to transition to the taser or OC spray. | Ex. G, Officer Body Cam Bates TPD 00040 at 0:00:12-0:02:58; Ex. I, Officer Body Cam Bates TPD 00039 at 0:00:25-0:03:16; Ex. K, Drone Video Bates TPD 00099 at 0:00:50-0:01:07; Exhibit L, Officer Body Cam Bates TPD 00041 at 0:01:25-0:02:21; Exhibit M, Officer Body Cam Bates TPD 00047 at 0:00:24-0:03:16; Exhibit N, Officer Body Cam Bates TPD 00050 at 0:00:23-0:03:15; Ex. C, Bermudez Depo. at 51:9-15; Ex. E, Harmening Decl. at ¶¶ 26-27 |
| 67. | Decedent was approximately 25-35 feet away from the officers when Decedent exited out of his vehicle. | Ex. H, Castillo Int. at 45:21-35<br>Ex. J. Bermudez Int. at 24:31-35<br>Ex. B, Garcia Depo. at 59:18-20, 68:6-9<br>Ex. C, Bermudez Depo. at 51:3-8 |
| 68. | There were good lighting conditions at the time of the incident and there were no issues with the lighting at all. | Ex. H, Castillo Int. at 24:32-34<br>Ex. F, Wissler Int. at 22:16-25 |
| 69. | When Decedent exited out of his vehicle, the officers could see Decedent's whole body, from the top of his head to the bottom of his feet. The officers never saw a gun on Decedent's person or a bulge or anything sticking out that might be a weapon concealed on his person. | Ex. A, Castillo Depo. at 60:13-61:5, 69:16-23; Ex. B, Garcia Depo. at 63:15-64:4, 83:8-11; Ex. C, Bermudez Depo. at 47:2-7, 48:7-49:1; Ex. D, Wissler Depo. at 36:3-37:4 |
| 70. | Decedent never reached into his waistband or into his pockets prior to (or during) the shooting. | Ex. A, Castillo Depo. at 61:6-11<br>Ex. B, Garcia Depo. at 64:9-18<br>Ex. C, Bermudez Depo. at 49:2-7; Ex. D, Wissler Depo. at 37:5-10 |

| | | |
|---|---|---|
| 71. | During the incident, Decedent was slowly walking towards the officers with his arms down by his side. Decedent never walked fast by any means, he was not speed walking, he never jogged and he never ran during the incident. | Ex. P, Garcia Int. at 25; Ex. G, Officer Body Cam Bates TPD 00040 at 0:00:12-0:02:58; Ex. I, Officer Body Cam Bates TPD 00039 at 0:00:25-0:03:16; Ex. K, Drone Video Bates TPD 00099 at 0:00:50-0:01:07; Exhibit L, Officer Body Cam Bates TPD 00041 at 0:01:25-0:02:21; Exhibit M, Officer Body Cam Bates TPD 00047 at 0:00:24-0:03:16; Exhibit N, Officer Body Cam Bates TPD 00050 at 0:00:23-0:03:15; Ex. P, Garcia Int. at 59:30-60:1; Ex. F, Wissler Int. at 15:6-8, 39:26-28, 49:1-3; Ex. A, Castillo Depo. at 58:23-59:3; Ex. B, Garcia Depo. at 69:12-70:4; Ex. C, Bermudez Depo. at 54:7-20; Ex. D, Wissler Depo. at 39:19-25 |
| 72. | Decedent had a flathead screwdriver in his right hand which was off to the side of his hip and it never moved or raised from that position prior to the shots. | Ex. P, Garcia Int. at 25:27-28; Exhibit Q, Photo of Flathead Screwdriver; Ex. A, Castillo Depo. at 57:23-58:19; Ex. B, Garcia Depo. at 66:13-67:24 |

