# "EXHIBIT A"

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

--oOo--

MARIA GUADALUPE DIAZ; A.D., a minor by and through his Guardian Ad Litem, MARIA GUADALUPE DIAZ; A.D., a minor by and through his Guardian Ad Litem, MARIA GUADALUPE DIAZ; LEONARDO DIAZ; and RAMONA RAMIREZ DE DIAZ,

Plaintiff,

v. Case No. 2:25-cv-03389-JLS (JCx)

CITY OF TORRANCE; ARTURO CASTILLO; CODY WISSLER; JESUS GARCIA; JASON BERMUDEZ; and DOES 6-10, inclusive,

Defendants.

_________________________________/

STENOGRAPHIC REPORTER'S TRANSCRIPT OF

REMOTE VIDEO DEPOSITION OF

ARTURO CASTILLO

MONDAY, JULY 13, 2026

Reported Stenographically by:

KIMBERLY D'URSO, CSR 11372, RPR

Job No. 28993

Torrance P.D.?
A. Yes.
Q. Okay. You didn't go to any other departments between LAPD and Torrance P.D.; correct?
A. No, sir.
Q. Okay. And how long had you been with Torrance P.D. at the time of the incident?
A. At the time of the incident, would be just over three years.
Q. Okay. And I think I saw in your interview, you had a total approximately -- law enforcement experience of approximately five years at the time of the incident? Does that sound about right?
A. Yes.
Q. Okay. Take me through your different assignments with Torrance P.D. until the date of the incident?
A. Yes. I am currently assigned to patrol officer, where I am a field training officer. I am also assigned to our SWAT team, which also helps instruct other officers with tactics, such as high-risk traffic stops, building searches, also officer rapid deployment for active shooters.
Q. How long -- the microphone is getting a little weird on me.

A. Okay.
Q. Were you trained on use of force, including both lethal and less-lethal?
A. Yes, we were.
Q. For example, were you trained on the use of the Taser?
A. Yes.
Q. Were you trained on the use of OC spray or pepper spray?
A. Yes.
Q. You were trained on the use of lethal force, as well; correct?
A. Yes.
Q. Okay. Did you also receive training on, like, use of the 40-milimeter?
A. Yes.
Q. Okay. At the academy, were you trained on the importance of tactics?
A. Yes.
Q. At the academy, were you trained on the importance of formulating a tactical plan when it's safe to do so?
A. When it's safe to do so, yes.
Q. Okay. At some point, did you give an interview related to this incident?

Q. Now, I take it you, yourself, did not hear the 911 call; is that correct?
A. Yes, sir.
Q. Does Dispatch communicate to you that they had received the 911 call and provide you with that information?
A. They provide us with limited information, but not all the details of the call.
Q. And the source of this information, would part of it be from the radio?
A. Yes.
Q. Would part of it also be from, like, an onboard computer in your vehicle?
A. Yes.
Q. Okay. Do you recall where you were when you first received information relating to this incident?
A. Yes, I do recall.
Q. And where were you?
A. I was in the area of Hawthorne and Fashion Avenue, which is by the Del Amo Mall.
Q. I don't know Torrance all that well. What distance would you say you were when you first received the call to the scene of where the actual shooting occurred? Like, how many miles, an estimate? I don't expect you to know exactly.

A. Approximately one mile, I would say.
Q. Okay. So relatively close?
A. Yes.
Q. Were you on another call when you first received information about this incident?
A. No, sir.
Q. Okay. Were you kind of doing patrol?
A. Yes. I was working with my partner at the time.
Q. And who was your partner?
A. Officer Bermudez.
Q. Was he training at that point?
A. Yes, he was.
Q. And were you his field training officer?
A. Yes, I was.
Q. Was this your partner's first day doing field training?
A. Yes.
Q. Do you recall approximately what time it was that you first received information regarding this incident?
A. It was possibly ten minutes before 1700 hours, which would be 5:00 p.m.
Q. And after receiving information about the call, do you begin to go to the area?

A. Yes. We start responding from the area of Hawthorne and Fashion, where I begin to talk tactics with my partner at the time.

Q. How much time would you estimate it took you to travel that approximate mile from where you were to the scene?

A. Just over five minutes, I would say.

Q. Okay. While you were traveling in this five-minute period of time, were there any updates regarding the call?

A. Yes, there was updates. The call-taker said that the caller hung up. They attempted to call back. There was no more information. But they worked on getting pings, and the phone ping that was being used was in the intersection of Maple and Oregon Court, where the potential man with a gun was at.

Q. Did you receive any information that anybody had been injured?

A. Not at the moment.

Q. Okay. Is there any other information that you had received about the call that we haven't discussed yet?

MS. POWELL: Objection. It's vague and ambiguous as to time.

You mean up until this point, Mr. Valenzuela?

BY MR. VALENZUELA:

Q. While you're traveling from where you received the call to the scene, have you told me so far the information about the incident?

A. Yes. He was just a man with a gun, and he was there to shoot someone.

Q. Okay. But you didn't -- the call did not indicate that somebody had actually been shot; would you agree?

A. Yes. He was there, looking to shoot someone.

Q. Okay. At some point did you receive information as to who the caller was?

A. While going to the call, our TPD communications -- which is the Torrance Police communications -- advised that the phone number possibly belonged to a Leonardo Diaz.

