# "EXHIBIT B"

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARIA GUADALUPE DIAZ; A.D., a minor by and through his Guardian Ad Litem, MARIA GUADALUPE DIAZ; A.D., a minor by and through his Guardian Ad Litem, MARIA GUADALUPE DIAZ; LEONARDO DIAZ; and RAMONA RAMIREZ DE DIAZ,<br><br>Plaintiffs,<br><br>vs.<br><br>CITY OF TORRANCE; ARTURO CASTILLO; CODY WISSLER; JESUS GARCIA; JASON BERMUDEZ; and DOES 6-10, inclusive,<br><br>Defendants. | Case No.: 2:25-cv-03389-JLS (JCx) |

VIDEO-RECORDED REMOTE VIDEOCONFERENCE DEPOSITION OF

SERGEANT JESUS GARCIA

THURSDAY, JULY 16, 2026

Reported by: Michelle Bulkley, CSR #13658
Job #28994; Pages 1 - 128

the incident, or did you have a different assignment?

A No, I was not. I had a different assignment.

Q What was your assignment at the time of the incident?

A I was a field training officer.

Q Did you review any documents in preparation for your deposition today?

A Yes, I did.

Q And what did you review?

A I reviewed the transcripts to my interview with Internal Affairs. I reviewed the call comments from dispatch, and I reviewed Learning Domain 20.

Q Did you review any of the videos of the incident?

A Yes, sir.

Q Would that be both body cams and dash cameras?

A Yes, sir.

Q Okay. And it's my understanding your body camera did not activate during the incident; correct?

A Correct, sir.

Q So is it safe to assume the body cameras

two years. I then got assigned to a sex crimes detective where I worked at for six years.

And then I worked four years as a robbery/homicide detective, and then I returned to patrol in February of 2022 as a field training officer.

Q And is that the assignment you had at the date of the incident?

A Yes.

Q Okay. And then I see now that you're a sergeant. When did you become a sergeant after the date of the incident?

A December 28, 2025.

Q Let me talk to you a little bit about the training that you received at the Orange County sheriff's academy. Okay?

A Yes, sir.

Q At the academy, were you trained on the importance of tactics?

A Yes, sir.

Q And were you trained on the importance of formulating a tactical plan if it's feasible to do so?

A Yes, sir.

Q Okay. Did you receive training at the

academy with regards to the TASER?
A Yes, sir.
Q With regards to the training that you received on the TASER, were you trained that you could use the TASER on a subject with a knife, especially if you have a lethal cover officer with you?
A Correct.
Q Okay. Were you trained with regards to the 40 millimeter at the academy?
A No, I was not.
Q Okay. Did you receive some training at the Torrance Police Department with regards to the 40?
A Yes, sir.
Q At the academy with -- you were trained on various less-than-lethal options?
A I believe at the academy, we were taught pepper spray, TASER, and -- yes, that would be all. That would be the only two.
Q With regards to the TASER, what was your training as to the distance a TASER could be used against an individual in the probe mode?
A In the probe mode, the maximum effective range is 21 feet.

Q And what about with the OC spray? What were you trained as to the distance that could effectively be used against an individual?
A I believe the max is anywhere from 12 to 15 feet, but most effective would be closer, maybe 5 to 7.
Q And with the OC spray, were you trained it's better to use it outdoors as opposed to indoors so as to not yourself be affected by the spray?
A Correct.
Q Okay. With regards to your training as to less-lethal force, was part of the training the importance of less-lethal force so as to try to apprehend an individual without having to resort to the use in deadly force if it's safe to do so?
A Yes, sir, when feasible.
Q Okay. Were you also trained with regards to the use of deadly force?
A Yes, sir.
Q Were you trained to give verbal warning prior to using deadly force when it's feasible to do so?
A Correct, sir.
Q Let me ask you a little bit about the training from the Torrance Police Department. I

think you had indicated you received training with regards to the Torrance Police Department with regards to the use of the 40 millimeter?

A Yes, sir.

Q Okay. And was part of the training that the 40 millimeter could be used on the subject with the knife, particularly if you had lethal cover with you?

A Yes, sir, if you have lethal cover basically standing right beside you.

Q And is there a certain distance with regards to the effectiveness of the use of a 40?

A Yes. I believe the maximum effective range would be 120 feet.

Q Did you say 120?

A Yes, sir.

Q The 40 millimeter is considered less lethal?

MS. POWELL: Eric, my connection just went down.

MR. VALENZUELA: Yeah. I think I saw you disappear. You want to wait a second?

MS. POWELL: Yeah. Can we take just --

MR. VALENZUELA: Sure. Let's go off the record for a minute.

THE VIDEOGRAPHER: Going off record at 10:21 a.m.

(Discussion off the record.)

THE VIDEOGRAPHER: Back on record at 10:23 a.m.

BY MR. VALENZUELA:

Q I forgot my last question, but I think it was something along the lines of is the 40 millimeter considered a less-lethal weapon?

A Yes, sir.

Q Okay. Is it under a certain distance that the 40 millimeter is considered a lethal weapon, like under 5 yards or something like that?

A I believe it's 5 feet.

Q Okay. So under 5 feet, it could potentially be considered a lethal weapon?

A Yes, sir.

Q Okay. Did you have training at the academy with regards to dealing with people who may be experiencing a mental health crisis?

A Yes, sir.

Q Okay. Did you have -- is part of the training to try to use deescalation tactics when dealing with a potentially mentally ill individual?

A Yes, sir.

Q Would the use of less lethal be considered one form of a deescalation tactic?
A Yes, sir.
Q Okay. As part of your training with regards to the use of deadly force, is part of the training that you're responsible to justify every shot that you fire?
A That's correct.
Q And based on your training, were you trained, if you shoot an individual center mass, that it could cause death or serious bodily injury?
A Yes, sir.
Q And with respect to the use of deadly force, are you generally trained that you can only use deadly force if there is an immediate or imminent threat of death or serious bodily injury?
A Yes.
Q And kind of the converse of that question, are you trained that if there's not an immediate or imminent threat of death or serious bodily injury, that you should not use deadly force?
A Yes, sir.
Q Okay. And you probably may have received this training from your police department and not from the academy, so let me ask you this: Did you

receive some training from the Torrance Police Department that there has to be an ability, opportunity, and apparent intent to immediately cause death or serious bodily injury to justify the use of deadly force?

A Yes, sir.

Q Okay. And are you generally trained that deadly force should only be used when there are no other reasonable options available?

A That is correct, sir.

Q Okay. Prior to -- or strike that.

With regards to the training, based on your training, if an individual -- strike that.

Based on your training, can you use death -- strike that.

Based on your training, can you use lethal force on an individual for having a knife in their hand, that fact alone?

A That fact alone, no, sir. It's got to be more information at hand for us to use lethal force.

Q Okay. And based on your training, if an individual has a gun in their hand, can you use deadly force against them, that fact alone?

