# "EXHIBIT C"

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARIA GUADALUPE DIAZ; A.D., a minor by and through his Guardian Ad Litem, MARIA GUADALUPE DIAZ; A.D., a minor by and through his Guardian Ad Litem, MARIA GUADALUPE DIAZ; LEONARDO DIAZ; and RAMONA RAMIREZ DE DIAZ,<br><br>Plaintiffs,<br><br>vs.<br><br>CITY OF TORRANCE; ARTURO CASTILLO; CODY WISSLER; JESUS GARCIA; JASON BERMUDEZ; and DOES 6-10, inclusive,<br><br>Defendants. | Case No.: 2:25-cv-03389-JLS (JCx) |

VIDEO-RECORDED REMOTE VIDEOCONFERENCE DEPOSITION OF

OFFICER JASON BERMUDEZ

THURSDAY, JULY 16, 2026

Reported by: Michelle Bulkley, CSR #13658
Job #28994; Pages 1 - 104

you had after graduating high school prior to attending the academy?
A I -- I worked in the parks and recs department in the City of Rancho Palos Verdes, and then I was a cadet at Torrance police.
Q What did you do for the park and recs division?
A I opened and closed the parks and just managed the parks during their open hours for the park visitors.
Q Okay. Any other employment that you have that you haven't mentioned?
A No. That's it.
Q And at the time of this incident, it was your first day as a field training officer; correct?
A No.
Q Or strike that.
At the time of this incident, it was your first day as a field trainee?
A That is correct, yes.
Q Sorry. Not field training officer.
A All good.
Q I misspoke.
And I take it that was the only assignment you've ever had is a trainee?

A Yes. Only assignment I had.
Q Okay. Which academy did you attend?
A I went to the Los Angeles County Sheriff's Academy, STAR Center.
Q Okay. And did you have some training at the academy with regards to the use of force, both lethal and nonlethal?
A Yes, I did.
Q With -- did you have some training with regards to the use of the TASER?
A In the academy?
Q Yes.
A No.
Q Did you have any training at the academy with regards to OC spray?
A Yes.
Q And based on your training, what is your understanding as to the distance that OC spray could effectively be used against a subject?
A Maximum effectency [phonetic] rate, probably 12 to 15 feet.
Q And were you trained it's better to use it outdoors as opposed to indoors to avoid self-contamination?
A Yes. Better to use it outdoors.

Q Okay. Did you have any training at the academy with regards to the 40 millimeter?

A No.

Q How about at the Torrance Police Department? Did you have any training with regards to the TASER?

A Yes.

Q Okay. And what is your understanding as to the range a TASER could be used in the probe mode as opposed to the drive-stun mode?

A Yeah. Up to 21 -- 21 feet, it would be effective in using it on a suspect.

Q Okay. And at the Torrance Police Department, did you have some training with regards to the use of the 40 millimeter?

A Yes.

Q And what is your understanding as to the effective range that the 40 millimeter could be used?

A Up to about 120 feet.

Q Were you trained that you could use a TASER on a subject armed with a knife if you have a lethal cover with you?

MS. POWELL: I'm going to object. It's an incomplete hypothetical.

You can go ahead and answer based on the facts that...

THE WITNESS: Yes. If you had lethal coverage right next to you, you can use your TASER on a subject.

BY MR. VALENZUELA:

Q Were you trained that you could use the 40 millimeter on a subject with a knife if you had lethal cover with you?

A Yes, if you're referring to lethal coverage standing directly next to you or right behind you.

Q Are you trained that there's a certain distance that an officer needs to be next to you in order for you to use the TASER -- strike -- let me clarify that. It was a bad question.

Were you trained that there's a specific distance that an officer needs to be next to you with lethal cover in order to use the TASER on a subject with a knife?

A Not necessarily, but the way we train is the lethal coverage stands in front, and the officer with the less-lethal option usually stands just slightly beside -- behind the lethal coverage officer but off to the -- off to the side.

Q And the same thing with the 40 millimeter. Are you trained that the officer needs to be a specific distance from you with lethal cover in order to use the 40 millimeter on a subject with a knife?
A Yeah, the same distance. Not necessarily trained a specific distance, but, again, behind the officer who's providing lethal cover and slightly off to the side.
Q Were you trained that using the TASER on an individual could cause neuromuscular incapacitation?
A Yes.
Q And is that a way to say that an individual's muscles will lock up?
A Yes.
Q That could cause the individual to fall to the ground; correct?
A Correct.
Q Were you yourself ever sprayed with OC spray, either in the academy or in training with the Torrance Police Department?
A Yes. In the academy.
Q Okay. Were you ever tased as part of your training with the Torrance Police Department?

tactically reposition or not is not a factor they should consider in deciding to use deadly force?
A Right. That's correct.
Q Okay. Were you trained that a factor you should consider in deciding to use deadly force or not is whether there's less than lethal alternatives available?
A I'm sorry. Can you rephrase the question?
Q Sure. Were you trained, in deciding to use deadly force or not, whether there's less lethal that's available as a factor you should consider in making that decision?
A Using less lethal isn't necessarily required before using deadly force, but it's an option.
Q Right now I'm just wondering if you were trained whether or not that's a factor to consider in deciding to use deadly force or not.
A Yeah. It's a factor to consider.
Q Were you trained at the academy in the importance of tactics?
A Yes.
Q Were you trained in the importance of formulating a tactical plan when it's feasible or safe to do so?

