# "EXHIBIT D"

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

--oOo--

MARIA GUADALUPE DIAZ; A.D., a minor by and through his Guardian Ad Litem, MARIA GUADALUPE DIAZ; A.D., a minor by and through his Guardian Ad Litem, MARIA GUADALUPE DIAZ; LEONARDO DIAZ; and RAMONA RAMIREZ DE DIAZ,

Plaintiff,

v. Case No. 2:25-cv-03389-JLS (JCx)

CITY OF TORRANCE; ARTURO CASTILLO; CODY WISSLER; JESUS GARCIA; JASON BERMUDEZ; and DOES 6-10, inclusive,

Defendants.
________________________________/

STENOGRAPHIC REPORTER'S TRANSCRIPT OF

REMOTE VIDEO DEPOSITION OF

CODY WISSLER

MONDAY, JULY 13, 2026

Reported Stenographically by:

KIMBERLY D'URSO, CSR 11372, RPR

Job No. 28993

A. Yes, sir.
Q. And do you remember the date that you attended the academy?
A. Yes, sir. From approximately February of 2024 to August of 2024.
Q. Did you attend -- what academy did you attend?
A. I attended the Los Angeles County Sheriff's Department.
Q. Okay. And then after that, was your first hire with Torrance P.D.?
A. Yes, sir.
Q. Okay. And did you ever serve in the military?
A. No, sir.
Q. Okay. Can you give me a brief rundown of some of the jobs you had after graduating high school, prior to joining the academy?
A. Just construction.
Q. Okay. And were you a field trainee at the time of the incident?
A. Yes, sir.
Q. And had you been a field trainee approximately three months at the time of this incident?
A. Approximately two months.
Q. Okay. And was -- is Garcia a sergeant or a different rank?

A. At the time of the incident, he was a field training officer.
Q. Okay. And was Officer Garcia your field training officer?
A. Yes, sir.
Q. Okay. Other than Garcia, had you had different training officers or just him?
A. I had other training officers prior to that.
Q. Okay. Had you worked with Officer Garcia prior to the date of this incident?
A. No, sir.
Q. Okay. I take it since you were only, like, two months into field training, you had never discharged your weapon in the line of duty; is that correct?
A. That is correct.
Q. Okay. Do you know whether or not your shooting was found to be within policy or not by your department?
A. It is still ongoing right now.
Q. Okay. And other than a field trainee, I take it you didn't have any other assignments prior to the date of the incident?
A. That is correct.
Q. Okay. Let me ask you a little bit about your training at the academy. Were you taught about the importance of tactics at the academy?

A. Yes, sir.
Q. Were you taught about the importance of formulating a tactical plan, if safe to do so, at the academy?
A. Yes, sir.
Q. Were you trained in the use of force at the academy, both lethal and non-lethal?
A. Yes.
Q. Did you receive some training at the academy on the Taser?
A. No, sir.
Q. You didn't receive any training at the academy on the Taser?
A. No, sir.
Q. Okay. Did you receive any training at the academy on the use of OC spray?
A. Yes, sir.
Q. Okay. And did you receive any training at the academy with regards to the use of the 40-millimeter?
A. No, sir.
Q. All right. Did you receive training at the academy with regards to de-escalation tactics?
A. Yes, sir.
Q. Did you receive any training at the academy with regards to dealing with people who may be suffering

from a mental health crisis?
A. Yes, sir.
Q. What is your understanding as to the distance OC spray could be used on an individual?
A. Approximately 12 feet.
Q. Did you have a Taser on your person during this incident?
A. Yes, sir.
Q. Okay. Did you receive some training from Torrance Police Department as to the use of the Taser?
A. Yes, sir.
Q. And what is your understanding as to the distance that a Taser could be used in the probe mode?
A. Approximately 20 feet.
Q. Do you know what kind Taser, the model that you had on the date of the incident?
A. Yes, sir. It was the Taser 7.
Q. Does that have two cartridges that shoot prongs?
A. Yes, sir.
Q. Okay. You had a handgun on you, on your person at the time of the incident?
A. Yes, sir.
Q. What kind of gun did you have?
A. That would be the Glock 45, which is a

