# "EXHIBIT E"

**LAW OFFICES OF DALE K. GALIPO**
Dale K. Galipo (SBN 144074)
dalekgalipo@yahoo.com
Eric Valenzuela (SBN 284500)
evalenzuela@galipolaw.com
21800 Burbank Boulevard, Suite 310
Woodland Hills, California, 91367
Telephone: (818) 347-3333 / Facsimile: (818) 347-4118
*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

MARIA GUADALUPE DIAZ, et al.,

Plaintiffs,

vs.

CIty of TORRANCE, et al.,

Defendants.

Case No. 2:25−cv−03389−JLS(JCx)

**DECLARATION OF WILLIAM HARMENING IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

# DECLARATION OF WILLIAM HARMENING

I, William Harmening, declare as follows:

1. I am an expert specializing in the procedures of police practices and proper police tactics, including proper procedures for the detention and arrest of individuals and the type and degree of force, if any, appropriate under different circumstances.

2. I am a competent adult and personally familiar with the facts contained herein and would and could competently testify thereto if called upon to do so.

3. I was retained in this action to render opinions regarding the incident that occurred December 2, 2024, that resulted in the officer-involved shooting of death of Leonardo Diaz.

4. The opinions I formed are made within a reasonable degree of certainty within the field of police practices based on over 36 years of professional law enforcement experience.

5. I am a graduate of the Illinois State Police Academy (1982), and from 2001 to my retirement in September 2018, served in the capacity of Chief Special Agent for the Illinois Securities Department. I am a former police academy instructor in Illinois and was responsible for all behavioral science instruction to Illinois police cadets completing their initial basic training. This instruction included the psychology of force, especially deadly force. Additionally, I was a member of the Central Illinois Critical Debriefing Team and became a member after my own officer involved shooting

6. Over the course of my law enforcement career, I have attended many different types of training, including investigative methods, violent and property crimes investigation, and crime scene processing and analysis. My investigative methods training included techniques related to trajectory analysis, blood stain analysis, and crime scene analysis, among others. I later became a police academy instructor in crime scene processing and analysis. I was also one of the first fifteen

officers in the State of Illinois to receive C.I.T. training ("crisis intervention team"). Those of us who received this training were trained as trainers. Additionally, until I retired, I qualified annually with my duty weapon and periodically attended law updates on the use of force. I have also participated in many different types of police training as an instructor or co-instructor and routinely taught in an academic setting on the subject of force, particularly the psychology of force. This instruction is evidence-based using peer-reviewed research.

7. In terms of academic qualifications, until my retirement, I served as the program coordinator of the Forensic Psychology certificate program at Washington University in St. Louis, one of the Nation's top research universities. In this capacity I also served as lead instructor for the following

courses:

- Introduction to Forensic Psychology (includes a comprehensive treatment of the use of force by the police);
- Crisis Intervention (includes a comprehensive treatment of the use of force by the police);
- Criminology;
- Correctional Psychology;
- Correction Theory and Practices; and
- Investigative Psychology.

Two of these courses, Introduction to Forensic Psychology and Crisis Intervention, deal extensively with the subject of police use of force. Additionally, I have authored four peer reviewed textbooks and a non-peer reviewed mass market book, as follows:

1. The Deadly Force Script: How the Police in America Defend the use of Excessive Force (2021, ABA Publishing).

2. Forensic Psychology (2015, Pearson Publishing). This widely used textbook includes an extensive treatment of the subject of force using the most current

research, as well as an entire section devoted to correctional practices (e.g., Inmate classification, management, and reintegration).

3. Crisis Intervention: The Criminal Justice Response to Mayhem, Chaos, and Disorder (2014, Prentice Hall). Also includes an extensive treatment of the subject of force, as well as a chapter devoted to the various types of crises that occur in jails and prisons.

4. Serial Killers: The Psychosocial Development of Humanity's Worst Offenders (2014, Charles C. Thomas).

5. The Criminal Triad: Psychosocial Development of the Criminal Personality Type (2010, Charles C. Thomas).

8. My areas of expertise in policing include, but are not limited to: police use of force; pursuits; police administration; training; police operations; criminal investigations; interviews and interrogations; civil rights violations and investigations; internal/administrative investigations; criminal investigations; police discipline; citizen complaints; and police policies and procedures.

