# "EXHIBIT F"

Masalcas: And I'm on the record. Today is Tuesday, December 10, 2024. The time is approximately 1137 hours. We're in the Bureau Commander's Conference Room of the Torrance Police Department.

My name is Sergeant Masalcas. I'll be conducting an interview today of Officer Cody Wissler, who is in the office with me. Also in the office today is my partner, Sergeant Kent Krumbach, my supervisor, Lieutenant Michael Chance, as an observer only, and Officer Wissler's attorney, Stephen Chulak.

This interview regards a officer-involved shooting that occurred on December 2, 2024 at approximately 1701 hours in the 2900 Block of Oregon Court in the city of Torrance, and was assigned DR 240045785.

The investigation is under the control, direction and command of Captain Titiriga.

You have the right to representation of your choice present with you today during the interview. And you have chosen to have Mr. Chulak represent you. Is that correct?

Wissler: Yes.

Masalcas: And, pursuant to Government Code Section 3303(g), I'm recording this interview. You have the right to record this interview. You're choosing to have your attorney, Mr. Chulak, record this interview. Is that correct?

Wissler: Yes.

Masalcas: Okay. And, to ensure a full, fair and effective investigation in this matter, and in order to preserve public confidence in the Torrance Police Department's ability to operate effectively, during the pendency of the investigation you are directed not to discuss this investigation with anyone,

other than me, your union representatives and/or legal counsel.

This order shall automatically be lifted at the conclusion of the investigation, when the need for accurate collection of information from subject and witnesses will abate.

This order is not intended to prevent you from engaging in protected concerted activity under the Meyers-Milias-Brown Act. You may continue to engage in protected concerted activity under the act, including, but not limited to, discussing any of any other aspects of your employment and working conditions with others, including coworkers.

If you're unsure whether discussing certain issues with others would violate this order, you are encouraged to consult with your union representatives and/or legal counsel who may advise you. You may also contact me with any questions. Do you understand?

Wissler: Yes.

Masalcas: And, I'm obligated by Government Code Section 3303(h) to advise you of your constitutional rights. Please be advised that you have the right to remain silent. Anything that you say may be used against you in court. You have the right to an attorney before and during questioning and at all times. Do you understand each of these rights?

Wissler: Yes.

Masalcas: And do you, nonetheless, wish to waive these rights, including your right to remain silent and speak to me now?

Wissler: No.

Masalcas: And, although you have lawfully refused to waive your constitutional rights, please be advised you are hereby ordered to answer all my questions about this investigation completely and truthfully.

Any refusal to do so, including, but not limited to, intentionally providing false information, or withholding material information, may be deemed insubordination and result in disciplinary action against you, up to and including termination.

Therefore, your answers in response to my questions cannot be used against you in a subsequent criminal proceeding. Do you understand?

Wissler: Yes.

Masalcas: And, prior to us proceeding with this interview, do you have any questions regarding the admonitions I have read to you?

Wissler: No.

Chulak: I would just like to clar-, - - to (unintelligible) some clarity, Sergeant, before you proceed. So, as a Supervisor with the Department, provider Officer Wissler that order, and as authorized by your Chief of Police, are we correct in understanding that pursuant to the admonition you just provided Officer Wissler, if he were to refuse to answer your questions he'd be subject to discipline? Is that correct?

Masalcas: Yes.

Chulak: That discipline could potentially be as much as discharge or removal from office?

Masalcas: Yes.

Chulak: In other words, the statement you intend to obtain this afternoon will be used for administrative purposes and administrative purposes only?

Masalcas: Yes.

Chulak: And, lastly, are we correct in understanding that the statement you obtain will not be used in any manner that is inconsistent with the Public Safety Officers Procedural Bill of Rights Act?

Masalcas: Yes.

Chulak: I'd like to make it clear on the record that, for those reasons and those reasons alone, Officer Wissler will be providing you a statement this afternoon. I want to be clear that he's not waiving any of his constitutional rights. However, he will completely and fully cooperate with your administrative investigation arising out of this incident, because case law and department policy require him to do so.

And I will also note, for the record, that prior to today's date you did advise of us of the nature and scope of this investigation, as well as respond to our request for pre-interview disclosures of any nonconfidential notes or documents/materials. I have nothing further at this time, sir. Thank you.

Masalcas: Okay. Thank you, sir.

All right, Cody, we're going to start off today, this interview, with you just telling us what your assignment and call sign was on December 2, 2024.

Wissler: Uh, uh, my assignment was the downtown beat for Patrol. And then my call sign was 9-"Adam," uh-24.

Masalcas: Okay. And were you working Full Uniform Patrol that day?

Wissler: Yes.

Masalcas: And was that in a marked black and white patrol car?

Wissler: Yes.

Masalcas: And who was driving your patrol car?

Wissler: I was driving the patrol car.

Masalcas: And did you have a partner that day?

Bermudez: Yes. My partner was Officer Garcia.

Masalcas: Okay. And on that date in question what was your tenure as an officer at the time of the shooting?

Wissler: At that time I was on my Month 3 of Patrol.

Masalcas: And do you have any other police experience leading up into becoming a Torrance Police Officer?

Wissler: No.

Masalcas: Okay. Were you ever a cadet or an explorer?

Wissler: No. No experience at all.

Masalcas: Okay. What was your training and experience at that time in regards to high risk felony vehicle traffic stops?

Wissler: Uh, we went over a majority of them throughout the academy when I was there for six - - about six months. And also we had a two-week patrol school which we went

over felony t stops and high risk stops. Uh, but those are the only two times we went over that.

Masalcas: On training was this your first felony - -high risk felony traffic stop?

Wissler: No. No.

Masalcas: How many, approximately, had you done prior to this?

Wissler: One.

Masalcas: Okay. Did you activate your body-worn camera during this incident?

Wissler: Yes.

Masalcas: Did you think it was a significant threshold incident?

Wissler: Yes.

Masalcas: And did you and your partner active in-dash camera during your incident?

Wissler: Yes.

Masalcas: And prior to this interview did you get an opportunity to review your body-worn camera and in-car camera video regarding the incident?

Wissler: Yes.

Masalcas: Did you review any other videos regarding the shooting that took place?

Wissler: No.

Masalcas: Were there other officers involved in this incident that you know of?

Wissler: Yes. There was, uh, myself, Officer Garcia, my partner, there was Officer Castillo, Officer, uh, Bermudez, and then there was Officer High and Officer, uh, Lasik were there as well.

Masalcas: Okay. And were - - what officers were present during the shooting?

Wissler: Uh, present, it was me, Officer Garcia, Officer Bermudez and Officer Castillo.

Masalcas: Okay. Do you know if Officer High was there at that time?

Wissler: I believe, I believe so. I believe, yeah, he, he was there at the time of the shooting. He wasn't there when the call first started but at the time of the shooting he was present.

Masalcas: Did you see him there?

Wissler: Yes.

Masalcas: Okay. At some point during the incident that took place on December 2, 2024 did you discharge your department-issued firearm?

Wissler: Yes.

Masalcas: And what is the make, model and caliber of your firearm that you used that night?

Wissler: It is Glock 45, 9 millimeter.

Masalcas: Okay. And, to your knowledge, is that firearm - - had it been previously altered in any way?

Wissler: No.

Masalcas: Do you know how many rounds were loaded in your firearm at the time?

Wissler: Eighteen.

Masalcas: Eighteen. So that's 17 - -

Wissler: Seventeen and then - -

Masalcas: - - in the magazine - -

Wissler: Yes, sir, and then one in the chamber.

Masalcas: Okay. Did you reload during then incident?

Wissler: No.

Masalcas: Was the ammunition that you used during the shooting department-issued?

Wissler: Yes.

Masalcas: After the shooting did you end up surrendering your firearm to anyone?

Wissler: Uh, yes.

Masalcas: Who was that?

Wissler: It was the two detectives in the Forensics Team that took (unintelligible).

Masalcas: Okay. All right. Okay, Cody, so at this point I'm going to give you an opportunity to give us a full summary of what

happened out there. And I want you to start from the very beginning all the way to the conclusion. Okay?

Wissler: Yes, sir.

Masalcas: Feel free to be as detailed as you want. We'll give you as much time as you want. I'm not going to interrupt you. And afterwards we'll just ask some follow-up questions and we'll go step by step clarifying things.

With that in mind, why don't you just start off by telling us, in your own words, from the very beginning of this incident to the end?

Wissler: All right. Uh, so, prior to the call we were at a storage unit off Maricopa and Crenshaw. At the time that we were wrapping up, uh, that call - - and I was talking with the reporting party, just giving her all the information and giving her a DR card.

At this point my FTO was in the car, uh, and he saw that a lot of calls were getting stacked on top of each other. So he was kind of looking at all of them. And once I got back in the car he just said, "We're taking this call over at Oregon Court and Maple." And I knew kind of where that was because I've been to that area on multiple calls before.

Um, as we're leaving, uh, the storage unit were going, uh, westbound on Maricopa and then we make, uh, a northbound turn onto Maple. As we're dr-, - - as I'm driving there Officer, uh, Garcia kind of gives me a rundown of what the call is, since I didn't hear the call go off since I was talking to the reporting party. He said that there's a - - the call came out as a 925 search which is just suspicious circumstances. RP said that there's a possible armed suspect in the area or armed person in the area that wants to shoot or cause harm.

