# "EXHIBIT H"

Masalcas: I'm on the record. Okay, today is Monday, December 9, 2024. And the time is 1108 hours. We're in the Bureau Commander's Conference Room in the Torrance Police Department.

My name is Sergeant Masalcas. I'll be conducting an interview today of Officer Arturo Castillo, who is in the office with me. Also in the office today is my partner, Sergeant Kent Krumbach, my supervisor, Lieutenant Michael Chance, as an observer only, and Officer Castilo's attorney, Stephen Chulak.

This interview regards an officer-involved shooting that occurred on December 2, 2024 at approximately 1701 hours in the 2900 Block of Oregon Court in the city of Torrance, and was assigned DR Number 240045785, in which Complainant Lieutenant Charlie alleged misconduct against Officer Saldivar related to a violation of policy related to a use of force incident.

The alleged misconduct is related to the booking detention of three juvenile offenders at the Torrance Police Juvenile Holding Area on August 2, 2023. The incident is documented under Torrance DR 230028788.

The investigation is under the control, direction and command of Captain Titiriga.

You have the right to representation of your choice present with you today during this interview. And you have chosen to have Mr. Chulak represent you. Is that correct?

Castillo: Yes.

Masalcas: And, pursuant to Government Code Section 3303(g), I'm recording this interview. You have the right to record this interview. You are choosing to have your attorney, Mr. Chulak, record this interview. Is that correct?

Castillo: Yes.

Chulak: Yes, sir.

Masalcas: To ensure a full, fair and effective investigation in this matter, and in order to preserve public confidence in the Torrance Police Department's ability to operate effectively, during the pendency of this investigation you are directed not to discuss this investigation with anyone, other than me, your union representative and/or legal counsel.

This order shall automatically be lifted at the conclusion of the investigation, when the need for accurate collection of information from suspects - - from subjects and witnesses will abate.

This order is not intended to prevent you from engaging in protected concerted activity under the Meyers-Milias-Brown Act. You may continue to engage in protected concerted activity under the act, including, but not limited to, discussing any of any other aspects of your employment and work conditions with others, including coworkers.

If you're unsure whether discussing certain issues with others would violate this order, you are encouraged to consult with your union representatives and/or legal counsel who may advise you. You may also contact me with any questions. Do you understand?

Castillo: Yes, sir.

Masalcas: I'm obligated by Government Code Section 3303(h) to advise you of your constitutional rights. Please be advised that you have the right to remain silent. Anything you say may be used against you in court. You have the right to

an attorney before and during questioning and at all times. Do you understand each of these rights?

Castillo: Yes, sir.

Masalcas: And do you, nonetheless, wish to waive these rights, including your right to remain silent and speak to me now?

Castillo: No.

Masalcas: Although you have lawfully refused to waive your constitutional rights, please be advised you are hereby ordered to answer all my questions about this investigation completely and truthfully.

Any refusal to do so, including, but not limited to, intentionally providing false information, or withholding material information, may be deemed insubordination and result in disciplinary action against you, up to and including termination.

Therefore, your answers in response to my questions cannot be used against you in a subsequent criminal proceeding. Do you understand?

Castillo: Yes.

Masalcas: And, prior to proceeding with this interview, do you have any questions regarding the admonitions that I have read to you?

Castillo: No.

Masalcas: Okay.

Chulak: Before you proceed, Sergeant, just to reiterate, as a Supervisor with the Department, and pursuant to the admonition you just provided Officer Castillo, are we

correct in understanding, then, that if he were to refuse to answer your questions this afternoon, he could be subject to discipline? Is that correct?

Masalcas: That's correct.

Chulak: That discipline could potentially be as much as discharge or removal from office?

Masalcas: Yes.

Chulak: In other words, the statement you intend to obtain this afternoon will be used for administrative purposes and administrative purposes only? Is that also correct?

Masalcas: Yes.

Chulak: And, lastly, are we correct in understanding that the statement you obtain will not be used in any matter that is inconsistent with the Public Safety Officers Procedural Bill of Rights Act?

Masalcas: That's my understanding, yes.

Chulak: I'd like to make it clear on the record, then, that, for those reason and those reasons alone, Officer Castillo will be answering your questions this afternoon. I want to be clear that he's not waiving any of his constitutional rights. However, he will completely and fully cooperate with your administrative investigation arising out of this incident because case law and department policy requires him to do so.

And, thank you, sir. And as far as any other questions, I have none. I will note for the record that prior to today's interview you did respond to my request (unintelligible) regarding the nature and the scope of today's interview, as well as responding to our request for pre-interview

disclosures. So I have nothing else at this time. Thank you, sir.

Masalcas: Okay. Thank you, sir.

Okay, Art, I'm going to start today's interview by just asking you some general background questions, and then about your equipment and assignments during the incident that took place on December 2, 2024. After that I'll give you an opportunity to summarize what happened, in your own words.

But, before we dive into all those details, can you just start off by telling us your assignment that day and your call sign on the night of the incident?

Castillo: Yes, that day I was, uh, working Uniform Patrol for the City of Torrance and I was assigned as 9-"Adam"-23, along with my partner, uh, Officer Bermudez.

Masalcas: And were you working Full Uniform Patrol?

Castillo: Yes, sir.

Masalcas: And what police equipment was on your person at that time?

Castillo: Well, my department-issued equipment was on me and, uh - - and my department-issued rifle as well.

Masalcas: And Sam Brown?

Castillo: Uh, yes.

Masalcas: What equipment did you have on your Sam Brown?

Castillo: On there my firearm, magazine and, uh, handcuffs, along with a, uh, tactical dump pouch is case for, uh, any other

purposes. Then I had my, uh, exterior, uh, vest which has, uh, more handcuffs, less lethal options, such as my taser, OC spray.

Masalcas: Okay. And were you driving a marked Black and White Patrol in the evening?

Castillo: Yes.

Masalcas: And did you have a partner?

Castillo: Yes.

Masalcas: And who was that?

Castillo: Officer Bermudez.

Masalcas: Any idea what Officer Bermudez' tenure is on the job, at the time of the shooting?

Castillo: That was his first day of Patrol but prior to that he had completed the, uh, Sheriff's Academy, which is approximately fi-, - - uh, five months.

Masalcas: Okay. And, if you don't mind telling us your tenure on the job, training and experience?

Castillo: Yes. So I am completing my fifth year overall as a police officer. Uh, prior experience was with Los Angeles Police Department for over a year and three months. With - - then, now with Torrance, I am completing my fourth year here. Currently, again, assigned to Patrol and also as Field Training Officer.

Masalcas: And were you a Field Training Officer on the night of the incident?

Castillo: Yes, sir.

Masalcas: And approximately how many years do you have as a sworn police officer?

Castillo: Approximately five years.

Masalcas: On the night of the incident were you wearing a body-worn camera?

Castillo: Yes.

Masalcas: Okay. And where is that positioned on your uniform?

Castillo: That is mounted on my left side of my exterior vest. On my, on my left pec area.

Masalcas: Where you - - like above your heart?

Castillo: Yes.

Masalcas: Okay. And did you consider this incident a threshold incident?

Castillo: Yes, based off the nature that was provided to us by, uh, Torrance Communications.

Masalcas: And was your body-worn camera charged and fully operational at the time of the incident?

Castillo: Yes, sir.

Masalcas: And was your in-dash camera on your patrol vehicle activated during the incident?

Castillo: During the incident, I do not recall.

Masalcas: Okay. Did you activate your body-worn camera manually?

Castillo: Yes.

Masalcas: Prior to this interview did you have an opportunity to review your body-worn camera?

Castillo: Yes.

Masalcas: Did you review any other video camera footage regarding this incident prior to this interview today?

Castillo: Yes. The other opportunity I had was to review the, uh, in-dash camera from Officer Garcia and Officer Wissler's patrol vehicle.

Masalcas: Were there any other officers that were involved in this incident?

Castillo: Yes.

Masalcas: Who is that?

Castillo: Officer Garcia and Officer Wissler. Uh, I believe they were assigned 9-"Adam"-24 that day.

Masalcas: Was this call initially assigned to you and your partner?

Castillo: It was, uh, provided to us first, yes.

Masalcas: And Officer Garcia and Officer Wissler were a assisting unit?

Castillo: Primarily, yes. However, we were dispatched first because we were the only free unit while Officer Garcia and Officer Wissler were tied up on another call. But, prior to going in route they, uh, self-dispatched themselves to that call, due to the fact that it was in their area that they normally patrol and, and are assigned to.

Masalcas: And what officers, to your knowledge, were present during the shooting?

Castillo: Besides Officer Garcia and Officer, uh, Wissler, I believe it was Officer Choy and Officer High who were assigned to 9-"Adam"-21.

Masalcas: And why did they arrive? Were they dispatched? Were they requested?

Castillo: I believe they were dispatched, uh, to assist us prior to, uh, arriving there.

Masalcas: Okay. And some firearm questions. At some point during the incident that took place on December 2, 2024, did you discharge your department-issued firearm?

Castillo: Yes.

Masalcas: And do you know the make, model and caliber of that firearm?

Castillo: Yes. The firearm is a Colt M4 Commando, uh, short barrel, uh, rifle, which is a 5.56 caliber.

Masalcas: And was that the firearm that you discharged during this incident?

Castillo: Yes.

Masalcas: To your knowledge, was that firearm altered in any way prior to this incident?

Castillo: No, just that the, uh, the department-issued equip-, equipment that I will get from my team, which will be the SWAT team.

Masalcas: Okay.

Castillo: So they have a suppressor on there, sir.

Masalcas: Okay. But that's nothing that you altered personally, it's an item that would be issued to the SWAT team or issued from the department?

Castillo: Yes.

Masalcas: Okay. Do you know how many rounds were loaded in your firearm, the 5.56, at the time of the shooting?

Castillo: Approximately 28 rounds.

Masalcas: And during the shooting did you reload at any time?

Castillo: No.

Masalcas: Was the ammunition that you used during the shooting, was that department-issued?

Castillo: Yes.

Masalcas: And after the shooting did you end up surrendering the firearm that you used or you discharged to anyone?

Castillo: Yes.

Masalcas: And who is that?

Castillo: To Detectives.

Masalcas: Okay. Okay. Art, I'm going to give you an opportunity right now to kind of give an overall summary. At this point I'm just going to ask that you tell us what happened from the moment you got the call to its very conclusion. We'll give you all the time you need. Feel free to be as detailed as you want. We will not interrupt you. And when you're

done I'll ask you some follow-up questions, taking you step by step through the incident.

