# "EXHIBIT J"

Masalcas: I'm going to go on the record. It's 0938 hours. Today is Tuesday, December 10, 2024. We're in the Bureau Commander's Conference Room of the Torrance Police Department.

My name is Sergeant Masalcas. I'll be conducting an interview today of Officer Jason Bermudez, who is in the office with me. Also in the office today is my partner, Sergeant Kent Krumbach, my supervisor, Lieutenant Michael Chance, as an observer only, and Officer Bermudez' attorney, Stephen Chulak.

This interview - -

Chulak: Good morning, sir.

Masalcas: Good morning, sir.

- - regards a officer-involved shooting that occurred on December 2, 2024 at approximately 1701 hours in the 2900 Block of Oregon Court in the city of Torrance, and was assigned DR 240045785.

The investigation is under the control, direction and command of Captain Titiriga.

You have the right to representation of your choice present with you during this interview. And you have chosen to have Mr. Chulak present. Is that correct?

Bermudez: Yes.

Masalcas: Pursuant to Government Code Section 3303(g), I'm recording this interview. You have the right to record this interview. Are you choosing to have your attorney, Mr. Chulak, record the interview for you?

Bermudez: Yes.

Masalcas: To ensure a full, fair and effective investigation in this matter, and in order to preserve public confidence in the Torrance Police Department's ability to operate effectively, during the pendency of the investigation you are directed not to discuss this investigation with anyone, other than me, your union representatives and/or legal counsel.

The order shall automatically be lifted at the conclusion of the investigation, when the need for accurate collection of information from subjects and witnesses will abate.

This information is not intended to prevent you from engaging in protected concerted activity under the Meyers-Milias-Brown Act. You may continue to engage in protected concerted activity under the act, including, but not limited to, discussing any of any other aspects of your employment and work conditions with others, including coworkers.

If you're unsure whether discussing certain issues with others would violate this order, you are encouraged to consult with your union representatives and/or legal counsel who may advise you. You may also contact me with any questions. Do you understand?

Bermudez: Yes.

Masalcas: And, I'm obligated by Government Code Section 3303(h) to advise you of your constitutional rights. Please be advised that you have the right to remain silent. Anything you say may be used against you in court. You have the right to an attorney before and during questioning and at all times. Do you understand each of these rights?

Bermudez: Yes.

Masalcas: And do you, nonetheless, wish to waive these rights, including your right to remain silent and speak to me now?

Bermudez: Based on the advice from my attorney, I respectfully decline.

Masalcas: Okay. And, although you have lawfully refused to waive your constitutional rights, please be advised you are hereby ordered to answer all my questions about this investigation completely and truthfully.

Any refusal to do so, including, but not limited to, intentionally providing false information, or withholding material information, may be deemed insubordination and result in disciplinary action against you, up to and including termination.

Therefore, your answers in response to my questions cannot be used against you in a subsequent criminal proceeding. Do you understand?

Bermudez: Yes.

Masalcas: And, prior to us proceeding with this interview, do you have any questions regarding the admonitions that I have read to you?

Bermudez: No.

Masalcas: Okay.

Chulak: Sergeant, before you proceed, just have to reiterate and make a few things clear on the record. As a Supervisor with the Department, and pursuant to the admonition you just provided Officer Bermudez, are we, then, correct in understanding that if he were to refuse to answer your questions he could be subject to discipline?

Masalcas: Yes.

Chulak: Are we also correct in understand that discipline could potentially be as much as discharge or removal from office?

Masalcas: Yes.

Chulak: In other words, the statement you intend obtain will be used for administrative purposes and administrative purposes only?

Masalcas: Yes.

Chulak: And, lastly, we're correct in understanding that the statement you obtain will not be used in any manner that is inconsistent with Public Safety Officers Procedural Bill of Rights Act?

Masalcas: Yes.

Chulak: I'd like to make it clear on the record, for that- - for those reasons and those reasons alone, Officer Bermudez will be answering your questions this morning. I want to be clear that he's not waiving any of his constitutional rights. However, he will completely and fully cooperate with your administrative investigation arising out of this incident, because case law and department policy requires him to do so.

And I'll also note, for the record, that prior to today's interview you did respond to our inquiries regarding the nature and scope of this investigation, as well as any pre-interview disclosures. have nothing further at this time. Thank you, sir.

Masalcas: Okay. Thank you, sir.

All right, we'll get started, Jason. If you don't mind just starting us off by telling us your assignment and call sign on December 2, 2024.

Bermudez: Yeah, so I'm assigned to the Patrol Division and on that day I was assigned as 9-"Adam"-24, working the west beat with my FTO.

Masalcas: Okay. And were you working Full Uniform Patrol that day?

Bermudez: Yes.

Masalcas: And Were you in a black - - marked black and white patrol car?

Bermudez: Yes.

Masalcas: And, were you driving or was your partner driving?

Bermudez: My partner was driving.

Masalcas: Okay. And who was your partner on December 2, 2024?

Bermudez: FTO Castillo.

Masalcas: And do you know - - well, tell us, what was your tenure as an officer at the time of the shooting?

Bermudez: Uh, I was an officer for about one month. I graduated from the police academy on, uh, N-, November 7th. And that was my first day on Patrol.

Masalcas: First day in Patrol. And, prior to this incident, what was your training and experience related to high risk felony vehicle stops?

Bermudez: Uh, all the training that I received in the Sheriff's Academy.

Masalcas: Had you ever performed a high risk vehicle stop in the real world up until that point?

Bermudez: No.

Masalcas: Okay. So, on that date in question did you activate your body-worn camera?

Bermudez: Yes.

Masalcas: And did you consider it a threshold incident?

Chulak: Do you understand what a threshold incident is?

Masalcas: A significant incident to where you felt it would justify and require rolling body-worn - -

Bermudez: Yes.

Masalcas: - - footage?

Chulak: I've got a clar-, - - you're aware your department has policies in place that require you or give you guidance in when to activate your camera, - -

Bermudez: Yes.

Chulak: - - correct?

Bermudez: Yes.

Chulak: Recall the question is: You believe this incident was one in which it required activation of the camera?

Bermudez: Yes.

Chulak: Or it to be appropriate to do so?

Masalcas: Thank you.

And did you activate your in-dash camera during the incident?

Bermudez: No,

Masalcas: Did your - - do you know if your partner did?

Bermudez: I don't believe so.

Masalcas: Okay. And, prior to this interview did you get an opportunity to review your body-worn camera and any in-car camera footage regarding this incident?

Bermudez: Yes.

Masalcas: Okay. Did you review any other videos regarding the incident prior to this interview?

Bermudez: No.

Masalcas: Were there other officers who were involved in this incident, other than you and your FTO, Officer Castillo?

Bermudez: Yes.

Masalcas: Who was that?

Bermudez: Uh, Officer Wissler and FTO Garcia.

Masalcas: Were there any other officers that were present that were doing the shooting, to your awareness?

Bermudez: No.

Masalcas: At some point during the incident that took place on December 2, 2024 did you discharge your department-issued firearm?

Bermudez: Yes.

Masalcas: And if you don't mind telling us, what is the make, model and caliber of the firearm you used in the - - on the night in question?

Bermudez: Uh, it's a Glock 45, uh, 9 millimeter.

Masalcas: And, to your knowledge, was that firearm used during the incident, was it previously altered in any way, to your knowledge?

Bermudez: No.

Masalcas: Do you know how many rounds were loaded in your handgun at the time of the shooting?

Bermudez: It was 18.

Masalcas: And during the shooting did you reload?

Bermudez: No.

Masalcas: Was the ammunition used during the shooting department-issued?

Bermudez: Yes.

Masalcas: And after the shooting did you ultimately end up surrendering your firearm to anyone?

Bermudez: Yes.

Masalcas: Who is that?

Bermudez: A detective.

Krumbach: Sergeant Krumbach here, for the record.

I might have missed it. What's the model of your Glock firearm?

Bermudez: It's a Glock 45.

Krumbach: And how many rounds are held in the magazine?

Bermudez: Uh, 17.

Krumbach: So and, if I understood you correctly, you said you went 10-8 that day with 18 rounds. So you were combat loaded?

Bermudez: Yeah, 17 rounds in the magazine and one in the chamber.

Krumbach: Okay. All right.

Masalcas: Okay. So, Jason, at this point we're going to give you an opportunity to give us a summary of what happened from the moment you got the call till its very conclusion. We'll allow you all the time you need. And so, feel free to be as detailed as you want. We're not going to interrupt you. And when you get done we'll ask you some follow-up questions and go step by step through the incident.

