# "EXHIBIT P"

Masalcas: Going on the record.

Garcia: I know.

Masalcas: Today is Monday, December 9, 2024. The time is approximately 1350 hours. We're in the Bureau Commander's Conference Room of the Torrance Police Department.

My name is Sergeant Masalcas. I'll be conducting an interview today of Officer Jesus Garcia, who is in the office with me. Also in the office today is my partner, Sergeant Kent Krumbach, my supervisor, Lieutenant Michael Chance, as an observer only, and Officer Garcia's attorney, Stephen "Chulack."

Chulak: Chulak.

Masalcas: Chulak.

Chulak: Shoe on your foot, lock on your door, sir, Chulak.

Masalcas: Chulak.

This interview regards a officer-involved shooting that occurred on December 2, 2024 at approximately 1701 hours in the 2900 Block of Oregon Court in the city of Torrance, and was assigned DR 240045785.

The investigation is under the control, direction and command of Captain Titiriga.

You have the right to representation of your choice present with you during this interview. And you have chosen to have Mr. Chulak present with you. Is that correct?

Garcia: Correct.

Masalcas: And, pursuant to Government Code Section 3303(g), I'm recording this interview. You have the right to record this interview. You are choosing to have your attorney, Mr. Chulak, record the interview. Is that correct?

Garcia: Correct.

Masalcas: To ensure a full, fair and effective investigation in this matter, and in order to preserve public confidence in the Torrance Police Department's ability to operate effectively, during the pendency of the investigation you are directed not to discuss this investigation with anyone, other than me, your union representatives and/or legal counsel.

This order shall automatically be lifted at the conclusion of the investigation, when the need for accurate collection of information from subjects and witnesses will abate.

This order is not intended to prevent you from engaging in protected concerted activity under the Meyers-Milias-Brown Act. You may continue to engage in protected concerted activity under the act, including, but not limited to, discussing any of any other aspects of your employment or work conditions with others, including coworkers.

If you're unsure whether discussing certain issues with others would violate this order, you are encouraged to consult with your union representatives and/or legal counsel who may advise you. You may also contact me with any questions. Do you understand?

Garcia: Yes.

Masalcas: I'm obligated by Government Code Section 3303(h) to advise you of your constitutional rights. Please be advised that you have the right to remain silent. Anything you say may be used against you in court. You have the right to

an attorney before and during questioning and at all times. Do you understand each of these rights?

Garcia: Yes.

Masalcas: And do you, nonetheless, wish to waive these rights, including your right to remain silent and speak to me now?

Garcia: No.

Masalcas: Okay. Although you have lawfully refused to waive your constitutional rights, please be advised you are hereby ordered to answer all my questions about this investigation completely and truthfully.

Any refusal to do so, including, but not limited to, intentionally providing false information, or withholding material information, may be deemed insubordination and result in disciplinary action against you, up to and including termination.

Therefore, your answers in response to my questions cannot be used against you in a subsequent criminal proceeding. Do you understand?

Garcia: Yes.

Masalcas: And, prior to us proceeding with this interview, do you have any questions regarding the admonitions that I have read to you?

Garcia: No.

Masalcas: Okay.

Chulak: May I ask just a few clarifying questions, Sergeant, before you proceed with your questioning. So as a Supervisor with the Department, and pursuant to the admonition you

just provided Officer Garcia, are we correct in understanding, then, that if he were to refuse to answer your questions he could be subject to discipline?

Masalcas: Correct.

Chulak: Correct? And that discipline could potentially be as much as discharge or removal from office? Is that correct?

Masalcas: Correct.

Chulak: In other words, the statement you obtain will be used for administrative purposes and administrative purposes only?

Masalcas: Yes.

Chulak: And, lastly, the statement you obtain will not be used in any matter that is inconsistent with Public Safety Officers Procedural Bill of Rights Act?

Masalcas: To my knowledge, yes.

Chulak: I'd like to make it clear on the record, that, for those reasons and those reasons alone, Officer Garcia will be answering your questions this afternoon. I want to be clear that he's not waiving any of his constitutional rights. However, he will completely and fully cooperate with your administrative investigation arising out of this incident because case law and department policy requires him to do so.

And I don't any other questions regarding the nature and scope of the investigation. And we'll also note, for the record, that you did previously respond to my request, or our request for pre-disclosures of any reports. So I have nothing further at this time, sir, thank you.

Masalcas: Okay. Thank you.

Okay, Jesus, I'm going to start off today's interview just asking you some general questions about your equipment and assessment, and your assignment for the incident that took place on December 2, 2024. I'll give you an opportunity to summarize what happened, in your own words.

But, before we start off, do you mind just telling us what your unit assignment and call sign were on the night of the incident?

Garcia: Uh, Unit 9-"Adam"-24, assigned to the downtown beat.

Masalcas: And were you working Uniform Patrol on that night?

Garcia: Yes.

Masalcas: And what police equipment did you have on your person at that time?

Garcia: I had, uh, my issued Glock 45, uh, issues - - department-issued taser, department-issued pepper spray, handcuffs - - two sets of handcuffs, uh, handcuff key, uh, and, uh, department-issued vest and, uh, uniform, police uniform.

Masalcas: Did you have your Sam Brown?

Garcia: Uh, yes, I did.

Masalcas: And were you driving or were you - - were you driving in a marked Black and White Patrol Car?

Garcia: Yes. I was riding passenger. My partner was driving.

Masalcas: Okay. And your partner's name that evening?

Garcia: Uh, Officer Wissler.

Masalcas: And what's his tenure on the job?

Garcia: It was Day 1, Month 3, of his, uh, training cycle.

Masalcas: Do you know if he had any other police experience prior to working for the Torrance Police Department?

Garcia: He did not.

Masalcas: And, if you don't mind just telling us your tenure on the job, training and experience.

Garcia: Um, I will be hitting my 21 year anniversary date of hire next month, January 4th. Uh, worked assignments in Patrol. Uh, worked, uh, as a - - worked, uh, 15 years in Detective, assigned to, uh, (unintelligible) Officer for three years. And I was Juvenile Area Investigator for two years. I worked Sex Crimes for approximately six years. And I worked Robbery Homicide for five years, before returning back to Patrol in February of 2022 where I, uh, became a Field Training Officer.

Masalcas: Okay. And what does - - can you just briefly tell us what your training and experience is with handling high risk felony traffic stops?

Garcia: Oh, uh, high risk felony traffic stops, uh, we're, we're taught that in the academy, uh, in the Orange County Sheriff's Academy. And then annually we go through some kind of felony stops training. I'm also on our, uh, EVOC, uh, uh, Training Cadre. And, uh, we usually will teach- - uh, I've been part of teaching that to new hires that come through Patrol School. And, same with my duties as FTO, we go over tra-, - - uh, felony traffic stops and, and how to correctly, uh, effect those. So, - -

Masalcas: Okay.

Garcia: - - basically throughout my entire career.

Masalcas: Okay. And on the night of the incident were you wearing a body-worn camera during the incident?

Garcia: Yes, I was.

Masalcas: Where do you position it on your uniform?

Garcia: On, the, uh - - my chest area. I've got it clipped onto my, my exterior vest.

Masalcas: Okay. And did you consider it a threshold incident that you were involved in?

Garcia: Yes, I did.

Masalcas: And did you record the incident on body-worn camera?

Garcia: No, I did not.

Masalcas: And why is that?

Garcia: Uh, I thought that - - when I first exited my vehicle I thought that I activated my camera by pressing onto the button, uh, twice as, uh, that's what's required to activate the camera. However, uh, apparently I, I didn't do it properly. Uh, I didn't realize that until we were searching the vehicle later on. So, uh, at the time I did, uh, I, I didn't realize it was just, uh - - just didn't happen. Uh, and there's no one more upset about that in this room that I am that my equipment didn't properly function.

Masalcas: Okay.

Garcia: Or that I didn't activate it properly.

Masalcas: But you recall attempting to activate your body-worn camera.

Garcia: Yes.

Masalcas: Okay. And it was - - as far as you - - you're concerned, it was some sort of user error or something to that extent, but you actually recall attempting to.

Garcia: Yes.

Masalcas: Do you know if it was charged and operational?

Garcia: It was charged and operational. I, I did have issues with it before, where I've attempted to activate it and it didn't work. And I provided my camera to Officer Slauson who conducted some kind of maintenance on it then he gave it back to me. So I don't know, uh, if it was operator error again or if the camera just simply didn't function.

Masalcas: On the night in question, did you - -

Garcia: Yeah.

Masalcas: - - think it was functioned?

Garcia: Yeah.

Masalcas: Did you have any reason to believe it didn't function?

Garcia: Um, I don't know. It, it functioned earlier in the day during a different call, so it's, uh - - it, it could have been a combination of both. But probably user error.

Masalcas: Do you think - - at the time when you attempted to activate it, were you concerned for your safety?

Garcia: It was a high stress situation at the time. I, uh, was multitasking, um, doing a lot of different things. We were faced with a high threat situation and I w-, - - you know, responsible for my partner and everybody else that was there. So there was a lot of things that were going on in my mind, where I didn't think to look and confirm that it was actually on. I - - in my mind I thought it was on, based on muscle memory and activations.

Masalcas: Do you remember if your in-dash camera was activated at any point on your vehicle?

Garcia: Yes.

Masalcas: And what activated that?

Garcia: Uh, while we were s-, - - while I was standing outside of my vehicle and the passenger side door, uh, Officer Castillo walked up to my - - walked up to our car and, and then said, "Hey, bro, make sure your in-dash camera is on." So I leaned into my car and I activated my lights. So, I, I blindly reached over while maintaining a visual of the vehicle and, uh, activated the lights and then exited my vehicle to, uh, get back in, in, in position where I was at.

Masalcas: Okay, so you activated your overhead takedown lights with the red and blue lights?

Garcia: Correct.

Masalcas: Okay. And - -

Garcia: To activate the dashcam.

Masalcas: And that was at the point when you were contacting the suspect vehicle that you - -

Garcia: Correct.

Masalcas: - - (unintelligible) located? Okay. And we'll talk more about that in a little bit. I'm just trying to get through some of these camera questions.

Did you ever get an opportunity to review the in-car camera footage?

Garcia: Y-, yes, I did.

Masalcas: Was that prior to this interview?

Garcia: Yes.

Masalcas: And did you review any other videos related to this incident?

Garcia: Yes, I did.

Masalcas: What - - do you know what videos those were?

Garcia: Uh, Officer Wissler's body-, body cam and, uh, Officer Bermudez' body cam and - - yeah, that was it.

Masalcas: And were they involved in the incident as well?

Garcia: Correct.

Masalcas: Okay. What officers were present dur-, - - when the shooting occurred?

Garcia: Officer Bermudez, Officer Wissler, Officer Castillo and myself.

Masalcas: And do you think there was any other officers there at the time?

Garcia: There was another unit that pulled up, but I don't know at what point they were either - - you know, I don't know if they, they made it to our location where we were at in our vehicles, at our vehicles.

Masalcas: You're referring to prior to the shooting?

Garcia: Prior to the, prior to the shooting I saw a unit driving westbound and stop behind us on Maple. Uh, but I don't know how soon, or at what point prior to the shooting, if they, if they arrived at our location. They were there after the shooting because then we - - you know, we, we, uh, continued on with, with the incident, with those officers present.

Masalcas: Okay, so you know that they were there for sure after the shooting. But you're - -

Garcia: Correct.

Masalcas: - - just not sure if they were there/if they were present during the shooting?

Garcia: Correct.

Masalcas: Okay. At some point during the incident that took place on December 2, 2024 did you discharge your department-issued firearm?

Garcia: Yes, I did.

Masalcas: Okay. And what is the make, model and caliber of that firearm?

Garcia: It is a Glock 45, 9 millimeter handgun.

Masalcas: Is it a 9 millimeter or a 45, do you know?

Garcia: It's a 9 millimeter.

Masalcas: Okay. Is the 45, is that the model?

Garcia: That's the, that's the make, yeah.

Masalcas: Okay.

Garcia: So, we, we - - originally I was issued a Glock 21 which is a 45 caliber, - -

Masalcas: Okay.

