# "EXHIBIT R"

# Deposition Transcript

Case Number: 2:25-cv-03389-JLS (AYPx)
Date: August 12, 2026

In the matter of:

## MARIA GUADALUPE DIAZ, et al. v CITY OF TORRANCE

# EDWIN PARTOVI, M.D.

CERTIFIED COPY

Reported by:
Cheryl Laboa

Steno
Agency, Inc.

315 West 9th Street
Suite 807
Los Angeles, CA 90015
concierge@steno.com
(888) 707-8366
NV: Firm #108F

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

-oOo-

MARIA GUADALUPE DIAZ; A.D., a minor by and through his Guardian Ad Litem, MARIA GUADALUPE DIAZ; A.D., a minor by and through his Guardian Ad Litem, MARIA GUADALUPE DIAZ; LEONARDO DIAZ; and RAMONA DE DIAZ,

Plaintiffs,

vs.

CITY OF TORRANCE; ARTURO CASTILLO; CODY WISSLER; JESUS GARCIA; JASON BERMUDEZ; and DOES 6-10, inclusive,

Defendants.

Case No. 2:25-CV-03389-JLS (AYPx)

REMOTE DEPOSITION VIA VIDEO TELECONFERENCE OF

EDWIN PARTOVI, M.D.

Wednesday, August 12, 2026 at 10:05 a.m.

REPORTED BY:
Cheryl L. Laboa, CSR No. 10039
JOB NO. 3031473
PAGES 1 - 102

STENO
Concierge@Steno.com
(888) 707-8366

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

-oOo-

| | |
|---|---|
| MARIA GUADALUPE DIAZ; A.D., a minor by and through his Guardian Ad Litem, MARIA GUADALUPE DIAZ; A.D., a minor by and through his Guardian Ad Litem, MARIA GUADALUPE DIAZ; LEONARDO DIAZ; and RAMONA DE DIAZ,<br><br>Plaintiffs,<br><br>vs.<br><br>CITY OF TORRANCE; ARTURO CASTILLO; CODY WISSLER; JESUS GARCIA; JASON BERMUDEZ; and DOES 6-10, inclusive,<br><br>Defendants. | Case No. 2:25-CV-03389-JLS (AYPx) |

Deposition of EDWIN PARTOVI, M.D., taken remotely via video teleconference on behalf of Defendants, with the witness located at Los Angeles, California, beginning at 10:05 a.m. and ending at 12:59 p.m. on Wednesday, August 12, 2026, before CHERYL L. LABOA, Certified Shorthand Reporter No. 10039.

APPEARANCES:

For the Plaintiff:

LAW OFFICES OF DALE K. GALIPO
ERIC VALENZUELA, ESQ.
evalenzuela@galipolaw.com
21800 Burbank Blvd., Suite 310
Woodland Hills, CA 91367
818-347-3333

(Present via video teleconference)

For Defendants CITY OF TORRANCE; ARTURO CASTILLO; CODY WISSLER; JESUS GARCIA; JASON BERMUDEZ:

JONES MAYER
THURGOOD M. WYNN, ESQ.
tmw@jones-mayer.com
3777 North Harbor Boulevard
Fullerton, CA 92835
714-446-1400

(Present via video teleconference)

INDEX OF EXAMINATION

WITNESS EDWIN PARTOVI, M.D.

| EXAMINATION | PAGE |
| --- | --- |
| By Mr. Wynn | 6 |
| By Mr. Valenzuela | 47 |
| Further By Mr. Wynn | 84 |
| Further By Mr. Valenzuela | 95 |

INFORMATION REQUESTED

Page Line

None

DOCUMENTS REQUESTED

Page Line

None

WITNESS INSTRUCTED NOT TO ANSWER

Page Line

None

INDEX TO EXHIBITS

EDWIN PARTOVI, M.D.

MARIA GUADALUPE DIAZ; A.D., a minor by and through his Guardian Ad Litem, MARIA GUADALUPE DIAZ; A.D., a minor by and through his Guardian Ad Litem, MARIA GUADALUPE DIAZ; LEONARDO DIAZ; and RAMONA DE DIAZ vs. CITY OF TORRANCE; ARTURO CASTILLO; CODY WISSLER; JESUS GARCIA; JASON BERMUDEZ; and DOES 6-10, inclusive

Wednesday, August 12, 2026

Cheryl L. Laboa, CSR No. 10039


| MARKED | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 1 | Autopsy Report | 14 |

Los Angeles, California
Wednesday, August 12, 2026; 10:05 a.m.

COURT REPORTER: Good morning. We are now going on the record. The time is 10:05 a.m. My name is Cheryl Laboa and I will be your court reporter this morning. My CSR Number is 10039 and I will now swear in the witness.

-oOo-

EDWIN PARTOVI, M.D.,
Having first been remotely sworn,
was examined and testified as
follows:

-oOo-

EXAMINATION

BY MR. WYNN:

Q. Good morning, Dr. Partovi.
A. Good morning.
Q. And am I pronouncing your last name correctly?
A. Yes.
Q. Will you please state and spell your name for the record?
A. Edwin Partovi, E-D-W-I-N, P-A-R-T-O-V-I.
Q. And have you been deposed in the past?
A. Yes.

Q. Approximately how many times?
A. Like five.
Q. Were your prior deposition testimonies in your capacity as a medical examiner for the County of Los Angeles?
10:07
A. Correct. Yes.
Q. When was your most recent deposition, if you remember?
A. About a year ago.
10:07
Q. Typically when we start a deposition, there are a series of admonitions about the process. Would you like me to review those admonitions with you or are you comfortable without me going into detail with all of those?
10:07
A. If you could briefly state them, I would appreciate that. Thank you.
Q. Okay. So although we're not in a courtroom, the oath that you just took has the same force and effect as if we are in a court of law.
10:07
Do you understand that?
A. Yes.
Q. Everything that you say today is given under the penalty of perjury, just as if you were testifying in a courtroom in front of a jury.
10:07
Do you understand that?

A. Yes.

Q. The court reporter who rendered the oath to you is taking down everything that is being said today, so it is important that we do not speak over each other because what we're saying is being memorialized.

10:08

So we're doing a good job so far but as we go, it may kind of turn into -- it may seem like a conversation. You may know what I'm going to ask, but just for the court reporter, I ask that we try and keep it to one person speaking at a time.

