JONES MAYER
Angela M. Powell, State Bar No. 191876
amp@jones-mayer.com
Thurgood M. Wynn, State Bar No. 345199
tmw@jones-mayer.com
Ryan M. Allein, State Bar No. 318078
rma@jones-mayer.com
3777 North Harbor Boulevard
Fullerton, CA 92835
Telephone: (714) 446-1400
Facsimile: (714) 446-1448

Attorneys for Defendants,
CITY OF TORRANCE; ARTURO CASTILLO;
CODY WISSLER; JESUS GARCIA; JASON
BERMUDEZ

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

MARIA GUADALUPE DIAZ; A.D., a minor by and through his Guardian Ad Litem, MARIA GUADALUPE DIAZ; A.D., a minor by and through his Guardian Ad Litem, MARIA GUADALUPE DIAZ; LEONARDO DIAZ; and RAMONA RAMIREZ DE DIAZ

Plaintiffs,

v.

CITY OF TORRANCE; ARTURO CASTILLO; CODY WISSLER; JESUS GARCIA; JASON BERMUDEZ; and DOES 6-10, inclusive

Defendants.

Case No. 2:25-cv-03389-JLS (AYPx)

Honorable Josephine L. Staton
Courtroom 8A

**DEFENDANTS' REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT AND/OR PARTIAL SUMMARY JUDGMENT OF ISSUES; MEMORANDUM OF POINTS AND AUTHORITIES**

***[Filed concurrently with: Defendant's Reply to Plaintiffs' Statement of Genuine Disputes of Material Fact and Additional Material Facts; Defendants' Evidentiary Objections to Plaintiffs' Evidence in Opposition; Declaration of Ryan M. Allein; Exhibits]***

Date: November
Time: 10:30 a.m.
Ctrm: 8A

Action filed: October 8, 2025



JONES MAYER LAW

Defendants CITY OF TORRANCE (hereinafter referred to as "City"); ARTURO CASTILLO; CODY WISSLER; JESUS GARCIA; and JASON BERMUDEZ (hereinafter referred to as "Officer Defendants") (collectively referred to as "Defendants") hereby submit this Reply in Support of the Motion for Summary Judgment and/or Partial Summary Judgment of issues ("Motion").[1] As set forth herein, Defendants submit that Plaintiffs MARIA GUADALUPE DIAZ; A.D., a minor by and through his Guardian Ad Litem, MARIA GUADALUPE DIAZ; A.D., a minor by and through his Guardian Ad Litem, MARIA GUADALUPE DIAZ; LEONARDO DIAZ; and RAMONA RAMIREZ DE DIAZ's (collectively referred to as "Plaintiffs") have failed to carry the burden of demonstrating a triable issue of material fact and, accordingly, summary judgment should be granted.

Dated: October 23, 2026 JONES MAYER

By:s/*Ryan M. Allein*
Angela M. Powell,
Thurgood M. Wynn,
Ryan M. Allein,
Attorneys for Defendants,
CITY OF TORRANCE, et al.

[1] As stated in the Motion, Plaintiffs have agreed to dismiss their denial of medical care claim (count two). Plaintiffs' Opposition to Summary Judgment ("Opposition"), at 2:22-23; Dkt. 63. Therefore, Defendants will not address this claim in their reply.

# TABLE OF CONTENTS


TABLE OF AUTHORITIES .......... 4

I. INTRODUCTION .......... 7

II. STATEMENT OF FACTS .......... 8

III. 42 U.S.C. § 1983 CLAIMS .......... 10

A. Excessive Force (Count One) .......... 10

1. The Graham Factors Support Summary Judgment .......... 10

a. Severity of the Crime at Issue .......... 11

b. Immediate Threat to the Safety of Officers and Others .......... 11

c. Other Factors .......... 19

d. Plaintiffs' Additional "Material" Facts .......... 20

2. Officer Defendants are Entitled to Qualified Immunity .......... 21

B. Plaintiffs' Fourteenth Amendment Claim Fails as a Matter of Law .......... 25

IV. STATE LAW CLAIMS .......... 26

A. Battery Claim (Count Four) .......... 26

B. Negligence (Count Five) .......... 26

C. Bane Act Claim (Count Six) .......... 28

IV. CONCLUSION .......... 28

# TABLE OF AUTHORITIES


Page(s)

**Federal Cases**

*A.D. v. Cal. Highway Patrol*,
712 F.3d 446 (9th Cir. 2013) .......... 25, 26

*Ashcroft v. al-Kidd*,
563 U.S. 731 (2011) .......... 21, 22, 25

*Buchanan v. City of San Jose*,
782 Fed. Appx. 589 (9th Cir. 2019) .......... 13, 14, 15

*Chew v. Gates*,
27 F.3d 1432 (9th Cir. 1994) .......... 12

*Fowzer v. City of San Berardino*,
2018 U.S. Dist. LEXIS 183442 .......... 9, 17

*Glenn v. Washington County*,
673 F.3d 864 (9th Cir. 2011) .......... 21, 23, 24

*Graham v. Connor*,
490 U.S. 386 (1989) .......... *passim*

*Hayes v. County of San Diego*,
736 F.3d 1223 (9th Cir. 2013) .......... 21, 23, 27

*Estate of Hernandez v. City of Los Angeles*,
139 F.4th 790 (9th Cir. 2025) .......... 16

*Jeffers v. Gomez*,
267 F.3d 895 (9th Cir. 2001) .......... 26

*Monzon v. City of Murrieta*,
978 F.3d 1150 (9th Cir. 2020) .......... 7, 18

*Napouk v. Las Vegas Metro Police Dep't.*,
123 F.4th 906 (9th Cir. 2024) .......... 24, 25, 27

