UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARIA GUADALUPE DIAZ, et al.<br><br>Plaintiffs,<br><br>v.<br><br>CITY OF TORRANCE, et al.<br><br>Defendants. | CASE NO. 2:25-cv-03389-JLS-AYP<br><br>**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND/OR PARTIAL SUMMARY JUDGMENT OF ISSUES (Doc. 57)** |

Before the Court is a Motion for Summary Judgment filed by Defendants City of Torrance, Arturo Castillo, Cody Wissler, Jesus Garcia, and Jason Bermudez. (Mot., Doc. 66.) Plaintiffs Maria Guadalupe Diaz; A.D., a minor by and through his Guardian Ad Litem, Maria Guadalupe Diaz; A.D., a minor by and through his Guardian Ad Litem, Maria Guadalupe Diaz; Leonardo Diaz; and Ramona Ramirez De Diaz opposed, and Defendants replied. (Opp., Doc. 63; Reply, Doc. 66.) Having considered the briefing and held a hearing on this matter, and for the following reasons, the Court GRANTS IN PART AND DENIES IN PART Defendant's Motion.

## I. BACKGROUND

This action concerns the use of deadly force by Torrance Police Department ("TPD") Officers Arturo Castillo, Jason Bermudez, Cody Wissler, and Jesus Garcia, on December 2, 2024.[1] At 4:41 p.m. on December 2, a TPD dispatcher received a 911 call, then informed TPD officers: "RP states that there is a man with a gun [at 2902 Oregon Court]. States he wants to shoot someone. We have one caller only." (Response to SGD ¶ 4, Doc. 68.) Officer Bermudez responded with an acknowledgment, and Officer Castillo requested to "get a drone up[.]" (*Id.* ¶¶ 5–6.) At 4:46 p.m., dispatch told officers that the phone number belonged to "a Leonardo Diaz, 34 year old Hispanic male, 6'1", 285, brown over black, black over brown," and that the phone ping was showing that the phone was at Oregon Court. (*Id.* ¶¶ 7, 10; Ex. B to Allein Decl., Dispatch Tr. at 11–12, Doc. 60.) Officer Garcia identified a green Dodge Charger parked on Oregon Court, with a Hispanic adult male sitting in the driver's seat, and the drone operator informed officers that the door of the Dodge Charger was ajar on the driver's side. (Dispatch Tr. at 12, 16.) The man sitting in the Dodge Charger was later confirmed to be Leonardo Diaz. (Response to SGD ¶ 12.)

---

[1] The following facts are undisputed, except "to the extent the [bodycam] footage and audio blatantly contradict testimonial evidence," in which case the Court views the facts "in the light depicted by bodycam [and drone] footage and its accompanying audio." *Hughes v. Rodriguez*, 31 F.4th 1211, 1218 (9th Cir. 2022).

At 4:58 p.m., Officers Wissler, Garcia, Bermudez, and Castillo arrived at the scene in two police cruisers. (Response to SGD ¶ 13; Ex. H to Wissler Decl., Wissler Body Cam at 00:28, Doc. 57-6; Ex. I to Castillo Decl., Castillo Body Cam at 00:09, Doc. 57-2.) Officers Wissler and Garcia parked their vehicle in the middle of the street, around one car length away from and behind Diaz's vehicle, which was parked on the side of the street, with the door still ajar. (Ex. G to Castillo Decl., Drone Video 1 at 13:05, Doc. 57-2.) Officers Castillo and Bermudez followed in their vehicle and parked next to the curb, "southwest . . . just a bit offset" of where Officers Wissler and Garcia were parked. (Response to SGD ¶ 15; Drone Video 1 at 13:04.) The officers immediately exited their vehicles. (Drone Video 1 at 13:04.) Officers Wissler and Garcia positioned themselves behind their vehicle's open doors, and Officers Castillo and Bermudez also stayed near the police vehicles. (Drone Video 1 at 13:04.) The officers had OC spray, a taser, and a gun on their person, and each police vehicle contained a 40-millimeter less lethal launcher. (Response to SGD ¶ 57.)

Officer Wissler yelled out to Diaz, "Driver—roll down all your windows!" (Wissler Body Cam at 00:30.) A few seconds later, he yelled out, "Driver—kick the door all the way open, let me see your hands!" then "Sir! Let me see your hands!" and "Open the door!" (*Id.* at 00:40–00:57.) During this time, Diaz's vehicle's door remained ajar, although it was opening and closing slightly. (*Id.* at 00:22–00:57.) Diaz would remain in his vehicle for approximately the next two minutes and 30 seconds. (Response to SGD ¶ 66.)

While Officer Wissler was giving instructions to Diaz, Officer Castillo walked around to the back of his vehicle and grabbed the M4 rifle from his trunk. (Response to SGD ¶ 21; Castillo Body Cam at 1:00–1:22.) Officer Castillo then walked up to Officer Garcia and told him, "Why don't you quarterback this? I got the long gun[.]" (Response to SGD ¶ 22; Castillo Body Cam at 1:23–1:30.) Officer Castillo then called out to Officer Bermudez, and told Officer Bermudez to "come over here with Mr. Garcia, he's going to

walk you through this." (Ex. J to Bermudez Decl., Bermudez Body Cam at 1:00–1:10, Doc. 57-1; Response to SGD ¶ 53.)