| | | |
|---|---|---|
| 73. | Castillo told his partner Bermudez to assist Garcia with whatever necessary tools he might need to deescalate the situation (such as the 40mm) and to do what he says. The purpose of this was for Garcia to start delegating roles, start delegating a game plan how to safely detain Decedent and make sure we have every possible resource out there to detain Decedent. Garcia was "quarterbacking" the situation meaning he would be the incident commander of the whole scene and delegating all the necessary roles. Castillo instructed Bermudez to follow his lead with regard to any instructions. | Ex. H, Castillo Int. at 26:10-12, 32:33-33:7, 72:7-24; Ex. J. Bermudez Int. at 23:33-35; Ex. A, Castillo Depo. at 51:17-53:8; Ex. B, Garcia Depo. at 47:18-48:3, 52:16-54:9; Ex. C, Bermudez Depo. at 39:12-40:16 |
| 74. | Castillo screamed for his partners (Garcia, Wissler and Bermudez) to deploy the 40mm because they needed that tool now. Castillo was thinking and hoping that one of his partners had the 40mm launcher up and running at this point because he had requested it. Both Castillo and Garcia yelled out for the 40mm during the incident. The request for the 40mm was a last ditch effort to utilize a less lethal option. Garcia was pleading and praying for the 40mm to get deployed. | Ex. H, Castillo Int. at 17:10-13, 50:35-52:14, 55:20-23; Ex. G, Officer Body Cam Bates TPD 00040 at 0:00:12-0:02:58; Ex. P, Garcia Int. at 20:1-6, 20:35-21:21, 61:2-15; Ex. A, Castillo Depo. at 74:19-75:21; Ex. B, Garcia Depo. at 101:5-19; Ex. D, Wissler Depo. at 45:10-25 |
| 75. | When Castillo was yelling for the 40mm, he thought that it was appropriate to shoot Decedent with the 40mm (less lethal). | Ex. A, Castillo Depo. at 75:22-76:1 |
| 76. | According to Castillo, his role was lethal coverage with his rifle (AR-15). Castillo designated Bermudez as a lethal cover officer. Wissler was also assigned as lethal cover. Garcia never designated Castillo to grab the long rifle (he did that on his own). | Ex. H, Castillo Int. at 33:22-36, 53:27-28, 55:10-18; Ex. F, Wissler Int. at 45:34-37; Ex. A, Castillo Depo. at 31:6-33:18, 53:9-12; Ex. B, Garcia Depo. at 52:2-14; Ex. C, Bermudez Depo. at 35:21-36:17 |

| | | |
|---|---|---|
| 77. | During the incident, there were no less than lethal options that were up and running. None of the four officers on scene were ever designated as less lethal during the incident nor did they volunteer to be the less lethal option. None of the officers attempted to use less lethal during the incident and the officers never assumed that anyone had less lethal up and running. Wissler never inquired whether anyone was designated less lethal. | Ex. H, Castillo Int. at 55:10-18; Ex. G, Officer Body Cam Bates TPD 00040 at 0:00:12-0:02:58; Ex. I, Officer Body Cam Bates TPD 00039 at 0:00:25-0:03:16; Ex. J. Bermudez Int. at 35:1-31; Ex. A, Castillo Depo. at 37:9-15, 91:19-25, 94:13-19; Ex. B, Garcia Depo. at 44:22-45:10, 49:7-12, 53:24-54:2, 62:23-63:5; Ex. C, Bermudez Depo. at 36:8-37:17, 40:23-41:11, 44:9-11, 51:16-23, 93:23-95:7; Ex. D, Wissler Depo. at 24:9-12 |
| 78. | When the four officers exited out of their two vehicles, they did not formulate a tactical plan and assign various roles. Other than telling Bermudez to move his car for a felony stop, no other plans (including a tactical plan) were formulated. None of the officers were designated as less lethal prior to exiting out of their police cruisers. The officers did not discuss anyone being designated as less lethal cover prior to the vehicle stop or during the stop. Castillo nor Garcia never designated Bermudez to use the 40mm, even though Bermudez entered the police vehicle to reposition it (this was perfect opportunity to retrieve the 40mm from the vehicle). | Ex. J. Bermudez Int. at 23:4-21, 35:1-13<br>Ex. A, Castillo Depo. at 38:10-15<br>Ex. B, Garcia Depo. at 54:10-55:6<br>Ex. C, Bermudez Depo. at 36:5-37:17, 41:5-20, 91:13-92:10, 94:21-95:7 |
| 79. | Before Bermudez repositioned his vehicle, Garcia already had his gun out, he saw that Castillo had the long rifle out, that Wissler also had his gun out and Bermudez pulled his gun out after repositioning the car. | Ex. B, Garcia Depo. at 56:18-57:6 |