Q. Okay. Based on that information, did you recognize having ever dealt with Mr. Diaz in the past?

A. No.

Q. Okay. Did you have any information about Mr. Diaz's criminal history?

A. No.

Q. For example, you didn't know whether or not he had ever physically injured anyone in the past; correct?

A. No.

broke into the business to commit a crime.

Q. Okay. Did you make contact with anybody while you were searching that business?

A. A neighboring business we did, who told us that that business had recently closed down.

Q. Okay. After you were told that that business had recently closed down, do you return to your vehicle?

A. Yes, I did.

Q. Okay. And then do you continue to search the surrounding areas, in your vehicle?

A. Yes. While we are doing that, our drone operators broadcasted over the radio, advising us that there was a male subject in a green Dodge Charger that was opening and closing his door, looking around in the area.

Q. Okay. Let me go back a little bit. You said that you had discussed tactics with your trainee while you were on the way to the location. Do you remember that?

A. Yes.

Q. Can you let me know what you discussed in relation to tactics?

A. Of course. So based on the fact that this was a man-with-a-gun call, we need to take things slowly while going there, and getting sufficient units. I

many times?
A. Approximately, over eight times.
Q. Prior to the date of this incident, had you ever encountered suspects who were armed with knives?
A. Yes.
Q. Do you have an estimate as to approximately how many times?
A. That one, I would say approximately over 15 times.
Q. So approximately eight times, prior calls with guns, and approximately 15 times prior calls with knives?
A. Yes.
Q. Prior to the date of this incident, had you ever encountered suspects who appeared to be suffering from mental illness or a mental health crisis?
A. Prior to this call, yes.
Q. And do you have an estimate as to approximately how many times?
A. Approximately, over 30 times.
Q. And I understand these are estimates. I'm not expecting you to know the exact number. I'm just trying to get a general understanding.
A. Of course.
Q. Based on your training, were you trained that

you could shoot somebody if they have a knife, based on that fact alone?

A. On that fact alone, we need more circumstances.

Q. Okay. And same thing with the gun. Based on your training, were you trained that if somebody has a gun, you can shoot them based on that fact alone?

A. Based on the totality of the circumstances, there will be options that, yes, we will have to shoot somebody with a gun.

MS. POWELL: Listen to his question.

MR. VALENZUELA:

Q. Let me try to ask it a little different. I'm trying to figure out, based on your training, were you trained that you could shoot somebody for merely having a gun?

A. No.

Q. Okay. Now, you had mentioned a little bit earlier that a drone had spotted a green Charger. Is that what you indicated?

A. Yes.

Q. Okay. And you're receiving this information from the dispatch still?

A. Yes, it gets broadcasted over the radio to myself and other officers in the area.

Q. Okay. And what, if anything, was communicated

Bermudez and Garcia and Wissler at that point; or are there additional officers when you guys exit out of your vehicles?

A. When we exited our vehicles, yes, we were the first four officers. There was a third unit that was still in the area, checking the other neighboring businesses.

Q. Do you know if that third unit arrived prior to the shooting?

A. They arrived as the shooting was occurring.

Q. Would that be Officers Choi and High?

A. Yes.

Q. Now, between Officer Garcia, Wissler, yourself, and Bermudez, who would be considered the senior officer between the four of you?

A. Based on time on the job and experience, it would be Officer Garcia.

Q. So, in addition to being the primary unit, Officer Garcia would be considered, like, the supervisor out of you four; is that fair?

A. He would be the senior officer.

Q. Now, as the senior officer, would Officer Garcia be the one to designate roles, such as lethal, less-lethal, contact, cover; or would it be somebody else?

A. He could do that, but we also planned that within ourselves. Especially as him and I are field training officers, we assigned those roles with our trainees at the time, who were Officer Wissler and Officer Bermudez.

Q. Okay. And did you assign a role to Bermudez in this incident?

A. Yes. He was a cover officer.

Q. What does the cover officer do?

A. In this situation, because it was with a man with a gun, and we were within the general area, and a reasonable suspicion left us to believe that this person in the vehicle could be possibly the man with the gun, we transitioned over to high-risk tactics, which, in that situation, it requires four officers who are assigned as lethal coverage, one officer being the contact officer who starts the commands.

And the other officers who gets different vantage points, based on the configuration of the cars, to get a better visual of inside the vehicle. Once that configuration is done, we try to utilize time, distance, and cover, to get more resources there to help assist us with the problem.

Q. Okay. So if I understand you correctly, you designated Bermudez as a lethal-cover officer; correct?

A. Yes.
Q. Okay. Did you ever hear Officer Garcia designate a role to Wissler?
A. No, sir.
Q. Okay. And who was designated -- I understand you said there's four lethal officers. Who was designated as the contact?
A. That would be the first vehicle that arrives there, that positions itself closest to the suspect vehicle, which would be Officer Wissler and Officer Garcia.
Q. Okay. Then, do you know which of those two had been designated as the contact?
A. At that point it would be Officer Wissler, who was the first vehicle there, and the driver of that vehicle.
Q. Okay. And it was your understanding that Wissler was the one driving that vehicle, and Garcia would have been the passenger?
A. Yes.
Q. So Wissler would be both lethal cover and the contact; correct?
A. Yes.
Q. Is -- is part of the reason why you designate a contact officer, so that multiple officers are not