A That fact alone, no, sir. There's got to be more information.

that you'll be doing it?
A Yes.
Q Okay. Is that the only recorded interview you provided regarding this incident?
A Yes, sir.
Q To your understanding, is this shooting incident still under review by your department?
A I believe, yes, it's still under review.
Q Okay. Going back briefly to your training on the use of the TASER, were you trained that if you tased somebody in the probe mode, that it could cause no muscular incapacitation?
A Yes. If the probes connect properly, then, yes, that -- that would occur.
Q And is that a fancy way of saying an individual's muscles will lock up?
A Correct.
Q And that could cause the individual to then fall to the ground?
A Yes, sir.
Q And is it your understanding that the TASER could be used in either the drive-stun mode or the probe mode?
A Yes.
Q The drive-stun is essentially where you

A Yes, sir.
Q How many -- do you recall how many shots you fired?
A Two shots.
Q And you intentionally pressed the trigger twice to fire those two shots; correct?
A Yes, sir. It was a volley of two shots.
Q In other words, there wasn't an accidental discharge?
A No, sir.
Q Okay. Other than your firearm, let me ask you about some other equipment that you may have had on you. Did you have a TASER on you?
A Yes, sir.
Q Do you recall what model that was?
A It was a TASER 7.
Q Does that have two cartridges for the probes?
A Yes, sir.
Q And did you have OC or pepper spray on your person?
A Yes, sir.
Q Did you have a baton on your person?
A No, I did not.
Q Did you have one in your vehicle?

A Yes.
Q Okay. And in your vehicle, you also had a 40 millimeter; correct?
A Correct.
Q Okay. Is it your understanding that each of the patrol cruisers that go out -- go out on patrol are equipped with a 40 millimeter?
A That is correct, sir.
Q Okay. You keep that like in the trunk of the vehicle?
A Yes. They're in the trunk of the vehicle. They're attached to a bracket on the rear door.
Q Generally speaking, the 40 millimeter that's stored in the back of the vehicle -- first of all, is your vehicle an SUV or like a car?
A It was an SUV.
Q Okay. I don't know if you would call that the trunk, but the back of the SUV, when it's stored in there, are the rounds of the 40 millimeter loaded already in the -- in the 40-millimeter weapon?
A No, they are not, sir.
Q Okay. So is the 40 millimeter generally stored unloaded?
A That is correct.
Q Okay. And then to deploy it, then you

example, if an individual is armed with a knife, whether you should use the sponge round as opposed to the OC round, or does the training not make such a distinction?

A I believe for that, the training would be to use a sponge round.

Q Okay. Now, going back to the incident, did you have a partner with you the date of the incident?

A Yes, sir.

Q And who was your partner?

A That was Officer Wissler.

Q Okay. And were you driving the cruiser that day or was Wissler?

A Officer Wissler was driving.

Q Okay. And you were a passenger, obviously.

A That's correct.

Q Okay. Were you his field training officer and he was your trainee at the time of the incident?

A Yes.

Q Okay. Do you have an understanding as to how long Officer Wissler had been a trainee on the date of the incident?

A That was day one of his third cycle of

training, which would have been his 25th shift as a police officer.

Q Okay. Had you -- prior to the date of this incident, had you acted as the field training officer for Officer Wissler?

A No, sir.

Q Okay. So this was the first time you guys were riding together?

A Correct.

Q Okay. Do you recall what time you started your shift that day?

A 2:00 p.m.

Q Okay. Do you generally recall around the time that you first received the information relating to the call?

A Yes.

Q Around what time was that?

A I believe it was around 4:45 p.m.

Q Okay. And prior to this incident, had you been on any other calls?

A Yes.

Q And I don't need to know what the nature of the calls were, but approximately how many had you been on?

A Two prior calls.

caller indicating that there is a man with a gun and that he was going to shoot people.

Q Okay. And are you receiving this information over the radio or also from the onboard computer in your vehicle?

A It's over the radio, and then some of the information is added to the onboard computer as well.

Q Okay. But primarily are you receiving this over the radio?

A Yes.

Q Okay. And then while you're en route to the location, prior to arriving to the location, were there any updates on the call?

A Yes. The updates on the call were that -- I believe someone from dispatch was conducting pings on the caller, and they indicated that the caller was calling from the area of Oregon Court and Maple, just east of.

Q Okay. Did the information of the call indicate that anybody had been physically injured?

A No, sir.

Q And then you ultimately arrive in the area of where the call came from; correct?

A Correct.

information that Mr. Diaz may work at one of the nearby businesses?
A Yes, sir.
Q Okay. And do you then drive to the area of that business to investigate?
A Yes, we did.
Q Okay. Would you agree sometimes when you receive calls, sometimes the information you receive is accurate; other times the information you receive is not accurate? Would you agree with that?
A That is correct. We -- we train our officers and -- you know, never to trust fully just what is being said over the radio, that it's always on us to arrive on scene and conduct a full and thorough investigation, to properly assess what -- what's going on.
Q So one of the duties when you respond to a call is to investigate to confirm whether the information you received about the call was accurate or not. Is that fair?
A Yes, sir.
Q Okay. At some point do you arrive at the area of the business where you received information that Mr. Diaz may have worked?
A Yes, we did.

look inside of the business?
A Yes.
Q Okay. Were the doors to the business locked?
A Yes, they were.
Q Did you look inside the windows of the business to see if you could see anybody inside?
A As best as we could. It was a really heavy -- really dark tint windows.
Q When you looked inside of the business, did it appear that the business was vacant?
A Yes.
Q Okay. Did you ever speak to any of the individuals of the neighboring business at that point?
A I did not.
Q Okay. So none of the individuals in the neighbor -- in the neighboring businesses ever told, at least you and Wissler, that that business had moved out like a week ago? You never got that information; correct?
A I did not.
Q Okay. Did Castillo or Bermudez ever inform you that they had spoken to an individual in one of the neighboring businesses?

which is when we were checking the businesses when the drone operator alerted us and said that the doors -- the driver's side door from that green Charger was opening and closing, at which time our focus kind of turned to that vehicle.

Q Did you ever receive any information that shots had been fired in the area?

A No, sir.

Q When you initially saw this green Charger, did you recognize as having seen it on prior occasions?

A Yes. And those occasions would be just me driving into work or leaving work or even during a patrol, I would see that vehicle driving either eastbound on Del Amo or even sometimes westbound.

I mean, the vehicle caught my eye just because it was a green Charger with a black hood. I used to own a green Charger -- I'm sorry. Not a green Charger. I used to own a Charger, so it just reminded me of the vehicle I owned.

And plus the guy -- whoever was driving it at the time would -- would rev their engine. So it was just one of those cars that stood out.