A Yes.
Q Did you have any training with regards to dealing with individuals who may be suffering from a mental health crisis?
A Yes.
Q And is part of that training to utilize deescalation tactics?
A Yes.
Q Is the use of less-lethal force one form of deescalation?
A Yes.
Q Is part of your training with regards to the use of deadly force that you're responsible to justify every shot?
A Yes.
Q Based on your training, were you trained that shooting somebody center mass could cause death or serious bodily injury?
A Yes.
Q With respect to the use of deadly force, are you generally trained that you can only use deadly force if there's an immediate or imminent threat of death or serious bodily injury?
A Yes.
Q And then the converse to that question,

are you trained if there's not an immediate or imminent threat of death or serious bodily injury, that you should not use deadly force?
A Yes.
Q Are you trained that an individual has to have the ability, opportunity, and -- and apparent intent to immediately cause death or serious bodily injury to justify the use of deadly force?
A Yes.
Q Are you generally trained that deadly force should only be used when there are no other reasonable options available?
A Sorry. Can you rephrase that?
Q Sure. Were you generally trained that deadly force should only be used when there are no other reasonable alternatives available?
A Sorry. Can you repeat that one more time, please?
Q Sure. Generally, were you trained that deadly force should only be used when there are no other reasonable options available?
A Yes.
Q Okay. Were you trained, prior to using deadly force, a verbal warning that deadly force would be used should be given when feasible?

A Yes.
Q Were you trained at the academy with regards to felony traffic stops?
A Yes.
Q Does that include high-risk felony traffic stops?
A Yes.
Q Did you also receive training at the Torrance Police Department with regards to conducting high-risk felony traffic stops?
A I did.
Q Do you know of any written policies or training in the Torrance Police Department that indicates four officers all have to be lethal cover when conducting a high-risk felony traffic stop?
MS. POWELL: I'm going to object that it's compound, Mr. Valenzuela, because you asked about policy and training in one question. I'd ask that you break it up, in terms of is there a policy and then is there a training.
BY MR. VALENZUELA:
Q Well, let's start, is there any written materials within the Torrance Police Department that indicates, when conducting a high-risk traffic felony stop, that all four officers present must be

fair?
A That's correct.
Q Did you have an attorney representing you during your interview?
A Yes.
Q Is that attorney Stephen Chulak, C-H-U-L-A-K?
A Yes.
Q Do you know if that's the same attorney that was provided to the other three shooting officers?
A I believe so.
Q Other than the interview that you gave on December 10th, did you give any other interview?
A No.
Q Okay. On the date of the incident -- I want to talk a little bit about the equipment you had on you. Okay?
A Okay.
Q First of all, you were in the vehicle with Officer Castillo; correct?
A Yes.
Q And Officer Castillo was your field training officer on the date of the incident; correct?

A Yes.
Q And were you driving or was Officer Castillo driving?
A Officer Castillo was driving.
Q Okay. And with regards to the equipment you had on you that day, did you have a handgun?
A I did have a handgun.
Q What kind of handgun did you have?
A A Glock Model 45.
Q Is that a 9 millimeter?
A Yes.
Q Is that a semi-automatic weapon?
A Yes.
Q Does that require you to pull the trigger for each bullet to be fired?
A Yes.
Q How many shots did you fire during this incident?
A Three.
Q And did you intentionally pull the trigger three times on the date of the incident?
A Yes.
Q In other words, there was no accidental discharge; correct?
A Correct. There was not an accidental

discharge.

Q Okay. Did you also have a TASER on your person during the incident?

A I did.

Q And what model -- what model TASER did you have?

A It's a TASER 7.

Q Okay. Does that have two prong cartridges?

A Yes.

Q Did you have OC spray on your person on the date of the incident?

A Yes.

Q Okay. Did you have a baton on you?

A Not on my person.

Q Did you keep one in your vehicle?

A Yes.

Q In the Torrance Police Department, does each police vehicle that goes on patrol have a 40 millimeter in the vehicle?

A Yes. It's affixed to the trunk of the patrol vehicles.

Q And it's my understanding that that 40 millimeter doesn't remain loaded while it's being stored in the vehicle; is that correct?

A Correct. It is stored unloaded.
Q Okay. And is the ammunition stored near the 40 millimeter?
A Yes, near the 40 millimeter.
Q Okay. Have you been on ride-alongs as a cadet?
A Yes.
Q On any of the ride-alongs that you had been on as a cadet, did you -- would any of those ride-alongs include an individual that was armed with a knife?
A Yes.
Q Do you have an estimate as to how many times?
A I would say maybe two or three times.
Q Okay. As a cadet, did you ever go on any ride-alongs where an individual was armed with a gun?
A At least once.
Q Going back to your training with regards to the use of deadly force, were you trained that deadly force could be used against an individual if they have a knife in their hand, that fact alone?
A Based on that fact alone, no. We would need more information.

you first received relating to the call?
A Yes.
Q And what was that?
A It was a man with a gun who stated he wanted to shoot somebody.
Q Was your FTO out of the vehicle when you first received that call?
A I believe he was at the trunk of our car while I was in the passenger seat.
Q But he would have been outside the vehicle near the trunk area?
A Yeah.
Q And did you receive the information on the call over the radio?
A Yes.
Q Okay. Does your vehicle also have an onboard computer?
A Yes.
Q Do you recall ever receiving any information relating to the call on the onboard computer?
A Yes. My FTO was receiving that information.
Q Okay. But when that call first came in, he wouldn't be able to see the computer, right,

because he's outside of the car?
A After the call came in, he went to go check the computer.
Q Okay. Did you also check the computer?
A No. He was relaying the information to me, what was on the computer.
Q So the source that you're receiving the information would have been over the radio or from your field training officer?
A So the initial call I heard over the radio, and then any other additional information that was being broadcasted over the radio, I would have been able to hear. And then anything that comes on our MDC, in-car -- in-car computer that FTO Castillo was reading, he relayed that information to me.
Q After initially receiving the call, how long does it take before you leave that area of the Chipotle?
A Before we leave Chipotle?
Q Yeah. In other words, how long do you remain at Chipotle after receiving -- first receiving the call?
A I would say like maybe less than a minute.
Q Then do you begin to go to the area of the

call?