9-millimeter gun.
Q. That's a semi-automatic gun?
A. Yes, sir.
Q. Do you have to pull the trigger for each shot of a bullet?
A. Yes, sir.
Q. Okay. Did you have any, kind of like, baton on your person?
A. Not on my person.
Q. Did you have one in your vehicle?
A. Yes, sir.
Q. Does every unit with Torrance P.D. also come equipped with a 40-millimeter?
MS. POWELL: Objection. Calls for speculation.
(Reporter clarification.)
MS. POWELL: You can answer, if you know.
THE WITNESS: Yes, sir.
BY MR. VALENZUELA:
Q. And that would include the vehicle that you were in; correct?
A. Yes, sir.
Q. Were you driving or was Garcia?
A. I was driving.
Q. Okay. At some point, do you receive information relating to the call?

A. Yes.
Q. And where were you when you first received any information relating to this call?
A. We were at a storage locker facility, off the corner of Crenshaw and Maricopa.
Q. Were you responding to a separate call?
A. That is correct.
Q. Okay. Was that call wrapping up when you received info about this call?
A. At the time of the call that we were talking about, we were finishing up the call that was at the storage locker.
Q. Okay. And distance-wise, how far would you estimate that the storage locker was from the scene of where the shooting occurred?
A. Approximately half a mile.
Q. Okay. So pretty short distance?
A. Yes, sir.
Q. Now, did you receive the information relating to this call over the radio?
A. Yes, sir.
Q. Did you also have an onboard computer in your cruiser?
A. Yes, sir.
Q. Did you also receive some of the information

relating to the call on the computer?
A. No, sir.
Q. It was almost exclusively over the radio?
A. Yes, sir.
Q. Okay. After receiving the call, do you begin to make your way to the scene?
A. Yes, sir.
Q. Do you recall there being any updates from when you first left the storage unit to when you arrived in the area of the -- of the shooting?
A. Yes, sir.
Q. And what updates did you receive?
A. We received that there was already a unit en route to that location. Due to the fact that that area is in our designated beat, we self-dispatched to assist that first unit, as well as there being a drone over the intersection of Maple and Oregon.
The drone operator notified us that there was no one in the middle of that intersection.
Q. Are you familiar with that area since it was part of your beat?
A. Yes, sir.
Q. So you had patrolled that area in the past?
A. Yes, sir.
Q. Okay. Had you seen that green Charger that

ultimately Mr. Diaz was in, prior to the date of the incident?
A. No, sir.
Q. Okay. As you sit here today, do you know whether you have ever had any contact with Mr. Diaz prior to the date of the incident?
A. No.
Q. Okay. So, it's safe to say you didn't know anything about his background, for example?
A. That is correct. I didn't know anything.
Q. Okay. You didn't know if he had a criminal history; correct?
A. That is correct.
Q. Okay. And you didn't know if he had ever physically injured anyone prior to the date of the incident; correct?
A. That is correct.
Q. Okay. Did you receive any information on the call that anyone had been physically injured?
A. No.
Q. Okay. On the way to the location, from the storage unit where you were at on the prior call, did you and Officer Garcia have any discussions relating to the call en route?
A. Yes, en route. Due to the fact that we were

participate in that?
A. That is correct. I was in the front of the place of business with my FTO, Officer Garcia, while Officer Bermudez and Officer Castillo were at the rear.
Q. Did you ever enter into that place of business?
A. No, we did not, due to the fact that the front door was locked and secured, and when we looked inside, it looked like the business was vacant.
Q. Okay. Did you ever talk to any of the neighboring individuals at the other businesses about that particular business?
A. I did not.
Q. Okay. Did you hear that conversation with Castillo and one of the neighboring tenants?
A. No.
Q. Okay. At some point, you -- do you get out of your cruiser when you're kind of looking at the front of this business?
A. That is correct. We parked in a parking lot and walked up to the specific unit. I do not recall the unit number. But we had to get out of our vehicles to check the door and make sure that no one was down, inside that business.
Q. And when you looked in the business, you didn't see anybody was down inside that business; correct?