9. In forming my opinions, I reviewed the following documents: (1) CA Learning domains; (2) CA deadly force statute TPD Policies; (3) Officer training records; (4) Drone videos; (5) Officer body cam videos; (6) Incident report; (7) Officer pics (bullet count); (8) Firearm test reports; (9) Dispatch/ 911 call transcript; (10) Diaz autopsy report; (11) Diaz psychiatric records; (12) Diaz criminal history; (13) TFD EMS records; and (14) Depositions (Castillo, Bermudez, Garcia, and Wissler).

10. The opinions I formed are made within a reasonable degree of certainty within the field of police practices based on over 36 years of professional law enforcement experience.

11. All police officers know and understand that deadly force can only be used in response to an imminent threat of death or serious bodily injury. The policies of the Torrence Police Department define such a threat as follows:

> An "imminent" threat of death or serious bodily injury exists when, based on the totality of the circumstances, a reasonable officer in the same situation would believe that a person has the present ability, opportunity, and apparent intent to immediately cause death or serious bodily injury to the officer or another person. An officer's subjective fear of future harm alone is insufficient as an imminent threat. An imminent threat is one that from appearances is reasonably believed to require instant attention.

12. The policy goes on to list the factors to be considered when determining the reasonableness of force. Among them are the following:

(j) The availability of other reasonable and feasible options and their possible effectiveness.

(n) Whether the person appears to be resisting, attempting to evade arrest by flight, or is attacking the officer.

And finally, California state law includes the requirement that deadly force only be used when "necessary."3 It states the following:

> As set forth below, it is the intent of the Legislature that peace officers use deadly force only when necessary in defense of human life. In determining whether deadly force is necessary, officers shall evaluate each situation in light of the particular circumstances of each case, and shall use other available resources and techniques if reasonably safe and feasible to an objectively reasonable officer.

The same statute also makes clear that "…retreat does not mean tactical repositioning or other repositioning tactics."

This California statutory language is embedded in all California police training modules. Both Officer Castillo and Officer Garcia had attended multiple use of force training sessions. Garcia's most recent use of force training prior to the shooting was two months prior. Officer Castillo's was approximately ten months prior. Both Bermudez and Wissler were just weeks out of the police academy. Both would have received this training pursuant to California POST Learning Domain 20.

The bottom line for California officers on the street is that their use of deadly force 1) must be in response to an imminent threat of death or serious bodily injury, and 2) there are no other feasible alternatives to deadly force available to them. In this case, it is not enough that Diaz made an anonymous 911 call saying he would shoot or stab someone. While this is to be considered by the responding officers, their use of deadly force cannot be based on that alone. That would amount to the officers using deadly force out of fear of future harm, and that is prohibited by all police training on the issue of deadly force. So, there are two questions to be answered in this case. First, did Diaz pose an imminent threat of death or serious bodily injury? And second, were there other available and feasible alternatives to all four officers shooting Diaz as he approached.

13. First of all, the officers completely ignored the fact that this matter was a mental health crisis call and not a suspect who had committed any crimes. That will be discussed later. At the time the officers fired their weapons, Diaz was walking casually from his car to where the officers were behind cover. At no time did he run, lunge, attack, or even display and screwdriver in his hand as he approached. He did not swing the screwdriver, raise it above his waist, hold it in an attack grip like a knife. He simply held it in his hand, and even then, shortly after exiting his vehicle, he held it by the shaft so that the entire screwdriver was no longer visible to the officers. He said nothing as he approached. And while he did refuse to stop walking, show his hands, or drop the screwdriver (the officers could not even see it and thought it was a knife), refusing an officer's commands, or the chaotic commands of multiple officers, by itself does NOT represent a lethal threat or any threat at all. From the time Diaz exited his vehicle to the time he was shot and killed, HE DEMONSTRATED NO IMMINENT THREAT OF DEATH OR SERIOUS BODILY INJURY.

14. All four officers, as well as those behind them, had a wide-open area to maneuver and to back up as Diaz approached. The police like to argue that they have no duty to retreat. However, that is a fundamental misunderstanding of police training.

First of all, as already discussed, under California law and POST training, tactical repositioning is NOT considered retreat. Furthermore, where a person is in the throes of a mental health crisis and crying out for help, mental health training, often referred to as CIT training, instructs officers to do whatever is necessary, including reposition themselves, to bring the situation to a peaceful conclusion and to get the individual in crisis the help they desperately need. And as previously discussed, that reality seemed lost on the officers. They had plenty of time to formulate a plan and to talk it through. Instead, the officer in charge, Castillo, grabbed an assault rifle and said, "I'm ready to rock." The four officers then simply waited for Diaz to approach to shoot and kill him.