Uh, there was no other details prior to that. Uh, as we're driving over, drawing o-, - - driving over there, I can hear over the radio Dispatch saying that there's a drone above, the drone can't find anyone, uh, but the felon is pinging at the Maple and Oregon Court location.

Uh, so we're still on our way over there, we're not there yet. I'm hearing all of this information as I'm driving. Uh, as we get closer and closer Officer Garcia spots, uh, a bicyclist biking, uh, southbound on Maple. Uh, it looked just to be a regular citizen like either going to work or from work. Nothing really stood out.

Uh, as we get even closer we see another, uh, bicyclist going northbound on Maple, same thing, nothing suspicious. I believe that they were just working out. Uh, so we make, uh, a righthand turn onto Oregon Court and we're going eastbound on there.

Uh, right away we can't see anyone standing out at all. Dispatch is still saying that the phone that R-, - - the RP called is in that location, just at the intersection of Maple and Oregon Court. We don't see anyone there. As we're driving, my FTO notices - - Officer Garcia notices a green Dodge with tinted windows with the door slightly open. Uh, but we don't - - I don't notice that so I keep on driving and we're looking through all the parking lots. Uh, we checked all the areas. We don't find anyone suspicious. We don't find anyone walking around at all, no suspicious activity.

As we, uh, make a U-turn and I drive back up towards, uh, uh, Maple, uh, again, you can see that the, the green Dodge, uh, door opens and closes a little bit. So that catches both of our eyes', uh, that someone is in there. All the other cars, you can clearly see nobody is in there, there's no tinted windows. All the cars, you can see that

there's no driver, they're all unoccupied. The only car in question is that Dodge because it's the tinted windows so you can't see how many people are in there, and that the door is kind of slowly opening and closing.

We get back onto Maple and that's where we meet Officer Castillo who was driving Officer Bermudez. Uh, we're talking to them and I tell them that, uh, we can't find anything all, there's someone in this, in this car right here. Um, I look over and I see that the - - I can see the license plate, so I run the license plates over Dispatch, over the radio and it comes back expired.

So, after talking with all the other officers, uh, we said that, oh, we could just stop it and see what's going on because they have expired registration. And then Officer Castillo made a point, saying that there is a homeless encampment on one of the other sides of the buildings. Uh, so we went to go check that out.

So Officer Castillo drove down Oregon Court. I followed him. Again we're still looking through, uh, all the parking lots as we're driving down Oregon and we can't see anyone standing out.

Uh, as we get closer and closer to, uh, the end of Oregon Court, Dispatch came back saying that one of - - that the RP used to work at one of the addresses located in that area. I can't remember the exact address but Officer Castillo and Officer Bermudez, uh, took their, their patrol car and went to the back side to check out that location. Uh, and then me and Officer Garcia parked, got out of our patrol car, and went to the front of that location.

Officer Bermudez and Castillo cleared the back. They said that it was locked, no signs of forced entry, no one is there. Uh, we went to the front, we looked around. There - - uh, the, uh, front window were, uh, tinted up so you

couldn't see in at all but if you stepped back you could look upstairs and it just l-, looked like the building was vacant. Uh, Dispatch then notified us that, uh, that company moved a couple weeks ago and that they're not there anymore.

So as me and Officer Garcia are walking - - and that's when I noticed Officer High because he was going to get on the radio and then that's when I said, "Oh, sir, I'll just let them up, update Dispatch of our location and that the area is - - appears to be vacant and there's no signs of forced entry."

As we - - as me and Officer Garcia start walking back to the car - - uh, throughout that whole process we can hear the drone operator saying that the, uh - - the green Dodge door is opening and closing. It's not fully opening, it's just opening up a little bit. Um, and we heard the dispatcher say that, uh, a couple times.

Um, and as we're walking back we're trying to - - he's kind of debriefing on, on how, uh - - how - - what I saw. I told him that I didn't see any suspicious activity. We didn't see anyone walking around. Um, the only thing that I noticed was hearing Dispatch saying that that car door was opening and closing. So that's the only kind of suspicious activity that, uh, we do have.

Um, so that's when I made the decision to get back in that patrol car and head over to that car to stop it. Uh, so as we get in the car, uh, we drive over there. I drive over there because I'm driving. Uh, at that point in time I haven't - - uh, based on my training and experience, I haven't done like a felony traffic stop or any traffic stop head-on, so I made the conscious decision to pass the car, turn around and make a U-turn. And that's when we, uh, conducted a traffic stop.

Uh, I pulled - - uh, uh, I was offset a little bit and, uh, probably, uh, maybe 10 to 15 feet behind the vehicle. Uh, got out of the car, uh, and that's when I, uh, turned on my body-worn camera. Officer Garcia turned on the lights so the dash camera is on. And that's when I made commands to, uh - - because you could see someone was in there and we just - - I couldn't confirm if there was one, four, or five, because the windows were tinted out. You couldn't see at all. All you could see was just the, the driver side window rolled down a little bit. And you could see like some movement in there.

I was giving commands. I was telling the, the person in the car to turn the car off. Uh, and then I notified - - oh, before that I said "The Torrance Police Department. Turn your car off." Uh, "Roll down your windows." Uh, to walk up and talk to him, how I do at every traffic stop, just to turn the car off, uh, and have them roll the windows down.

He didn't roll the windows down. I told him again to roll the windows down. And that's when Officer Castillo, uh, said that we're going to conduct this as a felony t stop. So I'm in the driver's seat standing out, uh, looking at the suspect's car. And Officer Garcia, Officer Castillo and Officer Bermudez are on the passenger door side. They're formulating a plan, uh, of like an arrest team.

And I'm - - my whole focus is just on the driver because we don't know how many people are there or if there's more than one person. Uh, and that's when I started giving commands of, uh, "slowly open the door, uh, with your left hand," "let me see both of your hands." This whole time he's not doing anything, the door just opens and closes. He's not keeping it open. He's not listening at all.

I can hear, uh, the other officers on my - - by the passenger, which is Officer Garcia, Castillo and Bermudez,

formulating a less lethal plan. And my sole focus is just to give commands and just keep on talking to the driver and keep my eyes on him. So I can hear them talking about it but I wasn't involved in any type of the conversation because my main focus was on the driver.

I'm still giving him commands, I'm giving him short and, uh, simple commands. That way there's no miscommunication on my part. I was just being very vocal and yelling, uh, "let me see your hands," "open the door slowly with your left hand." Just giving him verbal commands. He's not following any of those at all.

Uh, at one point he slowly opens the door a little further and I could see blood and a knife, or a sharp object, appeared to be a knife, in his right hand. Uh, and that's when I notified my partners that he's bleeding, that he has a knife in his hand. Uh, and that's when one of the officers gets on the radio and notifies Dispatch, uh, uh, Torrance Fire Department stage, because we could see that the driver at this point has visible injuries.

At this point when, uh, I n-, - - when I notified my team that there's a knife and there - - and then, uh, one of the other officers, Casti-, - - I can't remember which officer, but went over the radio, because I can hear him saying that the suspect had a knife. That's when another patrol vehicle comes, uh, westbound on Oregon Court. And they make a U-turn and they're right next to us.

Um, and that's when Officer High comes out and so now it's Officer High, me, and then Officer Castillo, Officer Bermudez and Officer Garcia. Uh, I'm still giving him commands "drop the knife, drop the knife," "let me see your hands." I'm being very vocal. I'm not whispering. There's no loud traffic where we are so he can't - - it's not like he can't understand me. I'm being very vocal.

At this point he c-, - - steps out of the vehicle and that’s when Officer Garcia comes around to my side. So now I’m in the driver’s seat behind the door, uh, standing out, giving him commands, yelling him - - at him, “drop the knife, drop the knife,” “turn around and walk back towards me.” He’s not listening to - - uh, to me at all. And that’s when he slowly walks diagonally towards, uh, me and Officer Garcia.

Uh, and at this point there’s cars still coming towards us, so I’m keeping an eye on the cars that are driving towards us and also yelling at the suspect and giving him commands. He has the knife in his hands, he’s walking towards us. There’s blood all over him. Uh, his hands are clenched and he still has the knife in his hands. And we - - he's got like a gaze of he’s like looking through me.

So at this point we don’t know if he’s on any drugs or anything, but we can just know that he’s not feeling any pain at all because there’s severe blood on both of his arms. Uh, and as he’s walking towards me, I, I - - I’m still giving him full commands. And as the - - as he gets closer and closer there’s a white Telsa that drives by. And once the Tesla is out of our view, that’s when I, uh, pulled my, uh, firearm and point at him. And I’m still giving him commands.

He’s still walking. He’s not dropping the knife at all. He’s still walking towards me. And now he’s in - - he’s probably 10 feet away and now I’m in fear for my life and also Officer Garcia’s l-, life and Officer Highs life, because I don’t know where Officer Garcia is at the moment. I don’t know if he’s - - because he’s not behind me, because I’m giving commands. And I can hear him talking. I just know he's somewhere to the left of me. And, um - - and I don’t know if he’s behind the door, uh, with the other patrol car or if he’s in the middle.

And at that point as the officer - - as the suspect, or the driver, starts walking towards us, uh, he's in a clear view of my partner, Officer Garcia. And he's still walking close. He's not listening to us. I'm telling him "drop the knife." Officer Garcia is saying "Drop the knife. I don't want to shoot you. I don't want to shoot you."