So, if you don't mind just telling us what you recall about the entire incident, in your own words, and just start from the beginning. Whenever you're ready.

Castillo: Okay. So it was, uh, December 2nd, Monday. Again, like I said, I was working 9-"Adam"-23 with my, uh, trainee, Officer Bermudez. Approximately 1655 hours, uh, we were dispatched to a suspicious circumstances at the area of Oregon and Maple.

Uh, Torrance Communications advised us that the, uh - - there was a man with a gun in that area. And we got a second broadcast stated that, that the person calling is the man with the gun and that he wants to shoot somebody. And that's the only information we got at that time.

So we were dispatched first. I talked to my trainee about how we will, uh, assess the situation tactically and how to approach it. So I made a - - uh, we requested an additional unit to assist us with it, based off the nature of the call. And also, uh, drones in order to get a visual, uh, view of that area, since it was pretty close to the, uh, station.

Uh, we responded from Hawthorne and Fashion. Uh, while in route to there, uh, I guess Torrance Communications began to, uh, trace back this phone number that called because we did not get any other callers. That was the only information we got. The, uh, line disconnected so they began to work that phone number and ended up getting a name of the owner of that phone number. And they provided us that information.

I can't recall the full name correctly, but, uh, they tried calling him back numerous times and there was no

answer. All they knew, it was in the area of, uh, Maple and Oregon.

While in route there, uh, Officer Garcia and Officer, uh, Wissler, uh, dispatched themselves and began to respond there as well. And they were actually closer, uh, to that location than us. So they ended up arriving at scene before us, uh, and began to start searching the area. Uh, they didn't search - - uh, they - - I'm sorry, they searched the area immediately, didn't see anything, uh, suspicious.

Uh, and we arrived as well, began to search the area also. Uh, by then Torrance Communications advised us that this person possibly worked in that area in a small business there. Uh, it was a electric scooter business, if I recall correctly. They gave us the address which, uh, I do not know exactly the numbers. It might be, uh - - if it's not 2709, 2909, but I cannot call - - uh, recall exactly what number it was.

So, uh, while we were there we did observe a green Dodge Charger. At that moment Officer Garcia had advised like, hey, he has seen this vehicle in this area and it must be to one of the, uh, employees around there in the area. So we drove by - - uh, bypassed, and began to still search, uh, while TPD Communications attempted to contact the, uh, reporting party to gather more information, or to see where the location was.

Uh, ultimately we went - - uh, me and my partner went to the rear of the business where this, uh, old scooter shop used to be. I saw another, uh, business owner there. I asked him, like, "Hey, sir, do you know if, uh, this business is still here?" He advised me that they no longer work at - - they're no longer in this complex and they moved out about a week ago.

So the - - at that point I advised, uh, Communications, "Hey, this business is no longer here." And then, uh, Officer Garcia said like - - oh, I'm sorry, prior to that, uh, (unintelligible) advised us the driver of the Dodge Charger or the occupant of the Dodge Charger actually began to open the door and, uh, and close it, opening and closing it a couple of times.

So Officer Garcia and his trainee decided to, uh - - to go and contact the occupant of that vehicle. It was a green Dodge Charger. Uh, and then, uh, me and my partner went ahead and assist.

So as we approached Officer Garcia and his trainee, they actually, uh, positioned their vehicle two car lengths away. Because there was a separate, uh, silver Nissan Altima that was parked directly behind the, uh, green Dodge Charger. And then Officer Garcia and Wissler, they positioned their vehicle behind the - - that Nissan Altima.

And then I positioned my vehicle off to the, uh, right side which will be the passenger side of Officer Garcia's vehicle, in order to assist them. Uh, at that moment they began to make callouts and, uh, try to see if they could contact this driver or, uh - - and at that point I'm trying to see from the distance, uh, to see if we could get a better visual on this vehicle. Because the vehicle had heavy window tint and I was - - uh, my vision was obscured. I couldn't see anything inside the vehicle.

So from there, uh, the occupant actually began to open the door again. He would, uh, slightly open it and then slightly close it. And he did that a couple of times. And I, uh - - I continued to relay that information to, uh, Communications.

Uh, at that point I began to fear that something wasn't right here, because, uh, any normal person, or reasonable

person, would be able to hear our commands, especially if they're able to open the door for a couple of seconds. So that kind of drew, uh, some concerns to me, because, I know if this person is related to our armed subject, by doing that he is possibly gaging us and trying to see our positions and, and possibly, you know, discharge his firearm. Because initially that's what we were responding to.

So at that moment I, uh - - I told Officer Garcia to turn on his forward-facing blue lights because initially they were just trying to do a consensual encounter. But, based off that nature, I, I advised him, "Let's turn those on in case the - - and initiate a detention on this, because it could possibly be related to our initial, uh, call for service."

From there I went and retrieved my, uh, department-issued, uh, rifle from the rear of my patrol vehicle. And I took over, uh, Officer Garcia's position which was the front passenger of his patrol vehicle. I told Officer Garcia like, hey, uh, uh, I have a long rifle, based on the fact that this person is possibly armed with a handgun, has good concealment behind the, uh - - the pillar of his vehicle, and we had a reasonable amount of distance, uh, I felt that was possibly the best tool in this situation in case this subject comes out and wants to have - - and wants to discharge his firearm at us. You know, it pretty much increased my fear factor in this situation. So I told Officer Garcia, hey, I'll replace him and I will go and for him to start quarterbacking this whole situation.

Officer Wissler continued to give, uh, some orders toe was the occupant of that vehicle to exit the car. And, again he wasn't, uh, obeying those orders. By then I, uh - - uh, I updated our Communications, and told them, "Hey, he's not obeying orders, uh, at that - - uh, at that time."

So this continued on for a couple minutes and then I finally observed that the, uh, occupant was able to push open the door a good threshold. And I was able to observe his hands. I saw both hands were, uh, bleeding profusely. Uh, left hand was - - had more blood on and his right hand had dry blood.

At that point I, uh, put it over radio, "Hey, he's bleeding profusely from his hands. Uh, could we get TFD to start staging, uh, b-, - - in case he might need some medical help?" Uh, and then he did open the vehicle door the entire length and I - - again we, we observed that he was bleeding from the hands, possibly from the wrist. And then I also saw that he had in his right hand a knife and he had it clenched. And I was only able to observe the, uh - - the silver blade. I wasn't ablet to observe the hand or to see how, uh, the length of the blade was.

At that point I, uh, put - - went over the air again, I said, "Let's upgrade this to a backup. I don't think we have enough…" - - uh, and that mentality, based off of that, what I observed, I didn't think we had enough officers to go ahead and deal with such situation. So I requested a backup in order to get more units to us. Again I told him that the subject is bleeding from the wrist and to continue to get the fire department to stage and - - or get as close as possible. Because, based on the blood that I observed, him bleeding profusely from the left wrist, and dry blood on his right hand, uh, it drew my fear that, hey, he either committed a crime or is there somebody possibly down inside the vehicle as well. And see like he was hurt, harming himself in that situation.

Uh, at that point I do recall hearing Officer Garcia put it over the radio, "The next unit that comes up, could you get a 40 millimeter?" which is one of our less lethal options. Due to the nature of it I thought it was a great thing to start raising over the radio so units could know,

like, we're going to need other options here. Uh, so the occupant got out of the vehicle. A Hispanic male adult, uh, black baggy shirt with, uh, gray shorts, baggy shorts, as well.

I saw the subject had the, uh, knife pointed towards our direction off to a side, which actually continued to draw - - uh, draw more fear towards me. Because, when he exited the vehicle he just had a thousand mile stare and was shaking his head. Because I know Officer, uh, Wissler began to give him orders to drop the knife and to get him down on the ground. And the, uh, suspect at that point, uh, began to shake his head and began to take more steps towards us.

Uh, he's shaking his head, like he was not obeying orders and did not want to, uh, obey our commands or actually, uh, cooperate with us. At that point he began to close the distance, uh, closer to us, began to take a couple steps. I did observe that he was looking towards everybody's directions to see the number of officers there. And I know in some situations like that, uh, suspects tend to square up other officers and see who might be the person they could attack first in that situation. Because, uh, officers began - - continued to give him commands and yet he continued to, uh, shake his head and, and disobey us. He had - - his demeanor was that he wanted to, to hurt us in that situation.

That point, uh, I would say he probably, within approximately seven to eight feet away from our patrol vehicles, I saw that Officer Wissler's commands weren't, uh, working with the subject or he was just disobeying them. I also did hear Officer Garcia telling him, like, "Hey, we are just trying to help you. We're not trying to hurt you, we're trying to help you out." Yet the suspect continued to, uh, advance forward towards us.

In that situation I still requested for other units that were there to, uh, get up the 40 millimeter launcher as another tool to go ahead and hopefully deescalate the situation. Because, obviously within that close proximity our, uh - - our commands, our words, you know, our concern for his safety, was not working. It was not deescalating.

So he continued to advance. And at that point I began to give him commands as well to "drop the knife, drop it." Uh, and he still did not do so. Uh, between approximately three feet I screamed out to my partners one more time, "Forty, forty, forty. Come on." Like, uh, "Somebody, please deploy the 40." Like, "We need this tool now. Because he's continuing to close the distance and had the knife clenched to his right hand still.

And, uh, he got in between both our vehicles because, uh, prior to that Officer Garcia repositioned my vehicle to the left side of his car which is one of the tactics that we use during a felony stop. Uh, I knew that he was possibly on the passenger side of my patrol vehicle. And then it was Officer Wissl-, Wissler who was on the driver side of his patrol vehicle. And then it was me on the passenger side of Officer Wissler's vehicle.

The suspect got close. I saw, I saw the suspect actually reach the threshold of the front bumper of our vehicle. Again, Officer Wissler and Officer Garcia giving him commands to get down on the ground, to which the suspect disobeyed and did not want to cooperate with us.

That quickly escalated my fear for our safety because at that point he was approximately three feet away from Officer Wissler and Officer Garcia. Which at that point my biggest, uh, fear in this was that he was within the lunging distance to possibly kill, stab or, or hurt my partner officers.

That moment, uh, I disengaged the safety from my long rifle and did a series of three rounds to the suspect to center mass. Uh, once the, uh, suspect, uh, stopped because, uh, he was no longer a threat, I, uh, disengaged from any fire and, uh, I pretty much, uh, observed everything that was going on, on scene. Uh, the reason I had to do that was because, again, for the - - my safety and the fear of my partners getting hurt. Due to the close proximity, uh, I had to discharge my firearm, uh, in center mass of the subject to stop the immediate threat in that situation.