So, if you don't mind at this point just kind of giving us an overall summary from the beginning of the incident to the very end, in your own words. And please start from the beginning.

Bermudez: Yeah. So, uh, me and my FTO were at, uh, Chipotle on Hawthorne and Fashion. And we received a call for service

regarding a man with a gun at 2909 Oregon Court. Uh, we responded to the call.

Uh, on our way there, uh, another unit had gotten - - uh, had arrived on scene before us. And, uh, over the radio it was advised that the drone - - one of the drone operators had, uh, utilized the drone and went on scene with that. And drone advised that there was a male in a, in a green Dodge Charger parked along the south curb, curb of Oregon Court facing east.

And, uh, when we arrived, uh, we had parked facing northbound, uh, Maple and, uh, the other unit there, uh, Wissler and Garcia, were parked facing southbound. And there was a conversation between the FTOs about how to proceed this, this call in.

Uh, the decision was made that we were going to check the area of 2909 Oregon Court and that building. So we had drove east on Oregon Court and we went, uh, to the, to the business. Uh, we got out of our vehicles and we searched the surrounding areas. Uh, there was no subject with a gun. And, uh, we made contact with one of the, uh - - with one of the people in the back, uh, that's working on the business.

And, uh - - and during the call, uh, it had been known that, uh, the - - either the subject in that vehicle or the registered owner of that Charger came back to working at a business that was at that location. And we had asked, uh, one of the workers there about that business. And he said it was no longer there.

So we decided to, uh, leave the, the building itself and the rear of it. That's where me and my FTO were searching. And we made our way back onto Oregon Court, driving westbound. And, uh, at that point Officer Wissler and Garcia were right in front of us, uh, facing west and we

were right behind it. And, uh, both of us made a U-turn and, uh, a felony stop was conducted. Uh, but Officer Wissler and Garcia as the primary unit, and, uh, we were, uh, just south of them, uh, facing the car.

And, uh, me and my FTO, we exited the car and Officer Wissler was giving commands. And, uh, uh, when we exited the car, uh, FTO Garcia, uh, advised to move, uh, the car that FTO Castillo parked in a position left, or north of that first vehicle, uh, in a felony stop position. And so I reversed that vehicle, uh, and then parked it next to, uh, the primary unit. And then at that point, uh, I put the vehicle in park and then now I was behind the - - the view of the door of the driver side of the unit that was most north.

And, uh, (unintelligible) - - uh, Officer Wissler was giving commands to the driver to step out. Uh, it was a while. Uh, the, the subject in the vehicle was noncompliant, uh, didn't respond to any of, of the verbal commands. And a short while later, uh, the subject steps out of the vehicle and he's bleeding on his wrist and his m-, - - from what I recall, he was bleeding like on his knees or thighs. And, uh, you know, I assumed, okay - - and, uh, when he opens the door he pulls out, uh, what appeared to be a knife. And, uh, at that point I was like, oh, he was - - he's probably just cutting himself. And I thought that maybe he called the police, uh, just like as a bait for us.

And, uh, he, he made no mistake about it, he, he got out of the vehicle and he displayed the knife like out. Uh, he didn't keep it or try to conceal it with his - - to his body. Uh, he made it out. He intended for us to see that knife.

And, uh, as he's exiting the vehicle, uh, Officer Wissler was still giving commands at this point, like "drop the knife," and, uh, he - - the way he exited his vehicle he like - - it was almost like he, he moved like kind of like the shape of

a banana. He was like going outward, not just directly, uh, like east. It was like he was kind of walking diagonally. And, uh, it appeared as though he was walking to my vehicle. And he kind of stopped in, in front. And at that moment I was like - - I remember raising my gun up and I was like, oh, my God, this is, this is my first day, there's no way he-, he's walking towards me.

Like, uh, I remember when he's kind of walking to me, he's walking to my direction, I couldn't believe it. And, uh, then he, he kind of - - he doesn't continue in that outward direction, he kind of just starts walking in between both vehicles. And, uh, he was - - like when he got out of that car and was there he looked in - - I looked into his eyes and it was just like a blank stare, like there - - it, it looked like a death stare. It was like a soulless body.

Uh, there, there was no like understanding of - - like h-, - - like he just was not going with the commands. Uh, there was no, uh, like nodding of his head "no," that he's not going to drop the knife. There was no, uh - - there was no like, no, I'm not going to drop - - he never said "no, I'm not going to drop the knife." Uh, just a complete disregard for advance.

And as he kept walking forward, uh, he, he wasn't stopping and he kept his deliberate walk. And now I'm like really concerned, like, oh, he's, he's just not understanding at all. And so now I made the decision to start giving commands because he's unresponsive to Offic-, Officer Wissler. So I was like, okay, maybe he needs just, just hear from someone else. And, uh, he was still just not responsive at all.

And he starts walking and he gets to about like the front bumper of my vehicle, uh, s-, south of my vehicle, about like five yards away from me, I'd say. And he's right at that bumper "slash" tire area. And at that point I was

really concerned that he was now, uh, in striking distance of attacking, uh, any of my - - any of the officers on scene. So I got really concerned, uh, that he would stab, uh, the officer who was, uh, south of me, who I believed at the time was Officer Wissler. Uh, and when I reviewed my bodycam footage I realized it was a - - it was Officer Garcia. Uh, but I was really concerned that he was going to stab them. And that's the reason I, I fired.

Uh, I fired three rounds simultaneously. Uh, and then the suspect fell to the ground and that's when I decided to stop firing. Uh, and, uh, I went around my vehicle and we formed an arrest team. I put on my gloves.

And, uh, at this point Officer Choy and Officer High had arrived and I don't believe they were there, uh, when the shots were fired. But I remember when we were, uh, going to make contact with the subject and hands-on, form the arrest team, uh, h-, - - uh, I put on, on my gloves and we went and Officer Choy, I believe, uh, got the knife out of the suspect's hand. And, uh, I placed handcuffs on the individual because we still haven't searched the subject for weapons, uh, or any other, uh, weapons that he had.

And then, uh, I started to see, uh, bullet wounds on his body so I started rendering first aid and, uh, just applying direct pressure, uh, over the wounds. And, uh, at this point I believe other units had started coming in. And FTO Wing had arrived and, uh, I believed he pulled me off. And then, and then after I was done - - and then I gave my public safety statement to Sergeant Stiller.

Masalcas: Okay. Anything else? Okay. We're just going to ask you some follow-up questions regarding your statement. And, some of them, they're going to be very detailed. And I'm going to try to take you step by step from the initial call, all the way up until the shooting and then beyond. Okay?

I know you mentioned earlier that a drone was up and that's what - - did that - - they provided you information that the green Charger was parked on the street on Oregon Court?

Bermudez: Yes.

Masalcas: Okay.

Bermudez: It was parked and the door was slightly ajar.

Masalcas: Okay. When you were driving to the call did you or your partner ask for any additional resources that you recall?

Bermudez: Yes.

Masalcas: And what was that?

Bermudez: Uh, we asked for additional units just to respond.

Masalcas: Okay. And did additional unit ever respond?

Bermudez: Yes.

Masalcas: Okay.

Bermudez: I believe it was - - uh, Garcia was, along - - uh, other units were also responding.

Masalcas: And did any other units respond?

Bermudez: Yes.

Masalcas: And who was that?

Bermudez: Uh, I remember seeing Officers Choy and High there. I remember seeing, uh, FTO Wing and, and his trainee,

which I believe was Gwell, Officer Gwell. And then, uh, shortly after it seemed like almost all the units were there. I remember seeing, uh, Officer Gadiz, Officer Marquez. That's - - and the - - Sergeant Stiller and Sergeant Salary.

Masalcas: Okay. When you were driving to the location - - I know you mentioned driving to the business portion. When you were driving to the business portion did you take note, did you personally notice the green Charger at that point?

Bermudez: Yes.

Masalcas: And where was that parked?

Bermudez: Uh, it was parked on, on the south curb of Oregon Court, uh, just east of, uh, Maple.

Masalcas: Okay. And at that point did you notice anyone inside?

Bermudez: Uh, well, we were advised that the, uh - - that there was a male inside from the drone. And we noticed the dr-, - - the driver's door was slightly ajar.

Masalcas: At that point?

Bermudez: Yes.

Masalcas: Okay.

Bermudez: Yes, we - - yeah.

Masalcas: At that point did you think that that could be the suspect, or were you checking this other business location first for some reason?