Garcia: - - but I - - a few months ago I had this new one issued.

Masalcas: Okay. And, to your knowledge, was the firearm you used during the incident previously altered in any way?

Garcia: No.

Masalcas: Do you know how many rounds were loaded in your gun at the time of the shooting?

Garcia: Yes.

Masalcas: How many?

Garcia: Eighteen.

Masalcas: And during the shooting did you reload?

Garcia: No.

Masalcas: Was the ammunition that you used during the shooting, was that department-issued?

Garcia: Yes.

Masalcas: And after the shooting did you end up surrendering your firearm to anyone?

Garcia: Yes, I did.

Masalcas: Who is that?

Garcia: To our Forensics, uh, personnel, Of-, - - uh, Carrie Harrison. I don't know the other person's name.

Masalcas: Okay. All right, Jesus, at this point I'm going to ask you to give us a summary of what happened. I want you to tell us everything that happened. Start from the moment you got the call, or went to the call, and take us all the way to the very conclusion of the call. And we're going to give you all the time you need. We're not going to interrupt you. And please be as detailed as you would like to be.

When you're doing we're going to just have some follow-up questions and go step by step clarifying things along the way. But, for right now, if you don't mind just telling us what you recall about this entire incident, in your own words, and start from the beginning.

Garcia: Okay. So I was working with my partner, Officer Wissler. And we were at a - - we were finishing up a burglary call at the storage unit on Maricopa and Crenshaw. And as we were walking to our vehicle we heard a call for service at the 2900 block of Oregon Court, where Dispatch advised there was a call of a m-, - - of an adult male. Something about an adult male with a handgun, and that he was going to go in and shoot the place or shoot people. I don't think they said specifically where.

Uh, and another unit was being dispatched. Uh, I believe it was "Adam"-23. And I told my trainee, I said, "Hey, that's, that's our, that's our beat. Let the radio know we're done with this call, uh, and we'll be on our way." So we

get in the - - we get in our vehicle. I get in the passenger seat. He's the driver. And we're exiting the storage unit, so we're kind of going over the details of the car as far as the description, which we didn't have, we just heard that it was an unknown male, uh, with a gun.

So we started talking about, about, uh - - about the call and what to look for as we're approaching the, the area. So we drive westbound on Maricopa, head northbound on Maple. And from a distance I can see two people on bikes. I see what looks like a White male adult riding on a bike heading northbound, but he's not at Oregon Court yet. So I'm thinking he's not involved. I see a Hispanic male riding a bike on the - - and they're both - - so one is on the - - so - - I'm sorry. The White male adult, he's on the - - appears like he's on the road, if I recall correctly. He's on the road heading northbound. And then there's another male riding southbound but he's on the east curb, on east sidewalk.

So, as we get close I kind of tell him to slow down so I can see the, the guy heading south to see if there's anything suspicious or if he waves me down, because the caller said that there is a man with a gun. So I figured if this guy saw something, since he was coming from that area, he might tell us something. But he didn't, he just was riding nonchalant, didn't pay us any mind.

So we get to Oregon Court and we make a right turn to eastbound Oregon Court. I believe we were the first unit there. Uh, I heard another unit get on the radio and say, uh, "First unit responding, can you check, uh, the businesses north of?" Or just "check the businesses." I believe there was a drone up as well. I recall hearing a drone, the Drone Team saying they're up but they didn't see anybody.

So as we made the right turn, um, there was a grey sedan parked just east of the, uh, east curbline. And then there was a green Dodge Charger parked in front of that. As we drove past that, uh, recall seeing, uh, the door slightly open and the window was cracked maybe about eight inches or so. And I can see a Hispanic male in there. Uh, and I j-, - - I saw facial hair. I saw what I thought was hair on his head. Uh, but the guy didn't seem to flag us down or anything.

And then there was a business just south of his location. And as we drove past his car and in front of the business, we could see that it was open, there was people working, forklifts. Looked like they were loading stuff. So I figured, okay, that guy must be on his lunch break, he hasn't seen anybody with a gun or anything, or else he would have flagged us down.

So kept going eastbound, uh, didn't really see anything. Uh, then that's when the radio said that, uh, the call - - the number - - the name associated with the phone number belonged to somebody named Leo, I believe it was.

So then I told my trainee to make a U-turn. I said, "You know what? Uh, that car is there. Let's just drive by that car and let's get the plate really quick, see who it comes back to. See if it comes back to this Leo guy." Uh, so we did that. He drove eastbound and, uh, uh, I guess, I guess I should have given him better instructions. I wanted him to stop east of the car so we can get the plate, put it out. But he ended up going past the car. And there we were, uh, past the car. And he gets the plate and he puts it out over the air. And that came back to someone else's last name, someone, Sandoval, out of LA or something.

So I was like, okay, not related - - possibly not related to, to this Leo guy. So Officer Castillo and his partner were stopped in the Number 2 lane, I believe it was, uh, facing northbound on Maple, just south of, uh, Oregon Court. So I told my partner to make a left turn, so he did, and we pulled up beside them.

And then at that point Officer Castillo said, "Hey, uh, there's a homeless encampment just north of Oregon Court. I bet you it's somebody from over there calling, some, some transient or something." So he said, "Let's go check that out." So I said, "Okay."

So we drive over there and we actually pulled up in front of 2909 Oregon Court, I believe, uh, p-, - - in the parking lot there. And as we're, um, exiting our vehicle the radio, uh, advised us that the person related to the phone number that called, Leo, uh, there was a prior call where he was listed as an employee at, um, some scooter shop at 2909 Oregon Court. Uh, and I believe the unit was Number 5.

So, like, darn it, we're right here. So then I told my trainee, I was like, "Hey, let's, let's go check it out." Officer Castillo is to the rear of the business on the north side that, uh, borders the easement to, uh, Del Amo. So my partner and I start walking westbound through the courtyard of the - - that business. And we eventually get to, uh, the suite number, which was 5. And at that point Officer High and Choy, they're coming eastbound walking through the courtyard.

We end up going to the business. It l-, - - it appeared closed. There's no one running around. There's no one screaming. So we're like, okay, well, there's - - if there was a shooting it didn't happen out here, let's check the inside. So windows were really dark so we kind of peeked through. But I also saw a business card that was wedged

into the door. So my thought was like, okay, well, that, that business card is there, if somebody was in there shooting or somebody went in that - - you know, that door might have been opened, that business card would have fallen out.

Uh, so I felt it safer walking up to the window because we couldn't see anything, so we checked the door, it was locked. Peeked through, didn't appear like anybody was inside. And then we can see a light on in the second level and there's an empty shelf, almost like vacant.

So we advised the radio that it was vacant and it was Code 4. Uh, at that point we received a photo on our work cell phones from someone in Dispatch, uh, from Officer Lavont of the - - of a person, uh, who they believed was Leo. They said, "Hey, here's a picture of Leo." And I saw that he had a bald head, moustache, facial hair. And then I told my partner, I said, "You know that guy in the car was Hispanic, had facial hair. But I could have sworn he had hair." He was like, "Yeah, I thought he had hair as well." Uh, probably was a hat or something that he had on. But, in, in my head like when I saw the - - as we drove past and I can partially see in his vehicle, I thought I saw hair.

So I, I let the radio know, I said, "Hey…" - - I, I also, in, in driving through the city or coming in and out of work, I've seen that Charger driving up and down Del Amo, sometimes on Maple. So it kind of made sense. I was like, "Well, that guy works here. He's parked up there. It's kind of odd." Uh, so I said, uh - - I got on the radio and said, "Hey, I've, I've seen that vehicle in the area before, so it might be associated to this address. It might be Leo. We're taking a look."

So I told my partner, "Let's go over there and take a look." So we drive through and I wanted him, once again, [SLIGHTLY LAUGHS] to stop in front of the car and, and so

we have a visual of the, the, the, the, uh, windshield, so we can see, you know, the person's actions, if this guy does have a gun. Uh, but it was really dark. You couldn't see in the vehicle really. So he ended up going past him and we're stopped behind him. So I'm like, "Dude. Like hurry up and make this U-turn. If that guy is the guy I'm not comfortable sitting here with our backs to the guy. If he decides, okay, I'm going to do something, he exits his vehicle and bum-rushes us with a gun, like we've got our backs turned, we're sitting ducks in this police vehicle which is also like a coffin for us." You know, our - - we've always trained to exit our cars as fast as possible, don't get, you know, uh, basically trapped in there.

So he hurried up and made a U-turn. Uh, I said, "Just make the U-turn." There was cars coming. I was like, "Just make the U-turn. You'll be fine. People are going to stop for us." So he did. Make a U-turn, gets - - pulls up beside the silver car, it felt like maybe like at the - - near the rear bumper of the silver car. But we're, we're kind - - we're pretty much parallel to the green Charger.

So he pulls up, we get out. And he starts giving the driver commands, uh, you know, to come out with his hands up, uh, come - - you know, "step out of the vehicle, let me see your hands," kind of thing. And nothing is happening.

Uh, Officer Castillo, they're right behind us, so he pulled his vehicle behind ours. But it was offset to the right a little bit, um, almost directly behind the silver car which was still maybe two car lengths in front of, uh, but not, you know, directly behind the green Charger.

So we're standing there and then I believe the door partially opens but then closes really quick. And so, so now we know someone is in there. And I tell Wissler to keep giving the guy commands, because Wissler has a

better angle. He's also a big guy, his voice carries probably a lot better [SLIGHTLY LAUGHS] than mine does.

So, uh, Officer Castillo ends up pulling up beside me. And that's when he said, "Hey, bro, turn on your overhead lights." I'm like, "Darn in." So I reach over with my left hand as I'm maintaining a visual of the vehicle, uh, because I'm thinking, okay, this guy is probably the guy that called and he does have a gun. And I don't want to be caught halfway in the car trying to activate the lights and he comes out and starts shooting at us.

So I activate my lights. Um, and, uh, I step out. And then Officer Castillo tells me, he says, "Hey, I've got, I've got the, uh, AR. I've got point. Uh, I'll take your position." So he then tells Officer Bermudez, "Hey, Garcia is your guy. Listen to whatever he tells you to do."

So I kind of stepped aside and I was kind of in no man's land. There was the vehicle that was in front of us, the gray car, but I didn't like that position of cover, uh, based on the angle. And then there's a light pole which I didn't want to go to either. So I told Bermudez to get in his car and reposition the vehicle and position it on the left side of my unit, and position it like a felony stop. I said, "Just position it like a felony stop, get out and stay there so you can have a better visual of the car."

So he does that. As he's doing that I'm making my way to the rear of my vehicle. And as soon as he got in position I ran over to our car, to that car, and I opened the passenger side door.

Uh, at that point we're calling for, um, the next unit that's coming up to bring a 40. I can see the unit traveling westbound, which I believe was Kevin High and Officer Choy, because that's who was with us at the call on - - at the address on 2909 Oregon Court. So they - - they're

driving westbound, we're asking for a 40 because the door opens and as the door is opening we can see that the subject's hands - - the subject's arm is bleeding, and he's got a, uh, sharp object in his, in his hand. Uh, I thought it was a knife. Uh, I just saw a long metal object. And I saw that his arms are bleeding.

And at this point, uh, I don't know what's going on. It was, it was kind of shocking because we were told there was a call of a man with a gun, but this guy has got a sharp object now.

So my mind starts racing like it usually does. And I'm thinking, okay, what happened? Why is this guy here? Um, why is he parked down the street if he works at 2909?

And I'm thinking all kinds of stuff, such as did, did this guy - - is he having some kind of marital, marital problems? Did he find out about his wife having an affair with like a coworker? Was he bringing her back to work? Wife or girlfriend. And, uh, was he bring her back to the location and then did something go south and he just started stabbing her in the passenger side of the car?

Because, as I mentioned, you couldn't see into the vehicle. It was really dark. So I'm thinking, okay, he's got blood on his hands because he either hurt somebody in the passenger seat, um, or he hurt himself. But I couldn't tell from the blood on his arms if they were self-inflicted wounds.