10:08

Does that make sense?

A. Yes.

Q. If you don't hear my question, please ask me to repeat it. And if you don't understand my question, please tell me that as well so I may rephrase or explain it to you so that you do understand.

10:08

Is that fair?

A. Yes.

Q. After this deposition finishes, you'll have a chance to review the transcript of this deposition should you wish to review it. And sometimes witnesses may make changes to their responses. I just caution that any changes that are material can impact your credibility in a negative way. So it's important that you testify to the best of your ability today.

10:08 10:09

Do you understand that?

A. Yes.

Q. If you need a break at any time, please let me know. I typically try and go for an hour and then see if a break is needed, but I'm willing to take a break before then if necessary. All I ask is that if a question is pending, that you answer the question before we go on break.

Does that make sense?

A. Yes.

Q. Have you taken any medication or drank any alcohol in the last 24 hours that you think may affect your ability to testify today?

A. No.

Q. Is there any other reason why you think you may not be able to give your best testimony today?

A. No.

Q. Now, I want to start with your background and education. What do you do for work?

A. Sorry, before we get started, can I just point out one thing? I just entered my information into the portal. There was like a link to get the Zoom link. It's a deposition of my name, I just noticed my name was misspelled there. So I don't know if you guys want to correct that.

Q. How was it misspelled, just so....
A. There was a B instead of a V. It's P-A-R-T-O-V-I. And it's P-A-R-T-O-B-I.
Q. Okay. Thank you. I'll make sure that that's corrected.
Now, what do you do for work?
A. I am a deputy medical examiner.
Q. And where are you a deputy medical examiner?
A. The Los Angeles County Department of Medical Examiner.
Q. How long have you been with the county of Los Angeles?
A. About two years.
Q. Have you worked for any other county or any other department of medical services?
A. Yes.
Q. Where else have you worked?
A. The New York City office of the chief medical examiner.
Q. And outside the chief medical examiner in New York, have you worked anywhere else?
A. I did some training, but not formally employed at the Connecticut medical examiner's office.
Q. And outside of the county of Los Angeles, New York City and Connecticut, have you worked for any

other county medical examiners?
A. No.
Q. What are your general duties and responsibilities as a medical examiner?
A. For cases that are assigned to me, I oversee the investigation and determination of the cause and manner of death.
Q. Can you describe your educational background that led to you becoming a medical examiner with the county of Los Angeles?
A. Sure. I have my undergraduate degree with a Bachelor's of Science in neuroscience from University of California Los Angeles. I have my medical degree from St. George's University.
I did my training in anatomic pathology and clinical pathology at Yale, Yale Medical Hospital, and I'm board certified in those two fields. And I did my forensic pathology training at the New York City Office of the Chief Medical Examiner and I'm board certified in that field.
Q. And you mentioned your educational background. What about any professional training that you've had to do to get to the position you are today?
A. Board certification and continuing medical education are a part of the board certification

process.

Q. And you say board certification, just because I don't know what that entails, can you describe what that means?

10:09 A. Yeah. Basically to be board certified in pathology, forensic pathology and really through most medical specialties, you need to have graduated from an eligible residency program or fellowship program and should pass the associated exams for them.

10:09 Q. You mentioned a residency program, did you do a residency program?

A. Yes.

Q. Where was your residency done?

A. At Yale. Yale Medical Hospital.

10:09 Q. Previously you mentioned the county medical examiners that you've worked for.

Do you have any experience in private practice?

A. No.

10:09 Q. Since you've been with the County of Los Angeles Department of the Medical Examiner, approximately how many autopsies have you performed?

A. Here in this office only or career total?

Q. Let's start with your current office.

10:09 A. For autopsies only in this office?

Q. Yes.
A. I have just like a rough estimate, 200.
Q. What about total throughout the three counties that you've worked in?
10:09 A. About 800.
Q. Does that 800 number include autopsies you may have performed during your fellowship or residency?
A. Yes.
Q. Have you ever been an emergency room doctor?
10:09 A. I was a medical student engaged in an emergency room hospital setting for training purposes, but I was never -- never worked as staff in a emergency room as a doctor.
Q. Have you ever treated a live patient?
10:09 A. Yes.
Q. In what capacity?
A. As a medical student.
Q. But never as a licensed doctor?
A. Not for anything that comes to mind because my
10:09 specialty, pathology, in general is pretty strictly diagnostic and not therapeutic.
Q. Have you ever gotten any board certification in emergency department medicine or anything like that?
A. I've had basic life support training in the
10:09 past but no other official, anything that comes to mind

for emergency medicine.

Q. Do you have any clinical experience in taking care of penetrating traumatic injuries like gunshot wounds?

10:09 A. Yes.

Q. In what capacity?

A. As a medical student. I mean, I suppose in medical examiner's offices, but if you're considering medical training, not the forensic setting, then that

10:09 doesn't apply.

Q. Did you perform the autopsy of Mr. Leonardo Diaz in medical examiner case number 2024-18831 on December 4th, 2024?

A. Yes.

10:09 Q. And your findings, were they memorialized into an autopsy report; is that correct?

A. Correct.

Q. And any opinions or conclusions that you reached during your investigation would have been

10:09 memorialized in that report, is that fair to say?

A. Yes.

MR. WYNN: I've marked as Exhibit 1 a copy of the autopsy report in this case.

(Defendant's Exhibit 1 marked.)

10:09 BY MR. WYNN:

Q. I'm going to share my screen, and what I'm going to do is I'm going to scroll through the document and give you a chance to read it and then ask you whether this is the document you recognize to be your report.

Does that make sense?

A. Yes.

Q. So on my screen you should be seeing what is page 1 of Exhibit 1. The entirety of Exhibit 1 is marked in the bottom right corner as TPD-00130, and the concluding page is 00152. So just for clarity I'll be referring to the numbers, the Bate stamp numbers when we go through the document that are in the bottom right corner for the record.

But Dr. Partovi, I'm going to scroll through this document and give you a chance to read it and then I'll ask you some questions after that. I'm on page TPD-00131 for the record. I'm now on page TPD-00132 for the record. And I stopped at what is marked as TPD-00133 for the record.

Dr. Partovi, do you recognize this document that I'm showing you?