*Nehad v. Brower*,
929 F.3d 1125 (9th Cir. 2019) .......... 18, 21, 22, 23

*Pearson v. Callahan*,
555 U.S. 223 (2009) ........................................................................................21

*Ryburn v. Huff*,
565 U.S. ...................................................................................................11, 12

*Sartor v. Cnty. of Riverside*,
2025 U.S. Dist. LEXIS 47295 (C.D. Cal. Mar. 14, 2025) ................................11

*Scott v. Harris*,
550 U.S. 372 (2007) ..........................................................................................8

*Smith v. City of Hemet*,
394 F.3d 689 (9th Cir. 2005)............................................................................11

*Estate of Strickland v. Nevada Cnty.*,
69 F.4th 614 (9th Cir. 2023)..............................................................................27

*T.W. Electrical Service, Inc. v. Pacific Electrical Contractors Association*,
809 F.2d 626 (9th Cir. 1987)............................................................................20

*Vos v. City of Newport Beach*,
892 F.3d 1024 (9th Cir. 2018)...........................................................21, 22, 23, 27

*Wilkinson v. Torres*,
610 F.3d 546 554 (9th Cir. 2010)......................................................................26

**California Cases**

*Brown v. Ransweiler*,
171 Cal.App.4th 516 (2009)..............................................................................26

*Grudt v. City of Los Angeles*,
2 Cal.3d 575 (1970)...........................................................................................27

*Hayes v. County of San Diego*,
57 Cal.4th 622 (2013)........................................................................................27

*Munoz v. Olin*,
24 Cal.3d 629 (1979)..........................................................................................27

*Nally v. Grace Community Church*,
47 Cal.3d 278 (1988)..........................................................................................26

**Federal Statutes**

42 U.S.C.
§ 1983 .......... 10

**Other Authorities**

Fourth Amendment .......... 27

Fourteenth Amendment .......... 25

Fed. R. Evid. Rule 801 .......... 17

## MEMORANDUM OF POINTS AND AUTHORITIES

## I. INTRODUCTION

The Ninth Circuit has made clear that "[j]udges and lawyers viewing an event like this in hindsight from the comfort of their armchairs are often tempted to dissect, evaluate, and second-guess the officers' actions piecemeal. That would be a serious mistake." *Monzon v. City of Murrieta*, 978 F.3d 1150, 1157-58 (9th Cir. 2020).

In Plaintiffs' Opposition to Summary Judgment ("Opposition"), Plaintiffs attempt to create triable issues of fact by referring to dozens of immaterial facts that try and distract from the undisputed facts that establish that Defendant Officers were authorized to use deadly force against Leonardo Diaz ("Diaz"). Specifically, the undisputed facts establish that Defendant Officers: (1) were informed via dispatch that a person, later identified as Diaz, had called in and told dispatch he had a gun at 2909 Oregon Court and that he was there to kill someone; (2) after arriving on scene, Defendant Officers developed a tactical plan to conduct a high-risk stop on Diaz; (3) repeatedly commanded Diaz to drop his weapon, and at one point, warned him they were going to shoot if he did not comply – this only happened after Diaz spontaneously exited his vehicle without being prompted; (4) gave Diaz multiple opportunities to comply, but Diaz refused; and (5) only shot Diaz after he was at most seven feet from them – i.e., he was so close that he fell at the right passenger wheel well right in front of where Officer Garcia was standing.

Although easy to do, we must not as litigators and judges comb through this video footage and pinpoint every single second and millisecond in an attempt to decide whether an officer's decision was reasonable. The simple truth is this, "If we are unable to make a reasonableness determination based on *one* review of a video in real-time, then an excessive



JM JONES MAYER LAW

force claim must be dismissed." This is because an officer does not have the benefit of pausing, slowing down, or rewinding the footage; rather he/she has to make a split-second decision in real-time. To analyze these videos otherwise is improperly judging an officer's decision "with the 20/20 vision of hindsight." *Graham v. Connor*, 490 U.S. 386, 396 (1989).

Therefore, when viewing the undisputed material facts with this limitation in mind, it is clear Defendant Officers were faced with an unfortunate reality: shoot Diaz *or* be stabbed. In the protection of themselves and their other officers, Defendant Officers made the choice to shoot. Accordingly, based on the undisputed material facts and when considering Defendant Officers' decision in real-time, this Court should grant Defendants' Motion.

## II. **STATEMENT OF FACTS**

In the Motion, Defendants submitted a mere *47* undisputed material facts. Inasmuch as these facts were pulled directly from body worn camera footage, drone footage, and Officer Defendants' deposition testimony, Plaintiffs for the most part admits these facts or asserts *interpretations* of facts that are clearly disproven by video evidence. *See Scott v. Harris*, 550 U.S. 372, 380-381 (2007).

It is further undisputed that prior to Defendant Officers firing their weapons, Officer Defendants: (1) received information stating, "[T]here's a man with a gun at 2909 Oregon Court" in Torrance and it was communicated to them the caller was the individual with the gun and he is there to kill someone, U.F. 1-2; (2) were told by dispatch the caller's phone number belonged to Diaz and that he worked at a nearby shop, which had recently closed down, U.F. 7-8; (3) arrived on scene, and Officer Garcia told Officer Bermudez to position his vehicle like a felony stop, U.F. 18; (4) were positioned approximately 20 feet away from Maple Avenue, which was full

of cars leaving work, U.F. 20; (5) formulated a plan in that Officer Garcia took charge of the engagement, Officer Garcia asked for less lethal – specifically for the next unit arriving on scene to bring a less-lethal option with them – and Officer Wissler provided the commands to Diaz, U.F. 22-25, 28; (6) Officers Choi and High were then designated less-lethal, but were unable to position themselves with the 40mm in time, U.F. 37; (7); then observed Diaz exit the vehicle and walk toward them with what appeared to be a knife, but was later determined to be a flathead screwdriver in his hand with the metallic part pointed towards them, U.F. 27, 29; (8) repeatedly told Diaz to drop the weapon, and Officer Garcia told Diaz " 'Stop . . . Drop the knife. I don't want to shoot you. Stop. I don't want to shoot you,"[2] U.F. 30-31, and (9) were approximately five feet away – or at most seven feet away – from them before they fired, resulting in Diaz falling right up against the front passenger wheel of Officer Wissler/Garcia's vehicle – directly in front of Officer Garcia and between both patrol vehicles. U.F. 33-36, 38.