At 5:00 p.m., Officer Garcia told Officer Bermudez to move his vehicle from the current position to park it north of the other police vehicle. (Bermudez Body Cam at 1:10–1:20; Response to SGD ¶ 18.) Officer Bermudez got back into his vehicle and moved it so that it was next to the other police cruiser on the street. (Bermudez Body Cam at 1:20–1:50.) Officer Bermudez exited the vehicle and positioned himself behind the vehicle's open driver-side door. (*Id.* at 1:50–1:58.) At this point, Officers Wissler and Castillo were also positioned behind the open doors of the other police vehicle; Officer Garcia positioned himself behind the open passenger-side door of the vehicle Officer Bermudez had just moved. (*Id.* at 1:50–2:02.) The police vehicles' doors were ballistic doors designed to stop bullets. (Response to SGD ¶ 82.)

Officer Wissler continued to give instructions to Diaz. At 5:00 p.m., he yelled, "Sir, open the door! Let me see both of your hands! Open the door with your left hand!" (Wissler Body Cam at 2:18–2:28.) Diaz pushed open his driver's side door, and Officer Wissler yelled "Drop that!" then told his fellow officers, "He's got a knife. He's bleeding." (*Id.* at 2:28–2:31.) From Officer Wissler's body camera footage alone, it is difficult to see at that moment whether Diaz had an object in his hand or what that object was. After the incident, it was determined that the object in Diaz's hand was not a knife, but a flathead screwdriver. (Response to SGD ¶ 27.) Officer Garcia asked dispatch to send less lethal force with the next unit arriving. (*Id.* ¶ 24; Dispatch Tr. at 17–18.)

Diaz then closed the door so it was ajar again. (Wissler Body Cam at 2:30–2:34.) Officer Wissler continued telling Diaz to "open the door," "let me see both of your hands," and "drop the knife." (*Id.* at 2:34–2:44.) Diaz slowly opened the door, and Officer Wissler yelled, "Push it out more! Let me see both hands." (*Id.* at 2:44–2:57.)

At around 5:01 p.m., Diaz pushed open the door and put one foot on the ground. (*Id.* at 2:57–2:59.) Officer Wissler yelled, "Stay right there! Turn around!" (*Id.* at 2:57–

3:01.) Diaz got out of his vehicle and shut the door. (*Id.* at 3:01–3:03.) He was around 25 to 35 feet away from the officers. (*Id.* at 3:01; Response to SGD ¶ 67.) His left hand was covered in blood. (Wissler Body Cam at 3:01; Response to SGD ¶ 29.) It is difficult to see from the body camera video alone whether Diaz was holding an object in his right hand, and what that object might be, but the drone video shows that Diaz was holding a narrow, long object in his right hand, which was later determined to be a flathead screwdriver. (Ex. K to Castillo Decl., Drone Video 2 at 00:51–1:00, Doc. 57-2.)

Diaz then began walking toward the officers at a slow pace, as Officer Wissler continued yelling "Turn around! Turn around!" (Wissler Body Cam at 3:01–3:03.) Diaz continued walking, while the officers repeatedly yelled at Diaz to "get on the ground" and "drop the knife." (*Id.* at 3:03–3:12.) Diaz appeared to shake his head as he continued to walk toward the officers. (*Id.* at 3:08–3:11.) Diaz walked toward the officers for about 17 seconds. (*Id.* at 2:59–3:16; Response to SGD ¶ 66.) Both hands remained down at or near his sides as he was walking. (Drone Video 2 at 00:52–1:06; Response to SGD ¶ 71.) Officer Castillo yelled "40, 40, 40, c'mon" in reference to the 40-millimeter less lethal launcher, but no officer was holding a 40-millimeter launcher at that time. (Castillo Body Cam at 2:50–2:58; Response to SGD ¶ 37.)

When Diaz reached the area where the officers' vehicles were parked, Officer Garcia yelled, "I don't want to shoot you—drop that!" (Wissler Body Cam at 3:13–3:16.) Around 2 seconds later, the officers shot him nine times. (*Id.* at 3:16; Response to SGD ¶ 49.) Officer Castillo fired two shots, Officer Bermudez fired three shots, Officer Wissler fired three shots, and Officer Garcia fired two shots. (Response to SGD ¶ 36.) The parties dispute how far away Diaz was from the nearest officer when he was shot. (*See id.* ¶ 33.) Plaintiffs assert, and the drone video indicates, that Diaz was more than five feet away from the nearest officers—Officers Wissler and Garcia—when the officers shot Diaz. (*Id.* ¶ 34; Drone Video 2 at 1:07.) The officers were positioned behind the open doors of their police vehicles at the time of the shooting. (*Id.*; Wissler Body Cam at 3:15; Response to

SGD ¶ 82.) They were all facing Diaz, with their backs to the cross-street Maple Avenue, which was at least 20 feet away. (Response to SGD ¶ 94; Drone Video 2 at 3:11.)

Diaz immediately fell to the ground and against the front passenger wheel of one of the police vehicles. (Wissler Body Cam at 3:16–3:18; Response to SGD ¶ 38.) He died from his gunshot wounds. (Ex. O to Valenzuela Decl., Doc. 63-17.) In total, from the time the officers exited their vehicles to the time they shot Diaz, the encounter lasted slightly less than three minutes. (Response to SGD ¶ 66.)

Plaintiffs filed this action on April 17, 2025. (Doc. 1.) Plaintiffs allege two claims against Officers Arturo Castillo, Cody Wissler, Jesus Garcia, and Jason Bermudez ("Officer Defendants") pursuant to 42 U.S.C. § 1983: (1) excessive force in violation of the Fourth Amendment; and (2) unwanted state interference with a familial relationship, in violation of the Fourteenth Amendment's Due Process Clause.[2] (FAC ¶¶ 29–37, 46–60.) Plaintiffs additionally allege three state law claims against all Defendants for (1) battery, in violation of California Government Code § 820; (2) negligence, in violation of California Government Code § 820; and (3) violation of the Bane Act, California Civil Code § 52.1. (*Id.* ¶¶ 61–85.) Defendants now move for summary judgment on these five claims.