| | | |
|---|---|---|
| 80. | Garcia went for his taser and began to transition to the taser because he wanted another option other than deadly force. The taser was stored on his chest/vest. It only takes approximately two seconds to transition to the taser that was stored on his chest. | Ex. P, Garcia Int. at 21:23-32, 62:18-20<br>Ex. B, Garcia Depo. at 123-124:3 |
| 81. | Officers Choi and High were also not designated as less lethal when they did arrive on scene. | Ex. A, Castillo Depo. at 92:1-11 |
| 82. | The officers were standing behind their police car doors, which are ballistic doors designed to stop bullets, in case Decedent had a gun (which he did not). | Ex. G, Officer Body Cam Bates TPD 00040 at 0:00:12-0:02:58; Ex. I, Officer Body Cam Bates TPD 00039 at 0:00:25-0:03:16; Exhibit L, Officer Body Cam Bates TPD 00041 at 0:01:25-0:02:21; Exhibit M, Officer Body Cam Bates TPD 00047 at 0:00:24-0:03:16; Exhibit N, Officer Body Cam Bates TPD 00050 at 0:00:23-0:03:15; Ex. P, Garcia Int. at 76:35-77:2; Ex. B, Garcia Depo. at 60:8-12, 82:11-83:7; Ex. C, Bermudez Depo. at 42:13-18 |
| 83. | Decedent never made a stabbing or slashing motion with the screwdriver he was holding in his righthand and he never tried to throw it. | Ex. A, Castillo Depo. at 58:14-16<br>Ex. B, Garcia Depo. at 67:5-68:2<br>Ex. C, Bermudez Depo. at 54:23-25; 55:4-6, 74:17-19;<br>Ex. D, Wissler Depo. at 38:18-23 |
| 84. | Bermudez saw that it was a screwdriver that was in Decedent's hand before it was removed from his hand. | Ex. C, Bermudez Depo. at 100:16-19 |

| | | |
|---|---|---|
| 85. | Decedent never tried to lunge at any of the officers. | Ex. A, Castillo Depo. at 89:18-20<br>Ex. C, Bermudez Depo. at 54:21-22<br>Ex. D, Wissler Depo. at 40:1-2 |
| 86. | At no point during the incident did Decedent try to flee. | Ex. A, Castillo Depo. at 81:3-9<br>Ex. B, Garcia Depo. at 98:2-4<br>Ex. D, Wissler Depo. at 63:22-24 |
| 87. | The officers never gave a verbal warning that deadly force would be used prior to firing despite it being feasible to do so when Decedent was slowly walking towards the officers. Officers are trained to give a verbal warning before firing when feasible to do so. Based on officer training, a verbal warning is a command to do something with a warning that deadly force will be used if not complied with. | Ex. A, Castillo Depo. at 64:1-4; Ex. B, Garcia Depo. at 15:20-23; Ex. C, Bermudez Depo. at 19:23-20:1; Ex. G, Officer Body Cam Bates TPD 00040 at 0:00:12-0:02:58; Ex. I, Officer Body Cam Bates TPD 00039 at 0:00:25-0:03:16; Ex. D, Wissler Depo. at 51:12-52:7; Ex. E, Harmening Decl. at ¶ 28 |
| 88. | Contagious fire is when one officer fires for his own reasons and another officer may fire as well based on hearing that the other officer fired not using his own reasons. This appears to be a case of contagious fire. | Ex. B, Garcia Depo. at 116:20-117:4; Ex. E, Harmening Decl. at ¶ 15 |
| 89. | Castillo fired three rounds at Decedent. Garcia fired two shots at Decedent. Bermudez fired three rounds at Decedent simultaneously. Wissler fired three rounds during the incident. | Ex. H, Castillo Int. at 18:1-3, 60:7-9<br>Ex. P, Garcia Int. at 24:9-11<br>Ex. J, Bermudez Int. at 13:10, 42:12-14<br>Ex. F, Wissler int. at 52:1-3<br>Ex. C, Bermudez Depo. at 23:17-19, 62:11-14; Ex. D, Wissler Depo. at 47:5-6, 60:23-61:9 |