giving conflicting commands?
A. Yes. Especially during high-risk tactics, we want to keep it to one voice, that way so other officers can start requesting other resources over the radio, such as getting more responding units there to bring us necessary tools, such as less-lethal options, shield options, or if it gets to a higher-level threat, maybe more pieces of armor.
Q. Did you, yourself, ever designate Bermudez to be a less-lethal officer?
A. No. Based on the high-risk tactics, he has to be assigned as lethal coverage until sufficient units get there.
Q. Okay. And at any point, did you ever hear Garcia designate Wissler as a less-lethal officer?
A. No. Based on the high-risk tactics that we transitioned over to, Officer Wissler was a lethal and contact officer.
Q. Okay. I want to ask you about the different equipment you had on you that day. Okay?
A. Yes, sir.
Q. Did you have a handgun on you?
A. Yes.
Q. What kind of gun did you have?
A. It's a Staccato P 2011, which is a 9-millimeter

pistol.
Q. Did you have OC spray on your belt?
A. I had that on my exterior vest.
Q. Okay. And how about a Taser? Did you have a Taser on your person?
A. Yes, I did.
Q. Okay. What about a baton or, like, a collapsible baton?
A. I had a baton that was readily accessible in my vehicle.
Q. Okay. The baton was in your vehicle, though, not on your person; correct?
A. Yes.
Q. But on your person, you had the OC spray and the Taser?
A. Yes.
Q. Do you know what model of Taser it is?
A. The Taser 7.
Q. Okay. Does that fire probes?
A. Yes. It has two sets of probes, which have a maximum effective range of about 22 feet.
Q. Okay. And that Taser could be used in the drive-stun mode, where you actually touch them with it, also?
A. You could do that, but there has to be two

ineffective, because Mr. Diaz, at the time, also had glasses, which would be another challenge that we would have to consider in that situation.

Q. Based on your training, if an individual is wearing glasses, are you trained that OC spray won't have an effect on them?

A. It's not going have the desired effect that we would want.

Q. But just so I understand you correctly, you, yourself, did not deploy OC spray during this incident; is that correct?

A. Yes, sir.

Q. Okay. And you, yourself, did not deploy a Taser during this incident; is that correct?

A. Yes, sir.

Q. Okay. In your vehicle, at some point, you transition to what was the M4 rifle?

A. Yes, I did.

Q. And that's stored in your trunk?

A. Yes, it is.

Q. Do you have any other weapons in your vehicle, other than the -- the M4?

A. Any other lethal weapons, it's just the M4 rifle that we have in the vehicle.

Q. Did you have any other less-lethal weapons in

your vehicle, like a 40?

A. Yes.

Q. You had a 40-millimeter less-lethal in your trunk?

A. We did. But based off of the --

MS. POWELL: You answered his question. Listen to his question.

THE WITNESS: Okay.

MR. VALENZUELA:

Q. So, just so I understand, you did have a 40-millimeter in the trunk of your cruiser; correct?

A. Yes.

Q. At any point, did you ever designate Bermudez to use the 40-millimeter?

A. No, sir.

Q. Okay. So, going back to when you first stopped your cruiser near the green Charger -- going back to that point. Okay?

A. Okay.

Q. You had some information that the individual in the green Charger was, like, opening and closing the door?

A. Yes. We observed that as we were going to attempt to talk to this individual.

Q. So could you see the individual inside of the

vehicle when he would open and close the door?

A. No. And the windows were heavily tinted, as well.

Q. So you saw the door opening and closing, but you couldn't see anybody inside of the vehicle?

A. No. And then, based off prior training that I've received, a man with a gun that's inside a vehicle, tend to use that as a method to fire from a very concealed position.

The opening and closing of the door could be used as a method to gauge and observe where officers' positions are at.

MS. POWELL: Listen to his question, because that wasn't his question.

BY MR. VALENZUELA:

Q. When the door was opening and closing, did you ever see a gun?

A. Not at the moment.

Q. Okay. When the door was opening and closing, could you see the individual's hands?

A. Yes. And they had blood on them.

Q. Okay. When he's opening and closing the door, could you just basically see the hands, or can you see any other part of the body?

A. I would say up to the forearms, which were also

filled with blood.

Q. Okay. And this individual would have been in the driver's seat?

A. Yes, in the driver's seat.

Q. Okay. Up until the point where the door is opening and closing the various times, do you ever see anybody else in the vehicle?

A. Not at that moment.

Q. Okay. How long would you estimate from when you parked your cruiser and got out of your car, until the individual in the green Charger actually exited out of his vehicle? So from when you exit your car to when the individual in the green Charger exits his car, do you have an estimate as to how much time passed?

A. I would say over two minutes, just over.

Q. During this two-minute time, there would be four officers outside of their vehicle, correct; yourself, Bermudez, Garcia, and Wissler?

A. Yes.

Q. Okay. During this approximate two-minute period of time, was there a tactical plan ever formulated?

A. Yes, which is why we transitioned to high-risk tactics.

Q. Who formulated this tactical plan? Was it

the radio; correct?

A. Yes.

Q. Okay. Did you think, at that point, that it was at least a possibility that the individual may have cut his wrist with that knife?

A. Based on the information we had, and that this individual wanted to shoot somebody, at that point I believed that this possibly was a disgruntled employee that possibly killed his former employer and had him in the vehicle. The large -- the large amounts of blood, led me to believe that this was possibly somebody else's blood.