Q Had you ever tried to like do a traffic stop on that vehicle prior to the date of this

incident?
A No, sir.
Q I think you had indicated, when you first spotted the vehicle, that the windows were down like 6 to 8 inches?
A Correct.
Q Do you -- okay. When you saw the Hispanic male inside, did you recognize him as having dealt with him in the past?
A No.
Q When the window was down 6 to 8 inches, was the door also somewhat opened, or was it closed at that point?
A I believe it was closed.
Q Okay. I think you had indicated that you guys ran the plates. Did the plates come back to Leonardo Diaz or to somebody else?
A It came back to a female, but I don't recall the name.
Q Okay. At some point -- strike that.
You then received information from the drone that it had observed the door like opening and closing on the green Charger; is that correct?
A Correct.
Q Okay. Was it at that point that you

decided to stop or investigate the vehicle?

A No. It was actually one of the officers working dispatch -- I believe it was the officer in charge -- sent a photo of Leo Diaz to my work cell phone. And I looked at that photo, and it closely resembled what I briefly observed, the person sitting in that driver's side of that green Charger.

Q When that photo was sent to you, did you recognize that individual as having dealt with him in the past?

A No, sir.

Q Okay. So you're sent the photo over your phone, and you believe that individual resembled the individual that you had seen in the green Charger; correct?

A Correct.

Q Is that when you decided to maybe investigate that vehicle?

A Right. I told Officer Wissler that the -- I had just received a photo and it looked like the driver -- the person sitting in the driver's seat of the green Charger.

Additionally, I alerted the -- advised the communications, the radio room, of my observations and how I have seen that vehicle in the past, and

A He parks it, I would say, southwest of mine, just a bit offset.

Q Okay. Now, prior to exiting your vehicle to make contact with the green Charger, did you ever discuss any tactics with Wissler up until -- prior to exiting out of your vehicle?

A Yes. While en route to the call, when we first received details of a possible man with a gun wanting to shoot people, once again, it was a very short drive there.

So briefly just talked to him about basically scanning the area, looking for anyone to either, A, flag us down or people running for cover or running to -- running for help, looking for any suspects or anyone armed with a gun, and basically being ready once we turned that corner on Maple and Oregon Court to be ready to be confronted potentially with -- by someone with a gun and basically confront that person and, if need be, you know, be ready to fire back if we get fired upon, you know, in case we get ambushed kind of thing.

Q And prior to exiting your vehicle, did you ever designate any role for Wissler, such as contact, cover, lethal, less lethal?

A So because we were the first two units on

scene and Officer Wissler is the driver, typically a driver in -- during a contact, during, let's say, a traffic stop or even a high-risk stop, the driver of that initial primary vehicle would be the contact person.

Additionally, the call described a man with a -- with a -- with a gun. So I wouldn't -- I wouldn't assign him as a less-lethal 40 or a TASER because we are facing a problem with someone armed with a gun. So he was assigned as lethal as well.

Q When you first saw Mr. Diaz in the vehicle through that 6- to 8-inch -- with the windows down, at that point did you see any weapons on Mr. Diaz?

A No, sir.

Q Did you see any injuries to Mr. Diaz at that point?

A No, sir.

MR. VALENZUELA: Okay. We've been going for about an hour. Why don't we take like a ten-minute break, and then we'll reconvene at 11:10, if that's okay with you.

MS. POWELL: Sure. That's fine.

THE WITNESS: Yes, sir.

THE VIDEOGRAPHER: Okay. Going off record at 10:59 a.m.

(Recess.)

THE VIDEOGRAPHER: Back on record at 11:10 a.m.

BY MR. VALENZUELA:

Q We were kind of at the point where you had exited your vehicle, and shortly thereafter, I think you said Castillo and Bermudez -- strike that.

We were at the point where you and Wissler had exited your vehicle, and shortly thereafter, Castillo and Bermudez had also exited their vehicle; correct?

A Correct.

Q Okay. And I think you said it was a really short period of time from when you and Wissler exited to when Castillo and Bermudez exited; correct?

A Yes, sir.

Q Okay. When all four of you are now out of your vehicle, first off, would you be considered like the senior or the supervisor officer at that point?

A Not the supervisor, but I was the most senior officer on scene.

Q Okay. Would any of the four officers be considered like the supervising officer at that

point?

A No, sir.

Q Okay. At that point, when all four of you exit out of your vehicle, do you ever formulate a tactical plan at that point assigning various roles to the different officers?

A Initially, when we exited the vehicle, Officer Wissler was tasked with saying commands. Initially I believe he told the driver to lower his windows, "Let me see your hands."

It wasn't until we noticed that the driver's side door began to partially open maybe 2 to 3 inches, and it did that maybe two to three times while we were standing there, at which point we realized that somebody was inside the car, and that person's actions, as far as opening and closing the door momentarily was a bit odd.

At that point is when I believe Officer Castillo went to his vehicle and retrieved his -- his patrol rifle, and he took my position from the passenger side door of our vehicle, and he instructed Bermudez to basically follow my lead in regards to any -- any instructions, at which point I told Officer Bermudez to move his vehicle from its current position and position it north of

Officer Wissler and my vehicle and instructed him to -- so that it would be easier for him to understand.

Without having to explain too much, I just told him to position it like a felony stop so that he knew basically what I was trying to convey to him, at which point he moved his vehicle and parked it just north of Officer Wissler and my vehicle.

He remained at the driver's side door of the vehicle. I then repositioned to the passenger side of his vehicle. So now I am at the passenger side of his vehicle, which is north of Officer Wissler and my vehicle, and then Officer Wissler is just south of me at the driver's side door of our vehicle.

During that time -- and in that time when Officer Bermudez is moving his vehicle, I'm instructing Officer Wissler to, you know, continue to give that person commands, as far as, you know, "Let me see your hands," and those -- those types of things.

I believe also at that time, when we observed that, Officer Castillo upgraded the call and asked for backup, meaning for officers to respond and respond code 3.

We also asked for less lethal. We asked for the next unit arriving on scene to -- to bring less-lethal option with them, and then that's when we then moved over to -- well, I -- I was now at my new position, and we were focused on the vehicle and the occupant inside.

Q Okay. So going back a little bit, at least when you guys, all four of you, exit out of your vehicles, at least at that point, you did not formulate a tactical plan and assign various roles at that point. Would you agree?

A At the initial stage, no. It was just Officer Wissler and I. He was going to contact the driver, and we were either going to identify if that was the person involved or not.

Q And the reason Wissler was the contact officer, that was because he was -- he was the driver, and generally the driver is the contact; correct?