A Yes.

Q Okay. And do you have an estimate as to the distance from where you were near the Del Amo Mall to where the incident ultimately occurred?

A It was about a five-minute drive.

Q Okay. While en route, do you receive any updates relating to the call?

A We got updates that our dispatchers were pinging the cell phone used by the reporting party who called 911, and that phone was pinging in the middle of Oregon Court, just east of Maple.

Q Did you receive any other updates?

A Yes. They said that phone belonged to a Leo or Leonardo Diaz, and they provided physical descriptors of him, that he's about 6 feet and 285 pounds.

Q Were you given any information about his criminal history?

A No.

Q Did the initial call indicate that anybody had been physically injured?

A No.

Q Did the initial call indicate that shots had been fired?

A No.
Q At some point you arrive in the general vicinity of the call?
A Yes.
Q Upon arriving at the general vicinity of the call, did you ever receive some information that Mr. Diaz may work at one of the nearby businesses?
A Yes.
Q Did you and Castillo go out to check out the businesses, the address you received where he may have worked?
A Yes.
Q Did you go to the rear of the business?
A Yes.
Q Prior to going to the rear of the business, did you see the police cruiser containing Wissler and Garcia?
A Yes.
Q Were they in the front portion of the business?
A They did go to the front of the business.
Q Do you have any communication with Wissler and Garcia before going to the rear of the business?
A I did not. I believe my FTO did.
Q Do you know what communications they had

Q Okay. At some point do you speak to any of the occupants of the nearby businesses?
A I believe FTO Castillo did.
Q Were you near FTO Castillo when he spoke to one of the occupants of the nearby business?
A Yes.
Q Okay. And do you recall what, if anything, the occupant said to FTO Castillo?
A He relayed to him that the business that Mr. Diaz worked at was no longer there.
Q Did he relay that that business had vacated approximately a week prior?
A Yes.
Q And then at some point do you receive some information that a drone is being utilized?
A Yes.
Q At some point do you receive some information about a green Dodge Charger?
A Yes.
Q Did you yourself ever see the green Dodge Charger prior to receiving radio communications about that vehicle?
A I believe the radio put out there was a Hispanic male in the green Charger before we might have arrived on scene.

Q Okay. And prior -- at some point you exit your vehicle?

A I did.

Q Prior to exiting your vehicle, did you have any discussions regarding tactics with FTO Castillo?

A FTO Castillo had brought up that due to he was the driver and it was my first day on patrol that he would be the contact officer. If [unintelligible] --

(Reporter clarification.)

THE WITNESS: Oh, yeah, yeah.

Can you repeat the question? Sorry. I got distracted with that.

MR. VALENZUELA: Sure. Can you read back the question, Madam Court Reporter?

(Whereupon the record was read as follows:

"Question: Prior to exiting your vehicle, did you have any discussions regarding tactics with FTO Castillo?")

THE WITNESS: Yes. So because Castillo was driving and because it was my first day on patrol, he -- he told me that he would be the contact officer if and when we did encounter this suspect, and that because we're going to a call of a

man with a gun who wants to shoot somebody, that we would be utilizing our firearms in contacting the subject.

BY MR. VALENZUELA:

Q So were you essentially designated as a lethal cover at that point?

A Yes. That's how I understood it.

Q At any point prior to exiting your vehicle, were you ever designated as a less-lethal option?

A No, never.

Q Prior to exiting your vehicle, did you and FTO Castillo have any discussions about somebody being a less-lethal option?

A Between me and FTO Castillo?

Q Correct.

A No.

MS. POWELL: I'm going to object that the question was vague.

Mr. Valenzuela, if you could clarify. Do you mean the conversation as between the two of them who would be lethal or anyone else?

MR. VALENZUELA: I think he answered it already, and it was just between him and Castillo.

MS. POWELL: Okay. All right. Very good.

BY MR. VALENZUELA:
Q At some point you and Castillo exit out of your vehicle?
A Yes.
Q Do you know whether or not Garcia and Wissler exited their vehicle prior to you guys?
A Yes. I -- I assume they did, a few seconds before -- before us.
Q Okay. So you guys exit your vehicle a pretty short time period after Garcia and Wissler; correct?
A Yes. It's within seconds.
Q Okay. And if I understand you correctly, you've been designated as a lethal, and your understanding, that Castillo was going to be a contact officer; correct?
A Yes.
Q At some point, when you exit your vehicle, where do you take a position up at?
A Right upon exiting, I'm on the like passenger side of my patrol vehicle.
Q Are you taking cover behind the passenger front door at this point?
A I believe I did, and then I moved up to take cover behind a -- I believe it was a gray

Nissan Altima which was parked just in front of our police car and was parked behind the Dodge Charger just to keep eyes on if anyone else was inside the vehicle on the passenger side.

Q Did you ever see anybody in the vehicle on the passenger side when you took that position near the Altima?

A No.

Q Is -- does the Altima stay there throughout the incident, or does it ultimately move?

A No. It stays there the entire time.