A. That is correct.
Q. Okay. Do you, then, go back into your cruiser after checking the front of the business?
A. While we are outside the business, that is when the drone operator notifies us that someone inside a green Charger is manipulating the driver's side door. At that point, that is when my FTO, Officer Garcia, notifies me that when we drove prior to that, passing a green Dodge Charger, he was able to observe a Hispanic male adult, sitting in that vehicle.
And he also notified me that that man possibly could match Leonardo Diaz, due to the fact that another dispatcher sent my FTO a picture of Leonardo Diaz.
Q. And you didn't recognize the namely Leonardo Diaz, did you?
A. That is correct. I did not recognize him.
Q. Did you see that photograph that was sent to your FTO?
A. Yes.
Q. Okay. And when you saw that photograph, again, you did not recognize the individual?
A. That is correct. My responsibility was to look on the north side of Oregon Court. So as we're driving down Oregon Court, I did not seen that green Dodge Charger, just because I was mainly focusing on the

keep eyes on him. With the call coming out as a man with a gun, I did not want to turn away from that vehicle and have a conversation with my officers.

My focus was to make sure that all the other officers that were formulating the plan were safe; and that's why I was keeping my eyes on the driver's side and not formulating any other plan with the other officers.

BY MR. VALENZUELA:

Q. Okay. So you did not inquire as to whether somebody else would have a less-lethal designation; is that correct?

A. That is correct.

Q. Okay. And then you, at some point, exit out your vehicle?

A. Yes, sir.

Q. Does Officer Garcia exit out around the same time you do, if you know?

A. Yes. We exit the car simultaneously.

Q. Okay. Do you know whether or not Castillo and Bermudez also exited out of their vehicle at approximately the same time you did?

A. I do not know, at that time, just because, like I said, my focus is on the vehicle ahead of us, with the call stating that a man has a gun. That was my ultimate responsibility.

to to look in your direction?
A. Can you rephrase that, please?
Q. Sure. You indicated he looked in your direction when you were giving him commands. Did I understand you correctly?
A. Yes.
Q. And I guess my question is, in your experience as a police officer -- I know it's only three months, but in your experience, is that uncommon that when you're giving a suspect commands, that they look in your direction?
A. That is not -- that is not uncommon.
Q. I don't know if I asked you, and I apologize. Have you ever seen an individual with a knife before, in the line of duty?
A. No.
Q. Had you ever seen an individual with a gun in their hand in the line of duty?
A. No.
Q. Okay. Based on your training, could you shoot an individual just for having a knife in their hand, that fact alone?
A. No.
Q. Based on your training, could you shoot an individual for having a gun in their hand, that fact

alone?
A. No.
Q. At some point when the decedent exits out of his vehicle and starts walking in your direction, what part of his body could you see? In other words, are you looking at, like, the front profile at that point?
A. Yes. I'm looking at the front pro- -- front profile of him.
Q. Okay. And can you see him from, like, the top of his head to the bottom of his feet, basically?
A. Yes. I can see his whole body.
Q. Okay. And do you see any gun on his person at that point?
A. I cannot physically see one, but with his baggy clothes, we could not rule out the fact that he could still be armed with a gun.
Q. But at least based on what you could see, you did not see a gun on him at that point?
A. The only thing that I could see is that he did not have a gun in his hand. With his baggy clothes, I could not rule out the fact that he did not -- was still not armed with a gun.
Q. Did you ever see any bulge or anything sticking out of his clothing that you mistook as a gun?
A. No.

Q. Did you ever see him -- strike that.
You don't see a gun in his hands; would you agree?
A. Yes.
Q. Did you ever see him reaching for his waistband?
A. No.
Q. Did you ever see him reaching for any of his pockets on his clothing?
A. No.
Q. When he's walking in your direction, where does he have what you believe to be a knife? Is it at his side? Is it up? How would you describe that?
A. It is in his right hand, and it is at his side, slightly up towards us. Not all the way up, but at an angle.
Q. And when you say "by his side," would the knife be at his side near the hip area, or somewhere else?
A. It would be a little further up. So it was -- his hands were down, but it was at a slight angle, towards officers.
Q. What part of his body would have been closest to the knife, Mr. Diaz? Would it have been, like, the side abdomen? His hip? How would you describe that?
A. His hip.