15. So clearly, Diaz posed no imminent threat of death or serious bodily injury in this case. There was only a fear of future harm based on something Diaz had said anonymously to the 911 operator. And to the second question, whether there were alternatives available to the officers, I would argue there were many, all of which could have been used safely and effectively while maintaining lethal cover. The available alternatives were as follows:

1. Officer Castillo knew at some point that Officer Choi was retrieving a 40mm less lethal weapon from his vehicle. It was Castillo who requested it. They could have simply backed up while Choi moved forward to deploy the weapon to gain compliance while maintaining lethal cover;

2. During the incident, officers were within the effective target rangeof the OC spray, which is approximately 10-15;

3. Diaz was within range to deploy a Taser. All four officers carried Tasers, and it would have immediately ended the situation. It is not enough to argue that the Taser doesn't always work, a common argument in police shootings, however in this case they had multiple Tasers. They could have easily deployed one with a backup ready and still have been able to maintain lethal cover; and

4. Each of the officers had an expandable baton and were properly

trained and certified in its use. A screwdriver in Diaz's hand would have been no match for a baton strike to his arm. This would have required one officer to move forward, but there still would have been lethal cover.

It is indeed confusing to me why all four officers chose to fire their weapons when there was NO lethal threat and when they had so many less lethal alternatives available to them. More than anything, this was a breakdown in supervision. Castillo made little effort to manage this situation and his officers. This was even more critical with two brand new officers fresh out of the academy at the scene. Their use of deadly force was likely nothing more than contagious fire after Garcia fired from a position in between the two. Not only did Castillo fail to supervise the crisis, but then he chose to hand it over to Garcia for no apparent reason while he took aim with an assault rifle.

16. From the moment the officers saw the blood on Diaz's wrists and arms, even before he exited his vehicle, they should have known this was a mental health response and not an offender arrest. Diaz's anonymous 911 call should not have been viewed as a crime at that point, but as a symptom of the crisis he was experiencing. Their goal should have been to end the situation peacefully or with minimal force and then facilitate an involuntary commitment of Diaz to get him the help he needed. Although none of the officers were CIT trained (unknown if Choi or High were) each had sufficient training to recognize the true nature of the call and the response that was needed. Both Castillo and Garcia were field training officers (FTO), and both had completed the state-mandated 8 hours of mental health instruction for FTOs. Bermudez and Wissler were weeks out of the police academy, and both had received mental health instruction pursuant to POST Learning Domain 37 (People with Disabilities).

17. In terms of their response, just about everything they did was antithetical to deescalation. Most importantly, no one tried to engage Diaz. It should have been Castillo who made the attempt. He knew his name by then, yet he made no effort to

use it. Even when Diaz exited his vehicle Castillo had time to engage him. Instead, all four officers began yelling commands. Castillo alone should have attempted to communicate with Diaz, and he should have attempted to do so without pointing an assault rifle at him. There was no need for any of the officers to have their guns drawn and on target before he even exited the vehicle. Castillo should have directed the other officers to remain quiet, and by the time Diaz exited his car, he should have already had a "contact and cover" plan in place. Had Castillo even tried to engage, he should have avoided commanding him to drop the knife. First of all, it wasn't a knife, and secondly, he should have attempted to build immediate rapport in spite of the screwdriver, not contingent upon Diaz dropping it.

18. It should have been apparent to the officers that Diaz was attempting to commit suicide by cop. But the police are under no obligation to oblige that wish. In fact, their obligation is to avoid it. Never should a non-threatening individual armed only with a screwdriver and wanting to die be able to casually walk toward a line of armed police officers until the officers all fire like a firing squad. The officers should not have reacted to the anonymous 911 call, but to what they could see and hear in front of them in real time. In fact, their own policies require that officers give priority to the mental health of the individual over making an arrest for a minor infraction:

> Officers should consider a 5150 commitment over an arrest when mental health issues appear to be a mitigating factor for people who are suspected of committing minor crimes or creating other public safety issues.

19. It is apparent from the four officers' deposition testimony that none of them could provide legitimate reasons why less lethal options were not used. All four testified that they could not use less lethal because their training instructs that the first four officers on the scene must provide lethal coverage. But their own policy, as well as California law, offers no such concession. Regardless of their training, the same rules of force apply to each officer involved. Furthermore, not all departments have

the luxury of having multiple officers for multiple assignments. I personally worked the midnight shift in a small rural sheriff's department where I was forced many times to make a high-risk stop alone. Police training addresses best practices and tactics but makes it clear that officers must remain flexible and adapt to the situation. By refusing to use less lethal options only because their training says the first officers must provide lethal coverage is then basing their use of deadly force on factors other than Diaz's behavior. That is inappropriate and antithetical to all police training on the use of force.