And that's when he keeps on walking. I hear one round go for the right, hit the driver and the dr-, - - uh, and the driver still has the knife in his hand and he's still walking. And that's when I fire twice, uh, because I was in fear for my partner's safety and his life, because the driver had a knife in his hands and he was in lunging distance to stab him, cut him, or even possibly kill Officer Garcia. And then he could get to me as well, if we didn't take any action.

Uh, and then once, uh, I fired the two shots, the driver fell down, I went around, I closed my door. And that's when, uh, I noticed that the driver still had the knife in his hands and both of his fists were clenched. Uh, I'm giving him commands to "drop the knife, drop the knife." He's not dropping the knife at all.

Uh, Officer Garcia, Officer Castillo and Officer Bermudez, they're formulating an arrest team. They're seeing what the best option is if someone has a shield, what's the best way, because the suspect still has a knife. Even though he's not an immediate threat to us because of the distance, he still poses a threat. Because if you get closer you could still stab us.

As they formulate a plan I'm walking up, uh, with my firearm still drawn on him, saying "drop the knife, drop the knife." As they walk towards, uh, the driver, that's when I turn my attention onto the, the car. Because we don't know if anyone else is in there. So now that's still a threat as well. So as the other officers are arresting, and handcuffing, and placing the driver in custody, my focus is

still on the sus-, - - or the driver's car, because, like I said, we never cleared it. And, with the tint, you can't see in there, uh, if there's any other people, there's any weapons or anything in there at all.

Once they handcuff and start rendering first aid to the driver, that's when me - - uh, Officer Castillo, takes point, I'm after him, then it's Officer Garcia and Officer High. And that's when we go clear the car.

Uh, we make our approach. Uh, Officer Garcia is holding the, uh, back, the rear driver door. Um, Officer Castillo is holding the front door, the front driver door. And Officer High is holding the trunk. I go around, open the front door, front driver door for Officer Castillo. He cleared that. I go around, open the, uh, rear - - uh, the dr-, - - rear driver door. Officer Garcia clears that. And then that's when I go and help Officer High clear the, uh - - the, uh, trunk.

Uh, Officer Castillo opens the trunk and that's when me and Officer High clear the trunk. There's no one else in the car at all. Um, and that's when we - - I make my way back to the area to see if I can render some type of aid or anything, but we have plenty of officers to get there. And that's when I get told to separate myself and go on the curb.

And that's - - I don't know what happened after that.

Masalcas: Okay. All right. Thank you, Cody. We're just going to ask some follow-up questions regarding that summary that you provided. First starts I just want to clarify, initially on the call you said that your partner had told you - - you didn't see the call, but - - and you didn't hear the call, but your partner told you that the - - you were going to a 925 search call - -

Wissler: Yes.

Masalcas: - - and that the suspect was armed and wants to hurt some-, - - harm someone. Is that correct?

Wissler: Yes.

Masalcas: Did he mention anything about a gun being involved?

Wissler: Yes. He said that, uh - - that the call came out as 925 search. That the RP is calling saying that there is - - uh, that a - - someone is there with a gun involved or firearm. Uh, and then that no one else is being dispatched there. There's just a drone over the top and we're going over there.

So it was just a brief summary of what - - we're looking just for someone that kind of stands out. But we're also being aware because someone could be possibly armed with a firearm.

Masalcas: Okay. And when you pulled up you said your partner noticed the green Charger when you pulled onto Oregon Court?

Wissler: Yes.

Masalcas: But you didn't at that time.

Wissler: No, I did not at that time, because I - - my focus was looking at the north side of the street, clearing those, uh, uh, cars and buildings. And his job was the south side of the street. And so that's when, when we drove down he noticed the car first. Um, and then we kept on going.

Uh, and that's - - and then, uh - - but, yeah, so I didn't notice it at first. But then when we came around, when it

was just me and Officer Garcia, that's when he pointed it out again. And that's when I noticed it.

Masalcas: And but that first time - -

Wissler: That first time, Officer Garcia was the only one that notice it because I was looking on the north side of the street.

Masalcas: Okay. And what information did he relay to you about that vehicle?

Wissler: He just said that, uh, the car's, the car's windows are really tinted but the front driver's door, uh, window was down a couple inches so you can see someone, uh, was in the vehicle. Uh, so that's - - he was just looking for people - - we were just looking for people in vehicles or walking around. Uh, and that's when he made a statement saying that, "Oh, there's someone that appears to be in the, uh, green Dodge." And that's when we kind of proceeded to keep on checking out the area to see if we could find anyone else.

Masalcas: Okay, so you were kind of keeping that green Dodge in the back of your mind - -

Wissler: Yes.

Masalcas: - - type of thing, - -

Wissler: Yes.

Masalcas: - - if I'm correct?

Wissler: Yes, we - - uh, as, uh, we're driving he made that comment and we're both talking, saying, "Oh, I, I don't seen anyone. These cars are clear." In the back of my mind I'm thinking that, uh, there's - - that's the only one that's occupied. And we - - he told me, with the windows

being as tinted as he described them, that there could be multiple in there, uh, especially with the driver's, uh, window being down a couple inches, you can briefly look in there. Uh, he didn't say with full confidence on how many people in there. He just knew that he saw someone in the driver seat.

Masalcas: Okay. And your expectation in terms of what you were looking for when arrived.

Wissler: I was - - uh, at that point I was just looking for anything that kind of stood out of the ordinary. The, uh, kind of descriptors that came out on the call wasn't really specific. They didn't give like, uh, an exact location, because as we're driving over there they say it's on, uh, Oregon and Maple, at that location. But when we drove there we couldn't see anyone at all, just the car was in that vicinity.

Uh, we were just looking to see if there was anyone that was standing out walking around, uh, if they were in the streets walking around with a gun or checking into other warehouses, because that whole area is full of warehouses.

So as we're - - as I'm driving there I'm just looking for all possibilities since it was kind of vague on what was going on, just that there was someone potentially there with a firearm.

Masalcas: Okay. Did you have a description of the suspect at that time?

Wissler: I did not have that. I know it was going out but, uh, I did not have the description at that time.

Masalcas: You didn't process it? Or, did you remember hearing it but not processing it?

Wissler: I remember hearing it but I didn't - - I don't - - I didn't process it.

Masalcas: Okay. While in route to the call did you guys ask for any additional resources?

Wissler: Uh, were talking about it but the drone was already there. We were so late to responding to it that the drone was already above checking out the area. And then, uh, before I could even ask for an additional unit for help, uh, Officer Castillo was already on his way over.

Masalcas: What unit was first on scene?

Wissler: I was - - uh, me and Officer Garcia were first on scene.

Masalcas: And then who arrived second?

Wissler: And then it was Officer Castillo and Officer Bermudez.

Masalcas: And, based on what you knew going into this call, when you were pulling onto Oregon Court, what did you think you were looking for? Did you think you were responding to a homicidal suspect?

Wissler: Yes, at - - uh, with a lot of those that it's uncertain it's like there's, uh - - you don't - - it's a lot of unknown so you're looking into any type of possibilities. There's been a lot of calls where I go on where they say it's a gun, but it's a knife. So I'm looking at there's a potential armed person in that vicinity, uh, either walking around or somewhere, because someone called in. So he's somewhat - - I'm thinking that he's somewhat visible when I get there.

Masalcas: But, based on the information that you were provided going in, you were thinking that you were dealing with someone who was armed - -

Wissler: Yes, armed - -

Masalcas: - - and they were - -

Wissler: - - and dangerous.

Masalcas: And dangerous. And they were going to harm someone.

Wissler: Yes.

Masalcas: Did you have any information going into the call to believe that he was suicidal in any way? Any specific information?

Wissler: No.

Masalcas: When you arrived can you describe the lighting at the time?

Wissler: The lighting at the time, uh, it was still daytime so there were - - it wasn't dark. We didn't need to use our spotlight to kind of clear the areas. Uh, the streetlights weren't even on at the time when we first got there. So it was pretty easy to kind of clear the cars, clear the parking lots, clear the warehouses, uh, because there's no issue with any of the lighting at all.

Masalcas: And then at some point you had a discussion with your training officer about the - - and after you met up near the business - -

Wissler: Mm-hmm.

Masalcas: - - you had a discussion about the Charger and whether or not it had someone inside the vehicle?

Wissler: Yes. Um, after we cleared that, uh, building - - uh, as we're clearing it I can hear over the radio that the door is opening and closing. I can't remember if it's Dispatch or

the drone officer, but someone was notifying us that the door is opening and closing. So we could tell that someone was in there.

Masalcas: Mm-hmm.

Wissler: Um, and he kept on saying "the green Dodge, the green Dodge," uh, or "the green vehicle." And that's when we knew that, uh, I - - and, and with my good conscience, I couldn't just drive away knowing that I didn't check everything, especially with knowing that someone is in that car, uh, and the windows are tinted so we can't safely, uh, clear the call because the suspect could potentially be in there, uh, since we didn't check it.

But all the - - like I said, all the other cars, you can clearly see that there was no one in there. That was just the only car that was in question.

Masalcas: And I know you mentioned earlier that your FTO mentioned that the car door was ajar. But did he say anything about any - - him seeing anyone in the car at that time?