From there other officers began to, uh, start coming up with a tactical plan to go ahead and apprehend this suspect because he was still a threat. Even though he was down on the ground, he still had the knife on his hand.

I drew my attention back to the green Dodge Charger because, based off my initial observations, I didn't know if, uh, there was anybody else inside the vehicle. If there was any other occupants or a possible down victim inside.

Uh, so I drew my attention there but then quickly realized I will be more useful in apprehending the suspect, so I had another officer who was Officer Choy, to replace me from my position. Uh, I repositioned myself back to the rear of the patrol unit to get better observation on the, uh, suspect.

I was able to gather an arrest team and, uh, came up with a plan in order to safely apprehend this, uh, suspect. I believe it was Officer Choy again. And then, uh, Officer Berumdez and I, we, uh, closed distance, disarmed the, uh, suspect from the knife and, uh, safely placed him in handcuffs from the front.

Immediately after that I told my partner officers to start administering first aid. So I explained to them, "Look for

any entry wounds and exit wounds on his body, in case of that like once you do locate those entry wounds or exit wounds, go ahead and start giving direct pressure. We, we could at least administer first aid from here until the fire department arrives."

Once those two officers were dealing with the suspect and giving him first aid, I re-, - - uh, I gave ahead and, uh, I drew my attention back to the Dodge Charger because that was still a threat that we had to contend to. Got another - - uh, partner officers to go ahead and assist me. And we went ahead and stared approaching the car.

I, uh, cleared the front driver door of the vehicle where the suspected had exit-, - - originally exited from. And then, uh, the partner officers went ahead and cleared the re-, - - the rest of the car.

Inside the vehicle I did observe large amounts of blood throughout the, uh, front driver door, the floorboard, center console and on the seat. Uh, once that was all done we made the scene safe, then we immediately requested the fire department to go ahead and start, uh, coming in to go ahead and attend to the down suspect.

Masalcas: Okay. At this point I'm just going to basically ask some follow-up questions. I'll start from the very beginning, once again from the initial call, and kind of walk our way through some clarifying questions and give you an opportunity to recall anything further.

Is there anything else you recall knowing prior to arriving on scene regarding the suspect, suspect vehicle?

Castillo: No. We were not provided a, uh, description initially of, uh, the suspect. We were just, uh - - or a vehicle. It just said that he's in the area at that intersection. Uh, TPD Commun-, - - like I said, TPD Communications, while they

did a - - uh, I think it was the, uh, OIC, the Officer In Charge, he did his research and he discovered who this person was. Like I said, I think it was, uh, Leo or, or something like that. That's all the information I, I got. Uh, he did say, "Hey, uh, look at your department phone."

But I did not look at my department phone because, based on the nature of this, I wanted to make sure that I am - - my eyes were fully aware of my surroundings and that. So I don't know if he, he - - if he provided, at that time, a picture of this person. That's all I could recall.

Masalcas: Did he, at that point, or the dispatcher, relay any description of the suspect who they thought owned the phone? Or anything - -

Castillo: Yes, if I recall correctly, uh, all - - uh, all I remember was Hispanic male adult. I don't remember the rest of the descriptors.

Masalcas: And while you were in route to that call - - I know you mentioned earlier you asked for a drone and an extra unit and you did some tactical preparations going into this with your partner. Were there any other resources that you or your partner asked for?

Castillo: [PAUSE] Uh, while in route, no. I just recall that.

Masalcas: Do you recall ever asking for - - well, you asked for an additional unit and then that unit was Officer Garcia and Officer Wissler?

Castillo: No, I don't believe so. I think the original unit was 9-"Adam"-21, Officer Kevin High and then, uh, Officer Choy.

Masalcas: Okay. But they didn't arrive till after - -

Castillo: After, yes.

Masalcas: - - Officer Garcia and Officer Wissler - -

Castillo: Yes.

Masalcas: - - showed up. Okay. And Officer Wissler and Officer Garcia, they showed up and arrived. Do you know if that was a training team as well?

Castillo: Yes, they were.

Masalcas: And do you know what the tenure of Officer Garcia and his trainee were at the time, approximately?

Castillo: I believe, Officer Garcia, approximately 20 years. Officer Wissler was on his third month of our training program, but prior to that he had just completed the Sheriff's Academy which was approximately five months of, of police training.

Masalcas: Okay. And, based on all the facts you knew going into this call before you arrived, did you think that there - - that you were dealing with a homicidal suspect or a suicidal suspect?

Castillo: Possibly s-, - - uh, homicidal, based on the fact that our Communications told us that he wants to shot somebody.

Masalcas: Did you have any information, whatsoever, prior to arrival, that would suggest the subject was possibly suicidal?

Castillo: Not to my knowledge.

Masalcas: Okay. And in terms of your vehicle, who was driving?

Castillo: I was.

Masalcas: You were the driver? And when you arrived on scene, I know you mentioned you and Officer Garcia and Officer Wissler, and Officer Bermudez is your partner, and you were driving around in the area checking for the suspect, correct?

Castillo: Yes.

Masalcas: And you had seen the - - you had noticed the green Charger, but you didn't take note of it at that point. You didn't necessarily think it was the suspect at that point?

Castillo: Initially I did not think it was involved.

Masalcas: But you mentioned earlier at some point Officer Garcia advised you that, hey, I've seen this vehicle before. Did that lend towards you believing it was or was not the suspect vehicle at that time?

Castillo: At that time, no.

Masalcas: Okay. But then later you received more information from the drone team indicating the door is opening and shutting.

Castillo: Yes.

Masalcas: And did that information and, based on the other circumstances of you checking the area and speaking with the owner of the business that the alleged suspect worked for, lend towards this possibly being the vehicle that contained the suspect?

Castillo: Possibly.

Masalcas: Once you located the suspect vehicle can you just kind of describe the environment? And what I'm asking you to describe at this time, if you don't mind just kind of giving

us the direction the vehicles are facing, and kind of where the initial vehicles were.

Castillo: Okay. So it was at the - - just east of the intersection on the south curbline. The vehicle was parked facing eastbound. It was actually the second vehicle just east of that intersection. Uh, and that street, Oregon, uh, it turns into a cul-de-sac where there's a bunch of our houses and small businesses there. So, uh, the vehicle was facing towards the end of the cul-de-sac.

Masalcas: And at some point - - well, actually, before we get into that, did you see anybody standing by the vehicle, standing outside the vehicle?

Castillo: When we ori-, originally arrived, no, there was no movement coming from that vehicle. Uh, or I didn't - - did I see anybody outside of it as well.

Masalcas: So you were - - and I know you mentioned it had heavy window tint.

Castillo: Yes.

Masalcas: You were unable to notice anyone was inside the vehicle at that time.

Castillo: Of course.

Masalcas: Okay. So you have a vehicle that you know - - well, let me ask you this. What did Garcia tell you about knowing something about this vehicle?

Castillo: He just said that he sees it drive around in the area. So kind of drew my conclusion that this person drives in this area, might work in this area, because there's a bunch of small businesses there.

Masalcas: Okay. So it's known to frequent the area?

Castillo: Yes.

Masalcas: And did he say that over the air? Or did he verbalize that to you in person car to car?

Castillo: He, he put that over the air.

Masalcas: Okay. And prior to contacting the suspect, did you ever see him standing outside the vehicle?

Castillo: No.

Masalcas: Walking around?

Castillo: No.

Masalcas: Okay. You mind telling me briefly what you could describe as the weather conditions and the lighting conditions that night?

Castillo: The weather was clear. It was still light. Uh, there was - - I wouldn't think that there was any obstructions that might, uh, intervene during our investigation.

Masalcas: And what about during the time of the shooting, I'm assuming the weather conditions were similar?

Castillo: Yes.

Masalcas: What about the lighting conditions?

Castillo: Lighting conditions were still good.

Masalcas: And at what point did you first take note of the suspect vehicle, the green Charger, and realize, hey, this is

possibly the suspect inside, or possibly there is someone inside and this is possibly our suspect?

Castillo: Yes, so, to (unintelligible), it was during the contact that Officer Wissler and Officer Garcia were trying to do, just to, uh, talk to this individual to see if maybe he's seen anything in the area. The minute I started seeing that he was opening and closing the door and the heavy window tint, uh, and then based off my training and experience, knowing like any reasonable person would be able to cooperate with a police officer, who were just trying to ask questions.

That's what drew my fear aspect on the situation, that he was opening and closing the door and possibly gaging our locations and seeing if he want - - if this was the person that was armed with the firearm, he could start, uh, discharging or firing rounds toward me and my partner officers.

Masalcas: When you decided to make contact with the suspect vehicle, where was your vehicle and where was Officer Garcia's vehicle?

Castillo: Okay. So my vehicle was parked directly behind the silver Nissan Altima that was behind the Dodge, green, Charger. And Officer Garcia, his vehicle were offset to my left.

Masalcas: Which would be north of your vehicle?

Castillo: Just north of, yes.

Masalcas: And where, exactly, were you when you decided that you were going to make contact with the suspect vehicle? Were you in the industrial area? On the street? Did you communicate that with the other officers at all?

Castillo: Yeah. So where I was at I actually was still behind the Nissan Altima, trying to get a better visual of the vehicle. Uh, at that point, once I saw my observations and getting that reasonable suspicion that this person might be involved, I actually re-, - - uh, took over Officer Garcia's position, which was behind his patrol - - uh, passenger patrol door, and I had - - I just took over his position there.

From there I told my, uh, partner officer to assist Officer Garcia with whatever necessary tools he might need for, uh - - to deescalate the situation.

Masalcas: And the - - you mentioned that it had heavy window tint. Were the windows up or down?

Castillo: They were, uh, up, closed.

Masalcas: All of them?

Castillo: All of them.

Masalcas: And the doors were closed?

Castillo: Yes. Initially, yes.

Masalcas: But you had received this information from the drone team - -

Castillo: Yes.

Masalcas: - - that he was opening and shutting the door.

Castillo: Yes.

Masalcas: And at that time you hadn't seen him open the door or shut it.

Castillo: No.

Masalcas: Okay. What was going through your mind at this point when you first made contact with him?

Castillo: That this m-, - - this person might have a firearm, based off the initial information we got. And determining that he was not cooperating with us, and, you know, pout that fear in me that this person might want to shoot at us during this situation. So the - - what really like r-, - - arose for me was my safety and the - - also for me the safety of my partners.

Masalcas: And at some point did you think, the subject, he had a gun and wanted to possibly shoot someone?

Castillo: Yes.

Masalcas: And that was based on - -

Castillo: The initial information we received.

Masalcas: And, if you don't mind, was there - - articulate to us why you thought that this was the suspect vehicle and possibly contained the suspect inside, everything you possibly can recall.