Bermudez: Yeah, we thought it could be. But I believe in the conversation between the FTOs, like when the vehicles were parked initially, I believe some information had come

in that, uh, that subject in the vehicle, uh, had worked at a business at Oregon Court. So, uh, the decision was just made to - - I mean, he was just related to that business, working. And I think we, uh - - we just went to, to the business to see if the subject was there with a gun.

Masalcas: And what did - -

Bermudez: And - -

Masalcas: I'm sorry.

Bermudez: Oh. And then after, after we didn't find anything, uh, and it was discovered that the business was no longer there, uh, the decision was made to (Unintelligible).

Masalcas: Okay. And what did you think you were contacting, what type of call?

Bermudez: Uh, a, a man with a gun.

Masalcas: A man with a gun?

Bermudez: Yes.

Masalcas: Do you remember any other information being broadcasted over the radio, or Dispatch or CAD, or anything, that - -

Bermudez: I think - -

Masalcas: - - gave any more details about that call?

Bermudez: I think the only description we were hearing was Hispanic male. And, uh, I think I remember the name like Leo or Leonardo. And then out of like Inglewood, I think, was the vehicle, registered to.

Masalcas: Did they provide you a photo or anything like that at any time?

Bermudez: Uh, no. They did describe a physical description. I believe it was six foot, uh, 285 pounds.

Masalcas: Okay. And at any point in time - - well, you guys describe-, - - you guys went to the business, checked on that and then after that you decided that - - or you - - was it like a collaborative - -

Bermudez: Yes. Yes.

Masalcas: - - conversation between you and your FTOs?

Bermudez: So, uh, yeah, we checked at Oregon Court. We had exited the vehicle. Uh, we had just searched, uh, that, that rear of the business. Uh, because we did a drive through in front of the business and then we went to the rear of the business. And there was no one resembling, uh, a suspicious person with a gun. So then we had just talked to workers there who we saw like in the garages or outside. And they had advised that, uh, that business wasn't there, they hadn't seen anything unusual.

So then, uh, uh, the decision was made to then contact that subject, uh, in the Dodge Charger.

Masalcas: Did the subject who - - did Dispatch indicate to you anything about the intentions of the subject who said he had a gun?

Bermudez: Uh, I do not recall hearing anything.

Masalcas: Okay. Based on what you knew of the call going into the call, - -

Bermudez: Mm-hmm.

Masalcas: What did you think you were dealing with, what type of suspect? A homicidal suspect, someone - -

Bermudez: Yes, I thought this person, uh, had a gun and was wanting to shoot.

Masalcas: Wanted to shoot people.

Bermudez: Mm-hmm.

Masalcas: Okay. Going into the call, any information prior to contacting him, did you have information at all that this suspect was suicidal?

Bermudez: Uh, no.

Masalcas: After you decided collectively to contact the vehicle that contained the subject in the green - -

Bermudez: Mm-hmm.

Masalcas: - - Charger, - -

Bermudez: Mm-hmm.

Masalcas: - - did you - - was it your intent to do a felony traffic stop at that time?

Bermudez: Uh, yes. Uh, like when, when we contacted him it was clear that we were doing a felony stop.

Masalcas: Like after you made that U-turn that you described - -

Bermudez: Yes.

Masalcas: - - it was - -

Bermudez: Yes, I was aware that we were doing a felony stop.

Masalcas: Okay. But ultimately ended up repositioning the vehicle, correct?

Bermudez: Yes.

Masalcas: And why was that?

Bermudez: Uh, FTO Garcia, uh, said to move the vehicle in a felony stop position.

Masalcas: Okay.

Bermudez: So - -

Masalcas: So the position that it was initially, your car was initially placed in with Officer Castillo, you felt - - or Officer Garcia felt, could have been positioned - -

Bermudez: Y-, yes.

Masalcas: - - better for a high risk felony traffic - -

Bermudez: Yes.

Masalcas: - - stop position?

Bermudez: Yes.

Masalcas: Okay. And, that position, can you just describe the direction of those vehicles and kind of how they were directed or pointed?

Bermudez: Yeah, a-, after I reparked it?

Masalcas: Yes.

Bermudez: Yeah, so we were both parked, uh, facing east on Maple, or on, uh, Oregon Court. And, uh, th-, - - uh, FTO Garcia and Officer Wissler's vehicle was, uh, south of the vehicle that I had parked, both facing east.

Masalcas: Okay. So you drove - - it was your vehicle and you drove that to the north side of Office Wissler's vehicle.

Bermudez: Yes.

Masalcas: Okay. Can you describe the lighting at the time when you went to go make contact?

Bermudez: Yeah, it was, uh - - it was kind of like, uh - - like a dawn, almost like the sun, the sun is kind of on its way down. There's [COUGHING] - - excuse me, still a - - still light out but there was a - - it was less light than, uh, in the middle of the day so to say.

Masalcas: Okay. And at the point when you made contact did you ever see the suspect in the vehicle? Or did you - - were you under the impression that you were reacting based on information that you heard from the drone and - - or any other information that you might have heard?

Bermudez: Yes. I didn't personally see a subject in that vehicle, upon - - uh, until he got out. But just what the drone said, I was aware that there was a subject. And the, the driver door being ajar, uh, was a big indicator that someone is more than likely in here.

Masalcas: And did your FTO tell you at any point in time that, "Hey, I think that guy is in there."? Or did he say anything to that extent?

Bermudez: Uh, just when we were driving around he was like, "Hey, just, just watch the Charger."

Masalcas: Okay. And did he mention any tactical concerns about that contact that you were going to make?

Bermudez: Uh, not that I recall.

Masalcas: Okay. Can you describe the suspect vehicle, the green Charger, to us, to the best of your knowledge?

Bermudez: Uh, yeah, just, uh - - I just remember like seeing a green Dodge Charger with, uh, dark window tint.

Masalcas: And were the windows up or down?

Bermudez: The windows were up.

Masalcas: Okay. And do you recall at that point if the passenger or any of the doors were ajar?

Bermudez: The driver door was ajar, ajar.

Masalcas: And did that suggest to you that he was possibly inside?

Bermudez: Yes.

Masalcas: At that point when you guys made the felony traffic stop on that vehicle was it your impression that the occupant was being detained?

Bermudez: Uh, yes.

Masalcas: Okay. And what crimes did you think you were possibly investigating at that point, based on, you know, the nature of the call and all of the information that you knew going into this?

Bermudez: Yeah, regarding a man with a gun, it would have been that he's, uh, carrying a firearm in public.

Masalcas: Did you have any thoughts or concerns, based on the nature of the call, about whether or not he had already committed a crime or was about to commit a crime?

Bermudez: M-, - - well, we were concerned that because we're responding to a man with a gun, that he would commit a crime with the firearm. But prior crimes, responding, we were unaware of that.

Masalcas: But in terms of your personal thoughts in your head, did you have any of those thoughts or concerns?

Bermudez: Uh, yeah, I thought he would commit a crime with the firearm.

Masalcas: Okay. Did you ever recall yourself or any other officers identifying their selves as police officers? And, if so, how so?

Bermudez: I don't recall verbally, uh, just with our uniform and, uh, marked, marked - - uh, the black and white marked police vehicle.

Masalcas: And did any units activate their lights once you guys conducted this - -

Bermudez: Uh, I believe Officer Wissler and Garcia had their lights on.

Masalcas: Okay. And but not the ones on your vehicle.

Bermudez: The ones on mine I don't believe were activated.

Masalcas: Okay. Do you know why?

Bermudez: Uh, I do not know why.

Masalcas: Did you just forget, or - -

Bermudez: Uh, well, yeah, when I reparked it I didn't, I didn't think about the lights. Uh, yeah.

Masalcas: Did you and your FTO formulate a plan to contact the suspect vehicle at any point in time? Or did - - was that a conversation between your FTO and Officer Garcia?

Bermudez: Yeah, I believe they ta-, - - they had talked about that.

Masalcas: So and that's once they got into this formation?

Bermudez: Uh, yeah, I believe, uh - - yeah, like once we - - like the decision was made to make the U-turn and contact that Dodge Charger. And then when they got out, uh, they talked about like - - or, yeah, we just did the felony stop.

Masalcas: Yeah. Did they formulate nay other plans or make any other directions to you or your partner officer, Officer Wissler?

Bermudez: Uh, no, not other than just to move that vehicle.

Masalcas: Okay. Did your partner, at some point in time, get out his M4?

Bermudez: Uh, yes.

Masalcas: And where did he go?