So he, uh - - the door opened and we saw the blood. That's when we put out over the radio, again, that we saw that the subject was bleeding, or had blood on his person and a sharp object. I believe we said knife. Um, and then that's when we, again, asked for someone to come up with a 40.

Um, seems like immediately after that the door opened up. And then out - - he steps out. And he steps out and he's a pretty big dude. Uh, I don't know, probably six feet, 250 pounds or so. He's a pretty big guy.

Uh, and he steps out and, uh - - oh, prior to that, as I was running around my vehicle, there's a moment there where commands weren't being given anymore. And I reminded Wissler, like, "Hey, keep giving him commands. Keep telling him, you know, what you've been telling him." So that's when the door opened. Um, and then he steps out and he's kind of just standing there, uh, facing us for - - momentarily. He's kind of facing us and he's standing with his - - both his arms down, but he's clenching this, uh, sharp object in his right hand.

And, gosh, it must have been like half a second where he's standing there and for a second I'm thinking, well, where's the, where's the 40? Where's - - where are these guys at? Like, what's taking so long to get that thing and get it up here?

Uh, so I began to want to transition to my taser because I, I said, "Well, let's - - we need less lethal. We need some kind of other option, uh, aside from, you know, our, our g-, - - our, uh, deadly, deadly force option." So I went for my taser, but, as I started going for my taser, he, then - - from where his vehicle was at, although he was basically - - when he stood out it seemed like he was in front of our - - gosh, if we were to split our vehicle in half he was closer to the driver side of, of our vehicle, which is where Wissler was standing behind the door.

So, as soon as I thought of transitioning to my taser he kind of just went diagonally, uh, started walking, which gave me the like, oh shit moment, he's moved diagonally. And then he just turned and was pretty much directly in front of me. So we started walking.

Uh, and it was kind of not what you expect, right? I've seen videos and I've investigated officer-involved shootings. And there's one in particular where a guy was sitting on the, on the ground with a, a knife and he was hit with a beanbag taser. I'm sorry, with a beanbag a few times. And he popped up and just started running at the officers at full speed. And there's a officer-involved shooting, uh, in that incident.

So, you know, you kind of picture, you know, that when something like that is going to happen it's going to be in that, in that way. But this guy was walking - - it was almost like it was in slow motion, but he was walking but it was very deliberate. And it was, uh, him with his hands down like this. And at some point, you know, Officer Wissler is still giving the commands but once he started walking we all started yelling and giving him commands.

And they were loud and clear commands, because I can clear-, clearly hear Officer Wissler, I can clearly hear Bermudez, and I can hear Castillo. And now I'm yelling out commands for him to "drop the, drop the knife," you know, "stop," "get to the ground." And he's not stopping. And he just keeps walking.

And there's a point where he kind of lifts his arms up, maybe six or seven inches, and he shakes his head "no." And he just keeps coming. And now he's like directly in front of my car. We're yelling, "Where's the t-, - - where's the 40?" And I'm thinking that other officers are, at any minute, going to run up behind me and they're going to deploy the 40 and at least get him to stop when he's at the distance that he's at. But the, the 40 is not coming.

And then he starts getting a lot, a lot closer. And he's directly coming my way. So I start kind of reverting back to, uh, crisis negotiations. I'm on our Crisis Negotiation

Team. So I'm thinking my mind like, okay, what's going on in this guy's life? Like, what, what is going on his life that's caused him to reach this point where he's now coming after us? You know, like, is he going through financial troubles, family troubles? Like, what is it and how can I connect with him to get him to stop?

And I'm hoping that my, my training in, in crisis negotiation is, you know, like, okay, this is it, this is your time to utilize those tools and get to this person and get him to stop so don't have to shoot him.

So I began to give him commands. I began to plea with him and tell him, like, "I don't want to shoot you. Stop." Like, you know, and I remember at one point I felt like I put my hand up to like tell him to stop, but he, he wasn't. He just kept walking in my direction.

And, uh, there was, uh - - there was a point where he was close enough where I, I, I looked at his, at his eyes and I, I can't - - [PAUSE] I can't, I can't get that look [PAUSE] our of my memory. And I just saw, I just saw a hopeless look in his eye. And I saw desperation, which to me was - - it doesn't matter what I say to this guy, he's not going to stop and he's going to, he's going to hurt me, or he's going to go after one of my partners.

And he got to the [PAUSE] - - there was a, there was a second there where I, where I felt helpless because with my time on as, as a police officer and the skills I've learned in communicating and talking to people, which I feel like I always have - - it's like one of my best assets, is talking to people, is, it's not going to work this time.

And he just kept coming and he was at the like front bumper of my, my vehicle which is directly in front of my window. I can see the silhouette of his body because he's such a big guy. And it's right in front of my, my door. And

for a second there I felt like I took a step back or created some distance. But then I thought the option to retreat wasn't, wasn't feasible. You know, if I retreat and Wissler doesn't retreat then is he going to go after Wissler and it's going to create a crossfire?

Like he reached a point where there was - - it was no longer safe for me and my partners for him to continue. So I ended up - - I, I pulled the trigger to my firearm and, uh, I pulled it, I, I recall only two times, because he was so close that I, uh - - it was a volley of two shots. And I was thinking if this doesn't stop him, uh, the third one is going to go to the head, because he was that close.

Uh, but after the second gunshot his, his body kind of folded where his legs kind of folded under and he just fell back, or fell straight down, and then leaned up. His body was leaned up into my wheel well. And, uh, I quickly went - - stepped around from my door so I can see him still, because I, I, I didn't know, okay, does he - - I mean, he, he was no longer advancing, but I wasn't sure if he, uh, you know, still had the knife in his hand, or if, uh - - because he was wearing a baggy black shirt and he was wearing, uh, baggy shorts. And I wasn't sure if maybe now he had - - he, uh, like had a gun in his waistband or something.

And I wasn't sure, uh, if he maybe reached for that and as soon as I closed my door he was going to have the gun pointed at me or something. So I quickly closed the door behind me so I can see him, because I can no longer see him once he went down. And, uh, I can see that he's sitting there and he's got the, the object in his right hand. And I can hear that he's breathing. So I immediately started giving him commands to tell him to, to drop the knife, that we, we want to get him help, we want to give him - - get him first aid, but we needed him to drop the knife.

But he wouldn't do it. So I then instructed the other officers to, uh, holster their we-, - - I, I instructed I think two officers, uh, to holster their weapons. I believe it was Officer Choy - - because at, at this point he's there now. It was Officer Choy and, uh, uh, Castillo was there. And I don't recall now who, who the other - - uh, I believe Wissler initially was and I told him to, to, to step back because I said, "Hey, man, you, you shot…" - - like, "Step back." Or I thought he shot. And I also didn't want him - - and he's a new guy, I didn't want him to walk up and see, you know, uh, what happened or see the guy - - see the gunshot wounds to his body or, or something.

And I didn't want him to sit there and, you know, be the person giving first aid to him. I, I, I didn't know. I, I just figured he was new on the job. I didn't know how trauma-, traumatic that was going to be for him. So I told him to step back. But he ended up, uh, being part of the, the team that went up. And I believe Officer - - we formulated a plan to have someone walk up and I believe we said - - somebody said, "Step on his l-, - - on his arm and then somebody else reach down and grab it."

So that's what we did, somebody stepped on his arm and then Officer Choy picked up the, the, the sharp object which, I looked at the handle, and it reminded me of a screwdriver, actually. Uh, and he started to walk away with it. And I told him, "No, no, stop. Just put it down right here, leave it there." Because I'm thinking - - no, now I'm thinking - - I'm going into detective mode where I'm thinking preserve the scene, preserve the evidence. Just from my experience, where people, you know, grabbing a weapon and then removing it from the scene, taking it back to their trunk, making it safe. And we were - - we always think like, no, why? Just if it's safe where it's at, leave it where it's at, don't manip-, manipulate it so we don't contaminate the scene.

Um, so that happened. And we immediate - - somebody handcuffed him and then they were going to put the handcuffs on his back. We said, no, put them on his - - in front of his body so that we can do compressions and do CPR, that kind of thing, check for wounds, so that we can let TFD know where they're at.

And then immediately had to transition into, oh, hold on, there's the car still. Like, we still need to go address the vehicle. So we formulated a team to go do that. And I was part of that team. And we were walking up to the car and, you know, my heart is pounding, I'm thinking what am I going to see in this car? I'm thinking I'm going to see, you know, a, uh, girlfriend that's stabbed, a kid that's stabbed. I, I didn't know what I was going to see once we got in there.

And, and, thank God, that when we opened the door we didn't see anybody in there or anybody that was hurt. Um, so, uh, that was that. And then we went into, you know, check on Officer Bermudez that was sitting down and started kind of trying to delegate, uh, securing the crime scene and putting out crime scene tape, that kind of thing. And, you know, uh, that was, that was kind of it.

Uh, one, one part I do re-, - - I, I totally left out, was when he was on the other side of my window and that second there or that moment, where, right before I pulled the trigger, is - - I remember, because I can see through the silhouette - - uh, through the window, open window, I can see him and his eyes and his hands. And I do remember there was a point right before I, I pulled the trigger, was that his, his hand grip on the, on the, on the object in his hand got tighter.

And that, to me, was like, okay, this - - he's now going to do something, whether he's going to forc-, forcibly push

through that door and come at me, or he's going to pivot and go after Wissler. But he was still looking directly at me so at that point I said, okay, it's me who he's coming after. For whatever reason he chose to come directly at me. So I think that-, - - I think that's about it.

Masalcas: I'm going to want to talk about - - I'm going to ask a series of questions and follow-up questions starting from the beginning and when you got the call. Are you good to continue?

Garcia: Yeah.

Masalcas: You mentioned that - - and - - well, were you dispatched to the call? Or did you - - I know you mentioned that you were on a different call at the time. Did you just add yourself to the call? Do you remember how that was?

Garcia: We were finishing up a report call and we added ourselves to the call because that call was within our beat.

Masalcas: And you mentioned that the involved person on this call, the suspect, was an unknown male, possibly named Leo, and you knew that going into the call. Did you know any other information - -

Garcia: Uh - -

Masalcas: - - going into this call, anything that you heard from Dispatch or - -

Garcia: I don't believe I knew the name until maybe after we were already on scene and after we drove past the green car the first time.

Masalcas: And when you drove up on scene at first were you the first unit there or - -

Garcia: Yes.

Masalcas: And did you immediately see the green Charger?

Garcia: As soon as we made the right turn, yes.

Masalcas: And I believe you said, you mentioned you had seen it before in that location.

Garcia: I've seen it in the area, driving eastbound Del Amo or northbound Crenshaw, that kind of thing. Uh, which made sense because the guy worked down the street, so - -

Masalcas: It's a pretty unique car to catch your eye?

Garcia: Yeah, it's a unique car and I used to own a Charger, so, uh, it kind of is one of those cars that you see, especially it was a unique color. I believe it was wrapped in a green color with a black hood. And the guy always revved his engine. And, uh, I believe that car has a Hemi, so it, it, it missed my - - made me miss my Dodge Charger with a Hemi.

Masalcas: And, when you turned onto that street and you saw that car, did you see someone in the car at that time?

Garcia: Yes.

Masalcas: Were you able to get a good look at him, enough to get a description of him?

Garcia: Yes. I thought it was - -

Masalcas: What did you see at the time?

Garcia: I saw a Hispanic male, probably in his late-20s/early-30s. Uh, saw facial hair and, uh, what I thought was a thick

moustache. And I thought I saw hair on his head but, uh - - uh, yeah, that's what I thought I saw.

Masalcas: And were you driving or was Wissler driving?

Garcia: Wissler was driving.

Masalcas: And he passed the vehicle?

Garcia: Yes.

Masalcas: Okay. And you saw this because the window was down a little bit?

Garcia: It was down about eight inches of so.

Masalcas: Okay. And the window was tinted?

Garcia: Yes, - -

Masalcas: Was it - -

Garcia: very dark.

Masalcas: Very dark tint? Did you know any other information about the suspect prior to arriving at that location?

Garcia: No.