A. Yes.

Q. And how do you recognize it?

A. It is the medical report for this case.

Q. And is it the medical report that you authored?
A. Correct.
Q. Now I'm going to stop sharing. When you are assigned to a case like you were for Mr. Diaz and perform an autopsy, what is your general process?
A. Really depending on the case type but in a case like this, you know, once I'm assigned the case, I will in advance of the examination do a thorough review of the records, case notes, make any communication with detectives or other individuals. And review of the records would include the investigative summary report, photographs, scene photographs as well as kind of studio photographs, a review of the imaging findings, CT, for example, or x-rays. And just any other information available before getting started on the exam.
Q. And then your report contains various sections such as an external examination of the body or an internal examination of the body. What do those sections mean within your report?
A. Yeah, it's just there's obviously different sections because of the, you know, the way we report things. There's various levels of complexity of the cases and just for organizational purposes there's

distinct entries here in our office, one of which is called a medical report summary, which is a diagnosis section for autopsy findings, and then a summary and opinion narrative, which is a more narrative style review of the findings, and then an opinion about the cause and manner of death, as well as sections, like you said, for external examination, injuries, internal findings and various other findings.

Q. And once you perform all of the examinations that are -- that make up those sections, is that how you formulate your opinions and conclusions that you put into the summary that you previously mentioned, the summary and opinion narrative?

A. Correct.

Q. Do you also consider any toxicology reports?

A. Yes.

Q. And outside of the materials that you mentioned that you review such as medical reports, investigative summaries, photographs, are there any other materials that you may rely on that you haven't mentioned?

A. Other ancillary lab tests like microbiology reports, genetics reports, anything that can help kind of evaluate for signs of natural disease or injury. Further investigative findings, they can be pretty open

in nature, like police reports, like other investigative reports and such.

Medical records is another thing I forgot to mention, before and after the autopsy if they're available. Like if they went to the hospital, if there's like a past medical condition or something, sometimes that's available for our review.

Q. And I know you mentioned that this process is a little different depending on the nature of the case, but is the general process you described typically what you follow when there's a -- you're doing an autopsy like you performed for Mr. Diaz?

A. Yeah, all that is pretty routine.

Q. In the approximately -- the rough approximate of 800 autopsies that you've done in the past, approximately how many of those involved death by homicide?

A. Yeah, these are really rough estimates, but something in the range of 200 I think would be accurate, like 150 to 1200.

Q. What's the difference between a cause of death and the manner of death?

A. Yeah, a cause of death is the sequence of events such as a disease process or injury that led to the death of an individual. The manner of death are

the circumstances around that death, and they usually hold, you know, a few discrete possibilities such as natural accident, suicide, homicide and undetermined.

Q. The homicide, suicide, accident, natural and undetermined, are those considered like classifications of a manner of death?

A. Yeah, one classification system that we use in forensic pathology is the manner of death classification system.

Q. In the case of Mr. Diaz, which of the classifications did you classify his death as?

A. A homicide.

Q. What does that mean when the manner of death is classified as a homicide?

A. The definition I use is death at the hands of another.

Q. Can you describe how you reached that conclusion?

A. In this case there were injuries, namely multiple gunshot wounds, the distribution of which and what I had known about the circumstances were consistent with being shot by another individual, which constitutes a homicide.

Q. When I say reasonable degree of medical certainty, in medical terms what does that mean?

A. It basically means we, as forensic pathologists, hold ourselves to a professional standard to have a medical opinion that is medically sound. And for something like a homicide, there's like, you know, a certain degree of certainty that we try to establish before assigning something as a homicide.

Q. In this specific case before classifying Mr. Diaz's death as a homicide, were there any alternate causes or contributing factors you considered?

A. There were notable findings, but from the beginning there was no consideration of any alternate manner of death. But there were certainly findings that were accounted for in the -- you know, in the duration of the autopsy.

Q. And what were those notable findings, if you remember?

A. There were essentially what appear to be -- there were incise wounds and puncture wounds of various parts of the body that appear to be self-inflicted but were after autopsy determined and, you know, after examination determined not to be contributory to death.

Q. When you say that those weren't contributory to death, what supports that conclusion?

A. Essentially with dissection examination of the

wounds, there was cutaneous hemorrhage, meaning bleeding into to skin associated with these wounds, but they were generally superficial wounds, just with the superficial soft tissue and without associated fractures or significant vascular injury.

10:30

Q. In Mr. Diaz's case what did you determine to be the cause of death?

A. The cause of death is multiple gunshot wounds.

Q. Now I'm going to bring back up Exhibit 1 that we previously looked at.

10:31

Dr. Partovi, are you able to see my screen? It should be showing Exhibit 1 right now.

A. Yes, I see it.

Q. I'm on Bates number TPD-00131, and at the top of that page it says medical report summary. And Doctor, you briefly discussed what this section generally means.

10:31

Do you mind as far as Mr. Diaz's investigation, what does this section, the medical report summary section entail?

10:32

A. Yeah, essentially the medical report summary is a standardized portion of the autopsy report that gives essentially the final diagnoses or the final anatomic diagnoses in sort of like a header, self header format for organizational purposes.

10:32

Q. When you say header, subheader, for example there is a 1 and it says multiple gunshot wounds of torso and left upper extremity.

Would that be an example of a header and then
10:33 the subheader would be everything below that?

A. Yes. And there could be a series of sub sub headers, just depending on how the pathologist like formulates, you know, each level of sequelae or complication of a disease process or an injury. This
10:33 is a pretty standardized way of reporting anatomic findings.

Q. And would the header, for example, be the conclusion and the subheaders would be kind of everything that was observed to reach said heading. Is
10:33 that fair to say?

A. Generally speaking, yes, but there is a lot of flexibility in how this header, subheader system is used. You know, there could just be different styles or different utilities for them, but generally speaking
10:34 the most parent header is like the underlying disease process, and then each subheader under that is sort of like another step in the sequence. Or it's sort of like enlisting all of the different findings associated with it. There's various different ways to use this
10:34 for organizational purposes, but yeah, generally

speaking what you're saying is correct.

Q. And in looking at your report, how did you sequence this -- how did you sequence it in this case?

A. Yeah, I mean the general headers are just -- will encompass all of the, like the gunshot wounds, for example, and then each of the gunshot wounds is enlisted under that with kind of a description of where the entrance wound is, exit wound if applicable, you know, lodge and site of the bullet, the wound track, involved organs, et cetera, just whatever is -- sorry, go ahead.