Notwithstanding these undisputed material facts, Plaintiffs attempt to create a triable issue of material fact by arguing it is disputed: (1) "whether the officers ever had information that Decedent was going to stab someone," Opposition, at 16:18-19; Dkt. 63; (2) "whether the officers

---

[2] Although this specific statement by Officer Garcia was not referred to in Defendants' Motion, Plaintiffs' raised this *new* issue by arguing that Officer Defendants failed to warn that deadly force would be used against Diaz. Opposition, at 20:8-14; Dkt. 63. Accordingly, Defendants' have a right to introduce new evidence to rebut evidence raised for the first time in opposition. *See Fowzer v. City of San Berardino*, 2018 U.S. Dist. LEXIS 183442, at *1 n. 3 (C.D. Cal. Oct. 25, 2018 ("While the general rule is that courts do not consider arguments or evidence raised for the first time on reply, courts permit summary judgment movants to submit new evidence to rebut arguments evidence raised for the first time in the nonmoving party's opposition."); Declaration of Ryan M. Allein ("Allein Declaration"), at ¶ 2; Exhibit A, at 96:7-11.

formulated a tactical plan prior to the shooting," *id*. at 17:1-2; (3) "whether the officers had sufficient time to get the 40mm from their police cruiser," *id*. at 17:19-20; (4) "whether it was reasonable for the officers to believe that [Diaz] had injured another person since there was blood on his hands," *id*. at 18:1-2; and (5) "whether [Diaz] ever communicated with the officers prior to the shooting." *Id*. at 18:13-14. However, as discussed below, either these facts are clearly refuted by the undisputed material facts *or* are immaterial to the issues before this Court – i.e., whether Officer Defendants' use of deadly force was reasonable.

## III. <u>42 U.S.C. § 1983 CLAIMS</u>

Plaintiffs argue that in applying the *Graham* factors, along with "[o]ther relevant factors including the availability of less intrusive force, whether proper warnings were given, and whether it should have been apparent to the officers that the subject of the force used was mentally disturbed," that Defendant Officers' use of deadly force was unreasonable. Opposition, at 10:5-15; Dkt. 63.

However, as discussed in detail below, Defendant Officers were entitled to use deadly force.

### A. Excessive Force (Count One)

#### 1. *The Graham Factors Support Summary Judgment*

The *Graham* factors to be considered are as follows: (1) the severity of the crime at issue; (2) whether the suspect poses an immediate threat to the safety of the officers or others; and (3) whether the suspect actively resists detention or attempts to escape. *Graham*, 490 U.S. at 395-95. The test is an objective one, viewed from the vantage of a reasonable officer at the scene, and is highly deferential to the police officer's need to protect himself or others. *Id*. at 396-97.

Again, the Supreme Court has indicated that "judges should be

cautious about second-guessing a police officer's assessment, made on the scene, of the danger presented by a particular situation." *Ryburn v. Huff*, 565 U.S. at 477. Moreover, the most important single element of the three specified factors is whether the suspect poses an immediate threat to the safety of the officers or others. *Smith v. City of Hemet*, 394 F.3d 689, 702 (9th Cir. 2005).

**a. Severity of the Crime at Issue**

In their Opposition, Plaintiffs minimize the potential for danger Defendant Officers could have faced. Specifically, Plaintiffs argue that Diaz engaged in misdemeanor conduct because he "was never actually armed with a gun." Opposition, at 10:25-11:9; Dkt. 63. However, Plaintiffs are doing exactly what the Supreme Court has warned against – i.e., weighing the officer's actions with the 20/20 vision of hindsight rather than from the perspective of a reasonable officer on scene. *Graham*, 490 U.S. at 396. As this Court recently stated, "Plaintiffs argument that 'it was no crime for [the suspect] to say he had a gun and wanted to smoke someone' discounts the legitimate public safety concern that prompted the [] employees to call the police." *Sartor v. Cnty. of Riverside*, 2025 U.S. Dist. LEXIS 47295, at *10 (C.D. Cal. Mar. 14, 2025). Therefore, just because Diaz ended up being unarmed with a firearm is irrelevant; rather, right up until deadly force was applied, Defendant Officers reasonably believed – based on the dispatch – that Diaz was armed with both a knife and a firearm. Essentially, Defendant Officers faced a legitimate public safety concern thereby providing the context for Defendant Officers' use of deadly force.

**b. Immediate Threat to the Safety of Officers and Others**

The second *Graham* factor, "whether the suspect pose[d] an immediate threat to the safety of the officers or others," is "the most

important single element of the three specified factors[.]" *Chew v. Gates*, 27 F.3d 1432, 1441 (9th Cir. 1994). As Plaintiffs correctly state, "[u]se of deadly force is reasonable only if an officer has probable cause to believe the suspect poses an immediate threat of death or serious bodily harm to *himself or others*." Opposition, at 11:14-16 (citing to *Gonzalez v. City of Anaheim*, 747 F.3d 789, 793 (9th Cir. 2014); *George v. Morris*, 736 F.3d 829, 838 (9th Cir. 2013)) (emphasis added).