## II. LEGAL STANDARD

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). *See also Fortyune v. American Multi-Cinema, Inc.*, 364 F.3d 1075, 1079-80 (9th Cir. 2004) ("Summary judgment is appropriate 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" (quoting Fed. R. Civ. P. 56(c))). "A dispute about a material fact is genuine 'if the evidence is such that a reasonable jury could return a verdict

[2] Plaintiffs' complaint also alleges a denial of medical care claim, but Plaintiffs have agreed to dismiss this claim, and Defendants do not address it in their motion. (*See* Allein Decl. ¶ 15, Doc. 60; Mot. at 19 n.11.)

for the nonmoving party.'" *Freecycle Sunnyvale v. Freecycle Network*, 626 F.3d 509, 514 (9th Cir. 2010) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A fact is "material" when its resolution "'might affect the outcome of the suit under the governing law.'" *George v. Morris*, 736 F.3d 829, 834 (9th Cir. 2013) (quoting *Anderson*, 477 U.S. at 248).

"If the moving party satisfies its initial burden of production, the nonmoving party must produce admissible evidence to show that a genuine issue of material fact exists." *Bernstein v. Virgin Am., Inc.*, 365 F. Supp. 3d 980, 984 (N.D. Cal. 2019) (citing *Nissan Fire & Marine Ins. Co. v. Fritz Companies, Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000)). "If the nonmoving party fails to make this showing, the moving party is entitled to summary judgment." *Bernstein*, 365 F. Supp. 3d at 984 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)). The non-moving party does not meet this burden by showing "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The United States Supreme Court has held that "[t]he mere existence of a scintilla of evidence in support of the non-moving party's position is not sufficient." *Anderson*, 477 U.S. at 252. Genuine factual issues must exist that "can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Id.* at 250. When ruling on a summary judgment motion, the Court must examine all the evidence in the light most favorable to the non-moving party. *Celotex*, 477 U.S. at 325. The Court cannot engage in credibility determinations, weighing of evidence, or drawing of legitimate inferences from the facts; these functions are for the jury. *Anderson*, 477 U.S. at 255. Without specific facts to support the conclusion, a bald assertion of the "ultimate fact" is insufficient. *See Schneider v. TRW, Inc.*, 938 F.2d 986, 990–91 (9th Cir. 1991).

## III. ANALYSIS

Defendants' entitlement to summary judgment on Plaintiffs' claims largely depends on whether Officer Defendants' use of deadly force was reasonable as a matter of law.

The Court therefore first discusses Plaintiffs' § 1983 claim for excessive force in violation of the Fourth Amendment before examining their other claims.

### A. Excessive Force

The Fourth Amendment guarantees the right to be free from unreasonable seizures. U.S. Const. amend. IV. Excessive force claims brought "in the context of an arrest or investigatory stop of a free citizen," invoke the protections of the Fourth Amendment. *Graham v. Connor*, 490 U.S. 386, 394 (1989). Deciding these claims requires an analysis of the objective reasonableness of the use of force, balancing "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Id.* at 396 (quotations omitted). The strength of the government's interest is measured by examining three primary factors: (1) the severity of the crime at issue; (2) whether the suspect posed an immediate threat to the safety of the officer or others; and (3) whether the suspect was actively resisting arrest or attempting to evade arrest by flight. *Id.* Yet, rather than mechanically marching through these nonexhaustive factors, the Court should "examine the totality of the circumstances, including whatever factors may be relevant in a particular case." *Marquez v. City of Phoenix*, 693 F.3d 1167, 1174–75 (9th Cir. 2012). A court should examine an officer's use of force based on the "perspective of a reasonable officer on the scene" and avoid post-hoc judgments based on the benefit of hindsight. *Graham*, 490 U.S. at 396. "'Because such balancing nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom . . . summary judgment or judgment as a matter of law . . . should be granted sparingly' in cases involving claims of excessive force." *Gregory v. Cnty. of Maui*, 523 F.3d 1103, 1106 (9th Cir. 2008) (quoting *Drummond v. City of Anaheim*, 343 F.3d 1052, 1056 (9th Cir. 2003)) (alterations in original).

Here, the nature of the intrusion is clear: all four Officer Defendants each shot Diaz multiple times. "The intrusiveness of a seizure by means of deadly force is unmatched." *Vos v. City of Newport Beach*, 892 F.3d 1024, 1031 (9th Cir. 2018), *cert. denied sub nom.*

*City of Newport Beach, Cal. v. Vos*, 587 U.S. 1014 (2019) (quoting *Garner*, 471 U.S. at 9). "The use of deadly force implicates the highest level of Fourth Amendment interests both because the suspect has a 'fundamental interest in his own life' and because such force 'frustrates the interest of the individual, and of society, in judicial determination of guilt and punishment.'" *A. K. H. ex rel. Landeros v. City of Tustin*, 837 F.3d 1005, 1011 (9th Cir. 2016) (quoting *Garner*, 471 U.S. at 9). Thus, while "there are no per se rules in the Fourth Amendment excessive force context," *George v. Morris*, 736 F.3d 829, 838 (9th Cir. 2013), an officer generally cannot use deadly force unless "the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others." *Gonzalez v. City of Anaheim*, 747 F.3d 789, 793 (9th Cir. 2014) (quoting *Scott v. Henrich*, 39 F.3d 912, 914 (9th Cir. 1994)); *Garner*, 471 U.S. at 3. Hence, "[b]ecause no one disputes that the officers used the highest level of force against [Diaz], the issue is determining whether the governmental interests at stake were sufficient to justify it." *Vos*, 892 F.3d at 1031.