| | | |
|---|---|---|
| 90. | Wissler and Bermudez heard gunshots go off before they fired. Castillo and Garcia did not hear any shots being fired prior to or after firing his shots, but did hear shots being fired simultaneously. Bermudez did not hear any shots fired after he fired his shots. Castillo believes he fired the first shot but not the last shot. | Ex. F, Wissler Int. at 49:36-50:4<br>Ex. A, Castillo Depo. at 64:5-65:5, 81:13-82:2; Ex. B, Garcia Depo. at 81:7-18; Ex. C, Bermudez Depo. at 58:1-10; Ex. D, Wissler Depo. at 47:2-48:3 |
| 91. | Castillo was under the impression that his first two shots struck the Decedent. | Ex. A, Castillo Depo. at 72:13-25 |
| 92. | Some of the gunshots occurred while Decedent was stopped and while he was falling down to the ground and on the ground. Some of the gunshots to Decedent's back also occurred while Decedent's back (as opposed to his front) was facing the officer(s). | Ex. G, Officer Body Cam Bates TPD 00040 at 0:00:12-0:02:58; Ex. I, Officer Body Cam Bates TPD 00039 at 0:00:25-0:03:16; Ex. K, Drone Video Bates TPD 00099 at 0:00:50-0:01:07; Exhibit L, Officer Body Cam Bates TPD 00041 at 0:01:25-0:02:21; Exhibit M, Officer Body Cam Bates TPD 00047 at 0:00:24-0:03:16; Exhibit N, Officer Body Cam Bates TPD 00050 at 0:00:23-0:03:15; Exhibit R, Deposition of Edwin Partobi, M.D. at 65:10–20, 67:20–68:12, 70:5–25, 71:22–72:11, 73:24–74:10 |
| 93. | When Decedent was stopped and falling to the ground or on the ground, the shooting officers did not feel that Decedent posed an imminent or immediate threat of death or serious bodily injury. | Ex. H, Castillo Int. at 63:6-13<br>Ex. P, Garcia Int. at 68:25-29<br>Ex. J, Bermudez Int. 44:2-13<br>Ex. A, Castillo Depo. at 76:2-12<br>Ex. B, Garcia Depo. at 89:2-18<br>Ex. C, Bermudez Depo. at 66:1-8, 68:6-12; Ex. D, Wissler Depo. at 51:5-11 |