Q. Had you -- up until that point, had you received any information that anybody had been killed?

A. Not at that moment, because the caller would not answer any phone calls after the initial statements.

Q. Up until that point, did you have any information that any of his employees were missing?

A. There was only one caller at that time.

Q. So, you did not have any information that an employer or an employee at his work was missing at that point; correct?

A. Not at that point.

Q. Okay. So, just so I understand your testimony, when you saw him with the knife, the injuries to his

wrist and the blood, it never crossed your mind that he may have inflicted that on himself?

A. No.

Q. Okay. And at least up until this point, you don't see anybody else in the car; correct?

A. The heavy window tint prevented us to see in the vehicle.

Q. So when I say you didn't see anybody else in the car, would that be a correct statement?

A. Based on my observations, no.

Q. Okay.

MS. POWELL: I think that was a double negative, Counsel. I'm not sure if the answer will be clear.

BY MR. VALENZUELA:

Q. Just so we're clear, you only saw, at least up until this point, one individual in the car in the driver's seat; is that correct?

A. Just the driver's seat.

Q. Okay. And why did you dispatch over the radio that you had seen the individual with the knife and blood on his wrist?

A. I requested a backup, based on the informa- -- based on the facts that we had seen, the large pool of blood that was on the arms and that actually dripped out

(Break taken.)

THE VIDEOGRAPHER: We're back on the record at 11:07 a.m.

MR. VALENZUELA:

Q. Okay. Going back a little bit, when you had first arrived on scene and went to check his prior place of business -- do you remember that?

A. Yes, sir.

Q. What was it that one of the neighbors had told you?

A. That the business had closed down approximately a week ago.

Q. And despite being told that the business had been closed down approximately a week ago, you thought there was a possibility that Mr. Diaz had killed his employer or an employee?

A. Yes. He could have been a disgruntled employee that possibly got terminated.

Q. But even though they told you that the business moved out a week ago, you thought he may have killed an employer or an employee? Do I understand you correctly?

A. Yes.

Q. Okay. Now, we were at the point where you were saying he's opening and closing the door, and you can see the -- I think you said the forearm, approximately,

A. I take the passenger side position of Officer Wissler's vehicle.

Q. Okay. Are you kind of like in the V of the passenger front door?

A. I would say just a step or two back, yeah.

Q. Okay. Do you have some training that a vehicle could be used for cover sometimes?

A. Yes, I do.

Q. And why did you take that position in that particular area with your rifle?

A. Because the suspect could also utilize their vehicle as cover. In this situation, we were dealing with a man with a gun; so we are allowed to deploy our rifle if we are going to be dealing with an armed suspect, or to meet their fire power or exceed it, as well.

Q. Generally speaking, when you receive information about a call, is one of the things that you try to do is respond to the call and to investigate?

A. Yes.

Q. And in your experience, sometimes the information you receive about the call is accurate, and other times it's not?

A. Yes.

Q. And one of the duties you do when you arrive is

to investigate, to gather information; correct?

A. Yes.

Q. Okay. When you took your position near the front passenger door of Wissler's vehicle, was there anybody to the right of you?

A. Prior to moving to the high-risk tactics, yes, my partner, Officer Bermudez, and also Officer Garcia.

Q. Okay. Both of them were near the front passenger door of Wissler's vehicle?

A. Yes, before we changed the configuration of the patrol vehicles to high-risk tactics.

Q. I think you indicated earlier, one of the documents or videos you reviewed in preparation for your deposition today was the body cam. Do you remember that?

A. Yes.

Q. In your body camera video, can you hear yourself -- I believe it's Garcia that you're talking to, say something to effect, "Do you want to quarterback this? I've got the rifle," or words to that effect?

A. Yes, I do.

Q. Was that Garcia that you were talking to?

A. Yes.

Q. Okay. Explain to me a little bit, what does it mean when you say, "Do you want to quarterback this"?

Can you explain that to me a bit?
A. Yes. In that situation, since we have two lethal coverage, the next unit available will help us start adjusting roles for a high-risk stop.
Based on the information that, hey, we're possibly dealing with a man with a gun, the best tactics used is going to be high-risk tactics to create that time, distance, and cover.
While that is going on as well, Officer Garcia also requested over the radio, to get a less-lethal launcher to respond to our location, in case we need to utilize that. And while we do that, we're awaiting for more units to arrive before we even ask a suspect to get out of a vehicle.
Q. And when you say, "Do you want to quarterback this?", or words to that effect, is the person that you've now indicated, "Hey, do you want to quarterback this?", would that be the individual now who would assign different roles to the different officers since they're taking the quarterback position?
A. Yes. That would be an officer that starts assigning roles.
Q. Okay. So, since you're not quarterbacking this, you kind of designated Garcia, or asked him to quarterback it. You, yourself, would not be assigning

roles at that point, if somebody else is acting as quarterback; is that true?

A. We could help each other out in those situations.

Q. But when you say, "Do you want to quarterback this?", you're kind of giving that responsibility to Garcia; is that fair?

A. Yes.

Q. And you've kind of taken the role of the lethal with the rifle at this point? That's going to be either your role or designation; correct?