A Correct. In fact, when we first pull up and Officer Wissler opened the door, he began to walk around the driver's side door as if he was going to walk up on the car and make contact similar to a regular traffic stop, at which point I stopped him and said, "No, you know, get back. Like we're

A Correct.
Q Okay. At some point after Castillo grabs the long rifle, does he basically tell you, "I'm going to be lethal; I've got the long rifle"?
A He --
MS. POWELL: Objection. Compound.
You can answer.
THE WITNESS: No. I believe what he tells me is -- he walks up beside me to my right and says, "Hey, I've got the long rifle; I can take point; I'll take your position," at which point I moved away from that -- that position and given it to him since he had a long rifle and had a better vantage point.
BY MR. VALENZUELA:
Q Prior to moving from that initial position on the passenger side of your vehicle, does Castillo tell you words to the effect, "Why don't you quarterback this? I got the long gun," or words to that effect?
A Yes, sir.
Q Okay. What did you understand that to mean when he told you, "Why don't you quarterback this"?
A It was basically to take charge and

designate any -- any roles, because at that time he had also told Officer Bermudez to basically follow my lead. To me, that indicated to, you know, basically take over also giving any instructions to his partner who was on his first day in patrol.

Q After Castillo told you to quarterback the situation and take charge of it, at that point did you ever designate either Bermudez or Wissler as lethal?

MS. POWELL: I'm going to object that it's compound; it may misstate his testimony. I don't recall if he said he understood it to be take charge of it.

But you can go ahead and answer.

THE WITNESS: No. At that time I did not specifically designate them as lethal.

However, based on their training and knowing that we're the first four officers on scene dealing with a potentially armed suspect, they -- base -- based on their training, knew that they were going to be designated as lethal without me having to tell them.

BY MR. VALENZUELA:

Q Okay. At that point, when Castillo told you to quarterback and take charge, did you ever

designate Bermudez or Wissler as less lethal?
A No, sir.
Q Okay. At some point after Castillo -- Castillo told you to quarterback the situation, I believe you indicate -- strike that.
After telling you to quarterback the situation, Castillo also told Bermudez to follow whatever you had to say, basically; is that correct?
A Correct.
Q Okay. And I believe you indicated that you had told Bermudez to -- to move -- to move their vehicle?
A That is correct.
Q Did he move -- move the vehicle that Castillo and Bermudez were in or the vehicle that you guys had pulled up in?
A He moved his own vehicle.
Q Okay. And when you told Bermudez to move the vehicle, did you ever tell him to also retrieve the 40 millimeter that was in the back of his vehicle at that point?
A No, I did not, sir. Once again, we were the first four officers on scene, and having him retrieve the 40 wasn't an option because we were faced with someone potentially armed with a gun.

Plus I believe pretty much as soon as he parked his car in that new position and opened his door and I was able to open the passenger side door, I believe within a second or two is when the driver's side door opened and -- and Mr. Diaz stepped out.

Q Did you ever hear Wissler tell Mr. Diaz to exit out of his vehicle?

A No, sir.

Q Prior to Mr. Diaz exiting out of his vehicle, did you ever hear anybody indicate that Mr. Diaz was bleeding from his wrist and that he had a knife?

A Yes.

Q Okay. Did you hear that over the radio, or did you hear that from one of the other officers or both?

A I heard it from the officers and then also the radio repeated the broadcast.

Q When you heard that the individual was bleeding from his wrist and had a knife, did you ever think it was a possibility that the individual had self-inflicted those wounds?

A At that time, no.

Q Did you ever think, when you heard that

the individual was bleeding from the wrist and had a knife, that the individual may be suicidal?

A At that time, no.

Q Okay. When you guys exited your vehicle -- when all four of you are now out of the vehicle and Mr. Wissler is giving commands, did you yourself want Mr. Wissler to give commands for Mr. Diaz to exit out of the vehicle, or did you want Mr. Diaz to remain in the vehicle?

A At that time we wanted him to remain in the vehicle and show his hands, especially after seeing the blood and the knife in his hand so that we can have more responding units arrive so that we can have less-lethal coverage and then also more officers on scene to be able to then extract Mr. Diaz and safely take him into custody.

Q After -- strike that.

Before Bermudez removed the vehicle, did you yourself already have your gun out?

A Yes, sir.

Q Okay. And you saw that Mr. Castillo had taken up the long rifle; correct?

A Yes, sir.

Q When Mr. -- or strike that.

When Officer Wissler was giving these

commands to Mr. Diaz, did he also have his gun out?

A Yes, sir.

Q Okay. After Bermudez moved the vehicle and got out of his vehicle, did you see whether or not he had his gun out?

A Yes, sir.

MS. POWELL: I'm going to object just -- it's vague and ambiguous as to "gun out." It could be interpreted different ways, Mr. Valenzuela, but the answers can stand.

MR. VALENZUELA: Okay.

BY MR. VALENZUELA:

Q When you -- when you had your gun out, when Wissler had his gun out, and when Castillo already had the long rifle out, prior to telling Bermudez to move the vehicle, why did you not designate Bermudez as less lethal at that point, since three of you already had your guns out?

A Because based on our training, whenever you do utilize a less-lethal option, you want to have an officer with lethal coverage standing right beside you.

For instance, in case you have the TASER and you deploy the TASER and the TASER is not effective and that person then comes after you, you

misstates his testimony as to the inclusion of the word "sufficient." I don't believe that that's what he said.

But you can go ahead and answer the question, Mr. --

MR. VALENZUELA: I'll reask it.

MS. POWELL: Okay.

BY MR. VALENZUELA:

Q Despite three officers having their guns out, did you think that was not enough lethal coverage to designate a fourth officer as less lethal?

A That is correct.

Q Okay. And you indicated that the reason you didn't designate, in part, a fourth officer as less lethal was because of your training?

A That is correct, sir.

Q What was the distance of the green Charger to where your vehicle was positioned?

A I'd say approximately 30 feet.

Q Did you think that that distance was too short of a distance to where the officers were positioned to designate somebody as a less-lethal option based on that distance?

A Are you referring to the first four

officers on scene?

Q Correct, to where Mr. Diaz is positioned.

A Based on everything that we had observed leading up to that point, that, once again, still was not an option, regardless of the distance, because of the position that we all took at that time.

Q And were you behind -- a position of cover behind your door?

A Correct.

Q And is that door like a ballistic door?

A Yes, it is.

Q Okay. Up until that point, had you seen a gun on Mr. Diaz or anywhere around him?

A No, we had not. However, the call did indicate that the caller said he had a gun, so we treated it as if someone was armed with a gun, which leads to another point, that we would not use a TASER or a 40 millimeter on someone who is potentially armed with a gun themselves.

Q But could you use a TASER or a 40 millimeter on somebody that is not armed with a gun?

MS. POWELL: I'm going to object. It would assume that they knew the person didn't have a

gun.

But you can go ahead and answer. I'll object that it's an incomplete hypothetical.

THE WITNESS: So at the time of the call, we believed that the occupant of the vehicle was armed with a gun. It wasn't until he exited with a knife that we saw that he had a knife in his hand.

However, he was wearing baggy clothing, making it easy to conceal a gun in his waistband.

To answer your question, can you use a TASER or a 40 on a person armed with a knife? Depending on the distance or if you have lethal coverage there and you have -- it's safe to do so, then, yes, it's possible.