Q Okay. At some point do you move your position from that -- behind that Altima?

A Yes.

Q And where do you move to?

A I move up to the passenger door of Officer Wissler and Garcia's police vehicle.

Q Okay. At this point, after you move positions that you just described, have you seen the -- Mr. Diaz in the vehicle up until this point?

A I don't think I physically saw him.

Q Okay. Do you yourself ever see the door opening and closing, of the green Charger?

A I believe when that was happening, I was moving the police vehicle, so I didn't see it.

Q Okay. At some point, when you take that second position after moving from the Altima, were you then instructed to move one of the vehicles?
A Yes.
Q Were you instructed to move the vehicle that you had been riding in or Garcia and Wissler's vehicle?
A Me and Castillo's vehicle.
Q Okay. And who told you to move the vehicle?
A FTO Garcia.
Q Do you recall around this time FTO Castillo telling you, "Do what Garcia says," words to that effect?
A Yeah, something along those lines.
Q Did you ever hear Castillo tell Garcia, "You want to quarterback this," words to that effect?
A I think -- I think I heard him say that, yeah.
Q Were you under the impression that Garcia was going to be taking the lead after you heard Castillo reference quarterbacking the situation and telling you, "Listen to what Garcia says"?
A The lead as in doing what FTO Garcia says

to do?
Q The officer designating the roles.
A Yes, yeah. He's designating the role for me.
Q And did you believe he was designating the role because FTO Garci- -- strike that.
Did you believe Garcia was designating the roles because Castillo told you, "Do what Garcia says," words to that effect?
A That and because FTO Garcia told me to move the car in a felony stop position.
Q So at least based on your understanding, Garcia was going to be designating the different roles for the officers; is that correct?
A At least for me. I can't speak to other officers, but for me, yes.
Q Yeah, your understanding.
A Yes.
Q Okay. Gotcha.
And then you comply with Garcia's directive to move the vehicle; correct?
A Yes.
Q At any point did Garcia designate you as a lethal cover?
A I don't think he necessarily told me like,

"Hey, you're lethal cover." I think that was something me and FTO Castillo kind of -- that was my understanding when we were -- in going en route to this call.

Q And to clarify, I meant did Garcia ever verbally tell you that you were going to be designated as a lethal cover?

A No.

Q Okay. Did Garcia ever tell you that you were going to be designated as a less-lethal cover?

A No.

Q And then you followed Garcia's directive to move the vehicle; correct?

A Yes.

Q And during this time, when Garcia told you to move the vehicle, he never told you to get the 40 millimeter out of the vehicle that you were going to be repositioning; correct?

A Correct. I was never instructed to get the 40 millimeter.

Q Where did you position that vehicle in relation to the other vehicle?

A I park -- I parked it just north of Officer Wissler and Officer Garcia's police vehicle, both facing east.

Q That street that the green Charger was on, does that run north and south?
A No. The Charger was parked in Oregon Court which runs east/west.
Q Okay. And I think you said the vehicle was pointed east?
A Yes.
Q The green Charger, that is.
A Yes. The green Charger facing east.
Q Okay. And you parked your vehicle north of the other police cruiser?
A Yes.
Q Did you understand the doors of that vehicle to be ballistic doors?
A Yes.
Q And ballistic doors are -- essentially means they could stop a bullet, some kind of bullet?
A Yes.
Q And I think I may have asked it, and I apologize. Where did you take up a position after you repositioned the vehicle?
A I was behind the driver door of my police vehicle that I moved, which was north of Officer Wissler and Garcia's vehicle.
Q Would you have been the further -- the

to his trunk and got his rifle and then rack a round in it.

Q Is that rifle an M4 Colt?

A I -- I think so. He may have a different rifle due to him being on SWAT. I'm not sure.

Q If you know. If you don't know, that's fine.

A No. I don't know.

Q Okay. Did you yourself ever volunteer to be the less-lethal cover?

A No.

Q At some point prior to Mr. Diaz exiting the vehicle, did you receive information that Mr. Diaz was bleeding from his wrist and that he had a knife?

A Yes.

Q Okay. And is that information you received over the radio or from the other officers or both?

A Yes. Over the -- over the radio.

Q Okay.

A And I -- I heard Officer Wissler, I believe, yell, "He has a knife."

Q Okay. So that information, you got it both over the radio and from what you heard from the

other officers?

A Uh-huh, yes.

Q When you heard that the individual in the vehicle was bleeding from the wrist and had a knife, did you ever think it was a possibility that he had self-inflicted those wounds?

A I only -- so when he exited the vehicle and then I saw -- I saw him bleeding from his wrists and the knees and thighs, that's when I assumed he was maybe cutting himself.

Q When you assumed that he was maybe cutting himself, did you ever think he may be suicidal?

A Maybe, but that was before we were contacting him. Once he exited the car, to me, his behavior changed, and he appeared to be homicidal, that he wanted to stab one of -- one of us officers.

Q So I think you indicated right now that when he stepped out of the vehicle and you saw that he was bleeding and had a knife, that you thought he may have cut himself. Did I understand you correctly?

MS. POWELL: I'm going to object that it misstates his testimony.

But you can --

THE WITNESS: Sorry. Like -- can you

rephrase that question, please?

BY MR. VALENZUELA:

Q Sure. I thought I just heard you say a little bit ago that when you saw he got out of the vehicle and you saw that he was bleeding from the wrists and had a knife that he may have been cutting himself. Did I understand you correctly?