Q. So --
A. Or his -- his quad area would be the closest.
Q. Would that be the area, like, in between his hip and abdomen?
A. Yes.
Q. Okay. Other than seeing the knife in that position -- and that would have been to his right side that you're describing; correct?
A. Yes.
Q. Okay. Other than seeing the knife in that position that you just described in the quad area between the hip and the abdomen, did you ever see the knife in any other position prior to the gunshots?
A. No.
Q. Okay. For example, you didn't see the knife near his shoulder area raised; correct?
A. Correct.
Q. Did you ever see the decedent making a slashing motion with that knife?
A. No.
Q. Did you ever see him making a stabbing motion with that knife?
A. No.
Q. When you saw Mr. Diaz exit out of the vehicle with blood on his hands and holding a knife, did it ever

cross your mind that he may have self-inflicted those wounds?

A. No. At that time, I believed that there could be someone possibly down inside that vehicle.

Q. Did you -- up until that point, did you ever see any other individual inside the vehicle?

A. At that point, with the dark window tint, we could not rule out that someone could possibly be in that vehicle still.

Q. My question's a little different. My question is: Did you actually, with your own eyes, see anybody in that vehicle, other than Mr. Diaz?

A. No.

Q. Okay. Up until that point, did you receive any information over the radio that anybody else had been physically injured?

A. No.

Q. Okay. As Mr. Diaz -- strike that.

Mr. Diaz was walking in a westerly direction towards where you officers were positioned; correct?

A. Correct.

Q. Did you ever see him running at any point?

A. No.

Q. Did you ever see him jogging at any point?

A. No.

Q. Did you ever see him lunge at anybody?
A. No.
Q. Okay. From where you're positioned -- strike that.
Did you, yourself, ever try to tactically reposition from where you were near the door of the front driver's side?
A. No.
Q. Okay. Was there anything behind you, physically obstructing you from repositioning?
A. No.
Q. Okay. Based on your training, are you trained to tactically reposition if it's safe to do so?
A. Yes, when safe and feasible.
Q. Okay. Did you ever try to increase the distance between you and Mr. Diaz when he was walking in a westerly direction?
A. No.
Q. Okay. And I think you indicated -- or let me ask you again, just so we're clear. I want to go through the different kinds of commands that you gave him. Okay? I think you touched on it a little bit, but I just want to make sure we're clear.
You told him to drop the knife; correct?
A. Correct.

A. Correct.
Q. Okay. Other than the blood that you told me on his hands, did you see blood anywhere else on his person?
A. Once he exited the vehicle, I was able to see blood on his shirt and his pants, as well -- or shorts, as well.
Q. Did you hear him say anything as he's walking in this northwesterly direction?
A. No.
Q. Okay. Did you ever hear him saying anything up until the time of the gunshots?
A. No.
Q. Did you ever hear him make any noises?
A. No.
Q. Did you, yourself, make eye contact with Mr. Diaz prior to the shooting?
A. Yes.
Q. Now, at some point, do you hear a gunshot before you fired your shot?
A. Yes.
Q. Okay. When you heard that first gunshot, which officer would have been closest to Mr. Diaz?
A. Myself, as well as Officer Garcia. We would be the two closest.

Q. Okay. And if I recall, Garcia, is he at the passenger side of the vehicle at that point?
A. Correct.
Q. In other words, you're at the driver's side of the vehicle, and Garcia would be at the passenger?
A. Correct.
Q. Okay. Now, when you heard that first shot, what distance would you estimate Mr. Diaz was from you?
A. Approximately 3 feet.
Q. Prior to hearing that first shot, did you ever hear any officer yell out for the 40-millimeter?
A. Yes.
Q. Do you know which officer? I don't want to know if you learned it later down the road. I'm trying to, right now, ask while you're there in the incident --
(Simultaneous speakers.)
A. At the time of the incident, I did not hear who exactly said it, but do I remember hearing, "40, 40, 40."
Q. Okay. And what did you think when you heard, "40, 40, 40"? Did you think someone was going to deploy the 40?
A. At that time, that is when I believed that whoever was speaking was trying to communicate to the third unit to get the 40 up. At that point, my main

BY MR. VALENZUELA:

Q. Okay. How many shots did you hear before you fired your first shot?

A. One.

Q. Okay. How many shots did you, yourself, fire?

A. Three.

Q. Do you know whether a round count was done on your gun?

A. Yes.

Q. And did that round count confirm that you fired three shots?

A. Yes.

Q. Did you fire your three shots in rapid succession, or was there a pause in between any of the shots?

A. There was a slight pause at each -- after each shot. But due to the fact that Mr. Diaz was closing the distance, and I already observed one gunshot not stopping him, there was minimal time between each shot.