20. The officers provided several factors that played into their actions that have no basis in fact or evidence. There was possibly a gun in his baggy shorts. There was possibly a victim in the car. Diaz had possibly killed someone inside the building. But all of these factors amount to a fear of the unknown, and the use of deadly force cannot be based on a fear of future harm. Such fears should certainly heighten their caution, but in deciding to use deadly force, they must be able to articulate an imminent threat of death or serious injury. There was no such threat in this case. An anonymous 911 call by itself in not enough, nor is Diaz's refusal to discontinue walking toward the officers. The closer he got, walking casually and in a non-threatening manner, the better the opportunity they had to bring the incident to a peaceful conclusion and get Diaz the help he needed. Instead, they responded as a firing squad and shot him nine times at close range.

21. It is my opinion that the officers violated accepted standards and training when they used deadly force against a man who posed no threat of death or serious bodily injury at the time the officers fired their weapons. He was neither attacking, lunging, running, nor even displaying the screwdriver in an aggressive manner. He was simply walking toward the officers without speaking. The officers failed to consider any number of available less lethal alternatives as required by California POST training and California state law, including the Taser, OC pepper spray, expandable baton, 40mm launcher, and tactical repositioning. Their use of deadly

force failed to meet the standard of "necessary" to defend human life as defined by both.

22. The officers failed to use their mental health training to respond to the incident as a mental health crisis rather than an offender arrest situation. They failed to consider that pursuant to TPD policy their goal, given Diaz's 911 call and the blood they could see on his arms, was to affect a 5150 commitment, and to give that goal priority over making an arrest for a minor crime or possibly no crime at all. They also failed to recognize that while responding to a mental health crisis, they had a duty to do whatever necessary, including to retreat, to bring the incident to a peaceful conclusion and to get Diaz the help he needed.

23. Officer Castillo, and to a lesser extent Officer Garcia, both field training officers, failed to properly supervise the incident. They failed to formulate a contact and cover plan to deploy less lethal weapons when there was sufficient time to do so. They failed to control the chaotic commands being given by all the officers. They failed to make any attempt to engage Diaz to build quick rapport. And they failed to limit the group's force presentation to better facilitate rapport. When Castillo grabbed an assault rifle and announced that he was "ready to rock," at that point the die was cast and the outcome decided.

24. It is my opinion that it was unreasonable to believe, given what the officers could see and hear, including real time reports from the drone operator, that Diaz had stabbed or killed another person in his vehicle or in the building.

25. It is my opinion that it was improper in the context of accepted standards of policing and police training for all four of the initially responding officers to maintain lethal coverage and not formulate a tactical plan that included the deployment of less lethal alternatives.

26. Two minutes and thirty seconds (amount of time from when officers exited their vehicles until Decedent exited his vehicle) is more than enough time to formulate a tactical plan and designate less lethal and to transition to less lethal, including the

40mm in the back of the police cruiser.

27. Seventeen seconds (amount of time from when Decedent exited his vehicle until the officers began to fire) is more than enough time to transition to a taser or OC spray which was stored on the officers' person. It takes approximately two seconds to transition to the taser or OC spray.

28. The officers did not give a verbal warning that deadly force would be used during the incident, despite being feasible to do so. As Decedent slowly walked towards the officers, it was feasible for the involved officers to give a verbal warning that deadly force would be used.

29. Officers are trained to reassess in between shots if it is safe to do so. Here, the involved officers did not appear to reassess in between shots despite it being safe to do so. Had the officers reassessed in between shots, they would not have shot Decedent as he was stopped, falling to the ground or already on the ground, including shots to his back.

30. I reviewed the recorded interviews of Defendant Officers Garcia, Castillo, Bermudez and Willser. None of these officers mentioned in their recorded interviews, that they did not use less lethal force against Decedent because based on their training all four officers on scene needed to be designated as lethal cover in a high risk felony stop and that they needed to wait for a fifth officer to arrive on scene to be designated as less lethal as they claimed in their depositions.

31. Officers are trained to recognize what suspects are carrying and to distinguish items in a suspect's hands to determine if they are weapons or not.

I declare under penalty of perjury of the laws of the United States of America, that the foregoing is true and correct. Executed on October 14, 2026, at Unionville, Tennessee.

[signature]

William Harmening