Wissler: Yes, he saw someone in the car, uh, but, like I said, the front - - uh, the driver side window was down maybe an inch or two inches so he could barely see, uh, get a good description of the person. But he could see someone was in the car.

Masalcas: And at some point you guys decided that you were going to make contact with that vehicle.

Wissler: Yes.

Masalcas: And did you believe at that time that that vehicle possibly contained the suspect who was claiming that he was armed with a gun and wanted to harm someone?

Wissler: Yes, uh, just because that was the only area that we didn't clear left. Uh, so I go into every situation it being the worst, so I just handle it as it could potentially be the worst, uh, and that, that is the last area that I spoke with my, uh - - my officer, Officer Garcia that the potential suspect or armed person could be in there because we haven't officially cleared that area, or cleared that vehicle.

Masalcas: [PAUSE] Okay. And then when you - - you mentioned earlier that you made the decision collectively to make a high risk felony traffic stop on that green Charger. You said you decided at that moment that you didn't want to take it head-on so you chose to - -

Wissler: Yes, I drove past it and made a U-turn and, uh, got, not right behind it, I (unintelligible) offset, uh, because initially, uh, I was going - - we were going to do just a regular traffic stop. Uh, so that's when I get out of the car and give my commands on how compliant the driver is. Um, if they roll the windows down, turn the car off and I can see their hands, uh, that kind of shows me how compliant they are.

Um, so when I gave out and gave him commands of rolling the window down, especially with how tinted the car was, he could roll the back window down and the front window down and you could get a good view to see if there's anyone in there. Um, and right away he wasn't listening to any of those commands at all. He wasn't being compliant. So that's when Officer Castillo made the executive decision to conduct it as a felony t stop because we don't know how many people are actually in that car with the tint and how tinted it was.

Masalcas: Okay. And was he being detained at this time?

Wissler: Uh, yes, he was.

Masalcas: And why? What reasons was that?

Wissler: Uh, because when the - - uh, when we got there the car was on and he had, uh - - uh, his registration was expired. So I was just - - I detained him just for that and then just pending an investigation, uh, to run him to see if he did match the car or to see if he matched the RP. There's just other things that we could have done, um, so that's why we detained him, uh, based off all that as well.

Masalcas: In addition to that, did you believe he was the possible subject that was calling in claiming with a gun?

Wissler: No. At that point I did not, uh, think that he was, uh, the actual suspect. I just knew that, uh, he could, he could be it. But I didn't - - wasn't - - uh, there was no like that is him or that wasn't. It's just it's always in the back of my mind that that could be that armed suspect. Until we completed clear him or clear the car, like I said. That's why my plan was to go over there and get his information, make sure that his driver matches the car registration and everything, uh, before (unintelligible).

Masalcas: So you couldn't rule him out.

Wissler: I couldn't rule him out, that's, that's what the whole point of stopping him and conducting a traffic stop to get all of his information to be able to rule him out and close the call out.

Masalcas: And then as soon as you made contact with him and he was uncooperative with your commands, with your voice commands, that's when the decision was made to upgrade it to a felony traffic stop.

Wissler: Yes.

Masalcas: Okay, got it. What concerns do you have considering the nature of the call and the fact that at this point he's not cooperating with your commands?

Wissler: At this point, uh, my concerns were that he could be armed, there could be more suspects in there, they all could be armed. Given the nature of my short experience, a lot of people that aren't compliant right away, there's some type of confrontation, so there's already that, that fear that shows that - - the windows are really tinted so we can't safely assume that he is by himself. We can't see if he's armed at all, uh, with how tinted the windows are and how there's only barely any, uh - - the driver's window is down a little bit, so we can't safely see if he's armed or if he's not armed. We can just see that he's in there. And with the door slowly opening and closing, we still can't rule out that he's by himself or that he's not armed, or that he, uh, has anything on him at all, because he's just opening and closing it slowly.

So at that point I knew that he was coherent and he was - - well, he was awake and he could hear me. Uh, it's just when I kept on giving him simple commands to "open the door all the way," uh, "let me see your hands," "open the door with your left hand," "slowly walk out," all those commands, that's when, uh, we started to figure that he wasn't listening at all.

Masalcas: Okay. And one of the commands you just mentioned "slowly walk out," I know you - - did you - - do you recall saying that - - those specific - - that specific command?

Wissler: Yes.

Masalcas: I mean for him to exit?

Wissler: Yeah, so how I started was I kept on saying "open the door with your left hand," "let me see both of your hands,

let me see both of your hands." Uh, I was repeating that over and over, "open the door slowly," "let me see both of your hands." And then when he opened the door all the way and I saw the knife, that's when I changed my, uh - - my commands to "open the door," "drop the knife," "let me see your hands."

And I just kept repeating that over and over again. And once he got out of the car that's when I said, "drop the knife," "turn around," "walk backwards towards me." And I just kept on repeating those. And when he stopped listening that's when I kept on - - I would change my commands again to saying, "drop the knife," "turn around," "get down on the ground." And I would just give him simple, easy commands. And, the whole process, he wasn't listening at all.

Masalcas: And those commands were continuously given by you?

Wissler: Yes.

Masalcas: And prior to him exiting, when you first made that - - the traffic stop, you mentioned that Officer Castillo made the executive decision to - -

Wissler: Mm-hmm.

Masalcas: - - effect a felony traffic stop. At that point did - - was the - - was Officer Castillo vehicle moved at that point?

Wissler: No. So how it - -

Masalcas: Or repositioned?

Wissler: No, I believe, uh, they were already out of the car. Uh, I don't know exactly where his vehicle was, I just know that, uh, I was in the driver seat kind of offset to the green Dodge and there was another vehicle that was parked

behind the Dodge. So he couldn't get up next to us. It wasn't - - they weren't angled together, uh, because we didn't have that access - -

Masalcas: Okay.

Wissler: - - (unintelligible) - -

Masalcas: And that was initially?

Wissler: That was - - because initially it was just going to be just a regular traffic stop that I was going to handle. And then Officer Bermudez and Officer Castillo was just kind of going to be on the passenger side just kind of observing. And then right when I gave the commands of "roll down the windows," he didn't roll the windows at all. I gave him commands a couple times. That's when Officer Castillo made the executive decision for the felony t stop. So all three, Officer Castillo, Officer Garcia and Officer Bermudez are on the passenger side door of my vehicle. And I am just by myself on the driver side.

Masalcas: Okay. And was there any reconfiguring of the vehicles, to your knowledge at any point in time after that?

Wissler: Uh, not to my knowledge.

Masalcas: Okay. So that vehicle - - to the best of your recollection, you recall your vehicle was facing in what direction?

Wissler: My vehicle was facing east.

Masalcas: Okay. And there was no vehicle, no police vehicle north of yours?

Wissler: Uh, not at that time.

Masalcas: Okay.

Wissler: A vehicle came in, uh, when one of the officers put out that there was a knife, because I, I remember just starting at the, uh, driver and see out of the corner of my eye a black and white patrol vehicle come my way and then make a U-turn. Uh, but that wasn't at the initial. The initial was just the two cars. That last car came in at the very end.

Masalcas: Okay. So you remember another car arriving at some point.

Wissler: Uh, yes.

Masalcas: And that car pulled onto your north side.

Wissler: Yes.

Masalcas: Okay. Who did you think was in that car?

Wissler: At that point - -I only knew that it was Officer High at that point, because, like I said, when we were, uh, clearing the building in the beginning he, uh - -

Masalcas: Well, did you see Officer High - -

Wissler: I saw him - -

Masalcas: - - or did you assume?

Wissler: I saw him come out and I could hear him, uh, talking as well.

Masalcas: Okay.

Wissler: Uh - -

Masalcas: All right. Let's talk about Officer Castillo. Did he retrieve any other equipment to deal with the situation at that time?

Wissler: Yes, I could hear him get, uh, the, uh - - his rifle and then he - - and then I heard him say that he'll have the long gun.

Masalcas: Okay.

Wissler: So I knew that he had a long gun and they were formulating some type of arrest team or a plan of getting officers there with less lethal. I knew they were working on that. I wasn't involved in that conversation because my main focus was just keep on giving commands to the driver and focus on him. Because the last thing I want to do is give my attention to them, and I turn around and lose focus on the driver and the driver comes out. And, if he is armed, he starts shooting at us.

So I wasn't involved in any of the kind of tactics. It was more of just giving commands to the driver and then they would periodically, uh, notify me. Like I was giving commands of rolling down the windows, turning the car off. And then they notified me that, okay, let's just conduct it as a felony t stop.

Masalcas: Okay.

Wissler: And that's when I changed commands of "open the door slowly."

Masalcas: And I know you were focused on your role and responsibilities - -

Wissler: Mm-hmm.

Masalcas: - - at that point, intently on the green Charger. The - - did you happen to see where Officer Castillo too up a position? Where did he take up a position (unintelligible)?

Wissler: Yes, he was on - - he was still on the passenger side. So him and Officer Bermudez - -

Masalcas: Or your vehicle?

Wissler: Of my vehicle, yes.

Masalcas: Okay.

Wissler: He stayed on that, on, uh, the passenger side.

Masalcas: Okay. And Officer Garcia and Wissler - - I mean, Bermudez, to your knowledge, where were they?

Wissler: Uh, to my knowledge, all three of the officers were on the passenger side. Uh, once - -

Masalcas: Got it.