Castillo: Based - -

Chulak: Well, if I may, Sergeant, at what point? Because I think as the situation evolved he began to gather additional information. So you want him to walk you through that, from this point and as he, again, began to gather information that led him to form that conclusion?

Masalcas: Well, at this point I'm - - we're at the point where he's now making a - - he's going to make contact with this vehicle.

Chulak: Mm-hmm.

Masalcas: At that point, what information did you have that you believed that it was him that he was possibly in that vehicle?

Castillo: Uh - -

Chulak: So, if you could, Officer, I would suggest go ahead and walk him through your thought process - -

Castillo: Okay.

Chulak: - - as you were beginning to acquire information and how you interpreted that, I think is what he's asking you to go forward and explain.

Castillo: So I would say, based on the fact that there was only one caller for this situation, he would - - they - - if I recall correctly, TPD Communications advi-, advised us that he was just east of that intersection, which that vehicle was just east of that intersection. Based on the fact that, the phone number, getting the name of the person and his former employer was in that area, and the business was in that area as well. And, most importantly, the fact they say he wants to shoot somebody, I thought in that situation that this might be a disgruntled employee that might have lost his job, is possibly there to, A), either hurt his boss or kill him.

Chulak: Okay.

Masalcas: And at the point when you made contact with him, were you detaining the subject at that time?

Castillo: Yes.

Masalcas: And why is that? Articulate the reasons why.

Castillo: Uh, based on the fact it might be possibly a person armed with a firearm, uh, do we know if he has a rifle - - uh, state of mind to go ahead and carry that firearm. And also based on the fact that he was bleeding from the wrist or and had dry blood on his hand, it drew my, uh, suspicion that this person might have just harmed somebody inside his vehicle.

Masalcas: And what possible crimes do you think you were investigating at that point?

Castillo: Assault with a deadly weapon, possible murder.

Masalcas: Did you have any other concerns, considering the nature of the call?

Castillo: Uh, for the safety of my partner officers.

Masalcas: And did you or your partner officer identify yourselves as police officers to the suspect?

Castillo: Yes.

Masalcas: And how was that?

Castillo: Uh, verbally.

Masalcas: Anything else?

Castillo: And through our, uh, patrol vehicles as well. And also the fact that we initiated our forward-facing red and blue lights to initiate a detention.

Masalcas: And did you tell your partner to activate the lightbar?

Castillo: Yes.

Masalcas: Okay. And why?

Castillo: Uh, based on the fact that the subject was uncooperative, the heavy window tint on the vehicle being out in a public street and p-, - - and the nature of this, uh, radio call, they drew my suspicion that this vehicle must have been involved with this.

Masalcas: Do you remember - - and, when you're saying "your partner" at this point, are you referring to Officer Wissler or Officer Bermudez?

Castillo: No, Officer Garcia, actually. And that's, that's why I told him to initiate his, uh, forward-facing blue lights.

Masalcas: Okay.

Castillo: Red and blue lights.

Masalcas: But at some point you switched partners, correct? You switched vehicles?

Castillo: Yes, so - -

Masalcas: Can you kind of - -

Castillo: Describe that? Yes.

Masalcas: - - describe that scenario, - -

Castillo: Of course.

Masalcas: - - what you mindset was?

Castillo: So, again, my vehicle is parked directly behind the Nissan - - uh, the silver Nissan Altima. I took over Officer, uh, Garcia's position which was on the passenger side of his patrol vehicle. At that point Officer Garcia, uh, brought it

up that he should reposition my vehicle to the configuration of the tactic that we use for felony stops. Which then would have placed my vehicle on the north side of their car.

At that point I remained where I was at. Then it was Officer Wissler on the driver side of that vehicle. And then Officer Garcia was on the passenger side of my vehicle after he, he and Officer Bermudez had repositioned my vehicle.

Masalcas: So were you on the south side of the south vehicle?

Castillo: Yes.

Masalcas: Okay. And on the passenger side. And then Officer Wissler was on the driver side of that south vehicle.

Castillo: Yes.

Masalcas: And Officer Garcia had your vehicle - -

Castillo: Yes.

Masalcas: - - which was slightly behind and moved to the north side of the - -

Castillo: Yes.

Masalcas: Okay. And was it adequately positioned to conduct a high risk vehicle stop at that time?

Castillo: Yes.

Masalcas: Can you describe what the high risk vehicle stop configuration looks like?

Castillo: Yes, so take - - it takes two vehicles. Uh, the first vehicle is initially always parked to the - - be center behind the suspect vehicle. But, based on the fact that there was instruction there, it would - - the first primary vehicle was just a little offset to the north. After that our - - the secondary vehicle is actually offset to the left side of the primary vehicle, pointed towards the, uh, driver door, or driver direction of the suspect vehicle. That vehicle is never up in front of the primary car. It's completely offset to it (unintelligible).

Masalcas: And what would you say is the purpose to position vehicles like this in a high risk vehicle stop scenario?

Castillo: Uh, to utilize most of the, uh, road. To utilize both vehicles and all their, uh, configurations like (unintelligible) door panels, the actual complete length of the car. And to get the best visual possible onto the, uh, suspect vehicle, in case, in this situation, this suspect vehicle did not have window tint, by doing that configuration I know one of my partner officers would have had better visual on the, uh, occupants.

Masalcas: And do you remember if you activated your spotlights during this scenario?

Castillo: I do not recall that.

Masalcas: Do you recall any other officers activating their spotlights?

Castillo: I do not recall that.

Masalcas: The decision to switch partners, was that your decision?

Castillo: Yes.

Masalcas: And the purpose was - - how would you describe that the purpose for that?

Castillo: The purpose was to - - for Officer Garcia to, uh, start delegating roles, start delegating a game plan on how we will, uh, safely detain the subject. Uh, and to, uh, start allocating more resources, most importantly, to make sure we have every possible resource out there to, uh, uh, bring the suspect - - uh, or to detain the suspect.

Masalcas: And when you got into your position on the passenger side of the south vehicle, what could you see from your vantagepoint?

Castillo: I could see directly down the line towards the, uh, driver side of the car and also the, uh, passenger side of the vehicle. So I had good 360 coverage of the vehicle.

Masalcas: And could see the driver seated in the driver seat at that time?

Castillo: Not until he opened the door.

Masalcas: And what would you say was your role at this point in the incident?

Castillo: Uh, my role is to be part of the, uh - - providing lethal coverage in case this suspect came out with a firearm.

Masalcas: And would you say that a position that you chose to be in was the best position to provide that cover, considering you had the long gun with you?

Castillo: Yes, based on the fact that we were - - we had great distance from the vehicle. And, you know, to have a precise, uh, firearm there in order to - - in case this guy meets with us with a different firearm, I thought I had the best position possible there.

Masalcas: And you're a member of the SWAT team, correct?

Castillo: Yes, sir.

Masalcas: And were you pointing your firearm in the direction of the suspect vehicle?

Castillo: Yes.

Masalcas: And why was that?

Castillo: Uh, to have it at a low rated position in case we are met with, uh, immediate threat, I could go ahead and engage that threat, if possible.

Masalcas: And was your firearm on safety at that point?

Castillo: Yes, it was.

Masalcas: Did you feel that the position that Officer Garcia - - was it Officer Garcia that moved the vehicle, or his partner, Officer Bermudez?

Castillo: I believe it was Officer (unintelligible) - -

Masalcas: Or your partner, Officer Bermudez?

Castillo: My - - I believe it was my partner, Officer Bermudez.

Masalcas: And did you feel that the position that he placed the vehicle in was what you had in mind when you explained this to Officer Garcia?

Castillo: Yes.

Masalcas: And prior to the suspect existing the vehicle, did anyone give him verbal commands? If so, who?

Castillo: Yes, it was Officer Wissler.

Masalcas: Did you tell him to give commands?

Castillo: He initially started and I told him to continue.

Masalcas: And do you remember what commands were given to him at that point?

Castillo: I believe to - - initially to "could we see your hands," first. And then as he exited with the, uh, knife he told him to drop the knife and to get down on the ground.

Masalcas: Prior to him exiting the commands were given to him were what, to your best of your knowledge?

Castillo: I believe it was "Driver, open door" and also to, uh, "let me see your hands," if I, if I recall correctly.

Masalcas: And why do you think that would have been? Why do you think those were the chosen commands at the time?

Castillo: Uh, based on the fact that we couldn't see inside the vehicle, the heavy window tints. Possibly, uh, a man armed with a firearm. We wanted to make sure we weren't met with a firearm first.

Masalcas: And were you conducting a high risk felony traffic stop at that point? Were you doing an extraction? Or were you waiting for additional resources?

Castillo: Once we repositioned our vehicles then, yes, we were trying to do a felony extraction for possible man armed with a firearm.

Masalcas: Did it - - did that extraction - - did you wait until Officer High and Officer Choy arrived? Or what was your mindset on choosing to, or not to, wait for them?

Castillo: So when - - just to go back, and prior to that, I think. When we were at scene searching they had arrived already at scene as well. So they were present when we were searching that area.

Once - - now, to go back forward, once we repositioned our vehicles to that felony stop configuration, they went ahead and actually arrived and began to assist us as well.

Masalcas: So in your mind they were very close?

Castillo: They were there.

Masalcas: Yeah. Okay. Prior to him stepping out of the vehicle did anyone other than Officer Wissler give him commands?

Castillo: N-, - - prior to getting out of the vehicle, no, I don't re-, - - I don't recall.

Masalcas: Would you say that the suspect was cooperating at this point?

Castillo: No.

Masalcas: And why not?

Castillo: Because he would open his door while Officer Wissler was giving commands and then he would shut it immediately. If I recall correctly, he probably did that two or three times, which led to believe that he was not obeying them and didn't want to obey them.

Masalcas: And that - - did that concern you further?

Castillo: Yes, it did.

Masalcas: Was the suspect communicating in any way at this point to you guys, either verbally or nonverbally?

Castillo: Prior to exiting the car?

Masalcas: Yes, (unintelligible).

Castillo: No.

Masalcas: And, from your perspective, from where your position was with the long gun, what can you - - what did you observe as he opened the door?

Castillo: I observed, uh, his hands were bloody and then he had the, uh, knife on his right hand while he opened the door with both hands. So, uh, I observed - -

Masalcas: So, from your position, when he opened the door you could see both his hands and then one of them was holding a knife?

Castillo: Yes.

Masalcas: Do you remember which hand was holding the knife at that time?

Castillo: The right hand.

Masalcas: Did you or your partner put out information to Dispatch that the subject was uncooperative and messing with the door?