Bermudez: Uh, he went to the passenger side of the vehicle that was parked initially by, uh, FTO Garcia and, uh, Officer Wissler.

Masalcas: And then what did - - did he tell you anything at that time?

Bermudez: Uh, just do what, uh, uh, FTO Garcia needs me to do. So - -

Masalcas: And what did he tell you to do?

Bermudez: Uh, move that - - uh, repark - - reposition that vehicle in a felony stop position.

Masalcas: Okay. And then where did Officer Garcia take up a position?

Bermudez: Uh, so when - - as I was moving the vehicle, uh, FTO Garcia was by the driver side of that first car that was parked, with Officer Wissler. And so during the entire, uh, incident that's where I believed he was still, by that vehicle. Uh, but after rewatching my body worn camera, it's - - uh, Off-, Officer Garcia was on the passenger side of the vehicle that I parked, right behind the (unintelligible) the door.

Masalcas: Okay. And you mentioned during the summary that you were positioned on the driver's door of the north vehicle in the - -

Bermudez: Yes.

Masalcas: - - felony traffic stop formation.

Bermudez: Yes.

Masalcas: How far away - - so were you behind the door?

Bermudez: I was behind the door.

Masalcas: Okay. And how far away would you estimate you were at that point from where the suspect was seated in his vehicle?

Bermudez: I would say it was approximately like 25 feet.

Masalcas: And what could you see at that point from your position?

Bermudez: Uh, I just vividly see the door being ajar. Uh, but the tint was so dark of the vehicle that I couldn't actually see, uh, inside.

Masalcas: Did you have your firearm out at that point?

Bermudez: Uh, yes, I believe it was at low ready.

Masalcas: And why is that?

Bermudez: Uh, we were responding to a man with a gun and, uh, so that already raised my concerns that the subject is potentially armed, uh, along with Officer Wissler giving commands and the driver being noncompliant, uh, to any, uh, of the commands to exit the vehicle.

Masalcas: And prior to the suspect exiting his vehicle you mentioned that Officer Wissler was giving him commands?

Bermudez: Yes.

Masalcas: Was he the only one giving him commands up until the point he exited his vehicle?

Bermudez: Uh, yes. Uh, Officer Wissler was the main officer giving commands and then at some point when the suspect was continuing to be noncompliant and, uh, continuing to walk forward on us, uh, that's when, uh, all the officers had now been giving verbal commands.

Masalcas: And do you remember - - back when Officer Wissler was the only one giving him commands, do you remember some of the commands he was giving?

Bermudez: Uh, I remember hearing something along the lines of "hey, driver," uh, either "step out" or "get out of the vehicle." Uh, and then I can't really recall what exactly was said, but

it was something along the lines of, uh, "step out," like, "get out of the vehicle."

Masalcas: Okay. And any other commands that you remember hearing?

Bermudez: Uh, no.

Masalcas: Okay. Was it your int-, - - did you think at that point that they were - - that you were conducting a full felony traffic stop? Or was it - - do - - did you think - - or did you have any opinion at that point as to what - - Officer Wissler's directions to him, what purpose those were for?

Bermudez: Yeah, just the fact that it was a, a man with a gun, so, uh, just, uh, wanting to see, uh, this subject did have a gun and, uh, to detain him to conduct an investigation regarding that.

Masalcas: Okay. Did the suspect cooperate with any of his commands?

Bermudez: No.

Masalcas: Okay. But at some point he did step out of the vehicle.

Bermudez: He, he did.

Masalcas: Okay. When the suspect opened the door - - the suspect opened the door at some point - -

Bermudez: Yes.

Masalcas: - - first?

Bermudez: Yes.

Masalcas: Okay. When he did what did you observe?

Bermudez: Um, I observed him with a knife and his wrists were bleeding, like wrists and hands. And then, uh, his like thighs or knees appeared to be bleeding too. And, uh, when he exited the vehicle he - - it was clear that he had a knife. And, uh, he was very obvious about having a knife. He, he made sure we saw. He just like kept it away from his body.

Masalcas: And so you saw the knife while he was still seated in the vehicle?

Bermudez: Yes, because as he was exiting the vehicle we, uh, like turned around (unintelligible) like now facing north on car to, to step out.

Masalcas: And after he exited his vehicle, and he stood - - did he stand up at that point?

Bermudez: Yeah. He stood up and, uh, he had the knife out like this.

Masalcas: Which direction was he facing?

Bermudez: Uh, he was facing like northwest.

Masalcas: Northwest. Would that be towards you?

Bermudez: Yes.

Masalcas: Okay. And were there any - - do you recall any radio transmissions being put out at that point? Obviously at that point you see a knife.

Bermudez: Yeah, I don't, I don't recall hearing, uh, anything on the radio. Uh, but after watching my body camera, uh, FTO Garcia advised the subject was bleeding and stepped out with a knife.

Masalcas: Okay. When you saw the knife were you - - did you believe he was - - did - - the suspect holding a knife?

Bermudez: Yes.

Masalcas: How was he holding it?

Bermudez: Uh, he was just holding out, a-, away from his body. Uh, it was just obvious that he wanted officers to see the knife. He didn't intend to conceal it in any way.

Masalcas: Okay. And was he pointing it in any particular direction?

Bermudez: Uh - - I think - -

Chulak: I think what he's asking is where the blade was pointed towards.

Bermudez: Yeah, I think the blade was, uh, here. No, I don't recall how the blade was facing.

Masalcas: Okay. Do you - - but he was facing you and he had the knife down? Was that in his right hand - -

Bermudez: Yeah, right hand.

Masalcas: - - or left hand?

Bermudez: Right hand.

Masalcas: And he was holding the handle of the knife?

Bermudez: Yes.

Masalcas: Okay. And you saw the blade, correct?

Bermudez: Yes.

Masalcas: Would you - - do you think that that was facing you at that time, - -

Bermudez: Yeah, it was - -

Masalcas: - - if you saw the blade?

Bermudez: Yeah. Yeah, it could have been facing me, or, uh, facing down.

Masalcas: Okay. At that point did you - - I know you said you saw him bleeding, he's holding a knife, he's stepping out of the vehicle. Did you still think he possibly possessed a firearm?

Bermudez: Uh, I thought it was possible, yeah.

Masalcas: When he stood up out of his vehicle did you realize that this was the suspect that you were - - the intended call was for?

Bermudez: Yes.

Masalcas: And - -

Bermudez: Yes, uh, because over the radio it had came out that the subject was - - uh, or somewhere along the call, either - - the drone updated it was - - uh, it was a Hispanic male adult approximately six foot, 285 pounds. And, uh, upon him exiting the vehicle he was - - he matched the description of Hispanic male that was heavier set.

Masalcas: When you saw him did you have any past experience with him in any way from any past or know anything about the - -

Bermudez: N-, no.

Masalcas: - - suspect's background? What was that?

Bermudez: No.

Masalcas: Okay. [PAUSE] Can you describe the knife that you saw at that moment?

Bermudez: Uh - -

Masalcas: Like in terms of size of the blade, color description?

Bermudez: I can't recall other than the blade, uh, appearing like a silver. Yeah, the blade was - - the blade itself, like it was silver in color.

Masalcas: And how long - - do - - did you have any - - from where you were at, did you have any opinion on maybe how long/how large that blade was?

Bermudez: Uh, maybe like a few inches.

Masalcas: Okay. Did anyone tell him to drop the knife?

Bermudez: Yes.

Masalcas: Who?

Bermudez: Uh, I believe Officer Wissler.

Masalcas: Okay.

Bermudez: And then I believe as the subject kept approaching, uh, more officers said that. I don't know who, though.

Masalcas: Okay. Did he cooperate with that request?

Bermudez: No.

Masalcas: Did you or any other officers tell him to walk back to you?

Bermudez: Uh, I don't recall hearing any-, anything like that.

Masalcas: But, nonetheless, he did walk back to you.

Bermudez: Yeah, he walked directly at, at us with the knife in his hand.

Masalcas: And I know you mentioned that he kind of initially started walking diagonally towards you.

Bermudez: Yes.

Masalcas: And then turned a little bit more towards the center of the - -

Bermudez: Yeah, so - -

Masalcas: Where the vehicles were positioned?

Bermudez: Yeah. He was walking kind of diagonally towards, towards my vehicle. And, uh, then he kind of makes the decision that he would - - he kind of stops. He stops. Until he reaches the point where he's kind of, uh, like almost between both vehicles, like more closer to my vehicle, and then he kind of splits the vehicles and walks between them.