Masalcas: Okay. While you're in route to the call did you ask for any additional resources or hear any other responding units ask for additional resources?

Garcia: I heard that the drone was I believe already in the air when - - prior to our arrival. And the drone didn't see anything. Uh, "Adam"-23 had been dispatched. I knew they were on their way but I don't recall where they were coming from. We were right down the street on Maricopa

and Crenshaw so I, I knew we were close. Uh, I didn't expect to be the first unit there. Uh, other units self-dispatched or, or were dispatched as well. Uh, so, no, no additional resources were called at that time.

Masalcas: Who was the handling unit?

Garcia: That would be - - that, that would be myself and Officer Wissler.

Masalcas: And you said you were the first unit on scene. Who was the second unit on scene?

Garcia: Uh, that would be Officer Castillo and Officer Bermudez.

Masalcas: Okay. And so, initially you're looking for - - what were you looking for?

Garcia: Well, initially I was just look for [SLIGHTLY LAUGHS] someone, someone to flag us down and say, "Hey, there's a guy down there with a gun." Because the way the call came in was kind of weird. It was just some unknown caller stating there's a man with a gun. And then there's a hang up. Then I believe they called that person back and that person didn't really say much and then just hung up again.

So we weren't sure if it was like an active shooter situation and somebody is, is calling in to report the shooter, and then on the callback, you know, the shooter realized that person is on the phone so they shot the guy. We, we didn't know.

Uh, I was looking for someone to flag me down. I was looking for someone walking ei-, either on Oregon Court or on any of the businesses north or south of carrying a gun. I - - that's basically what I was looking for.

Masalcas: Okay.

Krumbach: Sergeant Krumbach here, for the record, you're talking about a potential active shooter or based on these calls that were coming to TPD, but you're using the word "we." Who is that that you're referring to?

Garcia: "We," that would be Officer Wissler and I.

Krumbach: And is this based on conversations you're having with Officer Wissler? Or how are you both collectively coming to this - -

Garcia: No. In the car I'm talking about it. And I, and I believe I might have even mentioned in the call like, "Hey, dude, it's the holidays. People do funky stuff in the holidays." You know, coming from persons, that's when the - - it appeared like high volume of our critical incidents would happen during the holidays, just because of family issues, financial problems.

I don't know, people, you know, uh, getting desperate or maybe feeling like failures because bills aren't paid, rent is not paid, Christmas gifts aren't under the tree. I don't know, there's multiple reasons why people will kind of pick the holidays to be at their, at their worst or helpless.

Krumbach: And I guess now that we're talking about your conversation with Officer Wissler regarding this I guess time of the year and your experience with things in Crimes Persons and call-offs and what have you, since we're on the topic of Officer Wissler, what else do you talk to him about, from the time you guys leave that commercial burglary report, I think it was at Crenshaw and Maricopa, - -

Garcia: Yes.

Krumbach: - - to the time that you arrive at 2900 Oregon court? Is there anything else you guys are talking about?

Garcia: Uh - - I don't really recall because we got there pretty quick. Uh, I think it was just, hey, look out for people, look out for flag-downs look - - you know, you look left, meaning north, I'm going to look south. And, let's just see if, uh - - if something catches our eyes, something looks suspicious. Look for - - like I said, people running, or, or someone that just looks suspicious.

Masalcas: When you showed up to the - - when you arrived on scene and you had mentioned that you had - - you saw the green vehicle, weren't sure if it was related or not. You were expecting something, to see something more like a man with a gun walking on the street or an active shooter situation. But, at some point - - do you remember at what point you were sent a photo of the subject that was involved?

Garcia: Yes.

Masalcas: And when was that? Was that while you were in the area looking for the suspect? Or was that in route?

Garcia: That was, uh, when we were at - - that was after we circled back and drove past the vehicle, got the license plate, the return came back as some, some other person named Sandoval. Uh, I don't recall the first name. And that was after we met with Officer Castillo. And then he told us about the homeless encampment.

So we drove eastbound on Oregon Court again. Uh, and we pulled up in front of 2909 Oregon Court. That just happened to be, by chance, the parking lot that we pulled in front of, that we pulled into. And, you know, there's - - it's, uh - - there's businesses to the east and west. It just happened to be where we pulled up that was 290-, - - uh,

2909 Oregon Court. So as we were exiting our vehicle to kind of do a walkthrough of the area, that's when we were told that the person, uh, associated with that phone number, uh, is possibly an employee at the - - some scooter shop at 2909 Oregon Court, Unit 5.

Masalcas: And you were sent that photo to your work phone, I believe you said?

Garcia: Yes.

Masalcas: And at that point were you - - did you view your work phone?

Garcia: Right, we were walking toward Unit 5 and, and I believe the radio - - some - - Dispatch advised for officers to look at their work cell phones for a photo of, of Leo. So quickly pulled out my cell phone, looked at it, showed it to my partner. And then we continued to Unit 5.

Masalcas: At that point did you realize that that may have been the guy that was in the vehicle? Or - -

Garcia: It wasn't until after we checked the business and saw that it was empty that I talked to Officer Wissler and said, "Hey, that - - the guy in the green vehicle looked Hispanic and he had facial hair, but I could have swore I saw like a full head of hair on his head." Uh, and he said, "Yeah, I, I, I recall seeing that too, but I th-, - - I also thought he had hair." I was like, mm, could it have been a hat or something and we thought it was hair?

So we said - - I don't know, so that's when, uh, we told the radio - - uh, updated the radio about that information and, and the occupant of that vehicle, and told them it might be worth going back and taking a look. So I told them we, we would.

Masalcas: But did you think that it possibly resembled the suspect that was in the green Charger, the person that ultimately ended up being the suspect in the green Charger?

Garcia: Only the facial hair, uh, looked like - - you know, same facial hair, moustache and s-, - - like a beard. But I thought - - the photo that they sent us was a bald g-, - - the guy was bald.

Masalcas: Was it a CDL photo?

Garcia: No, uh, it didn't appear to be a CDL photo because, uh, it was a side profile photo. So I don't know where that photo came from.

Masalcas: Was it a Hispanic male?

Garcia: It was a Hispanic male, yes.

Masalcas: And you saw a Hispanic male in the green Charger?

Garcia: And I saw a Hispanic male so - -

Masalcas: Yeah.

Garcia: - - I couldn't say like that was 100 percent the guy. But let's go over there and, and check it out, maybe that guy saw something. Or, it could be our guy.

Masalcas: Did it match the general age of the person that you were looking for?

Garcia: I don't recall looking at the age, to be honest. Like, uh, I don't recall hearing the age of - - hearing Leo's age or I don't recall - -

Masalcas: I just meant from the photo did you - - when you saw the photo is he - -

Garcia: Oh, from the guy that we saw?

Masalcas: - - about the same age as - -

Garcia: Yeah.

Masalcas: - - the guy in the car?

Garcia: Yes.

Masalcas: And did you guys relay that to - - was that before or after you guys checked that business?

Garcia: It was after.

Masalcas: And did you relay that information to Officer Castillo and his partner, Officer Bermudez?

Garcia: We, we, we - - uh, we advised the radio so everyone heard it.

Masalcas: Okay. And you got back in your vehicles - -

Garcia: Correct.

Masalcas: - - and drove back onto Oregon Court?

Garcia: Correct.

Masalcas: And at this point were you driving westbound?

Garcia: Correct.

Masalcas: Okay. And you see the vehicle still there?

Garcia: Yes.

Masalcas: Could you tell if someone was still inside?

Garcia: No. I thought it was empty initially. And I was like, okay, my suspicions are false [SLIGHTLY LAUGHS] and the guy works at the business just south of it, and he was just on his lunch break and now he's heading back into work.

But, given the call and the circumstances, it still wasn't something that we were going to walk up on, just in case, for whatever reason, that is, you know, the caller, and that guy does have a gun, we, we stopped - - we positioned our vehicle similar to a traffic stop, and the proceeded to give commands.

Masalcas: Okay. And you - - did you tell Officer Wissler to pull around and behind him?

Garcia: No, he actually drove past him and then he did that on his own. Uh, drove past him, and then pulled around. Which, at that point I was kind of talking to him about tactics and, you know, if we have somebody just pull right in front of him and, you know, we have a clear picture of a windshield now. Our back is turned to him and - - but I think at the time we were, or at least I was, thinking, well, it's probably not going to be the guy. It's - - probably is on his lunch break. He's not there. Uh, and, uh - -

Masalcas: You mean he's not in the car now?

Garcia: He's not in the car, yeah.

Masalcas: Okay.

Garcia: He's not in the car anymore, yeah.

Masalcas: But, and, nonetheless, you set up tactically because - -

Garcia: Right.

Masalcas: - - you were - -

Garcia: Just in case, which usually, you know, I'm kind of more of a lowkey guy. I don't always treat everything like, you know, super tactical and, you know, I'm surprised I didn't just walk up on the car. But something, something t-, told me let's stop here, so we did. Uh - -

Masalcas: Do you think that might have had to do with the call for service?

Garcia: One hundred percent.

Masalcas: And that it might be a man with a gun?

Garcia: Yeah.

Masalcas: What do you think - - what - - the weather description and like - -

Garcia: Um, it was daytime still. Uh, weather was clear. Uh, yeah, it was about 5:00 so the sun was still up or was still sunlight at least.

Masalcas: When you pulled up could you - - you were on the passenger side and Officer Wissler was on the driver side?

Garcia: Correct.

Masalcas: About how far back do you think you were from the suspect vehicle?

Garcia: So there's a car - - probably a, probably a car length from the rear bumper.

Masalcas: Were any other police units with you at that time?

Garcia: Yes.

Masalcas: Who was that?

Garcia: Officer Castillo - -

Masalcas: And does he have a partner?

Garcia: - - and Officer Bermudez. Yes, Officer Castillo and Officer Bermudez.

Masalcas: Okay. Do you know if he was driving, or if Officer Castillo was driving?

Garcia: I do not know.

Masalcas: And where did they park?

Garcia: They initially parked to our - - the right side. To the right side of our unit, so the right side of, uh, our passenger side rear bumper. But they were offset to the right, almost directly behind the gray car that was between us and the green Charger.

Masalcas: Okay, so, from what you're describing, were they just south of you and just west of you?

Garcia: Correct.

Masalcas: Of your unit?

Garcia: Correct.

Masalcas: At that time when you first pulled up on the car, did you see the car door was open or closed?

Garcia: It was closed.

Masalcas: And do you remember if the windows were up at this point?

Garcia: No, still down, in the same, same position when we first got - -

Masalcas: Approximately eight inches down?

Garcia: Right.

Masalcas: With dark window tint.

Garcia: Right.

Masalcas: And when you passed by you couldn't tell if someone was inside at this point.

Garcia: No.

Masalcas: Got it. What's going through your mind at this point?

Garcia: What's going through my mind is, man, I really hope that this car is [SLIGHTLY LAUGHS] not involved and that that guy is now back in his business, and, uh, and, uh, that was just somebody on his lunch break and this is a big, you know, "Torrance fizzle," as we call it. Uh, uh, or like a - - gosh, what do you call those calls when somebody calls in something like a swatting call?

Masalcas: A fake call?

Garcia: Like a swatting call, right? Because somebody is like, hey, let's call this in so that we can go shoplift from Nike Store way down south and all the units will be north. Like those kind of things are going through my mind. Uh, and with the windows still being cracked a bit, so I thought, okay, the guy probably was on his lunch break and while we went to check 2909 here he is, uh, you know, back to work

at lunch. And the 2909 address is just like their office address and this other building which was just south of was maybe where they manufacture and, you know, uh, store their scooters that they sell. All of that was going through my mind.

Masalcas: But you positioned your vehicle, or you had your partner position the vehicle somewhat tactically because - -

Garcia: Right, be-, - -

Masalcas: - - you're still concerned.

Garcia: Because we're still concerned, because the window tint is super dark and we can't see who's, who's in there or not. And - -

Masalcas: And the nature of the call was - -

Garcia: And the nature of the call was a man with a gun. So we positioned our vehicle with a good enough distance to give ourselves reaction time in case the person inside was someone with a gun and that person, you know, came out firing, we'd have time and distance to re-, return fire and defend ourselves.