Q. For number 1 it says under the header 1, there's subheader A and it says penetrating gunshot wound of right clavicular region and then in quotes it has A. What does that mean?

A. So penetrating gunshot wound to clavicular region is a descriptor of one of the gunshot wounds, and then in parenthesis it's labeled as A because that's what correlates with the labeling system on the diagram.

Q. So was that -- sorry, I cut you off.

A. Yeah, sorry. So just to be cable to reference what's on the autopsy report with what's on the diagrams, there's sometimes a lettering system that it really depends on what the medical examiner is

comfortable with using, but it's essentially like a legend to be able to distinctly tell like one gunshot wound from the next.

Q. Okay. And as far as that specific gunshot wound, were you able to determine whether it was fatal or nonfatal?

A. Because of the complex nature of the combined like set of findings, the death is associated with multiple gunshot wounds and there's no like individual assignment of the fatality of each individual wound.

Q. So just so that I'm understanding, since it's multiple gunshot wounds, you weren't able to conclude whether any specific gunshot wound was fatal or nonfatal?

A. That is correct.

Q. And you mentioned the, kind of the nomenclature of A and how it corresponds to the diagram. And I'm looking under header 2, subheader A and there's a B. Would that be the next gunshot wound that you observed, and then kind of so forth in that lettering system?

A. Correct, yes.

Q. Based on all of the gunshot wounds that you observed, are you able to tell us whether any particular gunshot wound was fatal?

A. No.

Q. I am now scrolling on Exhibit 1. I am now on what is marked as TPD-00132, and under -- on header 14 your report says puncture wounds of neck, torso and upper extremities. What does that header mean?

10:38

A. Yeah, the header refers to the collective finding of all these puncture wounds because there were -- there was an abundance of them and many of them are organized into clusters involving various parts of the body.

10:39

Q. Are they organized into clusters because of where they are on the body or is that -- is there -- like why are they clustered in the way that you clustered them?

10:39

A. Yeah, essentially for practicality purposes and the significance of their findings, how close they are together, since they were all determined to be like I said earlier, like superficial without like vital injuries and noncontributory to death, the significance of individual wound tracks is like a trivial thing.

10:39

And just considering their like closely approximated nature in what appear to be clusters in the body, the combination of all this was reason enough to just cluster them, like give an approximate count and be descriptive in the location on the body.

10:40

Q. Now, for example, under header 14 on subheader B, it says cluster of approximately nine puncture wounds of right aspect of neck, and then if we look down at subheader M, it says two superficial puncture wounds of palmer left hand.

10:40

Is there a difference between when you list something as a puncture wound versus a superficial puncture wound?

A. Just give me one moment. Yeah, the reason I described it that way was that the superficial puncture wounds of the palmer left hand I described as superficial because they were more superficial limited to really the skin only, whereas those other ones without the superficial descriptor are still superficial, but they do go variably into some of the deeper tissue, which is still the superficial soft tissue which is under the skin, like thigh fibrous tissue, et cetera.

10:41

10:41

And the ones on the neck, for example, if you go into the details of the autopsy report findings, I describe it as the wound extend to the superficial aspects of the strat muscles of the lateral right and anterior aspects of the neck but without significant vascular injury.

10:41

Q. Okay. So when you say superficial, it seems

10:42

like there's a spectrum of what that means as far as the body. Am I saying that correctly?

A. Yeah. Absolutely. I mean, superficial is just such a -- it's such a generic term. Like it would be best advice to know like exactly how superficial it is, and that's the purpose of the details of the autopsy report to really determine -- like be able to document like what layers were actually injured.

Q. Now on the bottom of what is Bates numbered TPD-00132, there is a summary and opinion narrative.

Can you describe, and I know you did so briefly before, but can you describe this case what this section concludes or tells as part of your report?

A. Yeah. This is essentially an opportunity to communicate with the reader in a more narrative format. Sometimes with more kind of better lay like transcription of -- I'm sorry, a better lay like translation of what processes were going on and a story of what happened to the decedent.

So it's variable depending on the style of the doctor, but I like to start by revealing some clinical history, scene findings, investigative findings, include brief findings of imaging, you know, like post mortem CT, et cetera, autopsy findings, you know, an opinion about what processes were contributory,

something that a layperson wouldn't automatically think of just as an explanation. And then conclude the section with a cause and manner of death.

Q. And you mentioned that this is kind of more narrative of, kind of tells it in a way that makes it so potentially a layperson could understand.

Where do you get the information that you in this case for Mr. Diaz put into this narrative?

A. Everything that we had spoken to earlier as far as like what goes into preparing for an autopsy, like, you know, the investigative reports, just that's a synthesis of all the available accessible information.

Q. So, for example, where you say on the second sentence in the summary and opinion narrative that the decedent reportedly had a history of nitrous oxide abuse resulting in paranoia and delusions, would that come from a document like the medical records that you mentioned are sometimes available in these cases?

A. It could come from various, various sources in this case. I would have to check where that came from. Yeah, it could come from hospital records. It could come from the investigative report. It could come from verbal communication with a reliable source, like the police or family.

Q. So this section isn't -- isn't confined to law enforcement or detectives or like body worn video, for example? This could be family members or any kind of what you've determined to be a reliable source can provide you some type of information that you may find useful to put into this section. Is that fair to say?

A. Yes. I mean, that is the way I use it. I know that this section will be seen by interested parties, including like, you know, legal authorities. So I make an attempt to report like accurate information based on what I believe is a reliable source. But that could include families and medical records, yes.

Q. And are you -- just generally, are you able to look at like body worn video, for example?

A. Sometimes. There is inconsistent access to and uploading of police records here. Sometimes something like that is based on request. So that's my best answer.

Q. Do you remember whether you reviewed any body worn camera footage in Mr. Diaz's report?

A. I don't distinctly recall. I can also go into our records to see what media is available, but absent that, absent anything uploaded, I don't distinctly recall watching anything for this case.