Plaintiffs' argue that Diaz did not pose an immediate threat of death or serious bodily injury to Defendant Officers because: (1) Diaz walked slowly towards Defendant Officers and did not lunge or make a stabbing motion, or threaten them, Opposition, at 11:20-25; (2) Defendant Officers had the ability to "tactical[ly] reposition[]" themselves once Diaz approached them, *id.* at 12:3-13; and (3) Defendant Officers had the "opportunity to reassess the situation and recognize that [Diaz] has collapsed and was no longer advancing after the initial shots yet failed to do so." *Id.* at 12:14-16. Again, Plaintiffs are asking this Court to reexamine Defendant Officers' conduct with the benefit of hindsight, which runs afoul of the Supreme Court's directive. *See Ryburn*, 565 U.S. at 477.

Therefore, rather than reviewing this case through the lens of 20/20 hindsight, here are the undisputed facts. First and foremost, this is a situation where Defendant Officers believed that Diaz – was not only armed with a knife – but also armed with a firearm and willing to use this firearm against another. U.F. 1-2, 4. As far as Plaintiffs' contention that Defendant Officers "could see [Diaz] from head to toe and they never saw a gun in his hands or on his person, nor did they observe any bulge in his clothing that they believed was a gun," Opposition, at 16:24-27; Dkt. 63, the video evidence establishes that Diaz was wearing baggy clothing and could have easily had a firearm in the back of his pants, or some other area of his body.

U.F. 26, 28-33. Defendant Officers' belief that Diaz was armed with a firearm is not based on speculation or assumption but rather based on Diaz's *own* statements to dispatch.

Further, once Defendant Officers set up to make a high-risk stop, Diaz spontaneously stepped out of the vehicle and Officer Wissler observed what he reasonably believed to be a knife, coupled with the fact he observed Diaz bleeding. U.F. 26. Diaz then began walking towards Defendant Officers with the weapon to his side and the metallic portion pointed towards them. U.F. 29-30. Defendant Officers repeatedly commanded Diaz to turn around and drop the knife; however, Diaz continued to walk towards the officers with the weapon in hand.[3] U.F. 30. Finally, whether Diaz was three, five or even seven feet from Officer Defendants prior to Defendant Officers firing their weapons, U.F. 33, this is immaterial because it is undisputed that Diaz was *so close* to Officer Garcia that he fell right up against the front passenger wheel of Officer Wissler/Garcia's vehicle – directly in front of Sergeant Garcia and between both patrol vehicles. U.F. 38.

As the Ninth Circuit held, officers are not required to wait until an individual is "capable of actually inflicting death or serious harm, before being justified in using deadly force." *Buchanan v. City of San Jose*, 782 Fed. Appx. 589, 592 (9th Cir. 2019). In *Buchanan*, the relevant facts analyzed by the Ninth Circuit were as follows:

> The officers responded to an emergency telephone call by Watkins, who falsely reported that there was a man at his address threatening his family with a knife. When the officers

[3] Although Plaintiffs dispute whether Diaz nodded his head in a side-to-side motion, the video evidence corroborates Officer Garcia's deposition testimony. U.F. 31. As to Officer Garcia's *interpretation* of what Diaz's non-verbal cues meant, that goes to the officer's belief, not whether it was in fact true.

> arrived at the address, they saw Watkins standing outside the house next to two women, armed with a knife. At that point, the distance between the officers and Watkins was more than 130 feet. It is undisputed that Watkins then immediately advanced toward the officers in a threatening manner intending to commit 'suicide by cop.' Watkins fell to the ground fatally wounded. At the time the officers opened fire, Watkins was approximately 55 feet from them. When Watkins fell, he was approximately 18 feet from the officers.

*Id.* at 591.

In *Buchanan*, Plaintiffs claimed the officers' use of deadly force was unreasonable because Watkins posed no immediate threat *and* the officers had less intrusive tactics available to subdue Watkins, coupled with the fact the officers were on notice Watkins was emotionally disturbed. *Id.* at 591-93. The Ninth Circuit held as follows:

> [W]hen the officers began firing, it is undisputed that Watkins was advancing towards them at a rapid pace, armed with a knife in his hand, and ignoring the officers' repeated commands to stop. In these circumstances, the immediate threat to the officers justified their use of deadly force. Had the officers waited 1 to 1.5 seconds more before firing when they did, Watkins would have reached them with the knife before falling to the ground. *See Lal* [*v. California*,] 746 F.3d [1112,] 1118-19 [(9th Cir. 2014)] (concluding that officers' use of deadly force was reasonable when suspect had ignored officers' commands, previously demonstrated an intent to hurt others, and was charging at the officers with a rock over his head).

*Buchanan*, 782 Fed.Appx. at 591.

Overall, *Buchanan* is instructive. Although *Buchanan* dealt with an individual who was running at officers versus Diaz who was walking, the Court still found the officers were permitted to use deadly force when "Watkins was approximately *55 feet* from them." *Id*. (emphasis added). This was due to the fact that "[h]ad the officers waited 1 to 1.5 seconds more before firing when they did, Watkins would have reached them with the knife before falling to the ground." *Id*. Similar here, had Officer Defendants waited any longer, Diaz would have reached them and could have caused serious bodily injury or death to the officers.[4]

Further, as to Plaintiffs' argument that Officer Defendants had the ability to tactically reposition themselves, the undisputed facts establish that behind Officer Defendants was Maple Avenue, which was full of cars leaving from work and the officers were approximately 20 feet away from the street. U.F. 20. However, other than the expert opinion of William Harmening ("Harmening") – who never actually visited the scene of the shooting – Plaintiffs have proffered *no* evidence to establish the feasibility of Officer Defendants' ability to reposition themselves. Again, this comes down to the argument that officers *should have done this* – which again is not the standard by which we judge an officers' decisions.