Next, balancing the three *Graham* factors and considering the totality of the circumstances, the Court does not find that Officer Defendants' use of deadly force was reasonable as a matter of law.

The first *Graham* factor is the severity of the crime at issue. Citing to *Sartor v. County of Riverside*, Defendants argue that the "suspected crime was severe" because Diaz called 911 reporting that he had a gun and stated that "he wants to shoot someone." 2025 WL 1752139, at *4 (C.D. Cal. Mar. 14, 2025). Although the Court recognizes the public safety concerns implicated by such a call, it is undisputed that Diaz had not committed any serious crime. And officers did not receive any reports from any third party regarding Diaz, let alone any third-party reports that Diaz had hurt or threatened anyone around him. *See Vos*, 892 F.3d at 1031 (concluding that officers' conduct was not reasonable as a matter of law where "the officers were not responding to the report of a crime," but rather, they speculated as to what crime may have been committed). Moreover, the drone footage

and dispatch transcript show that officers were surveilling Diaz's parked vehicle for several minutes before Officer Defendants confronted Diaz, but they did not see any threatening or violent behavior from Diaz. (Drone Video 1 at 3:48–12:56; Dispatch Tr. at 12–17.) The drone operator thus did not inform Officer Defendants of any criminal behavior; the drone operator informed Officer Defendants only that Diaz's "door is now ajar on the driver's side." (Dispatch Tr. at 16.) Indeed, when Officer Defendants arrived, Diaz was merely sitting in his vehicle with the door ajar, providing little justification for the deadly use of force. *See S.R. Nehad v. Browder*, 929 F.3d 1125, 1136 (9th Cir. 2019) (finding that a jury "could conclude that the severity of Nehad's crimes . . . did not render [the officer's] use of deadly force reasonable" in part because "he was indisputably not engaged in any [felonious] conduct when [the officer] arrived, let alone when [the officer] fired his weapon").

The "most important *Graham* factor" is the second factor: "whether the suspect posed an immediate threat to anyone's safety." *Nehad*, 929 F.3d at 1132. "The use of deadly force is only reasonable if a suspect 'poses a *significant* threat of death or serious physical injury to the officer or others.'" *Id.* at 1132–33 (quoting *Gonzalez*, 747 F.3d at 793).

Defendants primarily argue that Diaz posed a threat to Officer Defendants' safety by "continu[ing] to advance and close in on the officers while holding what appeared to be a knife at the time at his side," such that the use of deadly force was reasonable. (Mot. at 22.) In reply, Defendants go even further, arguing that Officer Defendants "believed that Diaz [was] armed with a firearm and willing to use this firearm against another." (Reply at 13.) However, it is undisputed that Diaz was holding neither a knife nor a gun; rather, he was holding only a flathead screwdriver. Although Officer Defendants were told by the 911 dispatcher that Diaz had a gun, none of them speculated or observed that he had a gun during the nearly three-minute-long altercation. Indeed, when Diaz stepped out of his vehicle, he was not holding a gun, and it is undisputed the officers never saw a gun, a

bulge, or anything sticking out of Diaz's person that might be a gun. (Response to SGD ¶ 69.) A jury could conclude that it would be unreasonable for officers in the same situation to believe that Diaz was armed with a gun.

By contrast, Officer Defendants repeatedly but mistakenly commented on the fact that Diaz had a knife, stating "He's got a knife," and telling him to "Drop the knife." Still, a reasonable jury could conclude that mistaking Diaz's screwdriver for a knife was unreasonable. It is undisputed that there were no issues with lighting at the time of the shooting, and Plaintiffs' police practices expert avers that officers are trained to recognize what objects suspects are carrying, and to distinguish items in suspects' hands. (Response to SGD ¶¶ 68, 117.) Further, Officer Defendants had an unobstructed view of Diaz, including the screwdriver he was holding, for around 17 seconds, as he exited the vehicle and walked slowly toward the officers. Accordingly, the reasonableness of Officer Defendants' mistake should be decided by the jury. *See Nehad*, 929 F.3d at 1132 (holding that "whether [the officer] reasonably mistook the pen for a knife" is a jury question).

In response, Defendants argue that, in certain situations, a screwdriver can also be used as a weapon. (Mot. at 23.) However, even if the question of the deadly nature of the screwdriver were resolved in Officer Defendants' favor, the reasonableness of their actions still should be decided by a jury. Indeed, even if the officers were reasonable in believing that Diaz had a *knife*, Officer Defendants would not be entitled to summary judgment. *See Hayes v. Cnty. of San Diego*, 736 F.3d 1223, 1233 (9th Cir. 2013) ("[T]he mere fact that a suspect possesses a weapon does not justify deadly force." (internal quotation marks and citation omitted)). Rather, the totality of Diaz's actions could lead a reasonable jury to find that he did not pose a significant threat of death or physical injury to Officer Defendants in a manner that would warrant the use of deadly force, regardless of the nature of the sharp object in his hand. Again, around 17 seconds elapsed between Diaz getting out of his car, closing the car door, walking slowly toward the officers, and being shot. Diaz did not charge or rush the officers, nor did his pace significantly increase. *Cf. Hart v.*