| | | |
|---|---|---|
| 94. | The officers never tried to tactically reposition, and increase the distance from Decedent, at any time while Decedent was walking towards them. There was nothing physically obstructing the officers from backing up and increasing the distance between the officers and the Decedent. The street behind them was approximately 20 feet away. The officers are trained to tactically reposition themselves and increase the distance from an armed subject when it is safe to do so. Here, the officers should of tactically repositioned and increased the distance between themselves and Decedent. | Ex. A, Castillo Depo. at 76:16-77:2<br>Ex. B, Garcia Depo. at 90:10-91:22, 93:2-94:23; Ex. C, Bermudez Depo. at 59:19-60:17; Ex. D, Wissler Depo. at 40:5-18; Ex. E, Harmening Decl. at ¶¶ 14-15, 21-22 |
| 95. | In fact, Wissler tactically backed up after the shooting, indicating it was safe to back up. | Ex. D, Wissler Depo. at 50:21-51:4, 55:8-56:2 |
| 96. | Based on the officer's training, one of the factors an officer is to consider in deciding to use deadly force is whether or not it is safe to tactically reposition. | Ex. B, Garcia Depo. at 95:12-19 |
| 97. | During the incident, Decedent never communicated with the officers verbally or non-verbally. Decedent never verbally threatened the officers. | Ex. J. Bermudez Int. at 31:38-32:2<br>Ex. F, Wissler Int. at 34:37-35:2<br>Ex. A, Castillo Depo. at 69:5-8<br>Ex. C, Bermudez Depo. at 57:16-25; Ex. D, Wissler Depo. at 44:8-15 |
| 98. | Prior to the shooting, the officers did not have any information that Decedent was under the influence of drugs or alcohol. | Ex. A, Castillo Depo. at 83:12-14<br>Ex. C, Bermudez Depo. at 91:5-8<br>Ex. D, Wissler Depo. at 64:3-5 |

| | | |
|---|---|---|
| 99. | There were no other occupants in Decedent's car and officers never saw what they believed to be other occupants in Decedent's car. | Ex. J, Bermudez Int. at 57:38-58:2.<br>Ex. A, Castillo Depo. at 40:5-8, 45:4-19, 59:17-20, 70:7-10; Ex. B, Garcia Depo. at 107:17-19; Ex. C, Bermudez Depo. at 38:5-8, 97:2-5; Ex. D, Wissler Depo. at 39:5-13, 54:11-13 |
| 100. | None of the officers were physically injured during the incident. | Ex. A, Castillo Depo. at 69:10-15<br>Ex. B, Garcia Depo. at 124:7-13<br>Ex. C, Bermudez Depo. at 81:2-9<br>Ex. D, Wissler Depo. at 64:6-12 |
| 101. | The officers did not see Officers Choi and High exit out of their vehicles prior to the gunshots. | Ex. B, Garcia Depo. at 100:5-12<br>Ex. C, Bermudez Depo. at 90:2-10 |
| 102. | The officers formulated a tactical plan after the shooting (but not prior to). | Ex. C, Bermudez Depo. at 71:3-5 |
| 103. | Bermudez was in stunned and in shock immediately after the shooting. | Ex. C, Bermudez Depo. at 77:24-78:1 |
| 104. | The officers are trained on the importance of less lethal is to see if they could utilize that before resorting to the use of deadly force when feasible. | Ex. A, Castillo Depo. at 89:10-17<br>Ex. B, Garcia Depo. at 15:11-16<br>Ex. D, Wissler Depo. at 57:14-23 |
| 105. | Officers are trained that the availability of less lethal alternatives is a factor to consider in deciding whether or not to use deadly force. | Ex. B, Garcia Depo. at 124:14-19<br>Ex. C, Bermudez Depo. at 16:4-19 |