A. Yes.

Q. Okay. After your vehicle is moved, it was your vehicle that was repositioned; correct?

A. Yes.

Q. And I think you said Bermudez repositioned it?

A. Yes, sir.

Q. After Bermudez repositions the vehicle, what is, now, the configuration of the officers now? You're still at the front passenger door of Wissler's vehicle; correct?

A. Yes.

Q. Are the other officers now at different locations, now that your vehicle has been repositioned?

A. Yes. Based off the high-risk tactics, our

Q. Okay. And while you're giving these commands, does Mr. Diaz say anything in response?
A. He nods his head left to right, gesturing as, "No."
Q. Okay. Do you ever hear him say anything verbally, Mr. Diaz, at this point?
A. No.
Q. Did you ever hear him make any sounds?
A. No.
Q. Okay. Is Mr. Diaz walking towards -- strike that.
Is Mr. Diaz walking at this point?
A. Yes.
Q. And does that street run north and south?
A. East and west.
Q. Okay. What cardinal direction is Mr. Diaz walking at this point when he exits out of the vehicle?
A. He is walking east to west, towards us.
Q. Okay. From east to west.
And as he's walking, where is this knife now? Is it on his side? Is it up? How would you describe it?
A. He has it off to his side of the hip, pointed towards us.
Q. Okay. And it would have been off to his side,

near his hip area?
A. Yes.
Q. Okay. Other than seeing that knife off to his side in his hip area -- near the hip area, do you ever see that knife in any other position?
A. No.
Q. Prior to the gunshots?
A. No.
Q. Okay. For example, you never saw Mr. Diaz raise the knife above the hip level; correct?
A. No.
Q. Okay. You never saw that?
A. No.
Q. Okay. Did you ever see Mr. Diaz make a stabbing motion with that knife?
A. No.
Q. Did you ever see him make, like, a slashing movement with that knife?
A. No. It was just pointed towards us.
Q. Now, Mr. Diaz continues to walk in a westerly direction; is that correct?
A. Yes.
Q. Okay. Did you ever see Mr. Diaz, other than walking in this westerly direction; for example, did you ever see him running?

A. No.
Q. Did you ever see him jogging?
A. No.
Q. Okay. When Mr. Diaz exits out of his vehicle, is he bleeding?
A. Yes.
Q. And where do you see blood on Mr. Diaz?
A. He had it on his arms, wrist, shirt, pants, hands.
Q. When Mr. Diaz exits out of his vehicle -- when he exits out of the vehicle, is the door to the green Charger left open, or does he close it?
A. He closes it.
Q. So after he exits out, he closes the door behind him?
A. Yes.
Q. Okay. Prior to him closing the door behind him, do you ever see any other occupants in that vehicle?
A. No.
Q. Okay. At some point while Mr. Diaz is walking in a westerly direction, are you able to see his full body?
A. Can you repeat that?
Q. Sure. It was a bad question. If I ask a

question you don't understand, let me know and I'll try to rephrase it.

A. Thank you.

Q. When he's walking in a westerly direction, can you see the front of his person?

A. Yes. He's wearing baggy clothing.

Q. In other words, you're not looking at his back at this point, you're looking more at the front side of his person?

A. Yes.

Q. Can you see both of his hands?

A. Yes.

Q. Okay. And you can see from the top of his head to the bottom of his feet?

A. Yes.

Q. Okay. Do you ever see a gun at this point?

A. He was wearing baggy clothing, and I wasn't able to see if he had a firearm concealed in his person.

Q. How about the part that wasn't concealed? Did you ever see a firearm?

A. In his hands, no.

Q. Okay. Did you ever see a firearm sticking out his pockets?

A. The pants were -- the shorts that he was wearing were very baggy. It was easy to conceal a gun

in there.
Q. Did you ever see a bulge or anything sticking out which you thought may be a weapon concealed on his person?
A. No.
Q. Did you ever see him reach in his waistband at any point, prior to the gunshots?
A. No.
Q. Did you ever see him stick his hands in his pockets like he was going to retrieve a weapon?
A. No.
Q. Okay. At some point, Mr. Diaz continues to walk in a westerly direction, towards the officers; correct?
A. Yes.
Q. Is he walking kind of like in a straight line, or do you see him kind of like zigzagging in different directions? How would you describe that?
A. Yes. He's walking at an angle, after he looked at every single one of us, and walked towards the closest officer that he set his mind to, which would be towards Officer Wissler and Officer Garcia's direction.
Q. Okay. So that would be more towards, like, the middle of where the two cruisers are positioned; correct?

Q. Okay. Based on your training, are you trained to give a verbal warning before using deadly force, when feasible?
A. When feasible, yes.
Q. Okay. Did you hear any gunshots prior to you firing your weapon?
A. No.
Q. Okay. How about after you fired your two shots, did you hear any additional shots being fired?
A. I would say it was simultaneously.
Q. Okay. Did you fire your two shots in rapid succession, or was there a pause in between your two shots?
A. A pause between rounds.
Q. Okay. Do you have an estimate as to how long you paused in between the two rounds?
A. I would say half a second.
Q. Did you reassess in between firing your two rounds?
A. Yes.
Q. As you're firing, do you hear other officers also firing their weapons?
A. Yes, I do.
Q. Okay. Do you know which other officers were firing their weapons at that point? I'm not talking

about what you learned later down the road. While you're actually firing, like, were you cognizant of which of the other officers were firing?