BY MR. VALENZUELA:

Q Prior to Mr. Diaz exiting out of the vehicle, did you ever see a knife on Mr. Diaz?

A Prior to him exiting, no.

Q Prior to him exiting, did you ever see Mr. Diaz bleeding at all?

A I saw blood on his arms, but I did not know if that was his own blood or a victim's blood.

Q Up until that point, had you received any information that anybody else had been injured other than Mr. Diaz?

A No.
Q And up until that point, you didn't see anybody else injured. Would you agree?
A The windows were really dark, and you couldn't see through either the side windows or even the windshield. So it was unknown if someone else was either in the passenger seat or the rear seats that may have been injured.
Q Right now I want to focus on what you actually saw. Did you actually ever see anybody injured up until that point?
A No, sir.
Q Okay. How long were you -- strike that.
After you exited your vehicle with Wissler, Castillo, and Bermudez, from that point when you guys all exited out of your vehicles up until the point where Mr. Diaz exited out of his vehicle, do you have an estimate as to how much time passed during that period of time?
A I believe it was -- I believe it was about two, two and a half minutes from the time we arrived to the time where he exited his vehicle.
Q And in that two-minute, approximately, period, did you ever designate anybody as less than lethal in that two-period -- in that two-minute

period of time?

A For the officers on scene, none of them were specifically designated as less lethal because, once again, we were being confronted by a potentially armed suspect with a firearm.

However, we did request that the additional responding units arrive and arm themselves with a less-lethal option. Specifically the 40 is what we asked for. Because of the distance at which we were at, that would be the most effective less-lethal option.

Q At some point Mr. Diaz exits his vehicle; correct?

A Correct.

Q When Mr. Diaz exits his vehicle, are you looking at the front profile of him?

A Correct.

Q Can you see him from the top of his head to his feet, basically?

A Yes, sir.

Q Okay. At that point do you see him holding what you believe to be a knife?

A Yes, sir.

Q At that point do you see a gun?

A No, sir, I do not.

Q Okay. You may -- do you ever see any kind of bulge underneath his clothing which made you think that that was a gun?
A No, sir, because his shirt was too baggy.
Q Okay. You made a reference that he could potentially be concealing a gun in his waist.
Do you remember making that comment?
A Yes, sir.
Q At any point prior to the shots being fired, did you ever see Mr. Diaz reaching inside his waistband?
A No, sir.
Q Did you ever see him reach towards his waistband?
A No, sir.
Q Did you ever see him reach towards his pockets?
A No, sir.
Q Okay. When Mr. Diaz exits out of the vehicle, do you see any injuries to Mr. Diaz?
A I do not.
Q Do you see blood on him?
A Yes.
Q Where do you see the blood on him?
A I saw blood basically on his forearms just

sorry -- his left arm was pretty much straight down along the side of his body, maybe 2 to 3 inches away, and his right arm that was -- right hand that was holding the knife was maybe out away from his body maybe 8 to 9 inches away. It was -- so straight down but angled away, almost at like a 45 from his body.

Q When you say "8 to 9 inches," would that be 8 to 9 inches horizontally from his body?

A Correct, with a -- not with the elbow straight but with the arm -- arm -- not with the elbow bent but with the arm straight out.

Q What -- would the hand holding the knife be like near his hip or his right -- the side of his right thigh, that area?

A He had fairly long arms, so I'd say it's closer to just below the hip, more -- more on the thigh.

Q And that would be the side of his right thigh?

A Correct.

Q Did the knife essentially stay in that position up until the time of the gunshots?

A Yes.

Q In other words, you never saw him raise

the knife above that location; correct?
A No.
Q Would that be correct?
A Correct.
Q Did you ever see him make a stabbing motion with the knife he was holding?
A Depends on what you describe as a stabbing motion.
Q What's your understanding as to what a stabbing motion is?
A Well, a stabbing motion can be many things. A stabbing motion can be over the shoulder stabbing this way [demonstrating]. A stabbing motion can be sideways [demonstrating]. A stabbing motion can be this way [demonstrating]. A stabbing motion can also be from the position where he was at and you're thrusting forward and stabbing [demonstrating].
Q In any of those examples that you just gave, did you ever see him do any of those?
A No.
Q Similar question: Did you ever see him make like a slashing motion with the knife?
A No.
Q Did you ever see him make a throwing

motion with the knife he was holding?
A No, sir.
Q When he first -- when Mr. Diaz first exits out of his vehicle, he then stands up; correct?
A Correct.
Q When he first exits out of his vehicle and then stands up, what distance would you estimate he was from you at that point?
A I'd say 30 to 35 feet.
Q And I understand these are just estimates. I don't -- you didn't have a measuring tape. I don't expect it to be precise. I'm just asking for general estimates.
At that point are commands continuously being given to him?
A Yes, sir.
Q Is it essentially just Wissler giving commands, at least when he first steps out of the vehicle?
A Yes, sir.
Q And when he steps out of the vehicle, does he begin walking in the direction of the officers?
A There was a slight pause, less than a second, I would say, before he starts walking.
Q And would he be walking in a westerly

direction, or what direction would he be walking?

A Initially, once he began walking, he walked diagonally in a northwest position. He maybe did that for 7 or 8 feet, and then he did what I would describe as like a quarter turn and then continued westbound in a straight -- in a straight line.

Q So he's initially walking in a northwest direction, and then he kind of changes direction and now is walking in a westerly direction?

A Correct.

Q And when he first starts walking in this northwestern direction, how would you describe the speed of his walk? Was it a slow walk, a normal walk, a fast walk? How would you describe the speed of the walk?

A I would describe it as a -- as a normal walk.

Q Did he essentially maintain that same normal speed of walk from when he initially started walking till he was shot?

A Yes.

Q In other words, you never saw him jogging, for example?

A No.

Q Never saw him quick walking, for example?
A No.
Q You never saw him run; correct?
A Correct.
Q While he's walking, are some of the commands being given to him, "Drop the knife; get on the ground," words to that effect?
A Yes. Actually, when he first stepped out of the vehicle, Officer Wissler, I believe, initially told him to get back inside the car, but as he continued to stand, Officer Wissler told him to turn around, face away from us, and drop the knife.
Once he did not obey those commands and he began to walk diagonally and then eventually west, the commands were continued by Officer Wissler to, you know, "Stop. Get on the ground. Drop the knife."
I believe Officer Castillo then began to yell, "Stop the knife" -- I mean, "Stop. Get on the ground. Drop the knife." And then as he got closer to my location, I began to basically give the same commands, as far as, "Stop and drop the knife."
Q Was he ever told like, "Turn around and walk backwards towards us"?

have been the closest to you or to a different officer?

A Closest to me.

Q And when you fired your gun, what distance would you estimate Mr. Diaz to be?

A 4 to 5 feet.

Q Prior to firing your shot, did you hear any other shots being fired before you fired yours?

A No.

Q After you fired your -- how many shots did you fire?

A Two, sir.