A Yes. When he -- when he got out of the vehicle and I saw him holding what I thought was a knife, seeing the bleeding from the wrists and hands and seeing bleeding from his thighs, and I assumed prior to us contacting him, he was maybe cutting himself.

Q And because you assumed that he was maybe cutting himself, at that point did you ever think it was at least a possibility that he may be suicidal?

A I assumed it was a possibility.

Q Okay. Did you ever see any part of the Mr. Diaz while he was still in the vehicle, prior to exiting out of the vehicle?

A I don't -- I don't believe I visually saw him until he actually opened the door and stepped out.

Q When he -- when you see him open the door and step out, does he stand up?

A Yes. He stands up.
Q Okay. And when he stands up, are you able to see the front profile of him?
A Yes.
Q Can you see, for example, the top of his head to his feet?
A I can, yes.
Q And when he first stepped out of the vehicle and stood up, could you see his hands?
A Yes. I could see he was holding a -- what I thought was a knife in his right hand.
Q Okay. When he was holding this knife in his right hand, was it down by his side near his hip or his -- the side of his right thigh?
A I would say it was by the right side of his hip, maybe slightly above it, near maybe his belly button.
Q Was it off to the side?
A Yes. His -- his right arm was -- was off to the side. It was -- the knife was clearly visible. It wasn't intended to be concealed by any part of his body.
Q But what I'm trying to get at is, the knife is off to the side, his right side, maybe the height of his hip or his belly button; is that

correct?
A Yes.
Q Okay. And the left hand, how was that positioned?
A I think the left hand was just down by his side.
Q At that point, when you're able to see him standing up and you could see both of his hands, did you ever see a gun on his person at that point?
A Not in his hands.
Q Did you see it on any other part of his person at that point?
A No. I wasn't able to see his waistband either because of his large shirt that appeared pretty baggy.
Q But at least from what you could see, from the top of his head to the bottom of his feet, you couldn't see any actual gun; is that correct?
A Right. That's correct.
Q Okay. Did you ever see any bulge underneath his clothing which you thought was a gun?
A His -- his baggy clothing prevented me from seeing any bulge.
Q So you did not see any bulge that you thought was a gun; correct?

A Correct.
Q Okay. Did you ever see him at any point reach into his waistband?
A No.
Q Did you ever see him reach into any of his pockets?
A No.
Q Up until this point, where he's now stood up out of the vehicle and you could see him, had you received any information that anyone other than Mr. Diaz had been injured?
A No.
Q Did you receive any information that anyone had been shot?
A No.
Q And did you receive any information that any gunshots had been fired up until that point?
A No.
Q At some point do you hear commands being given -- or strike that.
I'm talking about at any point now, not before he exited the vehicle. While he's still in the vehicle, do you hear any commands being given to him?
A Yes.

immediately starts walking?
A Yes.
Q Upon exiting the vehicle, he stands up; correct?
A Correct.
Q When he first stands up, what distance would you estimate he was from you?
A I'd say 25 to 30 feet.
Q From the time you first exited out of your vehicle -- I'm talking about before you repositioned it. Okay? From the time when you first exited out of your vehicle until the time Mr. Diaz first exits out of his vehicle, do you have an estimate as to how much time passed?
A I believe it's 2 and a half minutes.
Q Okay. During that 2-and-a-half-minute period of time, did you ever hear Garcia designate any officer as less-lethal cover?
A No.
Q Same thing with Castillo. During that 2-and-a-half-minute period of time, did you ever hear Castillo designate anybody as less lethal?
A No.
Q How much time would you say passed from after repositioning the vehicle, getting out, until

his belly button.

Do you remember that?

A Yes.

Q Did the knife remain in that position up until the time of the shooting?

A Yes.

Q And when Mr. Diaz is walking in a northwestern direction, how would you describe the speed that he's walking? Is he slow walking, normal walking, fast walking? How would you describe the speed?

A I'd say it was a -- it was a normal walk.

Q Okay. And did he continue that normal walking pace up until the time of the shooting?

A Yes.

Q For example, you never see him -- you never saw him jogging?

A Correct. I never saw him jogging.

Q Did you ever see him running?

A No.

Q Did you ever see him lunging at anybody?

A No.

Q Did you ever see Mr. Diaz making a stabbing motion with that knife?

A No.

Q Did you ever see him making a slashing motion with that knife?
A No.
Q Did you ever see Mr. Diaz attempt to throw that knife?
A No.
Q While Mr. Diaz is walking in a northwestern direction, does he ever change the direction that he's walking?
A Slightly. He pivots and just walks west instead of northwest, so to say.
Q When he makes that pivoting direction, approximately what was the distance of Mr. Diaz from you?
A Approximately 15 feet.
Q Initially, when he's walking in a western direction, would he have been walking in your direction?
A When he was walking northwest, yes, that would have been my direction.
Q Okay. When he then begins walking west, in the direction of which officer is he now walking?
A I later learned it to be Garcia. However, I didn't -- I didn't know Garcia was on the passenger door of my vehicle at the time because,

A Yes.
Q Okay. Did you ever make eye contact with Mr. Diaz after he exited out of his vehicle prior to the gunshots?
A Yes.
Q And when was that?
A I think around the time when he pivoted, maybe like 15 feet in front of me because, when I saw him walking towards my direction, he was refusing to listen to Officer Wissler and Officer Castillo's commands.
I started -- I started giving commands now, such as, "Drop the knife; get on the ground and stop," and he didn't do any of those things, but he was -- he was looking at me.
Q Did you ever hear Mr. Diaz say anything prior to the gunshots?
A No.
Q Did you ever hear him make any noises prior to hearing the gunshots?
A No.
Q For example, you never heard Mr. Diaz verbally threaten anybody after having exited out of the vehicle; is that correct?
A I never heard Mr. Diaz say anything.