So it was not a rapid succession, but there was a slight pause in between each -- each shot.

Q. Do you have an estimate as to how much of a pause there was in between the shots that you were firing?

A. Approximately half a second.

Q. And did you hear any shots after you fired yours, or no?
A. No.
Q. Okay. Do you know who had fired the first shot that you heard?
MS. POWELL: You mean at the time?
MR. VALENZUELA: Yes, at the time.
THE WITNESS: At the time, I knew that it was Officer Castillo, since the round came from the right side of me. And then, when I observed that shot did not stop Mr. Diaz from walking towards officers with a knife in his hand, that is when I fired my first shot.
BY MR. VALENZUELA:
Q. Did that first shot appear to strike him, that Castillo fired?
A. Yes.
Q. And where do you believe it struck him at?
MS. POWELL: Objection. Calls for speculation.
You can answer.
THE WITNESS: I did not see the round hit him. I just heard it, and observed Mr. Diaz continuing walking towards me and Officer Garcia with a knife.
BY MR. VALENZUELA:
Q. What did you observe that led you to believe that that first shot struck him, because I thought you

Q. And was he still approximately this 3-feet distance, or a different distance?
A. He was approximately 2 and 1/2 feet away.
Q. Okay. What about when you fired this third shot? Where were you aiming for your third shot?
A. Center mass, as well.
Q. And what distance would you estimate he was when you fired the third shot?
A. Approximately 2 feet away.
Q. Okay. Was he still moving in this northwestern direction for all the shots?
A. Yes.
Q. Okay. Was the decedent stopped for any of the shots that you fired?
A. No.
Q. Was the decedent falling to the ground for any of the shots that you fired?
A. No.
Q. At some point after you fired your shots, did you see the decedent stop?
A. Yes. After my last shot, I observed the decedent fall to the ground and land on the passenger -- the front passenger door -- tire. And due to the fact that he was still armed with a knife, we had to reposition ourself to get coverage because he was 2 feet

away from us.

So that is when I backed up, tactically, because it was feasible, and began giving him commands to, "Drop the knife."

Q. Did you still think he posed a threat of imminent death or serious bodily injury when he was stopped and falling to the ground, Mr. Diaz?

A. No.

Q. Is that why you weren't firing while he was stopped and falling to the ground?

A. Correct.

Q. Okay. Did you, yourself, ever give a verbal warning that deadly force would be used prior to firing?

A. No.

Q. Okay. Did you hear anybody else give a verbal warning that deadly force would be used prior to hearing the gunshots?

A. Yes.

Q. And who was that?

A. That would be Officer Garcia.

Q. And what did you here in that regard?

A. While I was giving commands and Mr. Diaz continued to walk towards me and Officer Garcia, that's when I heard Officer Garcia saying, "I don't want to shoot you. I don't want to shoot you. Stop. I don't

want to shoot you."

Q. Based on your training with regards to verbal warnings that deadly force would be used, are you trained that the verbal warning essentially is: You tell the suspect to do something, or deadly force would be used against them?

A. When feasible.

Q. Okay. Were you also trained that shooting somebody center mass could cause them death or serious bodily injury?

A. Yes.

MR. VALENZUELA: Okay. I think we've been going for about an hour now. Why don't we take a ten-minute break, and then we'll come back in about ten minutes. Is that good with everybody?

MS. POWELL: Yeah, that's fine. Ten after 2:00.

MR. VALENZUELA: Okay.

THE VIDEOGRAPHER: We're off the record at 1:59 p.m.

(Break taken.)

THE VIDEOGRAPHER: We're back on the record at 2:10 p.m.

BY MR. VALENZUELA:

Q. Prior to firing your shots, did you ever see

hands team and go and contact Mr. Diaz.

But then my role was changed to keep eyes on the vehicles, since that vehicle was not cleared. So that is when the officers approached Mr. Diaz. And then I went to my driver's side door and kept eyes on the vehicle. I did not see what was going on with the other officers and Mr. Diaz.