Wissler: - - we saw that there was a knife, that's when Officer Garcia came over, because I could hear more clearly that he was next to me. Um, I didn't turn around to look, because my focus was on him, but, uh, clear that his voice because he was getting really louder and he was either, uh, to the left of me or behind the other car. I just knew he wasn't behind me because I would be like moving my arms and he still wasn't there, as I was keeping focus on the driver. So I knew he was to the left of me, or north of me, somewhere. I just didn't know if he had cover or if he was on the other side, but I knew he was to the left of me.

Masalcas: Before Officer Garcia moved to that position, north of you, did that other unit come around and park?

Wissler: It was more simultaneously.

Masalcas: Simultaneous.

Wissler: Yes.

Masalcas: Okay. Okay. [PAUSE] How far would you estimate in feet was the suspect from where he was seated in his vehicle - -

Wissler: Mm-hmm.

Masalcas: - - to where you were standing?

Wissler: Maybe - -

Chulak: At which time? Which time?

Masalcas: At when the - -

Chulak: (Unintelligible) - -

Masalcas: - - suspect was in - - yeah, in his vehicle still before he gets out.

Wissler: Before he gets out?

Masalcas: Yeah.

Wissler: Maybe 15, 20, feet, probably. Uh, yeah, from me - - from the front of my car to his car, probably 15, 20, feet.

Masalcas: Okay.

Wissler: Approximately.

Masalcas: And what could you see from your position?

Wissler: I - - like I said, with his tinted windows, I couldn't see anything at all. I could just - - uh, the window was rolled down a little bit and that's when I could hear that - - or see that he was in there, because I could see him moving. But I couldn't see anything else in the car because of how ti-, - - how dark the tinted windows were.

Masalcas: But at some point he opens the door?

Wissler: As - - and then as I keep on giving him commands, the door slowly opens wider and wider, as he's still not getting out of the car, uh, the door opens and closes, and that's when he opens it a little further than he was during the previous times. And that's when I see blood on his hand, on both of his arms, dripping down, and then a knife in is hands, or some sharp object is in his hands. And then the door closes again.

And that's when I notify, uh, the other officers, that I see blood, that there is a knife. Uh, but he's still doing the same thing. He opens the door a little bit and closes it. It's not - - he's not kicking it, he's just kind of shoving it and then it closes back. And so I can't clearly get a view of what's going on. I just get brief, uh, view of, uh, like in the car and then the door closes again.

Masalcas: But you relay that information to your partners?

Wissler: Yes. I relayed it to my partners and then my partners relayed it to Dispatch. And Dispatch put it over the radio and that's when, uh, the unit, uh, came, uh, Maple - - or came on Oregon Court westbound and then turned around and was north of us.

Masalcas: Okay.

Wissler: So as I say there is a kni-, - - that the suspect has - - driver has a knife, it goes on the radio. And almost

simultaneously I could hear the - - uh, the patrol car coming and making a U-turn. And then now I know that there's officers north of me. So now I'm not by myself. Um, I know that there's officers on the north and that's when Officer Garcia comes as well.

Masalcas: And were you holding your firearm at this time?

Wissler: At this time it was unholstered at a low ready. It wasn't pointed at the car. It was just to my side, just giving him commands. Uh, and then because cars were still coming by and I was just giving him commands. It didn't come up and I didn't point towards the suspect till the last car was cl-, cleared. And at that point he was probably six - - eight to six feet from my vehicle.

Masalcas: Do you recall if you started pointing your handgun in his direction when you saw him open the door with a knife in his hand?

Wissler: No. I didn't point my handgun towards him at all. Uh, I was just focused on giving him commands. Uh, and then I could also see cars, uh, driving westbound on Oregon Court. So I knew that I didn't have a clear, uh, background. Um, even if I did shoot him, it would go - - like there were other, other people so, um, I was still giving him commands, giving him commands. And as he's still walking towards us there's still cars coming westbound on Oregon Court, and then once the last, uh, car, uh, drives past us, that's when I bring my firearm up and I point at him.

Masalcas: Did the suspect cooperate with any of your commands?

Wissler: No.

Masalcas: Did he communicate back to you or your partners verbally or nonverbally in any way?

Wissler: No.

Masalcas: Do you remember him doing anything that might indicate that he heard you or is there any reason why you think he might have heard you?

Wissler: Uh, because, uh - - yes, because, uh, every time I would say to open the door he would make an effort to open the door and then it would close all the way. Uh, and then I would be giving him commands and he was making eye contact with me so I know that was listening to me and looking at me. It wasn't like he was looking at someone else while I was giving commands. He was making - - I was making eye contact (unintelligible) the whole time once he got out of the vehicle and I was giving him commands.

Masalcas: So as you were giving him commands he was looking back, directly back at you?

Wissler: Directly, directly at me.

Masalcas: As he was opening - -

Wissler: As he was - -

Masalcas: - - and shutting the door?

Wissler: Yes, mm-hmm. No, as he - - once he got out of the car.

Masalcas: Okay.

Wissler: Uh, I didn't see him at all. All I could see is when he was opening the door was the blood and, and the knife in his hand. Once he got out of the car, that's when he was making eye contact with me. Uh, and then as he got closer it was going back and forth to me, to Officer Garcia,

back to me. But I always had eye contact with him while I was giving commands.

Masalcas: And the moment when he stepped out of the car and - - was he facing you?

Wissler: He was facing me and that's when I said "drop the knife," "turn around." He slowly turned around and then, uh, turned back. So he made an effort to like turn around and face away from us. Uh, but he stopped halfway and then just made the reverse turn and then just faced us again. So he never fully turned around and we never fully saw his back.

Masalcas: Did you hear anyone put out any radio traffic at that time?

Wissler: Uh, yes, uh, that the ve-, - - the suspect got out of the vehicle and that he was armed with a knife. So I could hear - - because my responsibility wasn't the radio, it was more giving commands and keeping eye contact with him. But I could constantly hear one of the officers communicating with Dispatch and updating our, uh, situation and what was going on.

Masalcas: Okay. And I know you mentioned that he was - - he had a knife in his hand at that time?

Wissler: Yes. What appeared to be a knife or some type of sharp object - -

Masalcas: And - -

Wissler: - - that he had in his hand.

Masalcas: And do you remember which hand that was?

Wissler: It was in his right hand.

Masalcas: Okay. And you mentioned earlier that he was bleeding. Did you know if that was his blood?

Wissler: I couldn't confirm if it was his, his blood or someone else's blood. Uh, I just knew that there was blood all over him. And with how tinted the windows were we couldn't safely say that there wasn't someone bleeding in there. So we, we - - now, at that point, we see blood. Now we have to clear the car and make sure that there's no one in there bleeding as well. Uh - -

Masalcas: I'm sorry, did you - -

Wissler: No, that - - yeah, that was just - -

Masalcas: Okay.

Wissler: Uh, I couldn't confirm it was his blood or someone else's blood. I just knew that there was blood all over him.

Masalcas: Okay. And did you know at the time - - did you think he might still be armed with a gun?

Wissler: Yes. Uh, he wasn't - - I didn't even have - - get the opportunity to tell him to, uh, lift his waistband or check his waistband or anything, to see if he was armed. Uh, he wasn't listening to any of those commands so we couldn't safely, uh, confirm that he wasn't - - he didn't have a firearm. We just knew that he had a knife or some type of sharp object because we would see that clenched in his right hand. Uh, but we could not rule out a gun because we couldn't confirm that he didn't - - he wasn't armed with a gun.

Masalcas: And can you describe the suspect that you saw when he exited the vehicle?

Wissler: Yes, it was a Hispanic male adult, uh, he was, uh, pretty tall and pretty big. Uh, and then with the knife in his hands, the threat of his size as well the knife made, uh - - as he got closer, made me scared for my life as well as my other officers. Because, uh, his height and size alone is pretty intimidating and then also with a knife, and seeing that there's blood all over him and it looks like he's not feeling any pain, all those factors, uh, made me fear for my life. And I was scared for my life as well as my partners because he made - - it looked like he was making a conscious decision to walk either towards me or towards one of my partners.

Um, it wasn't like he was walking straight out of the car. He was walking at an angle towards where the, uh - - my unit, uh, driver's door and then the north unit's passenger door were open. So there was a gap where he could have potentially walked in and harmed, uh, either me or one of the other officers. Uh, but that's what I was looking at, is he was con-, - - it looked like he was making a conscious effort to walk towards an opening, not directly towards a car.

Masalcas: And have you ever - - had you - - at that moment when he first stepped out, had you ever seen him before?

Wissler: No, I've never seen him before.

Masalcas: You had no experience of background on him?

Wissler: I had no experience with him. I had no clue who he was. I didn't know if he owned that car. I just know, uh, prior to that Officer Garcia said he's seen the car driving around but he hasn't interacted with it, uh, he hasn't seen the person at all, he's just seen that car before.

Masalcas: And when you saw him holding the knife could you describe that knife to us?

Wissler: Uh, with his hands being clenched I couldn't see the, uh - - the shaft of it. I could just see something sharp and silver. Uh, and that's when I was still giving him commands "drop the knife, drop the knife." Uh, but I could see that it was something sharp in his hands. Whether it was a knife or something, I just knew it was something that if he got close enough he could potentially stab, cut or kill me or one of my officers - - or one of my, uh - - my partners.