Castillo: Yes, I provided that information.

Masalcas: And at some point when you saw the suspect's hands and he had bloody hands and a knife in his hand, what was going through your mind at that point?

Castillo: Uh - - that this man possibly just harmed somebody inside his vehicle, based off the nature. And that we could

possibly be his next, uh, victims. So I had a fear of (unintelligible) and out of my fear, and then the fear or my partner officers. You know, it, it really drew, uh, a lot of attention towards him and obviously raised my fear aspect of the whole situation.

Masalcas: Okay. And, did you, at that point, voice anything else over the radio?

Castillo: Yes, I did.

Masalcas: Do you remember what you put out?

Castillo: Yes, if I recall correctly, I stated, "Subject it armed with a knife. He's bl-, - - he's bleeding profusely from his wrist." And to start staging TFD.

Masalcas: And that was based on what you saw?

Castillo: My initial observations, yes.

Masalcas: And you mentioned that you also had concern that there might have been someone else in the vehicle?

Castillo: Yes.

Masalcas: Someone else that might have been injured? Did that increase your concerns for the situation?

Castillo: Yes.

Masalcas: And you asked for TFD to stage, I believe you said earlier?

Castillo: Yes, I did.

Masalcas: Okay. And, to you, what did that mean?

Castillo: In case there's any down victims inside that vehicle, we want to make sure we're able to administer aid. And if this subject did, uh, uh, cut his wrist, which was one of my observations, we want to at least administer aid as, as well to him.

Masalcas: Did you see him cut his wrist?

Castillo: I did not. I just saw that there was blood dripping from his wrist.

Masalcas: Did you have any information at that time that he had harmed himself?

Castillo: No.

Masalcas: But you saw the suspect holding what you thought was a knife at the time.

Castillo: Yes, sir.

Masalcas: And that was when he opened the door and you were able to see both hands at that moment.

Castillo: Yes.

Masalcas: Okay. Okay, I'm going to - - once he opens the door did the suspect look back at you in any - - at any point?

Castillo: He looked towards our direction and started scanning his entire environment.

Masalcas: And what did that tell you? What did you think (unintelligible)?

Castillo: In that situation I thought he was, uh, picking out his targets, seeing who he could possibly, uh, assault next, which raises more fear in the situation.

Masalcas: And at this time did you still think he was possibly armed with a handgun?

Castillo: Yes, based on the fact that he had, uh, baggy clothing and he was a heavier set male, it could have been easy for him to conceal a firearm, either in his back or in his, uh - - in his waistband.

Masalcas: So when he opens the door and beings to exit, what commands do you remember either Officer Wissler telling him or other officers?

Castillo: Uh, to "get down on the ground," to "drop the knife." And, from what I recall, the, the subject nodding his head, gesturing that he is not going to obey them.

Masalcas: And, to your knowledge, did any officer at any point in time ever tell him to exit his vehicle?

Castillo: Not that I recall. I don't remember that, uh, statement being said out there.

Masalcas: You'd mentioned earlier that Officer Wissler was telling him "hey, let's see your hands," - -

Castillo: Yes.

Masalcas: - - "open the door so we can see your hands," because the window tint was so dark.

Castillo: Yes.

Masalcas: Do you remember any commands of him giving the suspect to exit his vehicle?

Castillo: No, not that I recall.

Masalcas: Tactically, as a SWAT officer and an experienced officer with five years on the job, would you have wanted to wait for a backup unit to be in place prior to having him exit?

Castillo: Yes. That's why the - - I initiated the backup request to get more officers there.

Masalcas: Despite the fact that you didn't ask him to exit and you don't recall anyone asking him to exit his vehicle, he, nonetheless, exited, correct?

Castillo: Yes.

Masalcas: When he exited did he stand up?

Castillo: Yes.

Masalcas: And was he facing away or was he facing officers?

Castillo: He was facing towards our direction.

Masalcas: And could you see his hands at that point?

Castillo: Yes.

Masalcas: Did it look like he was facing any particular officer? Or was he just facing towards the middle of where the kind of funnel point of the patrol cars would have been?

Castillo: Yes, he was facing that - - towards that direction to where two officers were actually located. Where - - which were Officer Garcia and Officer Wissler.

Masalcas: And when he stood up and faced officers in that direction, what were your observations of him at that point? Can you describe as much detail as possible of what you saw?

Castillo: So initially, uh, I observed him shaking his head when the officers were trying to give him commands. To me that indicated that he's not going to obey them. And he was, uh, very, uh - - I would say - - he was determined with his decision-making to continue to advance on us. Uh, I saw that he just had a blank stare and was staring down to the, uh - - to our - - my partner officers.

Again, I did see that he had the, the knife on his right hand. He had it clenched up really well, because I was unable to see the, uh, actual handle of it. And he had it, not pointed down towards the ground, but pointed, uh, straight towards our officers, off to a side as well. And he continued with that type of motion until he closed the distance on us.

Masalcas: So when he stepped out of his vehicle he was holding the knife with the blade portion facing officers?

Castillo: Yes.

Masalcas: And was that in his right hand?

Castillo: Yes.

Masalcas: And when you saw him did you believe that this was the suspect that you were initially called to the location for?

Castillo: Yes.

Masalcas: Did you - - at that moment did you recognize the suspect at all from any prior calls for service or observations you've had in the past?

Castillo: No, sir.

Masalcas: Never seen him before.

Castillo: Never seen him before, sir.

Masalcas: Did you have any background on him, other than what Dispatch had already told you?

Castillo: That's the only information I've ever knew of this individual.

Masalcas: When he first stepped out of the vehicle and faced you tell me how you felt. Or, correction, when he first stepped out of the vehicle and faced the center of the - - where the vehicles were positioned, and where Officers Garcia and Wissler were, what did you feel at that time?

Castillo: Obviously I was scared for my safety, but, most importantly, I was scared for the safety of my partner officers, based on the fact that he had - - was approximately three feet away from their doors with a knife or a (unintelligible) weapon. It doesn't take much for him to fully lunge at one of my partners and potentially hurt them or kill them, and stab them with that knife.

So there was a huge, uh, fear aspect that arose, like I said, for my safety, and then, most importantly, for my partners, based on the fact the distance and the prior knowledge that I already had, like that was built up, up to that moment.

Masalcas: How did you feel at the moment when you first saw him step out of the vehicle and he started facing - - before he started walking towards officers, how did you feel when he stood up out of the vehicle, having not been asked to exit the vehicle?

Castillo: There was, uh, fear arising with me because, uh, any reasonable person that does not want to engage police officers would be obedient and try to, uh, cooperate with us. In this situation, uh, that fear began to rise because

this person exited, he was bleeding from his hands, which drew my suspicion that he possibly hurt somebody, he's possibly hurting himself, and he could possibly hurt my partners and myself.

Masalcas: And do you recall any specific commands being given to him at that time?

Castillo: Again, uh, to "drop the knife," "get down on the ground," from what I recall.

Masalcas: And, from your vantage point, from where you were at that moment, you mentioned you could see the knife, is that correct?

Castillo: Yes.

Masalcas: Can you describe it for me?

Castillo: It was, uh, like a silver pointed edge. Uh, that's all I could - - I do not know how long it was, or the handle that it had, but - -

Masalcas: Could you estimate it, from that distance that you were from him, from when he exited the vehicle - -

Castillo: Mm-hmm.

Masalcas: - - immediately by the door of his vehicle to you? What is that distance? And then would you be able to estimate the size of the knife?

Castillo: Okay, so you want me to describe first - -

Masalcas: (Unintelligible) describe it.

Castillo: Describe first the, the distance that he covered, or the distance that - -

Masalcas: No. The distance that he was from you - -

Castillo: Okay.

Masalcas: - - in that moment. And then what you would approximate the size of the knife.

Castillo: Oh, okay. So, from me he was approximately five to six feet away from me. And then that blade I would approximate to be, uh, four to five inches long.

Masalcas: And I may have not heard you, but did you see - - was there a color of the knife? Did it have any sheen?

Castillo: No. So the point - - the sharp edge, pointed edge, was silver, common color for that. But after he was, after he was apprehended and disarmed from that weapon, I saw that the handle was black.

Masalcas: Okay. And, just to clarify the distances that we were speaking about - -

Castillo: Mm-hmm.

Masalcas: - - a minute ago, how far would you estimate your distance from him when he first exited the vehicle before he started - -

Castillo: To walk towards us?

Masalcas: - - (unintelligible) - - yes.

Castillo: [PAUSE] So, we were like three car lengths behind. It was approximately over 30 feet.

Masalcas: Okay. And at this point you mentioned that officers were giving him commands?

Castillo: Yes.

Masalcas: Did you feel that they were clear commands and that he could hear those commands?

Castillo: Yes. And I knew he understand them because he was shaking his head which gestured to me that he is not obeying them.

Masalcas: Did any of the officers at the scene order the suspect to face away from you?

Castillo: I believe so, but I cannot recall correctly.

Masalcas: Would it be appropriate in a felony extraction scenario that officers would - -

Castillo: Yes, - -

Masalcas: - - make that (unintelligible)?

Castillo: - - because that is, uh, common training that we go to put the subjects in positions of disadvantage.

Masalcas: So, if they did make that request, he did not cooperate with it?

Castillo: Yes, sir.

Masalcas: And what were you thinking at this moment?

Castillo: That he is determined to, uh, disobey us and continue to, uh, close the distance between us.

Masalcas: Did you hear the suspect say anything at this point?

Castillo: No.

Masalcas: Other than shaking his head back and forth, did he make any noises? Did he communicate in any other way that he wasn't going to follow your directions?

Castillo: No.

Masalcas: He initially started walking towards officers.

Castillo: Yes.

Masalcas: Did anyone tell him to start walking towards officers?

Castillo: No.

Masalcas: No one gave him commands "walk back to the sound of my voice"?

Castillo: No.

Masalcas: And what were you thinking at this moment?

Castillo: That this is, uh - - he is eliminating a lot of our resources to safely apprehend him. To me it seemed that he was possibly choosing who was going to be his first victim to be able to be assaulted.

Masalcas: Okay. If you guys don't mind, I'd like to take a quick break. And I'm going to go off the record here at 1216.

[WENT OFF OF THE RECORD]

[CAME BACK ON THE RECORD]

Masalcas: Okay, we're back on the record. It's 1225 hours. We're in the Commander's Conference Room at the Torrance Police Department. Still in the room is myself, Sergeant Masalcas, my partner, Sergeant Kent Krumbach, my

lieutenant, Michael Chance, Officer Arturo Castillo, and his attorney, Stephen Chulak, Chumak.