Masalcas: We'll come back to that in just a moment, but when you say he stops, was this one continuous movement with walking? Or do you mean like he pivoted at that moment?

Bermudez: No. So he was walking diagonally and then, uh, stopped for like, you know, a second or a couple seconds. And then, then proceeded forward between the vehicles.

Masalcas: Did you hear the suspect say anything to you at this point?

Bermudez: No.

Masalcas: Did you - - but, nonetheless, continuous commands were being given to him by Officer Wissler. At this point were you giving him commands?

Bermudez: Uh, I just heard Officer Wissler continuously give commands and I believe the first time I had spoke, uh, was when he was hiding in front of the vehicles, because, uh, he was unresponsive to Officer Wissler's commands. And then, uh, in the Sheriff's Academy all my training regarding felony stops or giving commands is one person, uh, gives commands because that's what's clear and a subject that - - be given commands won't hear conflicting commands.

So, uh, at that point I figured he was unresponsive to Officer Wissler's commands so, uh, I think I said, uh, "get on the ground" or "stop" or "drop the knife," something along those lines.

Masalcas: And did he?

Bermudez: Uh, no. He never, uh, complied with any of the commands.

Masalcas: Did he do anything that you recall to communicate with you in any way verbally or nonverbally?

Bermudez: No.

Masalcas: Did he make any noises, any indication whatsoever that he understood what was being said or that you felt was him communicating with you?

Bermudez: No. The only time I heard him make a noise was, uh, after, uh, we had shot and, uh, when we were going to

render first aid and formerly arresting him put out, uh, a groining noise.

Masalcas: Okay. All right, so starting back when he's back and he's facing you and he has the knife, back at the green Charger at his door, - -

Bermudez: Mm-hmm.

Masalcas: - - and he initially starts walking towards you, what were you thinking?

Bermudez: That he has like - - I was like, oh, my gosh, I can't believe, uh, he's walking towards me with a knife. Uh, I just couldn't believe that it was, you know, my first, my first call, or my first day, uh, and like my third call for service. It was like my second hour, uh, in the field. I just couldn't believe that all that was happening. And, uh, just the way that he looked at us, it was like, it was like there was nothing in his eyes. And he just kept proceeding forward and I just, I just couldn't believe it.

Masalcas: Were you overwhelmed at that moment?

Bermudez: Uh, I wouldn't say overwhelmed. I was just like - - just, just kind of shocked that this was happening.

Masalcas: So it was unbelievable to you.

Bermudez: Yeah, unbelievable is a better word.

Masalcas: As he stepped towards you initially, - -

Bermudez: Mm-hmm.

Masalcas: - - and your vehicle, were you growing increasingly more concerned with each step that he took?

Bermudez: Yes. As he kept stepping forward, uh, I was, I was really concerned. Uh, because he can't stop in front of the vehicles. And, uh, just making eye contact with him, I was like really concerned that, uh, he wasn't going to listen to anything that we were telling him.

Masalcas: And other than this brief moment that you described as a second on two, or a few seconds, where he had stopped, was his movement continuously walking towards you before he had pivoted towards the center?

Bermudez: Yes.

Masalcas: And how quickly do you - - would you describe his walk?

Bermudez: It wasn't necessarily, uh, a super fast walk. It - - but it wasn't a slow walk either. It was just kind of like a deliberate walk. Uh, just a - - yeah, just a - - like a deliberate, uh, walk. What appeared to be like big steps.

Masalcas: Okay. Would you - - did you think he was gaining ground fairly quickly?

Bermudez: Yes.

Masalcas: Or - -

Bermudez: Yes.

Masalcas: Yes. And at this point he's still holding the knife and Officer Wissler is giving commands and you're growing increasingly more concerned about the suspect's actions. Do you remember ever hearing any other officer on scene or you requesting less lethal options?

Bermudez: Uh, I don't recall hearing, uh, anything for less lethal.

Masalcas: Okay. Did you assume at any point in time anyone else had less lethal, for any reason?

Bermudez: Uh, no.

Masalcas: Okay. Did you - - did anyone discuss any less lethal cover options prior to the stop or during the stop that you recall?

Bermudez: I, I - -

Masalcas: Or (unintelligible)?

Bermudez: I, I can't recall. Uh - -

Masalcas: Did you have any less lethal tools on your person at the time of the shooting?

Bermudez: Uh, yes.

Masalcas: And what were those?

Bermudez: A taser and OC spray.

Masalcas: And where is your taser positioned on your body?

Bermudez: Uh, it is positioned on, uh, my left hip, on my belt.

Masalcas: Did you attempt to transition to your taser at any point in time during this incident?

Bermudez: No.

Masalcas: And why is that?

Bermudez: Uh, well, the call was a man with a gun and when he exited - - uh, initially I was concerned that if he did exit that vehicle he would come out with a gun. And that's why my gun was initially drawn. And when he exited that

vehicle and had that knife out, uh, like I said, he just immediately started walking diagonal towards me. And I didn't feel like I had the time, distance and cover to, uh, utilize my taser.

Masalcas: Okay. And - - [PAUSE] okay, so let's just get into the suspect is approaching you, okay? Do you remember what commands were being given to him at that point?

Bermudez: Uh, I can't recall but I, I do remember hearing like "drop the knife." I remember - - I believe it was Officer Wissler saying "drop the knife."

Masalcas: Do you ever remember anyone saying anything about like "drop the knife or I'll shoot"?

Bermudez: Uh, at the scene, no. When I rewatched my body-worn camera I believe there was a voice that said, "Hey, sir, uh, please stop. I do not want to shoot you."

Masalcas: And as the suspect was taking more steps towards you, you were - - did you feel increasing more threatened?

Bermudez: Yes.

Masalcas: Okay. And at some point in time at - - did you feel that you or your partners had an immanent risk of dying or risk of suffering serious bodily injury?

Bermudez: Yes.

Masalcas: And at what point in him continuously walking towards you and then pivoting towards the center did you feel that way?

Bermudez: Uh, when he reached, uh, like the front of our vehicle, the front of the vehicle around the bumper area, uh, that's

when I felt im-, - - uh, that he could immediately stab, uh, my partners.

Masalcas: And at what distance would you estimate that to be?

Bermudez: Uh, from me or - -

Masalcas: From you, first of all, and then from whatever his immediate officers in his area.

Bermudez: Yeah, from me it was just across the hood of the vehicle, pr-, - - maybe like five years. Uh, and then, uh, from after viewing my body-worn camera and seeing that it was Officer Garcia there, uh, it looked like it was maybe, uh, four or five yards.

Masalcas: Four or five yards?

Bermudez: Yeah.

Chulak: Or feet.

Bermudez: Or, uh - - yeah, feet from the - - or, yeah, from, uh, the officer to the sus-, suspect.

Masalcas: Okay. And at that point you were feeling - - did you feel a concern for your own safety?

Bermudez: Uh, at, at which point?

Masalcas: At that point when you said that he had reached the - - kind of the front of the vehicle, when you - -

Bermudez: Uh, well, he - -

Masalcas: - - started feeling like - -

Bermudez: So - -

Masalcas: - - imminent danger?

Bermudez: Yeah. Uh, when he was walking in front of the vehicle, though, he wasn't, he wasn't any longer walking to me or looking at me. So my focus was now that he's going to stab my partners.

Masalcas: Okay. So, at that point it transitioned from a fear of your personal safety at that point, to the fear that he was going to stab or kill one of your partners?

Bermudez: Yes.

Masalcas: Okay. And what partners were that?

Bermudez: Uh, at the time I believed it was Officer Wissler. Uh, FTO Garcia, he was walking towards.

Masalcas: Okay. And those officers you believed were in the door - - the front doors in the center of the high risk traffic stop?

Bermudez: Yes. Of the, of the unit that was south to me.

Masalcas: And just to clarify, did you - - do you - - I think you said four to five yards, he was like four to five yards away. Is that correct, or do you feel it was - -

Bermudez: Uh - -

Masalcas: - - any other distance?

Bermudez: Uh, from, from me. Yeah, like, like across my, across my vehicle.

Masalcas: Yeah.

Bermudez: And in between both vehicles, yeah, like - -

Masalcas: What did you estimate his distance was to them in that moment.

Bermudez: It was only a few feet.

Masalcas: Okay.

Bermudez: Yeah.

Masalcas: And did you feel it was close enough to where he could stab them at any moment?

Bermudez: Yes. I felt like he could either, uh, stab them or he could, he could utilize the knife and, and throw it at them.