Masalcas: I know Dispatch mentioned, or you mentioned that you heard Dispatch say that it was a man with a gun call. But did they mention anything about what he was going to do with that gun?

Garcia: I believe the call said that he was going to go inside and shoot people or something. But we didn't know "inside" where.

Masalcas: And so, at this point did you think you were dealing with someone that was possibly homicidal?

Garcia: Yes.

Masalcas: And did you believe at that time that there was a possibility that he was inside of the vehicle?

Garcia: Yes.

Masalcas: Did you have any information that the person that you were dealing with was suicidal in any way?

Garcia: No.

Masalcas: And did you see the door cracked when you had pulled up? Was the door cracked open at all?

Garcia: [PAUSE] I, I don't recall if it was cracked or if he just at some point opened it and then it remained cracked.

Masalcas: After you were already there?

Garcia: I believe so, yes.

Masalcas: Okay. And at this time - - well, at what point did you actually think, oh, he's actually inside of the vehicle?

Garcia: When the door cracked open.

Masalcas: Okay.

Garcia: Because a door is not going to open on its own, so that's when I realized someone is inside and they're not obeying commands and just coming out, right? If it, if it was some guy on his lunch break he would just come out and say, "What's going on?" But - -

Masalcas: (Unintelligible) - -

Garcia: - - it was kind of just weird.

Masalcas: Who was giving him commands?

Garcia: Officer Wissler.

Masalcas: Did you tell him what to say?

Garcia: I just - - uh, no. I just told him to give commands. Uh, uh, we kind of - - we - - or, I, told him to be the person to give commands, that way there's just one person giving commands and there's not confusion or multiple, multiple people giving commands. It's just it's clearer that way.

Uh, and he, he just - - he started giving commands on his own, uh, as far as telling the guy what to do, "open the door," "come out with your hands up." Which was all, uh, appropriate to me. It wasn't, you know, anything that I felt I needed to tell him to do. He, he was doing okay on his own.

Masalcas: Do you remember the commands that he was giving?

Garcia: Yes.

Masalcas: And do you remember him specifically saying "step out of the vehicle."?

Garcia: He was saying, "Driver," uh, "open, open your door," uh, "come out with your hands, hands up where we can see them," stuff like that. "Step out of the vehicle" was, was, I believe one of them.

Because we definitely weren't going to walk up on a vehicle if it's a man with a gun. So we wanted him to come out with his hands clear, nothing in them. Uh, and then that way we can address whatever it is needed to be addressed, whether he is involved or, or not.

Masalcas: Okay. At this point you're still the lead vehicle.

Garcia: Correct.

Masalcas: Okay. And Officer Castillo and his partner are positioned slightly adjacent - -

Garcia: Southwest, yes.

Masalcas: - - southwest. Are you initiating a high risk vehicle extraction at this point?

Garcia: It wasn't until Officer Castillo approached my door with a, with a rifle and said, "Hey, I've got the rifle. I've got point." Uh, at that point I stepped away. But now I was behind him and I tried looking for cover to my right, but it was - - there's no real good cover. And then I looked at where their vehicle was and I noticed that it was, uh, behind me, where, where I mentioned.

Because at that point I hadn't looked to - - I wasn't focused on anything but directly at the vehicle in case somebody did come out with a gun. Uh, at that point is when I advised Officer Bermudez to move his vehicle and position it like a felony stop to the north of my vehicle.

Masalcas: Okay. And what was Officer Castillo doing at the time?

Garcia: Officer Castillo was standing at the front driver side door - - oh, sorry, front passenger side door, which is open. So he was standing behind that door taking cover.

Masalcas: Of his own vehicle, or of yours?

Garcia: My vehicle.

Masalcas: Okay. So you had left your passenger side door and Officer Castillo had taken up that position?

Garcia: Correct.

Masalcas: And why is that?

Garcia: Uh, he walked - - he had a rifle in hand and, uh, if this person did come out with a - - with, with some type of weapon, uh, uh, a rifle would be, uh, a better weapon to have than a, than a handgun. It's more accurate, for one. It's a higher - - it's a - - definitely has more power than a, than a, than a pistol would.

Masalcas: Were you concerned for your safety at this point?

Garcia: Uh, yes, once - - because at that point I believe the door had partially opened and then stayed cracked, so we knew that something, something was not right. You start to kind of get those - - you know, they describe the hair on the back of your neck kind of starting to prick up. So we knew something wasn't right.

And at that point, uh, I, I thought, okay, this, this is going to be the guy that called. This is, this is not, uh, some guy on his lunch break. This is - - based on his actions and his, uh, his, uh, not obeying the commands that Officer Wissler was giving him, which were loud and clear, uh, that this was going to be our guy.

Masalcas: Okay. And at this point did you detain him?

Garcia: Well - -

Masalcas: Was he detained?

Garcia: Yes, our lights, our lights - - our overhead lights were on. The red and blue lights were on. Uh, so, yes.

Masalcas: And you said you had Officer Bermudez reposition his vehicle. In what type of configuration?

Garcia: He repositioned his vehicle just north of - - at a - - almost like a 45, like a felony stop or - - yeah, felony - - uh, best, best way I'd describe it is a two-car felony stop.

Masalcas: Is that what you told him to do?

Garcia: Yes, I believe those were my specific words, "Reposition the car, put it to the left of ours, position it like a felony stop so you can - - so that you can see into that car." Because I figured the driver side of that vehicle positioned at an angle would have a much better line of sight on the Charger than Officer Wissler or, or Officer Castillo had.

Masalcas: And after Officer Castillo took you position on the passenger side of your vehicle, - -

Garcia: Yes.

Masalcas: - - where did you position (unintelligible)?

Garcia: I ran around and positioned myself in the front passenger side of Officer Bermudez and Officer Castillo's vehicle.

Masalcas: Which was north of your vehicle.

Garcia: Correct.

Masalcas: And was Officer Bermudez on the driver side door?

Garcia: Yes.

Masalcas: Was he taking up a position of cover behind his door?

Garcia: Correct.

Masalcas: And you were taking up a position of cover behind your passenger door at that point?

Garcia: Correct.

Masalcas: Okay. And who was giving commands at this point?

Garcia: Officer Wissler.

Masalcas: What crimes did you think you were possibly investigating at this point?

Garcia: I thought I was investigating a homicide.

Masalcas: Did you think it was possible that he had possibly already killed someone, or seriously injured someone, and they were either in his vehicle or nearby?

Garcia: Yes.

Masalcas: And why is that?

Garcia: Uh, because of the nature of the call, man with a gun, that was going, going to come in and shoot people. Uh, the blood on his arms, uh, from that distance I couldn't see if they were self-inflicted wounds. He also had - - I believe he had blood on both arms and he had a big bloody stain on - - it looked like a bloody stain, on his lap, like on his lower right leg, kind of groin area kind of thing. So I pictured him stabbing somebody in the seat, passenger seat behind him, beside him, and that blood kind of landed on him, or him putting his hand back on - - I don't - - I just pictured something like that.

Masalcas: And when - - okay. So the door was cracked, slightly.

Garcia: Right.

Masalcas: When did you make that observation?

Garcia: Uh, once I moved over to the passenger side of the vehicle eventually the door opened fully. And, uh - -

Masalcas: What did you see at that point?

Garcia: I can see his arm and the blood. Uh - -

Masalcas: Did you see anything else?

Garcia: The sharp object in his, in his hand.

Masalcas: What did that sharp object look like?

Garcia: Uh, it looked like, uh, some type of bladed weapon, some type of sharp weapon, uh, maybe about six - -

Masalcas: Can you describe that for me?

Garcia: Yeah. Maybe about six to seven - - no. Like six to eight inch, uh, metal, uh, blade or sharp pointed object. Uh, and then a - - I could see a black handle.

Masalcas: And at what point did you see that? Was he still seated in his vehicle?

Garcia: He was still seated. No. [PAUSE] Yeah, he was still seated. I'm, I'm trying to remember if when he pushed the door open, if he had it in his hand, or if we just saw blood. And then once he stepped out that's when, that's when we (unintelligible) - - I think, I believe that's when we saw it- - without going back and dissecting that video minute by minute, I just briefly looked at it, I would say it wasn't until he stepped out did we see - - did I see the sharp object in his, in his hand.

Krumbach: Okay.

Masalcas: Yeah, I'm just going on of what you recall at the moment.

Garcia: Right. The - -

Masalcas: You recall the door opening at a certain point.

Garcia: Right. And his left hand pushing it open. And then seeing blood.

Masalcas: Okay.

Garcia: And then it wasn't until he stepped out. And then that's when he - - once he stepped out that's when I saw the, the, the object in his right hand.

Masalcas: Okay. Did anyone tell him to step out of the vehicle?

Garcia: Yes. That was when Officer Wissler was giving him commands to step out with his hands, hands free, hands up.

Masalcas: Okay. Do you know if your spotlights were activated at this point?

Garcia: [PAUSE] I don't recall. I think, I think the spotlights from Officer Berumdez' side on the driver side was open, uh, was on, but I, I don't recall turning, turning mine on, that was positioned in front of me. And I don't recall whether the lights from my unit were turned on.

Masalcas: Okay. Were you - -

Garcia: It was, it was still fairly bright out.

Masalcas: Once he opened up the door with his left hand and you said you saw blood, did you - - were you concerned for your safety at that point?

Garcia: [PAUSE] At that point, kind of a shock, because we, we - - I don't know that we were expecting that. Or at least I wasn't. I wasn't expecting that, - -

Masalcas: Well, why wouldn't you - -

Garcia: - - seeing the blood.

Masalcas: - - expect that if you were asking him to step out of the vehicle?

Garcia: Um, I wasn't expecting to see blood on his, on his hand. Uh, obviously, due to the nature of the call, and whether he did shoot somebody, I wasn't sure that - - you know, usually if you're shooting somebody you're not going to have a bunch of blood on your arm if - - unless you're like super close. So, um, I didn't think, think that this initial was until he came out with the knife.

Then that's when I thought, oh, crap, this guy, uh, maybe didn't make it to wherever he was going to go shoot people and, instead, stabbed somebody in his passenger side.

That's when I started thinking about this might be more like a domestic thing, uh, for whatever reason. And, and, and even though he has that knife, he still has - - there's still potential for him having a gun.

So, it wasn't until, uh, he stepped out that I was like - - that I thought, okay, uh, then started to have, have that fear.

Masalcas: From where his driver's door was to where you were standing on the passenger side door of the north vehicle, what do you estimate that distance at?

Garcia: Oh, gosh. [PAUSE] Maybe thir-, - - maybe 30 feet.

Masalcas: Okay. And you saw the driver's door open.

Garcia: Right.

Masalcas: You saw his left hand with - -

Garcia: Right.

Masalcas: - - blood on it. And then what happened?

Garcia: Uh, at that point I was standing at the door, passenger door, of, of Officer Bermudez/Officer Castillo's vehicle. And I remember I had my gun at the low ready. And I was pointing in his direction at the low ready. And there was that second where he stepped out, kind of looked at us all with a blank stare, but then started to walk diagonally and then toward me, which is when, uh - - that's when things kind of kicked in at high gear, the fear of like, ooh, if you shoot this guy it's going to do something. Started to - - like that's when the "okay, this guy has just did something and now he's going to finish it." Um, those thoughts and that fear started to kick in.

So that's - - I was tracking him with my weapon still at the low ready, and now he's coming directly at me and he's not stopping. And I - - like I said, I recall at one point stepping back, or at least away from the window. Because I had my arm rested on the, on the doorframe, um, and I remember taking a half step back, uh, just to create some distance and continue the dialogue with him. Uh - -

Masalcas: Okay. And when you said he walked diagonally, did he - - when he initially stepped out of the vehicle did he face you?

Garcia: No, uh - -

Masalcas: Did he face other officers?

Garcia: He just faced directly in front of him, just directly west, where he just kind of stepped out, just looked directly west and then - -

Masalcas: And when he stepped out - -

Garcia: - - started walking.

Masalcas: - - and faced directly west, did you notice him holding anything in either of his hands at that point?