Q. Are you able to quickly determine whether that media was available right now?
A. Yeah, I'm looking through our system right now. I do not see any video file formats uploaded into our file sharing system. I'll also do a quick check of something else. There's nothing uploaded in our system that I can access right now.
Q. Okay. So if there's no -- if there are no videos in that system, that means that they weren't reviewed. Is that fair to say?
A. That just means they're not in our computer system. It's possible that the detective in person when they came to review autopsy, et cetera, like had a video in their hand. This was from a while back. Like I said, I don't distinctly recall watching anything, but that doesn't mean it doesn't exist and that I didn't watch it.
Q. And what about photographs, did you review any photographs as part of your summary and opinion narrative?
A. Yes. You're asking which photographs?
Q. Yeah, that would be my follow up question is which photographs. And I can be more specific if it's helpful. Like specifically the inside of Mr. Diaz's vehicle, the crime scene photographs, anything like

that.

A. Yeah, there was a review before the autopsy, you know, before the -- in preparation for the autopsy and then after the autopsy, like I said I'm reviewing the case for finalization of the report of all the photographs and what is uploaded in our system and the media. Like I was describing earlier are scene photographs which do show a vehicle, the inside of the vehicle, some police vehicles.

There are various other photos are the intake photo when the decedent came into the medical examiner's office. Studio photos, especially highlighting the injuries. Photographs of his clothing, just being hung up like in a drying area, and just scans of the autopsy diagrams.

Q. Now I've scrolled down Exhibit 1, and we are now looking at what is Bate stamped as number TPD-00133. In the middle of this document you say in your report at autopsy there are six penetrating and three perforating gunshot wounds of the body.

What is penetrating versus perforating?

A. So a penetrating gunshot wound has an entrance but not an exit. So typically the bullet is recovered from somewhere in the body. And a perforating gunshot wound has an entrance and an exit, so it's through and

through.

Q. When you say six penetrating and three perforating gunshot wounds, does that mean that there are nine wounds total?

10:52 A. There are nine gunshot wounds but there are more than nine defects on the body because three of those are through and through, and they will also have their accompanying exit wound.

Q. Got it. In saying that there are six

10:52 penetrating and three perforating gunshot wounds, you're not able to offer an opinion on the trajectory of each of those bullets. Is that fair to say?

A. Let me just check my notes.

MR. VALENZUELA: And I'll just quickly object

10:53 as misstates the witness' testimony.

THE WITNESS: Yes, I was able to determine the trajectory for those gunshot wounds.

BY MR. WYNN:

Q. And how are you able to -- well, let me go

10:54 back.

What does trajectory mean in medical terms?

A. Yeah, it essentially means the wound track and its orientation with respect to the body. So in an ideal world, a bullet travels in a straight line in the

10:54 air and the body. The trajectory, also known as

directionality depending on the terminology used, is essentially with respect to standard anatomic position where in space is the bullet traveling, like where is it coming from and where is it going. And we use, you know, standard left to right, downward front to back descriptors for those.

10:55

Q. So trajectory would be the bullet in space like before it enters the body. Am I understanding that correctly?

10:55

MR. VALENZUELA: I would object as misstates the witness' prior testimony.

THE WITNESS: Should I answer the question?

MR. VALENZUELA: Yes, sorry.

BY MR. WYNN:

10:55

Q. You can answer.

MR. VALENZUELA: Sometimes I'm going to object but it's just for the record. Neither counsel will be instructing you not to answer today. I'm just making any objection for the record.

10:55

THE WITNESS: Okay. Thank you. Sometimes in the forensic community, which is only terminal ballistics, we describe what happens to the body. We don't have expertise or knowledge about what happens to a bullet before it strikes the body and after it leaves

10:56

the body. So this is only terminal forensic pathology

ballistics.

Sometimes the word trajectory is used interchangeably with directionality. For that reason with your question I prefer the term directionality which is a description of what direction the bullet is going in the body.

BY MR. WYNN:

Q. Okay. So when you're opining on trajectory, it's specific to a terminal forensic pathology terminology. Am I getting that correct?

A. Yeah. In other words, when we talk about the directionality of a projectile, I'm describing the straight line that the projectile went through in the body.

Q. And then there is a trajectory outside of what is known as terminal forensic pathology and that may have a different medical definition. Is that fair to say?

A. I don't know what definition that is and that's not a medical definition because it's outside of the body, so it's not really medical anymore. Those questions are reserved for the ballistics experts in their respective fields.

MR. WYNN: I see we've been going about an hour. So Mr. Valenzuela, are you comfortable taking a

break now for about five minutes just to give the court reporter a break?

MR. VALENZUELA: Sure, absolutely.

MR. WYNN: Can we go off the record?

10:58 COURT REPORTER: Okay. Off the record.

(Recess.)

COURT REPORTER: Back on the record.

BY MR. WYNN:

Q. Okay. Dr. Partovi, before we took our break,

11:07 we were discussing the path of travel of a bullet.

So just to be clear, you're able to opine on the path of travel of a bullet inside the body, whereas a ballistics expert would opine on that path outside of the body?

11:07 A. That's the general idea, yeah. Ballistics experts, they may have more knowledge on how -- the flight of the bullet in air or other media as well as other ballistics findings, such as striations and firearm matching, stuff like that.

11:08 Q. And I'm scrolling up. You should still see Exhibit 1 in front of you, to page what is marked as TPD-00131. And under -- at header 1, it describes the -- what you've described as the penetrating gunshot wound for region A.

11:08 If we assume no other gunshot wounds, can you

opine on whether Mr. Diaz would have died from that gunshot wound alone?

A. Let me just review all the findings for those. One second. This gunshot wound penetrating gunshot wound to right clavicular region A does have lethal potential in itself. It does -- it is potentially life threatening in and of itself.

Q. Okay. And now if we go to header 2, subheader A, there's a penetrating gunshot wound of the superomedial left shoulder and it's in parenthesis B.

Assuming no other gunshot wounds, could Mr. Diaz have -- would this gunshot have been fatal or not to Mr. Diaz?

A. Yes, I'll give the same answer. This gunshot wound is potentially fatal in and of itself. It has lethal potential in and of itself.

Q. At header 4, subheader A, there's a perforating gunshot wound of left chest and in parenthesis C.

Same question for this gunshot wound. Assuming it was the only one, could it have been fatal to Mr. Diaz?

A. This wound track involves the subcutaneous and muscular tissues of the left chest that tunnel superficially under the skin only. This may have

contributed to the death in the form of exsanguination. Like there was a lot of blood loss in the decedent.