Additionally, as to Plaintiffs' argument that Officer Defendants had an "opportunity to reassess the situation and recognize that [Diaz] had collapsed and was no longer advancing after the initial shots yet failed to

---

[4] The Ninth Circuit further addressed the 21-foot rule, which "provides that a person at a distance of 21 feet or less may pose a threat to the safety of an officer." *Buchanan*, 782 Fed.Appx. at 592. As applied to *Buchanan*, the Court held that no case held "that an officer must wait until an armed suspect is within 21 feet, or capable of actually inflicting death or serious harm, before being justified in using deadly force." *Id*. Here, the facts are undisputed that Diaz was at most *seven feet away* before Defendant Officers fired their weapons. The 21-foot rule also supports a finding that Defendant Officers' use of deadly force was reasonable.

do so[,]" Opposition, at 12:14-16, the undisputed material facts that Diaz *remained* armed until Officer Choi eventually separated him from the screwdriver *after* the shots had already occurred. As the Ninth Circuit stated with regard to an individual armed with a knife on the *ground*, "While he had not yet resumed walking toward her, and he may have yelled out in pain rather than rage, *he was not yet incapacitated* [and] [t]hus, a reasonable officer could conclude that he continued to present an imminent threat." *Estate of Hernandez v. City of Los Angeles*, 139 F.4th 790, 800 (9th Cir. 2025) (emphasis added). Here, even assuming Diaz was headed to the ground when the shots continued (which Defendants' dispute), this conduct would still be objectively reasonable because Diaz was *still* armed and *still* a threat.

Plaintiffs further argue "[t]here was no evidence that [Diaz] 'hurt someone else prior to exiting the vehicle.' " However, as Plaintiffs concede, the "[u]se of deadly force is reasonable only if an officer has probable cause to believe that the suspect poses an immediate threat of death or serious bodily harm to *himself or others*." Opposition, at 11:14-16; Dkt. 63 (emphasis added). Although it was reasonable for Officer Defendants to believe the blood on his wrist/hand was from someone else, at a minimum, Officer Defendants were correct in their conclusion that Diaz posed an immediate threat of death or serious bodily harm to *himself*. Therefore, irrespective of whether there was another individual in Diaz's vehicle, Officer Defendants acted reasonably in believing Diaz represented a threat to himself.

Finally, Plaintiffs argue that Officer Defendants lack credibility, Opposition, at 13:15-14:6, and that their beliefs that Diaz was holding a knife – rather than a flathead screwdriver – were unreasonable. *Id.* at 14:7-28. First, with respect to Plaintiffs' credibility argument, Officer Castillo

testified to the following:

> In this situation, because it was with a man with a gun, and we were within the general area, and a reasonable suspicion left us to believe that this person in the vehicle could be possibly the man with the gun, we transitioned over to high-risk tactics, which, in that situation, *it requires four officers who are assigned as lethal coverage, one officer being the contact officers who starts the commands*.
>
> And the other officers who gets different vantage points, based on the configuration of the cars, to get a better visual of inside the vehicle. Once that configuration is done, we try to utilize time, distance, and cover, to get more resources there to help assist us with the problem.

Motion, at Exhibit C, at 31:9-23 (emphasis added).[5]

Plaintiffs offer no evidence Officer Defendants' deposition testimony was *inconsistent* with their initial interviews. In fact, Officer Defendants made *no* prior statements regarding the specifics underlying their high-risk stop training. *See generally* Fed. R. Evid. Rule 801. Finally, Defendants turned over documents reflecting this training. Allein Declaration, at ¶ 3; Exhibit B. Overall, Officer Castillo testified that high-risk stops involve the designation of four lethal officers and one non-lethal officer, and Defendants turned over training records; any insinuation that Officer Defendants changed their recollection of events after conferring with counsel is unsupported by the facts and instead rooted in speculation.

[5] Although not specifically stated in U.F. 19, Defendants cited to this portion of Officer Castillo's deposition in support of this fact. Therefore, Plaintiffs were placed on notice as to Officer Castillo's testimony regarding the specifics underlying the high-risk stop. *See Fowzer v. City of San Berardino*, 2018 U.S. Dist. LEXIS 183442, at *1 n. 3.

Opposition, at 13:24-14:6

Second, Plaintiffs argue Defendant Officers' belief the flathead screwdriver was a knife was unreasonable. Specifically, Plaintiffs refer this Court to *Nehad v. Brower*, 929 F.3d 1125 (9th Cir. 2019) in support. In *Nehad*, the officer "told homicide investigators that *he did not see any weapons*, and made no mention of feeling threatened by Nehad[,] [but] [f]ive days later . . . after consulting with his attorney and reviewing surveillance footage inside a police station, [the officer] claimed that he thought Nehad had a knife, that Nehad was 'aggressing' the car, and that he thought Nehad was going to stab him." *Id*. at 1133 (emphasis added). Therefore, the Court held that "[t]hese possible inconsistencies, along with video, eyewitness, and expert evidence that belies [the officer's] claim that Nehad was 'aggressing,' are sufficient to give rise to genuine doubts about [the officer's] credibility." *Id*.

Here, unlike in *Nehad*, Officer Defendants were consistent in their recollection of events in that they believed Diaz was armed with a knife. Although the knife turned out to be a flathead screwdriver, this does not change the fact that Diaz was "armed" with a weapon. To argue that Officer Defendants were unreasonable because they were unable to discern a knife from the metallic portion of a screwdriver – while in the process of negotiating with Diaz and trying to deescalate a heightened and stressful situation – is disingenuous and demonstrative of the type of "armchair quarterbacking" that *Graham* expressly prohibits. *See Monzon*, 978 F.3d at 1157.[6]

[6] As to the *Graham* factor weighing whether Diaz was resisting or seeking to evade arrest, it is undisputed that Diaz made no attempt to flee from officers.