*City of Redwood City*, 99 F.4th 543, 547, 550, 554 (9th Cir. 2024) (finding the use of deadly force reasonable as a matter of law where the suspect "rapidly approached" officers by "cross[ing] the backyard to within a few feet of the officers in less than 5.9 seconds" while "holding the knife out towards [the officers]"). Moreover, Diaz kept his arms, including the hand holding the purported weapon, down by his sides during the entire time he walked toward the officers; he did not raise the weapon toward the officers or swing it in their direction. A jury could interpret Diaz merely holding the weapon, but not brandishing it in any clear way, as non-threatening. *See Hayes*, 736 F.3d at 1234 (finding that "[t]here is no clear evidence, however, that Hayes was threatening the officers with the knife here" even where one witness testified that "Hayes was walking towards the deputies with the knife raised the time the shots were fired," as she also testified that Hayes "was not charging them"). Finally, there were at least four officers on the scene. Officer Defendants had arrived and begun to engage with Diaz more than two minutes and 30 seconds before Diaz exited the vehicle, during which they had time to reposition one of their police cruisers, open their police vehicles' doors, and take cover behind them. All Officer Defendants were taking cover behind their police car doors, which are ballistic doors designed to stop bullets, for the majority of the nearly three-minute-long encounter, including during the entire 17 seconds Diaz was walking toward them, and at the moment that Diaz was shot. On these facts, a reasonable jury could find that Diaz did not pose a significant threat of death or physical injury to the officers. *See Vos*, 892 F.3d at 1032 (finding triable issue of fact on excessive force claim inappropriate where officers "outnumbered Vos eight to one" and "had established positions behind cover of their police vehicles," even though "[t]he officers saw that Vos had something in his hand as he charged them").

Finally, the third *Graham* factor examines whether the suspect was fleeing or resisting arrest. It is undisputed that Diaz made no attempt to flee. As to Diaz's resistance, Defendants emphasize that Diaz repeatedly failed to comply with Officer Defendants'

commands to open the door and show his hands while Diaz was sitting in his vehicle, then, while Diaz was walking toward the officers, he ignored and appeared to shake his head in response to officers' commands to "turn around," "get on the ground," and "drop that." The Court recognizes that walking toward officers while holding an object, in violation of officers' direct commands to the contrary, amounts to more than mere passive resistance. *See Hart*, 99 F.4th at 553–54 (characterizing a suspect's "fail[ure] to comply with the officers' commands to drop the knife and instead rapidly approached them while wielding it" as "active resistance"); *Napouk v. Las Vegas Metro. Police Dep't*, 123 F.4th 906, 920 (9th Cir. 2024) (concluding that a suspect "actively resisted the officers' orders" by "deliberately moving toward the officers with a bladed weapon" and responding "I know" when told by an officer "one more step and you're dead"). At the same time, resistance "should not be understood as a binary state, with resistance being either completely passive or active"; rather, courts must "evaluate the nature of any resistance in light of the actual facts of the case." *Bryan v. MacPherson*, 630 F.3d 805, 830 (9th Cir. 2010). Here, although Diaz was "not perfectly passive," Diaz slowly walking toward Officer Defendants while holding what the officers identified as a knife, but what later was determined to be a screwdriver, despite their commands to "get on the ground" and "drop it" was also not "particularly bellicose[.]" *Smith v. City of Hemet*, 394 F.3d 689 (9th Cir. 2005) (finding that "it does not appear that Smith's resistance was particularly bellicose" where he "continually ignored the officers' requests to remove his hands from his pajamas and to place them on his head," "refused to place both his arms behind his back," and "physically resisted arrest . . . for only a brief time"). Diaz's refusal to comply with the officers' commands therefore does not render the officers' use of deadly force reasonable as a matter of law, especially when weighed against the other two *Graham* factors.

Summary judgment is particularly inappropriate in light of the less intrusive force options available to Officer Defendants, and the fact that Diaz showed signs of being mentally ill. First, "although officers are not required to use the least intrusive degree of

force possible, the availability of alternative methods is a relevant factor in determining whether the amount of force used in a particular instance, was, in fact, reasonable." *Nelson v. City of Davis*, 685 F.3d 867, 882 (9th Cir. 2012) (citation modified). Here, Officer Defendants were equipped with both tasers and OC spray on their person. Plaintiffs' police practices expert asserts that "[i]t takes approximately two seconds to transition to the taser or OC spray," and that the officers had "more than enough time" to transition to use those options during the 17 seconds Diaz walked toward them. (Harmening Decl. ¶ 27.) Further, Officer Defendants' police cruisers carried less-lethal 40-millimeter launchers in their trunks. Although Defendants assert that the 40-millimeter launchers were inaccessible at the time of the shooting, a jury could find the officers' failure to retrieve the 40-millimeter launchers during the two minutes and 30 seconds before Diaz exited his vehicle to weigh against a finding of reasonableness, especially because Officer Castillo had time to retrieve another weapon from the trunk, and Officer Bermudez had time to reposition one of the police vehicles. *See Vos*, 892 F.3d at 1034 (concluding that "it is undisputed that the officers had less intrusive force options available to them," in part because "the officers had upwards of 15 minutes to create a perimeter [and] assemble less-lethal means," and reasoning that "the events leading up to the shooting, including the officers' tactics, are encompassed in the facts and circumstances for the reasonableness analysis"). Additionally, the officers received information indicating that it was Diaz himself who called 911, and when they arrived at the scene, they saw that Diaz was visibly bleeding from his wrist. (Response to SGD ¶¶ 7–10, 63.) The officers thus thought that Diaz might have been suicidal or have inflicted self-harm. (*Id.* ¶ 63.) In the case of "a mentally ill individual," as opposed to "a person who has committed a serious crime against others," "the governmental interest in using [deadly] force is diminished[.]" *Deorle v. Rutherford*, 272 F.3d 1272, 1283 (9th Cir. 2001). Although the fact that Diaz showed signs of mental illness is by no means dispositive, a jury considering Diaz's signs of mental illness and the availability of several less-lethal

force options to subdue Diaz, in addition to the *Graham* factors, could determine that Officer Defendants' actions were unreasonable.