| | | |
|---|---|---|
| 106. | Officers are trained they could use a taser or 40mm on a subject with a knife especially if they have a lethal cover officer with them. In fact, when Garcia saw Decedent exit the car with what he thought was a knife, he asked for someone to come up with the 40mm and was expecting someone to come up with it. | Ex. B, Garcia Depo. at 14:3-15, 16:5-10, 60:21-61:14, 102:22-103:9; Ex. C, Bermudez Depo. at 12:21-13:12 |
| 107. | Officers are trained that if someone is tased it could cause neuro-muscular incapacitation which means the individuals muscles will lock up and could cause them to fall to the ground. | Ex. B, Garcia Depo. at 22:9-20 C, Bermudez Depo. at 14:10-19 |
| 108. | The involved officers were trained that they cannot shoot someone just for having a knife in their hand, that fact alone. | Ex. A, Castillo Depo. at 24:25-25:3<br>Ex. B, Garcia Depo. at 19:16-20<br>Ex. C, Bermudez Depo. at 25:20-25<br>Ex. D, Wissler Depo. at 35:20-23 |
| 109. | The officers had training regarding interacting with people who may be suffering from a mental health crisis and part of that training is deescalation tactics. | Ex. A, Castillo Depo. at 80:4-9<br>Ex. B, Garcia Depo. at 17:18-25<br>Ex. C, Bermudez Depo. at 18:2-8<br>Ex. D, Wissler Depo. at 11:21-12:2, 62:23-63:6 |
| 110. | The officers were trained to reassess in between shots if it's safe to do so. The officers were also trained that they are responsible to justify every shot. Here, it was safe to do so and had the officers done so they would have seen that Decedent had stopped and was falling to the ground or on the ground when some of the shots were fired, including shots to the back. | Ex. A, Castillo Depo. at 80:19-21<br>Ex. E, Harmening Decl. at ¶ 29<br>Ex. B, Garcia Depo. at 18:4-8<br>Ex. C, Bermudez Depo. at 18:12-15<br>Ex. D, Wissler Depo. at 63:14-17, 65:7-9 |

| | | |
|---|---|---|
| 111. | The officers are trained that they can only use deadly force if there is an imminent or immediate threat of death or serious bodily injury and if there is no such threat they should not use deadly force. | Ex. A, Castillo Depo. at 84:3-11<br>Ex. B, Garcia Depo. at 18:13-22<br>Ex. C, Bermudez Depo. at 18:20-19:4; Ex. D, Wissler Depo. at 64:13-21 |
| 112. | The officers are also trained that there has to be an ability, opportunity or apparent intent to immediately cause death or serious bodily injury to justify the use of deadly force. | Ex. A, Castillo Depo. at 84:12-16<br>Ex. B, Garcia Depo. at 18:23-19:6<br>Ex. C, Bermudez Depo. at 19:5-9<br>Ex. D, Wissler Depo. at 64:22-25 |
| 113. | Officers are trained that the use of deadly force must be necessary to defend human life. | Ex. B, Garcia Depo. at 97:18-98:1 |
| 114. | The officers are also trained that deadly force should only be used when there are no other reasonable options available. | Ex. A, Castillo Depo. at 84:17-20<br>Ex. B, Garcia Depo. at 19:7-10<br>Ex. C, Bermudez Depo. at 19:10-22<br>Ex. D, Wissler Depo. at 65:1-6 |
| 115. | Offices are trained that fear of future harm is insufficient to justify the use of deadly force. | Ex. E, Harmening Decl. at ¶¶ 12, 15, 20 |
| 116. | During the incident, Decedent did not pose an immediate or imminent threat of death or serios bodily injury. | Ex. E, Harmening Decl. at ¶¶ 13, 15, 20-21 |
| 117. | Officers are trained to recognize what suspects are carrying and to distinguish items in a suspect's hands to determine if they are weapons or not. | Ex. E, Harmening Decl. at ¶ 31 |

| | | |
|---|---|---|
| 118. | Plaintiffs propounded a Request for Production of Documents to all Defendants seeking all documents regarding TPD policies, practices, procedures, guidelines, or customs that refer or relate to high-risk felony traffic stops, including but not limited to, policy handbooks, training manuals, orders, field operations and memoranda. None of the documents produced in response support Defendants' contention that TPD officers are trained in high risk stops to have the first four officers all designated lethal coverage and there must be a fifth officer in order to designate them as less lethal. | Exhibit S, Plaintiffs' Request for Production of Documents to Defendants at 7; Exhibit T, Defendants Documents Produced in Response to Plaintiffs' RFP at 1-3. |