A. At that point, only Officer Wissler and Officer Garcia. Yeah.

Q. Okay. You -- you didn't know whether or not your trainee, Bermudez, had fired yet; correct?

A. Yes. He was further away from me.

Q. At some point, did you later learn from Bermudez that he also had fired his weapon?

A. Yes.

Q. Okay. And I think you said this earlier -- sorry for asking again -- did you hear anybody else give a verbal warning that deadly force would be used prior to firing?

A. Yes, I did.

Q. Do you know who it was that gave that verbal warning?

A. I believe it was Officer Garcia.

Q. Okay. And what do you recall him saying in regards to that verbal warning?

A. To "Stop, we don't want to shoot you."

Q. And you think, "Stop, we don't want to shoot you" is the verbal warning that deadly force would be used?

Q. Okay. But it's your testimony today, as he's falling to the ground, you don't recall any gunshots going off at that point, if I understand you correctly?

A. Yes.

Q. Okay. Did you ever hear Mr. Diaz verbally threaten anybody from when you first encountered him in the green Charger?

A. No. Just pointing the weapon towards us and not obeying commands.

Q. Okay. Were you, yourself, physically injured during this incident?

A. No.

Q. Did you ever see any of the other officers be physically injured during this incident?

A. No, because the threat was stopped.

Q. Okay. And again, at no point did you ever see a gun on Mr. Diaz's person; is that correct?

A. Not at the moment because it was -- it could be easily concealed with the baggy clothing he had on.

Q. Correct. But at least up to until the time you shot him, you never saw an actual gun with your own eyes, did you?

A. Yes.

Q. At some point after Mr. Diaz went to the ground, was he patted down?

A. Yes.
Q. And you would agree no gun was recovered from his person after he was patted down; correct?
A. At that moment, I did not know, because I transitioned to clearing the vehicle for any possible downed victim.
Q. When you went and cleared the vehicle, did you see anybody inside of the vehicle?
A. No. Just a large amount of blood on both of the driver and passenger seat.
Q. Okay. Did you ever see a gun inside the vehicle?
A. No. I didn't finish searching the vehicle, before -- plain view, no.
Q. Did you ever see, like, a bloody razor blade or anything in the vehicle?
A. A razor blade? No, not that I recall.
Q. Or any edged weapon?
A. Just the one that he had in his hand.
Q. At some point when Mr. Diaz goes to the ground, do you guys eventually put a tactical plan together to approach him?
A. Yes.
Q. Okay. At some point -- did he still have that object in his hand when he went to the ground?

were still under the belief that it was a knife?
A. Yes, I was.
Q. Okay. At some point, is medical aid rendered to Mr. Diaz?
A. Yes. During the tactical plan, that was what I discussed with Officer Choi and Officer Bermudez: "Once we safely apprehend him, we have to administer first aid immediately."
Q. Did you participate in that, or no?
A. No. I directed officers on how to do it, which was to do immediate pressure on any puncture wounds or exit wounds.
Q. When you fired your first shot, did you have the impression that your shot struck him?
A. Yes.
Q. And what gave you that impression?
A. I visually observed it.
Q. And where did you see it strike him?
A. The upper chest area, on the left side.
Q. Okay. The same question with regards to your second shot. Were you under the impression that that one also struck him?
A. Yes, sir.
Q. And where do you believe that one struck him?
A. Similar area, just on the upper, left side of

MS. POWELL: Objection. Calls for a medical conclusion, and calls for speculation.

MR. VALENZUELA:

Q. Based on what you observed, were you under the impression that he was still alive at that point?

A. I believe he was still alive.

Q. Okay. At any point while you were at the scene, did you get the impression that Mr. Diaz had passed away?

A. Not until after.

Q. Not until you left the scene?

A. Yes.

Q. Okay. How long were you at the scene after the shooting before you left?

A. Approximately five minutes.

Q. Do they then, like, separate you and escort you out of there?

A. Yes.

Q. Okay. In reviewing your body camera, you keep yelling out for somebody to use the 40, prior to discharging your weapon. Do you remember that?

A. Yes, I do.

Q. And you keep yelling out, like, "40. 40. Hurry up. Somebody use the 40," or words to that effect. Do you remember that?

A. I do.
Q. Were you under the impression that somebody had the 40-millimeter out at that point?
A. At that point, we had requested for the next responding unit, which would be the third unit that was there, to grab the 40, so we could have a less-lethal option, as Mr. Diaz was advancing towards us.
And from my recollection, I do recall that those officers, once they arrived, they were getting the less-lethal launcher, but there was insufficient time because Mr. Diaz continued to advance towards us, prior to that unit getting the 40-millimeter launcher.
Q. But when you're yelling out "40, 40," did you think somebody had the 40-millimeter out, ready to go?
A. No. That was me for telling them to hurry up.
Q. Okay. You didn't think somebody had already brought out the 40-millimeter and was ready to use it; you were saying that for them to hurry up?
A. Yes. "Hurry," as we need this, because Mr. Diaz was continuing to advance on us, limiting our distance and time to react.
Q. When you yelled out, "40-millimeter, hurry up," or "40-millimeter," or words to that effect, at least at that point, did you think it was appropriate to shoot with the 40-millimeter?

A. Yes.

Q. At some point, you had indicated that you saw Mr. Diaz stop and fall to the ground; correct?

A. Yes.

Q. When Mr. Diaz stopped and began to fall to the ground, did you still believe that Mr. Diaz posed an imminent threat of death or serious bodily injury at that point?