Q After you fired your two shots, did you hear any other shots being fired?

A No. I mean, to me, they sounded like they're simultaneous. If I did hear another round, maybe I thought it was just an echo of -- of the last round being fired, including mine.

Q While you were discharging your weapon, were you aware of whether or not any of the other officers were also discharging their weapons?

A I can -- I can hear what sounded like other gunshots, so I -- I figured other officers shot, but I didn't know who.

Q Do you know those other shots that you

could hear, whether they were coming from your right side or your left side?
A It sounded like they were coming from my right side.
Q Okay. And to your right would be Wissler, then Castillo; correct?
A Correct.
Q Bermudez would have been to your left on the driver's side of the vehicle; correct?
A Correct.
Q Do you recall whether or not all four officers were essentially taking a position behind the door prior to you firing your first shot?
A That's where -- I mean, I knew Officer Wissler was behind the door. I -- I know myself, I was behind the door. And Officer Bermudez was behind the door. And Officer Castillo, that's a position where I last observed him, so without looking over there, I believe that's where he was at.
Q And based on your training, could the ballistic door of the vehicle be used as cover?
A Potentially, yes, you can crouch down behind the door.
Q And that door, I think we discussed

earlier, is a ballistic door, correct, the doors on the vehicle you were driving?
A Correct.
Q Does that mean that like it's -- it's designed to stop bullets if you're shot at?
A Yes. I don't know up to what capacity or what type of bullet, but, yes, it could.
Q And up -- and up until the time that you fired your first shot, you had not observed a gun on Mr. Diaz's person; correct?
A Correct.
Q When you fired your first shot, where were you aiming?
A I was aiming -- aiming center mass.
Q And what was center mass based on what you were observing?
A Center mass was basically below his collarbone -- collarbone and above, I'd say, the belly button.
Q Were you under the impression that your first shot struck him?
MS. POWELL: Objection. Calls for speculation.
You can go ahead and answer.
THE WITNESS: Yes. I believe that the

BY MR. VALENZUELA:

Q When he stopped and started falling to the ground, did you believe he posed an immediate or imminent threat of death or serious bodily injury?

MS. POWELL: Again, that's compound because I believe his testimony was as -- when he was falling to the ground, he wasn't firing.

But go ahead and answer.

THE WITNESS: At that point, as previously stated, I had to reassess to determine whether I felt like I was in danger and needed to fire another round, which I didn't.

However, I still felt that he did pose a threat because he was holding a knife. However, he was no longer advancing toward me, so I was able to reposition.

So I would say, at that point, no. If not, I would have fired another round.

BY MR. VALENZUELA:

Q That was going to be my next question. That -- that's why you stopped; correct? Because you thought he didn't pose an imminent or immediate threat of death or serious bodily injury when he was stopped and falling to the ground; correct?

A Correct.

Q Did you see any of the shots being fired -- strike that.

Did you hear any shots being fired at Mr. Diaz while he was stopped, not walking in a westerly direction?

A No.

Q Okay. Did you hear any shots being fired at Mr. Diaz as he was falling to the ground?

A No.

Q Okay. At any point prior to firing your shots, did you ever try to tactically reposition yourself?

A No, aside from maybe taking a half step back.

Q At any point prior to firing your shots, did you ever try to increase the distance between you and Mr. Diaz?

A No. Once again, that -- that wasn't feasible. That would require all of us to move in unison. So if I decided to move, let's say, to the rear of my vehicle, then that would leave Officer Wissler in a position of disadvantage.

Additionally, it would leave Officer Bermudez basically on an island on the driver side of the vehicle.

So, no, I maintained my position. We're not required to tactically retreat when faced with, you know, a call like this or -- or prior to using deadly force, so.

Q Well, let's talk about that a little bit. Do you have training that you should tactically reposition yourself if it's safe to do so or feasible to do so?

A It's not a requirement. If -- if able to or tactically you can, then -- then, you know, it's an option, but it's not a "you shall" thing.

Q I'm not asking if you shall; I'm asking, based on your training, are you trained that you should tactically reposition yourself if it's feasible to do so?

MS. POWELL: I'm going to object that it's an incomplete hypothetical; it's vague and ambiguous. Under what circumstances?

BY MR. VALENZUELA:

Q You may answer.

A Depending on the circumstances, sure, you can reposition yourself. Based on the circumstances that we were faced with at this time, it didn't seem feasible to do so.

Q And let me just specify it a little bit

BY MR. VALENZUELA:

Q Well, let me ask you on your training. Based on your training, are you trained, with regards to the use of deadly force, that you should tactically reposition prior to using deadly force if it's safe to do so? I'm just asking about your training right now.

MS. POWELL: I would imagine, again, that that would depend on the scenarios in which they're being trained.

But you can answer.

THE WITNESS: Once again, it's based on the totality of the circumstances, the situation which we're faced with. If feasible, yes, it could be an option.

BY MR. VALENZUELA:

Q Based on your training with regards to the use of deadly force, are you also trained that you should try to increase the distance between yourself and a suspect prior to resorting to the use of deadly force, if feasible to do so?

MS. POWELL: I'm going to object. It's an incomplete hypothetical; it's vague and ambiguous.

If you can answer his question, go ahead.

THE WITNESS: Once again, it's based on

the totality of the circumstances, the situation in which we're faced with.

Creating distance, obviously, is always -- well, creating distances is -- could be a tool, could be something that you can use during a use of force or a deescalation. But once again, based on what we were faced with at this time, that wasn't -- that wasn't an option.

BY MR. VALENZUELA:

Q At any point did you ever tell any of the other officers, "Let's increase the distance from Mr. Diaz"?

A No, because at that time I felt like we had a safe distance from where we were conducting our high-risk stop. It was Mr. Diaz who decreased that distance by not obeying our commands and advancing forward.

Q Was -- and we'll take a break in a second. Just give me...

Was there anything physically obstructing you from backing up and creating distance with Mr. Diaz?

A Once again, no, there wasn't, but if I decided to move back, once again, I was going to leave my partner, Mr. Bermudez, who was on the

driver's side, once again, on an island by himself.

MR. VALENZUELA: Okay. Why don't we take another ten minutes? Does that work for everybody?

MS. POWELL: Sure. That's fine.

MR. VALENZUELA: Okay.

THE VIDEOGRAPHER: Okay. Going off record at 12:14 p.m.

(Recess.)

THE VIDEOGRAPHER: Back on record at 12:29 p.m.

BY MR. VALENZUELA:

Q Okay. I want to ask you another question with regards to your training on the use of deadly force, just focusing on the training right now.

Based on your training with regards to the use of deadly force, is one of the factors you are to consider in deciding to use deadly force whether or not it's safe to tactically reposition yourself?

A Yes.

Q I think I was asking it very wonky earlier, so Counsel may be very aware of that, so I tried to clean it up a little bit. But at any point did you give a verbal warning that deadly force was going to be used before you fired?