Q Now, did you hear any gunshots prior to you firing your weapon?
A Yes.
Q Okay. And approximately how many gunshots did you hear prior to firing your weapon?
A It was just one.
Q Okay. Did you hear any gunshots after you fired your three shots?
A No. After that first gunshot that I heard, I didn't hear any additional rounds.
Q Okay. Do you know -- strike that.
At the time of the incident, not what you learned later, as the incident is unfolding, did you know who fired that first round?
A I now know it to be Officer Castillo.
Q Did you know that when the incident was actually occurring?
A No.
Q You just thought one of the other officers fired, but you didn't know who it was?
A Yes.
Q Okay. How -- strike that.
Do you have an estimate as to how much time passed from when Mr. Diaz exited the vehicle till you heard that first gunshot?

Is that the --

(Simultaneous speakers.)

Q Go ahead. I'm sorry.

A It was about 15 seconds.

Q That's the estimate you gave earlier; correct?

A I believe so.

You said from the time he exits the vehicle till the time of the shooting?

Q Till the time you heard that first gunshot, do you estimate that to be approximately 15 seconds?

A Yes.

Q Prior to hearing that first gunshot, do you ever hear a verbal warning being given that deadly force would be used?

A At the time of the shooting, no, I did not.

Q During that 15-second period from when Diaz first exits the vehicle and you hear the first gunshot, did you yourself ever try to tactically reposition yourself?

A No.

Q Did you ever try to increase the distance between yourself and Mr. Diaz in this 15-second

period?

A No.

Q Was there anything physically obstructing you, behind you, preventing you from moving backwards and increasing the distance between yourself and Mr. Diaz?

A Well, behind -- behind me, probably several feet behind me is the direction of Oregon Court and Maple Avenue, and it's about 5:00 p.m., so a lot of cars were in the area leaving work.

Q How many feet behind you do you think that street was?

A I think maybe like 20 feet.

Q Okay. So in between that 20-foot space, is there anything physically obstructing you from backing up?

A No, I don't think so.

Q Okay. Who -- at the time of the incident -- not what you learned later. Right now I want to kind of focus on what you knew at the time of the actual incident.

When you heard that first gunshot, who did you believe was the closest officer to Mr. Diaz?

A I -- I assumed it was either Officer Garcia or Officer Wissler. I did not know

A Yes.
Q After you heard that first shot but before you began firing your shots, was Mr. Diaz still walking in a westerly direction?
A Yes.
Q Did Mr. Diaz stop after you heard that first initial stop -- strike that.
Did Mr. Diaz stop after you heard that initial first shot being fired?
A No.
Q Did you fire your three shots in rapid succession, or was there a pause in between the shots?
A No. It was a rapid succession.
Q Did you yourself ever give a verbal warning that deadly force would be used prior to firing?
A No.
Q Did you reassess in between the shots that you fired?
A Yes. In between the shots that I fired, I'd seen that Mr. Diaz was still advancing towards what I believed to be Officer Garcia or Officer Wissler with a knife in his hand.
Q And is it your testimony today that

Did you stop shooting after Mr. Diaz had stopped because you thought he no longer posed an imminent threat of death or serious bodily injury?

A Yes.

Q And when Mr. Diaz was falling to the ground, did you believe he posed an imminent threat of death or serious bodily injury?

A No, not at the time he was falling down.

Q Okay. What about when he was stopped prior to falling to the ground? Did you think he posed an imminent threat of death or serious bodily injury?

A Yes. When he's standing and walking towards the officers with a knife, yes.

Q What about when he's not walking towards the officers, when he's standing but he's now stopped? Did you think at that point, "He's not walking anymore; he's now stationary," just before he falls to the ground -- did you believe at that point that he posed an imminent threat of death or serious bodily injury?

MS. POWELL: I'm going to object that it lacks foundation, and it misstates testimony that that was an observation that this officer made.

But you can answer it.

Q Okay. Well, let me ask you, did he stop after the shots were fired?
A No. He just fell straight to the ground after the shots were being fired. He had the act of falling down.
Q And while he's in the act of falling down, he's no longer walking forward. Would you agree?
A Correct.
Q When he's in the act of falling down, did you believe he posed an imminent threat of death or serious bodily injury at that point?
A Not when he's falling down.
Q And is that why you stopped firing?
A Yes.
Q And I think you may have answered this, and I apologize if I asked it already. Did you see any shots being fired as he was falling to the ground?
MS. POWELL: I'm going to object. Lack of foundation for did you -- did he see any shots?
BY MR. VALENZUELA:
Q You may answer if you understand the question.
MS. POWELL: You can answer it if you saw any shots.

handcuffs on Mr. Diaz?
A Yes.
Q Was a tactical plan formulated to approach Mr. Diaz after the gunshots?
A Yes.
Q And who formulated that tactical plan?
A FTO Castillo.
Q Okay. Was the knife removed from his hand prior to you putting the handcuffs on Mr. Diaz?
A Yes.
Q And who removed that knife?
A Officer Choi.
Q At some point does a police vehicle containing Officer Choi and High arrive on scene?
A Yes.
Q Do you know whether they exited their vehicle prior to the gunshots being fired?
A What I knew at the time or what I know now?
Q What you knew at the -- at the time.
A No. At the time I -- I didn't know they arrived on scene.
Q Okay. At some point prior to hearing that first gunshot, did you hear any of the officers yell out, "40," multiple times?

shot and I went around the passenger -- or around my vehicle and I saw Mr. Diaz laying there and I saw what was in his right hand, that's when I realized it was a screwdriver.