Q. At some point, did you participate in clearing the green Charger?

A. That is correct.

Q. When you went to clear the green Charger, did you see any other occupants inside of the green Charger?

A. No.

Q. Did you see blood inside of the Charger?

A. Yes.

Q. Did you see, like, a razor blade or any edged weapons in there?

A. I did not. I did not search the vehicle, as well. We were just making sure no was one else was down in that vehicle, and then we left and had other officers conduct a -- an inventory search of that vehicle.

Q. Did you, yourself, ever see a gun inside of the green Charger?

A. I did not see anything in plain view. And then once we made sure no one else was in that vehicle, that

is when we left. I did not systematically search through the whole entire vehicle.

Q. Were you involved at all in the pat-down of Mr. Diaz after the shooting?

A. I was not involved in that.

Q. After the shooting, did you see that Mr. Diaz was still holding the item in his hand?

A. Yes. Once I saw Mr. Diaz fall onto the front passenger wheel, that is when I was able to tactically reposition. And I still commanded Mr. Diaz to, "Drop the knife." Once other officers came to formulate a plan, that is when they approached and handled Mr. Diaz. And my then focus was on the vehicle, so I --

(Simultaneous speakers.)

BY MR. VALENZUELA:

Q. Sorry. I didn't mean to cut you off there.

A. Yeah. So the last time I saw him, he still had the knife in his hand, and I was giving him commands to "Drop the knife."

Q. And where did you tactically position yourself to?

A. Once Mr. Diaz fell and he was approximately 2 feet away from me, that is when I closed my driver's side door and went back to the rear of my patrol vehicle to get a more tactical advantage and get better

coverage. And that's when I still commanded him to, "Drop the knife."

Q. At some point while you were at the scene, did you ever notice that the object he had in his hand was a flathead screwdriver?

A. No.

Q. Was that ever brought to your attention later?

A. Yes.

Q. Okay. After the shooting, how long are you at the scene before you leave?

A. Approximately five minutes.

Q. And you never approached Mr. Diaz, after he went down, to participate in the rendering of medical aid or anything like that; correct?

A. No -- yeah. My job was to focus on the car. I was not assigned to render aid. Once we finished clearing the car, we had multiple officers already on scene, administering first aid to Mr. Diaz.

Q. Did you see them do a pat-down of Mr. Diaz when he went to the ground?

A. I did not see them.

Q. And where do you go next after you're at the scene? Where do you then go, once you leave the scene?

A. Once we leave the scene, we were instructed to go to the Torrance Police Department station.

Q. And how did you get to the Torrance Police Department station?

A. I had our team mem- -- officers, Detective Nakashima and Detective Pittman transported me back to the station.

Q. Do you know how to spell those names, by any chance?

A. Pittman is P-I-T-T- -- I believe M-E-N or M-A-N. And I cannot spell the other one.

Q. Okay. No problem.

Were you then separated when you were waiting at the police department, after leaving the scene?

A. Yes.

Q. Okay. Let me go back to your training a little bit.

With regards to the training, you were trained, in part, on the use of less-lethal; correct?

A. Correct.

Q. And was part of the training the importance of less-lethal is that it gives you an opportunity to try a different tool before resorting to the use of the deadly force, when it's safe to do so?

A. Yes, when it's feasible to use it.

Q. Okay. Do you have a copy of your interview handy?

(Pause.)

THE WITNESS: Okay.

BY PLAINTIFF1:

Q. Okay. You would agree in this portion of your interview, you indicated that you were, giving commands to the decedent to, "Turn around and walk back towards me."

Do you see that?

A. Yes.

Q. Now, I'm looking at page 50, lines 17 to 21.

Can you read that to yourself, please, on page 15.

(Pause.)

THE WITNESS: Okay.

BY MR. VALENZUELA:

Q. Here you gave an estimate of approximately 6 to 7 feet from Mr. Diaz to Officer Garcia when you heard the first round go off; correct?

A. Correct.

Q. And that would have been a round fired by a different officer, not by you; correct?

A. Correct.

Q. And did you say you fired three rounds in total?

A. Yes.

Q. Okay. Did you indicate in your interview that you believed you fired two rounds?
A. Yes. At the time of the interview, I believed I shot two rounds.
Q. Did you later receive information from, like, a round count or something that had indicated you actually fired three?
A. That; and then once I reviewed my body cam footage, I was able to confirm that there was three.
Q. But you did that after you gave the interview?
A. Yes. I did not -- I did not. Sorry.
Can you repeat the question, please?
Q. Yes. That was after you gave your interview that you confirmed it was three?
A. Yes.
Q. When you gave the interview, you were still under the impression that you fired twice?
A. Correct.
MR. VALENZUELA: Let me just review my notes for a minute. I'm almost wrapped up.
Angela, while I'm reviewing my notes, do you want to ask questions?
MS. POWELL: Sure. I just have one clarifying questions.