Masalcas: Was he - - he was holding it in his right hand. Was he holding the handle of it?

Wissler: Yes. He was holding the handle so the blade - - uh, the sharp edge, you could see the sharp edge. So he had - - both of his hands were clenched and both of - - he had - - both of his fists were clenched like he was in like a fighting - - ready to fight. And then the knife - - uh, the sharp knife was sticking out. Uh, so it wasn't like he was hiding it or he had the, uh - - the, the sharp side was out.

Masalcas: And was the sharp side, was that pointing in any particular direction?

Wissler: It was pointing down and kind of towards us as he was walking. It wasn't like up towards us, but it was - - he was making an effort to slowly walk towards us and point it towards us.

Masalcas: Okay. So it - -

Wissler: But it wasn't like he was standing up pointing at us. It was at his side, and as he was walking he would lift it up towards us a little bit and then continue walking towards us.

Masalcas: Okay. But it was pointed downward and towards your direction - -

Wissler: Yes.

Masalcas: - - as he was walking.

Wissler: Yes.

Masalcas: Down at his side.

Wissler: Down - - yes.

Masalcas: And at the moment when he started walking towards officers was he walking directly towards you, or was he walking directly towards any particular officer?

Wissler: At first it looked like he was walking directly towards me, because he w-, - - it was like if he would have walked - - got out of his car and walked straight he would have almost ran into the passenger side of my vehicle. He was walking at an angle towards me and then also towards the opening where, uh, Officer Garcia was. The opening between the - - my patrol vehicle and then the patrol vehicle on the north of us. So he made a - - it looked like he made a conscious decision to walk towards an opening, not just straight at a car.

Masalcas: And when did you start telling him to drop the knife?

Wissler: Uh, right when I saw him - - uh, I was giving him commands on "drop the knife," uh, while he was in the car still. So when he opened the door and I saw him bleeding and having the knife, that's when I notified the other officers that he was bleeding, he had a knife. Um, that's when they put it over the radio. And that's when I changed my commands to "drop the knife," "let me see your hands," "slowly open the door." And I would just repeat those, "drop the knife," "let me see your hands," "slowly open the door."

And then as he got out I kept on saying "drop the knife," "turn around," "get down." Just I would always change my commands but "drop the knife" was always in one of the commands that I was giving.

Masalcas: At any point in time did he cooperate with those commands?

Wissler: No, not at all.

Masalcas: As he started walking towards you, what was going on in your mind?

Wissler: Uh, as he was walking towards me the fear of my safety and the other officers' safety exponentially increased as he got closer and closer. Uh, as I was giving him commands I could see that he was making eye contact with me. But his body language was saying that he wanted to fight, because he was very tense, he had - - both of his arms, uh, uh, were clenched like he was ready to fight. Uh, and I could just see that he wasn't listening to any of my commands. But I still had to give him commands, because, as the person in the front, that's my responsibility to give him commands, uh, to also be lethal cover for anyone else that's there.

Um, and as he got closer and closer, I started, uh, to get scared for my life and also, uh, my partner's life, because he was walking towards me and he was also walking towards my partner. Uh, and that's when, as he got closer and closer, I started getting - - I was fearful for my life and my partner's life. Uh, each step he took, uh, I would get - - I was more scared and more scared every single time.

Masalcas: And I know you mentioned that he wasn't listening to you. But did he hear you?

Wissler: Uh, he didn't make any type of body language to confirm that the heard me, but I couldn't - - I can't assume that he could hear me as I was giving him my commands. Uh, I just had to keep on giving them. And I wasn't trying to confuse him. They were just simple and easy commands to give him. That way he - - there wouldn't be any miscommunication.

Masalcas: Were they loud - -

Wissler: They were - -

Masalcas: - - and clear and concise?

Wissler: Yes, they were very loud. They were very clear. And I would constantly re-, - - be repeating them. And then as he got closer and closer that's when other officers were giving commands as well. So there was - - it wasn't just me giving him commands. It was other officers as well giving him clear and concise commands - -

Masalcas: And I know you - -

Wissler: - - on what to do.

Masalcas: And I know you mentioned that he was - - you were (unintelligible) - - you were becoming increasingly more concerned with the suspect's actions as he was closing the gap.

Wissler: Yes.

Masalcas: And at some point you felt in fear for your own safety and your own fear of imminent danger.

Wissler: Yes.

Masalcas: Is that correct?

Wissler: Yes.

Masalcas: But you also mentioned that you feared for your partner. Who was that?

Wissler: That was Officer Garcia. Because I knew he was by me by how I could hear him, because we were both giving him commands on "drop the knife, drop the knife." Uh, but I knew he was somewhere behind me. So, uh, now I'm thinking that I don't know if he has cover or if he's in between both of the, the patrol vehicles and then the driver has a straight line to Officer Garcia.

So now as he's getting closer and closer, that's when the - - I'm getting more and more scared for my life and also Officer Garcia's life, because Officer Garcia could be in a straight line where the suspect can just run towards him, stab him, kill him. And then I'm just right to the, the south of him and he can easily get to me as well.

Masalcas: Okay. So you were just south of - - so Officer Garcia was north of you.

Wissler: He was north of me, yes.

Masalcas: And was he slightly behind you, or - -

Wissler: He was - -

Masalcas: - - in front of you?

Wissler: He was slightly behind me, uh, and north of me. He wasn't in - - no officers were in my view. Uh, all I could see - - I was in the front and I could just see the driver. But as his commands got louder and louder I could tell that he was getting closer and closer to, uh, my area.

Masalcas: And as the suspect continuously walked towards you and other officers, can you describe his - - the speed, the style of walk that he made at that time?

Wissler: Yes, he, he was - - it looked like he was walking with a purpose. He wasn't stumbling, he wasn't walking back and forth. He - - uh, and he didn't stop at all once he started walking. Uh, once he got in front of me and in front of Officer Garcia he constantly walked right towards us. He didn't stop, got down, drop the knife or anything. He just made a constant walk right towards us and he didn't stop at all.

Masalcas: Did he change directions at any point in time?

Wissler: Uh, yes. So he changed directions from where he got out of the car, he walked towards an angle and then started walking towards me. And then he turned and walked slightly north of me, uh, to get in front of Officer Garcia, in between those two car-, - - uh, the two car doors.

Uh, but he didn't stop at all when he was changing directions. He was constantly moving. From the time he got out of the car to the time we fired our weapon, he was constantly moving.

Masalcas: And when he changed directions did you - - did that give you any concerns?

Wissler: Yes. Every time he changed directions it gave me more and more concerns for my safety and Officer Garcia's safety, because he was making an effort to walk towards me and then also towards Officer Garcia.

Masalcas: And at that point you said that you're still continuously giving commands. Did any other officers - - do you recall if any other officers were giving commands at that time?

Wissler: Yes. I, I could - - I hear - - I heard everyone giving commands once he got closer and closer. But I know I was giving commands the whole time and Officer Garcia was giving commands as well.

Masalcas: Do you remember what those were?

Wissler: He was saying "drop the knife, drop the knife," "I don't want to shoot you," "drop the knife." Uh, and that was all towards the end as he got really, really, really close. Uh, because for the majority I was giving commands. And once he got closer and closer to me and Officer Garcia, that's when Officer Garcia started giving commands towards him as well.

Masalcas: At this point in the high risk stop that you guys were making, did you recall at any point in time any officers requesting less lethal options?

Wissler: Uh, I can't - - I do not recall. I did not ask for any because my main focus was talking to the driver. I don't know what their discussion was. I know they were creating a plan as other officers were coming. Uh, but I did not hear a less lethal come out. Because by the time he got out of the car and got towards us there was, uh, the time of how he walked directly towards us, it wouldn't have given any officers enough chance to, uh, load a 40 or take the 40 out, or take your taser out - - or, re-holster their firearm, take the taser out, especially with how close distance we are. Uh, but, to my recollection, I don't know - - I didn't hear anyone bring out a less lethal.

Masalcas: Okay. And your role or responsibility was lethal cover at that point.

Wissler: Yes.

Masalcas: And you were handling your role and responsibility.

Wissler: Yes, sir.

Masalcas: Did you assume that other officers were orchestrating a plan to handle any (unintelligible) options?

Wissler: Yes, sir. So right when we made the - - when Officer Castillo made the conscious decision to turn this into a felony t stop, that's when I heard Officer Castillo, Officer Bermudez and Officer Garcia formulating some type of plan. I couldn't exactly hear what was going on, but I knew other officers around me were trying to formulate some type of arrest team or some type of plan. And my - - but my focus was just on the car. Because, like I said, at that point we never - - we didn't clear and we couldn't see in there at all. So I didn't want to step back and lose sight of the threat at that point, uh, just to be involved in a certain conversation. But I knew conversations were going around of tactics and how to handle it.

Masalcas: Okay. And when the subject got out of the car and started walking towards you, that was all in one continuous movement?

Wissler: Yes, to my - - yes, to my recollection, it was continuously moving. He didn't stop, turn around or get down on the ground or anything. He just constantly walked at kind of an angle towards me, and then straight, and then towards Officer Garcia to the left to me.

Masalcas: And in your opinion at - - during that window, was there any opportunity to utilize or bring up any less lethal options?