Chance: Chulak.

Masalcas: Shumack.

Chance: Chulak.

Masalcas: Chulak. Sorry.

Chulak: Close enough, that's fine. Shoe on your foot, lock on your door.

Masalcas: Copy that.

Chulak: Thank you, sir. It's, it's a common name and - -

Masalcas: Okay, so we're going to go back into the incident in question. And at that point where we left off prior to the break, we were at the point where the suspect had stepped out of the vehicle and was facing officers. At this point, after he exited, did he immediately start walking towards officers?

Castillo: Yes, he began to walk towards us and actually towards the center of the, uh, street.

Masalcas: And do you recall - - tell us how the suspect was walking. Kind of describe that - -

Castillo: You mean his pace?

Masalcas: Yeah, the pace, how deliberate he was, his stride, whatever you can regarding that.

Castillo: He was walking I would say with a purpose with the, uh, knife on his right hand, uh, just completely starting at us

and, and sizing up everybody there. As he continued - - as we continued to give him commands, still disobeying them and refusing to comply, at the pace that he was walking he quickly was able to, uh, close the distance on us and was determined to get as close as possible to us, to the point where he could easily harm me or my partners.

Masalcas: Okay. And you mentioned he was still holding the knife. Was he taking - - he was taking continuous steps. Did he ever stop - -

Castillo: No.

Masalcas: - - his movement towards officers?

Castillo: No.

Masalcas: And I believe you said he seemed to be intent on closing the gap between where he initially exited his vehicle and where officers were standing and p-, - - and giving him commands.

Castillo: Yes.

Masalcas: (Unintelligible) correct? And were the commands given to him continuous?

Castillo: Yes, they were.

Masalcas: Did they change at any point in time?

Castillo: I believe so. From what I recall hearing, some of the commands were to - - "we are not trying to hurt you, we're trying to help you," yet he still disobeyed those. And it showed that his demeanor was to, uh, hurt us.

Masalcas: I'm sorry, I didn't catch this, but in terms of his pace towards officers, would you say that was slow, moderate, fast? What was his walking pace towards officers?

Castillo: I would say between moderate - -

Masalcas: Moderate?

Castillo: Moderate to fast, I would say that.

Masalcas: And how did you feel as he continued to step closer and closer towards officers?

Castillo: Like he was backing us into a wall where he was eliminating any other possible alternatives in the situation.

Masalcas: And do you remember if any assisting units arrived on scene prior to the shooting?

Castillo: Yes.

Masalcas: And who were those officers?

Castillo: It was 9-"Adam"-21, Officer Choy and High.

Masalcas: Okay. And at some point during the commands that were given to - - while officers were giving commands to the suspect do you recall anyone, any officers requesting less lethal?

Castillo: Yes.

Masalcas: And what was that?

Castillo: That was Officer Garcia who initially put out the request over the radio for the next unit responding to get out the 40 millimeter lau-, - - uh, less lethal launcher. And then I requested it, uh, verbally to my partner officers very

loudly, because the commands were loud, to get the 40 up, which is indicating for a less lethal option to be, uh, presented in the situation.

And as the suspect continued to close the distance on us, again I screamed it out pretty loudly to my partners, that "we need the 40, uh, now." Like we need it, uh, i-, immediately as another form of de-escalation. Because obviously our commands, our presence, our firearms, were insufficient in this situation.

Masalcas: And as he was closing the distance did you feel that it was becoming - - you had mentioned he - - you felt like he was putting your back to a wall?

Castillo: Yes.

Masalcas: Did you feel like it was increasingly getting more and more of a serious situation?

Castillo: Yes, it was.

Masalcas: Did you - - do you recall if your inflection changed at any point in time while you were making the request for the 40 millimeter?

Castillo: Yes.

Masalcas: Did you feel like you were getting louder - -

Castillo: Yes.

Masalcas: - - and more deliberate about your request for it?

Castillo: Yes.

Masalcas: And why is that?

Castillo: Because I knew, uh, with the distance that was being closed upon us that option could easily be - - how would I say? The option will be inappropriate in that situation because the distance that he was to the partner of-, - - to my partner officers and myself, it was within striking distance. And that 40 millimeter, uh, option would have delayed the whole situation. Would have probably made it a lot easier for the subject to have lunged at one of our guys.

Masalcas: Did you think that the 40 mili-, - - was it like a last ditch effort in order to utilize a less lethal option at that point?

Castillo: Yes.

Masalcas: Did you think any officers did have the 40 millimeter launcher up and running at that point?

Castillo: I, I would hope so because we made the request.

Chulak: I would ask you not to guess or speculate. The question - -

Castillo: Okay.

Chulak: - - that was posed to you is if you knew at the time. Do you - -

Castillo: No.

Masalcas: Do you have any idea who was being requested to bring up the less lethal option of the 40 millimeter?

Castillo: No.

Masalcas: Okay. Was there any other less lethal cover options provided at this point in the scenario?

Castillo: [PAUSE] (Unintelligible) I'm sorry, can you repeat that?

Masalcas: Yeah. Was there any other less lethal options at this point in the scenario that were already up and running, like a less lethal cover option that was already assigned or - -

Castillo: Not that I recall.

Masalcas: Okay. And do you know why that would be?

Castillo: No, sir.

Masalcas: Did you have any less lethal tools on your person at the time of the shooting?

Castillo: Yes.

Masalcas: Okay. And what would that be?

Castillo: Uh, my department-issued taser, department-issued OC spray.

Masalcas: And where was your taser positioned on your body?

Castillo: On my, uh, left side of my exterior vest.

Masalcas: And, but you had the AR-15, your long rifle, that you were utilizing at that time as lethal cover option, correct?

Castillo: Yes.

Masalcas: So was it possible for you to transition at that point?

Castillo: Not in that situation.

Masalcas: And why is that?

Castillo: Due to the fact that the close proximity that we were in and the apparent danger that I was in and my partners were in, it was not an option in that situation.

Masalcas: And would you say the fact that the subject was noncooperative and continuously aggressing on the officers' positions, was that creating a situation where you had less and less time to utilize a less lethal option?

Castillo: Yes.

Masalcas: Did that go through your mind at the time?

Castillo: Yes.

Krumbach: Sergeant Krumbach here, for the record. Officer Castillo, you indicated you had your OC spray on you, correct?

Castillo: Yes.

Krumbach: Why did you not utilize your OC spray?

Castillo: It was not the best option in the situation.

Krumbach: For what reasons do you base your opinion on that?

Castillo: Due to the lack of time and the close proximity where all officers were at.

Krumbach: And with regards to your taser that you mentioned that you have on your person, for what reasons did you not use your taser?

Castillo: Again, due to the lack of, uh, time that we had and the fact that the suspect continued to advance towards us, uh, prevented me from switching the options to what I was alr-, already, uh, designated to.

Masalcas: And I know that this is a very - - the window of opportunity to utilize less lethal was short initially. I believe from the moment he got out of his car to the moment of the shooting was approximately 45 seconds. But in that time did you feel like that window was increasingly shrinking as he was aggressing?

Castillo: Yes.

Masalcas: Did you personally try to use any less lethal options at any point in time during the short window?

Castillo: Me, personally, sir? No, sir.

Masalcas: And that was because you were - -

Castillo: Assigned - - uh, my role was as lethal coverage in the situation.

Masalcas: And you had mentioned that you, personally, had verbalized that you wanted a 40 up.

Castillo: Yes.

Masalcas: At that moment where - - what was the distance of the suspect?

Castillo: That moment we were possibly within seven to 10 feet from our patrol vehicles.

Masalcas: So he had got out of his car and was walking towards the officers and would you say - - which officers was he walking towards?

Castillo: Which would be Officer Wissler and Garcia.

Masalcas: And in that timeframe he does not stop, I believe you mentioned earlier.

Castillo: Yes.

Masalcas: He continuously walks.

Castillo: Yes.

Masalcas: And he’s continuously closing the gap - -

Castillo: Yes.

Masalcas: - - between him and the officers. Did you believe that the window for less lethal options was increasingly shortening as well?

Castillo: Yes. I would say for every step he would take and advance towards us that window was closely clo-, closing.

Masalcas: And in that timeframe were you becoming increasingly concerned for the situation that you might have to use lethal option?

Castillo: Yes.

Masalcas: As the suspect continued to approach do you know what commands were given to the suspect?

Castillo: Again, to “drop the weapon,” “get down on the ground,” “stop.”

Masalcas: Do you ever remember any officer telling him that he might be shot if he didn’t stop?

Castillo: Not that I recall.

Masalcas: Do you ever recall any officers saying that they didn’t want to have to shoot him or - -

Castillo: I do recall that, yes.

Masalcas: Do you recall who that might have been?

Castillo: Officer Garcia.

Masalcas: You recall Officer Garcia saying - -

Castillo: Screaming, pretty loudly, like "we don't want to shoot you."

Masalcas: And do you recall him, or other officers at the time, telling him to stop?

Castillo: Yes.

Masalcas: So did - - at some point Officer Wissler is giving him commands but then other officers being giving him commands. At what point do you think that started happening approximately?

Castillo: (Unintelligible) - -

Masalcas: At that distance?

Castillo: I would say approximately seven feet.

Masalcas: And as the suspect took each and every step closer and closer to Officer Garcia and Officer Wissler, what was going through your mind at that time?

Castillo: That their lives were in jeopardy and the situation and, uh - - and mine as well, due to the fact the subject's demeanor and his intent to possibly (unintelligible) - - to stab my partners with that knife, it in-, increased the fear aspect for, for their safety and mind.

Masalcas: Did he say or do anything that would have led you to believe that he wasn't going to assault or stab the officers at that scene, or you?

Castillo: He did not say nothing. But he continued to shake his head and he actually clenched the knife even harder while it was still pointed towards our direction.

Masalcas: And did you feel you or your partners were in imminent danger of dying or risk of serious bodily injury at that time?

Castillo: Yes, sir.

Masalcas: Did you feel that way about your partners? Or did you feel that way about yourself?

Castillo: About myself and, most importantly, my partners.

Masalcas: And at what point did you start feeling that way? At what distance?

Castillo: When he got between approximately seven feet.

Masalcas: And did you feel for - - did you fear for their lives?

Castillo: Yes, sir.

Masalcas: Did you fear for your life?

Castillo: Yes, sir.

Masalcas: And at some point did you shoot at the suspect?

Castillo: Yes, sir.

Masalcas: The moment you pulled the trigger the first time what was going through your mind?