Masalcas: Did you think he was going to stab them?

Bermudez: Yes.

Masalcas: And why is that?

Bermudez: Uh, just, just like the look he had in his eyes, uh, and his deliberate walk towards us, refusal to comply, uh, and just the knife being out, uh, never, never intended to conceal it at all, uh, I believe that all his - - everything that he had done leading up to that point, uh, I believed he had every intention to use that knife against the officers and stab them. That's - -

Masalcas: Did you fear for their life?

Bermudez: Yes.

Masalcas: And at some point in time did you shoot the suspect.

Bermudez: Yes.

Masalcas: At that moment when you pulled the trigger what was going through your mind?

Bermudez: Uh, my - - oh, my gosh, he's, he's getting really close to them, he, he, he could stab them. And I just couldn't believe it was my first day and, uh, all like this is happening.

Masalcas: And you had mentioned that you gave commands at that point because you were growing increasingly more concerned.

Bermudez: Yes, uh, I - -

Masalcas: Do you remember what those commands were?

Bermudez: I recall saying "stop" multiple times.

Masalcas: And in that moment when you feared for your partner's life and you pulled the trigger for first time, was the suspect still holding the knife at that point?

Bermudez: Uh, yes.

Masalcas: And was he aggressing on your partners?

Bermudez: Yes.

Masalcas: Did you have an opinion - - I know you mentioned that you thought it was Officer Wissler at the time but after further review you realized it was actually Officer Garcia, - -

Bermudez: Mm-hmm.

Masalcas: - - but did you think that he was going towards Officer Garcia specifically or any other officer?

Bermudez: Well, when I had reparked that vehicle, uh, Officer Garcia was just behind Officer Wissler. So I though that they were like shoulder to shoulder, uh, in front of the driver seat of that first car. I didn't realize anyone was in the passenger side of my vehicle.

Masalcas: And in that moment when you fired that first round did you feel like you had any other option, other than shooting the suspect? Did you feel like you waited till the last possible moment?

Bermudez: Yes. I, I felt that we were even late.

Masalcas: If you didn't shoot at that moment what did you think he was going to do?

Bermudez: I thought he would stab, uh, my partner officers, either - - uh, either cause great bodily injury or kill them.

Masalcas: And at that time what were you aiming at?

Bermudez: Uh, it was like center mass area of his body, like the chest/stomach area.

Masalcas: And - -

Bermudez: Actually when he was - - that area but he was - - I was kind of faced diagonally from him, so, um, it was more like chest/stomach but like rib side cage area.

Masalcas: Okay. And the distance when you fired that first round from him to what we now know is Officer Garcia, - -

Bermudez: Mm-hmm.

Masalcas: - - what would you estimate that distance to be?

Bermudez: Uh, just across the hood of my vehicle, so maybe like just a few feet.

Masalcas: That he was from Officer Garcia?

Bermudez: Yes.

Masalcas: Okay.

Bermudez: Yes.

Masalcas: And how many rounds did you fire in total?

Bermudez: Uh, three.

Masalcas: Three. When you fired the first round did that stop the threat?

Bermudez: No. (Unintelligible) - - uh, until - - uh, after I fired three rounds then the su-, suspect, uh, went to the ground and that's when I stopped firing.

Masalcas: And I know you mentioned that you fired them simultaneously. Did you - - was there a moment there where you realized that he was still aggressing in that moment on him after you fired that first round?

Bermudez: Yes, because he was still standing with the knife in his hand.

Masalcas: And was he still moving towards officers?

Bermudez: Yes.

Masalcas: Did you feel it was necessary to fire a second round?

Bermudez: Yes.

Masalcas: And what was the suspect doing when you fired that second round?

Bermudez: Uh, standing up with the knife in his hand.

Masalcas: Was he still being given commands at that time?

Bermudez: Uh, I can't recall.

Masalcas: And you mentioned he was still holding the knife. Was he still aggressing at that time?

Bermudez: Yes.

Masalcas: And where did you aim the second round that you fired?

Bermudez: Uh, they were all around the same area, chest/stomach/ribcage, center mass area.

Masalcas: Center mass. Did the second round that you fired, did that stop the threat?

Bermudez: Uh, no.

Masalcas: And before you fired that second round did you have a moment where you felt anything in terms of your fear or concern for your safety or the safety of your partners?

Bermudez: Yeah, safety of my partners. I still felt that they could get - - they could be stabbed.

Masalcas: Was that a continuous feeling that you had - -

Bermudez: Yes.

Masalcas: - - at that moment?

Bermudez: Yes.

Masalcas: And when would that stop?

Bermudez: Uh, when the suspect, uh, fell to the ground.

Masalcas: Would you say that that is what would stop the threat?

Bermudez: Yes.

Masalcas: Once the threat was stopped?

Bermudez: Yeah, the immediate, uh, threat of him having the knife and stabbing stopped when he fell down to the ground.

Masalcas: And then but you fired a third round as well.

Bermudez: Yes.

Masalcas: So were the first two rounds, in your mind were they ineffective?

Bermudez: Uh, yes. The third - - Yeah, after the third round, then he had fell to the ground.

Masalcas: Okay. And was there any change between the second and the third round that you fired, in terms of your feelings of that he was going to kill or seriously injure your partners at that point, in that moment?

Bermudez: I, I felt the same, the same fear.

Masalcas: Until when?

Bermudez: Until he fell to the ground.

Masalcas: Okay. And at that point did you feel that the threat was stopped?

Bermudez: Yes, the threat of - - the threat, the threat of him stabbing an officer immediately stopped at that point.

Masalcas: Okay. [PAUSE] Did you feel in that moment that was absolutely necessary to provide those three simultaneous rounds on the suspect in order to stop the threat?

Bermudez: Yes.

Masalcas: And that was why?

Bermudez: Yes.

Masalcas: And that was why?

Bermudez: Oh, uh, because he was standing, uh, walking with the knife displayed outward, uh, walking towards an officer with the intent to - - uh, uh, with likely the intent was to stab the officer.

Masalcas: And your fear was that he would stab the officer that he was - -

Bermudez: Yes.

Masalcas: - - walking towards or your partner officer that was next to him?

Bermudez: Yes.

Masalcas: At that moment after you shoot, did you - - what did you do?

Bermudez: Uh, I went around my vehicle, and I remember holstering my weapon and putting gloves on me because I was going to be part of the arrest team, uh, to place handcuffs on the subject and then, uh, render aid.

Masalcas: And are you the one that placed handcuffs on him, or did someone else?

Bermudez: I placed handcuffs on him.

Masalcas: Okay. Did you also provide medical care, or - -

Bermudez: Yes.

Masalcas: - - was that another officer?

Bermudez: I provided medical aid.

Masalcas: And I know you mentioned earlier that you attempted to stop the bleeding. I forget what words you used. Well, what medical care did you provide to him?

Bermudez: Uh, I provided, uh, direct pressure over his wounds to his, uh, body.

Masalcas: Okay. Any other medical care that you knew of?

Bermudez: Uh, no, uh, those were the only ones I provided.

Masalcas: Okay.

Bermudez: And then - -

Masalcas: And were you relieved by another officer - -

Bermudez: Yes.

Masalcas: - - at some point who provided further medical care?

Bermudez: Yes.

Masalcas: Who was that?

Bermudez: I don't know who provided medical care. I just remember, uh, FTO Wing had pulled me off.

Masalcas: Okay.

Bermudez: Everything was kind of a blur, so - -

Masalcas: I understand. Did you - - do you know if - - what happened with the green Charger at that point?

Bermudez: No, I - - uh, after FTO Wing had pulled me off I kind of went away from - - I was on the curb and then - - uh, yeah, I don't know.

Masalcas: Okay. Do you know if they cleared the green Charger or anything?

Bermudez: Uh, no, I don't recall seeing, seeing that.

Masalcas: Okay. In your mind was it a concern that anyone might still be in the green Charger?

Bermudez: Uh, you know, I, I wasn't really sure. I think aft-, - - after I was pulled off I think - - uh, I didn't really think about that anymore.

Masalcas: What about during the incident, did you have any concerns that there might be someone else in the - - in that car?

Bermudez: Uh, I thought it was a possibility but my main focus was the subject who came out with the knife.

Masalcas: And after you provided lifesaving measures you mentioned that you had spoke to a supervisor.

Bermudez: Yes.

Masalcas: Did you let them know that you discharged your firearm?

Bermudez: Yes.

Masalcas: And provided a public safety statement?