Garcia: No, just his right hand.

Masalcas: Okay. And what was in that right hand?

Garcia: The sharp - - the, the object.

Masalcas: Okay. And did he turn around at some point?

Garcia: Away from us.

Masalcas: Oh, I'm sorry. When he exited he was already facing you?

Garcia: Right.

Masalcas: Okay. And he was holding the sharp object.

Garcia: Yes.

Masalcas: Okay. And you were holding your firearm at the low ready at that point.

[UNITELLIGIBLE COMMENTS]

Masalcas: We're - - let's take a break here. I think I'm having a problem with my recorder. We'll go ahead, and, if you don't mind, just quickly go off the record, at 1508 hours.

[WENT OFF OF THE RECORD]

[CAME BACK ON THE RECORD]

Masalcas: All right, I'm back on the record. We're - - it's 1517 hours. We're in the Bureau Commander's Room. This is Sergeant Jason Masalcas. I'm still with my partner, Sergeant Kent Krumbach, my lieutenant, Lieutenant Michael Chance, Officer Jesus Garcia, and his attorney, Stephen Chulak.

At where we left off, Jesus, you were explaining how the suspect was - - he had just exited the vehicle and he was facing officers. At that point you explained he was holding the sharp object in his right hand.

Did you - - at this point was Officer Wissler the only officer giving him commands?

Garcia: Yes.

Masalcas: And why is that?

Garcia: Uh, just helps control, uh, chaos. And if there's just one person giving commands and they're loud and clear, then that person is only focusing on the person giving him commands and they're clear and there's no confusion.

Krumbach: Okay.

Masalcas: And at this point were - - was it your perception of the commands, the intent, to just get him to open his door and show his hands? Or was it to start the felony extraction at that time?

Garcia: At that point where the subject is already out or - -

Masalcas: No.

Garcia: - - before he came out?

Masalcas: At that - - at - - well, yeah, before he had exited.

Garcia: Before he had exited it was to get the subject to step out with his hands free, uh, and just get him out of the vehicle so we can investigate further.

Masalcas: Okay. And once he stepped out and he was facing you guys with the knife, did - - were you giving him any other commands?

Garcia: Yes. Officer Wissler was giving him commands to "drop the knife and lay down on the ground." Uh, I believe he also told him to turn around and face away from us.

Masalcas: Did he do those things?

Garcia: No, he did not.

Masalcas: What was going through your mind at that moment?

Garcia: About a thousand things. Uh, like I stated before, at that point, after seeing the sharp object in his hand and the blood on his arms and his clothing, I began to think that - - well, several different scenarios. One of them being that he just either stabbed someone in, in his car, uh, like a partner or, or a child and, uh, now he was coming to, to attack us.

Masalcas: And when you partner, Officer Wissler, was giving him these commands, did he communicate back to you or your partners in any way?

Garcia: No. He - -

Masalcas: Both verbally, nonverbally?

Garcia: I believe that at his car when he first stepped out and he faced up for that, gosh, it seemed like a long time, but I know it was just a split second, he put his arms out about six or seven inches from his side and shook his head "no."

Masalcas: And what were your observations at this point of him?

Garcia: My observations were that he matched the description of the photo that we received so that got me thinking into, okay, this is the guy that called. And, uh, it looks like the photo. He's in the vehicle, he's covered in blood. He has a sharp object in his right hand. He's wearing baggy clothing. He's a pretty big guy. Like I said, he's - - I'd, I'd say he's at least six feet, maybe 250 pounds or so, wearing baggy clothing.

So I'm still thinking, even though he has a sharp object, he still has a, a weapon, maybe a gun in his waistband. So, although, in, in my mind I'm thinking he just stabbed somebody in his car, he, at any point, can transition to a firearm and, and, uh, attempt to shoot us.

Masalcas: Okay. And did anyone put out any radio transmissions at this point that you recall?

Garcia: Yes.

Masalcas: And what were those?

Garcia: Uh, they were we have a man with a knife, he's bleeding from his arms, the - - let's - - uh, you know, the next unit that comes up, let's get a 40, 40 going. Uh - -

Masalcas: And who is putting that information out?

Garcia: I think it was a combination, Officer Castillo and I. Because I, I do recall getting on the radio saying - - requesting a 40 again. Uh, and the radio - - I remember the radio saying it, it - - it's coming, or somebody saying it's coming.

Uh, and that was at the moment where he initially stepped out. Uh, I, I believe it was said beforehand when his arm first opened the door and we saw blood, but we said it again when he [KNOCKING SOUND], when he initially stepped out. Uh, I believe that's when I said it. Castillo had asked for it before and I asked for it when he stepped out - -

Masalcas: Did you specifically ask - -

Garcia: - - closer.

Masalcas: - - for a 40?

Garcia: Yes.

Masalcas: And you heard either Dispatch or another officer say - -

Garcia: It's coming.

Masalcas: "It's coming"?

Garcia: Yes.

Masalcas: And what did that - - what did you think that meant?

Garcia: That meant that that unit that I observed driving westbound was - - you know, had parked their vehicle b-, - - somewhere behind our vehicles and was in the process of, of removing the 40 from the bracket in the trunk, and

acquiring the rounds and loading it and, uh, making it ready for use.

Masalcas: And you mentioned the suspect had - - was - - had blood on him. Did anyone ask for TFD?

Garcia: I don't recall.

Masalcas: Okay, at this point the suspect is holding a knife, he's facing back towards officers.

Garcia: Right.

Masalcas: And - - [PAUSE] at that moment I know you mentioned that he matched the description of the person that you were there to look for.

Garcia: Correct.

Masalcas: Did you recognize him at any point in time? Like did you recognize him from any previous experience, or have any past experiences with him?

Garcia: No.

Masalcas: Any knowledge of him whatsoever?

Garcia: None.

Masalcas: And after he turned around and - - or, after he exited the vehicle and was facing officers, about how long did it take before he started walking towards officers?

Garcia: Less than a second. It was almost immediate.

Masalcas: So almost simultaneously?

Garcia: Right.

Masalcas: And you mentioned that he was still holding the knife, or he was holding a sharp object, and you described that to us. But, how was he holding it?

Garcia: He was holding the black handle in his right hand and he was holding it down along his right thigh, but out away from his thigh maybe seven to eight inches. And he had - - his left hand was almost just straight down, maybe a couple inches from his left thigh. That's how he was when he, when we first - - when he first stepped out.

Masalcas: Did you feel threatened at that moment?

Garcia: At that moment, uh, yes. I mean, he was almost - - it was almost like a fighting stance, you know, like not necessarily where he's putting his dukes up, but almost like a, like a flex kind of stance. And he's a pretty big guy. Uh, like I mentioned, he's about six feet, uh, 250 pounds, it seemed like, so he - - uh, I mean, pretty big, pretty big guy.

When, when he stepped out of the car he took up that entire area outside of his vehicle next to his door, so, uh, I, I did think, okay, this is a big guy, if this guy starts charging after us/coming after us we're going to have to act fast and, you know, where's, where's the 40 in case, uh, we can get that deployed before he covers any, any ground.

Masalcas: And you put that out over the air, right? The request for the 40?

Garcia: Yes.

Masalcas: Okay. Did - - and did you tell him to drop the knife, or did another officer tell him to drop the knife?

Garcia: Initially only Officer Wissler was telling him that, or told him. And then once he started to make - - uh, once he started to - - once he turned diagonally, then we all - - it was everyone telling him to, to, to stop or drop the knife.

Masalcas: And, this diagonal movement, can you describe that to me?

Garcia: Uh, so he's standing r-, - - initially he's standing in front of his open door. Uh, so he's in front of the door panel basically the open-, opening of his vehicle. And he started to walk in, uh, like a 45 degree angle.

Masalcas: Towards which direction?

Garcia: Toward the northwest. So he started walking and he took maybe four steps in that direction, and then did like a half turn and then started walking directly westbound, directly at my, at my passenger side door.

Masalcas: And did that make you feel more threatened when he made that diagonal move?

Garcia: Oh, yeah.

Masalcas: And at that point did - - you mentioned other officers started giving him commands?

Garcia: Yes.

Masalcas: Did that include you?

Garcia: Yes.

Masalcas: And what types of commands were those?

Garcia: I was giving him commands to "stop," "drop the knife," - - "stop," "drop the knife," uh, "I don't want to shoot you, I

don't want to shoot you." I believe I said that twice. Uh, I momentarily put my hand out - - uh, uh, trying to remember this. Momentarily I did some kind of motion, put my hand out if for some reason he wasn't understanding what we were saying. But he was looking directly at my hand, directly at the barrel of my weapon, and even with, with all of that, he didn't stop his advancing toward us, toward me.

Masalcas: Did he cooperate in any way?

Garcia: No, sir.

Masalcas: Did he communicate in any way to you at that point?

Garcia: Uh, maybe a few steps before he got to my front passenger, passenger side bumper he shook his head "no" again, when I was saying "stop, get on the ground, drop the knife." I - - uh, yeah.

Masalcas: The pace at which he was aggressing initially you said he was diagonal at a northwesterly direction. Was that more towards Officer Bermudez?

Garcia: It appeared that way, that initially he was walking - - it would be toward his direction. But once he got directly in front of my doors where he kind did a quarter turn, let's say, into, into my, my direction.

Masalcas: Did you feel he was walking directly towards you?

Garcia: Yes.

Masalcas: And how would you describe the speed at which he was walking?

Garcia: It was a - - it was like a normal walking pace. It wasn't fast by any means. It wasn't running, wasn't a speed

walk. But it was a normal walking pace. But, uh, the look on his face, the look on - - you know, the way he was holding the sharp object, and the way he was coming at me was very deliberate, very, uh - - it was, it was deliberate and aggressive, as, as like "I mean business, I'm going to, I'm going to do something to you, I'm going to hurt you."

Masalcas: And I know you had mentioned your CMT background and your attempts to deescalate and plead with him to stop. At any point in time did you - - at that point, as he's aggressing on you, did you feel that your commands were effective?

Garcia: No.

Masalcas: Did you continue to still give commands?

Garcia: Yes.

Masalcas: And at any point did he cooperate?

Garcia: No.

Masalcas: Okay. [PAUSE] At this time when he's aggressing towards you did you think that another officer was there with a less lethal option already up and running?

Garcia: I was expecting at any moment for one of the other officers that arrived on scene to come up somewhere, either alongside me or along one of the other officers and, and shoot him with a 40.

I was, I was waiting and basically praying for someone to yell out "40, 40, 40," as we're trained to do, so that we know that a 40 is being deployed and not a firearm is being fired. So that, uh, you know, it's clear to us and there's no reaction or contagious fire.

So I was, I was praying for the sound. I was praying to hear the sound "40, 40, 40," hear the 40 get deployed, see him get hit by the 40 and basically drop, but that, that didn't happen.

Masalcas: And did you hear anyone pleading for someone to shoot him with a 40?

Garcia: I heard Officer Castillo - - as, as the subject was now walking directly toward me and, oh, gosh, maybe five feet from my front bumper, I can hear Officer Castillo yelling, uh, basically pleading for a 40, like, "Where's the 40? Get the 40 up here." Or something, something to that nature. Uh, but, but, but it wasn't there.

Masalcas: At that time did you know who was going to bring the 40?

Garcia: I thought it was going to be either Officer Choy or Officer Kevin - - uh, Officer High, because they were, they were the unit that I saw driving westbound right before the guy's door opened. So I thought they were the only other unit there, and that they were, they were, they were the only ones present to, to bring up the 40.

Masalcas: And did you expect any of your other partners to bring up the 40?

Garcia: No.

Masalcas: And is that because of their current role at the time was - -

Garcia: Uh, it was because of our current role. We - - you know, we were basically all in line with each other. And I feel like if I were to move away and, and if he came directly at Wissler, that'd create some kind of crossfire. If, I moved away and then went after Officer Bermudez, now Officer Bermudez is on the island by himself and the other two

officers can't, can't do anything. Uh, so I felt like our roles that, that were there at the time with the short amount of time that we had to, to prepare and react to the subject's advance toward us, there - - it was not feasible for any of us to transition to a 40 or, or, or even a taser at that time.