Even though this went through only skin muscle, there is some bleeding associated with that and really it was the hemorrhage exsanguination with the signs of blood loss that were important in this case. So this gunshot wound may have been contributory to the multiple gunshot wound statement.

However, this is relatively speaking without injuring the ribs or the visceral organs, for example, it is relatively minor and could likely had a longer survival interval than the other injuries that we've spoke about. So this has lethal potential, but it may have been a survivable injury, just due to the extent of, you know, the internal findings as I described to you.

Q. And when you say longer survival, does that mean if that wound was treated?

A. Yeah, possibly.

Q. Under header 4, subheader B, there's a perforating gunshot wound of torso and in parenthesis it's D. Same question.

Assuming no other gunshot wounds, could this one have been fatal to Mr. Diaz?

A. Yes, this gunshot wound has lethal potential

in and of itself.

Q. I'm now at header 6, subheader A, it says penetrating gunshot wound of right upper back and in parenthesis it says E.

11:13 Same question for this gunshot wound. Assuming no others, would this have been fatal, this gunshot fatal to Mr. Diaz?

A. So this answer is more similar to the answer I gave for gunshot wound C of the left chest. Gunshot 11:14 wound -- a penetrating gunshot wound to the right upper back E has a wound track that involves the soft tissue and musculature of the back.

So just based on what I said about blood loss and the constellation of findings in this case, this 11:14 was likely contributory to death just in the fact that there is bleeding associated with it, but it's not as immediately life threatening in comparison to the other ones with visceral findings and fractures, et cetera.

Q. I am now at header 6, subheader A. It says 11:15 penetrating gunshot wound of right upper back -- oh, I'm sorry, I apologize. Let me take that back. I am under header 6, subheader B where it says perforating gunshot wound of right upper back and in parenthesis it says F.

11:15 What about that gunshot wound, assuming no

others was it -- could it have been fatal to Mr. Diaz?
A. This gunshot wound was in and of itself potentially life threatening, potentially fatal.
Q. I am now on the bottom of what's marked as TPD-00131. Under header 9 at subheader A, it says penetrating gunshot wound of superior left shoulder, in parenthesis G.
What about that gunshot wound, would that have been -- assuming no others, would that have been fatal to Mr. Diaz?
A. This gunshot wound in and of itself is potentially fatal.
Q. I am now on the top of Exhibit 1, page TPD-00132 under header 11, subheader A, it says penetrating gunshot wound of left arm, in parenthesis H.
What about that gunshot, same question?
A. Gunshot wound H in and of itself is potentially fatal.
Q. I am now at header 12, subheader A. It says penetrating gunshot wound of left arm and left axilla and in parenthesis it says I.
Same question. What about that gunshot wound?
A. Gunshot wound I is in and of itself potentially fatal.

Q. And I'm not seeing any further penetrating or perforating gunshot wounds.

Does that account for all of the gunshots that you observed?

11:17 A. Yes, that's all I have found.

MR. VALENZUELA: And just for the record, I think I indicates a reentrance.

THE WITNESS: Yes, thank you for pointing that out. Gunshot wound I has -- let me just be clear on

11:18 this. There's an entrance gunshot wound of the left arm. There is an exit gunshot wound of the left axilla or the underarm region. There's a reentrance gunshot wound of the underarm region, the left axilla and then the bullet is penetrating. So it's recovered in the

11:18 torso. Thank you for pointing that out.

BY MR. WYNN:

Q. And Doctor, you said that the penetrating gunshot wound of the left arm and left axilla which is in parentheses as I is potentially fatal. It's fatal

11:19 even if to -- a gunshot wound to an arm can still be potentially fatal?

A. Potentially, yes.

Q. In what way?

A. There's a lot of like dense vasculature, you

11:19 know, the blood vessel supply in that region is the

biggest risk, generally speaking.

Q. I am now on what has been marked as TPD-00133 of Exhibit 1, and in the second to the last paragraph in the summary and opinion narrative, it says, you say that there are self inflicted incised wounds of the upper extremities. And I apologize if I mispronounced that.

What does that mean?

A. So incised wounds are in lay terms known as cuts. There are two general -- you know, the most -- by far the most common types of sharp force injuries, sharp meaning something with a sharp edge, right, like a knife, scissors, whatever the sharp instrument might be.

And incised wounds are cuts. They're defined as being longer on the surface in the body than they are deeper in the body and stab wounds are deeper in the body than they are apparent wounds on the surface of the body.

And there are also, just kind of an atypical or sometimes used sharp injury that does fall into the category, you know, of sharp injuries but not incised or stab wounds which are puncture wounds, and we see that in this case also because they are considered a sharp type of injury.

Q. And at the bottom of that paragraph you say, "The incise wounds and puncture wounds are without associated fractures or significant vascular injury and are not contributory to death."

11:21 How did you reach that conclusion?

A. Essentially the autopsy was very informative. You know, in this case doing a dissection of wherever was involved, such as just looking at the tissue under the puncture marks, like I think I described

11:22 earlier to you about like the death of where the hemorrhage is, you know, in the layers of skin as well as just a dissection of the hands and forearm showing exactly like where the injuries are and where the injuries are not, you know, without significant

11:22 vascular injury was a notable finding. And the incise wounds meaning that they did not contribute to death in that way.

Q. Those wounds would have been actively bleeding; is that correct?

11:23 A. Yeah, there was -- yeah, there was likely some bleeding, just like any wound. If you cut yourself, even the smallest paper cut will have some bleeding --

Q. And do you remember approximately how many self inflicted wounds you observed?

11:23 A. I don't remember. I would have to refer to

the photos in the autopsy report, but there were many, like too many to count. I mean, sorry, they ware countable but too many to just eyeball looking at it.

Q. With all of those wounds likely being active, active as far as blood loss, would that not contribute to Mr. Diaz's death in any way?

A. So that is a very like keen question based on like the phenomenon I'm describing to you. I would expect for these to be relatively survivable and in the context of the injury -- the more severe injuries due to the gunshot wound, these have a trivial effect on his survival outcome in that they didn't -- they didn't in my opinion expedite his death. And that would be the threshold to determine whether that was contributory to death. Of course, that is an opinion, but that is my opinion.

Q. When the incise wounds or like superficial puncture wounds and the puncture wounds that you observed in this case, did you consider any of those to be life threatening wounds?