**c. Other Factors**

As to the other factors, Plaintiffs focus on: (1) the fact the video evidence indicates that Officer Defendants failed to provide Diaz a verbal warning that deadly force would be used against him, Opposition, at 15:9-14; (2) the availability of alternative methods of capturing or subduing Diaz, *id*. at 15:15-16:5; (3) the ability for Officer Defendants to reposition themselves, *id*. at 15:27-26:5; and (4) the fact that Diaz "was mentally disturbed." *Id*. at 16:6-14. First, as stated above, Sergeant Garcia testified he told Diaz, " 'Stop. Don't – 'Drop the knife. I don't want to shoot you. Stop. I don't want to shoot you.' " Allein Declaration, at ¶ 2; Exhibit A, at 96:7-11. This statement was unequivocal: drop the knife or I will shoot you. Obviously, this command would not have been reflected on video evidence because Sergeant Garcia's body cam was not working during the shooting. U.F. 14.

Second, as to the availability of alternative methods of capturing or subduing Diaz, Plaintiffs argue that "the officers carried tasers, OC spray and their cruisers were equipped with 40mms" and that Officer Defendants "had more than sufficient time to transition to the 40mm, the taser or their OC spray." Opposition, at 15:19-20, 25-26. However, as to the taser and OC spray, Sergeant Garcia testified the 40mm was "the most effective less-lethal option" based on the distance between Officer Defendants and Diaz. Allein Declaration, at Exhibit A, at 63:6-11. Nevertheless, although the 40mm was assigned to Officers Choi and High, they were unable to arrive on time before Diaz left his vehicle and walked towards Officer Defendants. U.F. 37. Therefore, Officer Defendants had a plan to utilize less-lethal methods, however, Diaz's own actions resulted in the 40mm not being able to be utilized.

Third, as discussed above, the undisputed material facts establish

that behind Officer Defendants was Maple Avenue, which was full of cars leaving work and that they were approximately 20 feet away from the street. U.F. 20. Harmening's declaration is unpersuasive because he never visited the scene of the shooting and Plaintiffs have proffered *no* evidence to establish the feasibility of Officer Defendants' ability to reposition themselves. Finally, as to the issue of Diaz's assumed mental health issues, the *only* fact referred to in support of this argument is that Diaz "had slit his own wrist[.]" Opposition, at 16:11; Dkt. 63. Again, Officer Defendants' conduct should not be weighed against the benefit of hindsight. Other than this injury there was *no* other evidence of Diaz suffering from a mental health issue, and at the time of the shooting, it was unclear whether the source of the blood was his wrist or hand. U.F. 29. The blood's source could have been his own or of someone else – essentially, it was unclear at the time. Overall, irrespective of all these other factors, Plaintiffs reference to dozens of "material" facts still does not alter the finding that Officer Defendants' use of deadly force was reasonable under the *Graham* factors.

#### d. Plaintiffs' Additional "Material" Facts

In support of their Opposition, Plaintiffs introduced *70 additional* facts. Opposition, at 16:16-18:25. It is apparent that Plaintiffs' strategy is to flood Defendants' Motion with immaterial facts in order to try and defeat summary judgment. However, mere "[d]isputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment." *T.W. Electrical Service, Inc. v. Pacific Electrical Contractors Association*, 809 F.2d 626, 630 (9th Cir. 1987). As discussed *ante* above, Officer Defendants' use of deadly force against Diaz was reasonable. Plaintiffs attempt at distracting this Court with dozens of facts – that are either interpretations of other facts or are clearly refuted by the video evidence – should not defeat summary judgment.

### 2. *Officer Defendants are Entitled to Qualified Immunity*

The qualified immunity analysis is two-pronged, and courts have discretion "in deciding which of the two prongs . . . should be addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). Under the first prong, the issue is whether the facts, taken in the light most favorable to the party asserting the injury, show the defendant's conduct violated a constitutional right. *Id*. at 232. Under the second prong, the issue is whether the constitutional right in question was "clearly established" when the conduct occurred. *Id*. at 232, 236.

Although "a case directly on point" is not required to show the right in question was clearly established, "existing precedent must have placed the statutory or constitutional question *beyond debate*." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (emphasis added). Specifically, "[w]hile in the 'rare' case a clearly established right may be obvious, clearly establishing a right usually requires 'controlling authority or a robust consensus of cases of persuasive authority.' " *Id*.

Here, Plaintiffs refer this Court to the Ninth Circuit's decisions in *Nehad*; *Vos v. City of Newport Beach*, 892 F.3d 1024 (9th Cir. 2018); *Hayes v. County of San Diego*, 736 F.3d 1223 (9th Cir. 2013); and *Glenn v. Washington County*, 673 F.3d 864 (9th Cir. 2011) in support of their contention Officer Defendants are not entitled to qualified immunity. Opposition, at 20:1-24:2; Dkt. 63. However, all these cases are distinguishable from the facts of this case. In *Nehad*, the officer responded to a call of a suspect making threats with a knife and encountered that suspect walking towards his police car in an alley. *Nehad*, 929 F.3d at 1130-31. The officer did not activate his police lights, identify himself as a police

officer, or issue a warning during the approximate minute the interaction lasted. *Id.* Less than five seconds after exiting his vehicle, the officer fatally shot the suspect – who was unarmed – from roughly *seventeen feet* away. *Id.* at 1131.

The Ninth Circuit doubted the officer's credibility given his conflicting accounts of the incident, doubt as to whether he reasonably mistook the suspect's pen for a knife, doubt as to whether the suspect would have posed a threat even if armed, and support from which to conclude that the officer created his own sense of urgency. *Id.* at 1133-35. Specifically, support was found via the suspect's slow and nonthreatening approach, the existence of sufficient lighting to distinguish a pen from a knife, the officer's failure to identify or provide warning, and an expert opinion that the officer had sufficient time to make an alternative decision. *Id.* at 1134.