Defendants unsuccessfully attempt to analogize this case to others in which officers' actions were found to be reasonable as a matter of law. In their papers and at the hearing, Defendants frequently invoked *Buchanan v. City of San Jose*, 782 F. App'x 589 (9th Cir. 2019). But *Buchanan* is easily distinguishable: in *Buchanan*, it was undisputed that the suspect "was advancing toward the officers at a fast pace (at least 12.3 feet per second), all while armed with a knife," *id.* at 591 n.1, whereas here, Diaz was walking at a slow pace, closing 25 to 35 feet in 17 seconds, while holding a screwdriver. Moreover, the *Buchanan* court was skeptical that it would have been "reasonably apparent to officers" that the suspect was mentally ill, and the evidence in *Buchanan* suggested that less-intrusive tactics were unavailable or inappropriate, *id.* at 592; however, in this case, the officers observed several signs that Diaz was mentally ill, suspected that Diaz was mentally ill, and were equipped with multiple less-intrusive force options. *Napouk v. Las Vegas Metropolitan Police Department*, 123 F.4th 906 (9th Cir. 2024), is similarly distinguishable. *Napouk* involved a suspect holding an object that "objectively looked like a machete," who continually advanced upon officers even as they "repeatedly retreated (at least four times) and attempted to engage and reason with" the suspect. *Id.* at 916, 919. By contrast, here, Diaz was holding only a screwdriver, and he walked slowly toward the officers, who did not attempt to retreat or use any less-intrusive means of subduing or reasoning with Diaz before using deadly force.

On balance, Defendants have not shown that Officer Defendants' decisions to shoot Diaz multiple times, after being at the scene with him for almost three minutes, during which time they took cover behind their police vehicles' doors, then watched him walk toward them with a screwdriver in his hand for 17 seconds, was reasonable as a matter of law, especially because Diaz was exhibiting signs of mental illness and because there were

multiple less-lethal options available at the scene and on the officers' person. The Court thus next turns to Officer Defendants' qualified immunity defense.

B. **Qualified Immunity for Excessive Force Claim**

The resolution of a qualified immunity defense turns on two questions: (1) whether, "[t]aken in the light most favorable to the party asserting the injury, . . . the facts . . . show the officer's conduct violated a constitutional right," and (2) "whether the right was clearly established" at the time of the officer's conduct. *Saucier v. Katz*, 533 U.S. 194, 201 (2001), *overruled on other grounds by Pearson v. Callahan*, 555 U.S. 223 (2009). The above analysis demonstrates that the evidence presented, viewed in the light most favorable to Plaintiffs, supports a finding that a constitutional violation occurred. Thus, the applicability of qualified immunity hinges on the second prong. "A clearly established right is one that is sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Vazquez v. Cty. of Kern*, 949 F.3d 1153, 1164 (9th Cir. 2020) (quoting *City of Escondido, Cal. v. Emmons*, 139 S. Ct. 500, 503 (2019)). "The dispositive question is whether the violative nature of particular conduct is clearly established" and the inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition.'" *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (internal quotations omitted) (citing *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011); *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004)). "Before a court can impose liability on [a defendant, it] must identify precedent as of . . . the night of the shooting . . . 'where an officer acting under similar circumstances as [the officer] was held to have violated the Fourth Amendment.'" *S.B. v. Cnty. of San Diego*, 864 F.3d 1010, 1015–16 (9th Cir. 2017) (quoting *White v. Pauly*, 580 U.S. 73, 79 (2017)).

The facts of the Ninth Circuit case *Vos v. City of Newport Beach*, 892 F.3d 1024 (9th Cir. 2018), closely parallel the facts in the instant action, giving Officer Defendants "fair notice that it was objectively unreasonable to use lethal force" in the situation they faced. *S.B.*, 864 F.3d at 1016. In *Vos*, officers responded to a 911 call about a suspect in a

7-Eleven convenience store cursing at people and reportedly holding a pair of scissors. 892 F.3d at 1028–29. The responding officer saw the suspect go into the back room and shut the door. *Id.* at 1029. Several officers arrived, and "positioned two police cars outside the store's front entrance in a 'v' formation and used the vehicles' doors for cover." *Id.* One officer was armed with a less-lethal 40-millimeter device, and other officers "readied themselves with lethal weapons." *Id.* The officers had propped open the 7-Eleven doors. *Id.* At the time of the shooting, at least eight officers were present. *Id.*

The suspect then opened the door of 7-Eleven's back room and "ran around the front check-out counter and towards the open doors." *Id.* "The distance between [the suspect] and the officers at the point he started running was approximately 30 feet." *Id.* He was holding an object over his head in his hand, and "[o]ne officer shouted that [the suspect] had scissors." *Id.* Officers told the suspect twice to "drop the weapon," but he "did not drop the object and instead kept charging towards the officers." *Id.* After about eight seconds, the suspect was shot four times and died from his wounds. *Id.* at 1030. After the shooting, the object in the suspect's hand, which the officers believed to be scissors, was found to be a "pronged metal display hook." *Id.* The Ninth Circuit ruled against the officers on the question of whether their deadly use of force was objectively reasonable, because "officers were not responding to the report of a crime," the officers outnumbered the suspect and "had established positions behind cover of their police vehicles," and although "[t]he officers saw that [the suspect] had something in his hand as he charged them," they "had less-lethal methods available to stop [the suspect] from charging." *Id.* at 1032. The Ninth Circuit also explained that the suspect's "indications of mental illness" may diminish "the government's interest in using deadly force[.]" *Id.* at 1034.