A. When he falls to the ground, no.

Q. What about when he stopped and begins to fall on the ground?

A. No.

Q. Okay. And is that, in part, why you stopped shooting?

A. Yes.

Q. Did you, yourself, at any point, try to tactically reposition yourself while he was walking in this westerly direction?

A. No.

Q. Okay. Was there anything physically obstructing you from backing up and increasing the distance between Mr. Diaz and yourself?

A. No.

Q. Okay. Do you have training that you should try to tactically reposition yourself when it's safe to do

so?
A. When it's safe to do so, yes.
Q. When you fired your weapon at Mr. Diaz, the first shot, approximately what distance was Mr. Diaz to you at that point?
A. Less than 5 feet.
Q. Okay. And what distance do you believe he was to Officer Wissler?
A. Approximately 3 feet.
Q. Would he have -- would Mr. Diaz have been the closest to Wissler when you fired your shot, or to another officer?
A. From that angle, it would be Officer Wissler and Officer Garcia.
Q. Okay. And that distance you believe to be approximately 3 feet?
A. Yes.
Q. Okay. And was he also approximately -- and 5 feet from you; did I understand you correctly?
A. Yes.
Q. Okay. And was he still that approximate 3 feet from Garcia and Wissler when you fired your second shot?
A. Yes, he still was.
Q. Okay. Okay. I want to show you, briefly, the body cam footage, just to confirm whether this is your

a couple questions from your interview, and then I think we'll be finished. Okay?

A. Yes, sir.

Q. And you had training with regards to interacting with people who may be suffering from a mental health crisis; is that correct?

A. Yes.

Q. Part of that training is de-escalation tactics?

A. Yes.

Q. And was this Bermudez's first day doing training?

A. Yes, sir.

Q. Had you trained other officers prior to the date of this incident?

A. I have.

Q. You're like a designated field training officer?

A. Yes, I am.

Q. Is that part of your training, to reassess in between shots, if it's safe to do so?

A. Yes.

Q. And is that what you were trying to do in this incident?

A. I did.

Q. Is it part of your training on deadly force

that you're responsible to justify every shot?
A. Yes.
Q. Did you ever see the decedent try to flee from you during the incident?
A. Can you repeat that? You sounded further away.
Q. I'm sorry. I'll get closer to my microphone.
Did you ever see the decedent try to flee from you during the incident?
A. No, just advance towards us.
Q. Do you recall how many shots you heard the other officers fire?
A. I don't recall the exact number.
Q. And I think you indicated you didn't hear any shots prior to you firing; correct?
A. Yes.
Q. And you didn't hear any shots after you stopped firing?
A. After I stopped firing, no.
Q. Okay. Do you know if you fired the first shot?
A. Yes.
Q. Do you believe you did?
A. Yes.
Q. Do you know if you fired the last shot?
A. No.
Q. Do you believe it was a different officer that

fired the last shot?

A. Yes.

Q. Do you recall how the decedent fell to the ground? In other words, did he fall on his butt? His back? Prone? On his chest? Do you recall how he went down to the ground?

A. Yes. He fall -- he fell to his buttocks, and his back landed on the wheel well of my patrol vehicle, on the passenger side.

Q. The front wheel well of the passenger side?

A. Yes, which would be the front passenger tire.

Q. Okay. Gotcha.

Did you notice where he was struck with the gunfire, after the shooting?

A. I believe center mass.

Q. You saw shots to his, like, chest and torso area?

A. When we were administering first aid, yes.

Q. Okay. Did you see shots to any other part of his body?

A. No.

Q. Okay. While they're rendering medical aid on Mr. Diaz, did you hear him make any sounds?

A. "Sounds," no.

Q. You didn't hear him say anything, did you?

A. No.
Q. After you saw decedent, after he got out of the car, did you recognize having ever dealt with him in the past?
A. No, sir.
Q. When he got out of the car, you could see a clear view of his face; correct?
A. Yes.
Q. And you don't recall ever having any interaction with him, if I understand you correctly?
A. No, sir.
Q. Did you have any information he was under the influence of drugs or alcohol prior to the shooting?
A. No, sir.
Q. Where did you go when you left the scene?
A. We responded back to the station.
Q. How did you get to the station? Did somebody drive you?
A. Yes, sir.
Q. Who was it that drove you?
A. Officer Lassak.
Q. Was it just you and Lassak in the vehicle when you were transported?
I'm sorry. I didn't hear that. Can you repeat that?

A. Yes.
Q. Okay. Thank you.
With respect to the use of deadly force, are you generally trained that you can only use deadly force if there is an imminent or immediate threaten of death or serious bodily injury?
A. Yes.
Q. And are you generally trained that if there's not an immediate or imminent threat of death of serious bodily injury, you should not use deadly force?
A. That is correct.
Q. Do you have that there has to be an ability, opportunity, and apparent intent to immediately cause death or serious bodily injury to justify the use of deadly force?
A. Yes.
Q. Are you generally trained that deadly force should only be used when there are no other reasonable options available?
A. Yes.
Q. Do you have a copy of your recorded interview handy?
A. "Handy"? No, sir.
Q. Well, let me ask you this and then --
MR. VALENZUELA: Do you have a copy, Angela?

up and running, like a less-lethal cover option that was already assigned?"