A At one point, as Mr. Diaz was getting

at officers, officers telling them to stop, being told, "Stop, I don't want to shoot you," without like the direct, "Stop right there, or you're going to be shot," I would say that that was within our training, as far as giving them a warning that they were -- were going to be shot.

Q Is the general training on a verbal warning that deadly force would be used -- is the general training to give a command or tell them that deadly force would be used against them if they don't comply with that command?

A Yeah. When feasible, giving someone a warning is something that we're trained on.

However, it depends on like the, once again, totality of the circumstances and a reasonable understanding by the individual that deadly force would be used if they continue.

Q Based on your training with regards to the use of deadly force, were you trained that the use of deadly force must be necessary to defend human life?

A Can you repeat that, please?

Q Sure. Were you trained, with regards to the use of deadly force, that the use of deadly force must be necessary to defend human life?

A Yes.
Q At any point did you ever see Mr. Diaz try to flee?
A No, sir.
Q Did you ever hear any of the other officers give a verbal warning that deadly force would be used prior to hearing the gunshots?
A Not a specific warning, no.
Q I want to ask you a couple of questions about your interview. Do you have a copy handy?
A Yes, sir.
Q During this incident, did you attempt to activate your body camera?
A Yes, sir, I did.
Q Was there some kind of malfunction with your body cam where it did not activate?
A Correct.
Q Did you believe this was a threshold incident which required the activation of the body cam pursuant to Torrance Police Department policy?
A Yes, sir.
Q Did you ever figure out what was wrong with the body camera, why it didn't activate?
A No, sir.
Q Did you continue to use that body camera

after this incident, or were you assigned a new one?
A I continued using one.
Q Does it -- did it seem to function properly after this incident?
A Yes, sir.
Q Do you know why it didn't function during this incident?
A I believe what happened is I -- in order to activate the camera, you have to press on the actual button -- I believe it's twice. I probably didn't press hard enough on one of the two times that I pressed it, which didn't activate the camera.
Q Did your vehicle also have a dash camera?
A Yes, it did.
Q Did you ever activate the dash camera on your vehicle during the incident?
A Yes.
Q Okay. Do you know whether or not Officers High and Choi arrived prior to the gunshots?
MS. POWELL: Objection. It calls for speculation.
You can answer.
THE WITNESS: Well, "arrived," that -- deeming "arrive," like parked at the scene and out

of their vehicle and standing beside us, or do you mean "arrived," as in arrived at the location in their vehicle?

BY MR. VALENZUELA:

Q I'll specify it a little bit.

Did you ever see Off- -- first of all, did Officers Choi and High -- were they in the same police cruiser?

A Yes, they were.

Q Did you ever see them exit out of their vehicle prior to the gunshots?

A No.

Q Can you please turn to page 18 of your interview.

A Yes.

Q Okay. Can you please read line 23 to approximately 27 to yourself and let me know when you've had a chance to do so.

A (Reviewing document.)

Done.

Q Okay. At least in this portion of your interview, did you indicate that commands were given to, "Come out with his hands up, you know, step out of the vehicle, let me see your hands kind of thing"?

A Yes. That's what I said at the time.
Q Okay. After listening to the videos of the incident, do you believe that was incorrect?
A Correct. It's incorrect.
Q Did you ever hear any of the officers yell for the 40 prior to the gunshots being fired?
A Yes.
Q Was that Officer Castillo?
A That was Officer Castillo, and I myself called out for the 40.
Q And did you hear -- I'm going based off the body cam. Did you hear Castillo repeatedly say, "40, 40, hurry up," words to that effect, right before the gunshots?
A Yes.
Q Did you yourself tell the next unit to come up, to bring the 40?
A Yes. I -- I broadcast that over the radio.
Q Can you please turn to page 20. Read to yourself lines 25 through 30.
A (Reviewing document.)
Yes.
Q Okay. You mentioned in there that while Mr. Diaz was in the vehicle because there was blood

on him, that he may have hurt himself, and you couldn't tell the blood on his arms, if they were self-inflicted wounds.

Do you see that?

A Actually, I said either because he hurt somebody or he hurt himself.

Q Correct. So at least at this -- in your interview, you thought it was a possibility that he had hurt himself, and that was why he had blood on him; correct?

A Appears that way, yes.

Q Okay. And then on that same page, lines 32 to 37, you make reference to him opening the door, seeing blood and a knife, and you asked someone to come up with the 40.

Do you see that?

A Yes.

Q Can you turn to page 21, please, and read to yourself 17 to 21.

A (Reviewing document.)

Yes.

Q In this portion of your interview, you make reference to, "Where's the 40? Where are these guys at? What's taking so long to get that thing and get it up here?"

Do you see that part?

A Yes, sir.

Q And you're making reference that you were expecting somebody to come up with the 40?

A Yes. I'm expecting Officer Choi or Officer High, who I had observed driving westbound prior to that, thinking, you know, how long is it going to take them to get -- get out of the car and bring the 40 up.

Q And then in the next paragraph, lines 23 to 32, can you read that to yourself for a second?

A (Reviewing document.)

Yes.

Q Here you indicated that you began to transition to your TASER because, "We need less lethal. We need some kind of other option aside from, you know, the deadly force option, so you went for your TASER. You started going for your TASER."

Do you see that?

A Yes.

Q So at least in this portion of your interview, you indicated that you began to transition to your TASER because you wanted another option aside from the deadly force option.

Do you see that?

After the shooting, did you take part in -- of the -- were you part of the arresting?
A Yes.
Q Did -- did you handcuff him, or did somebody else?
A Someone else did.
Q Did you assist in providing any medical aid to Mr. Diaz?
A No, I did not. I was providing cover downrange toward the vehicle. So although I was part of the arrest, I was not hands on. I was part of the team providing cover for the arrest team to put handcuffs on Mr. Diaz.
Q Okay. Were you part of clearing the vehicle after the shooting?
A Yes.
Q When you went to clear the vehicle, did you see anybody inside?
A No.
Q Did you see a gun inside the vehicle?
A No. We just did a quick -- cursory search for any victims or potential suspects, other suspects or something.
Q Did you see any blood inside the vehicle?
A Yes. I believe I saw some blood.

Q Did you see any other weapons in the vehicle?
A No.
Q After Mr. Diaz went down to the ground, did he still have what you believe to be a knife in his hand?
A Yes.
Q And when you were providing cover to the green vehicle after the shooting, as part of the arrest team, did you ever see anybody remove that item from Mr. Diaz's hand?
A Yes.
Q Who removed the item? Do you recall?
A I believe it was Officer Choi.
Q When Off- -- did you see Officer Choi remove that item from Mr. Diaz's hand?
A Yes.
Q How far away were you from Mr. Diaz when Officer Choi removed that item from his hand?
A Maybe 3 feet.
Q Did you notice at that point that the item he was holding was a flathead screwdriver?
A I did not notice it was a flathead screwdriver. I did notice that it was a black handle, and I recall seeing the brand Husky, but

tools, knives, or whatnot. So although it was the handle similar to a screwdriver, I still did -- I was not aware that it was a flathead screwdriver in fact.