Q And how far away were you from Mr. Diaz when you first realized that that was a screwdriver?

A If he was at the wheel well of the -- my car or the front wheel well and I was near maybe the trunk or rear -- rear wheel well, I'd say that's maybe 8 feet, 6 to 8 feet.

Q Okay. You'd mentioned something earlier that you thought Mr. Diaz still posed a threat while he was standing because he could potentially make a slashing motion or words to that effect.

Do you remember saying that?

A Yes.

Q At any point during the incident, did you ever see Mr. Diaz making a slashing motion?

A No.

Q When you cuffed Mr. Diaz -- strike that.

When you handcuffed Mr. Diaz, you did it to the front of his body as opposed to the back of his body; correct?

A I did.

Q You did.

A Yes.
Q Did you ever tell anybody that was there at the scene that you thought he was dead while you were applying pressure on his wounds?
A No.
Q At some point do Torrance Fire Department arrive?
A Yes.
Q Do they also begin rendering medical aid?
A By the time they arrived, I was -- I was relieved from any assignments.
Q Did you take part in clearing the green -- the Dodge Charger after that?
A No. I was applying medical aid while they were doing that.
Q And after applying pressure on the wounds, did you then go -- were you then moved away from the body?
A Yes.
Q And where did you go from there?
A FTO Wing had pulled me off or relieved me and took me to essentially the southeast curb -- or southeast curbed sidewalk of Oregon and Maple.
Q And shortly after the shooting, were you essentially in shock?

A Yes.
Q How long are you -- strike that.
You were then taken to the curb area; correct?
A Yes.
Q How long do you remain at the scene before you leave the scene?
A I can't remember. I -- I really can't remember. Maybe ten minutes, but I don't know.
Q Okay. Not a problem.
Where do you go after you leave the scene?
A I went to the station, to the Torrance station.
Q Did somebody drive you to the station?
A Yes.
Q And who drove you to the station? Do you recall?
A It was Officer Cadiz.
Q Was it just you and -- how do you spell -- do you know how to spell that officer's last name for the record?
A Yes. It's C-A-D-I-Z.
Q And it's just you and that officer when you're going to the station; correct?
A Correct.

A No.
Q Were you yourself physically injured during the incident?
A No.
Q Do you know whether or not any of the other officers were injured -- physically injured during the incident?
A I don't think they had any physical injuries.
Q Prior to leaving the scene, were you told whether or not Mr. Diaz had passed away?
A No. I didn't know.
Q Okay. While you went back to the station for this five to six-hour period, were you told that Mr. Diaz had passed away?
A Yes.
Q Okay. I wanted to show you a copy of your body camera just to confirm whether or not it's your body cam. Okay? I think it is, but I just kind of want to confirm. One second.
(Audio played.)
Q Can you see this on your screen, this still shot of the body cam?
A Yes.
Q Okay. Let me play it for you.

A I did.
Q And was that because you believed this was a threshold incident that required activation of the body cam pursuant to the Torrance Police Department policy?
A Yes.
Q Okay. In reviewing your interview in preparation for your deposition today, do you recall ever stating in there that you had received some training on high-risk felony stops from the traffic patrol school?
A No. I don't believe I mentioned it in my interview.
Q I think you answered this earlier, and I apologize. I forget what the answer was. But did you ever hear Officer Wissler giving Mr. Diaz commands to step out of the vehicle?
A No. I don't believe he ever gave him that command.
Q Okay. Can you turn to page 11 of your interview, please, lines like 17 to 21?
A Sure.
Yeah, I see that.
Q Okay. And you indicated, at least in this part of the interview, that you believed

Officer Wissler was giving commands for the driver to step out; correct?

A Yes.

Q But as you sit here today, after having reviewed some of the videos, do you think that was incorrect?

A Yeah. That's incorrect, and that's just due to being involved in a stressful incident and me mishearing things that you thought you heard.

Q No problem.

And then later on line 26 through 28 -- do you see that?

A Yes.

Q You make a reference to, "He's probably cutting himself"; correct?

A Right.

Q And is this in response to seeing him bleeding from the wrist?

A And his knees and thighs.

Q Okay. And that was your perception, that he was probably cutting himself and that's why he was bleeding?

A That's what I believed.

Q Okay. Can you turn to the bottom of page 12 and read that last partial paragraph to

don't know where exactly Officer Choi was.

Q But when the incident was actually occurring, you were unaware that they were there when the shooting occurred. Is that fair?

A Correct. I did not know Officer High was there. I did not know they parked their vehicle there. I -- I did not know they were there.

Q Okay. And that would be for both Choi and High?

A Yes.

Q Okay.

A They were working together that day.

Q Prior to the shooting, had you yourself ever seen a photo of Mr. Diaz?

A No.

Q And I understand this is your first day doing patrol, but just to clarify, you yourself had never dealt with Mr. Diaz prior to the date of the incident; correct?

A That is correct.

Q And you have no information of Mr. Diaz's background, for example; correct?

A That's correct.

Q For example, you didn't know if he had ever previously injured anybody; correct?