EXAMINATION

BY MS. POWELL:
Q. So, Officer Wissler, in your interview, the area that Mr. Valenzuela just covered with you, you told investigators that you gave a command to, "Turn around and walk backwards toward me."
As you sit here now, and you've had an opportunity to review your body-worn camera video, did you give him that command?
A. At that time, after reviewing footage, I did not give him command to walk back towards -- to officers.
Q. As you sit here now?
A. As I sit here now. But at the time of the interview, that was my statement. But as I sit here now.
Q. Okay.
MS. POWELL: I didn't have anything else, Mr. Valenzuela.
MR. VALENZUELA: Okay. Just give me a minute. I'm almost done.

FURTHER EXAMINATION

BY MR. VALENZUELA:
Q. And I think you indicated earlier -- I'm sorry if I'm asking you again. Did you have training at both the academy and at your police department interacting

with people who may be experiencing a mental health crisis?

A. Yes.

Q. And was part of that training to try to employ de-escalation tactics?

A. Yes.

Q. And one potential de-escalation tactic would be less-than-lethal, if it's feasible; correct?

A. Correct.

Q. When you were giving Mr. Diaz commands when he was still in the vehicle, were you attempting to detain or arrest him at that point?

A. He was just being detained at that point.

Q. Okay. Was part of your training on the use of deadly force that you're responsible to justify every shot?

A. Yes.

Q. Did you -- strike that.

At any point, did you see the decedent's back exposed to you when you were aiming at him?

A. No.

Q. At any point, did you ever see the decedent attempt to flee?

A. No.

Q. After the decedent was shot and he was on the

ground, did you notice any gunshot wounds on his person?
A. I did not.
Q. Did you have any information that the decedent was under the influence of drugs or alcohol?
A. No.
Q. Were you, yourself, physically injured during this incident?
A. No.
Q. Do you know whether the -- strike that.
Do you know whether any of other involved officers were physically injured during the incident?
A. No.
Q. Okay. With respect to the use of deadly force, are you generally trained that you can only use deadly force when there's an immediate or imminent threat of death or serious bodily injury?
A. Yes.
Q. And you're trained that if there's not an immediate or imminent threat of death or serious bodily injury, that you should not use deadly force?
A. Yes.
Q. And do you have training that there has to be the ability, opportunity, and apparent intent to immediately cause death or serious bodily injury?
A. Yes.

Q. And are you trained, generally, that deadly force should only be used when there are no other reasonable options available?
A. When feasible.
Q. When feasible; you would agree?
A. Yes.
Q. Okay. And are you trained to reassess in between shots, if it's feasible to do so?
A. Yes.
MR. VALENZUELA: I don't think I have anything further, Counsel.
MS. POWELL: I don't have anything.
THE CERTIFIED STENOGRAPHER: Ms. Powell, are you ordering a copy of this one?
MS. POWELL: Yes.
THE VIDEOGRAPHER: We're off the record at 2:28 p.m..
(2:28 p.m., deposition concluded.)
--oOo--

STATE OF CALIFORNIA)
) ss:
COUNTY OF BUTTE )

I, KIMBERLY E. D'URSO, do hereby certify:

That the witness named in the foregoing deposition was present remotely and duly sworn to testify to the truth in the within-entitled action on the day and date and at the time and place therein specified;

That the testimony of said witness was reported by me in shorthand and was thereafter transcribed through computer-aided transcription;

That the foregoing constitutes a full, true and correct transcript of said deposition and of the proceedings which took place;

Further, that if the foregoing pertains to the original transcript of a deposition in a federal case, before completion of the proceedings, review of the transcript [ ] was [ ] was not requested.

That I am a certified stenographic reporter and a disinterested person to the said action;

IN WITNESS WHEREOF, I have hereunder subscribed my hand this 26th day of July, 2026.

______________________________

KIMBERLY D'URSO, CSR NO. 11372, RPR