Wissler: Uh, I don't think so because of how quickly he was walking towards us. And you could also see that, uh, he was bleeding all over himself. And it looked like it wasn't b-, -

that pain wasn't bothering him at all. So any type of less lethal could have made it worse because at that point it looked like no pain - - and he didn't feel any pain at all. So using any type of taser, less lethal, a 40, would have just escalated the situation, uh, because it just would have made the, the subject even angrier because with all the blood on him and the cuts, as he slowly got closer, um, you could see that he wasn't feeling any pain. Because he wasn't saying "I need help, I need help." He wasn't saying - - he wasn't showing any actions that he was in pain.

Masalcas: Mm-hmm.

Wissler: With his clenched fists and how he was making the conscious decision to walk towards us, and not stop, you could see that the damage on him wasn't bothering him at all and he wasn't feeling any pain.

Masalcas: And I know you mentioned that Officer Garcia told him to drop the knife, he didn't want to have to shoot him. As this - - during this timeframe as the suspect is walking towards you and taking each additional step, are you growing increasingly more concerned with your safety and feeling threatened?

Wissler: Yes. Each step he takes, uh, my - - I'm in fear for my life and my partner's life. Uh, but out of the corner of my eye I can still see cars coming my way. So I don't have a clear - -

Masalcas: Mm-hmm.

Wissler: I have a clear shot of the subject but my background is not clear at all, because there's a car coming my way. So that makes me scared even more because even if he does run towards me then I have a background issues. I could possibly injure someone else. So seeing that car coming into view, it make me feel like I'm kind of helpless,

because I can't do anything because I don't have a clear background. And our whole training shows that you n-, - - you should have - - you need to know what your background and beyond is. And I couldn't consciously pull, uh, the trigger at that point because I consciously saw that my background wasn't clear.

So as he's getting closer and closer, uh, my fear is exponentially growing higher and higher with each step he takes.

Masalcas: And at what distance away was the suspect when you started feeling like there was some sort of imminent danger, or risk of serious bodily injury or death?

Wissler: Uh, I would say maybe, uh, like 10 to 12 feet, uh, because he could easily start running towards us. And even if we're able to get some shots off and shoot him, his momentum could still h-, - - uh, so we were - - we've been taught, we've seen a bunch of videos of where people still - - even though they get shot, they can still keep on walking and still, uh, attack. So we were still, uh - - I was still fearful for my life even if he was getting closer and closer, at a certain distance he would still do some damage to either me or my partner.

Masalcas: And did you fear for your life?

Wissler: Yes. Um, as he got out of the car and he was armed with a knife, and I saw him making a conscious decision to walk towards me, that's when I started becoming in fear for my life, uh, as well as other officers, because now we could see that there was a visible threat.

Before, we were - - uh, we were just in an unknown and I wasn't so much in fear, because we didn't know what was going on, but once we saw that he was - - had the weapon in his hand, and he had a knife in his hand, that's when I

started being in fear of my life and my partner's life. And then as he slowly got out of the car and walked towards me and my partner, that's when my fear increased. Would just go up every time he would take a step towards us.

Masalcas: Okay. And at a certain point do you shoot the suspect?

Wissler: Yes.

Masalcas: Okay. At that moment when you pulled the trigger for the first time, what was going through your mind?

Wissler: I was in fear for my life and my partner, Officer Garcia's, life. Uh, I knew that the suspect was in a very close range, uh, and he was in lunging distance to either stab, cut, or even possibly kill Officer Garcia and then get to me, because we're in a really close proximity. Um, and, uh, as he's slowly walking towards us I hear, um, a shot go off from the right and it hits the suspect and it's - - that doesn't bother him at all. So that's when I fire, uh, twice, because I knew the first shot at him, uh, he was still walking towards us. So I could see that the first shot that happened wasn't going to put the suspect down. So I was still in fear for my life and my partner's life.

Masalcas: And at that moment was he still holding the knife?

Wissler: He was still holding the knife when I fired both times. And he was still holding the knife when I closed the door and backed up. So as he was on the ground on - - leaning up against the, the passenger, uh, tire of the patrol car just north of me, he still had the knife in his hand. So I was giving him commands to still "drop the knife, drop the knife," and he still wasn't listening at all.

Masalcas: Okay. But at that moment when you pulled the trigger for the first time, I know you had mentioned you had already

heard - - well, did the - - did you hear the first round before you fired your first round?

Wissler: Yes.

Masalcas: Okay.

Wissler: Yeah, so I - - he had the knife the whole time as he's walking towards me and Officer Garcia, someone from the right shoots and it hit him, and he still has the knife in his hand and he's still walking towards us. So that's when I had to make the conscious decision to fire my firearm, because that first shot wasn't going to stop him and he's still going to walk towards me and towards my partner as well.

Masalcas: Can you just give me an estimate of the distance he was away from you, or what you would estimate Officer Garcia's location when you heard that first round go off?

Wissler: Six feet maybe. F-, - - seven feet, maybe. He was really close.

Masalcas: The suspect was - -

Wissler: The suspect - -

Masalcas: - - approximately six to seven feet away?

Wissler: Yes, mm-hmm.

Masalcas: And you felt like that was close enough?

Wissler: Yes.

Masalcas: That was lunging distance away?

Wissler: Yes, he was, he was in lunging distance before I fired. Uh, and then, uh, when the first shot came off he was, like I said, probably six or seven feet away from me.

Masalcas: At what point did you pull the trigger? At what distance was he, approximately?

Wissler: Maybe four or five feet away. Uh, he was - -

Masalcas: Okay, so he was still - -

Wissler: He was still - -

Masalcas: - - moving forward?

Wissler: - - moving forward - -

Masalcas: Okay.

Wissler: - - uh, when I fired both shots. He was still walking forward towards us.

Masalcas: Okay. Did you feel like you had any other option at that moment than to shoot the suspect?

Wissler: No, I felt like I had no other option, because by the time I would have holstered and taken out my taser he would have been on top of me or on top of my partner. Uh, so the only option, uh, to save, potentially, my life and my partner's life was to use my firearm because of the distance and the time. There was no time at all and the distance was very minimal.

Masalcas: And what were you aiming at?

Wissler: I was just aiming, uh, center mass. So just his chest, uh, in fear of my life and my partner's life.

Masalcas: And you fired two rounds total?

Wissler: Yes, sir.

Masalcas: Did you assess after the first round - -

Wissler: Uh - -

Masalcas: - - and fire a second round at the suspect?

Wissler: Yes. I shot once and there was a brief pause, and he's still walking towards and I shoot again. It wasn't like I shot, waited a little bit. I knew, with how close he was to us, I didn't have time to, uh, [SUTTERING] address the situation really quickly. So it was a brief, uh, address what was going on, I can see that he was still walking towards us.

Masalcas: Okay. And is that why you fired the second round?

Wissler: Yes, because I knew, uh, he was still walking towards us after the first shot.

Masalcas: And was he still holding the knife?

Wissler: And he still had the knife in his hand.

Masalcas: And that second round you fired, where did you aim that at?

Wissler: Same thing, center mass, just his - - the center mass. And then, after that, that's when the suspect, uh, fell down.

Masalcas: Did you believe - - did you have an opinion on whether or not the second round you fire stopped the threat?

Wissler: Uh, it stopped the initial threat. Uh, when I closed the door and backed up he still had the knife in his hand. So

there was still a threat there. There just wasn't an imminent threat, because he was on the ground too. Uh, he would have had to get up and lunge towards me. Uh, but there was still a threat because he still has, uh, the weapon in his hand.

Masalcas: And prior to shooting the second round did you still feel the same way you did before you shot the first round?

Wissler: I felt, uh, even more fear because after the first round he was still walking towards us. So now it's, uh, just - - like now it's proven in my thought that he's not feeling any pain and that he is making a conscious decision to walk towards me and my partner, Officer Garcia.

Masalcas: Did you hear any other rounds go off, other than the one you initially heard off to your right, or the two rounds that you shot?

Wissler: Uh, not initially. But, after wa-, watching my body cam footage, I saw the, the initial rounds. But, uh, at that point I could just hear the initial ones. And then I was just focused on, uh, the suspect at hand. I wasn't really listening to what else was going on, because he was so close to me and my partner I couldn't waste time hearing what else was going on - -

Masalcas: Why - -

Wissler: - - when the threat was in front of me.

Masalcas: I'm sorry. Why didn't you fire any additional rounds at the suspect?

Wissler: Uh, after I, uh, fired my second, uh, round that's when the suspect, uh, fell down and he was out of view because of my, my driver door. So that's when I backed up, closed the driver door. And that's when I pointed my firearm at

the suspect again, who was on the ground leaning on the patrol car that was just north of me. He still had the, uh, knife in his hand so I was giving him commands on, uh - - to "drop the knife, drop the knife" as other officers were formulating an arrest team.

Masalcas: And I know you had mentioned your backdrop was a concern of yours as the suspect was aggressing on you. And you had mentioned a vehicle passing - -

Wissler: Yes.

Masalcas: - - by. At that point did you fear the - - feel that the backdrop was clear?

Wissler: Yes.

Masalcas: What was your backdrop?

Wissler: My backdrop, uh, at that point once the, uh, car passed, uh, the backdrop was warehouses and cars and trees. There's cars parked on the street. We already cleared prior to this whole incident, uh, that no one is in any of those cars. Um, the only occupied car was the, uh - - the green, uh, Dodge. Uh, and we didn't see anyone walking around. So once that last car, uh, passed, that's when I knew that I had a clear background and there wasn't anyone walking, there wasn't anyone in the warehouse or anything, since we already cleared it out.