Castillo: That I had to stop this immediate threat from possibly stabbing or attacking my partners which will cause like serious bodily damage or even injury (unintelligible).

Masalcas: Did you feel like you had any other option at that moment?

Castillo: Based on the fact that he was approximately three feet away from them, I did not think there was any other option.

Masalcas: If you did not shoot at them at that moment, what do you think was going to happen? What did you think was going to happen?

Castillo: That he could have possibly stabbed one of my partner officers, either Officer Garcia or Officer Wissler. Which, then, he could have con-, continued on and come over to me.

Masalcas: And where were you aiming at that point?

Castillo: I was aiming towards the northwest direction towards center mass of the subject.

Masalcas: And at that point he was still holding the knife?

Castillo: Yes.

Masalcas: And he was still aggressing, - -

Castillo: Yes.

Masalcas: - - walking continuously - -

Castillo: Yes.

Masalcas: - - towards officers. When you fired that first round how far away would you estimate the suspect was from your partners, Officer Garcia and Officer Wissler?

Castillo: Approximately three feet.

Masalcas: And how many round, in total, did you fire?

Castillo: Approximately three.

Masalcas: And did the first round you fired, did that stop the threat?

Castillo: No. He still continued to move, uh, - -

Masalcas: And he was - -

Castillo: - - still walking towards my partners.

Masalcas: So, still on his feet, - -

Castillo: Yes.

Masalcas: - - still walking. And was he still continuously - -

Castillo: Yes.

Masalcas h: - - moving towards them?

Castillo: With the knife still in his hand.

Masalcas: And did it seem to have any effect on him?

Castillo: Not initially.

Masalcas: And why do you fire a second round at the suspect?

Castillo: Due to the fact he continued to advance and, and continued to close the distance between my partner officers.

Masalcas: And when he fired - - when you fired the second round where were you aiming?

Castillo: Still center mass.

Masalcas: And was he still aggressing on officers and holding the knife - -

Castillo: Yes.

Masalcas: - - that moment?

Castillo: Yes.

Masalcas: When he fired - - when you fired the second round how far away do you think he was from your partner?

Castillo: Still approximately three feet.

Masalcas: So was he - - what - - do you think that was - - do you that - - you said he was three feet for the first round.

Castillo: Mm-hmm.

Masalcas: Do you - - did he stop at that moment?

Castillo: Not that I could think of.

Masalcas: Okay. Do you think his continuous motion was still moving towards Officer Garcia and Officer - -

Castillo: Yes.

Masalcas: - - Wissler? Did firing the second round at the suspect, did that stop the threat?

Castillo: No.

Masalcas: Before you fired the second round how did you feel?

Castillo: Obviously scared for my safety and, most importantly, my partners' safety.

Masalcas: And what did you think would happen if didn't fire that second round?

Castillo: He could have easily stabbed one of my partners of killed them with that knife.

Masalcas: After firing the second round did you feel - - well, prior to sh-, - - prior to firing that second round did you feel like you had any other option at that moment, other than shooting the suspect, to eliminate the threat?

Castillo: No, sir.

Masalcas: And is that why you fired a third round?

Castillo: Yes, sir.

Masalcas: Did the third round stop the threat?

Castillo: Yes, sir.

Masalcas: And what happened at that moment?

Castillo: After the third round I saw the subject, uh, land next to the actual passenger - - front passenger wheel. And, based off that distance, from that wheel to the door, it was p-, - - approximately like two feet.

Masalcas: Okay, so after the third round he continued - - his momentum continued a little bit further.

Castillo: Mm, yes.

Masalcas: Did he collapse to the ground?

Castillo: Yes.

Masalcas: And do you feel that he was an imminent threat at that point?

Castillo: No, sir.

Masalcas: He had stopped his momentum. Was he still holding the knife?

Castillo: Yes, he was.

Masalcas: And can you describe his positioning at that moment?

Castillo: He was, uh, seated on the ground with - - his back was against the uh, tire and the wheel well. He still had, uh, his - - the knife was still in his right hand and he still had it on there.

Masalcas: And would you say he was closer to Officer Garcia or Officer Wissler at that point?

Castillo: At that point, Officer Garcia.

Masalcas: And where was Officer Garcia's position?

Castillo: He was on the, uh, passenger of the - - uh, the most north unit. He was behind the door.

Masalcas: And he was giving continuous c-, - - do you remember if he was giving continuous commands to the suspect?

Castillo: I do. I do remember to - - that they want to help him out. I re-, - - if I recall correctly, they still said "we want to help you out" and give him first aid.

Masalcas: I'm talking about before the shooting occurred.

Castillo: Yes.

Masalcas: Okay. And where were you aiming the third round?

Castillo: Center mass still.

Masalcas: So center mass on all three rounds.

Castillo: Yes, sir.

Masalcas: And before you fired the third round did you think your partners were in imminent danger of dying or at risk of serious bodily injury at that point?

Castillo: Yes, sir.

Masalcas: Did you feel you had any other option at that moment, other than shooting the suspect on a third round?

Castillo: There was no other option in that moment.

Masalcas: Why didn't you fire any additional rounds?

Castillo: Uh, he was not an immediate threat at that situation. Once I saw that he collapsed there was no need to continue, uh, discharging my firearm, if he didn't pose an immediate threat to my partners.

Masalcas: So, as soon as you assessed that he was no longer an immediate threat, you stopped shooting.

Castillo: Yes, sir.

Masalcas: After the shooting occurred what did you do?

Castillo: Again, I, uh, put out the broadcast, uh, "shots fired, officer needs help" and requested more units to assist us. Uh, after that I went ahead and, uh, drew my attention to the Charger to see if there was anybody else, because we still had to contend to that threat.

Then I had another officer, uh, take my position on holding that vehicle in order to safely apprehend the suspect and administer first aid. So I was the one that was coming up with the plan in order to safely apprehend the subject, the suspect, disarm him and then also give him first aid.

Masalcas: Okay, so you kind of took charge of the situation at that point?

Castillo: Yes.

Masalcas: And what directions - - well, what were your concerns at that moment?

Castillo: My concerns were to make sure my partners are okay and nobody was stabbed. To make sure that the scene is safe first, uh, which would involve like the suspect being disarmed. And also to go ahead and actually help him out and still give him first aid.

Masalcas: So after the suspect is down and no longer an immediate threat at that point, but he was still holding the knife, is that correct?

Castillo: Yes, sir.

Masalcas: And did you help facilitate the handcuffing and arrest of the suspect?

Castillo: I did not handcuff him, but I, I provided instruction to my partner officers to do so.

Masalcas: Okay. And what did they do?

Castillo: They - - I told them, actually, to not handcuff the su-, subject from the back, the best, best thing to do in this situation is handcuff him from the front and immediate - - uh, start giving first aid. I would have assumed that it's a lot more difficult to do that if his hands were handcuffed to the back.

Masalcas: So that consideration, to handcuff him in the front, was to provide better first aid and lifesaving - -

Castillo: Measures in this situation.

Masalcas: Okay. At this point you're still - - do you have any other threats - -

Castillo: Yes.

Masalcas: - - you're concerned with? What would that be?

Castillo: The vehicle.

Masalcas: And what would your concerns be about that?

Castillo: There might be another occupant inside, or there might be a down victim inside.

Masalcas: And so, were you providing cover for officers who were handcuffing the subject and simultaneously proving cover on the green vehicle as well?

Castillo: Yes, sir.

Masalcas: And you helped clear that vehicle, correct?

Castillo: Yes.

Masalcas: Okay. You cleared that vehicle - - would you say you cleared that vehicle fairly quickly?

Castillo: I would say at a moderate pace.

Masalcas: Do you think there was an urgency to clear the vehicle quickly?

Castillo: Yes.

Masalcas: And why is that?

Castillo: To make sure there is no down victims or other suspects inside, and then so we could focus our attention to the scene and continue to give aid to our down suspect still.

Masalcas: And the reason you thought there could be a possible suspect inside, what would that be?

Castillo: Again, based on the fact that the subject came out bleeding from his hands, possibly - - there was possibly an armed individual involved in this situation.

Masalcas: And do you recall if anyone ever asked for a shield?

Castillo: Yes.

Masalcas: And what did you think the purpose of that was?

Castillo: To, uh, safely approach the suspect in case he was still able to get up and attack us.

Masalcas: And did it cross your mind at all that the shield could be used to - - for the clearing of the vehicle or anything like that?

Castillo: Yes.

Masalcas: Because at that time you still believed there could be a subject that was armed with a handgun?

Castillo: Yes.

Masalcas: Based on the initial call.

Castillo: Yes.

Masalcas: Do you know what lifesaving measures were provided to the suspect?

Castillo: Chest compressions, uh, direct pressure on wounds. That's all.

Masalcas: And were you directing people to do that?

Castillo: Yes.

Masalcas: After the shooting did you notify a supervisor that you had discharged your firearm?

Castillo: Yes.

Masalcas: And who was that?

Castillo: It was, uh, Sergeant Salary and Sergeant Stiller.

Masalcas: Did you give them a public safety statement?

Castillo: Yes.

Krumbach: Sergeant Krumbach here, for the record. Hey, Art, I know that we've talked about this incident from start to finish. (Unintelligible) Sergeant Masalcas was doing all the questioning on that I've written down some questions during that process.

So the timeline of the questions I ask could be from the start, the middle, the beginning. If you're unsure about any of the questions I'm asking, or if you need help with like the timeline, just ask me to repeat it and we'll go from there.

Castillo: Okay.

Krumbach: How about we start towards the end. When you approached the vehicle, green vehicle, and you didn't observe anyone inside, did you have a feeling about that? Did that conger up any emotions? Do you remember?

Castillo: Uh, yes, I did. I remember f-, - - getting a eerie feeling that something is not right here and we might - - our safety might be in jeopardy in the situation.

Krumbach: Were you - - did you give any consideration or thought to - - you obviously observed blood on the suspect.

Castillo: Mm-hmm.

Krumbach: On Mr. Diaz when he exited and then inside the car I believe you mentioned you observed some blood. Did you give any consideration or thought that there could have been a victim in the area that was not identified yet or not located?

Castillo: That did cross my mind.

Krumbach: Can you just talk to us about your knowledge of the felony stops that we teach here at the department and - - can you talk about that?

Castillo: Yes, sir. That, that is the, uh, most common way we tend to use in order to safely apprehend and, uh, any like felony suspects or armed suspects. Mainly because it creates a lot of distance and provides base amount of coverage and gets more officers there in order to safely apprehend the suspect. Um, and with that type of tactic it really does help out with getting more resources and getting the p-, - - uh, the necessary tools that we need.