Bermudez: Yes.

Masalcas: Okay. We'll take a quick break, if you don't mind. I'm going to take a quick break, go off the record here at 1038 hours.

[WENT OFF OF THE RECORD]

[CAME BACK ON THE RECORD]

Masalcas: All right, we're back on the record. The time is 1052 hours. We're still in the Bureau Commander's Room. This is Sergeant Jason Masalcas. I'm still with my partner, Sergeant Kent Krumbach, my lieutenant, Michael Chance, and with Officer Jason Bermudez, and his attorney, Stephen Chulak.

All right. I just wanted to clarify a couple of things regarding the shooting. The - - in terms of the distances, I know we had some confusion. And, if you don't mind, if we could just clarify some of those distances in feet and just approximate - -

Bermudez: Yeah.

Masalcas: - - feet, as opposed to yards.

Bermudez: Yeah, yeah.

Masalcas: That way we're just consistent throughout.

Bermudez: Yes, yes.

Masalcas: So, in terms of when he was approaching Officer Gar-, - - what we know to be Officer Garcia - -

Bermudez: Mm-hmm.

Masalcas: - - at this time, and at the moment when you feared for his life and for his safety, and you feared that he would imminently stab him, at that moment what distance was the suspect from you in feet, approximately?

Bermudez: It was just across the hood of my bumper, so it was only probably like - -

Chulak: Well, maybe we could also do it this way. From the hood of your bumper would you say that it's then - - if it's the hood of your car, is it from the distance from where you're sitting now from Sergeant Masalcas? Or is it a little further?

Bermudez: No, just a little bit further.

Chulak: All right. So just go ahead and move back a little further. Just demonstrate. Is that about how far you think he was from you personally?

Bermudez: Uh, no, just a little bit further, like, uh - - maybe like, uh - -

Chulak: The hood of your car?

Bermudez: - - like - - yeah, (unintelligible) behind you or - -

Chulak: Okay. And then how much would you estimate that to be in feet?

Bermudez: Uh, maybe like seven/eight feet.

Masalcas: Seven/eight feet? Approximately - -

Chulak: From me.

Masalcas: - - the distance between you and where the suspect was.

Bermudez: Yeah.

Masalcas: Okay.

Chulak: And based on what the - - my client has demonstrated, Sergeant, that seems to me to be a reasonable estimation. Would you agree with that?

Masalcas: Sure.

Chulak: That appears to be seven/eight feet?

Masalcas: Yeah. And then, what would you estimate the distance he was at that moment between him and Officer Garcia?

Bermudez: I believe it to be approximately five feet.

Masalcas: Okay. And the distance between him and Officer Wissler?

Bermudez: Uh - -

Masalcas: Where we know Officer Wissler was positioned at this time.

Bermudez: Yeah, maybe - -

Masalcas: On the south - - the driver's door of the - -

Bermudez: Yeah.

Masalcas: - - south vehicle.

Bermudez: Yeah, maybe like - - also like, uh, eight feet or so.

Masalcas: Okay. So a few more feet away from - -

Bermudez: Yeah.

Masalcas: Okay. Okay. And I know you mentioned earlier that you felt like - - I - - you know, I had asked you if you felt that you had any other options at that point. And I believe you mentioned that you were - - you felt like you were late. Can you elaborate on that for us? What did you mean by that?

Bermudez: Uh, I just felt that he was, he was too close to what we now know at the time was Officer Garcia.

Masalcas: So and is that based on you hindsight or based on after reviewing the incident?

Bermudez: Yeah, reviewing the incident.

Masalcas: You felt like you waited far too long.

Bermudez: Yes. Yes.

Masalcas: And that you - - did - - and, based on that, do you feel like you gave him every opportunity to cooperate?

Bermudez: Yes.

Masalcas: And did he?

Bermudez: No.

Masalcas: Did you feel like you had any other decision that could be made other than that in that moment?

Bermudez: No.

Masalcas: Okay. In terms of just going back in terms of - - I know we went through each round that you fired, and kind of your mental outlook in each one and how you feared for Officer Garcia's and Officer Wissler's life, and you feared for that there would be imminent danger of serious bodily injury to one or both of them. Did you feel at any - - despite the fact that they were behind cover, did you feel that they could still be reached by the suspect?

Bermudez: Yes.

Masalcas: And how is that?

Bermudez: Uh, just the - - uh, uh, that the distance was so close that if the suspect wanted to, he could have ran, he could have, gone, easily opened the doors. First of all he could have gone easily around. Uh, in the Sheriff's Academy they had taught us, uh, like (unintelligible) the 21 foot rule. Uh, and they specifically did use a knife for the demonstration. Uh, so if the subject did choose to run, uh, they could, they could get to you, uh, within a matter of seconds, even with 21 feet. And the distance between him and the closest officer was far less than 21 feet. So, uh, yeah.

Masalcas: So when you mentioned you were late, you felt like you could have taken that lethal action, utilizing your firearm, even earlier justifiably?

Bermudez: Yes.

Masalcas: And you had felt imminent danger prior to.

Bermudez: Yes.

Masalcas: Did you think that, in addition to closing that gap, that he would be able to do anything else to get around them or to get by them?

Bermudez: Yeah, I mean, if he - - just continuing his pace, he would have gotten - - he would have immediately stabbed him. Uh, even if he had like chose to run he could have maybe stabbed him.

Masalcas: And I know you had mentioned that he was walking very deliberately - -

Bermudez: Mm-hmm.

Masalcas: - - and he was - - he had a blank stare. Based on his size, did you think that that came into play into your perception at the time that he would possibly overwhelm, or possibly be able to carry out some of these actions that you were describing?

Bermudez: Yeah, I - - yeah, looking at him, he was definitely larger than both all the officers on the scene, I believe, even - - larger, yeah.

Masalcas: And did that play into account?

Bermudez: Yeah, it, uh, like raised my fear.

Masalcas: In terms of the - - like I said, I know we went over each round individually and how you felt fear during each one of those. And I know you had mentioned that it was simultaneously - - it simultaneously occurred. But were you able to assess each round individually as you shot them? Did you - - I know you felt fear during that timeframe, - -

Bermudez: Yeah.

Masalcas: - - during each round. But do you recall having that feeling inside that - - that moment inside, where you were assessing that he was continuously aggressing, that he

was continuously moving towards you and still holding the knife?

Bermudez: No. It was after the three rounds when he fell down, that's when I realized it was no longer immediate threat.

Masalcas: Okay. So did you feel that it was in that moment that that action that you were taking was absolutely required in order to stop that threat?

Bermudez: Yes.

Masalcas: [PAUSE] I'm going to take you back to after the shooting. You mentioned that you had went to the curb.

Bermudez: Yeah.

Masalcas: Okay. And that was Officer Wing. FTO Wing had moved you to the curb?

Bermudez: Yeah.

Masalcas: And why is that?

Bermudez: He had sat me down. Uh I think he had seen like the shock on my face and I remember him sitting me down. I just remember him telling me to, to breathe. And so he had sat me down and, uh, kind of like, you know, seconds had passed and, uh - - and kind of realizing everything that had happened, uh, the decision was made that I was okay to stand up, so then I stood up.

Masalcas: But when that happened how did you feel?

Bermudez: Uh, just like shocked. Just couldn't believe it was my first day and what had happened.

Masalcas: And did you feel any other - - did you have any other feelings or emotions that were occurring inside of you at that moment, that you think might have led to your feeling or the look on your face of shock?

Bermudez: Mm, I - - just like - - uh, uh, I don't really - -

Masalcas: feelings or emotions regarding the incident - -

Bermudez: Yeah.

Masalcas: - - or what had just occurred or - -

Bermudez: Yeah, just like just disbelief, shock, stunned, all those kind of emotions.

Masalcas: Okay.

Krumbach: Sergeant Krumbach here, for the record. Officer Bermudez, you just mentioned, actually, that you received, actually, a demonstration through the Los Angeles Sheriff's Department, I believe, when you were at the academy - -

Bermudez: Mm-hmm.

Krumbach: - - of the training on the 21 foot rule, or the demonstration that they put on.

Bermudez: Yeah.

Krumbach: Approximately how long ago was that?

Bermudez: Uh, uh, only like a couple ago, September. It could have been August/September.

Krumbach: The sites on your department-issued gun, do you know - -

Bermudez: Mm-hmm.

Krumbach: - - what you were using on December 2nd?

Bermudez: Uh, a red dot from the Glock 45.