Masalcas: Where was your taser positioned on your body?

Garcia: It was on my, on my, on my vest.

Masalcas: On your chest?

Garcia: Yes.

Masalcas: Okay. And did you make any attempt to transition to the taser?

Garcia: Initially I did. Uh, for that split second when he first was standing outside of his vehicle, I, I made the attempt to transition to my taser. But then once he turned in that diagonal, uh, when he made that facing movement, uh, or he started walking diagonally, I, I, I didn't think there was going to be enough time for me to transition.

And the thought of using a taser and the taser not always being 100 percent, uh - - well, one, uh, not "accurate," but, uh, uh, to work properly, uh, I, I, I felt that I was too close in proximity to the subject to transition and have the weapon - - have the taser be effective. So I, I, I, I didn't transition and kept, kept on my firearm.

Masalcas: And I know you mentioned earlier that he possibly still - - you still believed that he was possibly still armed with a firearm. Is that still correct at this point, as he's aggressing on you?

Garcia: Correct.

Masalcas: After he exited the vehicle and in the short time that there was a window, in your opinion, a window of opportunity to utilize less lethal, did you feel like that opportunity was (unintelligible) quickly?

Garcia: The opportunity was quickly evaporating from our options as far as keeping each other safe or keeping ourselves safe. There was no, there was no time to transition.

Masalcas: And you - - and it crossed your mind, and you even tried to transition, - -

Garcia: Correct.

Masalcas: - - but were unable to because you realized that there - -

Garcia: Thing-, things were happening fast and he was aggressing on us or sp-, specifically on me.

Masalcas: And that you were dealing with a lethal situation versus a less lethal situation.

Garcia: Correct.

Masalcas: And - - [PAUSE] you had mentioned that you had told him to stop and drop the knife. Did you ever tell him that he would be shot if he continued to walk towards you?

Garcia: I, I believe that at the point where he was about a step from my front bumper I told him twice that I did not - - wanted to stop, I didn't want to shoot him, "Stop. I do not want to shoot you."

And that's when he was at a much closer range, obviously, and I, I looked into this eyes and just saw emptiness, and, and just desperate look in his eye that I've never seen before in somebody. Uh, and I, I knew at that point that n-, no matter what type of de-escalation tools, or tactics,

or verbalization I tried to use on him, what type of skills I've learned or acquired over the years as a CNT member, that it wasn't going to work.

Uh, which is what I can still see through the opening of my window, his hand gripped the sharp object tighter. And at that point I felt it's - - he's going to do it right now, he's going to - - he's already - - he was already way too close, way too close for comfort, based on our training and the distance of someone with a sharp object.

And I, I felt like every step he took it was an additional opportunity that we're giving him to stop what he was doing, stop his, his advance toward us and drop the weapon. And giving him one more chance to basically seek another way, uh, rather than, than what he had set in his mind to do.

Uh, and when we got to that point of, you know, there's, there's no - - there's nothing else I can do. Uh, and, like I mentioned, there was a moment there where I, I sincerely felt helpless as, you know, I'm going to have to pull the trigger of my firearm. Which is what - - something I did not want to do.

But I had to do it in order to protect myself and protect my, my partner at the time, uh, which is Officer Wissler, which was immediately to my right. Which I felt if the guy made his way toward me and overpowered me Wissler would be next. So that's when I, that's when I, uh, fired my weapon.

Masalcas: And when you said that you desperately wanted him to seek another way, did you mean you wanted him to cooperate?

Garcia: I wanted him to stop, drop the knife, let us take him into custody and take him to the hospital to seek psychiatric

evaluation, and get the type of help that he may need, uh, based on whatever it is he might have done. You know, uh, us shooting him, to me, wasn't - - you know, wasn't his, his only option.

I wanted him to know that there's other options. And I was hoping that by him and I sharing that moment where we're looking into each other's eyes, and me desperately telling him that I don't want to shot him, I was hoping that there was a bit of humanity left in him where he thought - - [PAUSE] where he thought this, this isn't fair, I'm not going to make this, this man who doesn't want to shoot me shoot me.

Masalcas: Did you think at that moment that you were in imminent danger?

Garcia: Yes.

Masalcas: Did you feel that your partners were in imminent danger?

Garcia: Yes.

Masalcas: And when you were looking into this eyes in that moment and you said you felt like he was going to do it, what - -

Garcia: It - -

Masalcas: - - did you feel he was going to do?

Garcia: I felt like he was going to just bum-rush through that door and start stabbing me. I just - - I pictured videos that I've seen, training videos I've seen, where officers have been in that situation where they're confronted with a - - you know, somebody walking toward them and, and them allowing them to get too close and the person just either stabbing them or stabbing somebody else. And I didn't want that to happen to me.

Masalcas: And how far away was he when you felt that way?

Garcia: About as close as you and I are right now, which is four feet.

Masalcas: And was it at that point that you decided to discharge your firearm?

Garcia: Yes.

Masalcas: Did you feel you had any other option at that moment?

Garcia: No.

Masalcas: At that distance?

Garcia: No.

Masalcas: Did you feel you gave every opportunity to cooperate, and to follow you commands and to seek another way?

Garcia: [PAUSE] I felt like I gave him - - I and my partners gave him every moment and then some to, to seek another way. I think we would have been justified in shooting him five to 10 feet before he - - we actually did.

So I feel like our reluctance to actually shoot him, and give him every opportunity to stop was given and then some, even if it came at our expense and, and really, really, uh, sacrificing a lot of our officer safety and really putting us in a position where we - - any one of us would have got really hurt or there was potential for crossfire because of how close he was.

Masalcas: And when you pulled the trigger that first time where were you aiming?

Garcia: Center mass.

Masalcas: And that was at about three feet away?

Garcia: Four.

Masalcas: Four feet away.

Garcia: Four to five.

Masalcas: How many rounds in total did you fire at him?

Garcia: Two.

Masalcas: After you shot that first round did the first round - - was it effective in stopping the threat?

Garcia: No.

Masalcas: What happened?

Garcia: I fired a second round because he, he didn't, he didn't go down. He didn't and he was still standing.

Masalcas: Was he still aggressing you?

Garcia: Uh, it appeared that way.

Masalcas: Did - - was he still holding the knife?

Garcia: Yes.

Masalcas: Did he make any attempt to cooperate at that moment prior to you discharging a second round?

Garcia: No.

Masalcas: Where were you aiming your second round?

Garcia: At his chest.

Masalcas: When you fired the second round about how far away was he from you at that point?

Garcia: Four feet.

Masalcas: And did the second round stop the threat?

Garcia: Yes.

Masalcas: Did you still think, prior to discharging that second round, that you or your partners were going to be in imminent danger, risk of suffering serious bodily injury or death?

Garcia: Yes, I did.

Masalcas: Did you feel you had any other options at that moment?

Garcia: No.

Masalcas: Why did you fire additional rounds?

Garcia: At that point he, uh - - he fell to the ground. I no longer saw him as immediate threat so I immediately closed my door so I could see him, to make sure that he wasn't going for a secondary weapon, in case he did have a firearm, firearm on him.

Masalcas: Okay. And he fell to the ground. Can you describe that, where, exactly, that was?

Garcia: Uh, so it almost seemed like his legs folded under him. And he fell almost straight down, but his body turned where his upper torso was now facing south and his body was - - his upper body was leaning up against the passenger side wheel well of my vehicle. Which, uh - -

when I closed my door to get a look at him really, really kind of gave me that, uh - - that "oh, crap" feeling. This guy was way too close.

Masalcas: And what did you guys do then?

Garcia: Uh, we gave him commands to, to drop the knife, because he, he was still holding it in his right hand, still had a fairly good grip on it. Uh, we knew we had to administer first aid and get him help. Uh, so we formulated a plan to - - I initially asked for a shield and I thought maybe Officer Castillo, because he's on the SWAT team, carries a shield in his car.

I knew no sergeants were at the location yet so I, I, I didn't think we had a - - I didn't think a sergeant was there with a shield. But I thought Officer Castillo did. So I asked for, uh, an officer to grab a shield, uh, because I thought let's get a shield, let's walk up to the guy, uh, use the shield, get the knife out of his hand and then let's take him into custody and, and, you know, administer whatever kind of first aid we needed.

Uh, I also thought about the shield because we still had to go check on the car. I didn't know what was waiting for us in the car. So we formulated a plan to do that, walked up to him, removed the weapon from his, from his hand, uh, put him in cuffs and then officers started to, uh, check for, uh, gunshot wounds or other injuries. And then at that point we, we went and searched the car to make sure that there was nothing else in there, or anyone else in there that, that needed our help.

Masalcas: Do you remember who went up and removed the knife?

Garcia: Uh, who, who took it out of his hand?

Masalcas: Yeah.

Garcia: That was Officer Choy.

Masalcas: Okay. And do you recall who handcuffed him?

Garcia: No.

Masalcas: But do you - - did someone handcuff him?

Garcia: Yes.

Masalcas: And I believe you said you handcuffed him to the front or - -

Garcia: Right, (unintelligible) - -

Masalcas: - - he was handcuffed in the front?

Garcia: I just recall that when they were trying to handcuff him somebody - - whoever it was, was trying to handcuff him behind his back and Officer Castillo saying, "No, handcuff him to the front because we're going to have to lay him on his back and, uh, potentially do compressions, if, if needed, for, uh, CPR."

Masalcas: And immediately after handcuffing him the concerns were providing him medical care?

Garcia: Correct.

Masalcas: And also clearing the vehicle.

Garcia: Correct.

Masalcas: Okay. And you had mentioned that, the shields that you requested, you were still concerned that - - with the vehicle, - -

Garcia: Correct.

Masalcas: - - using the shield. Why is that?

Garcia: We just didn't know what, what to expect in there. We didn't know if there was somebody else that was down in there, or if there's - - if he had an accomplice or something.

Masalcas: And that maybe he was also armed with a firearm?

Garcia: Correct.

Masalcas: Did an officer provide emergency medical services to him, lifesaving measures?

Garcia: Yes.

Masalcas: Was that immediate?

Garcia: Immediate.

Masalcas: Do you know who that was?

Garcia: Uh, after clearing the vehicle we circled back around and I believe I saw Officer Gwell, uh, do compressions.

Masalcas: And did anyone request TFD at that point?

Garcia: Yes. TFD was requested, I'm sure, before that. Or I, I don't know. I know TFD was requested, but, yes.

Masalcas: And then you guys went up and cleared the - - did you go up and clear the green Charger?

Garcia: Yes, I did.

Masalcas: And did you find anything else of value in there? Was there any persons?

Garcia: We - - I, I was only looking for persons. I did not seen anybody else in there. Uh, I didn't manipulate the vehicle. I instructed people not manipulate it. And I just walked away and went to check on, on my partner who, uh, obviously, you know, Day 1 of Month 3 could be a very traumatic situation and unknown, and we hadn't had the opportunity for he and I to talk about, you know, what to do in an officer-involved shooting type of thing.

So I, I quickly just went to him and spoke with him briefly about, uh, not talking to anybody, not manipulating his Sam Brown or his weapon, don't - - you know, don't make it safe, just leave it as-is because we're going to go back to the station, we're all going to be separated. And, uh, and he's going to be processed and they're going to need to take photos of, of his stuff and inventory. So that was all I had a chance to talk to him about.

Masalcas: Did the fact that you had a trainee with you, did that heighten your sense of fear and concern during this situation?

Garcia: Uh, most definitely, because I knew that I wasn't just responsible for myself, I was responsible for my partner, Officer Wissler. And then where I ended up in the - - basically, the lineup of where our vehicles were positioned, I was now sandwiched between him and Officer Bermudez who was to my left, who was on his third hour of his first shift. So I felt, uh, a huge sense of responsibility for both of them, including myself.