A. No. They potentially have life threatening value in a different context if there's no other reasonable explanation for death. But in this case they did not hasten his death, so the interpretation of that is that they were not contributory to death.

Q. Now, from -- assuming no gunshot wounds, could Mr. Diaz have -- could the self inflicted wounds have been fatal to Mr. Diaz?

MR. VALENZUELA: I'm going to object as calls for speculation and lacks foundation. You can respond.

THE WITNESS: Yeah, I mean, this is a hard question to answer with any reasonable level of medical certainty. The short answer is it's possible. I don't know because that's not the outcome of what happened in this case. The only way to know if that was the case and there was survival.

But based on the -- I'll put it this way. Based on the anatomic findings, I would expect with a level of medical certainty confident in this, that if for the sharp injuries, the puncture wounds and incise wounds, if there were those injuries themselves without the gunshot wounds, he would not have died at that time. Whether there was another interval that would extend beyond that indefinitely or for some other time, there is no way for me to reliably predict that.

BY MR. WYNN:

Q. I am now scrolling on Exhibit 1. I've stopped on the last page of Exhibit 1, which is TPD-00152, and it says that it's a laboratory analysis summary report.

Dr. Partovi, did you review this as part of

your autopsy report?
A. Yes.
Q. Can you based on your review of this document, can you tell us what, if anything, was -- what its findings were?
11:29
A. Essentially it's that his post mortem samples tested negative or nondetected for Ethanol also known as alcohol, common drugs of abuse and a more extended comprehensive panel of medications and substances of abuse.
11:29
Q. Did that comprehensive panel include nitrous oxide?
A. I requested it. It appears that it either was not tested or not reported.
11:30
Q. Is there a difference between not tested versus not reported?
A. There is a difference on my end when I'm looking at the paper. I mean, there's no difference on my end because all I can just see is that there's no mention of nitrous oxide. If there's a difference in the lab, that's a question for them.
11:30
Q. And as far as this report, is it it's just not tested as far as this toxicology?
A. I don't know. I don't know. All I can say is that there's nothing about nitrous oxide in the report,
11:30

but in my toxicology request, I did make a request in all capital letters, please test for nitrous oxide N2O.

11:31 Q. If, for example, I see that fentanyl was tested. If it's tested and not detected, would there be no mention of it in a toxicology report?

A. If it was tested and nothing was detected, it would be reported as we see it here, because it says drug results, not detected. So it does explicitly state whether it was tested.

11:31 There may be things that are tested and not reported; however, I don't know the system by which the tox lab decides to report things that they may or may not have tested, et cetera.

But usually when something is tested with

11:31 either a positive or negative result, detected or not detected result and it is something that has clinical or forensic significance to communicate to the forensic pathologist, it from my experience usually is communicated in the toxicology report.

11:32 Q. I believe that concludes my questions. Do you mind if I take a quick break to go over --

A. Absolutely.

Q. -- my questions?

MR. VALENZUELA: Counsel, can I get started on

11:32 mine and then you could go back and finish? Would that

be --

MR. WYNN: Yeah, of course.

MR. VALENZUELA: -- a more efficient use of time?

11:32 MR. WYNN: Yeah, that works.

MR. VALENZUELA: Once I'm done I'll pass it back to you if you have any follow up.

EXAMINATION

BY MR. VALENZUELA:

11:32 Q. We're still in the morning, right. Good morning, Doctor.

A. Good morning.

Q. Really quick on the toxicology since we have it up, no alcohol or illegal drugs were found in the 11:33 blood taken at autopsy based on the toxicology; is that correct?

A. No alcohol or tested illegal drugs based on the panel that was included, but this was a pretty comprehensive panel. We can see the drug screen for 11:33 the most common drugs of abuse and then the basic drugs includes many medications, medications of abuse and possibly other illicits. I forget the exact panel which was included.

But this particular panel was negative or not 11:33 defected for all illicit substances. That doesn't mean

that everything under the sun were tested, though.

Q. Correct. But for the drugs that were tested, there were no positive findings, would you agree?

A. That is correct.

11:33 MR. VALENZUELA: Can we stop the share screen, Counsel?

MR. WYNN: Yeah.

BY MR. VALENZUELA:

Q. Okay. It's a little easier to see you like

11:33 this. I want to go back a little bit.

You indicated you've done approximately 800 autopsies previously, and I understand this is a general estimate or prep.

A. Yeah, that's correct.

11:34 Q. Approximately how many of those autopsies involve death by gunshot wounds?

A. Another approximation, 200.

Q. You have training and experience with regards to gunshot wounds, correct, including distinguishing

11:34 entrance from exit wounds?

A. Correct.

Q. Including determining trajectories or pathways that a projectile takes once entering the body?

A. Correct.

11:34 Q. Do you ever use the trajectory rods when

you're doing an autopsy?

A. Yes, also known as a probe. I do use them routinely.

Q. Did you use any of those in this particular autopsy?

A. Possibly. I don't recall.

Q. If you did it would be in the photos?

A. No.

Q. So even if you did use them, it wouldn't be documented in the photograph?

A. Not necessarily.

Q. Is that more just for your own findings, if you will?

A. The reason for that is the photos, the autopsy photos that you see are taken in the studio photos before the autopsy, and those are not during the autopsy when I'm actually examining and probing the body. If there was something pertinent at the time of the autopsy using a probe or for whatever reason, I could use it photograph that, but my feeling was it was not necessary in this case.

Q. So your recollection, you, yourself, did not take any photographs with the rods in the body, correct?

A. Yeah, I mean, it really depends on the utility

of those rods, if it's meant for clarification, exactly like why are those being used. Because we want to use those judiciously in a way -- you don't want to blindly probe things either. It's not like every wound needs to be probed because when you poke at it, you also -- like it's not perfectly going through the hole. Like you're going to poke at other things and possibly confuse your findings internally. So it's best not to just do that willy-nilly.

11:36 Q. Do you recall if the body was clothed when you received it?

A. It was not clothed but I do see that there's an intake photograph of the clothes hanging in our office or was hanging.

11:36 Q. Did you do any examination of the clothing?

A. No, not in this case.

Q. You had discussed earlier about the decedent having a history of nitrous oxide use.

Do you remember that?

11:37 A. Yes. I remember saying that.