Here, the facts of this case are inherently different that *Nehad*. Most importantly, Diaz was *at most* seven feet away when Officer Defendants shot him, whereas, Nehad was *seventeen feet* away when the officer fired his weapon. *Id.* at 1130-31. The likelihood that Officer Defendants would have been stabbed – had they not fired their weapons – was much more likely than that of the officer in *Nehad*. Further, a knife and a flathead screwdriver are much more alike in appearance (i.e., both being metallic), than that of a knife versus a pen, which was at issue in *Nehad*. Further, the undisputed material facts establish that Sergeant Garcia provided Diaz a warning that if he did not drop the weapon, he would shoot him. Overall, as much as Plaintiffs try and squeeze the square peg of *Nehad* into the round hole of this case, *Nehad* is not the type of case that "placed the statutory or constitutional question *beyond debate*." *Ashcroft*, 563 U.S. at 741 (emphasis added).

Further, in *Vos*, officers saw Vos standing inside a 7-Eleven, yelling

and "pretending to have a gun." *Vos*, 892 F.3d at 1029. The officers spent 20 minutes creating a plan of action, which included a plan to "us[e] non-lethal force to subdue Vos." *Id*. Multiple officers including one bearing "a 40-millimeter less-lethal projectile launcher," entered the 7-Eleven to engage Vos. *Id*. When they entered, Vos ran towards the police officers stationed outside the 7-Eleven while holding what officers initially believed to be scissors (it later turned out to be a "pronged metal display hook"). *Id* at 1029-30. When Vos was *30 feet away*, the lead officer shouted "shoot him," intending to direct that order only to the officer holding a less-lethal weapon. *Id*. That officer fired, but so did two other officers wielding AR-15 rifles. *Id*. Vos was struck by bullets and died. *Id*. at 1030. The Court held the officers used unreasonable force. *Id*. at 1032.

Again, just like in *Nehad*, distance matters. In *Vos*, the officers fired their weapons and killed Vos who was *30 feet away* at the time. *Id*. at 1029-30. Although it was a mistake, the officers *still* fired their AR-15 when Vos was *no* threat to them while holding what appeared to be scissors. Here, unlike in *Vos*, Diaz was mere feet away from Officer Defendants when they decided to shoot. This was no *future* threat, but rather a threat that would have become actualized had Officer Defendants waited to utilize force. Overall, based on the distance at issue in *Vos*, Officer Defendants were not notice they were not constitutionally permitted to use force.

In *Hayes*, officers encountered a suspect in his kitchen. *Hayes*, 736 F.3d at 1227. When he complied with an officer's command to show his hands, revealing that he was holding a knife, pointed tip down, they immediately shot him. *Id*. at 1228. Further, in *Glenn*, officers responded to reports of a suicidal and intoxicated man holding a pocketknife. *Glenn*, 673 F.3d at 873. When the officers arrived, they positioned themselves a few feet from him and made sure all other bystanders were out of the way.

*Id.* at 874. Though he did not respond to their commands to drop the pocketknife, he stayed in the same position, holding that pocketknife to his own neck, and made no sign of moving until the officers fired upon him. *Id.* at 873-74. Overall, both these cases "stand for the proposition that the mere fact alone 'that the suspect was armed with a deadly weapon does *not* render the officers' response per se reasonable under the Fourth Amendment.'" *Napouk v. Las Vegas Metro Police Dep't.*, 123 F.4th 906, 917 (9th Cir. 2024). However, "none of those cases supports . . . [the] proposition that an armed individual can pose a threat *only* when that person brandishes the weapon in a 'threatening manner.'" *Id.* (emphasis in original). Rather, "[c]ourts have repeatedly rejected that unreasonable argument" and have held that, " '[i]f the person is armed – or reasonably suspected of being harmed – a furtive movement, harrowing gesture, or serious verbal threat might create an immediate threat.' " *Id.* (quoting *George v. Morris*, 736 F.3d 829, 838 (9th Cir. 2013)).

*Napouk* and *Hart* are the cases this Court should consider. In *Napouk*, although the suspect was yielding what appeared to be a machete, and later determined to be a plastic sword, the Court stated the following relevant facts:

> [Officers] attempted to engage Lloyd Gerald Napouk for several minutes, but he refused to follow their commands and repeatedly advanced towards them with what they believed was a long, bladed weapon. When he advanced upon them a final time with the weapon, coming within *nine feet* of Sergeant Kenton, both officers fired their weapons, killing him.

*Napouk*, 123 F.4th at 912.

Based on these facts, the Ninth Circuit found the officers' conduct reasonable. Specifically, the Court stated "that Napouk had repeatedly

disobeyed commands to stop moving toward the officers and to drop the weapon. By telling him that they would shoot him if he took another step, the officers clearly indicated to him their reasonable perception that they saw further deliberate movement toward them with the weapon as a threat. Rather than comply with their repeated commands, Napouk continued to hold the object, moving it around and pointing it in various directions, and continued to deliberately advance towards them." *Id*. at 918.

The Ninth Circuit held that "[b]ased on all the facts and circumstances, there was 'no immediate need to subdue' the suspect at the moment the officer used force against him" and "[o]fficers 'need not avail themselves of the least intrusive means of responding to an exigent situation,' [citation], and we decline to create a rule by which officers have a duty to indefinitely retreat when faced with an immediate threat." *Id*. at 919.