Similarly, in the instant action, officers were not responding to a report of a crime. Like in *Vos*, when Officer Defendants arrived at the scene, they arranged their two police vehicles next to each other and took cover behind the vehicles' open doors until Diaz

emerged. When Diaz emerged from his vehicle and started walking toward the officers, he was 25 to 35 feet away from them; likewise, in *Vos*, the subject was 30 feet away from the officers when he emerged from the back room and started moving toward them. Both suspects were carrying what the officers perceived to be a weapon, and both suspects were told to drop the object, but did not. Both suspects were shot within a number of seconds after they started moving toward the officers—the suspect in *Vos* was shot about eight seconds after he started running toward the officers, and Diaz was shot about 17 seconds after he started slowly walking toward the officers. Officer Defendants, like the officers in *Vos*, had less lethal force available to them. And like the officers in *Vos*, Officer Defendants here observed that Diaz was showing signs of mental illness.

Defendants' sole argument in response is that "distance matters." (Reply at 23.) But Defendants' contention that in *Vos*, "the officers fired their weapons and killed Vos who was *30 feet away* at the time" is patently wrong. (*Id.* (emphasis in original).) Rather, in *Vos*, the Ninth Circuit found that "[t]he distance between [the suspect] and the officers *at the point he started running* was approximately 30 feet," but that about eight seconds elapsed before he was shot. 892 F.3d at 1029–30 (emphasis added). In any event, in both *Vos* and the instant case, the suspects were only a short distance away from the officers, with the suspect in *Vos* running toward the officers, while Diaz was walking toward them, when they were shot. The law was therefore clearly established, and Officer Defendants were on sufficient notice, that using deadly force on an individual, even when they are moving toward officers, holding what is perceived to be a sharp weapon, and ignoring commands to drop the weapon, constitutes a constitutional violation where there are multiple officers on the scene who have had time to position themselves in defensive positions and have less-lethal options available to them, and where the suspect has shown signs of mental illness. Accordingly, the Court concludes that Officer Defendants are not entitled to qualified immunity as to their use of excessive force, and are therefore not entitled to summary judgment on Plaintiffs' Fourth Amendment claim.

C. **Interference with Familial Relations**

Survivors "may assert a Fourteenth Amendment [substantive due process] claim based on the related deprivation of their liberty interest arising out of their relationship with [a decedent killed by law enforcement]." *Moreland v. Las Vegas Metro. Police Dep't*, 159 F.3d 365, 371 (9th Cir. 1998) (citing *Byrd v. Guess*, 137 F.3d 1126, 1133–34 (9th Cir. 1998)). Whether the underlying seizure violated the Fourth Amendment has no bearing on the success of such a claim, as the two rights are governed by distinct standards. *Id.* Specifically, a substantive due process claim requires a plaintiff to demonstrate that an officer's conduct "shocks the conscience," a standard that requires either "deliberate indifference" or "purpose to harm," depending on "whether the officer[ ] had the opportunity for actual deliberation." *Porter v. Osborn*, 546 F.3d 1131, 1138–39 (9th Cir. 2008). "Deliberation in this context 'should not be interpreted in the narrow, technical sense.'" *Ochoa v. City of Mesa*, 26 F.4th 1050, 1056 (9th Cir. 2022) (quoting *Wilkinson v. Torres*, 610 F.3d 546, 554 (9th Cir. 2010)).

Here, Plaintiffs argue that "the involved officers had time to deliberate because they were at the scene for multiple minutes prior to the shooting." (Opp. at 30.) But the officers' presence at the scene for several minutes does not itself create a triable issue as to the opportunity for deliberation for the purposes of a substantive due process claim. *See Porter*, 546 F.3d at 1140 (applying the purpose-to-harm standard even where an altercation lasted approximately five minutes). Rather, the cases to which Plaintiffs cite show that the deliberation inquiry turns on whether the officers are reacting to a "public safety threat" that is "rapidly escalating," "because the critical consideration is whether the circumstances are such that the actual deliberation is practical." *Greer v. City of Hayward*, 229 F. Supp. 3d 1091, 1108 (N.D. Cal. 2017) (internal citations omitted). For example, in *Greer*, the court reasoned that the substantive due process claim should be decided by the jury where "the officers had time to deliberate while they lay on [the suspect's] back as he struggled to breathe." *Id.* Likewise, in *Garlick v. County of Kern*, the court reasoned that

"if the trier of fact believes Plaintiffs' allegation that [the suspect] was passively noncompliant and already on the ground when [the officer] arrived, they could infer that at arrival [the officer] had time to deliberate before using baton force as alleged." 167 F. Supp. 3d 1117, 1168 (E.D. Cal. 2016).