And your response was: "Not that I recall." Correct?

A. Yes.

Q. And then they asked you: "Do you know why that would be?"

And your response was: "No, sir." Correct?

A. Yes.

Q. Okay. Based on your training, is less-lethal one form of a de-escalation?

A. Yes, it is.

Q. And are you trained that the importance of less-lethal is to see if you could utilize that before resorting to the use of deadly force? Is that your understanding?

A. Yes.

Q. Okay. Did you ever see the decedent lunging at anybody?

A. No.

MR. VALENZUELA: Okay. I think that's all I have.

Counsel, do you have any questions today for your client?

MS. POWELL: I actually do, Mr. Valenzuela.

leading.
BY MS. POWELL:
Q. You can answer.
A. Yes. At that point, I did not know where exactly they were at and who was getting the 40-millimeter launcher.
Q. Why did you not wait for Officers High and Choi to respond and position with the 40-millimeter before engaging Mr. Diaz?
A. Mr. Diaz exited the vehicle on his own, without being told so, and began to close the distance on us, limiting the effective range for that 40-milimeter launcher.
MS. POWELL: All right. I have nothing further, Mr. Valenzuela.
MR. VALENZUELA: Really briefly.

FURTHER EXAMINATION

BY MR. VALENZUELA:
Q. There's initially four officers there, right? You, Bermudez, Garcia, and Wissler; correct?
A. Yes, sir.
Q. Before Mr. Diaz ever exits out of his vehicle, none of those officers were ever designated as less-lethal; is that correct?
A. Yes, sir.

Q. Did you ever hear anybody tell Officer High or Choi that they were going to be designated less-lethal? Did you, yourself, ever hear that?
A. I heard the request that next unit responding to grab a less-lethal option --
Q. Okay.
A. -- over the radio.
Q. But did you ever hear anyone specifically tell High or Choi, any of those two officers, while they were at the scene, "You're designated less-lethal"?
A. No.
Q. I think I may have asked this, and I apologize. Did you ever hear any of the officers command Mr. Diaz to walk backwards towards you guys?
A. No. We told him to face away from us, before we told him to get back into the car -- after we told him to get back into car.
Q. Okay. And nobody that you heard ever told him to walk back towards you guys; is that correct?
A. Yes. He began to walk towards us on his own, not obeying commands.
Q. Okay.
MR. VALENZUELA: Nothing further, counsel.
MS. POWELL: I have one follow-up, Mr. Valenzuela.

FURTHER EXAMINATION

BY MS. POWELL:

Q. As part of your training as a Torrance Police, officer, when you engage or employ high-risk tactics, what is your understanding of which officers would be designated lethal coverage and which officers would be designated less-lethal?

A. So, the first four officers that arrive are going to be assigned as lethal coverage. Their duties is to deal with the threat, which will possibly, in this situation, would be the vehicle.

From there, we are requesting resources, which we did in this situation, for the next responding units to bring less-lethal options, and also be part of an arrest team.

Q. And that's the training that you assume that Officers High and Choi received, as well; correct?

A. Yes.

MS. POWELL: Nothing further.

MR. VALENZUELA: Really briefly.

FURTHER EXAMINATION

BY MR. VALENZUELA:

Q. Do you have normally a 40-millimeter on your car when you do patrol?

A. Yes. It's secured.

Q. Okay. So you -- you have both the M4 rifle and the 40-millimeter when you're out doing patrol?

A. Yes.

Q. Does Officer Garcia, if you know, also have or is also assigned a 40-millimeter when he does patrol?

A. Yes. All vehicles are equipped with a 40-millimeter launcher and secured into the vehicle.

Q. That was going to be my next question.

Every vehicle has its own 40-millimeter assigned to it when they go do patrol?

A. Yes. And we are -- we inspect the vehicles to make sure it has that equipment on there.

Q. Okay. And in this situation, none of the four initial officers were assigned the 40-millimeter, despite there being two of them in two different cruisers; is that correct?

A. Yes. Based off the high-risk tactics, we were assigned as lethal coverage until the third unit gets there to be assigned less-lethal coverage.

MR. VALENZUELA: Okay. Nothing further.

MS. POWELL: All right.

THE CERTIFIED STENOGRAPHER: Ms. Powell, are you ordering a copy?

MS. POWELL: Yes.

THE VIDEOGRAPHER: Off the record at 12:21.

(12:21 p.m., deposition concluded.)

--oOo--

STATE OF CALIFORNIA)
                    ) ss:
COUNTY OF BUTTE     )

I, KIMBERLY E. D'URSO, do hereby certify:

That the witness named in the foregoing deposition was present remotely and duly sworn to testify to the truth in the within-entitled action on the day and date and at the time and place therein specified;

That the testimony of said witness was reported by me in shorthand and was thereafter transcribed through computer-aided transcription;

That the foregoing constitutes a full, true and correct transcript of said deposition and of the proceedings which took place;

Further, that if the foregoing pertains to the original transcript of a deposition in a federal case, before completion of the proceedings, review of the transcript [ ] was [ ] was not requested.

That I am a certified stenographic reporter and a disinterested person to the said action;

IN WITNESS WHEREOF, I have hereunder subscribed my hand this 26th day of July, 2026.

______________________________________

KIMBERLY D'URSO, CSR NO. 11372, RPR