Q But at least in this part of your interview, you specifically said, "So that's what we did. Somebody stepped on his arm, and then Officer Choi picked up the -- the sharp object, which I looked at the handle, and it reminded me of a screwdriver, actually."

That's what you specifically said; correct?

A Correct. The handle reminded me of a screwdriver-type handle, the shape of it.

Q Sometimes as a police officer, you receive swatting calls, right, where the info turns out to be false?

A Correct.

Q Okay. Can you turn to the bottom of page 42, that last paragraph of the bottom of 42, and read it to yourself.

A (Reviewing document.)

Yes.

Q In this paragraph, you indicated that you didn't want to walk up on a vehicle if it's a man

changed the situation; right?

We started thinking things like maybe -- he's opening and closing his door. He is armed with a handgun. He's quickly opening and closing his door either to muster up the courage to step out and start firing at us, or he's taking a look back to see where we're positioned so that he can, you know, properly acquire targets on us.

So, yeah, that was the initial thought, but things changed --

Q But --

A -- based on actions.

Q But at least in this part of the interview, you indicated you weren't going to walk up on the vehicle because he may have a gun, and you wanted him to come out of the car with nothing in his hands; correct?

A Correct.

Q And I think you indicated, by the time you guys exited out of the vehicle, you were the lead vehicle; correct?

A Yes, sir.

Q Up until the time of the gunshots, you did not have any information that anybody had been killed; correct?

A Correct.
Q Can you please go to page -- bottom of -- the last paragraph of 52 to the following page, line 12.
A (Reviewing document.)
Yes.
Q Here you're asked about your perception of the commands, and you had indicated that before he exited, it was to get the subject to step out with his hands free, to get him out of the vehicle so you can investigate further.
Do you see that?
A Yes.
Q That's kind of what we discussed a little bit earlier right now?
A Correct.
Q And I think you indicated earlier you had never dealt with Mr. Diaz before; correct?
A Correct, sir.
Q So you had no information, for example, about his criminal history?
A No, sir.
Q You had no information whether he had previously physically injured anybody; correct?
A Correct.

Q Did you have any information that he was under the influence of drugs or alcohol?
A No, sir.
Q Can you turn to page 60, lines 29 to 38. Read that to yourself, please.
A (Reviewing document.)
Yes, sir.
Q Here you indicated that you were expecting that any moment for one of the other officers that arrived on scene to come up somewhere, either alongside you or the other officers, and shoot him with the 40; correct?
A Correct.
Q And that you were waiting and basically praying for somebody to yell out, "40, 40," as they're trained to do so that you know that it's less lethal being deployed and there's no reaction or contagious fire; correct?
A Correct, sir.
Q What's your understanding as to what contagious fire is?
A Contagious fire would be under a high-stress situation, when there's multiple officers present and one officer fires for his own reasons or perceived reasons to use deadly force,

that another officer may fire as well based on hearing that other officer fire, not using his own reasons for using deadly force or feeling that threat is imminent.

Q And did you think that Choi or High were going to come up with -- behind you guys with the 40 millimeter?

A I was hoping that that would happen, yes.

Q Can you turn to page 61, lines 19 to 24, and read that to yourself.

MS. POWELL: Wait one second.

Okay.

THE WITNESS: 61, what lines again?

BY MR. VALENZUELA:

Q 19 to 24.

A Okay.

(Reviewing document.)

Yes, sir.

Q Here you basically said, because you saw Choi and Officer High -- you saw their unit driving westbound, that you thought they were going to bring up the 40; correct?

A Correct.

Q Can you turn to page 64, the last two lines of 64 to the first paragraph of 65.

advancement toward us and seek -- get other help, I guess you can say.

Q Was part of the reason you wanted to take him to the hospital for psychiatric evaluation because you thought he might have self-inflicted some wounds on himself?

A At -- at that time I didn't know whether the wounds were self-inflicted because I couldn't -- I couldn't exactly see that he had harmed himself or that he harmed someone in the passenger side of that car.

Q And you never saw anybody else injured prior to you firing your shots; correct?

A Correct.

Q And I think you -- we went over an earlier part in your interview where you thought at least it was a possibility that those wounds may have been self-inflicted; correct?

A Correct.

Q And you indicated you fired two shots; correct?

A Yes, sir.

Q And you said that in your interview as well as that was an accurate estimate as to the shots you fired; correct?

MR. VALENZUELA: I'm going to object as leading.

MS. POWELL: I don't have anything further.

FURTHER EXAMINATION

BY MR. VALENZUELA:

Q Really quick, how long does it take you to transition from your firearm to your TASER?

A Firearm to TASER?

Q Yeah.

A Maybe four to five seconds, I would -- I would guess.

Q Well, I don't want you to guess. You -- you have training on transitioning from a firearm to a TASER; correct?

A Maybe two to three seconds.

Q Is that your best estimate?

A Best estimate.

Q Okay.

A To safely holster, transition to my TASER and -- ah, I mean, to get it up on sight, yeah, and then maybe four to five seconds total.

Q Where do you keep -- where did you have your TASER on your person, on --

A On my -- on my exterior vest.

Q Is that like on your front vest somewhere?
A On the left side to -- so that it can be a cross-draw, which is per policy.
Q And you have a side holster for your handgun?
A Correct.
Q Did you yourself receive any physical injuries during this incident?
A No, sir.
Q Do you know if any of the other officers on scene received any physical injuries during the incident?
A No, sir.
Q Based on your training with regards to the use of deadly force, is the availability of less than lethal alternatives at least a factor to consider in deciding whether or not to use deadly force?
A It is a factor, yes.
MR. VALENZUELA: I don't have anything further.
MS. POWELL: I don't have anything.
MR. VALENZUELA: All right. I think you're done.
THE REPORTER: Ms. Powell, did you need to

purchase a copy of the transcript?

MS. POWELL: Yes.

THE REPORTER: Okay.

THE VIDEOGRAPHER: Okay. Going off record at 1:13 p.m.

(Deposition concluded at 1:13 p.m.)

REPORTER'S CERTIFICATE

I, MICHELLE BULKLEY, a Certified Shorthand Reporter of the State of California, do hereby certify:

That SERGEANT JESUS GARCIA, in the foregoing deposition named, was present and by me sworn as a witness in the above-entitled action at the time therein specified;

That said deposition was taken before me at said time, and was taken down in shorthand by me, a Certified Shorthand Reporter of the State of California, and was thereafter transcribed into typewriting, and that the foregoing transcript constitutes a full, true, and correct report of said deposition and of the proceedings that took place;

IN WITNESS WHEREOF, I have hereunder subscribed my hand on 7/26/2026.

Michelle Bulkley

MICHELLE BULKLEY
CSR #13658