A Correct.
Q And you were unaware of his criminal history; correct?
A Yes.
Q Did you have any information that Mr. Diaz was under the influence of drugs or alcohol prior to the shots being fired?
A No.
Q Okay. Okay. Can you please go to page 23, please, and I want to ask you about lines 4 through 8 to begin with.
A Okay.
Q You were asked: "Did you -- did you and your FTO formulate a plan to contact the suspect vehicle at any point in time, or did -- was that a conversation between your FTO and Officer Garcia?"
And your response was: "Yeah. I believe they -- they had talked about it."
Do you see that?
A Yes.
Q And then later -- can you read line -- on the same page, line 17 to 21 to yourself.
A (Reviewing document.)
Okay.
Q And I think -- I think there may be a

misspelling, but it says: "Yeah. Did they formulate nay" -- I think it's supposed to say "any," but in any event: "Did they formulate other plans or make any other directions to you or your partner officer, Officer Wissler?"

A Uh-huh.

Q And your response was: "Uh, no, not other than just move the vehicle."

Do you see that?

A Yes.

Q Okay. Were you guys attempting to detain Mr. Diaz after having parked behind his vehicle?

A I would say once he wasn't listening to commands and -- then we had activated the forward-facing red light. At that point the detention was being initiated.

Q Can you turn to page 32, the bottom of page 32 to the top of 33. Can you please read that to yourself.

A Sorry. The bottom of page 32 --

Q Yeah. Starting at line 33 on page 32, maybe to line 3 on page 33.

A Okay.

(Reviewing document.)

Yes.

Q You indicated here that the only time you heard him make a noise was after he had been shot when you guys were going to render first aid and formally arresting him, he put out like a groaning noise.

Do you see that?

A Yes.

Q Okay. So here you're indicating that you heard him make some kind of groaning noise when you guys were going to formally arrest him; is that correct?

A That's correct.

Q Okay. Can you turn to the bottom of page 34, line 30 to 37, please, and read that to yourself.

A Line 34 to 37?

Q 30 to 37.

A Oh.

Q I think the question starts at 30.

A Okay.

(Reviewing document.)

Okay.

Q Here you're asked about Mr. Diaz holding the knife; Wissler is giving him commands; you're growing increasingly concerned; and then you're

asked: "Do you remember ever hearing any other officer on scene or you requesting less-lethal options?"

And your response was: "I don't recall hearing anything for less lethal."

Do you see that?

A Yes.

Q And you yourself never assumed that anybody else was designated as less lethal; correct?

A I didn't -- I didn't know what anyone else was doing. I couldn't see anyone else.

Q Can you turn to the top of page 35, line 1 through 4.

A Yeah.

Q You were asked: "Did you assume at any point in time anyone else had less lethal for any reason?"

And your response was: "Uh, no."

Correct?

A Correct.

Q And then the next question is line 6 through 13, you were asked: "Did anyone discuss any less-lethal cover options prior to the stop or during the stop, that you recall?"

And then your response was: "I can't

recall."

Do you see that?

A Yes.

Q Okay. And I think you already indicated you yourself never attempted to transition to the TASER; correct?

A That's correct.

Q Okay. And then, to be fair, you mentioned, correct, being "yards" to "feet." Let's go over that part really quick.

A Yeah.

Q I think it's on page 37, lines 11 through 25.

A Sure.

Q Here you're asked: "4 or 5 yards?"

You said: "Yeah." And then your attorney, Chulak, says: "Or feet?"

And then you said: "Yeah. Feet, yeah, from the officer to the suspect."

A Uh-huh.

Q Is that where you corrected it, that you meant to say "feet," not "yards"?

A Yes. So I just think I was confused because that was my first day. I didn't have a lot of experience as a police officer, and a lot of the

A Yes.
Q And I think you answered already earlier you never saw any other individuals in that green Charger; correct?
A Correct.
Q Okay.
MR. VALENZUELA: Okay, Counsel. No other questions.
MS. POWELL: I have a couple.

EXAMINATION

BY MS. POWELL:
Q So, Officer Bermudez, when you were asked about whether or not you heard a warning and you said "no" to that question by Mr. Valenzuela, did you hear Officer Garcia say words to the effect of, "I don't want to shoot you"? Did you hear that that day?
A That day? No, I did not.
Q Would you consider that a warning?
A Yes.
Q But you didn't hear it; correct?
A Correct.
Q And you were asked about whether or not you realized what Officer Choi was holding was a screwdriver.

A Correct.
MR. VALENZUELA: I'm going to object as leading.
BY MS. POWELL:
Q Were you able to see the handle of it when Officer Choi was holding it?
A Yes.
Q Did that also factor into whether or not you believed it was a knife or a screwdriver at that point?
A Yes.
MS. POWELL: All right. I don't have anything further.

FURTHER EXAMINATION

BY MR. VALENZUELA:
Q Just briefly, earlier you had indicated that you recognized it as a screwdriver before Choi removed it from his hand, did you not?
A Yes, I did.
MR. VALENZUELA: Okay. Nothing further.

FURTHER EXAMINATION

BY MS. POWELL:
Q When was that, you recognized that it was a screwdriver?
A After I had shot Mr. Diaz and he was

REPORTER'S CERTIFICATE

I, MICHELLE BULKLEY, a Certified Shorthand Reporter of the State of California, do hereby certify:

That OFFICER JASON BERMUDEZ, in the foregoing deposition named, was present and by me sworn as a witness in the above-entitled action at the time therein specified;

That said deposition was taken before me at said time, and was taken down in shorthand by me, a Certified Shorthand Reporter of the State of California, and was thereafter transcribed into typewriting, and that the foregoing transcript constitutes a full, true, and correct report of said deposition and of the proceedings that took place;

IN WITNESS WHEREOF, I have hereunder subscribed my hand on 7/26/2026.

Michelle Bulkley

MICHELLE BULKLEY
CSR #13658