Masalcas: And you've already talked about clearing the vehicle, but, other than that, immediately following the shooting what happened and what did you do?

Wissler: Uh, so after, uh, I shot him twice and the subject fell onto the, the patrol car that was just north of me, backed up and, uh, closed the door, uh, my main concern was still him, because he was still in striking distance. And my

focus was just giving him commands to "drop the knife, drop the knife," as other officers are formulating an arrest team.

Uh, as they formulate their arrest team and go up and handcuff the subject, that's when I turned my focus onto the car since we still haven't cleared that car out. So as officers are handcuffing him, rendering aid, my focus is just looking at the car, because the windows are still tinted, we can't see if there's anyone else in the car, if there's any potential weapons or anything.

So that's when my focus goes from the driver to the car now. Because I'm still the front in line at the driver's door and I still have to clear - - we still have to clear that car. So that's when focus goes from the driver - - because we already have a bunch of officers, uh, rendering aid to him, that's when my focus goes to the, uh - - the dr-, - - the car, because if they're still in firing range if there is a potential suspect in that car with, uh, a gun. So that's when I shift my, uh - - my mentality to the car now instead of the driver.

Masalcas: Okay. And after the shooting did you notify a supervisor that you had discharged your firearm?

Wissler: Yes.

Masalcas: Did you give him a public safety statement?

Wissler: Yes.

Masalcas: Okay. Do you want to take a brief break for just a moment, if you don't mind?

Wissler: Yeah. I'd love a break, yeah.

Masalcas: Two minutes. We're going to go off the record. It's 1251.

[WENT OFF OF THE RECORD]

[CAME BACK ON THE RECORD]

Masalcas: Okay, we're going to go back on the record. The time is 1257. We're still in the Bureau Commander's Office. And just here is myself, Sergeant Masalcas, my partner, Sergeant Kent Krumbach, my boss, Lieutenant Michael Chance, and Officer Cody Wissler, along with his attorney, Stephen Chulak.

All right. So just a couple more follow-up questions, Cody, if you don't mind. Just to clarify, and I know we had already brought this up before, but, in terms of the initial call when you were out on Maricopa and Crenshaw your partner tells you that "let's go to the 925 service call" - - I believe you initially said that he was armed and wanted to harm someone. I just want you to try and recall, as best you can, what that call was that you were going to and what the suspect's intent was, based on the initial information you were provided by our FTO.

Wissler: So, basically, initial information, I knew that there was potentially an armed suspect in that area. Uh, and that they are there to potentially harm, uh, an in-, - - specifically some type of specific individual. Uh, so as we're driving there we're, uh - - I'm looking, kind of replaying my what could happen in a bunch of different situations, just knowing that there is a potential armed suspect there, we don't know exactly where he is, uh, there's a phone ping saying that it's by Maple and, uh - - Maple and Oregon Court, but those might not be exact, uh, so could be anywhere in that location, uh, and then as we're getting there, uh - - getting there, that's when we see the two bicyclists.

So now I'm making sure that they're all right. And then we see another one, so now there's a lot of things I've got to take into consideration. Um, and then we make that turn onto Oregon Court and nothing really stands out. Uh, just tell my FTO that I'll look on the north side and he'll look on the south side, and then we'll just see if anything stands out.

Since the drone is already over there and they don't see anything that specifically stands out, uh, we might be able to see someone in a car or someone walking that the drone can't see. Uh, but just in the back of my head I know that there could be potential armed suspect with a firearm or some type of, uh, weapon, uh, in that vicinity. So we have to check every single area before we can clear saying that it could be a false alarm.

So at that point, uh, I'm under the impression that someone is there armed and dangerous, they're looking to harm someone, until I look through every single area and clear that no one is there.

Masalcas: Okay. And did your FTO, did he clarify at any point in time what the caller stated he was armed with?

Wissler: He stated - - he clarified that it was a firearm. Uh, and that was, uh, as we were getting closer. So he just said that there's someone there with - - (unintelligible) thought potentially armed. Um, and then as we get closer and closer he said, oh, "Someone potentially is there with a firearm." Uh, so that's when, uh, we're driving there and the drone operator says that no one is really standing out and they can't see anything. But, uh, we still have to do our due diligence of clearing the whole location, uh, even if the drone can see that nothing is there.

Masalcas: And you heard that he was armed with a firearm. What did you - - and he was intent to harm someone.

Wissler: Mm-hmm.

Masalcas: What did you think he was going to do by harming someone?

Wissler: I, uh, was thinking that he was going to either - - he's going to shoot someone. Uh, because he had - - the, the R-, - - the call came out saying that that's what, uh - - that w-, - - that's what the RP was calling about. So we knew that he had - - potentially had the means and the intent to already do it.

Uh, so we were just looking for someone that had like an opportunity, if there was someone walking by, or there was someone - - that like a business open, if there was like a family gathering or some type of gathering that could kind of narrow our search. But we knew that there was possibly someone in there armed with a firearm and potentially looking to, uh, harm or kill someone in that area.

Masalcas: Okay. And now I'm going to take you back to the traffic stop. When you are giving commands to him, and during that time between when he gets out of the vehicle and you're providing commands to him, does - - did you ever see him make any physical gestures, any - - did he make any kind of indication whatsoever that he did hear, or didn't hear, or would refuse to follow your commands?

Wissler: No. The only thing that I saw was that his - - both of his, uh, fists were clenched and he had a knife in his hand and he wasn't listening to any of my commands. Whether it was "drop the knife," "get out slowly," "turn around," "get out," "open the door with your left hand," any clear and simple command I gave him, he wasn't doing any of them. He didn't follow a single, a single one. Especially with turning around and walking back towards us saying "drop

the knife," none of those actions he did, uh, followed the commands that I was giving him.

Masalcas: Okay. I think you mentioned earlier that you m-, - - did you mention earlier that he might be 11550 or on - - under the influence of drugs? Or did you have that opinion?

Wissler: Uh, no, I just knew that he was - - he just made like a - - he was looking kind of like towards me or through me. Uh, but his body language showed that he was consciously making this effort because he - - like I said, like his - - what really stood out was his fists were really clenched.

And, a lot of people, when they want to fight or want to be confrontational, that's what their go-to is, no matter if they wanted to or not, your body kind of like usually does that. Uh, and that's what stood out because he was - - it looked like he was like kind of making eye contact with me but his body language was showing something that he wanted to, uh, do some type of harm, with how he was really clenching his fists with the knife in his hand.

Masalcas: Okay. And I know you said that - - I mean, I know you didn't - - you don't know if he was under the influence of any narcotics or controlled substances, but did you have an opinion on whether or not he might be?

Wissler: Uh, I didn't have, uh, an opinion. I just knew that, uh, by the looks of it, uh, he just didn't feel any pain, with how much blood was on him. Uh, the only thing that I was thinking about was that he wasn't feeling any pain at all. Um, a reasonable person that was bleeding would come out and say "I need help, I need help."

Um, even if they're trying to kill themselves or do something, they end up saying like "I need help." Um, and he just wasn't. He was acting like the - - there was no blood on him. He was acting like everything was normal to

him. So he wasn't giving any type of saying that he was feeling anything, or he needed help or anything at all. He was just making a conscious decision to walk toward with, uh, a sharp knife.

Masalcas: Okay. Okay. Cody, looking back, is there anything you would approach differently, if you could handle this differently, if given the chance?

Wissler: No. I would have handled it the same. Uh, like I said, uh, we identified - - identified us, that "This is the Torrance Police Department. Turn off your car. Roll down your windows." Um, I said that very clearly multiple times. That's when Officer Castillo made the conscious decision to do a felony t stop. And I constantly made those commands. Uh, we staged Fire at the location once we saw that he was bloody. We had additional resources come once we saw that he was armed. Uh, and my focus was just giving him commands, uh, and not losing sight of him, since I was the front - - person in the front.

Um, as he got closer and closer, uh, he posed a bigger threat to me and my, and my partner, Officer Garcia. And, uh, once I had a clear background and all the cars (unintelligible), that's when I, uh - - my firearm is at a low ready and that's when I came on target to the subject. And, and as he's walking towards me I'm still giving him commands "drop the knife, drop the knife."

And when I see, uh, one shot hit him, uh, my concern for my safety and my other partner's safety increases even more because now he's showing that he really doesn't feel any pain at all. So that's when, uh, with the distance that he was in, he was just in lunging distance to stab my partner, potentially kill him, or severely hurt him, and that's when I had to discharge my firearm.

The first one, he was still walking towards us so that's when I had to fire him again. And then after the second one he fell down and he was still a threat.

So, all those steps leading up, I feel like I was giving him clear and concise commands on what to do. Uh, I wasn't stuttering my words. I wasn't trying to trick him. I wasn't trying to give long extended sentences and confuse him. Uh, I was doing everything in my best to avoid that situation and I felt like he was just making a conscious decision to come toward us no matter what. I said what other officers said.

Masalcas: Okay. Is there anything about this incident that we haven't discussed or you believe we should know about? Is there any statement you'd like to add, alter or change for the record?

Wissler: No.

Masalcas: Okay. This interview has ended. And the time is 1306 hours.

[END OF INTERVIEW]