Krumbach: When a felony stop is - - a tactic is used, what's the - - what does each - - let's say there's two units, the first units, the unit that is primary behind the suspect vehicle, then the one that's offset. What's your knowledge about what we teach for what each officer should possess at that time or be - - have in their hands?

Castillo: In that - - if you are the primary unit you're most commonly going to be - - uh, you're going to draw and exhibit your firearm in that situation.

Krumbach: And by "primary unit," which - - are you referring to - -

Castillo: The one that's directly behind the vehicle, - -

Krumbach: Okay.

Castillo: - - and then also the one that's offset from the vehicle.

Krumbach: Okay.

Castillo: So the first two units there are primarily they're the ones that draw and exhibit their firearm.

Krumbach: So, taking you back to the scene at Oregon Court, I think you mentioned that there was, I think, a gray Nissan Altima, if I understood you correctly.

Castillo: Yes.

Krumbach: Were you ever able to clear that vehicle before he had exited the car? Or did you give any consideration to that?

Castillo: I did, and I observed that it empty.

Krumbach: Okay.

Castillo: Yes.

Krumbach: Some of the statements and commands that were given to Mr. Diaz, you mentioned that he was shaking his head. Was it - - did you have an opinion on like the timing of him shaking his head, based on the commands? Or is he just shaking his head the moment he walks out of the car?

Castillo: No. From what I observed it was after we would give him the commands he would shake his head, which to me gestured that he's going to disobey them.

Krumbach: So, if I understand you correctly, that's a positive response by him that he - - you feel he's understanding the commands that were given to him.

Castillo: Yes.

Krumbach: Did you see a reason to ever try to talk to him in Spanish or - -

Castillo: Uh, no, sir.

Krumbach: And why is that?

Castillo: To me, the gesture of the head made it seem that he was – he clearly understood what was being said to him.

Krumbach: Okay. I'm going to take you back again maybe towards the beginning. You made a statement with where you replaced Officer Garcia at that primary passenger side vehicle unit. You mentioned that he was removed from that spot to something to the effect of a quarterbacking situation. What was your understanding of what that would entail?

Castillo: Uh, so by that I mean he would be the incident commander of that whole scene. Uh, obviously he is one of the most senior officers, a fellow FTO with me. We have a lot of responsibilities by him being as close as possible to our trainees and be able help them out in the situation. I, I told him like in this situation he should be, uh, commanding this incident and start delegating all the roles necessary. Which he began to do, because one of the first things he did was, hey, let's get - - let's lethal up. Which he requested over the air. And he also said that we - - that he's going to reposition my vehicle in order to start doing the, uh, tactic of, of felony extra-, - - or high risk felony stop.

Krumbach: Now taking you back to the very beginning of what you talked about. This call eventually comes out.

Castillo: Yes.

Krumbach: The call does come out. You say - - you start responding to it. And you made a statement earlier where you said you were talking with your trainee, and your trainee in this case being Officer Bermudez. Do you remember what you were talking to him about?

Castillo: Yes, uh, tactics on how to approach this, uh, what's the best way to, uh, respond to the location, what resources

do we have available that could actually assist us in getting there safely. And, most importantly, like, hey, if there is an armed suspect who's waiting for us there, like what tactics will we use to address that threat.

Krumbach: Do you remember any specific statements that you (unintelligible), that you guys talked about or anything?

Castillo: No, sir.

Krumbach: Okay. Can you talk about what - - when you utilized or when you chose to use lethal force, what optic are you using for - - on your M4?

Castillo: My M4, I'm using, uh, red dot optic.

Krumbach: Okay. And what is your eyesight? Or how do you align the sites with the target? What does that look like?

Castillo: It's a red circular dot that you would just, uh, raise up to your eye level and direct it towards the threat that you are, uh, going to, uh, uh, obviously discharge your firearm with.

Krumbach: Okay. And does this require one eye to use or two eyes to use?

Castillo: I would say it's, uh, up to the user. For me, personally, it's - - I would - - I use, uh - - I only, I only have to use one eye's focus and I could keep my other eye open in order to continue to assess the whole scene.

Krumbach: Do you feel that by having two eyes open it had any bearing on what you were able to observe, not only the threat, but the environment around you?

Castillo: Yes.

Krumbach: Okay. And why is that?

Castillo: Because one eye is focused on the red dot, the other eye is open on his movement and actually my backdrop as well.

Krumbach: And, your backdrop, do you remember what you had that day?

Castillo: Yes, it was, uh - - pretty much it was a cinderblock wall of a building.

Krumbach: What's your peripheral view of - - if anything, of Officer Wissler, like his configuration in relation to the open door on the driver side of I guess the unit that you were at when the engagement occurred?

Castillo: From my peripheral I saw his, uh - - his open chest area up by the window.

Krumbach: Okay.

Castillo: Which could have been an easy target for our suspect.

Krumbach: Did you have any further peripheral view of Officer Garcia?

Castillo: No, just my initial, that he was behind the door.

Krumbach: Okay. Now, the officers - - did you - - (unintelligible) - - is Officer Wissler behind the door? Well, I know you said his ch-, - - his torso might have been exposed a little bit?

Castillo: Uh, up, uh, by the window?

Krumbach: Yeah.

Castillo: Possibly.

Krumbach: Okay. Those doors could be some version of cover and concealment. With Mr. Diaz armed with a knife, how did that - - how did you gage their vulnerability with them standing behind the door?

Castillo: Uh, still very likely, because - - just because they're standing behind there doesn't mean they're going to move in case this assailant actually comes towards them. This assailant could have, since he was down the middle of where those two patrol vehicles were, and the doors were, he could have easily attacked them off from the side where their side body is not covered whatsoever.

Krumbach: And that was something you were cognizant of - -

Castillo: Yes.

Krumbach: - - at the time you utilized lethal force options?

Castillo: Yes.

Krumbach: Did you learn anything - - going back to kind of like the beginning when you're responding, you mentioned you actually responded to the scooter shop and - - or what potentially could have been the area of the scooter shop.

Castillo: Yes.

Krumbach: And you spoke with an employee of an adjacent business?

Castillo: Yes.

Krumbach: Did - - and he said that that business recently closed, if I understood you correctly, right?

Castillo: Yes.

Krumbach: Do you remember what the timeframe was on when he thought the business closed up shop?

Castillo: Yes, he said approximately one week.

Krumbach: Okay. Now, did you have any opinion, or did you have an understanding of, although the business could be closed, there still could be property inside belonging to the business? Or did you know if they were completely gone?

Castillo: I'm not, I'm not entirely sure.

Krumbach: Okay. Kind of my last question for you. Did you have an opinion from Mr. Diaz, after your observations of his behavior, if he could have been altered or under the influence?

Castillo: Yes.

Krumbach: And what was that?

Castillo: I would say, based on the fact that he was uncooperative, his, uh - - his stare was very blank, like there was no remorse behind what his eye-, - - like behind them. And the fact that he was still able to continue to move after one, the first initial shot, like it could have told me that he was possibly under the influence of an unknown narcotic.

Krumbach: That's all I have.

Masalcas: Okay, I'm going to take a quick break here.

Chulak: All right.

Masalcas: And then we can finish up. The - - I'm going to go off the record. It's 1:04.

[WENT OFF OF THE RECORD]

[CAME BACK ON THE RECORD]

Masalcas: Okay, we're back on the record. It's 1309 hours. We're still in the Bureau Commander's Office with myself, Sergeant Masalcas, my partner, Sergeant Krumbach, my lieutenant, Lieutenant Michael Chance, and Officer Castillo, and Stephen - -

Chulak: Chulak.

Masalcas: - - Chulak, - -

Castillo: (Unintelligible) - -

Masalcas: - - Officer Castillo's attorney.

Just a couple more questions for you, Officer Castillo, before we finish. In any way did the fact that you had a trainee assigned to you with one day on the job, and your knowledge of the fact that Officer Garcia, who is an FTO also had a trainee, did that in any way lend towards your concerns with the situation, your concerns with the scenario? And did it give you any kind of heightened sense of concern for this situation?

Castillo: Yes, it did.

Masalcas: And could you tell us how that made you feel or what that made your concerns?

Castillo: Yes. Being, uh, the more tenured officer there, and having a brand new officer with you, uh, it is my responsibility for their safety. I need to make sure that I'm able to protect them at any given time while simultaneously showing them how to do this job. So, yes, it does bring up more fear in me, that I have to protect this individual because

he is my responsibility. And I was, and I was there to do that.

Masalcas: Okay. And do you have any training, knowledge or experience, in any way, regarding suspects who have been shot and are still able to function or still able to aggress on victims or police officers, suspects who have been shot and are still able to carry out and create threats and kill people?

Castillo: Yes.

Masalcas: What would that be?

Castillo: I would say it's numerous, uh, trainings that I have gone with the department, numerous s-, scenario-based trainings of, uh, you know, engaging with, uh, a role player that has a knife and being able to stop such threat, even after like engaging with them with, uh - - obviously with a firearm they're still able to carry forward and move forward in order to like enact what they want to do, which is, in this situation, cause harm to me and my partners, possibly stab us or kill us.

Masalcas: So you had - - going into this call you had knowledge that, someone, just because they're shot, they can still present a vital threat to innocent bystanders, innocent people and officers?

Castillo: Yes.

Masalcas: And he had been given numerous commands throughout this incident, from the beginning, after exiting, he was told to get on the ground by officers, he was told to stop, and that they didn't want to shot him. At any point in time if he stopped and dropped to the ground, what do you think would have been the result of this?

Castillo: He would have stopped and gone to the ground, uh, we would have, uh, uh, obviously come with a game plan in order to go ahead and, uh, safely apprehend the subject and still administer aid to him because he still had an injury to him, which could have been possibly self-inflicted, from - - based on my knowledge, which was his, uh, bleeding wrist. So we still had - - there's still options there if that was presented.

Masalcas: But if he would have cooperated with your commands, would this have - - would this - - he could have - - would you say he could have prevented this from happening?

Castillo: Yes, sir.

Masalcas: This end result of him being shot.

Castillo: Yes, sir.

Masalcas: Okay. Looking back, is there anything you would have approached differently or handled differently, if given the opportunity?

Castillo: No, sir.

Masalcas: Is there anything about this incident that you think we haven't discussed and you believe we should know about?

Castillo: No, sir.

Masalcas: Do you want to give any kind of final statement?

Castillo: No, sir.

Masalcas: Okay. Is there a statement you'd like to add, alter, or change for the record?

Castillo: No, sir.

Masalcas: Okay. This interview has ended. The time is now 1314 hours.

[END OF INTERVIEW]