Krumbach: Okay. And can you just talk to me how - - when you're in training or when you received training with that site system how the target comes into view.

Bermudez: Uh, yeah, just that, uh, aim your red dot, uh, center mass. That's where my red dot was.

Krumbach: So is it safe to say that the red dot is overlaid upon the target?

Bermudez: Yes.

Krumbach: Okay. And do you use one or two eyes when you acquire the sites on your red dot?

Bermudez: Uh, two.

Krumbach: Okay. And how is - - does it reduce your field of view, as like we're talking right now, is your field of view reduced because of this optic?

Bermudez: Uh, it - -

Krumbach: Or does it remain the same?

Bermudez: It's tough, because I was in a state of tunnel vision too, so, uh, I'm not really sure.

Krumbach: What about when you're at the range, when you were training on it, did - - as I'm sitting here - -

Bermudez: Yeah.

Krumbach: - - talking to you today - -

Bermudez: Yeah, no you're - - yeah, you're focused on your - - the target inside of that.

Krumbach: Okay. But are you able to see the - -

Bermudez: Uh - -

Krumbach: - - peripheral, like - -

Bermudez: N-, - -

Krumbach: - - as I'm talking to you right now?

Bermudez: No.

Krumbach: Your backdrop, - -

Bermudez: Mm-hmm.

Krumbach: - - do you remember what it was that day when you - - on December 2nd - -

Bermudez: Yeah, I, I, - -

Krumbach: - - when you used your lethal force?

Bermudez: - - I remember it was a, it was a vehicle, uh, like a, like a gray vehicle that was parked just, uh, west - -

Krumbach: Okay.

Bermudez: - - of his Charger. And it was the - - like a business on the corner right there. And it was the sidewalk. And I don't remember seeing anyone past him or in front of him.

Krumbach: Any occupants of the car that you remember seeing there?

Bermudez: No.

Krumbach: Did you - - any - - what did the business look like? What did that structure look like?

Bermudez: Uh, like a commercial - - it's like a commercial building. I can't remember if it was brick or not, but I just know it was a business there.

Krumbach: Were you aware what your backdrop was?

Bermudez: Yes.

Krumbach: (Unintelligible.)

Bermudez: Yes.

Krumbach: And that was a factor - -

Bermudez: Yes.

Krumbach: - - for your decision to use - -

Bermudez: Yes.

Krumbach: - - lethal force?

Bermudez: Yes.

Krumbach: You're obviously a police officer with the City of Torrance. Have you ever held any other employment with the City of Torrance before being a sworn police officer?

Bermudez: Yes.

Krumbach: And what was that?

Bermudez: I was a police cadet.

Krumbach: For the City of Torrance?

Bermudez: Yes.

Krumbach: Okay. And what did you do when you were a police cadet?

Bermudez: Uh, I kind of assisted with, uh, administrative duties. I was assigned to, uh, the Traffic Division and Detectives Division.

Krumbach: Did you ever do ride-alongs?

Bermudez: Yes

Krumbach: And how many do you think you did during your time working at - -

Bermudez: Approximately 30.

Krumbach Any time during those 30 ride-alongs did you ever get any exposure to felony traffic stops that the sworn officers were doing in the field that day?

Bermudez: Yes.

Krumbach: And, if you had to put a number on it, how many times do you think that you at least had some exposure to that in the field?

Bermudez: Uh, I'm assuming like five.

Krumbach: And during those five, either - - you know during those five did you ever talk about it with the officers? Or did they ever share any insights with you after you completed that call, or after you completed that arrest or that investigation where the felony stop was used?

Bermudez: Uh, I can't recall like a strict debrief of a felony stop.

Krumbach: You mentioned at the very beginning your - - when we were talking today that you also received training on felony traffic stops at the academy.

Bermudez: Mm-hmm.

Krumbach: Do you remember kind of like what that was, or what it consisted of?

Bermudez: Yeah, it just consisted of, uh, uh, one, one, one subject in a, in a suspect vehicle and then, uh, two, two vehicles being used - - uh, two patrol vehicles being used to conduct a felony stop, - -

Krumbach: And - -

Bermudez: - - usually with, uh, each, each police vehicle having two officers, or two recruits at the time.

Krumbach: Okay. Actually, I'm going to take you back here to Torrance. Once you graduated the academy you went through patrol school?

Bermudez: Yes.

Krumbach: Did you get any additional exposure on felony traffic stops - -

Bermudez: Yes.

Krumbach: - - during that time?

Bermudez: Yes.

Krumbach: You kind of remember in generalities what it was?

Bermudez: Uh, yeah. I was the, uh, uh - - [PAUSE] yeah, it was, uh - - I think we had precited either, either one suspect or two suspects. And then, uh, uh, me, along with another officer, uh - - either two or three officers doing the felony stop with me giving, uh, verbal commands.

Krumbach: Did you ever - - were you ever asked, or did you ever participate as a role player for different scenarios when you were a police cadet here?

Bermudez: Uh, I remember role playing for SWAT, - -

Krumbach: Okay.

Bermudez: - - in SWAT training.

Krumbach: And what - - do you remember like either - -

Bermudez: Uh, I believe - -

Krumbach: - - what those trainings were about?

Bermudez: Yeah. I believe it was active shooter.

Krumbach: Okay. Do you know if you ever participated in any trainings or - - that involved felony traffic stops?

Bermudez: Yes. Uh, we did - - I remember doing cadet trainings and, uh, they were put on to us by like the cadet coordinators.

Krumbach: Mm-hmm.

Bermudez: And I do remember one of the scenarios being, uh, felony traffic stops.

Krumbach: All right, so taking you back to the scene on December 2nd, I think you actually had a - - (unintelligible) if I remember

correctly, were once the suspect - - once Mr. Diaz gets out of the car, he makes like a walking movement I think that you said something similar to like a banana shape?

Bermudez: Yeah.

Krumbach: Did you have an opinion on that route of travel of him and why he was choosing that path?

Bermudez: I don't know why he was choosing that path, but, yeah, I just thought he was walking right to me. Uh, and that's kind of when it looked like the fear sink in, uh, oh, my God, this is my first day, I - - you know, first day, uh, second (unintelligible) the field, third call for service, just - - yeah, just couldn't believe all that was happening.

Krumbach: We now know that it was Officer Garcia that was across the door - -

Bermudez: Mm-hmm.

Krumbach: - - to you. If you just kind of - - just real quickly, do you remember if you had any knowledge if he was standing behind the open car door, or what his kind of positioning was at the time the - -

Bermudez: Yeah. I - -

Krumbach: - - (unintelligible)?

Bermudez: Well, I thought, uh, Officer Wissler and Garcia were like standing shoulder to shoulder at that.

Krumbach: Was it your opinion that Officer Garcia was behind the door? Or was he like to the right of, actually, his open car door?

Bermudez: Yeah, so like going what I observed at the time.

Krumbach: Mm-hmm.

Bermudez: I didn't know Garcia, Officer Garcia was there at all. I thought, uh, Officer Wissler was behind that driver door of the primary unit. And figured Officer Garcia would be standing shoulder to shoulder - -

Krumbach: Okay.

Bermudez: - - with Gar-, - - with Officer Wissler, uh - -

Krumbach: Are you operating under the - - your opinion at the time, are you operating under the belief that either of those officers are standing behind any cover or concealment?

Bermudez: Uh, yeah, I wasn't sure. I figured, I figured it would be most likely just because that's the way we train.
Krumbach: Okay.

Bermudez: I wasn't sure.

Krumbach: Now, if they were standing behind cover and concealment, let's just say it was like open doors, would that have had an effect on your decision to use lethal force, like with Mr. Diaz?

Bermudez: No.

Krumbach: And why is that?

Bermudez: Uh, based on my training in the Sheriff's Academy, I saw how quickly, uh, a suspect could utilize a knife to stab an officer, and how quickly they can close the distance to, uh, stab an officer.

Krumbach: So that cover and concealment that, even if they were using it, - -

Bermudez: Mm-hmm.

Krumbach: - - he could have defeated that?

Bermudez: Yeah.

Krumbach: That's it, partner.

Masalcas: All right, looking, Jason, is there anything that you would approach or handle differently if given the chance?

Bermudez: No.

Masalcas: And, is there anything about this incident that we haven't discussed or you believe that we should know about?

Bermudez: No.

Masalcas: And is there any statement you'd like to add, alter or change for the record?

Bermudez: (Inaudible.)

Masalcas: Okay. This interview has ended. I'm going to go off the record. The time is now 1111.

[END OF INTERVIEW]