Uh, y-, - - af-, afterwards, after clearing the vehicle, I remember walking back and seeing Officer Bermudez sitting on the curb and, uh, people consoling him. So I went over to just make sure he's okay. Uh, but, yeah,

that was, that was, uh - - there was a lot of responsibility on my shoulders, I felt. Not, n-, - - with the, you know, arriving at the call, seeing the door crack open and realizing, oh, crap, this is, this is our guy. And then everything that happened during and after, and then transitioning into, you know, uh, CRASH person detective mode and securing the crime scene and setting up crime scene tape, and, uh, you know, instructing people, you know, what to do and put business cards over shell casings so that they don't get kicked, kicked around by responding officers or TFD personnel, that all kind of kicked in.

So it was, it was kind of a lot. And, uh, I eventually was told to remove myself from that and - - which I did, and I just went to sit on the west side of Maple Street, just kind of observing and, uh, maybe every now and then chiming in and saying something to somebody as they're walking by to make sure that certain things were done. Because, ultimately now this has been a crime scene, right? And, uh, you want to be able to, to, uh, keep the crime scene about as pure as we can, uh, in, in regards to how everything happened, uh, so that the investigators can do their job and not wonder, hey, where, where's the - - you know, why are there shell casings way over here, where's the weapon that the subject had, that kind of thing.

Uh, yeah. Sorry.

Masalcas: Did - - I know you mentioned earlier that you had some knowledge or training and experience of the 40 millimeter being ineffective with subjects with a knife. Is that correct? Did you mention anything about you know that at times it's - -

Garcia: I think I just said in general they could be ineffective.

Masalcas: Oh, can be ineffective.

Garcia: Yes.

Masalcas: Okay. Do you have any experience or knowledge or - -

Garcia: Uh - -

Masalcas: Of people who have been shot and still continued to aggress or be threatening and be potentially violent afterwards, after sustaining gunshot wounds.

Garcia: I think just in general and going to multiple trainings, uh, and seeing videos of persons either not being, uh, affected by a 40, 40 millimeter round and just walking right through them, it could be because of their mental state, could be that they're on some type of narcotics, that the, the pain compliance on that just doesn't work. Uh, the taser could not work effectively if you don't have the properly connection between the, the darts. Uh, so people can, uh, you know, walk right through those as well.

Or, depending on their mental state or, or, or narcotics, they just - - it just doesn't work, they just pull them right out and keep coming. So all, all of that, uh, was definitely, uh, something that was on my mind. And, like I mentioned before, th-, th-, things happened so fast, the distance was closing so fast that we were immediately met with a, a, a lethal situation, not a less lethal situation. And given our position of where we were standing, the ability to safely transition and, and utilize one of those tools wasn't, wasn't feasible at the time.

Masalcas: Did you have any opinion as to whether or not he was under the influence of any narcotics?

Garcia: I, I don't know.

Masalcas: Do you think at any point in time - - while you were giving out commands or you were pleading with him to stop, did

you think at any point in time he - - if he only cooperated that this could have ended differently?

Garcia: Yes.

Masalcas: After the shooting did you notify a supervisor that you discharged your firearm?

Garcia: Yes.

Masalcas: Did you give him a public safety statement?

Garcia: Yes.

Masalcas: Okay. Looking back, is there anything you'd approach or handle differently if given a chance?

Garcia: No.

Krumbach: Yeah, Sergeant Krumbach here, for the record. Hey, Officer Garcia, I've just been jotting down some questions along the way. I know Sergeant Masalcas just kind of walked you through from start to finish. My questions are kind of from beginning to end. So if I ask something and you're kind of confused about the timeline related to that question, just let me know and I can verify that for you. Okay?

Garcia: Yes. Sir.

Krumbach: When you ended up clearing the vehicle when you approached the green car, green Charger, clear it and there was no one inside the cabin or the trunk, did that - - did you feel anything? Or did that make you have - -

Garcia: I felt - -

Krumbach: - - an opinion in your head at that moment?

Garcia: I felt relief. I felt relief that, that no one was in the vehicle and then no one was hurt. Uh, I still, still in the back of my mind was thinking, well, hopefully there's nobody at the 2909 Oregon Court address that's, that's hurt. And, we, for whatever reason, obviously, didn't have access to the building, didn't see it.

And then, uh, uh, the thought of, uh, suicide by cop came to mind. Like, shit, this was a suicide by cop. The guy wanted us to kill him, for whatever reason.

Uh, and then I think the thought of thank God he didn't come out with a gun and start shooting at us, uh, and one of us having been injured and, and, and - - or killed, uh, w-, - - you know, crossed my mind. I, I was, I was thankful of that, uh, for sure. Or thankful that, even as he, uh, aggressed on us, that he didn't pull out a gun to, to- - you know, uh, to increase the, the - - you know, or to - - oh, how do I say this? Or to complete or, you know, what he set out to do. Uh, so I'm glad that - - it was, it was, it was a lot of emotions, I guess you can say.

Krumbach: As he's nearing the vehicles do you remember if - - the door that you were positioned behind, do you remember if the window was up or down?

Garcia: It was down.

Krumbach: It was down? And standing behind that door, in whatever specific position you were in, you did have some cover and concealment. How did that factor into your decision to use lethal force?

Garcia: Uh, well, standing behind the door gave me a little bit of, uh, confidence. I know those doors are ballistic - - they're, they're ballistic doors, so I figured, okay, I've got some kind of cover if he comes out - - if he produces a weapon,

starts shooting at us, I'm going to be behind cover and I'm going to be able to return fire.

Uh, and even the door itself, you know, with him not producing a firearm but still advancing toward us with a sharp object, uh, gave me like a sense of like a barrier that he would have to overcome in order to get to us, or get to me. Uh, but once he got too close and it was, it was, it was - - it, it was - - that barrier was no longer really, uh, uh, like any kind of positive reinforcement for me - - because he was too close.

If at any point he decided to change his pace and really come after me, with his size and his just determination, and carry out what it is he set out to do, my reaction, me pulling the trigger, it hitting the door, hit - - it hitting a B-, B-pillar or something and, and not being effective, it was, it was not an option.

Krumbach: So you still, despite the fact that you were standing behind the door, if I understand you correctly, you still had a fear of - -

Garcia: Correct.

Krumbach: - - his attempt.

Garcia: Correct.

Krumbach: I believe you touched on reasons for the taser as a less lethal option and, previously, some of the factors that went into the 40 millimeter not being available. However, your OC spray, did you give any consideration to using that or kind of walk me through that?

Garcia: Uh, not really. Uh, with - - the OC spray didn't really come to mind. Only, only because OC spray is not effective to everybody. Some people it doesn't bother them at all.

You spray me and it's going to hurt. Uh, I've also seen people get pepper sprayed and still be able to carry out whatever it is they're set to do. Uh, I mean, uh, in training, we got pepper sprayed and had to still run over to somebody and handcuff them and put handcuffs on. So I didn't think pepper spray would, would be effective. Uh, uh, and, uh, I thought it would only anger him and now he would just blindly start running at, at anybody. Uh, where in this case he was coming directly at me, I let like that was - - although it's a terrible position to be in, I felt it was controlled in, in a sense.

Krumbach: We obviously talked about some of the verbal commands that were given by not only yourself but some of the ones that you were aware that were given by Officer Wissler and others. I think you made mentioned earlier of using a nonverbal command - -

Garcia: Right.

Krumbach: - - or gesture which was the outstretched arm.

Garcia: Right.

Krumbach: You made mentioned of the fact that he was shaking his head and if I understood you correctly it was - - you felt like that was in response to the commands that the various people were telling him. Did you see any reason to use any Spanish commands? Or did you feel that your - - you were getting the point across with what had been done so far?

Garcia: Uh, you know, at the time it may have crossed my mind, but I also thought about the call coming in and the call-taker, and didn't specify and say, you know, the caller was a Spanish-speaker, or something like that. And that is something that, after the fact, I thought, shoot, I should

have maybe said something to him in Spanish. But it seemed like he understood what, what we were saying.

Uh, but you also have, you know, police lights, lights are activated, two police cars, four officers in full uniform with guns pointing directly at, at you. I, I think that's the universal - - and, and my hand gestures, I, I think that's the universal language for anyone to say I should probably stop what I'm doing. I mean, you can be a foreigner from a completely different country and - - or - - and know that you should probably stop what you're doing based on what we have in front of him.

Krumbach: Taking you back to like probably your first - - some of your first observations of him once he exited the car, I think you made mention that you didn't know, when he exited or when you first saw his arm, that if it was self-inflicted or not. I guess my question is: From that distance that you made that observation from, would you have been able to make a determination, one way or the other, if it was self-inflicted or if he was a victim of some assault or something?

Garcia: I could not tell from that distance. And, uh, I actually couldn't tell even when he was five feet in front of, in front of me before I pulled the trigger. And even after, uh, we - - officers went to handcuff him, I couldn't see, you know, your typical self-inflicted lacerations or, uh, stab wound type. I didn't know where the blood was coming from, which is why we said "let's go search the vehicle." I, I honestly thought we were going to find, uh, another person on the passenger seat.

Krumbach: This is probably my last question for you.

Garcia: Okay.

Krumbach: You mentioned that you have - - you do have a collateral assignment on the Crisis Negotiation Team.

Garcia: Yes.

Krumbach: Can you talk to me a little bit about like what your background is on that, and then like what training and how do you practice on your training days, or through professional development or what have you, related to dealing with either suicidal subjects or mentally disturbed individuals? Speak about that maybe what you received?

Garcia: Um, so I've been on the Crisis Negotiation Team, I want to say, since 2008. Uh, I went to a 40-hour basic, uh, crisis negotiation course. Uh, also went to a, uh, 24-hour advanced, uh, crisis negotiation course for domestic violence, uh, type, type situations.

We have monthly, uh, training w-, within our CNT, our Crisis Negotiation Team, including there's usually four collateral - - not "collateral," sorry. Four quarterly trainings that we go to every year with, uh, CAHN, which is the California Association of Hostage Negotiators, where we sit through debriefs of, of, uh, uh, other agencies providing debriefs for, uh, some type of in-, incident that they, that they negotiated with, you know, various individuals that were involved in various types of crisis.

Uh, we do joint training with our SWAT team, uh, preparing for, you know, crisis type situations. Um, it's basically, uh, a lot of, uh, training on active listening, communication, uh, you know, basically trying to build rapport or talk people out of crisis. You know, whether it's a jumper, whether it's someone holding a knife to their, their neck, someone, uh, you know, locked in the bedroom with a gun and you're communicating with them, usually via telephone, uh, to basically get them to understand that this isn't the only option, that there's other options, there's

people that care for them, there's something to live for kind of thing. Uh, so, uh, yeah, that's about it.

Krumbach: And obvious-, - - in addition to the training, you know, there's callouts that obviously you - -

Garcia: Right.

Krumbach: - - receive on the team. But then there's - -

Garcia: Correct.

Krumbach: - - maybe less defined instances where you - - I'm assuming you utilize in Patrol.

Garcia: Uh, I'm sorry.

Krumbach: How - - have you been successful in negotiating or achieving safe surrenders of subjects who were in crisis?

Garcia: Uh, yes. There's - - you know, uh, callouts happen. They give them - - they're, they're - - obviously, it's not a planned event so, again, being - - you know, we can, we can potentially respond to 10 callouts in a year or 15 or three.

Um, but I, I feel like I use my skills and, uh, that I've learned through CNT on a daily basis, whether I'm going to uh, a call of a d-, - - family disturbance and you're dealing with an individual that's, uh, angry or aggressive. And you use your verbal, verbal communication skills and de-escalation skills to basically bring them down and be able to continue on with the investigation, wherever that may lead.

Or, you know, uh, we've - - almost daily, we're going to some kind of call of a suicidal subject or a subject that's in crisis. And we've got to sit there and talk to them,

evaluate them, and, uh, at times, take them in for, for a mental health evaluation. So I, I feel like those skills are utilized daily, uh, sometimes multiple times a day. And, yes, they have been successful. Uh, and - - yeah.

Masalcas: All right. Is there anything about this incident that you think we haven't discussed that you believe we should know about?

Garcia: No.

Masalcas: Is there any statement you'd like to add, alter or change for the record?

Garcia: No, sir.

Masalcas: All right. This interview has ended. The ti-, - -

[END OF INTERVIEW]