Q. Do you recall what specifically was the source of that information?

A. Let me -- at the very least I see it in our medical legal investigative report, which you guys should also have. I'm doing like a control F for

nitrous. Per the decedent's FBI, fingerprint returns, decedent had been arrested twice for possession of nitrous oxide. Next entry, the decedent uses nitrous oxide six to seven times a day. Using in the last couple of years. His vitamin B12 level was high, caused by nitrous oxide. His medical records also say he has a medical history of nitrous oxide abuse.

Q. So is this information you're getting from the coroner's investigator report?

A. Correct. There is also a line that says per the Lange Portal. Lange is our way of accessing medical records. It says that he has a medical history of nitrous oxide abuse. I didn't independently access those records. I could right now, but they're saying that it's reported in the medical history.

Q. Just so I'm clear, you got that information from the coroner's investigation report, is that fair?

A. Correct.

Q. Are you familiar with the term "mechanism of death"?

A. Yes, I am.

Q. Was the mechanism of death in this case exsanguination?

A. Yes.

Q. Is that the medical term for bleeding to

death?
A. Yes, bleeding to death or bleeding out.
Q. Exsanguination is not an instant or immediate death, would you agree?
11:39 A. No, generally there needs to be some time interval. But that varies.
Q. That could take multiple minutes, correct?
A. It varies. The order of magnitude varies.
Q. But you would agree it's not an instantaneous
11:39 or immediate death, would you agree?
MR. WYNN: I'm going to object. Lack of foundation. Doctor, you can answer.
THE WITNESS: Yeah, I mean almost by definition exsanguination does require some time
11:39 interval to accumulate. Exactly what interval that is varies depending on the injury or disease process.
BY MR. VALENZUELA:
Q. Based on these injuries that you observed, do you have an estimate as to what that time interval
11:40 would be for the exsanguination to occur?
MR. WYNN: Objection. Speculation, lack of foundation. You can answer, Doctor.
THE WITNESS: It's on the order of minutes.
BY MR. VALENZUELA:
11:40 Q. Okay. You believe it would have taken minutes

for the exsanguination to occur?

A. Yes, minutes.

Q. Generally speaking, sustaining gunshot wounds is painful, correct?

11:40 MR. WYNN: Objection. Lack of foundation, speculation.

BY MR. VALENZUELA:

Q. You may answer.

A. This is out of my area of personal or

11:40 professional expertise but yes, I would assume so.

Q. When you're doing the autopsy and you identify gunshot wounds A through I, that's for identification purposes, correct? You're not indicating the sequence they were sustained by those letters; is that correct?

11:41 A. That's exactly right.

Q. And when you're describing the bullet trajectory in the body, that's with the body in the anatomical position?

A. Correct.

11:41 Q. And prior to doing the autopsy, would the height and weight of the individual be taken down?

A. Yes.

Q. Earlier you indicated that you couldn't tell which particular gunshot wound was the fatal gunshot

11:41 wound.

Was that in part because of the mechanism of death here was exsanguination?

MR. WYNN: Objection. Lacks foundation, speculation. You can answer, Doctor.

11:42 THE WITNESS: Yeah, it's not that I couldn't tell which was the fatal gunshot wound. It's that I assigned -- the cause of death was from a contribution of multiple gunshot wounds, and then I went into detail about like sort of the relevance and the findings when

11:42 there was questioning about whether each individual one was life threatening.

BY MR. VALENZUELA:

Q. And here you found that the cause of death was the multiple gunshot wounds, correct?

11:42 A. That's correct.

Q. And I think you indicated earlier you found that the manner of death was a homicide, correct?

A. That's correct.

Q. You did not find that the manner of death was

11:43 suicide, accidental, natural or undetermined, correct?

A. Correct.

Q. You make reference to not finding soot or stippling on any of the gunshot wounds.

What is soot and stippling?

11:43 A. Soot is burnt gun powder particles that are

deposited on a surface, such as the body. And stippling is unburnt gun powder particles that abrade the skin or other surface.

Q. Generally speaking, what distance do the individual need to be from the shooter to find soot or stippling? Is there a general distance?

MR. WYNN: Objection. Lacks foundation, speculation. You can answer, Doctor.

THE WITNESS: Yeah, it really depends on the firearm, so this answer is highly variable but generally speaking, soot is between a foot and a half, two feet and stippling is within a three or four feet or so.

BY MR. VALENZUELA:

Q. And because you didn't find either of those, would you expect the distances to be greater than those because you did not find either of those?

A. One second.

MS. POWELL: I'm going to object that it calls for speculation.

MR. VALENZUELA: Well, I don't know if you both can object, Counsel. Maybe send Thurgood a text of your objection.

THE WITNESS: Should I answer it?

BY MR. VALENZUELA:

Q. Yes, you can.
A. So in this case the ranges of fire for all the gunshot wounds are best described as indeterminate rather than distance. And the reason for that is because there could always be an intermediate object that blocks out the soot or stippling.
So they're compatible with but not necessarily from a distance, and for that reason we describe them in the forensic pathology community as indeterminate range of fire.
Q. What significance does -- strike that.
You mentioned in describing the different gunshot wounds margin of abrasion. What forensic significance does the margin of abrasion have?
A. Usually that's an indicator of an entrance gunshot wound.
Q. Okay. That helps you to distinguish entrances from exits?
A. Yeah, classically. Like there could be overlapping findings, et cetera, depending on the types of gunshot entrance and exit wounds but yeah, that's usually a classic indicator of an entrance gunshot wound.
Q. And did you indicate earlier that you had not seen the videos of the incident?

A. Correct.

Q. I want to go through some of -- do you have a copy of your report handy?

A. Yes, it's in front of me.

11:46 Q. Okay. So I'm going to go through the gunshot wound starting with A through I and then I'm going to ask you a couple questions about it. Okay?

A. Okay.

Q. Okay. Starting with gunshot wound A, you had

11:47 the entrance of that on the right clavicular region of the chest, correct?

A. Yes.

Q. Would that be near the area of the clavicle bone or would that be a different area?

11:47 A. Yes, clavicular means associated with the clavicle.

Q. On that particular gunshot wound A you make reference of nondisplaced fractures of T3 and T4.

Do you see that?

11:47 A. Correct.

Q. Are T3 and T4 part of the spine?

A. The vertebral column, yes, the spine.

Q. So would a gunshot wound A struck part of the spine?

11:48 MR. WYNN: Objection. Speculation. You can