Both *Hart* and *Napouk* are the cases most analogous to the facts of this case, and Plaintiffs have failed to point to "existing precedent . . . [that] placed the statutory or constitutional question beyond debate. *Ashcroft*, 563 U.S. at 741. Accordingly, Officer Defendants are entitled to qualified immunity.

**B. Plaintiffs' Fourteenth Amendment Claim Fails as a Matter of Law**

As stated in the Motion, when an officer "makes a snap judgment because of an escalating situation, his conduct may only be found to shock the conscience if he acts with a purpose to harm unrelated to legitimate law enforcement objectives." *Id*. "Legitimate law enforcement objectives [include] arrest, self-defense, or the defense of others." *A.D. v. Cal. Highway Patrol*, 712 F.3d 446, 454 (9th Cir. 2013). Under the "purpose to harm" standard, an officer "violates the due process clause if he uses force

with only an illegitimate purpose in mind." *Id.* at 453. "The purpose to harm standard is a subjective standard of culpability." *Id.* Under this standard, a plaintiff must submit non-speculative evidence that demonstrates an officer's improper motive. *See Jeffers v. Gomez*, 267 F.3d 895, 907 (9th Cir. 2001).

Again, there there is *no* evidence that Officer Defendants acted "with a purpose to harm [Diaz] unrelated to legitimate law enforcement objectives." *Wilkinson v. Torres*, 610 F.3d 546 554 (9th Cir. 2010). Rather, the evidence supports a finding that Defendant Officers utilized deadly force in "self-defense, or the defense of others" based on Diaz walking toward them with a weapon in hand. Accordingly, summary judgment is appropriate as to count three.

## IV. <u>STATE LAW CLAIMS</u>

### A. Battery Claim (Count Four)

As stated in the Motion, "[a] state law battery claim is a counterpart to a federal claim of excessive use of force. In both a plaintiff must prove that the peace officer's use of force was unreasonable." *Brown v. Ransweiler*, 171 Cal.App.4th 516, 527 (2009). Here, as discussed *ante* in section III, Defendant Officers' use of force against Diaz was reasonable. Accordingly, because the use of force was reasonable, no issues of material fact exist with regard to the battery claim, and therefore, count four should be dismissed as a matter of law.

### B. Negligence (Count Five)

Further, as stated in the Motion, "in order to prove facts sufficient to support a finding of negligence, a plaintiff must show that [the] defendant had a duty to use due care, that he breached that duty, and that the breach was the proximate or legal cause of the resulting injury." *Nally v. Grace Community Church*, 47 Cal.3d 278, 292 (1988). The California Supreme

Court has long recognized that peace officers have a duty to act reasonably when using deadly force. *Munoz v. Olin*, 24 Cal.3d 629, 634 (1979); *Grudt v. City of Los Angeles*, 2 Cal.3d 575, 587 (1970). In *Hayes v. County of San Diego*, 57 Cal.4th 622 (2013), the California Supreme Court observed that California "negligence law, which considers the totality of the circumstances surrounding any use of deadly force [citation], is broader than federal Fourth Amendment law, which tends to focus more narrowly on the moment when deadly force is used." *Id.* at 639.

First, the uncontroverted facts establish that Defendant Officers were properly trained in the use of force *and* TPD policies clearly articulated when deadly force could be applied, along with the circumstances for when officers were required to render medical aid to a suspect. U.F. 47-54. Second, Plaintiffs fail to adequately allege Diaz was suffering from a mental illness or that it should have been apparent to Defendant Officers that Diaz had a mental illness. *See Vos*, 892 F.3d at 1034. Finally, the fact that Diaz was holding a flathead screwdriver does not affect the reasonableness of Defendant Officers' decision to use deadly force. *See Grandison*, 2012 U.S. Dist. LEXIS at *29-30 (citing to *Simons*, 42 Cal.App.4th at 1107-08). Further, it was reasonable – based on the totality of the circumstances – for Defendant Officers to believe Diaz was armed with *both* a knife and firearm. Specifically, Diaz called 911 and told dispatch *he* was the individual with the gun and that he was "gonna *shoot* somebody, [and] gonna *stab* somebody." U.F. 2 (emphasis added). Although Defendant Officers mistakenly believed Diaz held a knife, this belief was reasonable as a matter of law. *See Estate of Strickland v. Nevada Cnty.*, 69 F.4th 614, 621-23 (9th Cir. 2023); *Napouk*, 123 F.4th at 916.

Accordingly, because Defendant Officers use of force was objectively reasonable, even under the higher standard as articulated in *Hayes*, count

five should also be dismissed as a matter of law.

**C. Bane Act Claim (Count Six)**

Finally, as stated in the Motion, for substantially the same reasons that Plaintiffs cannot show that Defendant Officers' shots amounted to an unreasonable use of deadly force, Plaintiffs are also unable to show that these shots violated the Bane Act.

## IV. CONCLUSION

Based on the foregoing, the Court should grant Defendants' Motion for Summary Judgment and/or Partial Summary Judgment of Issues in their favor and against Plaintiffs Maria Guadalupe Diaz, et al.

Dated: October 23, 2026

Respectfully Submitted,

JONES MAYER

By: s/*Ryan M. Allein*
Angela M. Powell,
Thurgood M. Wynn,
Ryan M. Allein,
Attorneys for Defendants
CITY OF TORRANCE, et al.

## CERTIFICATE OF COMPLIANCE

The undersigned, counsel of record for CITY OF TORRANCE, et al., certifies this brief contains **6,960** words, as determined by my word-processing software, which complies with the stipulation signed by all parties and this Court's order on August 26, 2026 [Dkt. 56].

Dated: October 23, 2026 Respectfully Submitted,

JONES MAYER

By: s/*Ryan M. Allein*
Angela M. Powell,
Thurgood M. Wynn,
Ryan M. Allein,
Attorneys for Defendant
CITY OF TORRANCE, et al.