The instant action does not involve the same type of opportunity to deliberate as in *Greer* and *Garlick*. Rather, the facts here show that Diaz exited the vehicle and started walking toward the officers of his own volition, meaning that as Diaz approached them, "the officers had to make a snap decision about [Diaz's] intentions and the threat he posed to them[.]" *Ochoa*, 26 F.4th at 1057 (affirming grant of summary judgment to defendants on Fourteenth Amendment claim where officers followed the suspect into a backyard, where they encountered the suspect with "two knives in one hand and refused to obey the officers' commands," then "fired about 30 shots" at him). In other words, once Diaz begun advancing toward the officers, they "had to react quickly." *See Porter*, 546 F.3d at 1140 (noting that "the officers had to react quickly" "once [the suspect's] evasive actions began"). Although several seconds elapsed before Diaz reached the officers' vehicles, he was continuously advancing toward the officers during this time and ignoring their orders to stop, thereby escalating the situation. *See id.* at 1140–41 (cautioning courts against interpreting "'deliberation' in the narrow, technical sense" and finding that no actual deliberation was practical where "the events in the pullout were in constant flux, with much yelling [and] confusion"). No reasonable jury could therefore find that in such a situation, "the circumstances allowed the state actors time to fully consider the potential consequences of their conduct." *Moreland*, 159 F.3d at 373; *see also Porter*, 546 F.3d at 1140 (applying the purpose-to-harm standard even where "the record contains facts suggesting that [the officer's] own conduct created and agitated this escalating situation and that his reactions were disproportionate to the situation he faced"). Accordingly, the Court applies the purpose-to-harm standard, which examines whether "[the officers] acted with a *purpose to harm* [the decedent] for reasons unrelated to legitimate law enforcement

objectives." *Ochoa*, 26 F.4th at 1056 (citation omitted). "Legitimate objectives can include 'arrest, self-protection, and protection of the public.'" *Id.* (quoting *Foster v. City of Indio*, 908 F.3d 1204, 1211 (9th Cir. 2018)).

Plaintiffs do not, and cannot, point to any facts producing a genuine dispute that Officer Defendants acted with a purpose to harm Diaz, rather than in the interests of self-protection. (*See* Opp. at 31.) Indeed, Officer Defendants repeatedly yelled at Diaz to drop his weapon, turn around, and get on the ground, before shooting him when he got close to them with an object in his hand. *See Zion v. Cnty. of Orange*, 874 F.3d 1072, 1077 (9th Cir. 2017) (concluding that an officer "didn't violate the Fourteenth Amendment by emptying his weapon" at a suspect because "[w]hether excessive or not, the shootings served the legitimate purpose of stopping a dangerous suspect"). Moreover, Plaintiffs do not provide any opposition to Defendants' argument that Officer Defendants are entitled qualified immunity on the Fourteenth Amendment claim. Accordingly, the Court concludes that Officer Defendants are entitled to summary judgment on Plaintiffs' claim for interference with familial relations.

### D. State Law Claims

#### 1. Battery

The standard for determining the reasonableness of an officer's use of force pursuant to a battery claim is analogous to the Fourth Amendment's reasonableness inquiry. *See Brown v. Ransweiler*, 171 Cal. App. 4th 516, 527 (2009). For the reasons discussed above, a reasonable jury could conclude that Officer Defendants' use of force was not reasonable. (*Cf.* Mot. at 130–31 (recognizing the analogous nature of the standards).) Defendants' motion for summary judgment is therefore denied as to this claim.

#### 2. Negligence

The California Supreme Court has "long recognized that peace officers have a duty to act reasonably when using deadly force." *Hayes v. County of San Diego*, 57 Cal. 4th

622, 629 (2013). Under California negligence law, "liability can arise if the tactical conduct and decisions leading up to the use of deadly force show, as part of the totality of circumstances, that the use of deadly force was unreasonable." *Id.* at 626. For the same reasons Defendants are not entitled to summary judgment on Plaintiffs' excessive force and battery claims, they are also not entitled to summary judgment on Plaintiffs' negligence claim. (*Cf.* Reply at 27–28 (acknowledging that California negligence law recognizes a "higher standard" of objective reasonableness than federal Fourth Amendment law).)

### 3. **Bane Act**

"The Bane Act civilly protects individuals from conduct aimed at interfering with rights that are secured by federal or state law, where the interference is carried out 'by threats, intimidation or coercion.'" *Reese v. City of Sacramento*, 888 F.3d 1030, 1040 (9th. Cir. 2018); Cal. Civ. Code § 52.1(a). "Section 52.1 'provides a cause of action for violations of a plaintiff's state or federal civil rights committed by 'threats, intimidation, or coercion.'" *Reese*, 888 F.3d at 1040 (quoting *Chaudry v. City of Los Angeles*, 751 F.3d 1096, 1105 (9th Cir. 2014)). "The elements of a section 52.1 excessive force claim are essentially identical to those of a § 1983 excessive force claim. Thus, where a plaintiff's claims under the federal and state constitutions are co-extensive, the discussion of a plaintiff's federal constitutional claim resolves both the federal and state constitutional claims." *Knapps v. City of Oakland*, 647 F. Supp. 2d 1129, 1168 (N.D. Cal. 2009). "As the California Constitution contains a similar provision [to the Fourth Amendment], and the United States Constitution defines the minimum protection provided under the California Constitution, the same analysis applies here." *Id.* Thus, for the same reasons Defendants are not entitled to summary judgment on Plaintiffs' excessive force claim, they are also not entitled to summary judgment on Plaintiffs' Bane Act claim. (*Cf.* Mot. at 35 (arguing only that Defendants are entitled to summary judgment on this claim "[f]or

substantially the same reasons that Plaintiffs cannot show that Defendant Officers' shots amounted to an unreasonable use of deadly force").)

IV. **CONCLUSION**

For the foregoing reasons, the Court GRANTS IN PART AND DENIES IN PART Defendants' Motion for Summary Judgment. Summary judgment is GRANTED in favor of Defendants on Plaintiffs' third claim for interference with familial relations in violation of the Fourteenth Amendment. For all other claims, summary judgment is DENIED.

DATED: November 16, 2026

HON. JOSEPHINE L. STATON
UNITED STATES DISTRICT JUDGE